UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:21-cv-20557-BB

BARBARA HALL,

Plaintiff,

v.

CARNIVAL CORPORATION
d/b/a CARNIVAL CRUISE LINES,

Defendant.
_____________________________/

LOCATION: Remote Audio-Video Communication
DATE: Thursday, October 28, 2021
TIME: 3:33 p.m. - 5:41 p.m.

VIDEOTAPED DEPOSITION OF ANGELA VAUGHN

Taken before Violet Varga Smith, Florida Professional Reporter, Notary Public in and for the State of Florida at Large, pursuant to Notice of Taking Videotaped Deposition in the above-styled cause.





APPEARANCES:

ON BEHALF OF THE PLAINTIFF:
EDUARDO J. HERNANDEZ, LLC
10691 N Kendall Drive, Suite 109
Miami, FL 33176
BY: EDUARDO J. HERNANDEZ, ESQ.

ON BEHALF OF THE DEFENDANT:
FOWLER WHITE BURNETT, P.A.
Brickell Arch, Fourteenth Floor
1395 Brickell Avenue
Miami, Florida 33131
BY: CHRISTOPHER B. SMITH, ESQ.

ALSO PRESENT: BRANDON MENDIOLA, VIDEOGRAPHER

I N D E X


WITNESS:
ANGELA VAUGHN
Direct Examination by Mr. Smith 3
Cross-Examination by Mr. Hernandez 112
Re-Direct Examination by Mr. Smith 121


E X H I B I T S

| Defendant | Description | Page |
|---|---|---|
| A | Photo of entrance to cabin bathroom | 115 |





Thereupon, the following proceedings were had:

THE VIDEOGRAPHER: In the case styled Barbara Hall versus Carnival Cruise Lines, Case Number 1:21-CV-20557-BB. This is the video deposition of Angela Vaughn on October 28th, 2021. The time is now 3:33 p.m.

Would counsel please state their appearances for the record.

MR. HERNANDEZ: Eddy Hernandez for Ms. Hall.

MR. SMITH: Christopher Smith for the defendant, Carnival.

THEREUPON:

ANGELA VAUGHN

Was called as a witness, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SMITH:

Q. Good afternoon, ma'am. How are you?

A. I'm okay.

Q. Would you please just tell us your full name for the record?

A. Angela Lee Vaughn.

Q. And Ms. Vaughn, is this the first deposition you've given in your life?





A. It is.

Q. All right. Well, I'm sorry for the -- I'm sorry for having to bring you here.

But this deposition is really a question and answer session. It's pretty informal. The only real formality is sort of the fact that you are under oath like you would be in a court of law. Does that make sense?

A. Yeah.

Q. All right. Now, do the best you can, please, to let me finish my question before you start answering, just because it becomes very difficult if we're talking over each other to get what you say accurately recorded.

A. Sure.

Q. And we do want to have it accurate with what you're saying. Okay?

A. Okay. Yep.

Q. It's not necessarily a marathon. I don't think we'll be here all night, certainly, but if you need a break, just ask for one. Okay?

A. Okay. I've got to work here not too far off. I hope not.

A. Correct. I have a prescription.
Q. Okay.
A. I mean, there it doesn't matter, apparently, but.
Q. You can probably get them a little cheaper, probably.
A. Oh, I don't know. Heck, I still have them.
Q. But to your knowledge, did Ms. Hall purchase any medication?
A. Did she buy any? I don't know. I thought I was the only one that bought them.
Q. Okay. Did you lend any of your medication to Ms. Hall for her use?
A. I did.
Q. You did?
A. I believe so, yeah.
Q. Okay. What did you give Ms. Hall?
A. Maybe some Tramadol.
Q. Okay. Do you know how many Tramadol Ms. Hall took the second full day of cruising, the day you visited the Yucatan?
A. Oh, heck no. Now, keep in mind I was on my first cruise away from my grandchildren and everybody. First time away





from everybody, everybody ever. So I was getting my buzz on. I'm not going to -- I don't recollect a whole bunch.
Q. Well, did Ms. Hall -- after giving Ms. Hall the Tramadol, are you aware of whether she took the Tramadol and consumed any alcoholic beverages?
A. I don't really think she was drinking a whole bunch after that first night.
Q. Okay.
A. I mean, I can't say. I don't remember.
Q. Let me ask you this. The very first night --
A. She's not really a drinker, though. It's just not her thing.
Q. Let me just ask you this before I move on, though. The very first night, do you know how many alcoholic drinks that Ms. Hall consumed on her own?
A. Heck no, I don't know.
Q. Okay. During the trip to Yucatan, did Ms. Hall seek out any sort of medical treatment, to your knowledge?
A. Yeah, we looked for shams or





something, but -- I don't know if you've ever been there. It's like a third world country. And, yeah, we didn't find one.
Q. I've been to Mexico. I stayed at like a five star --
A. The Yucatan?
Q. I stayed at like a very nice hotel in a very like Beverly Hills part of Mexico City.
A. Right on. I would say obviously i wasn't in the Yucatan. Woah, that place is, yeah, something else.
Q. Did she, you know, did she buy any sort of like brace or anything like that for herself?
A. Yeah, well, we got some ACE wraps, that thing. I'm not sure if she got a brace. No, I think we could just find the ACE wraps.
Q. Okay. So an ACE wrap?
A. A few of them, yeah.
Q. Did she use the ACE wrap?
A. Yeah.
Q. Okay. After you got back on the ship from the Yucatan, do you remember anything else that took place on the cruise ship that --





the rest of that day?
A. A lot of eating.
Q. Anything else?
A. I'm not sure. One of the nights we went to one of the like trivia shows.
Q. You went to like a show? Okay.
A. A trivia show. I'm not sure if it was that night or the next night.
Q. Did you go to a bar after the show?
A. I did. I was visiting the bar every chance I could.
Q. Did Ms. Hall accompany you to the bar after the show?
MR. HERNANDEZ: Form.
THE WITNESS: She may have. I don't know if she was drinking or what. You can only get one drink every so often and if the lines were long, then she would get me something. I'd get me a drink and she'd get me a drink.
BY MR. SMITH:
Q. Gotcha. Did you have an all-you-can-drink package?
A. We did.
Q. The both of you?

Q. There's a ledge; right?
A. Yeah.
Q. And then at the top of the photograph where the shampoo and conditioner bottles are is the shower floor; right?
A. Right.
Q. Okay. So you'd agree that all of this, bathroom floor, ledge and shower floor, are all the same color and -- all the same color; right?
MR. SMITH: Objection to form.
THE WITNESS: Right, yeah, yeah, you can't really ascertain one from the other, yeah.
BY MR. HERNANDEZ:
Q. Now, the -- do you recall -- do you recall that the door to get into the bathroom opened out into the cabin?
MR. SMITH: Objection to form.
THE WITNESS: Right, yeah.
MR. HERNANDEZ: What's wrong with the form? What's wrong with the form, Mr. Smith?
MR. SMITH: Asked and answered. She said she doesn't remember. Foundation.





MR. HERNANDEZ: Well, this is a cross. I'm entitled to ask.
I'm sorry, did we get an answer?
THE WITNESS: Yes, the door opened out.
BY MR. HERNANDEZ:
Q. Okay. As you came to the -- if you recall, as you came to the bathroom, were there any warning signs outside of the bathroom that you recall seeing?
A. Not that I can remember, no.
Q. Once you were inside the bathroom, do you recall any warning signs?
A. No.
Q. Once you were inside the bathroom, do you recall any warning signs specifically warning of the ledge that we were talking about a little bit earlier that's depicted in Exhibit A?
A. No.
Q. As you walked into the bathroom, was there any handrail in the immediate entrance area that you could use if you needed to?
A. No. I mean --
Q. I'm sorry. Go ahead.
A. Go ahead. I don't remember a





handrail, no.
Q. Okay. And going back to Exhibit A for another moment, you said it looked horrible. Do you mean by that that the ledge blended into the bathroom floor and blended into the shower floor?
MR. SMITH: Objection to form.
THE WITNESS: Yeah. Yeah, that's -- I mean -- yeah, that's not good.
BY MR. HERNANDEZ:
Q. We know --
A. I didn't remember there was a ledge being -- I mean, that's a pretty good ledge.
Okay, go ahead.
Q. We know -- we know the difficulties that Ms. Hall had with the shower ledge that's in Exhibit A. Did you personally experience any difficulties with this shower ledge?
A. Oh, I tripped all over that room.
Q. In the raised areas?
A. Yeah, sometimes. Yeah, sometimes. I mean.
Q. And finally --
A. Yes, they are all over.
Q. And finally, the cruise line lawyer





asked you some questions about what you may have been drinking, what Ms. Hall may have been drinking. If you recall, did you tend to have a drink of preference during that cruise?
A. I did.
Q. What was it?
A. Shots of Patron.
Q. All right. And as between the two of you, who would you say is -- you know, who would you say is more likely to have -- to have a pop, to have a drink?
MR. SMITH: Objection to form.
THE WITNESS: Oh, she -- I'm the drinker.
BY MR. HERNANDEZ:
Q. All right. So that being the case -- and I think you may have testified to this, but I've got to make sure I get it in the record. And I'm really interested in the first day and into the first evening, but did Ms. Hall buy you drinks on her card?
A. I mean, they are already paid for, but yeah, we'd walk up and -- because I was doing shots, they'd go so quick. And she was drinking that foo-foo drink. So yes, she would

— she would get me a shot, I would get me a shot, and then -- yeah, or she would, you know — would get me drinks too, yeah.

MR. HERNANDEZ: Okey doke. That's all I have. Thank you very much, ma'am.

MR. SMITH: Ma'am?

THE WITNESS: Okay. You're welcome.

MR. SMITH: I have a few follow-up questions to those. Okay?

THE WITNESS: Okay.

REDIRECT EXAMINATION

BY MR. SMITH:

Q. You said sometimes you tripped around the room on the ship?

A. Right. Yeah.

Q. I didn't hear you say that you tripped in the bathroom, though; correct?

A. I tripped — I trip over air sometimes.

Q. So you would agree sometimes when people trip -- well, would you agree then sometimes people trip and it's the person's own fault for not paying attention?

MR. HERNANDEZ: Form.

THE WITNESS: I mean, I do it all the





time, so.

BY MR. SMITH:

Q. Okay. So is it fair to say then that sometimes people trip because of their own -- their own failure to pay attention to where they are walking?

MR. HERNANDEZ: Form, asked and answered.

THE WITNESS: Some people do a lot of things, but, I mean, you can look at that floor and you can tell that that should be a different color or warnings or something. I mean -- you know, I mean, I'm sure you can look at it and think the same thing.

BY MR. SMITH:

Q. That doesn't answer my question, ma'am.

Is it fair to say that sometimes people can trip because of their own failure to pay attention to where they are walking?

MR. HERNANDEZ: Asked and answered three times.

THE WITNESS: I mean, I guess they can.

BY MR. SMITH:

Q. I'm sorry, can you repeat your





answer?

A. I said, I guess some people can.

Q. Okay. Including, you admitted, yourself?

A. Oh, yeah, I do.

Q. Ma'am, you're a nurse; right?

A. Uh-huh.

Q. Do you agree that excessive alcohol intake can impair a person's coordination?

MR. HERNANDEZ: Form.

THE WITNESS: I think that's common knowledge.

BY MR. SMITH:

Q. Do you agree that it's also common knowledge that excessive alcohol intake can cause blurry vision?

MR. HERNANDEZ: Form.

THE WITNESS: Blurry vision? I don't know about that.

BY MR. SMITH:

Q. Can excessive alcohol intake, ma'am, cause someone to be unsteady on their feet?

MR. HERNANDEZ: Form.

THE WITNESS: Excessive, yeah. I think everybody knows that.





BY MR. SMITH:

Q. Ma'am, you were just making some comments about sort of the architecture or layout of the bathroom. Do you have any qualifications or education as an architect?

A. No.

Q. Do you have any qualifications or education as an engineer?

A. I do not.

Q. Do you have any qualifications or education as a flooring safety expert?

A. I don't. Do you?

Q. I do not.

A. Oh, okay.

Q. I'm not licensed or -- I don't have an engineering degree myself either.

A. Okay.

Q. Ma'am, do you have any license, education or training as a safety expert?

A. Maybe not in that area, no.

Q. Okay.

A. I do when it comes to taking care of people, yeah.

Q. That would be in your capacity as a nurse; right?