UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO: 1:21-cv-20557-BB

BARBARA HALL,

Plaintiff,

v.

CARNIVAL CORPORATION,
d/b/a CARNIVAL CRUISE LINES,

Defendant.
______________________________/

Remote Audio-Video Communication

Friday, June 29, 2021

10:03 a.m. - 3:08 p.m.

VIDEOTAPED DEPOSITION OF BARBARA HALL

Taken before Paula Pace, RPR, Notary Public in and for the State of Florida at Large, pursuant to Notice of Taking Deposition filed in the above case.



APPEARANCES:

ON BEHALF OF THE PLAINTIFF:
SINGER & ASSOCIATES, P.A.
1101 South Federal Highway
Hollywood, Florida 33020
BY: Peter G. Walsh, Esquire

ON BEHALF OF THE DEFENDANT:
FOWLER WHITE BURNETT, P.A.
Brickell Arch, Fourteenth Floor
1395 Brickell Avenue
Miami, Florida 33131
BY: Christopher B. Smith, Esquire

ALSO PRESENT: Brandon Mendiola, Videographer
Jeannie Reporting

\- - - - - -

I N D E X

\- - - - - -


| | PAGE |
|---|---|
| **Barbara Hall** | |
| By Mr. Smith | 003<br>187 |
| By Mr. Walsh | 180<br>190 |


E X H I B I T S

(Appearing on Page 3)



E X H I B I T S


| DEFENDANT'S | PAGE |
|---|---|
| No. 1 - Movement report | 136 |
| No. 2 - Photo pg 1 (Retained) | 144 |
| No. 3 - Photo pg 2 (Retained) | 148 |
| No. 4 - Photo pg 3 (Retained) | 149 |
| No. 5 - Photo pg 4 (Retained) | 149 |
| No. 6 - Photo pg 5 (Retained) | 150 |
| No. 7 - Photo pg 6 (Retained) | 150 |
| No. 8 - Photo pg 7 (Retained) | 151 |
| No. 9 - Photo pg 8 (Retained) | 152 |
| No. 10 - Photo pg 10 (Retained) | 152 |
| No. 11 - Photo pg 13 (Retained) | 152 |
| No. 12 - Photo pg 14 (Retained) | 153 |
| No. 13 - Photo pg 26 (Retained) | 154 |
| No. 14 - Photo pg 27 (Retained) | 155 |
| No. 15 - Winners Luck Bar receipt | 168 |
| No. 16 - Winners Luck Bar receipt | 169 |
| No. 17 - Cheers package receipt | 170 |
| No. 18 - Transaction receipt | 170 |
| No. 19 - Transaction receipt | 171 |
| No. 20 - Transaction receipt | 172 |
| No. 21 - Transaction receipt | 172 |
| No. 22 - Transaction receipt | 172 |
| No. 23 - Transaction receipt | 173 |
| No. 24 - Transaction receipt | 174 |
| No. 25 - Transaction receipt | 174 |
| No. 26 - Transaction receipt | 174 |
| No. 27 - Transaction receipt | 175 |




THE VIDEOGRAPHER: In the case styled Barbara Hall vs. Carnival Cruise Lines, this is the video deposition of Barbara Hall on June 29, 2021. The time is now 10:03 a.m.

Would counsel please state their appearances for the record.

MR. WALSH: Good morning. This is Peter Walsh on behalf of Ms. Hall.

MR. SMITH: Good morning. I'm Christopher Smith on behalf of Carnival.

Thereupon,

BARBARA HALL,

was called as a witness and, having been duly sworn, was examined as follows:

DIRECT EXAMINATION

BY MR. SMITH:

Q. Good morning, Ms. Hall. How are you?

A. **I'm fine, thank you.**

Q. Thank you for joining us today. If you would just for the record, to get us started, please state your full name.

A. **Barbara Joyce Hall.**

Q. And before we really get into things, I just wanted to provide some instructions. I

Q. Four, okay.
A. I was taking like 800 milligrams every six hours.
Q. Okay. Were you doing the four tablets every six hours on board the ship as well?
A. Yeah.
Q. What day was this next visit you had to guest services?
A. The 4th.
Q. Okay. And you say Angela went down to the medical center with you, right?
A. Yes.
Q. And who did you talk to down there?
A. I don't know who he was.
Q. Okay. He was a male?
A. It was a male at the desk, uh-huh.
Q. Do you know if it was the same person you saw the first time?
A. I don't know.
Q. Did you get a name for this gentleman?
A. No. I'll be honest, I was very upset with the way I was treated the first time, so I didn't even want to go the second time. But then when he said that sometimes they do compassionate care, I figured there's no sense in going when



they're not going to do anything for me.
Q. Okay. Before your cruise did you look at any resources to see what services the medical center could provide you?
A. No.
Q. Okay. The first time you went down to the medical center back on March the 2nd, that was after you got back from Cozumel, did you tell them that your friend thought your arm was broken?
A. I told them -- I don't know if I told them my friend thought it was. I told them I thought my arm was broken.
Q. What was the -- what did you talk about the second time down to the medical center on March 4th?
A. The second time I just went down there and I told them that I'd been down there before and they said I had to have the five, almost $500 to see the doctor and x-rays. I said, I have my insurance.
They said they don't take private insurance on the cruise because of not being able to run it or something.
And I said, told them that the guy upstairs told me about the compassionate care.



He said, well, I don't know what he's talking about, we don't have that.
And I said okay, I guess I'll wait until I can see the doctor at home.
Q. Okay. This time down to the medical center on March 4, did you see any type of payment machine to swipe a card or accept payment?
A. No, I didn't look. Like I said, you're standing, it's a little tiny white room and there's like a hole cut in the wall and that's where you see the person. Kind of like the board behind you, it's just a wall. The rest of it is, you know, it's just that one hole and the rest of it is wall.
Q. Okay. Did you make any sort of contemporaneous recording of your interaction with the person down at medical?
A. No, I've never done anything like that. I've never sued anybody. I don't know what you're supposed to do. I wasn't planning on suing.
Q. Did you make a note, a written record of anything like in a diary or a journal after this interaction?
A. After that interaction, no. After the first one I took pictures of the bathroom and stuff



and...
Q. Okay. All right. Let's use that as an opportunity to look at I think the photos you took, so you can just basically just identify them for us.
(Thereupon, Defendant's Exhibit No. 2 was marked for identification.)
BY MR. SMITH:
Q. We'll mark as Exhibit 2 the next photograph here. I'm going to put it up on a screen and ask you if you can see it. Can you see this photo up on the screen?
A. Uh-huh.
Q. Is this a photo you took, ma'am?
A. Yes.
Q. And was it a photo you took inside your cruise cabin?
A. Yes.
Q. Do you remember what day it was you took the photo?
A. No.
Q. Was this photo taken after your incident?
A. Yes.
Q. All right. At the time you fell was

this towel in the photo present?
A. No.
Q. And the reason you took this photo, ma'am, was what?
A. Just to show my family and stuff what happened, I mean.
Q. Okay. So it looks like there's a gold section here in the middle of the photo and then a blue tile section once you enter the bathroom, correct?
A. Correct.
Q. Do you recall which threshold you tripped over when you fractured your wrist?
A. I believe it was the shower one. Like I said, I don't exactly remember.
Q. Okay. When you did fall on the night, early morning of perhaps March 1st, do you recall how you ended up on the floor after you fell, how your body was positioned?
A. Yeah, my feet were kind of by the gold thing and my head was up higher than the picture.
Q. Okay.
A. Kind of like -- I'm a big girl, there's not a whole lot of room in there. Like I said, I'm a big girl. The picture that you see, I



covered all that area.
Q. Okay. Were you inside the shower itself, any part of your body inside the shower?
A. Oh, yeah, my hip all the way up.
Q. Where was your head located, inside or outside of the shower?
A. Inside the shower. Right in the corner. I'm lucky I didn't end up with something on my head.
Q. Were you face down when you came do a stop?
A. Yes.
Q. And after falling on the early morning hours of March 1st, where were your feet located?
A. Down here by the gold I said.
Q. Were your feet inside or outside of the bathroom?
A. Inside.
Q. Okay.
A. I had already pulled the door shut.
Q. Okay. So before you fell --
A. Yeah, because Angela had to knock on the door and ask if I was okay.
Q. And when the door is closed, is the light already on in the bathroom?



A. Yes.
Q. And at that point which direction are you facing?
A. I pulled the door shut, so I was facing towards the toilet, which would have been done -- the toilet is straight ahead of the door there.
Q. Okay. So facing straight ahead is the toilet. Was there anything blocking your view of the path you would need to walk?
A. No.
Q. And there was nothing at the time of the, just prior to the fall blocking your view of this blue shower threshold, right?
A. No, there was no towel or anything there.
Q. Okay. And in this photo where this towel is and the blue threshold, that's the threshold you had seen on two prior occasions in visits to your cabin bathroom, correct?
A. Correct, but I hadn't been sleeping either.
Q. Well, when you woke up from your sleep and needed to go to the bathroom that first night of the cruise, ma'am, were you feeling the effects



of the alcohol you had drank?
A. Not that I recall. I mean, I was tired which, I mean, I get up in the middle of the night to go to the bathroom at home and I'm tired, I just know where I'm going.
Q. Okay. Even if you had woken up and you're tired, do you agree that a reasonable person should still look where they're walking?
A. Well, yes.
Q. That photo I'll mark for the record, page 1 of this set of documents we marked as Exhibit 2 to the deposition.
(Thereupon, Defendant's Exhibit No. 3 was marked for identification.)
BY MR. SMITH:
Q. This next photo of your arm, ma'am, was this taken on board the ship as well?
A. Yes.
Q. Do you remember what day it was taken?
A. Probably the second day.
Q. Okay. Is that March 1st?
A. Probably.
Q. Okay.
A. It's in my pajamas there, so.
Q. We'll mark this photo of your wrist on