UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:21-cv-20557-BB

BARBARA HALL,

Plaintiff,

v.

CARNIVAL CORPORATION
d/b/a CARNIVAL CRUISE LINES,

Defendant.
_______________________________/

LOCATION: Remote Audio-Video Communication
DATE: Thursday, October 28, 2021
TIME: 3:33 p.m. - 5:41 p.m.

VIDEOTAPED DEPOSITION OF ANGELA VAUGHN

Taken before Violet Varga Smith, Florida Professional Reporter, Notary Public in and for the State of Florida at Large, pursuant to Notice of Taking Videotaped Deposition in the above-styled cause.





APPEARANCES:

ON BEHALF OF THE PLAINTIFF:
EDUARDO J. HERNANDEZ, LLC
10691 N Kendall Drive, Suite 109
Miami, FL 33176
BY: EDUARDO J. HERNANDEZ, ESQ.

ON BEHALF OF THE DEFENDANT:
FOWLER WHITE BURNETT, P.A.
Brickell Arch, Fourteenth Floor
1395 Brickell Avenue
Miami, Florida 33131
BY: CHRISTOPHER B. SMITH, ESQ.

ALSO PRESENT: BRANDON MENDIOLA, VIDEOGRAPHER

I N D E X

WITNESS:
ANGELA VAUGHN
Direct Examination by Mr. Smith 3
Cross-Examination by Mr. Hernandez 112
Re-Direct Examination by Mr. Smith 121

E X H I B I T S



| Defendant | Description | Page |
|---|---|---|
| A | Photo of entrance to cabin bathroom | 115 |



Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705



Thereupon, the following proceedings were had:

THE VIDEOGRAPHER: In the case styled Barbara Hall versus Carnival Cruise Lines, Case Number 1:21-CV-20557-BB. This is the video deposition of Angela Vaughn on October 28th, 2021. The time is now 3:33 p.m.

Would counsel please state their appearances for the record.

MR. HERNANDEZ: Eddy Hernandez for Ms. Hall.

MR. SMITH: Christopher Smith for the defendant, Carnival.

THEREUPON:

ANGELA VAUGHN

Was called as a witness, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SMITH:

Q. Good afternoon, ma'am. How are you?

A. I'm okay.

Q. Would you please just tell us your full name for the record?

A. Angela Lee Vaughn.

Q. And Ms. Vaughn, is this the first

Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705



deposition you've given in your life?

A. It is.

Q. All right. Well, I'm sorry for the -- I'm sorry for having to bring you here.

But this deposition is really a question and answer session. It's pretty informal. The only real formality is sort of the fact that you are under oath like you would be in a court of law. Does that make sense?

A. Yeah.

Q. All right. Now, do the best you can, please, to let me finish my question before you start answering, just because it becomes very difficult if we're talking over each other to get what you say accurately recorded.

A. Sure.

Q. And we do want to have it accurate with what you're saying. Okay?

A. Okay. Yep.

Q. It's not necessarily a marathon. I don't think we'll be here all night, certainly, but if you need a break, just ask for one. Okay?

A. Okay. I've got to work here not too far off. I hope not.

Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705

Q. What time do you have to go to work?
A. Oh, I don't have to be there till 5:30. We're okay.
Q. Okay. We'll keep that in mind.
So other than those kind of basic rules that -- one of the other things I wanted to share with you just briefly is that when you answer a question, please do so verbally. Don't shake or nod your head, just because we don't know what that necessarily means and we don't want to misinterpret you. Okay?
A. I'll do my best.
Q. Other than that, if you answer the question, I'll assume you've understood what I've asked you. Is that fair?
A. Fair enough, yeah.
Q. All right. Great.
Can you tell us, ma'am, where you're testifying from today?
A. My house in East Lynne, Missouri.
Q. All right. What is the address of your home there at East -- in East Lynne, Missouri?
A. 401 North Pennsylvania Avenue.
Q. How long have you lived at that





address, ma'am?
A. About four years.
Q. Does anyone else live with you at that address, ma'am?
A. My husband.
Q. Is it just you and your husband?
A. Yep.
Q. And what type of home is it that you live at there? Is it like single family, apartment, condo?
A. Single family.
Q. Do you own or rent the home, ma'am?
A. I'm buying it.
Q. Meaning you own the home; correct?
A. Yes.
Q. All right. How long have you lived -- well, let me ask you this. Is East Lynne like a suburb outside of Kansas City?
A. No, it's far -- it's south of Kansas City. It's, I want to say, 20, 30 miles south.
Q. Okay. Is Kansas City the nearest -- Kansas City, Missouri the nearest close like major city?
A. Yes.
Q. Okay. How long have you lived in





East Lynne, Missouri for now?
A. Four years.
Q. Where did you live prior to that, ma'am?
A. Harrisonville.
Q. Is that another town in Missouri?
A. It is.
Q. How far is that from East Lynne, approximately?
A. About seven miles north.
Q. All right. And how long did you live there for?
A. Seventeen years.
Q. Okay. So a long time?
A. Uh-huh, yes.
Q. All right. Do you have any -- do you have any children, ma'am?
A. I do.
Q. Okay. How many children do you have?
A. Two.
Q. All right. Boys, girls?
A. One of each.
Q. All right. They no longer live with you; correct?





A. No.
Q. Are they both over the age of 18, outside of the home, doing their own thing?
A. Yes.
Q. Okay. Where were you born, ma'am?
A. Saint Luke's Air Force Base in Phoenix, Arizona.
Q. Okay. Did you grow up in Arizona?
A. Yes, I did.
Q. Okay. Is that where you went to high school?
A. Yes.
Q. Where did you go to high school in Arizona?
A. Mohave High School in Bullhead City, Arizona.
Q. All right. And did you attend any college after that?
A. No.
Q. All right.
A. I went to nursing school, but that was here.
Q. Okay. We'll talk about that in just a second.
Did you obtain your high school

diploma from Mohave High School?
A. No.
Q. All right. Did you attend -- I'm sorry.
Did you obtain a GED later on?
A. I did.
Q. Okay. Where were you living when you got your GED?
A. Harrisonville.
Q. In Missouri?
A. Yes.
Q. Okay. And did you go -- you said you went to nursing school in Missouri as well?
A. Yes.
Q. Okay. Have you been to any other types of trade schools post -- you know, post high school education at all besides nursing school?
A. No.
Q. Okay. How long was your nursing program, ma'am?
A. Ten and a half months.
Q. And what type of degree or certificate did you obtain after that?
A. I have my LPN license.





Q. LPN? Okay.
A. Yep.
Q. And when you have an LPN license, is that through the state of Missouri?
A. Yes.
Q. What brought you to the state -- well, did you live anywhere else between -- any other places besides Arizona before you moved to Missouri?
A. I lived in Las Vegas for a little bit.
Q. Okay. Was that as an adult?
A. Yes.
Q. What were you doing in Las Vegas for work?
A. I stayed home with my daughter.
Q. Okay. Were you married at that time to someone else?
A. No.
Q. Okay. Have you been married previously other than your current husband?
A. Yes.
Q. How many times have you been previously married, ma'am?
A. One.





Q. When did that marriage end?
A. I'm going to say 1992.
Q. Okay. Have you ever been charged with any kind of crime, ma'am?
MR. HERNANDEZ: Objection to form.
BY MR. SMITH:
Q. You can go ahead and answer.
A. Yes.
Q. Okay. What kind of charges were you charged with?
MR. HERNANDEZ: Form.
BY MR. SMITH:
Q. You can answer.
A. Okay. Domestic and a bad check.
Q. A bad check?
A. Uh-huh.
Q. Okay. What was the nature of the charge related to the bad check?
MR. HERNANDEZ: Form.
THE WITNESS: It was a payday loan. I thought that when it went through the bank that it was okay, but that's not how it works.
BY MR. SMITH:
Q. Where did you obtain the payday





loan?
A. Oh, man.
MR. HERNANDEZ: Form.
THE WITNESS: I can't remember the name of the place. It was almost -- you know, it was over 20 years ago.
BY MR. SMITH:
Q. It was over 20 years ago? Okay.
A. Yeah.
Q. Do you remember the name of the -- what was the jurisdiction, like the county, for instance, where the charge was filed?
MR. HERNANDEZ: Form.
THE WITNESS: In Harrisonville.
BY MR. SMITH:
Q. Say it again? Go ahead.
A. In Harrisonville.
Q. Andersonville?
A. Harrisonville.
Q. Oh, Harrisonville. Okay. Harrisonville, Missouri?
A. Yes.
Q. Do you know what statute, if any, you were charged under for that bad check?
MR. HERNANDEZ: Form.

THE WITNESS: Oh, I don't know.
BY MR. SMITH:
Q. Fair enough.
Do you know what the specific crime they alleged against you was? Like was it fraud, was it -- can you -- do you remember that?
MR. HERNANDEZ: Form.
THE WITNESS: Oh, I don't.
BY MR. SMITH:
Q. Okay.
A. I just paid the $100 and was done with it.
Q. You paid $100, ma'am, to resolve it?
MR. HERNANDEZ: Form.
THE WITNESS: Yeah, I just paid off the check and it was over. Yeah.
BY MR. SMITH:
Q. Okay. Were the charges, to your knowledge, dismissed against you after that?
MR. HERNANDEZ: Form.
THE WITNESS: As far as I know, yeah.
BY MR. SMITH:
Q. Any other crimes you've been charged with in the past?

Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705



MR. HERNANDEZ: Form.
THE WITNESS: Domestic.
BY MR. SMITH:
Q. Okay. How long ago was that?
MR. HERNANDEZ: Form.
THE WITNESS: Fifteen -- 15 years ago.
BY MR. SMITH:
Q. Okay. Was that a misdemeanor charge or a felony, ma'am?
MR. HERNANDEZ: Form.
THE WITNESS: Oh, misdemeanor.
BY MR. SMITH:
Q. Okay.
A. It was dropped.
Q. And it was dropped. Okay. Is that it?
MR. HERNANDEZ: Form.
THE WITNESS: Yes.
BY MR. SMITH:
Q. Very well.
I don't think I asked you your date of birth.
MR. SMITH: Can we get her date of birth just off the record, please?
THE VIDEOGRAPHER: We're going off the

Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705



record at 3:43 p.m.
(Thereupon, a discussion was held off the record.)
THE VIDEOGRAPHER: We're going back on the record at 3:43 p.m.
BY MR. SMITH:
Q. All right, ma'am, we were just off the record momentarily so you could provide us your date of birth.
After you got your LPN license, where did you go to work first?
A. Oh, the same place I had been, at Golden Years in Harrisonville.
Q. Can you repeat the name of that employer for me, please?
A. Golden Years.
Q. Okay. Are you still employed by Golden Years?
A. I am.
Q. All right. How many years have you been working with them now for?
A. Almost 15.
Q. Can you describe for us what kind of employer Golden Years is?
A. It's a nursing home.

Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705



Q. Okay. Is it located in Harrisonville?
A. It is.
Q. Do you work full-time hours with them?
A. At least.
Q. Do you do overtime?
A. Oh, yeah.
Q. Okay. How many hours a week do you think you're working with them lately?
A. Close to 50.
Q. Okay. What is your current job title with Golden Years?
A. I'm a charge nurse.
Q. A charge nurse?
A. Yes, LPN.
Q. Has your job title changed over the 15 years that you've been with them?
A. Yes.
Q. What did you start out working as for Golden Years?
A. A nursing assistant.
Q. And you had a promotion to charge nurse?
A. Yes, after I went to school.

Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705

Q. Okay. Have you had any more -- have you had just one promotion or have you had multiple promotions at Golden Years?
A. No, I just went from nursing assistant to -- then I went through classes and went to certified nursing assistant, and then to LPN.
Q. Okay. And now you're an LPN charge nurse for Golden Years; correct?
A. Right.
Q. Do you have any other licenses or certifications that relate to your employment besides the LPN license?
A. No, no. Other than like CPR and IV's and stuff like that, no.
Q. Like a CPR certification you have related to work?
A. Right.
Q. Okay. What was the other -- what was the other training, I guess, you had? Can you repeat that?
A. IV certification.
Q. IV. Okay.
Have you had any relevant on-the-job training related to being a charge nurse?

Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705



A. Excuse me?
MR. HERNANDEZ: Form.
BY MR. SMITH:
Q. Have you had any other like relevant medical or nursing training that you obtained through work in the last 15 years?
A. No.
Q. Okay. As an LPN with Golden Years, are you required to do any sort of continuing nursing education?
A. We were, but it pretty much stopped when COVID hit.
Q. Okay. Before COVID, before COVID, what type of sort of continuing education would you do? Can you just roughly describe what that was like?
A. Just online small classes and tests.
Q. Okay. And can you give us an example of what types of courses online you were taking?
A. Just -- like how to take care of residents. Let's see. That's -- it's been a while. That's -- yeah, it's just stuff pertaining to taking care of residents in a nursing home setting.

Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705



Q. Okay. Anything about like dealing with emergency medical care or triage, things of that nature that you would have done through continuing nursing education?
A. No.
Q. Okay. So, obviously, the case we are here to talk about today involves who I understand to be a friend of yours named Barbara Hall; is that right?
A. Correct.
Q. How did you meet Ms. Hall?
A. She was my charge nurse there.
Q. Okay. When you say she was your charge nurse there, are you referring to your employer, Golden Years?
A. I am.
Q. Okay. So when you first met Ms. Hall, were you still a nursing assistant?
A. I was.
Q. Okay. Did the plaintiff, Ms. Hall, play any role in you going and getting your LPN license?
A. No.
Q. Okay. That's a decision you made on your own?

Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705



A. Right.
Q. All right. Do you remember what year it was that you first met Ms. Hall at work?
A. I want to say 2009.
Q. Okay.
A. Approximately. I'm not real sure. It was right before I started school, so.
Q. That's okay. Yeah, an approximation for things like that going back several years, that's quite all right. I just want to get a rough sense of when you first met her.
So you probably first met her about 10 -- a little more than 10 years ago, Ms. Hall; is that fair to say?
A. Yes.
Q. Okay. Over that first year or two that you knew Ms. Hall, Ms. Vaughn, did you all spend any time together outside of work?
A. No.
Q. Okay. When did that change, as far as your friendship is concerned, if at all?
A. I would say shortly after, right around when I was going to nursing school.
Q. Okay. So when you went -- when did you go to nursing school, approximately, if you

Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705

recall?
A. 2010, 2011.
Q. Okay. 2010, 2011?
A. Uh-huh, yes.
Q. All right. Just give me a sense at that time frame, let's say 2011 forward, what would you and Ms. Hall do for -- just for fun outside of work?
A. Well, we both work an awful lot. So we'd meet up here and there for lunch and talk on the phone. Maybe we went to the botanical gardens and just simple things like that.
Q. Okay. Are there any other activities or hobbies you both like to participate in back in that time frame, 2011, when you started hanging out outside of work?
A. We didn't do much, no. Oh, sorry.
Q. All right, Ms. Vaughn. So let's take it a little bit further forward in time. About three -- let's say three years before the cruise that we are here to talk about in this case that took place on the CARNIVAL VALOR, what activities or hobbies would you and Ms. Hall engage in outside of work, if any?
A. I would say just -- just shopping or





going out and having lunch.
Q. Okay. Did you two partake in any like recreational activities before the CARNIVAL VALOR cruise together, like bowling? I mean, anything, anything at all. Jogging, walking?
A. Bowling, that's funny. No, not really, uh-uh.
Q. Okay. Whether you did with her or not, before the CARNIVAL VALOR cruise that you all went on in this case, Ms. Vaughn, are you aware of any hobbies or passions that Ms. Hall had before the cruise that she liked to do?
A. Just, well, nursing and spending time with her kids. She worked an awful lot, so.
Q. Okay. Again, and this is to the extent you know, but before the CARNIVAL VALOR cruise that we are here to talk about, before that time, what types of things did --
A. Hold on. Please hold on just a second.
Q. Sure.
A. Okay. I'm sorry. My dog is whining and oh, my goodness.
Q. That's okay.

Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705



A. Okay. Now, what was the question?
Q. So before you and Ms. Hall went on the CARNIVAL VALOR cruise when she was injured, to your knowledge, whether you did these activities with her or not, did Ms. Hall have any particular -- well, strike that. I think we talked about that before the break.
But you said spending time with her children is something Ms. Hall liked to do before the cruise?
A. Oh, yeah. Her son was in the army. She'd go and she'd -- she spent her time going to visit him.
Q. Okay. Where was her son stationed before the cruise?
A. Well, he was out of the army like by the time of the cruise, but he was overseas and then somewhere in Kansas.
Q. Okay. So would she go to Kansas from time to time to visit him?
A. Yeah.
Q. Did she drive -- take the car out there?
A. I'm thinking, yeah.
Q. Okay. Before the Carnival cruise,

Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705



did your -- to your knowledge, did Ms. Hall have any limitations on her ability to drive?
MR. HERNANDEZ: Form.
THE WITNESS: No.
BY MR. SMITH:
Q. And this is to your knowledge. If you don't know, just tell me you don't know, but.
A. Oh, I will. I will.
Q. Before the CARNIVAL VALOR cruise, did -- to your knowledge, did Ms. Hall have any limitations to any of her activities of daily living, like doing household chores, you know, going for walks, things like that?
A. No, not that I'm aware of.
Q. Okay. And again, you know, you might not necessarily be the type of friend that she would confide this stuff in you. So if you don't know, tell me you don't know, but.
A. I will.
Q. Before the CARNIVAL VALOR cruise, are you aware of Ms. Hall ever getting in any sort of motor vehicle accidents?
A. No.
Q. Okay. Before the CARNIVAL VALOR

Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705

cruise, to your knowledge, had Ms. Hall been involved in any slip, trip or fall incidents?
A. No, I don't think so.
Q. Okay. And again, to the extent you know, before the CARNIVAL VALOR cruise, had Ms. Hall filed any sort of lawsuits before the cruise?
A. Not that I know of.
Q. To your knowledge, before the CARNIVAL VALOR cruise, ma'am, had Ms. Hall had any major surgeries that you're aware of?
A. No.
Q. Had Ms. Hall, ma'am, to your knowledge, had any previous issues before the CARNIVAL VALOR cruise with her balance?
A. No.
Q. Had Ms. Hall, ma'am, before the CARNIVAL VALOR cruise, to your knowledge, ever had any issues with spells of dizziness?
A. No.
Q. To your knowledge, ma'am, did Ms. Hall have any issues with arthritis in her lower extremities?
MR. HERNANDEZ: Form.
THE WITNESS: No.





BY MR. SMITH:
Q. Did Ms. Hall, to your knowledge, ma'am, before the CARNIVAL VALOR cruise, suffer from any type of chronic medical condition that you're aware of?
MR. HERNANDEZ: Form.
THE WITNESS: No.
BY MR. SMITH:
Q. Before the CARNIVAL VALOR cruise, ma'am, to your knowledge, was Ms. Vaughn taking any sort of prescription medicine?
A. Oh, gosh, I don't know. No, not that I'm aware of.
Q. Okay. Before the CARNIVAL VALOR cruise, ma'am, to the extent you know, had Ms. Hall been seeing any sort of therapist, counselors, psychologist or psychiatrist for mental health concerns?
A. No.
Q. Before the CARNIVAL VALOR cruise, ma'am, and to the extent you know, had Ms. Hall ever had any issues using either of her two hands?
A. No.
Q. To the extent you're aware, ma'am,





had Ms. Hall ever suffered any fractures of her wrists prior to the CARNIVAL VALOR cruise you all went on?
A. No.
Q. All right, ma'am, can you please tell me a little bit -- well, let me ask you this. You're obviously an LPN. Are you familiar with the term musculoskeletal system?
A. Yes.
Q. Okay. So when I'm talking about the musculoskeletal system, I'm talking about the whole body, including the spine. Okay?
MR. HERNANDEZ: Form.
THE WITNESS: Right.
BY MR. SMITH:
Q. To your knowledge, had Ms. Hall, before the cruise, had any medical problems with her musculoskeletal system, including her spinal column?
A. Not that I know of.
Q. Before the CARNIVAL VALOR cruise, ma'am, to your knowledge, did Ms. Hall smoke cigarettes?
A. No.
Q. Does she smoke cigarettes now, to





your knowledge?
A. No. I think she -- I think she said she might have used to, but I've never seen her smoke.
Q. Fair enough.
Are you aware of Ms. Hall ever, in the time that you've known her, to use any illegal drugs?
MR. HERNANDEZ: Form.
THE WITNESS: No.
BY MR. SMITH:
Q. Ma'am, I'd just like to ask you a little bit about your own cruise history, if you have any. Okay?
A. Okay.
Q. Before going on the CARNIVAL VALOR cruise in February, March of 2020, had you ever been on a cruise before?
A. No.
Q. Okay. So the CARNIVAL VALOR cruise at the end of February into March of 2020 was your very first cruise; is that right?
A. Correct.
Q. Okay. Had -- before that cruise on the CARNIVAL VALOR, ma'am, had you ever been on

vacation previously with Ms. Hall?
A. No.
Q. Okay. So the CARNIVAL VALOR cruise, would that be the first vacation you ever took with Ms. Hall?
A. Yes.
Q. All right. Tell me about why it was decided to take this particular CARNIVAL VALOR cruise at the end of February 2020.
A. A coworker. She goes on cruises I think about three times a year, at least.
Q. Okay. What's the name of that coworker?
A. Michelle Overturf.
Q. Michelle Overture?
A. Overturf.
Q. Can you spell the last name, please?
A. O-V-E-R-T-U-R-F.
Q. What's her job title at Golden Years?
A. She's an RN.
Q. And is Michelle the RN still employed by Golden Years?
A. She is.
Q. All right. And how was it that





Michelle the RN influenced your decision to make the Carnival -- take the trip on CARNIVAL VALOR, ma'am?
A. She said she had had a great time and she enjoyed it.
Q. Okay. Did she -- did she recommend Carnival to you specifically or just cruising in general?
A. Just cruising in general.
Q. To your knowledge, had Michelle ever taken a Carnival cruise before?
A. I don't know.
Q. Okay. To your knowledge, ma'am, had Ms. Hall ever been on a cruise before this one on CARNIVAL VALOR?
A. No.
Q. Were there any other reasons that led you to wanting to take the CARNIVAL VALOR cruise at the end of February 2020?
A. No.
Q. Do you remember when it was that you booked your tickets?
A. I don't know. I just gave her the money and she took care of it.
Q. Okay. So Ms. Hall took care of the





booking process; correct?
A. Right.
Q. Did you -- before Ms. Hall booked -- well, strike that.
Before you gave Ms. Hall the money to book the tickets, did you do any research on your own about the CARNIVAL VALOR?
MR. HERNANDEZ: Form.
THE WITNESS: No, not about the VALOR. I did a little bit of research on cruises, but not much.
BY MR. SMITH:
Q. Tell me what you did as far as your research on cruises.
A. Oh, I was just looking to see like where it went and if I needed a passport and things like that.
Q. Got it.
Did you do any specific research before the cruise about Carnival Cruise Line?
A. No.
MR. HERNANDEZ: Form.
BY MR. SMITH:
Q. Before you got on board the CARNIVAL VALOR, ma'am, did you look up the cruise





passenger ticket contract on Carnival's website?
MR. HERNANDEZ: Form.
THE WITNESS: I think I may have looked it up, but I didn't go through it very thoroughly.
BY MR. SMITH:
Q. Okay. But you recall looking at the cruise passenger ticket contract for the Carnival cruise online?
MR. HERNANDEZ: Form.
THE WITNESS: You know, I can't say that I did or didn't.
BY MR. SMITH:
Q. Fair enough.
Do you remember whether you were -- do you remember accepting the terms and conditions of the cruise ticket contract before you got on board CARNIVAL VALOR with Ms. Hall?
MR. HERNANDEZ: Form, lack of predicate.
THE WITNESS: I'm not sure. I mean, I don't know if I would have had to do -- have done that separately on my phone or if she did it when she did the tickets.
BY MR. SMITH:
Q. Right.

A. So I'm not sure.
Q. Okay. Well, let's back up. Again, you had said that the ultimate booking process of the tickets was done by Ms. Hall; is that right?
A. Correct.
Q. Okay. And then once the tickets were booked, did Ms. Hall e-mail you your boarding information?
A. I don't -- I don't know. She may have screenshotted me a few things, but -- you know, I wasn't particularly worried about all that. Someone said cruise and I'm like, "I'm in."
Q. Okay. Fair enough.
How did you and Ms. Hall get from your home in Missouri down to where you would meet up at CARNIVAL VALOR?
A. Rented a car.
Q. Okay. And where did you all leave from? What town was it? Was it her house, your house?
A. She drove -- she drove by here and picked me up.
Q. All right.

Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705



A. So East Lynne, I guess.
Q. And where was the cruise leaving from?
A. New Orleans.
Q. Do you remember what day you arrived in New Orleans?
A. Yes. It was the -- I want to say -- oh, well, the 26th or 27th of February. I'm not sure if we got there before or on my birthday.
Q. Okay. When is -- okay, yes, your birthday is when, again? I'm sorry. Just the date, not the year.
A. The 27th of February.
Q. Twenty-seventh of February. Okay. So you remember arriving either the day before your birthday or on your birthday itself, February 27th; correct?
A. Right.
Q. Do you remember the date you boarded the cruise ship CARNIVAL VALOR in New Orleans?
A. Not exactly.
Q. All right. That's fine.
A. I want to -- yeah.
Q. Just let me ask you this. Where did you stay in New Orleans when you first arrived

Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705



before the cruise, if anywhere?
A. We did -- we stayed overnight in this -- we just stayed in a hotel. I can't -- I don't know the name of it.
Q. Okay. Do you know what part of town you were staying in where the hotel was located?
A. No. It was close to a scary part.
Q. It was close to a scary part?
A. Yeah.
Q. Okay. So the night you stayed over in the hotel before the cruise, did you go out and do anything in New Orleans?
A. No.
Q. Where did you eat dinner that night that you got to New Orleans; do you remember?
A. I -- I don't. I think we just had stuff with us. I don't remember. I don't remember going out, though.
Q. Fair enough.
Did you and Ms. Hall bring any alcoholic beverages down with you from Missouri in the car?
MR. HERNANDEZ: Form.
THE WITNESS: I think I had -- I think I had a few shots, but the motel we stayed in

Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705



in Missouri, well, it was a dry county, so.
BY MR. SMITH:
Q. When you say a few shots, are you talking about a few shots of liquor?
A. Yeah, little shot bottles. I had them anyway. My friend sent them to me for my birthday.
Q. Oh, yeah. Are you talking about mini bottles of liquor?
A. Yeah.
Q. And where did you consume the mini bottles, in New Orleans or before you left?
MR. HERNANDEZ: Form.
THE WITNESS: In New Orleans, the night before the cruise.
BY MR. SMITH:
Q. Okay. What type of liquor was it?
A. Fireball.
Q. Fireball Whisky?
A. Yes.
Q. How many mini bottles of Fireball Whisky did you consume the night before the cruise?
MR. HERNANDEZ: Form.
THE WITNESS: Oh, maybe two.

Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705

BY MR. SMITH:
Q. Okay. Did Ms. Hall have any of the Fireball Whisky?
MR. HERNANDEZ: Form.
THE WITNESS: I believe so.
BY MR. SMITH:
Q. Okay. So the night before the cruise, how many of the Fireball Whisky mini bottles do you think Ms. Hall had?
MR. HERNANDEZ: Form.
THE WITNESS: Well, I only had four total, so it couldn't have been more than two.
BY MR. SMITH:
Q. Okay. So to the best of your recollection, Ms. Hall had two mini bottles of Fireball Whisky the night before the cruise?
MR. HERNANDEZ: Form.
THE WITNESS: I don't know --
MR. HERNANDEZ: Form, asked and answered.
THE WITNESS: I can't say if she drank them or not.
BY MR. SMITH:
Q. I'm sorry, can you repeat your





answer, ma'am?
A. I said I can't say if she drank them or not. I know I offered.
Q. Okay. Did you or Ms. Hall have anything else to drink alcoholic-wise the night before the cruise?
MR. HERNANDEZ: Form.
THE WITNESS: Gosh, I don't think so.
BY MR. SMITH:
Q. Okay. What did you do next, the next morning in New Orleans for breakfast before getting on the cruise ship?
A. Went through a drive through, like McDonald's or something like that.
Q. Okay. Did you have anything to drink that morning with breakfast?
A. Alcohol?
Q. Anything, yes, alcohol or otherwise.
A. Well, I probably had a sweet tea.
Q. Okay.
A. She probably had water with lemon.
Q. All right. Was any alcohol consumed that morning with breakfast?
A. No. Dear God.
Q. The only reason I ask, it is New





Orleans.
A. Okay. I'm from Vegas, so I get it.
Q. Yeah. And you're on vacation.
A. Right.
Q. All right. Do you know where you ate lunch that day that you boarded the cruise ship?
A. Oh, heck no.
Q. Okay. Well, do you remember what time it is you boarded the CARNIVAL VALOR in New Orleans?
A. Late afternoon, early evening.
Q. Okay. If you can, do you recall an approximate time you boarded the cruise ship?
A. Four, five-ish.
Q. Okay. So when you boarded the cruise ship, ma'am, can you tell us, please, what was the first activity you did on board, if anything?
A. Well, we walked through the door. They hand you a drink and then you go wandering around looking at stuff. Other than that, there's not much to do because you can't go to your room yet. So just explored, I guess.
Q. Okay. Can you repeat what you said





about you can't go to your room yet?
A. Right, you can't immediately go to your room. You have to wait.
Q. Okay. All right. Did they take your bags from you, though?
A. Yeah, before we boarded.
Q. Did you or Ms. Hall bring any alcohol with you on board the cruise ship in your bags?
A. No.
Q. You said you had a welcome drink when you boarded; is that right?
A. Correct.
Q. Did your welcome drink contain alcohol?
A. Yes.
Q. Do you know what type of alcohol was in the welcome drink?
A. If I was to guess, I would say rum.
Q. Okay. How many welcome drinks did you have?
A. Well, they just give you one and then you wander off.
Q. Okay. Did you have one welcome drink and Ms. Hall had one welcome drink that

you observed as well?
A. Right.
Q. All right. So where about the ship do you recall when you were, you know, wandering around before going to the room?
A. I know we went through the kind of buffet style restaurant and by the casino and to the bar. And other than that, just walking the inside deck, or I don't even know if that's what it's called, but just walking around that floor.
Q. Tell me a little bit about the restaurant. Can you describe what that was like?
A. It was -- like I said, it was a buffet. So we were just walking through and people are scrambling, getting food because they had been waiting, I guess.
Q. Right.
A. Waiting to get on the ship.
Q. Was the buffet style restaurant on the same level as the pool deck?
A. I -- I don't think so. I'm not sure about that.
Q. Fair enough.
Did you get anything to eat at that





buffet restaurant yourself?
A. We did.
Q. All right. Do you remember what you and Ms. Hall ate at the buffet restaurant?
A. Oh, heck no.
Q. All right. No recollection at all. Did you eat like -- well, strike that.
Did you eat something small at the restaurant or did you have like a full meal, that you can remember?
MR. HERNANDEZ: Form.
THE WITNESS: Oh, just nibbled on some stuff through the line.
BY MR. SMITH:
Q. All right. You mentioned visiting a bar before going to the room; is that right?
A. Correct.
Q. Do you remember the name of the bar you visited?
A. No. I mean, I'm not sure if we went before or after, but I know we ended up at the bar.
Q. All right. So to clarify that, you don't remember whether you went to the bar with Ms. Hall prior to visiting the cabin the first





time or after; is that right?
A. Right, right.
MR. HERNANDEZ: Form.
THE WITNESS: I think it was before because we had a pretty lengthy wait.
BY MR. SMITH:
Q. All right. And do you remember the name of that bar?
A. No, I don't.
Q. Okay. Do you remember where in the ship the bar was located, like what deck it was on, for instance?
A. Oh, gosh. I was lost most of the time I was on that ship. I don't know.
Q. That's fine.
How did you find out, ma'am, that your cabin was ready for you and Ms. Hall?
A. Gosh, I don't know.
Q. Do you know when it was you first visited the cabin, what time on the day that you boarded the ship?
A. It was as we were taking off out of New Orleans a little bit because I was watching, you know, the land still go by.
Q. Okay. So the first visit to the





cabin, the ship had started moving?
A. Right.
Q. Okay. And then when you visited the cabin for the first time, was it still daylight outside?
A. The sun was going down. It was in between, twilight.
Q. Okay. Fair enough.
The first time you visited the cabin, ma'am, the cabin that was -- well, let me strike that.
The cabin you had on board CARNIVAL VALOR, ma'am, was it a balcony cabin?
A. It was.
Q. All right. And you shared that cabin with Ms. Hall; correct?
A. Right.
Q. Did you share the cabin, you and Ms. Hall, with any other passengers?
A. No.
Q. All right. And I think I know the answer to this question, but let me ask you because you were there and you can tell me for sure. But were you and Ms. Hall traveling on that voyage with anyone else like as travel

companions or was it just the two of you?
A. Just the two of us.
Q. Okay. And let me ask you this. During any point in the cruise, did you and Ms. Hall meet anyone specifically that you spent a substantial amount of time with during the cruise?
A. No.
Q. Okay. Like did you meet anyone that you met up with and kind of became friends with, exchanged phone numbers, something of that nature?
A. No.
Q. Okay. Did you meet up with anyone at all on the cruise ship that you exchanged contact information with?
MR. HERNANDEZ: Asked and answered.
THE WITNESS: Not that I did. I don't know, she's a lot more friendly than I am. But, I mean, I don't -- I don't remember anybody.
BY MR. SMITH:
Q. Do you remember Ms. Hall meeting anyone on board that she exchanged contact information with?





A. I don't think so. No.
Q. Okay. All right. That first -- let's go back to the first visit into the cabin. Was Ms. Hall with you at that time?
A. Yes.
Q. Okay. And when you got into the cabin, what's the first thing you both did?
A. What's the first thing we looked at?
Q. Sure.
A. Oh, the balcony.
Q. Okay.
A. That's the first thing I looked at.
Q. Did you go out on the balcony itself?
A. I did.
Q. All right. Did you go into the cabin bathroom inside your passenger cabin?
A. I'm sure at some point.
Q. What do you mean at some point?
A. Well, I'm sure sometime while I was there, I did.
Q. Sometime during the first visit to the cabin?
A. Right.
Q. Okay. What do you remember about





that first visit inside the cabin bathroom, ma'am, if anything?
A. It wasn't -- it wasn't memorable.
Q. It was memorable or it wasn't memorable, I'm sorry?
A. It wasn't. It's just I'm sure I had to go to the bathroom sometime during that.
Q. Okay. I'm sorry that I ask, but I kind of have to. Did you use -- the first time that you were in the cabin, did you go into the cabin bathroom, that you can remember, to actually use the toilet?
A. Yes.
Q. Okay.
A. And to put my stuff away.
Q. Okay. So you -- when you say put your stuff away, are you talking about you went inside the cabin bathroom to put away like your toiletries, toothbrush and things like that?
A. Correct.
Q. Okay. And that all took place during your first visit to the passenger cabin you shared with Ms. Hall; correct?
A. I believe so.
Q. All right. And during your first





visit to the bathroom in the cabin there to do those activities, ma'am, were you able to walk in and walk out of the bathroom without any issue?
MR. HERNANDEZ: Form.
THE WITNESS: I didn't fall down, so I would say yes.
BY MR. SMITH:
Q. Okay. And when you walked into the bathroom on the first visit to the cabin, ma'am, did you see that the cabin bathroom had a shower area?
MR. HERNANDEZ: Form.
THE WITNESS: Yes.
BY MR. SMITH:
Q. Okay. And did you see that the shower area, ma'am, had a threshold on the floor to keep the water in the shower area?
MR. HERNANDEZ: Form.
BY MR. SMITH:
Q. On that first visit to the cabin bathroom.
A. No. I mean, but I wasn't looking either, so.
Q. Okay. So the first time you visited

the cabin bathroom to use the toilet, you weren't looking down at the floor; is that what you're saying?

MR. HERNANDEZ: Form.

THE WITNESS: I wasn't looking at the shower.

BY MR. SMITH:

Q. Okay. On that first day before you went to bed, ma'am, for the night, did you ever use the shower?

A. To be honest with you, after we went to the cabin and went back out, I don't remember a whole lot. You see, I'm the drinker of us. So I just don't remember a whole bunch, as terrible as that sounds.

Q. It's okay.

So after the first visit to that passenger cabin, did you do anything else that you remember inside the cabin, like watch TV, you know, take a nap, anything else besides go out on the balcony and use the restroom?

A. I don't remember doing anything else besides putting my stuff away.

Q. Okay. So after you leave the passenger cabin for that first time, where do





you and Ms. Hall go next?

A. Just out, checking out the ship. No, no, they called us to that -- where you've got to go downstairs and -- I guess for in case of emergencies.

Q. Sure.

A. That took a little bit.

Q. So after the cabin -- you visited the cabin the first time, you went and did the muster drill, I take it?

A. Yes, that's it. Yeah.

Q. Did you visit any more bars on board the ship before the muster drill?

A. I don't know.

Q. Okay. I recall you saying to me earlier that it was either before getting into the passenger cabin or after that you did visit a bar; correct?

A. Okay. I was visiting the bar every chance I could, so.

Q. Well, this instance you recall of visiting the bar either before the cabin visit or after the first cabin visit, was Ms. Hall with you at the bar as well?

A. I'm going to say yes and yes.





Q. Okay. And at the bar that time, again, either just before the cabin visit or after, did Ms. Hall have a drink, alcoholic drink?

A. I don't know if she was still drinking the one from getting on the ship or.

Q. Okay.

A. I really don't know. I'm sorry.

Q. Do you not know because you can't remember or would you just explain your answer?

A. Right, yeah, I don't remember.

Q. Okay.

A. You know, I didn't know I was supposed to be keeping track of all that stuff.

Q. That's okay. If you don't know, just tell me.

A. That's what I'll tell you. Yep.

Q. Other than the -- so let's go back to the muster drill. After the muster drill was over, what event do you recall happening next on board?

A. I don't -- I don't -- I don't know.

Q. Okay.

A. I don't know if we went along, you know, went and discovered the cruise. I don't





think we went back to -- yeah, we might have went back to the room for a few minutes and then we came out and we hung out for a couple of hours.

Q. Okay. So you went back to the room and do you remember what you did in the room the second time you visited it?

A. I'm not sure. I'm not even sure we went there.

Q. Okay. Do you remember -- again, if you don't know, that's fine. Just, please, tell me. But as a follow-up I'd like to ask, this second visit to the room, do you remember if you visited the cabin bathroom at that time?

A. I don't remember.

Q. Do you recall whether Ms. Hall went in the cabin bathroom on the second trip back to the cabin?

A. No, if I don't remember me going, I sure don't remember what she was doing.

Q. Let me -- before I forget, let's backtrack briefly to the first visit to the cabin, the very first time you went in the passenger cabin.

A. Okay.

Q. Do you recall, do you recall whether Ms. Hall went into the cabin bathroom that first trip to the cabin?
A. Oh, I don't remember.
Q. Okay. So let's go back to, okay, you're not sure whether you went back a second time to the cabin or not. Do you remember anything else that occurred that night before you went back to the cabin the final time for bed?
A. Yeah, I remember just going out and checking out a few things on the ship and going to the bar.
Q. Which bar did you go back to?
A. I don't know the name of bars.
Q. Okay.
A. The one by the casino is all -- we'll go with that.
Q. By the casino?
A. Uh-huh.
Q. Yeah, okay, you recall the bar by the casino?
A. Well, it was by slot machines, so I'm going to say yeah.
Q. Okay. What were you drinking at the





bar by the casino?
A. Me? Shots of Patron.
Q. Okay. What was Ms. Hall drinking at the bar by the casino?
MR. HERNANDEZ: Form.
THE WITNESS: I don't know, some kind of blended foo-foo drink.
BY MR. SMITH:
Q. Okay. How many of the alcoholic blended drinks did Ms. Hall have, if you know?
MR. HERNANDEZ: Form.
THE WITNESS: I'm not sure. A few.
BY MR. SMITH:
Q. Okay.
A. I don't know because I was drinking shots like they were going out of style. So pretty much after the second time at the bar, I don't remember a whole bunch of that night.
Q. Did you go to any shows on board that night?
A. I don't think so.
Q. Okay. Do you recall eating dinner that night on board the ship?
A. I don't recall much of that night.
Q. Do you recall when you finally made





it back to your cabin to bed?
A. No.
Q. Okay. To your knowledge, ma'am, did your friend, Ms. Hall, suffer any injury on board the CARNIVAL VALOR?
A. Well, the next morning, you know, the first morning after spending the night, when I woke up she was tearful and holding her arm up and said she hurt herself the night before. So I'm going to say yeah.
Q. Okay. All right. Before we ask -- talk more about that, let me ask you this. Did Ms. Hall, to your knowledge, suffer any other injuries, additional injuries on board during the course of the cruise, to your knowledge?
A. Not that I know of.
Q. Okay. So, again, can you just explain for me how you found out about -- how it was that you found out the next morning after the first night on board about Ms. Hall's injury?
A. I'm sorry, I have to reposition.
Q. Not a problem.
A. I woke up and she was -- I think she was kind of crying, holding her arm up.





Q. And that morning when she was crying, is that the first awareness you had that something happened to her?
A. Yes.
Q. Did you -- were you an eyewitness to her falling, stumbling, anything?
A. No. She said that I came and knocked on the door and asked her something. I don't remember any of that and I guess I must have just walked away because I don't remember any of that.
Q. Okay. Yes, during the middle of the night or the early morning, can you remember anything at all about her, Ms. Hall, in the vicinity of your cabin bathroom?
A. No.
Q. Okay. Like, for instance, at the time that Ms. Hall might have been on the floor in the cabin bathroom overnight, after you boarded the ship earlier that day, do you remember whether the cabin lights were on in your cabin?
MR. HERNANDEZ: Form.
THE WITNESS: Oh, heck, I don't know.
BY MR. SMITH:

Q. You don't know? Okay.
A. I don't.
Q. Okay. So your first recollection is truly just from the next morning of Ms. Hall crying, holding her arm?
A. Right, I don't remember going back to the room or anything, so.
Q. Okay. Do you remember what time it was in the morning when you woke up the next -- the next morning?
A. No.
Q. What was it that Ms. Hall said to you at the time you encountered her crying?
A. Well, she said she hurt her arm and fell in the bathroom.
Q. What else did she say about that?
A. I don't really know. I was inquisitive. She told me I came and knocked on the door and I don't remember doing that. And she said after that I must have just left.
Q. Okay. What else do you remember --
A. She probably said she was okay because she's tough like that.
Q. What else, if anything, do you remember her telling you that morning when you





-- when you became aware of her injury?
A. That she -- that she fell in the bathroom, is all.
Q. She fell in the bathroom?
A. Right.
Q. What -- did Ms. Hall explain to you how she fell in the bathroom?
A. She said she tripped.
Q. Did she describe how she tripped?
A. She might -- she might have. I don't -- I'm not sure.
Q. What do you remember about how she said she fell?
A. Tripping over the ledge of the bathroom.
Q. Okay. Did she say which ledge she tripped over?
A. The one going into the shower.
Q. The one going into the shower?
A. I think that's -- yeah, I think that's the only actual one inside the bathroom.
Q. Okay. Is there a step at the door to the bathroom that you have to walk over to get in?
A. I think so. I don't know. There





are those little steps everywhere.
Q. Okay.
A. And I'm not graceful, so.
Q. Did she say anything else about how it was she came to trip over the ledge inside the bathroom?
A. What do you mean?
Q. Well, did Ms. Hall tell you where she was looking right before she tripped?
MR. HERNANDEZ: Form.
THE WITNESS: Where she was looking? No.
BY MR. SMITH:
Q. All right. Did Ms. Hall tell you anything about whether there was ship movement, anything like that that contributed to her fall?
MR. HERNANDEZ: Form.
THE WITNESS: I -- I don't remember.
BY MR. SMITH:
Q. Okay. Did Ms. Hall tell you there was anything on the floor she saw before she tripped?
A. If she did, I don't remember it.
Q. I'm sorry, could you repeat your answer? Just because of the Zoom I didn't hear





you.
A. Oh, I said if she did, I don't remember her saying anything.
Q. Okay. Were there any like liquid substances on the floor that she told you about at the time she fell?
A. I don't know. I mean, I don't know, so.
Q. Did she tell you whether the light was on in the bathroom at the time she fell?
A. I don't remember that either. I mean, you know, you're probably going to say, well, there was this and that and the light was on and, I mean, you know.
Q. Go ahead. I'm sorry, were you finished?
A. Something I would usually have heard in a conversation.
Q. Okay. Do you recall whether Ms. Hall told you if there was a light on inside sort of the cabin itself, not the bathroom, but the cabin before she fell?
A. I don't know. I don't remember her saying anything, but I don't know.
Q. Okay. So after she told you about

her injury, ma'am, that morning after the first sort of half day of the cruise, what did you both do at that point?
A. Excuse me?
Q. What did you two do at that point after you found out about her injury?
A. Went down to the -- I guess they call it the infirmary there.
Q. Is that the first thing you remember doing after becoming aware of her injury?
A. That and we went and canceled our outing.
Q. Okay. You had booked -- had you booked a shore excursion at one of the ports of call?
A. Yeah. Right.
Q. Do you remember what shore excursion it was that you canceled?
A. We were supposed to go ziplining.
Q. Where were you going to go ziplining?
A. Cozumel.
Q. Okay. Did you -- where did you have to go to cancel your ziplining; do you remember? Where on board the ship, I should say.





A. Over to customer service, I guess.
Q. Okay. Did you go down to like -- did you go to cancel the shore excursion trip first or did you go down to the infirmary first? What do you remember as far as that's concerned?
A. I -- I couldn't tell you.
Q. Okay. And do you remember what day it was at this point that you became aware of her injury and you went to the infirmary and the customer service desk?
A. The day after boarding.
Q. The day after boarding? Okay.
A. Uh-huh.
Q. Was that a sea day when the ship -- the ship wasn't in a port of call that day; it was just traveling across the ocean?
A. Right.
Q. Okay. So you did go down to the medical infirmary with Ms. Hall the day after you boarded; is that right?
A. Right.
Q. All right. Do you know what time of day it was when you went down there?
A. In the morningish.
Q. Okay. Had you had anything to eat





for breakfast or lunch yet?
A. Oh, gosh. I don't remember.
Q. Okay.
A. I'm going to take notes next time.
Q. What do you remember of the visit to the infirmary, medical infirmary area?
A. That it was way down in the bottom.
Q. Okay.
A. And old and kind of creepy. And the gentleman -- I'm not sure what he was, really, what title, but I guess he wanted a bunch of money beforehand. So we left. She just didn't have it.
Q. Okay. Tell me about the gentleman you interacted with. What did he look like?
A. I want to say a little younger than middle aged. Slightly tall white male.
Q. Okay. Can you remember what the male was wearing?
A. Scrubs.
Q. Scrubs?
A. Uh-huh.
Q. Did you catch the guy -- the gentleman's name?
A. Oh, heck no.





Q. Okay. Did you -- well, do you know whether the gentleman was a crew member of the ship or not?
A. Well, God, he worked there. I sure hope so.
Q. Okay. You said the word creepy, was it, in response to one of the previous questions? Can you explain what you were referring to?
A. Oh, walking -- you mean walking -- yeah, walking down to the bottom, below deck, that's just scary to me. And it was all -- I don't know, no one knows or nothing, you know.
Q. Right. Okay. What was the area like where you were having the conversation with the gentleman you were telling me about?
A. It was -- what do you mean what it was like? It was through the infirmary door to this little seating area.
Q. Okay. It was like a seating area?
A. Yes, it was just three or four seats.
Q. Was it like a waiting area?
A. Yeah. It was kind of right there by the window, though. So, I mean, I don't really

know how to explain that.
Q. Okay. Well, there's a window. Was there like a pane of glass separating you from the person you were talking to?
A. I think -- I think he came out -- I don't remember.
Q. Okay. Do you remember who was doing the talking between yourself and Ms. Hall with the gentleman down at the infirmary?
A. I sure as heck didn't know what was going on.
Q. I'm sorry, it's just the Zoom and it's sometimes hard to hear. Could you repeat what you just said?
A. I said she did because I sure didn't know what was going on.
Q. Okay. What specifically did Ms. Hall say, if you remember, to the gentleman?
A. Just that she hurt her arm.
Q. Okay. Did she say anything else besides she hurt her arm?
A. Boy. I don't know.
Q. Okay. Is that she hurt her arm all that you can remember that Ms. Hall said on that visit to the medical infirmary?





A. Yeah. And they -- that and they wanted a bunch of money that she didn't have. They wanted it, you know, beforehand.
Q. Who allegedly said that?
A. Who said what? Oh, it was the little lady at the -- yeah, at the window, that it was going to be -- I'm not sure how much, but it was, you know, more than she had readily available, so.
Q. You don't remember any -- are you saying there was a specific amount of money discussed?
A. Yeah, they wanted some down before they would look at her.
Q. Well, what exactly do you remember? Do you remember any specific statements that came from the gentleman while you were down there with Ms. Hall at the medical infirmary?
A. I don't.
Q. Okay. Do you have a specific recollection of there even being a specific amount of money being discussed down there?
MR. HERNANDEZ: Form.
THE WITNESS: I want to say maybe something like a thousand dollars.





BY MR. SMITH:
Q. A thousand dollars, you think?
A. I'm not sure. Yeah, I didn't -- I'm not one that pays attention to a bunch of detail, obviously.
Q. Okay. Well, at the time you were down there at the medical infirmary with Ms. Hall like we've been talking about, were you paying attention to much detail at that time, that you remember?
A. No. I was just sitting there waiting for her to take care of herself.
Q. So at the time that you were down there with Ms. Hall at the medical infirmary, you weren't really paying attention; is that correct?
MR. HERNANDEZ: Form.
THE WITNESS: Right. I just went down there to accompany my friend.
BY MR. SMITH:
Q. All right. Did the gentleman at the window, did you notice whether he had a name tag or not?
A. I -- I don't know.
Q. Okay. Did the gentleman at the





window, was he wearing any sort of hat?
A. I -- I don't think so, but I don't know.
Q. All right. Approximately how tall, if you can recall, was this gentleman at the window?
A. I don't know. Taller than me, but everybody is.
Q. How tall are you, just for frame of reference? I apologize for asking.
A. Almost 5-foot.
Q. Okay. How was the -- to the extent you can remember, the gentleman at the window that you say was there at the medical infirmary, what was his body type like?
A. Probably pretty regular build. Not overweight, not underweight.
Q. Was there anyone else at the window there besides the three of you, the gentleman, yourself, and Ms. Hall?
A. There was a little lady came in and out.
Q. Okay. Did she say anything?
A. I'm sure she -- I don't know. Not to me, but.

Q. When you were down there --
A. None of them were talking to me.
Q. Okay. When you were down there at the window with Ms. Hall, did you fill out any paperwork?
A. I'm not sure. I didn't. I think she asked -- I'm not sure if she did or not.
Q. Okay. Yeah, I guess my next question would be did you see Ms. Hall fill out any paperwork while you were down there in the infirmary?
A. I don't know if she did or not. I mean, I think she asked how much it was and then it was pretty much over after that. She may have filled out something, but I'm not sure.
Q. Okay. In terms of -- you referred earlier to Ms. Hall's finances, Ms. Vaughn.
A. Yeah.
Q. And again, to the extent you're aware. If you don't know, that's fine, but to the extent you're aware, what types of sort of money payment methods did Ms. Hall have on her at the time of the cruise?
A. I think she was using her debit card.





Q. Okay. She did have her debit card?
A. Yeah.
Q. Did you or Ms. Hall bring any cash on board?
A. I did.
Q. How much cash did you have on board?
A. A bunch of ones and fives to tip people.
Q. Okay. Do you know how many it totaled at the beginning of the voyage?
A. I would say 200.
Q. 200? Okay.
Obviously, sometimes, ma'am -- I'm just prefacing this question. Sometimes after someone falls or gets hurt, passengers -- everyone has a cell phone, obviously. They may take pictures of the room or their injury or whatever it is. Did -- on this visit to the infirmary, did Ms. Hall show any pictures to the gentleman at the window, that you were aware of?
A. Not that I'm aware of. I don't know.
Q. Okay. Did you have any pictures on your phone of the bathroom, any of Ms. Hall's alleged injuries?





A. No.
Q. Okay.
A. Oh, of her arm, probably.
Q. You have some photos of her arm?
A. But not of the room or anything.
I may have.
Q. Do you recall showing the person at the window on this visit down to the medical infirmary any photos of Ms. Hall's arm?
A. I -- I don't.
Q. Okay.
A. Wow.
Q. At the time you were at the medical infirmary down there, ma'am, did you know whether Ms. Hall had broken her wrist?
A. I had my suspicions. We were hoping for a sprain, but we're both nurses, so, you know.
Q. Right. Did you have anything --
A. I don't know.
Q. Sorry. Did you have anything -- I'm sorry, I just cut you off. I apologize.
A. That's okay. We -- I don't know. I just really thought it was sprained, for the most part.





Q. All right. So at the time that you were down at the window, you thought it was sprained, her wrist?
MR. HERNANDEZ: Form.
THE WITNESS: Right. I mean, I thought it might be broken, but I didn't think so because she was -- I don't know, she's a pretty strong lady.
BY MR. SMITH:
Q. All right. And considering you -- well, I know you didn't -- you didn't have any specific knowledge whether it was sprained or broken at that time; correct?
MR. HERNANDEZ: Form.
THE WITNESS: No, I can't see through her arm.
BY MR. SMITH:
Q. Right. But what you believed at the time you were at the medical infirmary down there, you thought it was a sprain; is that correct?
MR. HERNANDEZ: Form.
THE WITNESS: I don't -- right, well, I don't know. I was kind of on the fence.
BY MR. SMITH:

Q. All right. At that point in time it wasn't like, you know, a medical emergency at that point in time; right? She was -- your friend, Ms. Hall, was stable; would you agree with that?
MR. HERNANDEZ: Form.
THE WITNESS: Well, I mean, it wasn't an emergency because we didn't leave the ship, you know, and go home, so.
BY MR. SMITH:
Q. Okay. So you stayed on board the ship because it wasn't a medical emergency at that time; correct?
MR. HERNANDEZ: Form.
THE WITNESS: Right. It takes a lot to be an emergency for a couple of nurses.
BY MR. SMITH:
Q. I can imagine.
Do you recall what -- at the time down at the window, do you recall anything about what Ms. Hall's arm looked like?
A. It was swollen. It was starting to bruise.
Q. Okay. Do you recall specifically how much bruising there was at that point, if

Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705



any?
A. The next morning?
Q. Yes, the next morning, after --
A. It was just starting.
Q. Okay. It was only just starting to bruise; is that correct?
A. Right.
MR. HERNANDEZ: Form.
BY MR. SMITH:
Q. Did you or Ms. Hall have any sort of prescription or nonprescription medication on you that she took?
A. We both have lots of medications.
Q. But anything like to treat pain, for instance, like an Advil, Tylenol, anything like that?
A. Oh yeah, yeah, I always carry that stuff.
Q. Do you carry -- did you carry any prescription pain medication at the time of the cruise?
A. I probably had my Tramadol.
Q. You had Tramadol. Okay. Did you give Ms. Hall any of your Tramadol?
A. No, not of mine. We went on shore

Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705



and she may have got them. I did.
Q. Okay. Did you give her any nonprescription medication, like a Tylenol or an Advil?
A. I may have.
Q. Okay. Is there anything else you recall being said at the time you went down to the medical center the day after the -- Ms. Hall's injury?
A. What do you mean anything being said; about what?
Q. Anything being said about anything, at that visit to the window.
MR. HERNANDEZ: Form.
THE WITNESS: Oh, I don't know. I'm sure we were conversing, but.
BY MR. SMITH:
Q. Okay. I mean, what do you remember about the personality of the gentleman behind the window on that first visit?
A. I mean, like I don't know. I was sitting through most of it. She was the one dealing with those people.
Q. Okay. Well, I mean, do you remember if the guy was a mean-spirited sort of nasty

Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705



guy? Was he friendly? What, if anything, do you remember about the gentleman's sort of --
A. I don't remember anything outstanding.
Q. -- you know, not character, but just his demeanor, his personality?
MR. HERNANDEZ: Form.
THE WITNESS: I don't remember anything outstanding.
BY MR. SMITH:
Q. Okay. He didn't seem like he was a mean guy, behind the window; is that fair to say?
MR. HERNANDEZ: Form, asked and answered.
THE WITNESS: I -- I don't know. I wasn't talking to him, so.
BY MR. SMITH:
Q. Okay.
A. I mean, he didn't -- he wasn't lashing out or anything, so.
Q. Okay. Well, you say he wasn't lashing out. Did anything that occurred down there at the medical center make you think he was intending to harm Ms. Hall?

Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705

MR. HERNANDEZ: Form.
THE WITNESS: You mean like assault her or something?
BY MR. SMITH:
Q. Well, just intending to do her harm. Did he seem like he was trying to intend to do her harm in any respect?
MR. HERNANDEZ: Form.
THE WITNESS: Intend her harm? God, that sounds awful. I mean, not that I know of, no.
BY MR. SMITH:
Q. Okay.
A. He wasn't very helpful, but he didn't hurt her, so.
Q. Okay. How long was the interaction, if you can remember, down at the medical center the day after Ms. Hall's injury?
A. Just a few minutes.
Q. Okay. So after that interaction, what did you do that day from there?
A. Well, like I said, I'm not sure if we went to cancel the activity before or after, but I think we went and ate and then we went back to the room and waited for -- was that the





day that we went off? Oh, my. I'm not sure.
Q. It's okay.
A. I didn't know I was supposed to be taking notes through the cruise.
Q. No, it's okay. Again, you don't have to guess.
After the visit down at the medical center, it would be, I guess -- that would be the first full day you were on the ship; right?
A. Correct.
Q. All right. So after the medical center visit, did you go do any drinking at any bars the rest of that day?
A. On the boat or off the boat?
Q. On or off the boat.
A. Oh, yeah, I was drinking like a sieve.
Q. Okay. Was Ms. Hall drinking?
A. I don't think the next day. She wasn't feeling too hot.
Q. Okay.
A. I'm --
Q. That's fine.
A. Oh, my.
Q. What happened the following day? So





you went -- you had the first full day on board the cruise ship. You went to the medical infirmary, you told us. The next day, what do you remember happening?
A. Wasn't the next day our next stop? Yeah, I think the next day was our next stop.
Q. Okay.
A. We got off and took a ride around Yucatan, was accosted by people peddling goods, and then got back on, on the little bus thing and went back to the boat.
Q. Okay. So you got off at the Yucatan Peninsula?
A. Yes.
Q. And what -- and was this like a shore excursion you participated in or did you just go off, you two, on your own?
A. No, we just went off. A bunch of people got on the bus and went down there, to the market or whatever.
Q. Did you or Ms. Hall buy anything at the market in the Yucatan?
A. Oh, yeah. Heck yeah.
Q. What did you guys buy?
A. Gifts for our grandchildren. And a





hammock.
Q. So the day after the visit to the medical infirmary, Ms. Hall went with you on shore; is that correct?
A. Right. On an open air kind of bus thing.
Q. Okay. Was she able to use the hand she had injured to any degree?
A. Heck no. No.
Q. Okay.
A. I had to help put her clothes on.
Q. Okay. Which arm was it that -- or which wrist was it that she injured, ma'am, if you remember?
A. Oh, my gosh, I can't believe I don't know this. I'm not sure. I want to say the left. Right? I'm not -- yeah, I'm not sure. I want to say left, though.
Q. Okay. Did -- at this trip to the Yucatan, did Ms. Hall buy any sort of medicine at that trip to the Yucatan?
A. Yes, I did. I got inhalers and Tramadol.
Q. Okay. Did you buy those for your personal use?

A. Correct. I have a prescription.
Q. Okay.
A. I mean, there it doesn't matter, apparently, but.
Q. You can probably get them a little cheaper, probably.
A. Oh, I don't know. Heck, I still have them.
Q. But to your knowledge, did Ms. Hall purchase any medication?
A. Did she buy any? I don't know. I thought I was the only one that bought them.
Q. Okay. Did you lend any of your medication to Ms. Hall for her use?
A. I did.
Q. You did?
A. I believe so, yeah.
Q. Okay. What did you give Ms. Hall?
A. Maybe some Tramadol.
Q. Okay. Do you know how many Tramadol Ms. Hall took the second full day of cruising, the day you visited the Yucatan?
A. Oh, heck no. Now, keep in mind I was on my first cruise away from my grandchildren and everybody. First time away





from everybody, everybody ever. So I was getting my buzz on. I'm not going to -- I don't recollect a whole bunch.
Q. Well, did Ms. Hall -- after giving Ms. Hall the Tramadol, are you aware of whether she took the Tramadol and consumed any alcoholic beverages?
A. I don't really think she was drinking a whole bunch after that first night.
Q. Okay.
A. I mean, I can't say. I don't remember.
Q. Let me ask you this. The very first night --
A. She's not really a drinker, though. It's just not her thing.
Q. Let me just ask you this before I move on, though. The very first night, do you know how many alcoholic drinks that Ms. Hall consumed on her own?
A. Heck no, I don't know.
Q. Okay. During the trip to Yucatan, did Ms. Hall seek out any sort of medical treatment, to your knowledge?
A. Yeah, we looked for shams or





something, but -- I don't know if you've ever been there. It's like a third world country. And, yeah, we didn't find one.
Q. I've been to Mexico. I stayed at like a five star --
A. The Yucatan?
Q. I stayed at like a very nice hotel in a very like Beverly Hills part of Mexico City.
A. Right on. I would say obviously i wasn't in the Yucatan. Woah, that place is, yeah, something else.
Q. Did she, you know, did she buy any sort of like brace or anything like that for herself?
A. Yeah, well, we got some ACE wraps, that thing. I'm not sure if she got a brace. No, I think we could just find the ACE wraps.
Q. Okay. So an ACE wrap?
A. A few of them, yeah.
Q. Did she use the ACE wrap?
A. Yeah.
Q. Okay. After you got back on the ship from the Yucatan, do you remember anything else that took place on the cruise ship that --





the rest of that day?
A. A lot of eating.
Q. Anything else?
A. I'm not sure. One of the nights we went to one of the like trivia shows.
Q. You went to like a show? Okay.
A. A trivia show. I'm not sure if it was that night or the next night.
Q. Did you go to a bar after the show?
A. I did. I was visiting the bar every chance I could.
Q. Did Ms. Hall accompany you to the bar after the show?
MR. HERNANDEZ: Form.
THE WITNESS: She may have. I don't know if she was drinking or what. You can only get one drink every so often and if the lines were long, then she would get me something. I'd get me a drink and she'd get me a drink.
BY MR. SMITH:
Q. Gotcha. Did you have an all-you-can-drink package?
A. We did.
Q. The both of you?

A. Yeah, we would have to both get it.
Q. Okay.
A. So I talked her into it.
Q. Fair enough.
So the next day, what happened the next day? That would have been the third full day of cruising.
A. The third full day of cruising, you said? One, two, three. Isn't that when we were heading back into -- yeah.
Q. Okay. You think you were heading back to like the home port in New Orleans?
A. Right, well, we went to Cozumel, Yucatan, yeah.
Q. On the third full day of cruising, did you stop anywhere, any ports of call?
A. No, we didn't stop anywhere after the Yucatan.
Q. Okay. So it was like a sea day, the third full day?
A. Okay.
Q. Right, because --
A. We can call it that.
Q. I don't know. You tell me.
A. Yeah, I mean, we were at sea. So if





that's what it's called, okay.
Q. Okay. Anything on that sea day as you're headed back to home port; any major events that you recall taking place?
A. Major events? Gosh, I don't know what you would consider a major event, but no.
Q. On the third full day of cruising, ma'am, are there any -- did you speak with anyone that you thought worked on board the cruise ship?
A. Did I sleep with anybody?
Q. Speak. I'm sorry. I said speak. I'm sorry if you didn't hear me.
A. I'm like, what? I'm like, no. Did I speak with anybody that I thought worked on the cruise ship? I'm sure a bunch of them, a bunch of people.
Q. Okay. Do you remember any of those conversations?
A. No.
Q. Do you recall visiting the guest services desk?
A. When we got our refund for the excursion, I do.
Q. Was that back on the day after Ms.





Hall's -- of Ms. Hall's injury, though?
A. I think so, yeah. On the way back, I don't -- dear Lord. I know it sounds terrible, but I don't remember.
Q. Okay. So on the way back from the Yucatan, do you remember stopping at the guest services desk, any sort of customer service desk?
A. I don't know.
Q. Okay. Do you remember any other visits at all down to the medical infirmary after that first one we have already talked about?
A. Yeah, we went down there one more time. Don't ask me when, because I don't know.
Q. You went down again?
A. Yeah.
Q. Do you remember when that was you went down a second time?
A. I just said don't ask me when. No, I don't know.
MR. HERNANDEZ: Form.
BY MR. SMITH:
Q. Okay. I'm sorry, I might not have heard you there. I apologize.





A. That's okay. That's okay.
Q. Do you remember anything that happened the second time you went down to the medical infirmary?
A. All I really remember is them wanting some money that she didn't have, so. I mean, they wouldn't see her either without -- I mean, that's just crazy, I think. You know, that's her only option. If you're hurt, they should see you.
Q. Do you have any specific recollection of what anyone said down at the second trip to the medical infirmary, ma'am?
A. No.
Q. And do you know who was -- well, were you at the window again, that you remember?
A. I believe we were right inside the door, yeah.
Q. Who was at the window this time, if you can remember?
A. I want to say it was a little lady.
Q. A lady?
A. You know, I'm not sure. I sat down in the chair and she did her thing.
Q. So do you know whether it was a man,

a woman, or you don't know that was at the window the second time --
A. I don't know.
Q. You don't know?
A. I remember seeing a little lady, but I don't remember if it was that day or the day -- or the first day. I don't know.
Q. Who was -- on the second trip down at the medical infirmary, were you doing any of the talking at that point?
A. God, I hope not. I don't -- not that I remember.
Q. Do you recall what the person behind the glass was wearing, if at all -- if anything, at the time of the second trip down to the medical infirmary?
A. Heck no, I don't remember what someone was wearing. No, I don't remember what somebody was wearing.
Q. Can you tell me any specific statements that came out of mouth of the person behind the window the second visit to the medical infirmary, ma'am?
A. I can't.
Q. Can you tell me anything that Ms.





Hall said or that you overheard Ms. Hall saying at the time of the second trip down to the medical infirmary?
A. I can't. I don't know.
Q. Is there anything about that second trip down to the medical infirmary, ma'am, that made you think the person behind the window was intending to cause harm to Ms. Hall?
MR. HERNANDEZ: Form.
THE WITNESS: I mean, I don't know. They weren't helpful, but, I mean, I don't know how -- they weren't hurting her or anything, attacking her. I don't understand because I mean.
BY MR. SMITH:
Q. Well, is that all the -- is that the only impression you got from the interaction down at the medical infirmary the second time, that maybe the person behind the desk just wasn't being helpful?
MR. HERNANDEZ: Form.
THE WITNESS: Well, I -- I didn't see them physically hurt her or anything or try to.
BY MR. SMITH:





Q. Okay. You've referred to some sort of a demand for payment. Where did you get that information from?
A. Because they were wanting a significant amount of money to see her in the infirmary.
Q. Okay. But where does that -- where did that information come from? Because you can't remember any specific statements that, you know --
A. Well, I remember leaving the infirmary and her saying, "I didn't have the money for that." She told me they wanted a bunch of money, that's why nothing happened there.
Q. You heard the plaintiff, Ms. Hall, say "I don't have the money for that"; is that right?
MR. HERNANDEZ: Form.
THE WITNESS: Correct.
BY MR. SMITH:
Q. Is that all you heard as it regards payment for service at the medical center?
A. Well, she was talking to me, though.
Q. I'm sorry?





A. She was speaking to me.
Q. Right.
A. Yeah, I mean, I remember talking to them and she's like, "No, I can't do that," and then we left.
Q. Okay.
A. I mean.
Q. But is that -- I'm just trying to make sure I'm clear. Is that the only thing you heard about the second interaction at the medical center from Ms. Hall?
A. Yeah. That I can remember, yeah.
Q. There's nothing else you remember Ms. Hall saying besides "I didn't have the money for that"; is that correct?
MR. HERNANDEZ: Form.
THE WITNESS: I don't even remember the exact words she used, but.
BY MR. SMITH:
Q. Okay. You don't even remember the exact words she used; is that right?
MR. HERNANDEZ: Form.
THE WITNESS: Right.
BY MR. SMITH:
Q. And you don't remember any of --

A. I don't.
Q. And you don't remember any of the exact words the person behind the window used either; correct?
MR. HERNANDEZ: Form.
THE WITNESS: No. What did I miss?
BY MR. SMITH:
Q. Is there anything else of note you can remember from the second time down to the medical infirmary with Ms. Hall?
A. No.
Q. Ma'am, are you familiar with what the policies and procedures are for how passengers are charged for visits to the shipboard medical center?
A. Am I familiar with how they are charged?
Q. Yeah, are you familiar with what the shipboard medical center's policies and procedures are for charging guests for medical care?
A. I do not know.
Q. Okay. So after that day at sea headed back to New Orleans, when did you disembark the ship?





A. I mean, when it docked.
Q. When it docked?
A. Yeah.
Q. Okay. Did you and Ms. Hall do anything else of note before the ship docked and you left the ship?
A. Did we do anything else? Did we do anything else? No, I mean, just gathered our stuff and left.
Q. Okay. Did you take the rental car back to Missouri with her?
A. Yes.
Q. Did you spend an additional night in New Orleans and do anything?
A. No.
Q. Okay.
A. We went back and got our stuff and split.
Q. Gotcha. Do you know when it was Ms. Hall first saw a doctor after getting back home to Missouri?
A. I think the morning after we got back.
Q. Now, you are more than welcome, if it's, you know, if it's the truth that, you





know, you're not the type of friend that goes with her to all her medical appointments or you keep out of that business, that's fine, or if you are that -- you know, if you guys are very close and that's something you know, that you share together, that's fine too. But how involved were you in the medical care that Ms. Hall received for her wrist injury after the cruise?
A. Oh, I really wasn't, other than helping her do -- you know, like to get dressed and do stuff that she absolutely couldn't on the trip. You know, she couldn't put on her jeans or fasten her bra or any of that. You know, and then I had to help her carry her luggage off the ship.
Q. Okay.
A. I mean, other than that, no, I didn't go to her -- I didn't do any of that with her because, yeah, I've got work and stuff myself.
Q. So after you got back home, you didn't provide any home assistance for her; is that right?
A. No, she had her son in there and





stuff. No.
Q. Okay.
A. I did not go over to her house and help her, if that's what you're asking. No, I didn't.
Q. All right. Did you attend any of the medical visits for her wrist that she had after the cruise?
A. I did not.
Q. You know, sometimes a friend -- you know, because after you have surgery, right, you probably can't drive yourself. Did you participate in that when Ms. Hall had surgery on her wrist?
A. No, someone else drove her.
Q. Okay.
A. I mean, I would do those things, but she had her son, so.
Q. All right. Just after the cruise had ended, like in the month or two months afterwards, ma'am, how often were you seeing Ms. Hall, approximately?
A. I would usually see her once or twice -- just once or twice a month.
Q. Okay. How was she doing in that

time, that one to two months after the cruise with respect to her wrist injury?
A. Well, I mean, it was tender for a long time and she can't turn it, really. But, I mean, she's tough, so.
Q. Okay. When did -- when, if at all, did Ms. -- did you see Ms. Hall back at work, at the Golden Years nursing home?
A. Oh, she doesn't work there.
Q. Okay. She does home health care now; right?
A. Right.
Q. So she left Golden Years -- do you remember -- do you know when she left Golden Years to do the home health care type visits?
A. Oh, God. When I was in nursing school. That was a long time ago.
Q. Okay. So if you don't know, you don't know. That's fine. If you do know, please tell me. When did she go back to work after the CARNIVAL VALOR cruise?
A. I'm not sure. I mean, I think she had to wait quite a while because of her arm.
Q. Okay. Do you know if she's still working now at the -- being a nurse or a home

Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705



health nurse?
A. Yes.
Q. Okay. Has at any point in time up to present, after the cruise, ma'am, has she had any complaints, Ms. Hall, to you about any problems at work related to her wrist injury?
A. Well, she has -- she has one child -- well, I guess he's a young adult -- and she can't lift him onto the rides and stuff anymore. There's a few things, yeah, that she can't do.
Q. What does she have to lift him onto again?
A. Like onto a carousel.
Q. A carousel?
A. Uh-huh. And walk with him. She can't do that. She couldn't do that either.
Q. Was she able to lift the patient out of the carousel before the cruise?
A. Oh, yeah.
Q. And what do you mean by carousel? Is it like a bike?
A. You know, like the animals that go around the thing and it plays music and they go up and down.
Q. Okay. How old is her patient; do

Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705



you know?
A. I want to say late teens, early 20s.
Q. Okay. Do you know what his height and weight is?
A. I don't.
Q. Okay. But to your knowledge, before the cruise, did Ms. Hall need any help with lifting this gentleman, her patient?
A. Oh, well, he helped some. But I think she just did it herself.
Q. Who helped some?
A. The kid.
Q. Okay.
A. He can help some, yeah.
Q. Okay. Is the young man that she assists still able to help himself some with these types of movement activities?
A. Oh, heck, I don't know.
Q. Okay. Have you at all since the cruise, have you seen Ms. Hall on the job actually performing any sort of work that she does?
A. No, no, I've never seen her at work there.
Q. Okay. Have you been on any other

Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705



vacations with Ms. Hall after this cruise?
A. No.
Q. To your knowledge, has Ms. Hall been on any additional vacations after the CARNIVAL VALOR cruise until present?
A. I know she went down to Florida, but I thought it was for her deposition. I'm not sure. But I know she went down there.
Q. It may have been for that. Other than like that, is there anything she traveled for?
A. Do what?
Q. Has she been on any trips, whether a vacation or not, other than the trip to Florida for her deposition?
A. I don't -- I couldn't -- I don't know.
Q. Okay. Has she gone anywhere to visit family in the next state over or anything like that after the cruise, that you know of?
A. Shortly after the cruise, you mean?
Q. Yeah. Well, any time after the cruise until now.
A. She may have went to Minnesota and seen her family. I mean, I don't know. Her

Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705

sister passed away and a lot went on, so.
Q. Okay. Do you know when the trip to Minnesota was?
A. I'm not even sure she went to Minnesota.
Q. Okay. Fair enough.
Are there any activities outside -- well, are there any other activities at work you're aware of that Ms. Hall now has an issue with, after the cruise?
A. I know she -- she used to walk -- the one child, kid, young man, whatever, used to walk him quite a bit and I don't think she can do that anymore.
Q. What about her wrist injury is problematic with walking? Can you explain, if you know?
A. She has to hold on to him and assist him and be his support.
Q. Is there anything else involving work that you're aware of that Ms. Hall is now limited or can no longer do?
A. I don't know. I haven't worked with her in quite a while.
Q. Okay. Fair enough.





To the extent you know, after the cruise, ma'am, is there anything around the house, like household chores, personal hygiene, like brushing hair, going into the shower, anything within that realm in the home that she's now more limited in doing as it relates to her wrist injury, that you know of?
A. I don't know.
Q. Okay.
A. We have been best friends --
Q. Are there any hobbies or activities she used to like to do? I'm sorry.
MR. HERNANDEZ: Let her finish.
BY MR. SMITH:
Q. I didn't mean to cut you off. What did you say?
A. I said we have been best friends for years. I think I've been to her house twice.
Q. How about hobbies and activities; are there any hobbies and activities after the cruise that she's more limited in doing?
A. I don't know. She's a lot more active than I. Hobbies, I'm -- painting she used to do. I don't know.
Q. Do you still consider your friend,





Ms. Hall, still to be more active these days than you are?
A. Oh, yeah. All I do is work.
Q. Can you explain that a little bit? Nowadays after the cruise, how is Ms. Hall more active than you are?
A. She's always been more active than me. She ran around everywhere.
Q. All right.
A. I don't want to leave the house.
Q. All right. So like in the last year, let's say, give me an example, how is it that Ms. Hall is running around everywhere?
MR. HERNANDEZ: Form.
THE WITNESS: She goes to the botanical garden. She goes and sees her other friends. She had a thing at the park for her sister that passed away. I mean, she works an ungodly amount of hours, even more than I do.
BY MR. SMITH:
Q. Okay.
A. I mean, that's about what I know.
Q. How often after the cruise has she been going to the botanical garden,





approximately?
A. I don't -- I don't know. I just went there with her once. I don't know how often she goes.
Q. You went with her one time to the botanical garden after the cruise?
A. She sometimes goes to this outdoor theater. She -- I mean, she does all kinds of stuff, or did. I mean, I'm not sure now.
Q. Well, let me ask you this. Has Ms. Hall been to the outdoor theater, that you know of, after the cruise, the CARNIVAL VALOR cruise?
A. I don't know. I just -- I don't know.
Q. Can Ms. Hall still drive a car?
A. Yep.
Q. Does Ms. Hall do anything like ride a bike?
A. No.
Q. Does Ms. Hall do any exercise outside the home?
A. I'm going to go out on a limb and say no.
Q. Does she do any exercise inside the home, that you know of?

A. I don't -- I don't think so. I don't know.
Q. Is she a member of a gym?
A. I doubt it.
Q. Is she a member of any sort of like local athletic association or country club?
A. No, we ain't got time for that.
Q. Is Ms. Hall a member of a church?
A. She might be associated with one, but I don't think she goes regularly.
Q. Okay. In the time you've known Ms. Hall, has she ever regularly attended church?
A. I mean, not that I'm aware of.
Q. Have you been out to eat with Ms. Hall since the CARNIVAL VALOR cruise?
A. I have.
Q. Is she able to use utensils like fork, spoon and knife?
A. Yeah.
Q. Is she able to use fork, spoon and knife with her -- the hand that was -- the wrist that was injured?
A. I guess -- I mean, I guess, yeah. I mean, I don't know. You've got to hold the knife -- I mean, hold the fork with that, so.





Q. Right.
A. I know she does mention that she can't turn it. And, I mean, it wouldn't turn for a while. Yeah, she can't turn it all the way.
Q. When is the last time that she complained to you that she couldn't turn her wrist all the way?
A. Oh, God. It's been a couple of months.
Q. Okay.
A. I mean I don't -- I haven't seen her much lately.
Q. Has Ms. Hall complained to you at all about being unable to use utensils with both hands?
A. I mean, no, she hasn't like come out and said "I can't cut my food" or nothing, no.
Q. Okay. Has Ms. Hall complained to you at all, ma'am, about being limited in reaching up to get things off her shelves or out of cabinets?
A. She's mentioned that she can't do all the things she used to with that arm, you know, but, I don't know, she's not much of a





complainer, really.
Q. Has she specifically stated any particular tasks that she's struggling with now? Because you just mentioned --
A. Like helping, you know, hold on to Nick or, excuse me, her patient, that's the one thing I can remember.
Q. Okay. Can Ms. -- does Ms. Hall cook, to your knowledge? Since you've been her friend, does she like to cook?
A. I mean, she preps her lunches. I don't think she cooks a whole bunch.
Q. Okay. Do you know whether she's able to still cook now after the CARNIVAL VALOR cruise?
A. I -- I don't know. I mean, I don't see why she couldn't cook. You can do that with no hands, basically.
Q. To your knowledge, has Ms. Hall had any problems sleeping after the CARNIVAL VALOR cruise?
A. Oh, heck, I don't know. She works night shifts. So, I mean, I don't know. I can't really answer that.
Q. Okay. Has she had any complaints to





you about problems sleeping after the VALOR cruise?
A. I mean, a little bit, yeah. Actually, she did a little bit, but that was -- I mean, that was a little while back.
Q. Okay. Was that right after her surgery?
A. Within the -- within a couple of months after.
Q. To your knowledge, does -- is Ms. Hall still seeing any type of physician for her wrist injury, currently?
A. I don't know. I don't know if she is going to therapy or not.
Q. Do you know if she currently has any future surgeries scheduled for her injured wrist?
A. Oh, my gosh, not that I know of.
Q. Okay. Is Ms. Hall on any medication that would be relatable to her wrist injury at the present time, that you're aware of?
A. Not that I'm aware of.
Q. Is Ms. Hall seeing any counselors, therapists, psychologists or psychiatrists at the moment for any mental health issues that are

in any way attributable to her injury?
A. Oh, I don't -- I don't know. I don't think so, but. She's not mentioned anything like that to me.
Q. All right. Are there any specific examples you're aware of at all besides principally her patient that she's -- sort of any issues she's struggling with related to the injury since the time of the cruise until present, ma'am?
A. I mean, I think she's mentioned like trying to lift him up with just that hand, and it just won't turn to do certain things, but. I mean, yes, she has.
Q. Okay. Do you know if she has any particular limitation on what she's able to lift with the affected arm?
A. I don't know.
Q. Do you know if any doctors have put any restrictions on her as it relates to her injury?
A. I mean, maybe in the beginning, but that's been a while.
Q. Okay. Are you aware of any limitations doctors have put on her now?





MR. HERNANDEZ: Form.
THE WITNESS: No. I mean, not that I know of, no.
BY MR. SMITH:
Q. Okay. Did you speak with Ms. Hall about this deposition that you're giving today, before today?
A. I just texted her because I didn't have a phone number. She didn't have it either, so. But yes, she knows I was doing this today.
Q. Okay. Did you guys talk about what the deposition would be like, the two of you?
A. No. She just said it would be Zoom and just be honest. I told her, "I don't remember a whole bunch," and she goes, "I bet."
Q. Fair enough.
A. But that's it.
Q. I really don't want to know anything about what you may have spoken about with any of Ms. Hall's attorneys, but did you speak to any of Ms. Hall's attorneys before the deposition today?
A. Yes, just to advise me that I was doing the Zoom meeting.
Q. Okay. Well, that sounds like a





pretty brief meeting. How long was it?
A. A minute. It wasn't really a meeting. They called me and sent me a link.
Q. All right. Fair enough.
You've known Ms. Hall -- just to backtrack briefly, you've known Ms. Hall now for about 10 years; right?
A. A little over. 10, 12.
Q. Okay. Is she the type of friend that if she asked you to, you'd do a favor for her? Within reason. Obviously, I'm not talking about things that are illegal.
A. Well, sure. I mean, if I could, absolutely.
Q. Is she the type of friend you'd do anything to help out if she was in need?
A. I mean, yeah. She would never ask me to do anything unscrupulous. So, yeah.
Q. Right.
MR. SMITH: All right, ma'am, I don't have any other questions for you at this time. Thanks so much for your time today.
THE WITNESS: You ran out of questions? Oh, my gosh. All righty. You have a good day.





MR. HERNANDEZ: Wait a second.
MR. SMITH: Hold on. Hold on. I'm sorry.
MR. HERNANDEZ: I have a few when he's done.
THE WITNESS: Okay.
MR. HERNANDEZ: Are you done, Chris?
MR. SMITH: Yes, I'm done. I'm sorry.
MR. HERNANDEZ: Oh, okay.
THE WITNESS: You know this whole time I can only see me; right?
MR. HERNANDEZ: It's all right. Don't worry about it.

CROSS-EXAMINATION

BY MR. HERNANDEZ:
Q. Are you good? My questions are about five minutes. Do you need a restroom break or anything?
A. No. If it's five minutes, let's get it done.
Q. Okay. I'm with you.
Okay, Ms. Vaughn, a couple of things here might be repetitive, but I've got to make sure I do my job.
A. Okay.

Q. Ms. Hall's fall -- and I know you don't remember a whole heck of a lot, but it was the first night of the cruise; did I get that right?
A. Yeah.
Q. Okay. And this was your first cruise and, as you understand it, her first cruise as well, ever?
A. Right. Right. Yeah.
Q. And to the best of your recollection, while both you and she had stepped into the cabin bathroom before her fall, neither of you had made use of the actual shower; correct?
MR. SMITH: Objection to form.
THE WITNESS: Right. Yeah.
MR. HERNANDEZ: What's wrong with the form? Hold on.
MR. SMITH: It's been asked and answered. I mean, and foundation.
MR. HERNANDEZ: Well, this is my cross, Counselor.
MR. SMITH: Asked and answered and foundation.
You can answer.





BY MR. HERNANDEZ:
Q. Prior to her fall, had either you or her made use of the actual shower?
A. No.
MR. SMITH: Form.
BY MR. HERNANDEZ:
Q. Now, as I understand it, the shower area of the bathroom had a curtain; correct?
A. Right.
Q. Okay. And as I also understand it, the entire floor of the bathroom was the same color, a blue speckled color?
MR. SMITH: Objection to form.
THE WITNESS: Okay.
BY MR. HERNANDEZ:
Q. No, no, I'm asking you.
A. Oh, I don't remember the color of the bathroom floor.
Q. All right. Do you remember it all being the same color?
MR. SMITH: Form.
THE WITNESS: I believe it was, yeah.
BY MR. HERNANDEZ:
Q. Okay. I'm going to show you a couple of photos and let me know if you





recognize them.
A. All I see is me.
Q. Oh, so we may not be able to show you the photos. Let me give it a shot.
A. Okay. Oh, wait, it says you started screen sharing. So let's see.
Q. Right.
A. That's awesome.
Q. Can you see my screen?
A. Yes, let me try and -- oh, I can enlarge it.
Q. Beautiful.
A. Yes, I see it.
Q. All right. I'm showing you a photo that I'll mark as Plaintiff's Exhibit A.
(Thereupon, Plaintiff's Exhibit A was marked for identification.)
BY MR. HERNANDEZ:
Q. We have a few of these, but for the sake of getting us in and out of here quickly, I'm just going to show you this one.
Do you recognize this -- what's depicted in this photograph?
A. Right, yeah, well, up there to the top right -- oh, yeah, I see it now. It's the





shower. Yep. Oh, gosh, yeah, that looks horrible.
Q. Okay.
A. Gosh.
Q. So do you recognize Plaintiff's Exhibit A as the entrance to the cabin bathroom of the cabin that you and Ms. Hall shared on the Carnival ship?
A. Right, yeah.
Q. Okay. And as one steps over the -- let's call it silver threshold -- you encounter what I call a blue speckled floor; right?
MR. SMITH: Objection to form.
THE WITNESS: Correct.
BY MR. HERNANDEZ:
Q. Okay. And so towards the bottom where my cursor is right now --
A. Yeah.
Q. -- the bottom of the photo, that's the bathroom floor where the sink and commode are; correct?
A. Okay, yeah.
Q. And then as we travel up, if you see my cursor?
A. I do.

Q. There's a ledge; right?
A. Yeah.
Q. And then at the top of the photograph where the shampoo and conditioner bottles are is the shower floor; right?
A. Right.
Q. Okay. So you'd agree that all of this, bathroom floor, ledge and shower floor, are all the same color and -- all the same color; right?
MR. SMITH: Objection to form.
THE WITNESS: Right, yeah, yeah, you can't really ascertain one from the other, yeah.
BY MR. HERNANDEZ:
Q. Now, the -- do you recall -- do you recall that the door to get into the bathroom opened out into the cabin?
MR. SMITH: Objection to form.
THE WITNESS: Right, yeah.
MR. HERNANDEZ: What's wrong with the form? What's wrong with the form, Mr. Smith?
MR. SMITH: Asked and answered. She said she doesn't remember. Foundation.





MR. HERNANDEZ: Well, this is a cross. I'm entitled to ask.
I'm sorry, did we get an answer?
THE WITNESS: Yes, the door opened out.
BY MR. HERNANDEZ:
Q. Okay. As you came to the -- if you recall, as you came to the bathroom, were there any warning signs outside of the bathroom that you recall seeing?
A. Not that I can remember, no.
Q. Once you were inside the bathroom, do you recall any warning signs?
A. No.
Q. Once you were inside the bathroom, do you recall any warning signs specifically warning of the ledge that we were talking about a little bit earlier that's depicted in Exhibit A?
A. No.
Q. As you walked into the bathroom, was there any handrail in the immediate entrance area that you could use if you needed to?
A. No. I mean --
Q. I'm sorry. Go ahead.
A. Go ahead. I don't remember a





handrail, no.
Q. Okay. And going back to Exhibit A for another moment, you said it looked horrible. Do you mean by that that the ledge blended into the bathroom floor and blended into the shower floor?
MR. SMITH: Objection to form.
THE WITNESS: Yeah. Yeah, that's -- I mean -- yeah, that's not good.
BY MR. HERNANDEZ:
Q. We know --
A. I didn't remember there was a ledge being -- I mean, that's a pretty good ledge.
Okay, go ahead.
Q. We know -- we know the difficulties that Ms. Hall had with the shower ledge that's in Exhibit A. Did you personally experience any difficulties with this shower ledge?
A. Oh, I tripped all over that room.
Q. In the raised areas?
A. Yeah, sometimes. Yeah, sometimes. I mean.
Q. And finally --
A. Yes, they are all over.
Q. And finally, the cruise line lawyer





asked you some questions about what you may have been drinking, what Ms. Hall may have been drinking. If you recall, did you tend to have a drink of preference during that cruise?
A. I did.
Q. What was it?
A. Shots of Patron.
Q. All right. And as between the two of you, who would you say is -- you know, who would you say is more likely to have -- to have a pop, to have a drink?
MR. SMITH: Objection to form.
THE WITNESS: Oh, she -- I'm the drinker.
BY MR. HERNANDEZ:
Q. All right. So that being the case -- and I think you may have testified to this, but I've got to make sure I get it in the record. And I'm really interested in the first day and into the first evening, but did Ms. Hall buy you drinks on her card?
A. I mean, they are already paid for, but yeah, we'd walk up and -- because I was doing shots, they'd go so quick. And she was drinking that foo-foo drink. So yes, she would

-- she would get me a shot, I would get me a shot, and then -- yeah, or she would, you know -- would get me drinks too, yeah.

MR. HERNANDEZ: Okey doke. That's all I have. Thank you very much, ma'am.

MR. SMITH: Ma'am?

THE WITNESS: Okay. You're welcome.

MR. SMITH: I have a few follow-up questions to those. Okay?

THE WITNESS: Okay.

REDIRECT EXAMINATION

BY MR. SMITH:

Q. You said sometimes you tripped around the room on the ship?

A. Right. Yeah.

Q. I didn't hear you say that you tripped in the bathroom, though; correct?

A. I tripped -- I trip over air sometimes.

Q. So you would agree sometimes when people trip -- well, would you agree then sometimes people trip and it's the person's own fault for not paying attention?

MR. HERNANDEZ: Form.

THE WITNESS: I mean, I do it all the

Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705



time, so.

BY MR. SMITH:

Q. Okay. So is it fair to say then that sometimes people trip because of their own -- their own failure to pay attention to where they are walking?

MR. HERNANDEZ: Form, asked and answered.

THE WITNESS: Some people do a lot of things, but, I mean, you can look at that floor and you can tell that that should be a different color or warnings or something. I mean -- you know, I mean, I'm sure you can look at it and think the same thing.

BY MR. SMITH:

Q. That doesn't answer my question, ma'am.

Is it fair to say that sometimes people can trip because of their own failure to pay attention to where they are walking?

MR. HERNANDEZ: Asked and answered three times.

THE WITNESS: I mean, I guess they can.

BY MR. SMITH:

Q. I'm sorry, can you repeat your

Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705



answer?

A. I said, I guess some people can.

Q. Okay. Including, you admitted, yourself?

A. Oh, yeah, I do.

Q. Ma'am, you're a nurse; right?

A. Uh-huh.

Q. Do you agree that excessive alcohol intake can impair a person's coordination?

MR. HERNANDEZ: Form.

THE WITNESS: I think that's common knowledge.

BY MR. SMITH:

Q. Do you agree that it's also common knowledge that excessive alcohol intake can cause blurry vision?

MR. HERNANDEZ: Form.

THE WITNESS: Blurry vision? I don't know about that.

BY MR. SMITH:

Q. Can excessive alcohol intake, ma'am, cause someone to be unsteady on their feet?

MR. HERNANDEZ: Form.

THE WITNESS: Excessive, yeah. I think everybody knows that.

Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705



BY MR. SMITH:

Q. Ma'am, you were just making some comments about sort of the architecture or layout of the bathroom. Do you have any qualifications or education as an architect?

A. No.

Q. Do you have any qualifications or education as an engineer?

A. I do not.

Q. Do you have any qualifications or education as a flooring safety expert?

A. I don't. Do you?

Q. I do not.

A. Oh, okay.

Q. I'm not licensed or -- I don't have an engineering degree myself either.

A. Okay.

Q. Ma'am, do you have any license, education or training as a safety expert?

A. Maybe not in that area, no.

Q. Okay.

A. I do when it comes to taking care of people, yeah.

Q. That would be in your capacity as a nurse; right?

Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705

A. Right, yeah, uh-huh. You just asked me a question and I'm just answering it.
Q. Okay. Ma'am, you were looking at a photo there, I think -- was it Exhibit A, Plaintiff's Exhibit A? Can we please put the photo back up?
A. I can't do anything, sorry. I hope you're not asking me.
Q. It's up. That's okay.
Do you see the photo on the screen, ma'am?
A. Okay. Not yet.
Q. Let me know when you see it.
A. Okay, I see it.
Q. In this photo, ma'am, do you know when it was taken?
A. I don't.
Q. Do you know whether the lighting conditions in this photograph were the same -- the same as they were at the time that Ms. Hall suffered her injury on board?
A. Heck, I don't know. I was passed out.
Q. Okay. Do you know whether this towel was on the floor at the time of Ms. Hall's





injury?
A. I do not know. Is that what that is? Oh, yeah, I guess it is. No, I don't know.
Q. Ma'am, did you -- actually, strike that.
Do you recall being asked by Mr. Hernandez about pointing out a ledge in the bathroom here?
A. Pointing out? I mean, he was asking me if I saw it.
Q. Okay.
A. I can't point anything out on there.
Q. And do you see the ledge in the photo here, Exhibit A?
A. Yeah, I do.
Q. Okay. And do you recall your testimony earlier when you told me that your first trip to the bathroom before Ms. Hall's incident, you weren't looking at the ledge?
A. Yeah, I mean, I -- yeah.
Q. Well, ma'am, if you had simply looked down, there would have been nothing preventing you from seeing the shower ledge; correct?
MR. HERNANDEZ: Form.





THE WITNESS: I don't know. I mean, I still don't remember.
BY MR. SMITH:
Q. Well, if you could see the ledge now in this photo, ma'am --
A. Right.
Q. -- you would have been able to see the ledge back on the first day that you boarded the ship?
MR. HERNANDEZ: Form.
THE WITNESS: I guess if the curtain was pulled, I would have.
BY MR. SMITH:
Q. I'm sorry, can you repeat that?
A. I said, I guess if the curtain was pulled, I would have, but I don't remember. I don't remember going into the bathroom looking for a ledge.
Q. Okay. Well, do you remember looking at the bottom of the curtain, whether it was covering the ledge or not, at the first time you went into the bathroom?
A. I'm pretty sure I just went in to go to the bathroom. I wasn't scoping out everything in the bathroom.





Q. Okay. So you weren't paying attention where the shower curtain was at all when you went to the bathroom before Ms. Hall's incident; correct?
MR. HERNANDEZ: Form.
THE WITNESS: No, no. Who does that?
BY MR. SMITH:
Q. And because you weren't -- you don't remember the time of Ms. Hall's fall at all, you don't know where the shower curtain was positioned at the time she fell either; right?
MR. HERNANDEZ: Form.
THE WITNESS: No. How would I?
MR. SMITH: Okay. Thanks. I have no further questions.
THE WITNESS: You're welcome.
MR. SMITH: All right. If there's nothing else, ma'am, as a witness you have the opportunity to read your deposition transcript to check to see if the transcription was accurate. Or you can waive the reading. It's completely up to you.
THE WITNESS: Oh, I don't need to read it. I mean, I'm all right.

MR. SMITH: All right. So she'll waive the reading of the transcript and we will order a copy, electronic copy, please. And we will order the video as well.

THE VIDEOGRAPHER: Okay. Going off the record at 5:41 p.m.

(Thereupon, the deposition concluded at 5:41 p.m., and the reading and signing having not been waived.)





CERTIFICATE OF SHORTHAND REPORTER

STATE OF FLORIDA )
):SS
COUNTY OF MIAMI-DADE )

I, Violet Varga Smith, the undersigned authority hereby certify that the foregoing transcript, Pages 1 through 129 are a true and correct transcription of the deposition of ANGELA VAUGHN, taken before me at the time and place stated in the caption hereof. I further certify that the witness waived the reading and signing of the deposition.

I further certify that I am not a relative, employee, or attorney or counsel of any of the parties', nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

IN WITNESS WHEREOF, I hereunto set my hand and affix my official seal of office this 12th day of November, 2021.

Violet Varga Smith
Florida Professional Reporter





CERTIFICATE OF OATH

STATE OF FLORIDA )
):SS
COUNTY OF MIAMI-DADE)

I, Violet Varga Smith, the undersigned authority, certify that ANGELA VAUGHN appeared before me via Zoom videoconferencing and was duly sworn.

WITNESS my hand and official seal this 12th day of November, 2021.

VIOLET VARGA SMITH
Notary Public in and for
the State of Florida
My Commission No. GG 981914
Expires: July 11, 2024

VIOLET VARGA SMITH
Notary Public - State of Florida
Commission # GG 981914
My Comm. Expires Jul 11, 2024
Bonded through National Notary Assn.

**MR. HERNANDEZ: [14]** 12/13 12/25 32/19 36/13 36/24 37/4 48/5 49/4 54/5 59/17 67/17 84/14 112/1 112/4
**MR. SMITH: [1]** 14/23
**THE VIDEOGRAPHER: [2]** 14/25 15/4
**THE WITNESS: [11]** 32/20 36/25 37/5 48/6 49/5 54/6 59/18 67/18 84/15 113/16 116/14

**$**

**$100 [2]** 13/12 13/14

**1**

**10 [4]** 20/13 20/13 111/7 111/8
**10691 [1]** 2/3
**109 [1]** 2/3
**11 [1]** 131/17
**112 [1]** 2/14
**115 [1]** 2/19
**12 [1]** 111/8
**121 [1]** 2/15
**129 [1]** 130/7
**12th [2]** 130/20 131/10
**1395 [1]** 2/7
**15 [4]** 14/6 15/22 16/18 18/6
**18 [1]** 8/2
**1992 [1]** 11/2
**1:21-cv-20557-BB [2]** 1/3 3/4

**2**

**20 [3]** 6/20 12/6 12/8
**200 [2]** 70/11 70/12
**2009 [1]** 20/4
**2010 [2]** 21/2 21/3
**2011 [4]** 21/2 21/3 21/6 21/15
**2020 [4]** 28/17 28/21 29/9 30/19
**2021 [4]** 1/12 3/6 130/21 131/11
**2024 [1]** 131/17
**20s [1]** 99/2
**26th [1]** 34/8
**27th [3]** 34/8 34/13 34/17
**28 [1]** 1/12
**28th [1]** 3/6

**3**

**30 [1]** 6/20
**33131 [1]** 2/8
**33176 [1]** 2/3
**3:33 p.m [2]** 1/12 3/7
**3:43 [2]** 15/1 15/5

**4**

**401 [1]** 5/24

**5**

**5-foot [1]** 68/11
**50 [1]** 16/11
**5:30 [1]** 5/3
**5:41 [1]** 129/8
**5:41 p.m [2]** 1/12 129/6

**9**

**981914 [1]** 131/16

**:**

**:SS [2]** 130/3 131/3

**A**

**ability [1]** 24/2
**above [1]** 1/20
**above-styled [1]** 1/20
**absolutely [2]** 95/12 111/14
**accepting [1]** 32/16
**accidents [1]** 24/23
**accompany [2]** 67/19 84/12
**accosted [1]** 79/9
**accurately [1]** 4/15
**ACE [4]** 83/16 83/18 83/19 83/21
**across [1]** 62/16
**action [2]** 130/17 130/18
**activities [12]** 21/14 21/23 22/3 23/5 24/12 48/2 99/17 101/7 101/8 102/11 102/19 102/20
**activity [2]** 39/18 77/23
**address [3]** 5/21 6/1 6/4
**admitted [1]** 123/3
**adult [2]** 10/12 98/8
**Advil [2]** 74/15 75/4
**affix [1]** 130/20
**afternoon [2]** 3/20 39/12
**afterwards [1]** 96/21
**age [1]** 8/2
**aged [1]** 63/17
**air [3]** 8/6 80/5 121/18
**alcohol [9]** 38/17 38/18 38/22 40/8 40/15 40/17 123/8 123/15 123/21
**alcoholic [6]** 35/21 38/5 51/3 54/9 82/6 82/19
**alcoholic-wise [1]** 38/5
**all-you-can-drink [1]** 84/23
**alleged [2]** 13/5 70/25
**allegedly [1]** 66/4
**almost [3]** 12/5 15/22 68/11
**amount [5]** 45/6 66/11 66/22 91/5 103/19
**Andersonville [1]** 12/18
**ANGELA [7]** 1/14 2/13 3/5 3/15 3/24 130/9 131/7
**animals [1]** 98/22
**answer [14]** 4/6 5/8 5/13 11/7 11/13 38/1 44/22 51/10 59/25 107/24 113/25 118/3 122/16 123/1
**any major [1]** 86/3
**anymore [2]** 98/9 101/14
**apartment [1]** 6/10
**apologize [3]** 68/10 71/22 87/25
**appearances [2]** 2/1 3/9
**appointments [1]** 95/2
**approximate [1]** 39/14
**approximation [1]** 20/8
**Arch [1]** 2/7
**architect [1]** 124/5
**architecture [1]** 124/3
**area [11]** 48/12 48/17 48/18 63/6 64/14 64/19 64/20 64/23 114/8 118/22 124/20
**areas [1]** 119/20
**Arizona [5]** 8/7 8/8 8/14 8/16 10/8
**arm [16]** 55/8 55/25 57/5 57/14 65/19 65/21 65/23 71/3 71/4 71/9 72/16 73/21 80/12 97/23 106/24 109/17
**army [2]** 23/11 23/16
**arrived [2]** 34/5 34/25
**arriving [1]** 34/15
**arthritis [1]** 25/22
**ascertain [1]** 117/13
**assault [1]** 77/2
**assist [1]** 101/18
**assistance [1]** 95/23
**assistant [4]** 16/22 17/5 17/6 19/18
**assists [1]** 99/16
**associated [1]** 105/9
**association [1]** 105/6
**assume [1]** 5/14
**ate [3]** 39/6 42/4 77/24
**athletic [1]** 105/6
**attacking [1]** 90/13
**attend [3]** 8/17 9/3 96/6
**attended [1]** 105/12
**attorney [2]** 130/14 130/16
**attorneys [2]** 110/20 110/21
**attributable [1]** 109/1
**Audio [1]** 1/11
**Audio-Video [1]** 1/11
**authority [2]** 130/6 131/7
**Avenue [2]** 2/7 5/24
**awareness [1]** 56/2
**awesome [1]** 115/8
**awful [3]** 21/9 22/14 77/10

**B**

**backtrack [2]** 52/22 111/6
**bags [2]** 40/5 40/9
**balance [1]** 25/15
**balcony [4]** 44/13 46/10 46/13 49/21
**bank [1]** 11/21
**bar [21]** 41/8 42/16 42/18 42/22 42/24 43/8 43/11 50/18 50/19 50/22 50/24 51/1 53/13 53/14 53/21 54/1 54/4 54/17 84/9 84/10 84/13
**BARBARA [3]** 1/4 3/3 19/8
**bars [3]** 50/12 53/15 78/13
**Base [1]** 8/6
**basic [1]** 5/5
**bathroom [51]** 2/19 46/17 47/1 47/7 47/11 47/18 48/1 48/3 48/10 48/11 48/22 49/1 52/14 52/17 53/2 56/15 56/19 57/15 58/3 58/4 58/7 58/15 58/21 58/23 59/6 60/10 60/21 70/24 113/12 114/8 114/11 114/18 116/6 116/20 117/8 117/17 118/7 118/8 118/11 118/14 118/20 119/5 121/17 124/4 126/8 126/18 127/17 127/22 127/24 127/25 128/3
**BB [2]** 1/3 3/4
**Beautiful [1]** 115/12
**becomes [1]** 4/13
**becoming [1]** 61/10
**bed [3]** 49/9 53/10 55/1
**beforehand [2]** 63/12 66/3
**behind [7]** 75/19 76/12 89/13 89/22 90/7 90/19 93/3

**B**

**below [1]** 64/11
**besides [9]** 9/17 10/8 17/13 49/20 49/23 65/21 68/19 92/14 109/6
**bet [1]** 110/15
**beverages [2]** 35/21 82/7
**Beverly [1]** 83/8
**bike [2]** 98/21 104/18
**birth [3]** 14/22 14/23 15/9
**birthday [5]** 34/9 34/11 34/16 34/16 36/7
**blended [4]** 54/7 54/10 119/4 119/5
**blue [2]** 114/12 116/12
**blurry [2]** 123/16 123/18
**board [20]** 31/24 32/18 39/18 40/8 44/12 45/24 50/12 51/21 54/19 54/23 55/5 55/14 55/20 61/25 70/4 70/6 73/11 79/1 86/9 125/21
**boarded [11]** 34/19 39/6 39/10 39/14 39/16 40/6 40/12 43/21 56/20 62/20 127/8
**boarding [3]** 33/9 62/11 62/12
**boat [4]** 78/14 78/14 78/15 79/11
**body [2]** 27/12 68/15
**book [1]** 31/6
**booked [5]** 30/22 31/3 33/8 61/13 61/14
**booking [2]** 31/1 33/3
**born [1]** 8/5
**botanical [4]** 21/11 103/15 103/25 104/6
**bottles [7]** 36/5 36/9 36/12 36/21 37/9 37/16 117/5
**bottom [5]** 63/7 64/11 116/16 116/19 127/20
**bowling [2]** 22/4 22/6
**Boy [1]** 65/22
**Boys [1]** 7/22
**bra [1]** 95/14
**brace [2]** 83/14 83/17
**BRANDON [1]** 2/10
**breakfast [4]** 38/11 38/16 38/23 63/1
**Brickell [2]** 2/7 2/7
**brief [1]** 111/1
**broken [3]** 71/15 72/6 72/13
**bruise [2]** 73/23 74/6
**bruising [1]** 73/25
**brushing [1]** 102/4
**buffet [5]** 41/7 41/15 41/20 42/1 42/4
**build [1]** 68/16
**Bullhead [1]** 8/15
**bunch [14]** 49/14 54/18 63/11 66/2 67/4 70/7 79/18 82/3 82/9 86/16 86/17 91/14 107/12 110/15
**BURNETT [1]** 2/6
**bus [3]** 79/10 79/19 80/5
**business [1]** 95/3
**buzz [1]** 82/2

**C**

**cabin [57]** 2/19 42/25 43/17 43/20 44/1 44/4 44/10 44/10 44/12 44/13 44/16 44/18 46/3 46/7 46/17 46/17 46/23 47/1 47/10 47/11 47/18 47/22 48/1 48/10 48/11 48/21 49/1 49/12 49/18 49/19 49/25 50/8 50/9 50/17 50/22 50/23 51/2 52/14 52/17 52/18 52/23 52/24 53/2 53/3 53/7 53/9 55/1 56/15 56/19 56/21 56/22 60/21 60/22 113/12 116/6 116/7 117/18
**cabinets [1]** 106/22
**cancel [3]** 61/24 62/3 77/23
**canceled [2]** 61/11 61/18
**capacity [1]** 124/24
**caption [1]** 130/10
**car [5]** 23/22 33/19 35/22 94/10 104/15
**card [3]** 69/25 70/1 120/21
**CARNIVAL [51]** 1/7 1/7 3/3 3/13 21/22 22/3 22/9 22/17 23/3 23/25 24/10 24/21 24/25 25/5 25/10 25/15 25/18 26/3 26/9 26/14 26/20 27/2 27/21 28/16 28/20 28/25 29/3 29/8 30/2 30/2 30/7 30/11 30/15 30/18 31/7 31/20 31/24 32/9 32/18 33/18 34/20 39/10 44/12 55/5 97/21 100/4 104/12 105/15 107/14 107/20 110/8
**Carnival's [1]** 32/1
**carousel [4]** 98/13 98/14 98/18 98/20
**carry [4]** 74/17 74/19 74/19 95/15
**cash [2]** 70/3 70/6
**casino [6]** 41/7 53/17 53/19 53/22 54/1 54/4
**catch [1]** 63/23
**cell [1]** 70/16
**center [8]** 75/8 76/24 77/17 78/8 78/12 91/23 92/11 93/15
**center's [1]** 93/19
**certificate [3]** 9/24 130/1 131/1
**certification [2]** 17/16 17/22
**certifications [1]** 17/12
**certified [1]** 17/6
**certify [4]** 130/6 130/11 130/13 131/7
**chair [1]** 88/24
**chance [2]** 50/20 84/11
**character [1]** 76/5
**charge [10]** 11/18 12/12 14/8 16/14 16/15 16/23 17/8 17/25 19/12 19/14
**charged [6]** 11/3 11/10 12/24 13/24 93/14 93/17
**charges [2]** 11/9 13/19
**cheaper [1]** 81/6
**child [2]** 98/7 101/12
**children [3]** 7/17 7/19 23/9
**chores [2]** 24/13 102/3
**Chris [1]** 112/7
**CHRISTOPHER [2]** 2/8 3/12
**chronic [1]** 26/4
**church [2]** 105/8 105/12
**cigarettes [2]** 27/23 27/25
**city [7]** 6/18 6/20 6/21 6/22 6/23 8/15 83/9
**clarify [1]** 42/23
**classes [2]** 17/5 18/17
**clear [1]** 92/9
**close [5]** 6/22 16/11 35/7 35/8 95/5
**clothes [1]** 80/11
**club [1]** 105/6
**college [1]** 8/18
**color [7]** 114/12 114/12 114/17 114/20 117/9 117/10 122/12
**column [1]** 27/19
**comments [1]** 124/3
**Commission [1]** 131/16
**commode [1]** 116/20
**common [2]** 123/11 123/14
**Communication [1]** 1/11
**companions [1]** 45/1
**complainer [1]** 107/1
**complaints [2]** 98/5 107/25
**concerns [1]** 26/18
**concluded [1]** 129/7
**condition [1]** 26/4
**conditioner [1]** 117/4
**conditions [2]** 32/17 125/19
**condo [1]** 6/10
**confide [1]** 24/18
**connected [1]** 130/16
**consume [2]** 36/11 36/22
**consumed [3]** 38/22 82/6 82/20
**contain [1]** 40/14
**continuing [3]** 18/9 18/14 19/4
**contract [3]** 32/1 32/8 32/17
**contributed [1]** 59/16
**conversing [1]** 75/16
**cook [4]** 107/9 107/10 107/14 107/17
**cooks [1]** 107/12
**coordination [1]** 123/9
**CORPORATION [1]** 1/7
**Counselor [1]** 113/22
**counselors [2]** 26/17 108/23
**country [2]** 83/2 105/6
**county [4]** 12/11 36/1 130/3 131/3
**court [2]** 1/1 4/9
**covering [1]** 127/21
**COVID [3]** 18/12 18/13 18/13
**coworker [2]** 29/10 29/13
**Cozumel [2]** 61/22 85/13
**CPR [2]** 17/14 17/16
**crazy [1]** 88/8
**creepy [2]** 63/9 64/6
**crew [1]** 64/2
**crime [2]** 11/4 13/4
**crimes [1]** 13/24
**cross [4]** 2/14 112/14 113/21 118/1
**Cross-Examination [2]** 2/14 112/14
**cruise [105]** 1/7 3/3 21/21 22/4 22/9 22/12 22/18 23/3

Case 1:21-cv-20557-BB Document 43-3 Entered on FLSD Docket 01/05/2022 Page 36 of 42


**C**

**cruise... [97]** 23/10 23/15 23/17 23/25 24/10 24/21 25/1 25/5 25/7 25/10 25/15 25/18 26/3 26/9 26/15 26/20 27/2 27/17 27/21 28/13 28/17 28/18 28/20 28/22 28/24 29/3 29/9 30/11 30/14 30/19 31/20 31/20 31/25 32/8 32/9 32/17 33/13 34/2 34/20 35/1 35/11 36/15 36/23 37/8 37/17 38/6 38/12 39/6 39/14 39/17 40/8 45/4 45/7 45/15 51/25 55/15 61/2 69/23 74/21 78/4 79/2 81/24 83/25 86/10 86/16 95/9 96/8 96/19 97/1 97/21 98/4 98/18 99/7 99/20 100/1 100/5 100/20 100/21 100/23 101/10 102/2 102/21 103/5 103/24 104/6 104/12 104/12 105/15 107/15 107/21 108/2 109/9 113/3 113/7 113/8 119/25 120/4
**cruises [3]** 29/10 31/10 31/14
**cruising [7]** 30/7 30/9 81/21 85/7 85/8 85/15 86/7
**crying [4]** 55/25 56/2 57/5 57/13
**cursor [2]** 116/17 116/24
**curtain [6]** 114/8 127/11 127/15 127/20 128/2 128/10
**customer [3]** 62/1 62/10 87/7
**cut [3]** 71/22 102/15 106/18
**cv [2]** 1/3 3/4

**D**

**d/b/a [1]** 1/7
**DADE [2]** 130/3 131/3
**daily [1]** 24/12
**daughter [1]** 10/16
**daylight [1]** 44/4
**dear [2]** 38/24 87/3
**debit [2]** 69/24 70/1
**decided [1]** 29/8
**decision [2]** 19/24 30/1
**deck [4]** 41/9 41/21 43/11 64/11
**defendant [4]** 1/8 2/6 2/18 3/13
**demand [1]** 91/2
**demeanor [1]** 76/6
**depicted [2]** 115/23 118/17
**deposition [14]** 1/14 1/19 3/5 4/1 4/5 100/7 100/15 110/6 110/12 110/21 128/19 129/7 130/8 130/12
**Description [1]** 2/18
**desk [5]** 62/10 86/22 87/7 87/8 90/19
**detail [2]** 67/5 67/9
**difficult [1]** 4/14
**difficulties [2]** 119/15 119/18
**dinner [2]** 35/14 54/22
**diploma [1]** 9/1
**Direct [3]** 2/14 2/15 3/18
**discovered [1]** 51/25
**discussion [1]** 15/2
**disembark [1]** 93/25
**dismissed [1]** 13/20
**DISTRICT [2]** 1/1 1/1
**DIVISION [1]** 1/2
**dizziness [1]** 25/19
**docked [3]** 94/1 94/2 94/5
**dog [1]** 22/23
**doke [1]** 121/4
**dollars [2]** 66/25 67/2
**Domestic [2]** 11/14 14/2
**doubt [1]** 105/4
**downstairs [1]** 50/4
**dressed [1]** 95/11
**drill [4]** 50/10 50/13 51/19 51/19
**drink [18]** 38/5 38/16 39/21 40/11 40/14 40/18 40/25 40/25 51/3 51/4 54/7 84/17 84/19 84/20 84/23 120/4 120/11 120/25
**drinker [3]** 49/13 82/15 120/14
**drinking [12]** 51/6 53/25 54/3 54/15 78/12 78/16 78/18 82/9 84/16 120/2 120/3 120/25
**drinks [5]** 40/20 54/10 82/19 120/21 121/3
**dropped [2]** 14/14 14/15
**drove [3]** 33/23 33/23 96/15
**dry [1]** 36/1
**duly [2]** 3/16 131/9

**E**

**e-mail [1]** 33/8
**early [3]** 39/12 56/13 99/2
**East [7]** 5/20 5/22 5/22 6/17 7/1 7/8 54/1
**eat [6]** 35/14 41/25 42/7 42/8 62/25 105/14
**eating [2]** 54/22 84/2
**Eddy [1]** 3/10
**EDUARDO [2]** 2/2 2/4
**education [8]** 9/17 18/10 18/14 19/4 124/5 124/8 124/11 124/19
**electronic [1]** 129/3
**emergencies [1]** 50/5
**emergency [5]** 19/2 73/2 73/8 73/12 73/16
**employee [2]** 130/14 130/15
**employer [3]** 15/15 15/24 19/15
**employment [1]** 17/12
**encounter [1]** 116/11
**encountered [1]** 57/13
**engage [1]** 21/24
**engineer [1]** 124/8
**engineering [1]** 124/16
**enjoyed [1]** 30/5
**enlarge [1]** 115/11
**entitled [1]** 118/2
**entrance [3]** 2/19 116/6 118/21
**ESQ [2]** 2/4 2/8
**evening [2]** 39/12 120/20
**event [2]** 51/20 86/6
**events [2]** 86/4 86/5
**everybody [5]** 68/8 81/25 82/1 82/1 123/25
**everyone [1]** 70/16
**everywhere [3]** 59/1 103/8 103/13
**Examination [6]** 2/14 2/14 2/15 3/18 112/14 121/11
**examined [1]** 3/17
**examples [1]** 109/6
**excessive [4]** 123/8 123/15 123/21 123/24
**exchanged [3]** 45/11 45/15 45/24
**excursion [5]** 61/14 61/17 62/3 79/16 86/24
**excuse [3]** 18/1 61/4 107/6
**exercise [2]** 104/20 104/24
**experience [1]** 119/17
**expert [2]** 124/11 124/19
**Expires [1]** 131/17
**explored [1]** 39/24
**extent [9]** 22/17 25/4 26/15 26/21 26/25 68/12 69/19 69/21 102/1
**extremities [1]** 25/23
**eyewitness [1]** 56/5

**F**

**fact [1]** 4/8
**failure [2]** 122/5 122/19
**fall [7]** 25/2 48/6 59/16 113/1 113/12 114/2 128/9
**falling [1]** 56/6
**falls [1]** 70/15
**family [4]** 6/9 6/11 100/19 100/25
**fasten [1]** 95/14
**fault [1]** 121/23
**favor [1]** 111/10
**February [8]** 28/17 28/21 29/9 30/19 34/8 34/13 34/14 34/17
**February 2020 [2]** 29/9 30/19
**February 27th [1]** 34/17
**fell [9]** 57/15 58/2 58/4 58/7 58/13 60/6 60/10 60/22 128/11
**felony [1]** 14/9
**fence [1]** 72/24
**Fifteen [1]** 14/6
**fill [2]** 69/4 69/9
**filled [1]** 69/15
**final [1]** 53/9
**finally [3]** 54/25 119/23 119/25
**finances [1]** 69/17
**financially [1]** 130/17
**finish [2]** 4/12 102/13
**finished [1]** 60/16
**Fireball [6]** 36/18 36/19 36/21 37/3 37/8 37/17
**five-ish [1]** 39/15
**fives [1]** 70/7
**FL [1]** 2/3
**floor [18]** 2/7 41/10 48/17 49/2 56/18 59/21 60/5 114/11 114/18 116/12 116/20 117/5 117/8 117/8 119/5 119/6 122/11 125/25
**flooring [1]** 124/11
**FLORIDA [10]** 1/1 1/16 1/18 2/8 100/6 100/14 130/2 130/24 131/2 131/16
**follow-up [2]** 52/12 121/8
**foo [4]** 54/7 54/7 120/25 120/25
**foo-foo [2]** 54/7 120/25

F

**food [2]** 41/16 106/18
**foot [1]** 68/11
**Force [1]** 8/6
**foregoing [1]** 130/6
**forget [1]** 52/21
**fork [3]** 105/18 105/20 105/25
**form [87]** 11/5 11/11 11/19 12/3 12/13 12/25 13/8 13/15 13/21 14/1 14/5 14/10 14/17 18/2 24/3 25/24 26/6 27/13 28/9 31/8 31/22 32/2 32/10 32/19 35/23 36/13 36/24 37/4 37/10 37/18 37/20 38/7 42/11 43/3 48/5 48/13 48/19 49/4 54/5 54/11 56/23 59/10 59/17 66/23 67/17 72/4 72/14 72/22 73/6 73/14 74/8 75/14 76/7 76/14 77/1 77/8 84/14 87/22 90/9 90/21 91/19 92/16 92/22 93/5 103/14 110/1 113/15 113/18 114/5 114/13 114/21 116/13 117/11 117/19 117/22 117/22 119/7 120/12 121/24 122/7 123/10 123/17 123/23 126/25 127/10 128/5 128/12
**formality [1]** 4/7
**foundation [3]** 113/20 113/24 117/25
**Fourteenth [1]** 2/7
**FOWLER [1]** 2/6
**fractures [1]** 27/1
**frame [3]** 21/6 21/15 68/9
**fraud [1]** 13/6
**friend [12]** 19/8 24/17 36/6 55/4 67/19 73/4 95/1 96/10 102/25 107/10 111/9 111/15
**friendly [2]** 45/19 76/1
**friends [4]** 45/10 102/10 102/17 103/17
**friendship [1]** 20/21
**full-time [1]** 16/4
**fun [1]** 21/7
**funny [1]** 22/6

G

**garden [3]** 103/16 103/25 104/6
**gardens [1]** 21/12
**gathered [1]** 94/8
**GED [2]** 9/5 9/8
**general [2]** 30/8 30/9
**gentleman [15]** 63/10 63/14 64/2 64/16 65/9 65/18 66/17 67/21 67/25 68/5 68/13 68/19 70/20 75/19 99/8
**gentleman's [2]** 63/24 76/2
**gets [1]** 70/15
**GG [1]** 131/16
**Gifts [1]** 79/25
**girls [1]** 7/22
**glass [2]** 65/3 89/14
**God [6]** 38/24 64/4 77/9 89/11 97/16 106/9
**Golden [15]** 15/13 15/16 15/18 15/24 16/13 16/21 17/3 17/9 18/8 19/15 29/19 29/23 97/8 97/13 97/14
**goodness [1]** 22/24
**goods [1]** 79/9
**gosh [11]** 26/12 38/8 43/13 43/18 63/2 80/15 86/5 108/18 111/24 116/1 116/4
**Gotcha [2]** 84/22 94/19
**graceful [1]** 59/3
**grandchildren [2]** 79/25 81/25
**great [2]** 5/17 30/4
**grow [1]** 8/8
**guest [2]** 86/21 87/6
**guests [1]** 93/20
**gym [1]** 105/3

H

**hair [1]** 102/4
**HALL [153]**
**Hall's [16]** 55/20 69/17 70/24 71/9 73/21 75/9 77/18 87/1 87/1 110/20 110/21 113/1 125/25 126/18 128/3 128/9
**hammock [1]** 80/1
**handrail [2]** 118/21 119/1
**hanging [1]** 21/16
**harm [5]** 76/25 77/5 77/7 77/9 90/8
**Harrisonville [9]** 7/5 9/9 12/14 12/17 12/19 12/20 12/21 15/13 16/2
**has one [1]** 98/7
**hat [1]** 68/1
**health [5]** 26/18 97/10 97/15 98/1 108/25
**heck [15]** 39/8 42/5 56/24 63/25 65/10 79/23 80/9 81/7 81/23 82/21 89/17 99/18 107/22 113/2 125/22
**height [1]** 99/3
**helpful [3]** 77/14 90/11 90/20
**hereby [1]** 130/6
**hereof [1]** 130/10
**hereunto [1]** 130/19
**HERNANDEZ [91]** 2/2 2/4 2/14 3/10 3/10 11/5 11/11 11/19 12/3 13/8 13/15 13/21 14/1 14/5 14/10 14/17 18/2 24/3 25/24 26/6 27/13 28/9 31/8 31/22 32/2 32/10 35/23 37/10 37/18 37/20 38/7 42/11 43/3 45/17 48/13 48/19 54/11 56/23 59/10 66/23 72/4 72/14 72/22 73/6 73/14 74/8 75/14 76/7 76/14 77/1 77/8 87/22 90/9 90/21 91/19 92/16 92/22 93/5 102/13 103/14 110/1 112/7 112/9 112/12 112/15 113/17 113/21 114/1 114/6 114/15 114/23 115/18 116/15 117/15 117/21 118/1 118/5 119/10 120/15 121/4 121/24 122/7 122/21 123/10 123/17 123/23 126/7 126/25 127/10 128/5 128/12
**Hills [1]** 83/8
**history [1]** 28/13
**hit [1]** 18/12
**hobbies [7]** 21/14 21/23 22/11 102/11 102/19 102/20 102/23
**hold [9]** 22/20 22/20 101/18 105/24 105/25 107/5 112/2 112/2 113/18
**holding [3]** 55/8 55/25 57/5
**home [22]** 5/22 6/8 6/12 6/14 8/3 10/16 15/25 18/25 33/17 73/9 85/12 86/3 94/20 95/22 95/23 97/8 97/10 97/15 97/25 102/5 104/21 104/25
**honest [2]** 49/11 110/14
**hope [4]** 4/25 64/5 89/11 125/7
**hoping [1]** 71/16
**horrible [2]** 116/2 119/3
**hot [1]** 78/20
**hotel [4]** 35/3 35/6 35/11 83/7
**hours [4]** 16/4 16/9 92/4 103/19
**house [7]** 5/20 33/21 33/22 96/3 102/3 102/18 103/10
**household [2]** 24/13 102/3
**huh [9]** 7/15 11/16 21/4 53/20 62/13 63/22 98/15 123/7 125/1
**hung [1]** 52/3
**hurt [9]** 55/9 57/14 65/19 65/21 65/23 70/15 77/15 88/9 90/23
**hurting [1]** 90/12
**hygiene [1]** 102/3

I

**I'd [3]** 28/12 52/12 84/19
**I'll [4]** 5/12 5/14 51/17 115/15
**I'm [106]** 3/21 4/3 4/4 6/13 9/3 11/2 16/14 20/6 22/23 23/24 24/15 26/13 27/10 27/11 32/20 33/1 33/13 33/13 34/8 34/11 37/25 39/2 41/22 42/20 46/18 46/20 47/5 47/6 47/8 49/13 50/25 51/8 52/8 52/8 53/24 54/12 55/10 55/22 58/11 59/3 59/24 60/15 63/4 63/10 65/12 66/7 67/3 67/3 68/24 69/6 69/7 69/15 70/13 70/21 71/21 75/15 77/22 78/1 78/22 80/16 80/17 80/17 82/2 83/17 84/4 84/7 86/12 86/13 86/14 86/14 86/16 87/24 88/23 91/25 92/8 92/9 97/22 100/7 101/4 102/12 102/23 104/9 104/22 105/13 108/22 111/11 112/2 112/8 112/8 112/21 114/16 114/24 115/14 115/21 118/2 118/3 118/24 120/13 120/19 122/13 122/25 124/15 125/2 127/14 127/23 128/25
**I've [9]** 4/24 5/15 28/3 83/4 95/20 99/23 102/18 112/23 120/18
**identification [1]** 115/17
**illegal [2]** 28/8 111/12
**imagine [1]** 73/18
**immediate [1]** 118/21
**immediately [1]** 40/2

**I**

**impair [1]** 123/9
**impression [1]** 90/17
**incident [2]** 126/19 128/4
**incidents [1]** 25/2
**infirmary [32]** 61/8 62/4 62/9 62/19 63/6 63/6 64/18 65/9 65/25 66/18 67/7 67/14 68/14 69/11 70/19 71/9 71/14 72/19 79/3 80/3 87/11 88/4 88/13 89/9 89/16 89/23 90/3 90/6 90/18 91/6 91/12 93/10
**influenced [1]** 30/1
**informal [1]** 4/7
**information [5]** 33/9 45/16 45/25 91/3 91/8
**inhalers [1]** 80/22
**injured [5]** 23/3 80/8 80/13 105/22 108/16
**injuries [3]** 55/14 55/14 70/25
**injury [23]** 55/4 55/21 58/1 61/1 61/6 61/10 62/9 70/17 75/9 77/18 87/1 95/8 97/2 98/6 101/15 102/7 108/12 108/20 109/1 109/9 109/21 125/21 126/1
**inquisitive [1]** 57/18
**instance [5]** 12/12 43/12 50/21 56/17 74/15
**intake [3]** 123/9 123/15 123/21
**intend [2]** 77/6 77/9
**intending [3]** 76/25 77/5 90/8
**interacted [1]** 63/15
**interaction [4]** 77/16 77/20 90/17 92/10
**interested [2]** 120/19 130/17
**ish [1]** 39/15
**issue [2]** 48/4 101/9
**issues [6]** 25/14 25/19 25/22 26/22 108/25 109/8
**IV [2]** 17/22 17/23
**IV's [1]** 17/15

**J**

**jeans [1]** 95/13
**job [6]** 16/12 16/17 17/24 29/19 99/20 112/24
**Jogging [1]** 22/5
**July [1]** 131/17
**jurisdiction [1]** 12/11

**K**

**Kansas [6]** 6/18 6/19 6/21 6/22 23/18 23/19
**Kendall [1]** 2/3
**kid [2]** 99/12 101/12
**kids [1]** 22/14
**kinds [1]** 104/8
**knife [3]** 105/18 105/21 105/25
**knocked [2]** 56/8 57/18
**knows [3]** 64/13 110/10 123/25

**L**

**lack [1]** 32/19
**lady [6]** 66/6 68/21 72/8 88/21 88/22 89/5
**land [1]** 43/24
**Large [1]** 1/18
**Las [2]** 10/10 10/14
**lashing [2]** 76/21 76/23
**late [2]** 39/12 99/2
**lately [2]** 16/10 106/13
**law [1]** 4/9
**lawsuits [1]** 25/6
**layout [1]** 124/4
**led [1]** 30/18
**ledge [19]** 58/14 58/16 59/5 117/1 117/8 118/16 119/4 119/12 119/13 119/16 119/18 126/7 126/13 126/19 126/23 127/4 127/8 127/18 127/21
**Lee [1]** 3/24
**lemon [1]** 38/21
**lend [1]** 81/13
**lengthy [1]** 43/5
**license [6]** 9/25 10/3 15/10 17/13 19/22 124/18
**licensed [1]** 124/15
**licenses [1]** 17/11
**life [1]** 4/1
**lift [5]** 98/9 98/11 98/17 109/12 109/16
**lifting [1]** 99/8
**light [3]** 60/9 60/13 60/20
**lighting [1]** 125/18
**lights [1]** 56/21
**liked [2]** 22/12 23/9
**limb [1]** 104/22
**limitation [1]** 109/16
**limitations [3]** 24/2 24/12 109/25
**limited [4]** 101/22 102/6 102/21 106/20
**lines [3]** 1/7 3/3 84/18
**link [1]** 111/3
**liquid [1]** 60/4
**liquor [3]** 36/4 36/9 36/17
**LLC [1]** 2/2
**loan [2]** 11/20 12/1
**local [1]** 105/6
**LOCATION [1]** 1/11
**Lord [1]** 87/3
**lower [1]** 25/22
**LPN [11]** 9/25 10/1 10/3 15/10 16/16 17/7 17/8 17/13 18/8 19/21 27/7
**luggage [1]** 95/15
**Luke's [1]** 8/6
**lunch [4]** 21/10 22/1 39/6 63/1
**lunches [1]** 107/11
**Lynne [6]** 5/20 5/22 6/17 7/1 7/8 34/1

**M**

**machines [1]** 53/23
**mail [1]** 33/8
**major [5]** 6/23 25/11 86/3 86/5 86/6
**male [2]** 63/17 63/19
**man [4]** 12/2 88/25 99/15 101/12
**marathon [1]** 4/20
**March [2]** 28/17 28/21
**market [2]** 79/20 79/22
**marriage [1]** 11/1
**married [3]** 10/17 10/20 10/24
**matter [1]** 81/3
**McDonald's [1]** 38/14
**meal [1]** 42/9
**mean-spirited [1]** 75/25
**medical [42]** 18/5 19/2 26/4 27/17 62/19 63/6 65/25 66/18 67/7 67/14 68/14 71/8 71/13 72/19 73/2 73/12 75/8 76/24 77/17 78/7 78/11 79/2 80/3 82/23 87/11 88/4 88/13 89/9 89/16 89/23 90/3 90/6 90/18 91/23 92/11 93/10 93/15 93/19 93/20 95/2 95/7 96/7
**medication [6]** 74/11 74/20 75/3 81/10 81/14 108/19
**medications [1]** 74/13
**medicine [2]** 26/11 80/20
**meeting [4]** 45/23 110/24 111/1 111/3
**member [4]** 64/2 105/3 105/5 105/8
**memorable [3]** 47/3 47/4 47/5
**MENDIOLA [1]** 2/10
**mental [2]** 26/18 108/25
**methods [1]** 69/22
**Mexico [2]** 83/4 83/8
**MIAMI [5]** 1/2 2/3 2/8 130/3 131/3
**MIAMI-DADE [2]** 130/3 131/3
**Michelle [5]** 29/14 29/15 29/22 30/1 30/10
**middle [2]** 56/12 63/17
**miles [2]** 6/20 7/10
**mine [1]** 74/25
**mini [5]** 36/9 36/11 36/21 37/8 37/16
**Minnesota [3]** 100/24 101/3 101/5
**misdemeanor [2]** 14/8 14/11
**misinterpret [1]** 5/11
**miss [1]** 93/6
**Missouri [15]** 5/20 5/23 6/22 7/1 7/6 9/10 9/13 10/4 10/9 12/21 33/17 35/21 36/1 94/11 94/21
**Mohave [2]** 8/15 9/1
**moment [2]** 108/25 119/3
**momentarily [1]** 15/8
**month [2]** 96/20 96/24
**months [5]** 9/22 96/20 97/1 106/10 108/9
**morningish [1]** 62/24
**motel [1]** 35/25
**motor [1]** 24/23
**mouth [1]** 89/21
**movement [2]** 59/15 99/17
**Mr [189]**
**Mr. [2]** 117/23 126/7
**Mr. Hernandez [1]** 126/7
**Mr. Smith [1]** 117/23
**Ms [139]**
**Ms. [36]** 20/17 21/18 22/10 25/6 25/17 26/16 26/21 27/1 27/22 28/6 29/1 30/14 31/3 31/5 32/18 33/4 33/8 44/16 45/23 53/2 54/10 62/19 65/18 73/21 74/24 82/4 90/1 93/10 101/9 101/21 104/15 105/15 113/1 119/16 120/2 120/20
**Ms. Hall [31]** 25/6 25/17 26/16 26/21 27/1 27/22 28/6 29/1 30/14 31/3 31/5 32/18 33/4 33/8 44/16 45/23 53/2 54/10 62/19 65/18

**M**

**Ms. Hall... [11]** 74/24 82/4 90/1 93/10 101/9 101/21 104/15 105/15 119/16 120/2 120/20
**Ms. Hall's [2]** 73/21 113/1
**Ms. Vaughn [3]** 20/17 21/18 22/10
**multiple [1]** 17/3
**musculoskeletal [3]** 27/8 27/11 27/18
**music [1]** 98/23
**muster [4]** 50/10 50/13 51/19 51/19

**N**

**nap [1]** 49/20
**nasty [1]** 75/25
**nature [3]** 11/17 19/3 45/12
**nearest [2]** 6/21 6/22
**neither [1]** 113/12
**nibbled [1]** 42/12
**nice [1]** 83/7
**Nick [1]** 107/6
**nod [1]** 5/9
**None [1]** 69/2
**nonprescription [2]** 74/11 75/3
**north [2]** 5/24 7/10
**Notary [2]** 1/17 131/15
**notice [2]** 1/19 67/22
**November [2]** 130/21 131/11
**Nowadays [1]** 103/5
**number [2]** 3/4 110/9
**numbers [1]** 45/11
**nurse [11]** 16/14 16/15 16/24 17/9 17/25 19/12 19/14 97/25 98/1 123/6 124/25
**nurses [2]** 71/17 73/16
**nursing [18]** 8/21 9/13 9/17 9/20 15/25 16/22 17/4 17/6 18/5 18/10 18/25 19/4 19/18 20/23 20/25 22/13 97/8 97/16

**O**

**O-V-E-R-T-U-R-F [1]** 29/18
**oath [2]** 4/8 131/1
**Objection [8]** 11/5 113/15 114/13 116/13 117/11 117/19 119/7 120/12
**observed [1]** 41/1
**obtain [4]** 8/25 9/5 9/24 11/25
**obtained [1]** 18/5
**ocean [1]** 62/16
**October [2]** 1/12 3/6
**October 28th [1]** 3/6
**office [1]** 130/20
**official [2]** 130/20 131/10
**oh [64]** 5/2 12/2 12/20 13/1 13/9 14/11 15/12 16/8 21/17 22/24 23/11 24/9 26/12 31/15 34/8 36/8 36/25 39/8 42/5 42/12 43/13 46/10 53/4 56/24 60/2 63/2 63/25 64/10 66/5 71/3 74/17 75/15 78/1 78/16 78/24 79/23 80/15 81/7 81/23 95/10 97/9 97/16 98/19 99/9 99/18 103/3 106/9 107/22 108/18 109/2 111/24 112/9 114/17 115/3 115/5 115/10 115/25 116/1 119/19 120/13 123/5 124/14 126/3 128/24
**Okey [1]** 121/4
**online [3]** 18/17 18/19 32/9
**open [1]** 80/5
**opportunity [1]** 128/19
**option [1]** 88/9
**order [2]** 129/3 129/4
**Orleans [15]** 34/4 34/6 34/20 34/25 35/12 35/15 36/12 36/14 38/11 39/1 39/11 43/23 85/12 93/24 94/14
**outdoor [2]** 104/7 104/11
**outing [1]** 61/12
**outstanding [2]** 76/4 76/9
**overheard [1]** 90/1
**overnight [2]** 35/2 56/19
**overseas [1]** 23/17
**overtime [1]** 16/7
**Overture [1]** 29/15
**Overturf [2]** 29/14 29/16
**overweight [1]** 68/17

**P**

**P.A [1]** 2/6
**p.m [7]** 1/12 1/12 3/7 15/1 15/5 129/6 129/8
**package [1]** 84/23
**Page [1]** 2/18
**Pages [1]** 130/7
**pain [2]** 74/14 74/20
**painting [1]** 102/23
**pane [1]** 65/3
**paperwork [2]** 69/5 69/10
**park [1]** 103/17
**part [5]** 35/5 35/7 35/8 71/25 83/8
**partake [1]** 22/2
**participate [2]** 21/15 96/13
**participated [1]** 79/16
**parties' [2]** 130/15 130/16
**passed [3]** 101/1 103/18 125/22
**passenger [8]** 32/1 32/8 46/17 47/22 49/18 49/25 50/17 52/24
**passengers [3]** 44/19 70/15 93/14
**passions [1]** 22/11
**passport [1]** 31/16
**patient [5]** 98/17 98/25 99/8 107/6 109/7
**Patron [2]** 54/2 120/7
**pay [2]** 122/5 122/20
**payday [2]** 11/20 11/25
**payment [3]** 69/22 91/2 91/23
**peddling [1]** 79/9
**Peninsula [1]** 79/13
**Pennsylvania [1]** 5/24
**people [13]** 41/16 70/8 75/23 79/9 79/19 86/17 121/21 121/22 122/4 122/9 122/19 123/2 124/23
**person [7]** 65/4 71/7 89/13 89/21 90/7 90/19 93/3
**person's [2]** 121/22 123/9
**personal [2]** 80/25 102/3
**personality [2]** 75/19 76/6
**pertaining [1]** 18/24
**Phoenix [1]** 8/7
**phone [6]** 21/11 32/22 45/11 70/16 70/24 110/9
**photo [9]** 2/19 115/14 116/19 125/4 125/6 125/10 125/15 126/14 127/5
**photograph [3]** 115/23 117/4 125/19
**photos [4]** 71/4 71/9 114/25 115/4
**physician [1]** 108/11
**picked [1]** 33/24
**pictures [3]** 70/17 70/19 70/23
**place [8]** 12/5 15/12 21/22 47/21 83/11 83/25 86/4 130/10
**plaintiff [4]** 1/5 2/2 19/20 91/16
**Plaintiff's [4]** 115/15 115/16 116/5 125/5
**play [1]** 19/21
**plays [1]** 98/23
**point [12]** 45/4 46/18 46/19 61/3 61/5 62/8 73/1 73/3 73/25 89/10 98/3 126/12
**policies [2]** 93/13 93/19
**pool [1]** 41/21
**pop [1]** 120/11
**port [3]** 62/15 85/12 86/3
**ports [2]** 61/14 85/16
**positioned [1]** 128/11
**post [2]** 9/16 9/16
**predicate [1]** 32/19
**prefacing [1]** 70/14
**preference [1]** 120/4
**preps [1]** 107/11
**prescription [4]** 26/11 74/11 74/20 81/1
**present [5]** 2/10 98/4 100/5 108/21 109/10
**preventing [1]** 126/23
**principally [1]** 109/7
**problem [1]** 55/23
**problematic [1]** 101/16
**problems [4]** 27/17 98/6 107/20 108/1
**procedures [2]** 93/13 93/20
**proceedings [1]** 3/1
**process [2]** 31/1 33/3
**Professional [2]** 1/17 130/24
**program [1]** 9/21
**promotion [2]** 16/23 17/2
**promotions [1]** 17/3
**psychiatrist [1]** 26/17
**psychiatrists [1]** 108/24
**psychologist [1]** 26/17
**psychologists [1]** 108/24
**Public [2]** 1/17 131/15
**pulled [2]** 127/12 127/16
**purchase [1]** 81/10
**pursuant [1]** 1/18

**Q**

**question [10]** 4/6 4/12 5/8 5/14 23/1 44/22 69/9 70/14 122/16 125/2
**questions [7]** 64/8 111/21 111/23 112/16 120/1 121/9 128/15
**quick [1]** 120/24
**quickly [1]** 115/20

**R**

**raised [1]** 119/20
**Re [1]** 2/15
**Re-Direct [1]** 2/15
**reaching [1]** 106/21
**readily [1]** 66/8
**ready [1]** 43/17
**realm [1]** 102/5
**recognize [3]** 115/1 115/22 116/5
**recollect [1]** 82/3
**recollection [6]** 37/16 42/6 57/3 66/21 88/12 113/11
**recommend [1]** 30/6
**record [9]** 3/9 3/23 14/24 15/1 15/3 15/5 15/8 120/19 129/6
**recorded [1]** 4/15
**recreational [1]** 22/3
**REDIRECT [1]** 121/11
**reference [1]** 68/10
**refund [1]** 86/23
**regular [1]** 68/16
**regularly [2]** 105/10 105/12
**relatable [1]** 108/20
**relative [2]** 130/13 130/15
**Remote [1]** 1/11
**rental [1]** 94/10
**repetitive [1]** 112/23
**Reporter [3]** 1/17 130/1 130/24
**reposition [1]** 55/22
**required [1]** 18/9
**research [4]** 31/6 31/10 31/14 31/19
**residents [2]** 18/22 18/24
**resolve [1]** 13/14
**response [1]** 64/7
**rest [2]** 78/13 84/1
**restaurant [6]** 41/7 41/12 41/20 42/1 42/4 42/9
**restrictions [1]** 109/20
**restroom [2]** 49/21 112/17
**ride [2]** 79/8 104/17
**rides [1]** 98/9
**righty [1]** 111/24
**RN [3]** 29/21 29/22 30/1
**role [1]** 19/21
**room [15]** 39/24 40/1 40/3 41/5 42/16 52/2 52/5 52/6 52/13 57/7 70/17 71/5 77/25 119/19 121/14
**rough [1]** 20/11
**rules [1]** 5/6
**rum [1]** 40/19

**S**

**safety [2]** 124/11 124/19
**Saint [1]** 8/6
**sake [1]** 115/20
**sat [1]** 88/23
**scary [3]** 35/7 35/8 64/12
**scheduled [1]** 108/16
**school [14]** 8/11 8/13 8/15 8/21 8/25 9/1 9/13 9/17 9/18 16/25 20/7 20/23 20/25 97/17
**schools [1]** 9/16
**scoping [1]** 127/24
**scrambling [1]** 41/16
**screen [3]** 115/6 115/9 125/10
**screenshotted [1]** 33/11
**Scrubs [2]** 63/20 63/21
**sea [5]** 62/14 85/19 85/25 86/2 93/23
**seal [2]** 130/20 131/10
**seating [2]** 64/19 64/20
**seats [1]** 64/22
**second [21]** 8/24 22/21 52/7 52/13 52/17 53/6 54/17 81/21 87/19 88/3 88/13 89/2 89/8 89/15 89/22 90/2 90/5 90/18 92/10 93/9 112/1
**seek [1]** 82/23
**sees [1]** 103/16
**sense [3]** 4/9 20/11 21/5
**service [4]** 62/1 62/10 87/7 91/23
**services [2]** 86/22 87/7
**session [1]** 4/6
**setting [1]** 18/25
**seven [1]** 7/10
**seven miles [1]** 7/10
**Seventeen [1]** 7/13
**seventh [1]** 34/14
**shake [1]** 5/9
**shampoo [1]** 117/4
**shams [1]** 82/25
**share [3]** 5/7 44/18 95/6
**shared [3]** 44/15 47/23 116/7
**sharing [1]** 115/6
**she'd [3]** 23/12 23/12 84/19
**she'll [1]** 129/1
**shelves [1]** 106/21
**shifts [1]** 107/23
**ship [39]** 34/20 38/12 39/7 39/14 39/17 40/8 41/3 41/19 43/11 43/14 43/21 44/1 45/15 50/2 50/13 51/6 53/12 54/23 56/20 59/15 61/25 62/14 62/15 64/3 73/8 73/12 78/9 79/2 83/24 83/25 86/10 86/16 93/25 94/5 94/6 95/16 116/8 121/14 127/9
**shipboard [2]** 93/15 93/19
**shopping [1]** 21/25
**shore [6]** 61/14 61/17 62/3 74/25 79/16 80/4
**SHORTHAND [1]** 130/1
**shot [4]** 36/5 115/4 121/1 121/2
**shots [7]** 35/25 36/3 36/4 54/2 54/16 120/7 120/24
**shower [20]** 48/11 48/17 48/18 49/6 49/10 58/18 58/19 102/4 113/13 114/3 114/7 116/1 117/5 117/8 119/5 119/16 119/18 126/23 128/2 128/10
**sieve [1]** 78/17
**signs [3]** 118/8 118/12 118/15
**silver [1]** 116/11
**simple [1]** 21/12
**single [2]** 6/9 6/11
**sink [1]** 116/20
**sister [2]** 101/1 103/18
**sleep [1]** 86/11
**sleeping [2]** 107/20 108/1
**Slightly [1]** 63/17
**slip [1]** 25/2
**slot [1]** 53/23
**small [2]** 18/17 42/8
**Smith [110]** 1/16 2/8 2/14 2/15 3/12 3/12 3/19 11/6 11/12 11/24 12/7 12/15 13/2 13/10 13/18 13/23 14/3 14/7 14/12 14/19 15/6 18/3 24/5 26/1 26/8 27/15 28/11 31/12 31/23 32/6 32/13 32/24 36/2 36/16 37/1 37/6 37/14 37/24 38/9 42/14 43/6 45/22 48/8 48/15 48/20 49/7 54/8 54/13 56/25 59/13 59/19 67/1 67/20 72/9 72/17 72/25 73/10 73/17 74/9 75/17 76/10 76/18 77/4 77/12 84/21 87/23 90/15 90/25 91/21 92/19 92/24 93/7 102/14 103/21 110/4 111/20 112/2 112/8 113/15 113/19 113/23 114/5 114/13 114/21 116/13 117/11 117/19 117/23 117/24 119/7 120/12 121/6 121/8 121/12 122/2 122/15 122/24 123/13 123/20 124/1 127/3 127/13 128/7 128/14 128/17 129/1 130/5 130/23 131/6 131/15
**sometime [3]** 46/20 46/22 47/7
**son [4]** 23/11 23/14 95/25 96/18
**sounds [4]** 49/15 77/10 87/3 110/25
**south [2]** 6/19 6/20
**SOUTHERN [1]** 1/1
**specific [11]** 13/4 31/19 66/11 66/16 66/20 66/21 72/12 88/11 89/20 91/9 109/5
**speckled [2]** 114/12 116/12
**spell [1]** 29/17
**spells [1]** 25/19
**spend [2]** 20/18 94/13
**spending [3]** 22/13 23/8 55/7
**spent [2]** 23/12 45/5
**spinal [1]** 27/18
**spine [1]** 27/12
**spirited [1]** 75/25
**split [1]** 94/18
**spoken [1]** 110/19
**spoon [2]** 105/18 105/20
**sprain [2]** 71/17 72/20
**sprained [3]** 71/24 72/3 72/12
**stable [1]** 73/4
**star [1]** 83/5
**starting [3]** 73/22 74/4 74/5
**state [8]** 1/18 3/8 10/4 10/6 100/19 130/2 131/2 131/16
**stated [2]** 107/2 130/10
**statements [3]** 66/16 89/21 91/9
**STATES [1]** 1/1
**stationed [1]** 23/14

**S**

**statute [1]** 12/23
**stay [1]** 34/25
**stayed [8]** 10/16 35/2 35/3 35/10 35/25 73/11 83/4 83/7
**staying [1]** 35/6
**step [1]** 58/22
**stepped [1]** 113/11
**steps [2]** 59/1 116/10
**stopped [1]** 18/11
**strong [1]** 72/8
**struggling [2]** 107/3 109/8
**stumbling [1]** 56/6
**style [3]** 41/7 41/20 54/16
**styled [2]** 1/20 3/2
**substances [1]** 60/5
**substantial [1]** 45/6
**suburb [1]** 6/18
**Suite [1]** 2/3
**sun [1]** 44/6
**support [1]** 101/19
**surgeries [2]** 25/11 108/16
**surgery [3]** 96/11 96/13 108/7
**suspicions [1]** 71/16
**sweet [1]** 38/19
**swollen [1]** 73/22
**sworn [2]** 3/17 131/9
**system [3]** 27/8 27/11 27/18

**T**

**tag [1]** 67/22
**tall [3]** 63/17 68/4 68/9
**Taller [1]** 68/7
**tasks [1]** 107/3
**tea [1]** 38/19
**tearful [1]** 55/8
**teens [1]** 99/2
**tend [1]** 120/3
**tender [1]** 97/3
**term [1]** 27/8
**terms [2]** 32/16 69/16
**terrible [2]** 49/15 87/4
**testimony [1]** 126/17
**texted [1]** 110/8
**Thank [1]** 121/5
**Thanks [2]** 111/22 128/14
**theater [2]** 104/8 104/11
**therapist [1]** 26/16
**therapists [1]** 108/24
**therapy [1]** 108/14
**they'd [1]** 120/24
**thinking [1]** 23/24
**thoroughly [1]** 32/5
**thought [9]** 11/21 71/24 72/2 72/5 72/20 81/12 86/9 86/15 100/7
**thousand [2]** 66/25 67/2
**threshold [2]** 48/17 116/11
**Thursday [1]** 1/12
**ticket [3]** 32/1 32/8 32/17
**tickets [5]** 30/22 31/6 32/23 33/4 33/7
**till [1]** 5/2
**time [91]** 1/12 3/6 5/1 7/14 10/17 16/4 20/18 21/6 21/15 21/19 22/14 22/19 23/8 23/12 23/17 23/20 23/20 28/7 30/4 39/10 39/14 43/1 43/14 43/20 44/4 44/9 45/6 46/4 47/9 48/25 49/25 50/9 51/1 52/7 52/14 52/23 53/7 53/9 54/17 56/18 57/8 57/13 60/6 60/10 62/22 63/4 67/6 67/9 67/13 69/23 71/13 72/1 72/13 72/19 73/1 73/3 73/13 73/19 74/20 75/7 81/25 87/15 87/19 88/3 88/19 89/2 89/15 90/2 90/18 93/9 97/1 97/4 97/17 98/3 100/22 104/5 105/7 105/11 106/6 108/21 109/9 111/22 111/22 112/10 122/1 125/20 125/25 127/21 128/9 128/11 130/9
**times [3]** 10/23 29/11 122/22
**tip [1]** 70/7
**title [4]** 16/13 16/17 29/19 63/11
**toilet [2]** 47/12 49/1
**toiletries [1]** 47/19
**toothbrush [1]** 47/19
**total [1]** 37/12
**totaled [1]** 70/10
**tough [2]** 57/23 97/5
**towards [1]** 116/16
**towel [1]** 125/25
**town [3]** 7/6 33/21 35/5
**track [1]** 51/14
**Tramadol [8]** 74/22 74/23 74/24 80/23 81/19 81/20 82/5 82/6
**transcript [3]** 128/20 129/2 130/7
**transcription [2]** 128/21 130/8
**travel [2]** 44/25 116/23
**traveled [1]** 100/10
**traveling [2]** 44/24 62/16
**treat [1]** 74/14
**treatment [1]** 82/24
**triage [1]** 19/2
**trip [23]** 25/2 30/2 52/17 53/3 59/5 62/3 80/19 80/21 82/22 88/13 89/8 89/15 90/2 90/6 95/13 100/14 101/2 121/18 121/21 121/22 122/4 122/19 126/18
**tripped [9]** 58/8 58/9 58/17 59/9 59/22 119/19 121/13 121/17 121/18
**Tripping [1]** 58/14
**trips [1]** 100/13
**trivia [2]** 84/5 84/7
**truth [1]** 94/25
**TV [1]** 49/19
**Twenty [1]** 34/14
**Twenty-seventh [1]** 34/14
**twice [3]** 96/24 96/24 102/18
**twilight [1]** 44/7
**Tylenol [2]** 74/15 75/3

**U**

**uh [11]** 7/15 11/16 21/4 22/7 22/7 53/20 62/13 63/22 98/15 123/7 125/1
**uh-huh [9]** 7/15 11/16 21/4 53/20 62/13 63/22 98/15 123/7 125/1
**uh-uh [1]** 22/7
**ultimate [1]** 33/3
**unable [1]** 106/15
**undersigned [2]** 130/5 131/6
**underweight [1]** 68/17
**ungodly [1]** 103/19
**UNITED [1]** 1/1
**unscrupulous [1]** 111/18
**unsteady [1]** 123/22
**us [12]** 3/22 5/18 15/8 15/23 18/18 35/17 39/17 45/2 49/13 50/3 79/3 115/20
**utensils [2]** 105/17 106/15

**V**

**vacation [4]** 29/1 29/4 39/3 100/14
**vacations [2]** 100/1 100/4
**VALOR [42]** 21/22 22/4 22/9 22/17 23/3 24/10 24/21 24/25 25/5 25/10 25/15 25/18 26/3 26/9 26/14 26/20 27/2 27/21 28/16 28/20 28/25 29/3 29/8 30/2 30/15 30/18 31/7 31/9 31/25 32/18 33/18 34/20 39/10 44/13 55/5 97/21 100/5 104/12 105/15 107/14 107/20 108/1
**Varga [5]** 1/16 130/5 130/23 131/6 131/15
**VAUGHN [14]** 1/14 2/13 3/5 3/15 3/24 3/25 20/17 21/18 22/10 26/10 69/17 112/22 130/9 131/7
**Vegas [3]** 10/10 10/14 39/2
**vehicle [1]** 24/23
**verbally [1]** 5/8
**versus [1]** 3/3
**via [1]** 131/8
**vicinity [1]** 56/15
**video [3]** 1/11 3/5 129/4
**videoconferencing [1]** 131/8
**VIDEOGRAPHER [3]** 2/10 3/2 129/5
**VIDEOTAPED [2]** 1/14 1/19
**Violet [5]** 1/16 130/5 130/23 131/6 131/15
**vision [2]** 123/16 123/18
**visit [29]** 23/13 23/20 43/25 46/3 46/22 47/1 47/22 48/1 48/10 48/21 49/17 50/12 50/17 50/22 50/23 51/2 52/13 52/22 63/5 65/25 70/18 71/8 75/13 75/20 78/7 78/12 80/2 89/22 100/19
**visited [9]** 42/19 43/20 44/3 44/9 48/25 50/8 52/7 52/14 81/22
**visiting [6]** 42/15 42/25 50/19 50/22 84/10 86/21
**visits [4]** 87/11 93/14 96/7 97/15
**voyage [2]** 44/25 70/10

**W**

**waive [2]** 128/22 129/1
**waived [2]** 129/9 130/11
**walk [7]** 48/2 48/3 58/23 98/15 101/11 101/13 120/23
**walked [4]** 39/20

**W**

**walked... [3]** 48/9 56/10 118/20
**walking [10]** 22/5 41/8 41/10 41/15 64/10 64/10 64/11 101/16 122/6 122/20
**walks [1]** 24/14
**wander [1]** 40/23
**wandering [2]** 39/21 41/4
**warning [4]** 118/8 118/12 118/15 118/16
**warnings [1]** 122/12
**watch [1]** 49/19
**watching [1]** 43/23
**we'd [2]** 21/10 120/23
**wearing [5]** 63/19 68/1 89/14 89/18 89/19
**website [1]** 32/1
**weight [1]** 99/4
**welcome [9]** 40/11 40/14 40/18 40/20 40/24 40/25 94/24 121/7 128/16
**WHEREOF [1]** 130/19
**whining [1]** 22/23
**Whisky [5]** 36/19 36/22 37/3 37/8 37/17
**white [2]** 2/6 63/17
**window [22]** 64/25 65/2 66/6 67/22 68/1 68/6 68/13 68/18 69/4 70/20 71/8 72/2 73/20 75/13 75/20 76/12 88/16 88/19 89/2 89/22 90/7 93/3
**wise [1]** 38/5
**Woah [1]** 83/11
**woke [3]** 55/8 55/24 57/9
**woman [1]** 89/1
**world [1]** 83/2
**worried [1]** 33/12
**worry [1]** 112/13
**wrap [2]** 83/19 83/21
**wraps [2]** 83/16 83/18
**wrist [15]** 71/15 72/3 80/13 95/8 96/7 96/14 97/2 98/6 101/15 102/7 105/21 106/8 108/12 108/17 108/20
**wrists [1]** 27/2

**Y**

**Yep [6]** 4/19 6/7 10/2 51/17 104/16 116/1
**you'd [3]** 111/10 111/15 117/7
**young [3]** 98/8 99/15 101/12
**younger [1]** 63/16
**yours [1]** 19/8
**Yucatan [13]** 79/9 79/12 79/22 80/20 80/21 81/22 82/22 83/6 83/11 83/24 85/14 85/18 87/6

**Z**

**ziplining [3]** 61/19 61/21 61/24
**Zoom [5]** 59/25 65/12 110/13 110/24 131/8