UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 21-CIV-2057-BLOOM

BARBARA HALL,

Plaintiff,

-vs-

CARNIVAL CORPORATION,

Defendant.
_______________________________/

SWORN VIDEO DEPOSITION

TUESDAY, NOVEMBER 30, 2021

12:54 P.M. TO 4:19 P.M.

DEPOSITION OF

SUSAN VASQUEZ

Taken before Jorge Garcia, Court Reporter, a Notary Public for the State of Florida at Large, pursuant to Notice of Taking Deposition Duces Tecum filed in the above-styled cause.

APPEARANCES:

On Behalf of the Plaintiff:
EDUARDO J. HERNANDEZ, LLC
BY: EDUARDO J. HERNANDEZ, ESQUIRE
10691 N. Kendall Drive, Suite 109
Miami, Florida 33176
(305) 567-0910
ehernandez@ejh-law.com

On Behalf of the Defendant:
FOWLER, WHITE, BURNETT, P.A.
BY: VICTOR PELAEZ, ESQUIRE
1395 Brickell Avenue, 14th Floor
Miami, Florida 33131
(305)789-9200

Also Appears:
Oliver Lee, Videographer



INDEX


| TESTIMONY OF SUSAN VASQUEZ | PAGE |
|---|---|
| Examination by Mr. Hernandez | 5 |
| Certificate of Oath | 137 |
| Certificate of Reporter | 138 |
| Errata Sheet | 139 |


INDEX OF EXHIBITS FOR PLAINTIFF


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit A | Deposition Notice | 79 |
| Exhibit B | iCare Notes, Medical Interaction Log, and HESS Procedures | 79 |


(EXHIBITS RETAINED BY EDUARDO J. HERNANDEZ, ESQ)



PROCEEDINGS

THE VIDEOGRAPHER: In the case styled Barbara Hall vs Carnival Corporation, Case Number 21-CIV-2057-BLOOM, this is the videotaped deposition of Susie Vasquez as corporate representative for Carnival Corporation. This deposition is taking place via Zoom on November 30, 2021. The time is now 11:54 p.m. (sic). Our videographer is Oliver Lee. Counsel will state their appearances for the record, after which, our court reporter, Jorge Garcia, will then swear in the witness.

MR. HERNANDEZ: Eddie Hernandez for the plaintiff.

MR. PELAEZ: Victor Pelaez on behalf of the defendant, Carnival Corporation.

THE REPORTER: Jorge Garcia, the court reporter.

Hi Susie, if you could show me a photo ID, please? Thank you. Saw it already.

Please raise your right hand.

(Witness sworn)

THE REPORTER: All right, Eddie. Go ahead.

MR. HERNANDEZ: Thanks, Jorge.

THEREUPON:



SUSAN VASQUEZ,

having been first duly sworn and responding, "Yes" was examined and testified as follows:

EXAMINATION

BY MR. HERNANDEZ:

Q. Please state your name and business address.

A. Susan Brown Vasquez. Everyone calls me Susie. And that's 3655 Northwest 87th Avenue in Doral, Florida. Zip code is 33178.

Q. Who is your employer?

A. Carnival Corporation.

Q. And how long have you been with Carnival Corporation?

A. A little over 17 years.

Q. What department are you presently in?

A. Legal Services. Which is the risk management department at Carnival Cruise line.

Q. Is the name of the department Legal Services, or Risk Management?

A. It's kind of both. It's considered the risk management department, but call ourselves legal services, so it kind of depends who you ask between corporate, and the operating line.

Q. And what is your present position?

A. Director of claims, and staff counsel.

Page 6

Q. And how long have you held that specific position?
A. I was hired in 2004, with much of the same responsibilities, but my title back then was manager. I was subsequently promoted, several years later, to director, and then assumed the staff counsel responsibilities and role about ten years ago.
Q. What are your responsibilities as staff counsel?
A. I advise the company in operational matters, as needed. I also manage the various ticket contracts for the operating line, and just generally assist the departments with legal needs as they arise.
Q. And what are your duties, generally, as director of claims?
A. I oversee all passenger and guest related claims and lawsuits.
Q. Who is your supervisor at present?
A. Ultimately, it is a general counsel, and we have a dotted line through assistant counsel, Heather Weeter.
Q. Spell the last name, please.
A. W-e-e-t-e-r.
Q. W-e-e-t-e-r?
A. Uh-huh (affirmative).

Page 7

Q. You're a lawyer, correct?
A. Yes.
Q. When were you admitted to practice?
A. I passed the bar in 1997.
Q. Admitted anywhere other than Florida?
A. No.
Q. Where did you go to undergrad?
A. I went to University of Florida, and Florida State University undergrad.
Q. Which one was law school?
A. St. Thomas was law school.
Q. Oh. I'm -- I'm sorry. You went to UF and FSU for undergrad?
A. Correct. Yeah.
Q. In the last five years, can you estimate how many depositions you have given in the capacity of corporate representative?
A. I would have a hard time estimating. I do not keep track, but I would say, in the last five years, in excess of a hundred.
Q. In the last five years, how many times have you appeared at trial on behalf of Carnival either as a witness, or as corporate representative?
A. Again, I don't keep track, but probably a dozen. Maybe more

Page 8

Q. For purposes -- I'm sorry?
A. Maybe more. It's probably at least a dozen.
Q. For purposes of today's deposition other than your lawyer, who have you spoken to, who have you interviewed?
A. I have not personally interviewed any of the onboard witnesses. I spoke with our litigation representative Monica Borteseggi (phonetic), who does all of the heavy lifting in the discovery process and getting the corporate documents. And I know that counsel has spoken to others, and I've spoken to counsel obviously about those communications, et cetera, and just got a flavor for the discovery process to date, and all of the things that have gone forward in this litigation up until now.
Q. I'm sorry. Ms. Borteseggi is your litigation what?
A. Her title is litigation representative. She actually is the person that communicates with all of the departments, and all of the shipboard witnesses to gather information in the discovery process for lawsuits.
Q. To your knowledge, has she spoken to or interviewed any witness, including shipboard witnesses, to this incident?

Page 9

A. So there really were no shipboard witnesses. Obviously, this occurred inside Ms. Hall's personal cabin, inside her personal bathroom, and the matter was not reported, and was not investigated onboard until a few days later. It was I think reported to guest services in the medical center, so there were no eyewitnesses. I don't know who all she communicated with to gather the documents that you have requested in discovery.
Q. Just so we are clear, my question was not limited to eyewitnesses. I want to know whether, if you know, whether Borteseggi spoke to any witness relative to this matter, including shipboard.
A. Well, I don't know what you mean by witness. We know that the one shipboard person who interacted with Ms. Hall was the nurse onboard. And that nurse was actually deposed in that lawsuit, and I read through that deposition. We know that her cabinmate, who was a witness, Mrs. Vaughn (phonetic), has also been deposed. So we have that deposition testimony. Although, she doesn't remember much from the cruise, or that evening. And I'm not really aware of any other witnesses that would be relevant in this context.
Obviously, to the extent that you are

requesting documents from on board the ship, Monica would have had to reached out to the ship to get those, or to the shoreside departments to get those documents. I don't know each person that she might have emailed or spoke to during the discovery process.
Q. What's the nurse's name?
A. I'd have to look it up. Do you mind -- I have in front of me, I'm doing my deposition on my iPad. I have in front of me my laptop, so with your permission as we go along, I'll let you know if I want to pull something up, and then if you agree --
Q. That's fine.
A. Yeah. I'll just pull up his deposition testimony really quick, and I'll have his proper name and spelling. It's Joseph, and it's Cagumbay, C-a-g-u-m-b-a-y, who is a registered nurse. And he was working onboard the cruise in question, in the medical center.
Q. All right. So you mentioned that you don't know what I mean by witnesses, for example, Nurse Cagumbay, in my question, is a witness. So I'm not limiting my question to someone who witnessed the moment of the fall but, when I say witness, someone who interacted with her, someone that was involved with her on the ship. Cagumbay would be an example.



Do you know if Ms. Borteseggi spoke to anyone else, other than the nurse? I'm sorry, did you say she spoke to the nurse?
MR. PELAEZ: Objection to form.
THE WITNESS: I think counsel actually spoke to the nurse, and then the nurse was actually deposed.
BY MR. HERNANDEZ:
Q. So, again, my question is, just so we're clear, do you know, if anyone, who Ms. Borteseggi has spoken to?
A. No. I did not review all of the discovery materials that she got back and forth. She usually emails the ship for any relevant documents you're requesting, and then goes from there if she needs to track something down. I'm not aware of any other relevant witnesses that she would have spoken to.
Q. My question wasn't limited to relevant witnesses, Ms. Vasquez. My question is: do you know of anyone that Ms. Borteseggi has spoken to?
A. I just answered twice. I do not know anyone else that Ms. Borteseggi spoke to.
Q. What materials have you reviewed to prepare for this afternoon's deposition?
A. I've reviewed the deposition testimony of Ms. Hall; her traveling companion, Ms. Vaughn; the



nurse. I also reviewed all of the discovery materials, the pleadings to date, the relevant documents that you had requested in discovery. I do have also the prior incidents for trip and falls in cabin bathrooms onboard this particular ship, the Valor, and that's pretty much it. I also have medical records and a few things. Everything that has been produced by the plaintiff, as well.
Q. And when you say discovery, have you reviewed both defendant's responses, and plaintiff's responses, or just your company's responses?
A. I looked through everything in the file. Yeah. I looked through pretty much everything that's been produced to date.
Q. Produced by the defense, or produced by the plaintiff, or both?
A. Like I just said, both. I looked through everything that's been produced in this case.
Q. Well, you didn't say both. That's why I'm asking.
A. Yes, I did. And I looked through everything that's been produced by both parties to date. That was sent to me, anyway, and I assume that's the complete file.
Q. You've read over the notice of taking



corporate representative deposition?
A. I read through the notice, and I read through the objections waged by my counsel. Yes.
Q. Do you understand you are here to testify on behalf of the company?
A. I am, yes.
Q. You agree that Carnival, at the time that my client was on the ship, owed her duty of reasonable candor of the circumstances?
A. That is the legal duty that ship owner owes to passengers. Yes.
Q. You agree that this extended -- its duty of a reasonable candor of the circumstances, extended to her cabin, and its bathroom?
MR. PELAEZ: Objection to form.
THE WITNESS: Yes. I mean that's a legal conclusion, but yes. A legal duty that a ship owner has to its guests is to use reasonable care under the circumstances, during all aspects of the defendant's cruise. At least while they are onboard.
BY MR. HERNANDEZ:
Q. And its duty of reasonable candor under the circumstances, you would agree, extended to warning my client of unknown and non-obvious dangers?
MR. PELAEZ: Objection to form.

Page 14

THE WITNESS: I do not this that's relevant in this case, but if -- to the extent that there is a hidden, or unknown danger, unknown to the passenger, that is known to the cruise line, I would agree that the legal duty is that it might have a duty to warn under those circumstances, depending on the circumstances.
BY MR. HERNANDEZ:
Q. At the time of this cruise, who owned the medical department on the Valor?
MR. PELAEZ: Objection. Beyond the scope of the deposition.
THE WITNESS: Yeah. I don't know how really to answer that. I don't know what you mean by owned. I mean, for the purposes of this litigation, Carnival agrees that it owned and operated the vessel in question on the day in question.
BY MR. HERNANDEZ:
Q. Did it own and operate the medical department on the day in question?
MR. PELAEZ: Same objection.
THE WITNESS: For purposes of this litigation, I would agree that the medical center facility itself can be deemed owned and operated by Carnival. It is manned by independent contractors. The doctors on

Page 15

board are not employees. They are independent contractors of the company.
BY MR. HERNANDEZ:
Q. Your position is that the doctors in your medical centers are independent contractors. The nurses, however, are employed by Carnival, correct?
MR. PELAEZ: Objection.
THE WITNESS: It is my understanding, yes, that in March of 2020 the nurses would have been employees of carnival.
BY MR. HERNANDEZ:
Q. So the nurse that we spoke of earlier, Mr. Cagumbay, C-a-g-u-m-b-a-y, on March 4, 2020, was an employee of Carnival, correct?
A. I have not researched it for purposes of today's deposition, but it's my understanding, yes, that that would have been accurate.
Q. At the time of this cruise back in March of 2020, who set the charges for the services provided in the medical department on this ship?
A. I don't know specifically who sets those charges.
Q. Who would know?
A. I mean, to the extent that you had asked me to look into that, I would have looked it up. I would

Page 16

assume it's someone from our, you know, the medical team, but I don't know what person in that department actually goes through and sets the charges for the doctor's fees, x-rays, et cetera.
MR. PELAEZ: I just want to insert an objection that these questions regarding who sets policies, or charges for the medical department, I believe, are beyond the scope of the 30(b)(6) notice.
MR. HERNANDEZ: Counsel, I'm going to ask you, please, to limit your objections to form as the rules and the law require.
MR. PELAEZ: That wasn't a form objection.
MR. HERNANDEZ: I got your correspondence, Counsel.
BY MR. HERNANDEZ:
Q. So I'm clear, when I said who, I meant what entity, what company, not what person.
MR. PELAEZ: Same objection.
THE REPORTER: I don't know. I have not researched that for purposes of today. It is outside the scope of the notice, so it is not something that I look up.
BY MR. HERNANDEZ:
Q. Your testimony is that, speaking on behalf of Carnival Corporation, you do not know what entity sets

Page 17

the charges for the services that are offered by the medical department that is owned and operated by your company?
MR. PELAEZ: Objection.
THE WITNESS: I have not researched that for you today. It was outside the scope of your notice.
BY MR. HERNANDEZ:
Q. I don't believe it was, but we'll let the court decide.
A. Well, if you could point me to the area in the notice that you think is covered by that question, I'd like to see it.
Q. Are there circumstances, say back in March of 2020, where, say on the Valor, passengers would be seen by your medical staff without a charge?
A. Sure. Yes.
Q. Tell me some of those circumstances.
MR. PELAEZ: Objection to form.
THE WITNESS: I can't answer that hypothetical. It's just a hypothetical. So you're asking me -- you know, we sail six million people a year during normal times, so there are many times where guests are not charged for services. There are many times that they might be seen and only get a quick consultation that there might be a charge waived

for that. Under normal circumstances, it operates like a regular medical center would shoreside, in that the doctors and consultation fees are charged to the patient, and/or their insurance company.
Q. Give me one example where a passenger would not be charged on the Valor back in the year 2020.
MR. PELAEZ: Objection to form.
THE WITNESS: One example would be if someone, for example, tripped and fell on the Lido Deck and hurt their arm, and went down to the medical center. Many times, depending on the circumstances of that incident, those charges will be waived and posted to a different account. And, you know, that medical services will be provided to the guest free of charge.
BY MR. HERNANDEZ:
Q. All right. So you've used two terms, and I don't know if you're using them interchangeably, or as synonyms. You said, there are times where the passenger may not be charged, and there are times when the charges may be waived. What is the difference?
A. It would be the same thing, basically. There is always a fee that would be associated with a doctor consultation, and I believe, with most consultations onboard, as well as x-rays, or diagnostic tests, medicines that are distributed, et cetera, but



sometimes those charges will be waived, or -- or charged to, or taxed to a different account, and not charged to the passenger.
Q. So when you say a different account, what do you mean?
A. It's posted, not to the guest sail and sign account, it's posted to another account. A shipboard account.
Q. All right. So are you aware of any instances, say in the last three years, where a trip-and-fall in a cabin, charges were not applied, or charges were waived by a medical department on one of your ships?
MR. PELAEZ: Objection to form. Beyond the scope.
THE WITNESS: It is quite possible. I did not research that. I have no -- I would have no way of knowing or researching that.
BY MR. HERNANDEZ:
Q. And this decision to not charge a passenger, or waive the charges, who makes that decision?
A. It can be the doctor, it can be somebody in guest services, it can be really probably anyone in the supervisory level on the ship could request that, and it would probably be honored. But I think it normally comes from a combination of communications



between the shipboard medical staff, and the guest services team.
Q. To your knowledge, is the decision ever made by a nurse in your medical department?
A. No. It's usually not. It would be done at, I would think, the doctor level, and/or the guest services level. Depending on the circumstances of the underlying incident.
Q. And what policies or procedures existed at the time of my client's cruise for a doctor, or a guest services personnel to follow in making that determination whether to charge or not charge a guest for a medical visit?
A. I did not research the medical policies for today. I have not seen written policies. I just know, in my 17 years of experience, that many times they are waived depending on the circumstances of the investigation, or the incident itself.
Q. But you already told me earlier that no investigation occurred here, right?
A. So she tripped, I guess, in the middle of the night in her cabin, and then did not report it -- I mean, she claims the next day. She later explained in her deposition it was probably the following day, in Cozumel, on the 2nd. The first shipboard record we



have of her reporting anything, however, was on March 4th, which was the last full day of the cruise, which was the last sea day.
Q. Okay. And then -- go ahead.
A. And it looks like she went to the guest services desk and reported that she had fallen in her cabin three days prior. They referred her down to the medical center, and then there was a medical interaction log from the nurse of his discussion with Ms. Hall. And that's the first and only records we have of her indicating the -- the fall in her cabin on the early morning hours of March 1st.
Q. Okay. And what you referred to we'll get to in a moment, well, in a little bit. You're referring to the comment details of the iCare notes, right?
A. That is correct.
Q. Okay. So, preliminarily, we can agree that, while still on the cruise, she reported the fall to guest services.
MR. PELAEZ: Objection to form.
THE WITNESS: She reported that she fell in her cabin, yes, to guest services, I believe. I don't have a photographic memory, but I think that is detailed in the iCare notes.
BY MR. HERNANDEZ:

Q. Okay. And we can also agree that, while still aboard, while the cruise was going on, she also reported, and had an interaction with at least one person in the medical department, Nurse Cagumbay, right?
A. That is correct. Yes.
Q. Okay. What is the height of the shower ledge, the curb in the bathroom in my client's cabin?
A. It looks like it's maybe two inches. I don't think I've seen an actual measurement, but it looks somewhere between, I would guesstimate, around two to three inches. Maybe a little less.
Q. You haven't been there yourself to look over this particular bathroom we're mentioning, right?
A. I don't believe I've ever been in cabin 8429 onboard the Valor. No.
Q. You agree that my client fell in the bathroom in her cabin, right?
A. I -- I can only tell you that she reported and has testified now that she fell inside of her cabin on the early morning hours, around 2:30 in the morning on March 1, 2020.
Q. Do you have any reason to dispute where and when the incident occurred?
A. I think she's even unclear about what



happened. She doesn't seem to remember exactly how, or the mechanism of her fall. She thinks it was the lip that somehow tripped her up on her way to the -- to the bathroom.
Q. My question is where, and when. Where, do you dispute, or do you have any facts that dispute it happened in her cabin bathroom?
A. We have nothing to refute her allegation that she fell inside of her cabin bathroom on March 1, 2020.
Q. Have you any evidence or facts, have you any -- seen anything to refute that the fall caused her a wrist/hand injury?
A. I have not seen anything to indicate that she did not injure her wrist. She claims, at least as early as March 4th, that she had fallen in her cabin and her wrist hurt.
Q. So now, if I'm understanding what you've just said, it's your position that it was not until March 4 that Carnival learned of the fall?
A. There is no record onboard of her reporting an incident inside of her cabin to guest services, or to the medical center, prior to March 4.
Q. Right. But you see that in her testimony, because you've admitted having seen her deposition,



she said she reported it earlier.
A. She --
Q. I'm not asking you to agree with that, I'm just asking, have you seen that?
A. She claimed in her deposition that she thinks she went down to guest services sooner than that, and she thinks she went to medical center sooner than that. She's very unclear on the circumstances of that, and she obviously has the date wrong. And I think she clarified that later in her depo that she was probably mistaken, but in any event, she is claiming that she reported to somebody, earlier than the 4th, that she had fallen.
Q. All right. Okay. Going back to my question. Is it Carnival's position today, and ultimately at trial, that she's wrong, and the first report did not come until the 4th of March?
A. I think that would be up to the finder of fact to determine who they believe, or whether they believe that the ship would have, you know, followed its procedure to actually put that in the iCare notes sooner, or the medical interaction log sooner, or not. That's not really up to me to decide that.
Q. I'm not asking you to decide it. I'm asking you what your company's position is. Is it your



company's position that she did not report it any earlier than the afternoon of March 4?
A. I have no indication that she reported it earlier than that to guest services, or to the medical team. And in my 17 years of experience, if someone -- if a guest does report down to either guest services, or to the medical center, reporting that they had fallen, or reporting that they had injured their arm, it would be noted in -- in the medical interaction log if it was in medical services, or into the iCare notes if it was to guest services.
Q. So whether she reported it on the 2nd, or she reported it on the 4th, was any investigation done, on the ship, once she did report it?
A. No. She did not want to see the doctor onboard. She went down to the medical center and let the nurse know that she had injured her arm. She asked if she could see a doctor, and if there were charges for that. The nurse explained that, yes, there are customarily charges for that, but that she could get the doctor. And Mrs. Hall said that she did not want to pay for medical charges, that it had already happened three days prior, and that she was a nurse herself, and that she would just go see her primary care physician as soon as she got home, which

Page 26

was the following day.
Q. So it's your -- it's the company's testimony that my client did not want to see the doctor, right?
A. That is what she indicated to the nurse, that she did not want to have to pay for any medical fees associated with a -- a doctor consult, or an x-ray, and that she would just then wait until she got out of the ship the next day and seek treatment back home.
Q. Is it your testimony that she did not want to see the doctor because she had to pay, or she just didn't want to see the doctor?
A. According to the nurse in his deposition, and according to her in her deposition, she was upset that she would have to pay for a doctor consult and did not want to pay that fee. And she also indicated that since she was a nurse herself, and it had already happened three days ago, she had an ace bandage and had already wrapped it up, that she would just seek treatment the next day when she got home. Which it's my understanding that shortly after she got back, that's exactly what she did.
Q. In fact, isn't the situation that she didn't have the money to pay what your company was charging?
A. I have no idea what her financial circumstances are. They never got that far. She didn't

Page 27

ask to see the doctor. She left the -- the nurse without even doing a consultation, or consultation form. She literally just went to the window, asked about that, and then advised the nurse that never mind she -- she didn't want to pay for any medical services. She would just wait and go to her primary care physician at home. And that she was a nurse herself, and that it already happened three days ago, and she was going to be home the next day. So she just made the decision, I guess, to seek treatment at home rather than pay for a consultation onboard.
Q. Right. So your company's position is that bottom line, she just didn't want to pay, right?
MR. PELAEZ: Objection to form.
THE WITNESS: I mean it seems like it was a combination of factors. It seems like she didn't want to pay for a consult, and she didn't really think she needed to, because it had already happened three days ago, and that she had it wrapped, she had a -- it was a -- she's a nurse. She was suspicious that it might be broken, and that she would seek treatment when she got home, which is, my understanding, exactly what she did.
BY MR. HERNANDEZ:
Q. When is -- when is this medical staff

Page 28

interaction log used?
A. It's used by the nurses or the medical staff every time they have a guest interaction period. Period. It's my understanding now that if they have a phone call that comes in through either 911 or guest services, they will write it in that guest interaction log. If they have a direct contact with a guest, meaning the guest comes down to the medical center, they will note that in the guest interaction log. And I think the -- the log, as it's drafted now, actually has, you know, check boxes to say whether it's a direct encounter, a phone call, et cetera.
Q. When did your company start using this form, this medical staff interaction log?
A. We've always had a guest interaction log. It used to be handwritten, when anyone would come down. I don't know when this form was implemented. I know it was being used, obviously, in the first week of March 2020, but I don't know how long before that they implemented this form.
Q. All right. So had my client been seen by the doctor, even by the nurse, we would then see the, you know, the shipboard medical records that we're all familiar with, right?
A. Hypothetically, yes. So if the guest wants to

Page 29

see a doctor, then they will then do the next step of doing a guest consultation form, and then they will, you know, the medical records, a SeaCare entry -- which is our electronic health record system -- entry would be created, and whatever notes by the medical professionals that saw the guests would be input into that database.
Q. So when -- when there's an actual SeaCare record created, does the medical staff interaction log go away, or do both exist contemporaneously?
A. It used to be that they would put everyone on the consultation log. I think now -- and I had not researched that, it's outside the scope -- but I think now, if the guest -- if it's just an interaction, and the guest consultation form is not created, and an actual, you know, patient/doctor relationship is not created, then they'll just have the interaction log.
And I think that -- and I'd have to research this to be 100 percent sure -- I think that once that relationship is created, they would not need the medical staff interaction log. They have the guest consultation form, and the actual medical records. But I'd have to verify that 100 percent with our medical team.
Q. But that's my question. The ladder -- I'm

interested in the ladder part of your answer. If a doctor/patient relationship is established, does the interaction log get torn up and thrown away?

MR. PELAEZ: Objection. Beyond the scope.

BY MR. HERNANDEZ:

Q. It's in the SeaCare notes now?

A. That's what I don't know definitively. I don't think that they would do a guest interaction log. If the guest came down to the medical center and said I need -- I want to see a doctor, or I want to see a nurse, they would just enter the guest consultation form in the SeaCare records. I think, under those circumstances, they don't do the interaction log. It's only when the guest leaves, and they don't actually have a consultation. But I would have to verify that to be 100 percent sure. I am not 100 percent sure.

Q. So the interaction log is created after the guest has left?

A. It is created contemporaneously with the visit. I think the nurse in this case testified he did it right after, you know, she left. You know, he's not sitting there writing it down while he's interacting with the guest. He does it right after the guest has --



Q. This is an online form, right?

MR. PELAEZ: Objection. Beyond the scope.

THE WITNESS: I don't know where it lives on their computer, on the medical center. It's probably a form that lives on their computer. I don't know if it's an internet-based form or not.

BY MR. HERNANDEZ:

Q. Getting back to my question then. Whether she reported it on the 2nd, whether she reported it on the 4th, no -- we can agree that Carnival did no investigation, while she was still on the cruise, into the incident?

A. That is correct. She did not seek, you know -- the accident reporting protocols would not have been triggered, because she did not actually seek medical treatment.

Q. So it's your testimony that the accident report protocol is only triggered when a guest seeks medical care?

A. That is usually when it gets triggered, by the doctor noting that they need to extend treatment beyond first aid to a guest, or a passenger. That's when, usually, the internal accident reporting criteria are triggered for the company. And then, at that point, the chief security officer would be



notified. Depending on the circumstances, they would come down and, you know, start conducting their accident investigation in anticipation of litigation, or a claim.

Q. All right. But you're not saying that onboard medical care is the sine qua non of your -- your starting an investigation on one of your ships, right? There are other instances where you all investigate incidents where the guest hasn't sought treatment.

A. That is -- that is true. There have been instances and, depending on the circumstances, it might not be a personal injury. It could be an allegation of a crime, or a missing person. There could be other circumstances, too. But that is, for the most part, how personal injuries, from accidents onboard, are investigated. It usually -- the triggering event is usually a visit to the medical center, and then the doctor making the determination that the treatment needed was beyond first aid, which was the criteria.

Q. All right. Here we have a situation where she went to get services, then to the medical window, or went to the medical window, then to get services, and informed your employees that she had a fall, and thought she might have a fracture, but, you know, hey,



it's three days old. I'll see a doctor when I get home.

MR. PELAEZ: Objection to form.

THE WITNESS: She never said that she thought it was fractured, at least I had no indication that she thought it was fractured, or that she told the nurse that, but she did say that she injured her forearm. That she fell in her cabin three days prior.

BY MR. HERNANDEZ:

Q. So your company knew, while she was still on the ship, that her contention was that it happened in her cabin bathroom?

A. Yes.

Q. But yet no investigation was done?

A. That is correct. She did not seek medical attention. No doctor would have -- reporting protocols would not have been triggered based on these circumstances.

Q. So I -- I -- I have to go back to my question then. Is the reporting protocol only triggered when a passenger seeks medical care on your ship?

MR. PELAEZ: Objection to form.

THE WITNESS: No. Depending on the circumstances, other things could trigger an accident investigation. If you had someone -- it just depends

Page 34

on the circumstances. But no investigation was done here.
BY MR. HERNANDEZ:
Q. Such that no accident report was generated, no statements were taken, no photos were taken, right?
A. Not contemporaneous with her cruise, no. That's correct.
Q. Well, did it happen at some point?
A. Yes. When she filed a claim and a lawsuit. Now that's what we've been doing in the discovery process for the better part of several months now, right?
Q. So you're telling me there is an accident report now?
MR. PELAEZ: Objection.
THE WITNESS: No. There's an investigation, obviously, because of the litigation.
BY MR. HERNANDEZ:
Q. Is -- does an accident report related to this incident, regardless of when it was created, exist in this case?
A. There are many reports now from Counsel, but not -- not -- not one generated onboard the ship by the chief security officer. No.
Q. All right. Other than those that your lawyers

Page 35

may have taken, have any statements been taken by Carnival personnel?
A. I know the lawyers have spoken to -- to -- to people, and I know that we have now deposed the one sort of eyewitness that we have, which is the nurse who actually encountered Ms. Hall on March 4th. I'm not aware of any other statements taken by Counsel. I have not seen them if there are any.
Q. You would agree with me that a wrist fracture is something that requires care beyond first aid, right?
MR. PELAEZ: Objection to form.
THE WITNESS: I would agree that it depends on the type of fracture, obviously, and I'm not a doctor. But under these circumstances, had she seen a doctor, and hypothetically, had they taken an x-ray, and denoted a fracture, that that -- then would have probably triggered the accident reporting criteria.
MR. PELAEZ: Your video cut out.
MR. HERNANDEZ: Yeah, your camera --
THE WITNESS: Yeah. It's -- my phone is somehow connected to my iPad; I don't know why. Let me just turn my phone -- well, I can't turn it off because -- sorry, somebody just called in on my phone, and it's connected to my iPad somehow, sorry.

Page 36

BY MR. HERNANDEZ:
Q. Are you good?
A. Yeah. Can you see me and hear me okay?
Q. All right. So --
A. Oh here we go again. I don't know how to --
Q. We back?
A. Yes.
Q. Okay. So you just said that, had she seen the doctor, that it more than likely would have triggered the accident reporting criteria. Do I have that right?
MR. PELAEZ: Objection to form.
THE WITNESS: Hypothetically, if she saw the physician, and the physician took an x-ray of the arm, the x-ray radiology report revealed a fracture, then I would think that an accident report would have been created for this particular incident.
Q. Even if the incident occurred on the 1st, but she did not -- she did not see your doctor until the 4th, would that still hold true, what you just said?
A. Yes. Usually, we would have asked the chief security officer to initiate an investigation, so that we could try to document what she was claiming happened in case she filed a claim.
Q. What exactly is -- strike that. What exactly

Page 37

was your company's accident reporting criteria in March of 2020?
MR. PELAEZ: Objection. Beyond the scope.
You can answer if you know.
THE WITNESS: I don't know how to answer that. I mean, I think we've just been discussing in detail what would trigger an accident investigation. So you're going to have to be more specific. That's a very broad question.
BY MR. HERNANDEZ:
Q. It's not broad at all. What criteria would trigger, to use your word, the accident reporting?
MR. PELAEZ: Objection.
THE WITNESS: One of them would be if a guest responded to a medical center, and a doctor noted treatment beyond first aid, that would normally -- under normal circumstances, trigger the accident reporting criteria.
BY MR. HERNANDEZ:
Q. What else?
MR. PELAEZ: Objection to form.
THE WITNESS: It depends on the security staff. So if somebody is reporting a theft, if somebody is reporting a sexual assault --
MR. HERNANDEZ: I don't need -- I don't

Page 38

need -- I can limit this to personal injury.
THE WITNESS: Okay. Under -- under most circumstances, it's an interaction with the medical staff. It can, however, be a guest who is chronically complaining, or asking for an accident report to be created, or circumstances that would give rise to some manager onboard saying, this person is going to -- they've already said they're going to file a claim or a lawsuit, or et cetera, we need to create an accident report. So I have seen that, as well. But generally speaking, what triggers it is the visit to the medical center.
Q. And here, if I've understood your testimony, this criteria that you've just described for us was not met in Carnival's view, because no treatment was rendered on your ship?
MR. PELAEZ: Objection to form.
THE WITNESS: The accident reporting criteria was not triggered here, because she never -- she never sought medical treatment. She told the nurse she did not want to see the doctor, that she would get medical treatment at home, so this did not trigger the reporting protocol.
BY MR. HERNANDEZ:
Q. Was any investigation conducted by your

Page 39

company when you received our letter of representation?
A. Sure. Yeah. At that point, the adjuster and Monica would start creating a claims file, and getting the relevant shipboard records, et cetera.
Q. Who was the adjuster on this file?
A. I don't know who it was initially in 2020. It would now be Maurice Vega, because he's our only remaining passenger adjuster for now.
Q. So -- and I'm sorry. Tell me what was done, specifically, by way of investigation when the rep letter was received. You said a claim file would be set up. Anything else?
A. I mean, all of that work product it's just the lawyer gearing up for a claim, right? So it includes getting the claims file together. It includes getting all of the relevant shipboard records relating to Ms. Hall, and her traveling companions' cruise itself, and just to see what they can piece together regarding her allegations.
Q. Leaving aside what your lawyers may have done, once a formal lawsuit was filed, did your department, or any department at Carnival, go beyond investigation wise what was done when the letter of rep was received?

Page 40

MR. PELAEZ: I don't know. I just want to object here. I mean, to the extent that you're asking witness about what Carnival did, specifically, when a claim letter was received. Anything beyond that point is going to be a part of an investigation, an ongoing investigation after getting notice of a claim. That's all work product. It's all privileged investigation material. If you ask specific questions that to communications, things that were done, documents, records, anything like that, I'll permit that. But just generally asking questions about the claims investigation process, I think all that's privileged.
MR. HERNANDEZ: This will be the second time, Counsel, I ask you to limit your objections to form.
MR. PELAEZ: You can't just ask me to limit my objections to form when I'm making an objection based on your question calling for privileged documents, information, or materials. You know, claims handling, materials, investigation is done, not only in a litigation, but once there is an active pending litigation. So I can't just object to form, because that would be improper and, you know, not correct. It's inaccurate.
MR. HERNANDEZ: Well, that's what the rules require, Counsel.

Page 41

MR. PELAEZ: No, it's not. The rules require me to state my objections in a concise and non-argumentative fashion, and that's exactly what I'm doing.
MR. HERNANDEZ: We'll see.
MR. PELAEZ: Okay.
BY MR. HERNANDEZ:
Q. Ms. Vasquez, getting back to my question, other than what your lawyers may have done when the complaint was filed, was there any other investigation conducted by Carnival?
MR. PELAEZ:
THE WITNESS: Yes. Through the legal department, managed by lawyers, in anticipation of this claim. Yes. There are many things that are done on the back end that I do not believe you are entitled to. I believe of the processes are work product, and you are not entitled to that.
MR. HERNANDEZ: The results are work product, the processes most certainly are not, but look if you don't want to answer it, we'll go to court.
MR. PELAEZ: That's not a question. There's no question.
THE WITNESS: Right. I just don't think that our legal processes on the back end, our reserving

structure, all of that, is relevant to the context of the 30(b)(6) deposition, and I don't think it's appropriate, and it's outside of the scope.

MR. HERNANDEZ: I'm not asking you about reserves, I'm not asking you about strategy, I'm not asking you about lawyer theories. I'm asking you what was done. Meaning, you know, this document, that document was gathered. This witness, that witness was spoken to. That's all I'm asking.

MR. PELAEZ: Objection. That's all work product privilege. Investigation conducted in anticipation of ongoing litigation, or during the course of litigation.

MR. HERNANDEZ: Are you instructing her not to answer, Counsel, so we can move on?

MR. PELAEZ: I am. I am. I am. I'm instructing her not to answer.

MR. HERNANDEZ: Perfect. I don't need to -- that's fine.

MR. PELAEZ: She's already adequately explained generally what the process is once a claim is received, once Carnival receives notice of a claim. The types of things they do, the types of documents that they request, and who they reach out to, and who they contact. I believe you're entitled to that.



She's given you that information, and now you're simply asking additional questions as to specifically who Carnival contacted as part of its investigation here after the fact. Certain things that I think are encompassed under the work product privilege.

MR. HERNANDEZ: Are you done with your speaking objection?

MR. PELAEZ: She's done a good job of responding to your question, so --

MR. HERNANDEZ: Are you done with your speaking objection, Mr. Pelaez?

MR. PELAEZ: I'm done making my assertion of privilege clear on the record, Mr. Hernandez.

BY MR. HERNANDEZ:

Q. And either at the time of the representation letter, Ms. Vasquez, or at the time of the complaint, what individuals were involved in investigating this claim?

MR. PELAEZ: Objection. Asked and answered.

THE WITNESS: The claim letter in March of 2020 -- I'm not sure when it came in, actually. I would have to look to see what the process was, because as of March 13, 2020, we all went remote, and many of our employees were furloughed a couple of months later. So, but generally speaking, if it was



before March of 2020, the claim would go directly to me in my office. I would stamp it. We would start a process rolling with an adjuster, and a litigation rep, and my in-house team, to create a claims file, and wage an investigation.

And then, of course, when the litigation is filed, we send it out either to outside counsel, or in-house counsel for Carnival, and they make whatever determination they want as to what witnesses they need, what investigation they want to conduct. And that is what I believe is privileged. So to the extent that you want to ask something else, I could probably answer it.

Q. Well, let's try answering my question which was very simple. I just want to know, in this case, whether at the time of the rep letter, or the time of the complaint, the name of the individuals who did any investigating. That's all I'm asking.

A. It would have been me, Monica Borteseggi, and probably, Maurice. I'd have to look in the claims file to see if another adjuster was working on the file before Maurice was.

Q. All right. And then outside of that, it would be your lawyers?

A. It -- I -- I -- I did not research the history



of this particular claims file for today to know whether it was assigned to an in-house lawyer. We don't have in-house litigation lawyers that it might have gone to for a while, before it went to Mr. Pelaez. I'm not sure.

Q. My question is, beyond the three individuals, yourself included, that you just mentioned, any other investigation would be by your lawyers, whether they're in-house, or outside?

MR. PELAEZ: Object to form.

THE WITNESS: Or at the direction of the lawyers, right. Right.

BY MR. HERNANDEZ:

Q. So now, from the investigation that was done in-house, such as it was, did -- not your lawyers, Carnival -- did Carnival arrive at any conclusions that Ms. Hall was comparatively negligent?

A. Yes.

Q. And what conclusion was that?

A. She consumed at least 12 alcoholic beverages on the day in question. She admits that she took some or all of all 12 of those drinks. She also admits in her deposition, under oath, that she was sleepy and not paying attention. She admits that she had been into the bathroom at least twice before this incident

Page 46

occurred. That she had seen the subject step up into the bathroom and the threshold around the shower. She knew it was there. She just, I think, was sleepy, and little bit intoxicated, and just -- just forgot about it, and tripped over it in the middle of the night.

Q. What evidence, if any, does Carnival have that Ms. Hall was intoxicated at the exact time of her fall?

A. She had 12 alcohol drinks in about the 9 hours prior to her last drink at 10:30 at night. 7 of those were in the last 2 or 3 hours of the evening. She admitted in her deposition testimony that she consumed all or part of every single one of those drinks. She herself said she wasn't sure if alcohol was a factor or not. When she was asked the question under oath, you know, "Were you drunk?" She was like, "Well, I'd been drinking." I mean, she conceded that that might have had a part, a role, in what happened.

She also said at least three or four times in her deposition testimony that she was very sleepy, and that -- and that she was a very large woman in a small bathroom, and she obviously just was not paying attention to where -- to her surroundings. She said that she knew the ledge was there. It was not a hidden danger to her. She was aware of the threshold,

Page 47

or the lip around the shower. And, indeed, that would be common sense that the shower would have some time of lip around it.

And I think all of those circumstances would easily allow a finder of fact to find her comparatively negligent for this incident. If not completely at fault.

Q. Sure. Does Carnival have a breathalyzer test that evinces my client was intoxicated at the moment of her fall?

A. No. Carnival does not ever give breathalyzers to guests, unless a doctor needed it for a medical reason, there would be no reason to do that. But no.

Q. Does Carnival have a blood alcohol reading of my client at the time of her fall?

A. You know that we do not, because she didn't report it for three days, and we didn't have any opportunity to do that. Not that we would have. Carnival would not get a breathalyzer reading, or blood alcohol results from a guest, simply to prove a level of intoxication. That's not a policy or procedure that is followed onboard our ships.

Q. Does Carnival know of any witness that described my client as intoxicated at the moment of her fall?

Page 48

A. I only know your client herself testified that she wasn't sure if it played a factor. But she had been drinking all day, it was the middle of the night, she had just woken up from a dead sleep, and was sleepy, possibly still intoxicated, and not paying attention to her surroundings.

Q. She didn't say possibly intoxicated in her deposition, did she?

MR. PELAEZ: Objection to form.

THE WITNESS: The question, I think, was, "Were you drunk?" And her answer was, "Well I'd been drinking." So, I mean, it's, you know -- and she admitted that she'd been drinking all night. That there was 12, you know, drinks in the hours leading up to her fall.

BY MR. HERNANDEZ:

Q. Not all night, right? Because this happened -- what time did -- what time did her fall happen, do you even know?

A. She wasn't even sure. Sometime after midnight. She said she got back before midnight, and sometime after midnight.

Q. Has Carnival's investigation lead it to any conclusions relative to whether this danger was open and obvious?

Page 49

A. Yes.

Q. What conclusions has Carnival arrived at?

A. I would first say, this is not a dangerous condition. This is a small lip in a shower to keep water inside a shower, that is common in any configuration, land-based, or otherwise. You have some type of barrier in a shower to keep water from going all over the bathroom floor. So I would not say that that's a dangerous condition.

However, it is an open and obvious condition for which, not only would any reasonable person know that it was there, your own client testified under oath that she saw it before at least twice. That she knew it was there. She had successfully navigated that bathroom already two times before she fell in the middle of the night that night.

Q. Any other elements that form your -- your company's conclusion that this was open and obvious?

A. I mean, you can see from any photograph taken of it that you can clearly see that it's a shower, clearly see that there's a lip, and she testified that she did know about it, saw it, and it was open and obvious to her.

Q. She used those words, open and obvious?

A. No. Because that's a legal term. But she

Page 50

said, I think, under oath, "Did you see it?" "Yes." "Did you notice the ledge the first time?" "Yes." "Did you successfully navigate in the bathroom around the ledge the first time?" "Yes."
Q. And I presume then that all this leads Carnival to believe, or posit, that she failed to exercise care for her own safety, right?
A. I think that is a reasonable conclusion that any finder of fact would -- would be able to find. That she herself, unfortunately, was not paying attention to her surroundings in the middle of the night, and she -- she tripped over a ledge that she knew was there, she should have known it was there, remembered that it was there. That she was sleepy, she was tired, she'd been drinking all night, and she failed to appreciate the lip, and she fell. It's very unfortunate, but it doesn't mean there is anything wrong with the lip, it -- it just means that, unfortunately, Ms. Hall was not paying attention to her surroundings that night.
Q. My next question has nothing to do with cause, but insofar as the mechanism. Does your company dispute that insofar as mechanism, she tripped on the step or curb of the shower?
MR. PELAEZ: Objection to form.
THE WITNESS: I mean, she testified under oath

Page 51

that she really doesn't know what caused her to fall. She's assuming it was the lip of the shower, I think is the way that the end of her deposition testimony ended up. So if you go by your client's own testimony, the mechanism of her fall was that she failed to appreciate the lip, and that, somehow, her feet got caught on to it, and she fell into the shower and hurt her arm.
BY MR. HERNANDEZ:
Q. I'm not asking you to repeat what my client has said. I'm asking you what Carnival's position is. And maybe Carnival's position is what hers is, but I'm -- I'm -- just so we're clear, I'm asking you for your company's position on did she in fact trip over that ledge, over that curb, over that step?
MR. PELAEZ: Objection to form.
THE WITNESS: Carnival would have no way of knowing, since it was inside a passenger's cabin in the middle of the night. So all we can do is listen to what she thinks happened and let the finder of fact decide for themselves what happened, and who was at fault for it.
BY MR. HERNANDEZ:
Q. Well, but you've told me that you've conducted an investigation. So, from the investigation that you've conducted, have you determined whether -- or

Page 52

maybe you haven't. Have you determined that she in fact tripped over that curb or ledge to the shower?
MR. PELAEZ: Objection to form.
THE WITNESS: I don't really know that we will ever have an answer to that. It's really a matter of a finder of fact listening to all the evidence. Which will include everything we've discussed to date. The number of drinks she had, the fact that it was the middle of the night, the fact that she was a very large woman in a small bathroom, and she should have been paying attention a little bit more. And all of these things came out in her deposition testimony, so I don't think it's an appropriate question for a 30(b)(6) witness, who was not a fact witness, to make that determination. That's up to the finder of fact.
MR. HERNANDEZ: I think it's a very proper question, but we'll let the court decide that, as well.
BY MR. HERNANDEZ:
Q. Carnival doesn't dispute that she was injured, right? From that fall?
MR. PELAEZ: Objection to form.
THE WITNESS: I have nothing, as I stand here today, to say that she didn't injure her wrist that night, because that's what she claimed onboard. And then she did seek medical treatment, like she said she

Page 53

was going to do when she got home. And I believe that did diagnose a fractured wrist, and I that she received treatment for that about 10 days later.
BY MR. HERNANDEZ:
Q. Other than, ostensibly, the sleepiness, the drinking, and the failure to take care, is it Carnival's position that my client did anything else to cause her fall?
A. Well, I know that she was on a lot of medications. She has a lot of underlying co-morbidities due to her weight, high cholesterol, diabetes, blood pressure, she has bad knees. She's on drugs for her osteoarthritis. She's on metformin, dyazide, there's -- she had listed several medications which are probably contraindicative of alcohol, but I'm not a medical doctor to make that determination, so I would leave that up to a medical expert to opine as to whether those could have caused or contributed to her falling.
Q. What facts support Carnival's position that it discharged its duties to my client by warning of all hazards and/or conditions? What facts?
A. Could you repeat that question? That doesn't make any sense the way that you waged it. Are you talking about the potential for dangers in this particular bathroom?

Q. I'm asking you what facts support your company's defense that you fully discharged your duties to my client by warning of any and all hazardous and/or conditions?

MR. PELAEZ: Objection to form.

THE WITNESS: I have not seen any hazards or conditions that would need a warning or need to be advised of in the subject bathroom. She claims that she tripped on the ledge to the shower, the lip that keeps the water in the shower and keeps it from running all over the rest of the bathroom. She testified that she saw it beforehand, she knew it was there. She had been in the cabin a couple of times, and the bathroom a couple of times, and navigated around it just fine on those two times.

So there's nothing hidden about the lip itself. It is an open and obvious type of situation, and she knew it was there, and just failed to appreciate it in the middle of the night on March 1st.

BY MR. HERNANDEZ:

Q. So it's your testimony that there was no need for Carnaval to warn her of this lip, as you called it?

A. That would -- that's correct. Right. You would have no need to warn of something that's obvious



and known to the passenger.

Q. We can agree that at the time of my client's cruise in March of 2020, for example, there was no placard or sign outside the bathroom, warning of this lip or step, right?

A. Right. You would not need a sign warning of the lip because it is obvious that there would be a lip around the shower to keep the water inside the shower.

Q. And we can agree that, at the time of my client's cruise, there was no placard or sign inside the bathroom that warned of this step or lip at the shower, right?

A. Right. You would not need a sign for an obvious condition. Something that anyone would appreciate with using their ordinary senses.

Q. Sure. And we can agree that at the time of my client's cruise, there was no color demarcation of that step or lip to the shower, right?

A. It's all the same material, basically. You can see differences in the texture. It's very obvious. But it's all the same color. They do usually fold up a towel or have the little mat on one side of it. And then you can also have the shower curtain, when it's closed, sort of denotes the area of



the shower. So there's other visual indicators, I guess, that that's the shower area.

Q. We can agree that, at the time of my client's cruise, this step or lip to the shower didn't have any yellow or other colored tape on it, right?

A. I have not seen any evidence of that. No. That would be strange.

Q. That would be strange? Why?

MR. PELAEZ: Objection.

THE WITNESS: It just would be unnecessary, and the tape would be subject to wet conditions all the time, and it would come off and probably cause some type of tripping hazard. It would just be very unnecessary.

BY MR. HERNANDEZ:

Q. What facts support your company's defense that it did not owe my client a duty to warn her of the subject condition, the threshold?

A. Because that's a legal determination. There's no duty to warn of something the passenger knows about. There's caselaw directly on the point regarding showers, exactly, so.

Q. What facts support Carnival's defense that the doctors involved in her assistant care and/or treatment were independent contractors?



A. That's just the relationship and how it works. There's an independent contractor agreement. They get signed on for a particular, you know, section of time, and they are paid a salary for that, you know, service.

Q. But why -- so she -- was she seen by one of your doctors?

A. No.

Q. So how is that a defense in this case if she wasn't even seen by one of your doctors?

MR. PELAEZ: Objection, form.

THE WITNESS: You're asking whether they are an agent or an independent contractor. So they are an independent contractor. How it's relevant in this case, I don't know, because she didn't want to see the doctor, so that's up to the lawyers to determine.

BY MR. HERNANDEZ:

Q. It's your company's defense, that's why I'm asking. Because --

A. Because I think you in the complaint -- yeah. You allege in your complaint that we failed to provide care and that somehow the doctors could be responsible for that. Therefore, that is, I think, a valid legal defense to wage. I don't care to engage in a factual dispute with you. We know that your client testified

Page 58

that she never saw a doctor, so.

Q. I'm aware of that.

A. We'll leave that to the judge as to whether that's relevant. And whether your claims for medical negligence by the medical staff get stricken or not. But as long as their --

Q. Well, yeah --

A. Right. That's why the defense is still valid, and reasonable, and those are the facts that support it.

Q. So getting back to my question which you haven't answered. The facts then that support the defense is the agreement between your company and the doctor or doctors on this ship at the time.

MR. PELAEZ: Objection to form.

THE WITNESS: So, it's a legal analysis that a judge would have to -- obviously, to determine whether the doctors onboard are in fact independent contractors, versus an employer, an agent, for which their negligence could be imputed to the cruise line.

BY MR. HERNANDEZ:

Q. I'm well aware of that, Ms. Vasquez. My question is, again, limited to facts. What facts support that the doctors were ostensibly independent contractors? The agreement between Carnaval and the

Page 59

doctors?

A. Correct. Yes. The agreement for sure, yeah.

Q. Anything else --

A. The nature of the relationship. The way that the relationship is managed. I think it's well outside the scope of what's relevant in this case, since we know she never even saw the doctors.

Q. What facts support the defense that any nurses involved in plaintiff's assessment of care or treatment were borrowed servants of independent contractors?

A. So the nurses work under the direction and supervision of the doctors onboard who are independent contractors. So they -- if they are told by the doctors to do something, they will do it, because they are basically their servants. And so that is an old legal doctrine. Again, these are legal terms. I don't think they're appropriate for a 30(b)(6) deposition. However, that is the relationship as it exists onboard between the medical staff, the doctors and the nurses.

Q. I'm not asking for a legal analysis. I'm limiting my questions to facts. I simply want to know what facts Carnival relies upon to aver that the nurses are borrowed servants of the independent

Page 60

contractor doctors. That's all.

A. And I just went through every single one of them. The way that they behave and the way that they are supervised and managed by the medical staff and support.

Q. What facts support the defense that my client's own negligence was the sole cause of her fall?

MR. PELAEZ: I think we've kind of covered this in many respects. But again, we know, by her own testimony -- I don't think we need to look outside of her own testimony -- that she knew the shower had a lip. She had seen the lip. She had navigated it at least two times before she fell. She had 12 different alcoholic drinks with 1.25 ounces or more of alcohol in each one of them. And she drank at least part or all of every single one of those prior to her fall.

We know that it was the middle of the night. She even admitted that she was sleep. She had just gotten up. She also admitted that she's a very large woman, and it's a very small space, and that she was quickly going to the bathroom.

I think all of those facts would give rise to any reasonable finder of the fact, finding that Ms. Hall, unfortunately, was the sole person

Page 61

responsible for this particular unfortunate fall.

Q. What facts support your company's defense that her injuries -- my client's injuries, were as a result of the actions, or fault of third parties?

A. I -- I don't -- I don't think that's still on the table. I think that she has now testified that Ms. Vaughn did not pay any role in this. There was not something left on the floor. Something that caused her to slip. It was just her failing to appreciate the lip that caused her to trip.

Q. So there are no third parties that you can point to, am I right?

A. I don't believe so. No. Unless, of course, there is some sort of allegation later about the medical care rendered to her shoreside after the cruise. But I'm not aware of any further medical negligence claims after she had treatment on her wrist.

Q. What facts support your company's defense that her injuries or damages were caused by an intervening or superseding condition? What is the intervening or superseding condition, factually?

A. I mean, I -- I think that was probably waged thinking that someone had left something on the floor. She's now testified that it was not -- there was

nothing -- no liquid or substance left on the floor, that she just tripped on the lip. So the only other intervening or superseding causes of that would be her level of intoxication, and possibly that she was asleep, or just wasn't paying attention that night.

Q. Anything other than that?

A. Not that I can think of while I -- as I sit here today. No. I mean, other than what we also discussed that the medications she was on that might be contraindicated. I know she had a bad knee, so I don't know if that causes some instability. Other than what we've already discussed, I'm not aware of any other facts that could be deemed to be a superseding or intervening cause.

Q. What facts support your defense that her injuries are from a pre-existing injury? Facts.

A. I don't know what else she is claiming. It seems to me, from her deposition testimony, that it's just the wrist. And I don't believe that we have any indication that the wrist was a pre-existing injury. However, to the extent that she's claiming any other neck, back, knee, et cetera, we do have medical records that are pretty replete with her prior, you know, medical conditions and underlying comorbidities not related to the fractured wrist.



Q. What facts support your defense that my client has failed to mitigate to lessen her damages? Facts.

A. I have not reviewed all of the medical records, so I don't know. You know, I know she didn't seek treatment. But again, when she did, they still waited several days. It's doesn't seem like that delay caused her any harm. So I'm not aware as I sit here today, I would defer to the medical experts, as to whether she was prescribed some type of PT that she didn't do. If she was non complaint. I don't know because I don't have -- copies of her medical records. I would leave that to the medical experts to opine whether she might have failed to mitigate damage to her wrist.

Q. I understand that and I'm not asking you for what your experts may opine on. I'm simply asking you what facts are you aware of today, November 30th of 2021, that support that she did A, or B, or C that caused a -- that caused her to not mitigate her damages? Facts. Not expert opinions. Facts.

MR. PELAEZ: Objection to form.

THE WITNESS: I just told you that she didn't seek treatment for several days, obviously. However, it's my understanding from the medical doctors, because I'm not one, that that didn't cause her any



damage or harm. And as evidenced by the fact that her own treating doctor waited another week or so to actually perform the surgery, that makes sense to me.

But I'm not a medical expert. I don't have all of her medical records. So I can't -- I cannot identify where she might have failed to mitigate without knowing the full particulars of her medical care and her full medical records, which we do not have to date, and I do not have. So I do think that I am allowed under the rules for a 30(b)(6) to defer to the medical testimony on that issue of mitigation.

MR. HERNANDEZ: We'll see.

BY MR. HERNANDEZ:

Q. What facts support your contention that your company did not have actual or constructive notice of dangerous or risk creating condition? Facts.

A. The lip itself is not a dangerous condition. It is open. It is obvious. It is something that is known not just in maritime law but known on land-based configurations. Everyone knows that a shower will have some type of enclosure to prevent the water from going all over the bathroom. Whether that is a step down into a shower. Whether it's a lip around it, or a tub, everyone knows it is something in the ordinary course of scope of everyone's life that that is a



condition that they are going to encounter.

Q. What facts support Carnivals defense that Ms. Hall failed to seek timely medical treatment?

A. Well, as we just said, she didn't report it for three days, at least by Carnival's records. And then, when she did report it, she still failed to see the doctor. However, it doesn't seem like that caused her any harm, that delay, since her own treaters, when she got home, still waited another week or so to perform any type of, you know, operation or surgery on the injury.

Q. What facts support Carnival's contention that Ms. Hall refused medical treatment and acted against medical advice?

A. Well, I know that at the guest care, they said for her to go to the medical center, which she did. And when she got to the medical center and asked about charges, and found out there were charges, she just decided she didn't want to pay those charges and decided that she would just wait until she got home the next day to see her primary care physician.

Q. Was it a situation that she decided she did not want to pay those charges, or was it a situation where she was unable, at the time, to pay those charges?

MR. PELAEZ: Objection to form.

THE WITNESS: I mean, that's just a matter of semantics. It would just get posted to her -- it would just be posted to her sail and sign account, which goes against her credit card, and I think she testified it was linked to her credit card. When she's a solvent, professional woman, you know, a hard-working nurse. So it's not like she doesn't have the money. I think she just didn't want to pay it and thought it was not necessary since she was going to be home the next day. She's a nurse herself and she thought she knew best. And maybe she did. And she went and got, you know, medical care when she got home.

BY MR. HERNANDEZ:

Q. What facts -- not opinions -- what facts support your company's defense that the care my client has received was excessive, unnecessary, or unreasonable?

A. I don't have any facts, as I sit here today, to say that the surgery that she got after the cruise for the wrist fracture was unnecessary. I think that was more a defense of that the customary expenses would be what was actually, you know, charged and paid for by insurance company, rather than what it might



have been billed by the doctors themselves.

MR. HERNANDEZ: Let's go off the record.

THE WITNESS: This is a great time for us to go off the record, because remember I said at 2:15 I need to run and pick up my son. But he gets out at 2:20. I should be back here by 2:30. Is that okay?

MR. HERNANDEZ: Well, yeah. That's why I stopped.

THE WITNESS: Oh. Thank you. I thought --

THE VIDEOGRAPHER: We're off the record at 2:11.

(Recess taken from 2:11 p.m. to 2:36 p.m.)

THE VIDEOGRAPHER: We're back on the record at 2:36.

THE REPORTER: All right. You're good.

BY MR. HERNANDEZ:

Q. Other than -- strike that. Are you aware of any eyewitnesses to the fall?

A. No.

Q. Other than the nurse we've spoken of earlier, Mr. --

A. I just call him Nurse Jason.

Q. What are the names of other shipboard witnesses, if any?

A. The only ones I believe that might have



relevant information would be whoever entered those notes into the iCare system. So we could look at the iCare records for that name of that person. And possibly the guest -- I mean the shore excursion desk. I think what happened was that when she thinks, on the 2nd, she canceled, or the 1st, that she reported her injury to guest services, I think she was actually at the shore excursion desk canceling her shore excursion.

They are right next to each other the same deck, basically. One is just across from the other one, so she might have just been confused. Because I do see in her records that she canceled, or she got a refund of that beach -- not beach excursion, the ziplining excursion, on the evening hours of March 1st.

Q. So who gave her that refund on March 1st?

A. It would have been someone at Shore X, and then it gets posted to the guest services account.

Q. Can we identify who that was?

A. I mean, probably not. We could probably identify the folks that were actually working for the shore department on that cruise. I don't know that you're ever going to figure out who it was that she, you know, spoke to cancel that zip line excursion. We



do have the name of the iCare -- I mean the guest services representative who interacted with Mrs. Hall on the 4th of March. And that name is Dmytro Sukhomlin. So D-m-y-t-r-o S-u-k-h-o-m-l-i-n.

Q. All right. Is there a written record of the cancellation and refund of the shore excursion on March 1st?

A. Not that I've seen, other than that it was refunded to her sail and sign account. But customarily what happens is they go to the Shore X desk, and the Shore X will cancel it. Which automatically they'll ask for her sail and sign card, it processes, and then the refund goes through to guest services. So if I think that, if she had any interaction, I think that's who it was with on March 1st.

Q. Okay. So, on March 1st, to receive this refund, she would have had to have told someone at your shore excursion desk of her injury.

A. Maybe. Maybe not. I don't know what she told them, but she asked for a refund for whatever reason, and they gave it to her. And then the next day, it looks like they processed something when she was ashore. She bought a beach excursion the following day in Cozumel.

Page 70

Q. What are the reasons, back in March of 2020, that your company refunded excursions?
A. It can be any number of reasons. I mean, people might change their mind. They might not feel like hiking the next day, or whatever. There can be any number of reasons that someone would want to cancel or rebook a different tour.
Q. So if I'm onboard back in March of 2020 and I just don't feel like doing an excursion that I've already purchased, Carnival would refund it?
MR. PELAEZ: Objection --
THE WITNESS: Probably. Yeah.
BY MR. HERNANDEZ:
Q. Not always through, right?
A. Depends on the circumstances.
Q. Correct.
A. In my experience, yes. The tour group works very well with the guests. If they don't want to participate in the tour, they'll just refund it in advance. That's not a problem.
Q. Don't your shore excursion tickets specifically have a cancellation period in them, much like your passenger tickets?
MR. PELAEZ: Objection. Beyond the scope.
THE WITNESS: I don't know what the back of a

Page 71

ticket itself says, but I know, in experience, that our shore operations team will refund shore tours when asked, for any number of reasons.
BY MR. HERNANDEZ:
Q. You've looked at Carnival's answers to interrogatories?
A. Yes.
Q. Why haven't these been sworn?
A. I don't know. Possibly because maybe Monica just wasn't able to print them out and sign them.
Q. Who is Dennis Nourmoukhametov?
A. That is another --
Q. Let me spell it for the court reporter. N-o-u-r-m-o-u-k-h-a-m-e-t-o-v.
A. He's anther guest services rep onboard the Valor at the time of her cruise.
Q. The individual you mentioned earlier, Dmytro Sukhomlin, S-u-k-h-o-m-l-i-n, is he still employed?
A. I don't know. We could easily pull the CPSs locates for both of those folks to see if they're still with the company.
Q. While you're at it, I'd like to know if Cagumbay is still employed.
A. Okay.
THE WITNESS: Victor, can you just take notes

Page 72

for us to ask Monica or Maurice to pull the CPS info for those three?
BY MR. HERNANDEZ:
Q. Oh. You're not doing it just now?
A. No. I don't have access to CPS anymore, remotely. But we can -- we can find out for you by, you know, tonight or tomorrow.
Q. Oh, I thought you were about to do it. Okay.
A. I mean, if we send an email to Monica, she's back in the office.
THE WITNESS: So, Victor, if you want to fire off an email, we might get it by the conclusion of the depo. Or Maurice. Actually, Maurice is probably -- or Tanya. So copy Tanya, Maurice, and Monica, and between the three of them, I'm sure somebody can pull CPS for us.
MR. PELAEZ: Okay.
BY MR. HERNANDEZ:
Q. So in so far as knowledge, can we agree that Cagumbay, the nurse, would have knowledge of the interaction between Ms. Hall and the medical department?
A. On March 4th, yes.
Q. To your understanding, does the nurse have any knowledge beyond that?

Page 73

A. No. He only recalled one interaction that was noted in the interaction log.
Q. How about Mr. Sukhomlin, what knowledge would he have relative to Ms. Hall?
A. That she came around 1 o'clock in the afternoon on the last sea day and reported it to guest services that she had fallen in the bathroom on embarkation evening, which is -- we know now to be early morning hours of March 1st. They embarked on February 29th.
And she also advised him, I believe, that she didn't want to pay the medical charges. She said she had insurance, I think. It was noted in the iCare notes. She also told him in that she had previously gone to the Shore X desk. So this, in what I just discussing before, there's iCare notes reflecting that she actually told him that it was the Shore X desk that she'd gone to before, not guest services. So I think she's just confused about who she reported what to and when.
But in those notes, it says that she came to the Shore X desk before her ziplining tour and asked that the ziplining excursion was refunded. And then at that time, Mister -- I don't know how to pronounce the last name, so let's just call him Dmytro, advised

her that he could get her priority debark, if she wanted, the following morning.
Q. Due to the injury?
A. She was claiming right at that time, I think that injury was about 1:25 in the afternoon, that she had injured her arm, and so she asked her what she needed, basically, and if she needed the priority debark. And then Dennis comes in later the following morning, advising that there were no medical charges since she didn't seek medical treatment. Debark morning, the guest was already off the ship, and they were closing up the -- the interaction log.
Because I think they had sent an iCare letter. Usually, when someone reports an injury or whatever, it gets noted and then they'll try to send like TLC letter to the cabin checking on the guest. But because it was reported on the last sea day, at the end of cruise, I'm not sure if, you know, procedurally, what all they were able to get off in the last hours of the cruise.
Q. So wait a second, was an iCare letter sent or not?
A. I think so, because in the iCare notes when you look at it, it says, "Docks." So there may be a letter in there. I don't know if that was produced in



discovery or not, but we could probably pull that. And it generally says, you know, "We're sorry to learn of your issue onboard. We hope that you're doing well. If you need us contact us." That kind of thing.
Q. Do you have a copy of it before you?
A. I don't. But we can pull it through iCare to see if it's there. It looks, to me, in the iCare printout, that it should still be somewhere in the iCare system.
Q. Have you seen it, in preparation for the depo?
A. No. But I don't have a photographic memory, so it may have been produced to you in discovery. I don't know.
Q. I haven't seen it.
A. Yeah. So --
Q. Go ahead.
A. There's nothing more.
Q. So Mr. Dennis, did he actually interact with her? If you know from the iCare detail.
A. I don't think so. It looks like he was just reviewing all the open cases for guests on debarkation morning, to make sure no one else needed a follow up or no one else needed assistance, or no one else needed medical charges waived, et cetera. And so he



looks like he was looking through the cases from the day before, from Dmytro's entries, and looks like he was just closing it out. Since at 9:31, she was already off the ship.
Q. Going back then to the answers to interrogatories. Who did the research investigation to formulate these answers? I'm sorry, you know what, the first ones at least our form. Who did the research and investigation to come up with these responses?
A. Most of it is managed by Monica, and then she will reach out to whatever department might have the relevant information, and start gathering it, and then she gives it, generally, to counsel. And then, with assistance of counsel, they prepare the responses. And then they usually pass them along to me to review and I ask Monica any questions that I might have. So it's sort of a collaborative effort, usually.
Q. So in this case though, given the changes in your department, was it in fact Ms. Borteseggi?
A. It definitely was still Ms. Bortessegi from March of 2020 on. March 1st of 2020, on. So, however, the adjuster might have changed. I believe the old adjuster for the Valor was Mario, but I'd have to look. So he might have assisted on some level. I



don't know when your claim letter came in.
Q. Have you reviewed these answers?
A. I skimmed them again before my deposition. But I can pull them up if there's a question you have about them.
Q. I have one question that's specific. But, in having reviewed them, do you note any errors, discrepancies, anything that you would like to change?
A. I don't, as I sit here today, have anything. But I don't have them pulled up to review. Like if you just let me -- you want me to verify the ones that are under --
Q. No. No.
MR. PELAEZ: You verified. You verified.
THE WITNESS: Oh. Okay. Okay.
BY MR. HERNANDEZ:
Q. So, in response to number 11 --
A. Okay. I'm sorry. Would you mind letting me pull up the ones you're looking at, so that we're on the same page.
Q. No. I can pull them up, or you can pull them up. Whatever you prefer.
A. Okay. So defendant's discovery response, I have a folder for that. And I have -- which ones are you looking at?

Q. Carnival's responses to additional interrogatory 11.
A. Answers and objections to plaintiff's interrogatories. Okay. Let's find it. Answers to interrogatories numbers 11. Okay. Yes.
Q. Do you see where it says, in response to 11A, "Plaintiff refused a recommendation for medical care on board"?
A. Yes.
Q. Who made a recommendation for medical care onboard?
A. Well, the iCare notes denote that the iCare representative Dennis -- or not Dennis, Dmytro, told her that she should go down to the medical center if her arm hurt, and not to worry about the charges. And then we know from the nurse's interaction log and the notes from the nurse that, you know, he -- she asked the questions of would there be a charge, how much did she think the charge -- did he think the charge would be, and that then she decided she didn't want medical care. I don't think he ever said specifically, "You need medical care." He never saw her arm to advise her one way or another.
Q. All right.
MR. HERNANDEZ: Hey, Oliver. Can you please



enable to the share screen thing?
THE VIDEOGRAPHER: Go ahead.
MR. HERNANDEZ: Thanks.
Let me know when you can see my screen, Ms. Vasquez.
THE WITNESS: Yeah. It's thinking, it says -- it says, "Eddie Hernandez has started to" -- oh, there we go. That's -- okay. I see an iCare record, it looks like.
MR. HERNANDEZ: All right. So, for the record, Exhibit A is going to be the notice of deposition.
(Deposition Exhibit A marked)
MR. HERNANDEZ: Exhibit B will be the iCare notes, medical interaction log, and the HESS procedures.
(Deposition Exhibit B marked)
BY MR. HERNANDEZ:
Q. Now, do you recognize this as -- what's up on the screen, you recognize as the iCare note we've been talking about and we've mentioned a few times, right?
A. Yes.
Q. Okay. So, you said a moment ago that the guest services associate recommended medical care. He advised her to visit the medical center, right?
A. Yes.



Q. All right. And you also said, "And not" -- these are your words -- "And not to worry about the charges." Right? You said that a moment ago.
MR. PELAEZ: Objection. Form.
THE WITNESS: It says --
BY MR. HERNANDEZ:
Q. What does it actually say?
A. So the first one, the entry at 1:16 -- there's two entries at 1:16. So at 1:14, she reports an injury onboard. At 1:16, Dmytro notes, "As per the guest, she fell down in the bathroom on embarkation day. Guest did not want to go to the medical center as she does not want to pay the medical charges. Guest advised, with procedure, guest has third-party insurance. Then GSA" -- which is guest services agent -- "advised" -- and this is in the next line, also at 1:16 p.m. -- "Guest was advised to visit the medical center, as guest will be informed about the charges before any treatment will be done."
Q. All right. So it wasn't "Don't worry about the charges." It's "You'll be told what the charges are before anything is done."
A. Yeah. It sounds like that's how -- how it went. Like, you know, you can discuss with them, but you should go to the medical center. They're not



going to do anything without your, you know, permission, I guess.
Q. So now, going back to interrogatory 11 and the answer to sub part A, outside of this guest services associate, Dmytro, advising her to go to the medical department, we can agree she was never recommended for medical care while on your ship, right?
MR. PELAEZ: Objection to form.
THE WITNESS: She -- yeah. She refused to actually see the doctor. She did not want to actually initiate medical care because of the charges and because it had already been three days, and because she was going to be home the next day and she thought she could just treat it at home, which she did.
BY MR. HERNANDEZ:
Q. Or because she couldn't afford it at the time, right? You don't know.
MR. PELAEZ: Objection to form.
THE WITNESS: I don't -- I think she testified that she's perfectly solvent. She works, you know, something like 80 hours a week as a nurse. She makes a good living. She could afford 100 bucks if she wanted 100 bucks to see the doctor. She just didn't think it was really necessary, I guess, because it was already the end of the cruise. She had already dealt

Page 82

with it for three days. She was getting off the following day and was going to go see her primary care physician.

BY MR. HERNANDEZ:

Q. Isn't it a situation, Ms. Vasquez, that she didn't have her credit card with her, and she didn't have enough money on her debit card? Isn't that what actually happened?

MR. PELAEZ: Objection to form.

THE WITNESS: I don't remember reading that anywhere in her record, and, honestly, if she needed medical care, they would have figured it out. Either get a promissory note or waive the charges. I mean, she just -- they just never got to that point. She just -- she just walked away from the medical staff that day.

BY MR. HERNANDEZ:

Q. There's no evidence that any discussion of waiving the charges was had with her. There's no written evidence of it, right?

A. She actually never discussed any of that with anyone. She told the nurse, never mind, she'll just go see the doctor back home. She doesn't want to pay any medical charges in the medical center onboard the Valor. She was already at the end of her cruise. It

Page 83

had happened three days prior, and she was going to be home the next day. So she made the assessment that she could wait until the next day, and that's what she did.

Q. Ms. Vasquez, my question is, is there any written evidence in this file, in this litigation, that a discussion was had with my client by your employees about the potential for waiving charges? Yes or no?

MR. PELAEZ: Objection to form.

THE WITNESS: I have no idea, but it doesn't really matter. I me, she decided she didn't want to pay anything, so she wasn't going to get to that discussion. She never asked. She never saw the -- she never actually sought medical treatment. She just went down to the medical center, and thought about it further, and then just decided, according to the nurse, to just get treatment when she got home the next day. Which she did.

BY MR. HERNANDEZ:

Q. Did your nurse ever say to her, "Look, if you're worried about paying for this, don't. We can arrange something"?

A. I don't think, in his deposition, he said that there was any type of discussion. That it was a

Page 84

pretty brief encounter that she said, "I don't want to pay anything to see a doctor and I'm going to be home tomorrow. I'll just use my own insurance and go to my own doctor tomorrow." And that was it.

Q. It's your testimony that my client said, "I don't want to pay anything to see any doctor"? That's your testimony under oath before the jury? Is that a yes?

MR. PELAEZ: Object to form.

THE WITNESS: She, I think, said that in her testimony. That -- in her deposition, that she didn't want to pay. She thought -- she was wrong about the charges themselves, but she -- it was pretty clear from her depo that she didn't think she should have to pay anything, and didn't want to pay anything, and that she was going to be home the next day, and she would just be her own doctor, which she did.

BY MR. HERNANDEZ:

Q. Is there anything in writing in this file, in this litigation, that in any way, shape, or form discusses this concept of a promissory note that you brought up a moment ago?

A. Only the nurse's testimony, and I don't have a photographic memory of how that went. But, you know, I would defer to his testimony as to what he remembers

Page 85

saying or not saying. The only records that we have, that we've been discussing today, are this medical staff interaction log, and the iCare records, all from March 4th.

Q. All right. While we're at it -- I'm going to have to bring it back up. Something happened here. Just for the record, and because it's part of Exhibit B, do you recognize this as a fair and accurate copy of the medical staff interaction log we've been talking about, right?

A. Yeah. That looks to be right. Yes.

Q. There's no more to it, this is it, right?

A. I'm -- I'm fairly certain that that's a correct copy of the same one that is in our file. Yes.

Q. And just so we can be done with Exhibit B, let me show you a portion of the HESS procedures that were produced to me. Remind me, HESS stands for?

A. Health, Environmental, Safety, and Security. And I'm sorry, I would just like to go back because you had asked a question, and I see it now. You had asked a question earlier about being advised to see the doctor, and I said guest services advised her to see the doctor, but the nurse also writes on the staff interaction log that he advised the guest to be seen

Page 86

by the doctor for treatment and further evaluation. So there was, I guess, the nurse --
Q. You're back at the interaction log?
A. Yes. You had just asked that question and I did not remember that the nurse also noted that he said he advised her she should see the doctor.
Q. It doesn't say "should" does it?
A. "Advised the guest to be seen by the doctor for treatment and further evaluation." And then the response to that advise was, "The guest stated that she will just see the doctor back home. She stated that she is also a nurse and she stated that it is already happened three days ago."
Q. This nurse Cagumbay, Joseph Cagumbay, he's an actual nurse, I take it, because I see RN, right?
A. Correct. Yes.
Q. He's not a medical secretary or anything like that?
A. No. He's an RN.
Q. Right. So, while he was interacting with my client, did he put -- did he conduct any examination? Did he even touch her?
A. No. Because they were -- she never got to that point. She never actually went into the medical center and filled out a consultation form to be seen

Page 87

by a doctor or nurse. She just had the interaction at, basically, the front door, that has like a window. You know, like a check in window like you would check in at a doctor's office, it's kind of like that.
And she asked those questions. He said, "You know, if you're saying that your arm is hurt, you should come in and see the doctor." And she said, "No. Never mind. I'll just go tomorrow. I don't want to pay anything. I'm going to be home tomorrow." So she made the determination that that was what she wanted to do and that's what she did.
Q. It's your testimony under oath that she used the words "never mind"?
MR. PELAEZ: Objection to form.
THE WITNESS: I would defer to however she said she walked away. I mean, you know. We know what the records say. So "The guest stated that she will just see the doctor back home. She stated that she was also a nurse, and she stated that its already happened three days ago."
BY MR. HERNANDEZ:
Q. This portion of the HESS procedures that were produced to me, have you looked them over?
A. I'm sorry, say that again.
Q. The portion of the HESS procedures that were

Page 88

produced to me, have you looked them over?
A. I mean, I've seen this procedure many times. Yes.
Q. So that's where I'm going with this. What -- I know there's a lot of components and parts to the HESS manual, HESS procedures. What portion is this that we're looking at here?
A. That's just an occupational health and safety procedure 1122, talking about preventing slips, trips, and falls.
Q. And this is -- correct me if I'm wrong -- this is a document, the HESS document, that applies to all your ships, right?
A. HESS, well it's -- this is the procedure that applies to the fleet, yes.
Q. Right. It doesn't just apply to this ship; it applies to your fleet.
A. Yes.
Q. Okay. And as you've just said, this section of the HESS is directed at preventing slips, trips, and falls, right?
A. That's what it says.
Q. As part of that, there's a section that directs your onboard employees to identify areas with a high frequency of slips and of falls, right?

Page 89

A. Yes. I believe so. You're not showing it to me and I -- again, I --
Q. Well, it's your document but I'm happy to show it to you. On the second page under slip and fall prevention, what's the first un-bolded bullet point? What does it say there?
A. "Identification of areas of areas with high frequency of slips and falls." Is that what you wanted me to read?
Q. You just did. Thank you. Are there any other sections of the HESS manual that deal with the prevention of slips, trips, or falls?
A. Yes.
Q. Why wasn't that produced?
A. Maybe they're not relevant to cabins. More like mopping areas, cordoning off when you're cleaning, that type of thing.
Q. Other than the two, I guess that we've discussed now. One that's ostensibly applicable to cabins, and the public areas HESS slip, trip, and fall prevention sections, are there any others?
A. As part of the HESS manual?
Q. As part of the -- well, yes. My question for now is as part of the HESS manual.
A. So I think they put all of the housekeeping

Page 90

procedures technically live within the HESS ecosystem now. So there's a ton of, obviously, cleaning procedures, and maintenance procedures. There's checklists for, you know, the crew members for the cabins, and stewards cleaning. I don't think anything is specifically relevant to the allegations in this case. Because most of it is, you know, cleaning.

And so, had there been a slip-and-fall component to this, I would think some of it might be relevant, but I don't think there's anything that we're missing that would be relevant to the trip over the shower lip inside a cabin bathroom.

Q. And just so -- I think we're done with that. Just so I'm clear, and again, I'm not interested in what your lawyers have done -- you're not aware of any statements from anyone in this case -- not from my client, not from a witness, not from a crew member, right?

A. Only what we've discussed so far, the iCare interaction log, the medical interaction log, and her deposition testimony. And then Ms. Vaughn's testimony and Mr. Nurse's testimony.

Q. I'm talking about statements. You know that your company has a form statement. I think it's called a guest injury statement, or guest injury

Page 91

witness statement. You have not seen any of those here, right?

A. As we discussed at length at the beginning of the depo, there was no accident investigation prepared in this matter. Which and the accident investigation includes a passenger injury statement. So no, none of those documents exist for this case.

Q. So, apropos the latter part of your answer, the accident investigation portion. There's no accident report as we know them in these case, right?

A. That's correct.

Q. All right. Is there any report of non-conformity, a corrective action report under the ISM?

A. No. Because there's nothing wrong with the configuration of the shower as we found it.

Q. Any reports to the flag state?

A. No.

Q. Any reports to US Coast Guard?

A. No.

Q. I know you have photos of the -- I presume you have photos of the cabin and bathroom now. Back then -- let me ask the question this way. Through the time that we filed our complaint in court, had you taken any photographs or video of the cabin or its bathroom?

Page 92

A. Can you tell me when the complaint was filed?

Q. Yeah.

A. Thank you.

MR. PELAEZ: February 10, 2021.

THE WITNESS: And it's the Valor, right? So it's not a ship we sold. No. I would think that the photographs would have been taken once the lawyers, you know, engaged in an expert. I also know that we -- I've seen photographs that your client took, that I think she discussed in her deposition. I did see those photographs, as well, that were taken after the fall, but during her cruise.

BY MR. HERNANDEZ:

Q. But none that your company took first.

A. That's right. It is my understanding there are photographs now that were taken in conjunction with an inspection.

Q. Have you reviewed the expert reports in this case?

A. I have not. I -- I did not. I discussed them a little bit with counsel, but.

Q. Are you aware of any photographs or video of my client while on the Valor?

A. No. Only her sail and sign entry photograph.

Q. Has Carnival conducted any surveillance or

Page 93

taken any video of my client since the letter of representation was sent to you all?

A. I don't know.

Q. You don't know?

A. I don't know.

Q. So who would know?

MR. PELAEZ: I can tell you there's been none.

THE WITNESS: My lawyer would know, but I don't know.

MR. PELAEZ: There has been none.

BY MR. HERNANDEZ:

Q. Other than -- I guess we can group them both, or deal with them both, but other than the iCare notes and this medical staff interaction log, are you aware of any other cataloging of exchanges between your people on the ship and my client?

A. No. I'm not aware of anything further beyond that. And, obviously, communications from you in the claim after, but.

Q. No. No. That's not my question. On the ship.

A. No. I mean, there are transaction records from her alcohol purchases and all the normal records of cruise, but nothing that dictates or outlines an interaction and things that Ms. Hall was stating or

saying.
Q. All right. My understanding is you've located prior similar incidents on this ship for a three-year period?
A. Yes.
Q. All right. I want to get into those with you, and this is absolutely without prejudice to my position that what we've requested has not been complied with. We asked for three years on the same class of ship, which I think is only three or four ships. So are you prepared to talk about prior incidents on any ship other than Valor?
A. No. I believe all of that was objected to in discovery and they only -- they only asked Monica to pull the Valor. Prior similar trip-and-fall incidents on shower lips on the Valor.
Q. Well, let's talk about those then. I guess we'll have to address the other part with the court. How many -- how many years did Ms. Borteseggi search?
A. She did three years from your client's cruise, back.
Q. On the Valor, right?
A. Yes. Yes.
Q. All cabins, or just a certain configuration of cabin?



A. All cabins.
Q. And how many incidents were revealed?
A. Two.
Q. All right. Tell me about the first one. And, again, you can -- I'm not saying that I won't seek production of these records that you're looking at, for perhaps another reason, but I stipulate that you're looking at them now, will not be deemed a waiver.
A. Okay. Thank you.
MR. PELAEZ: Thank you, Counsel.
THE WITNESS: Okay. The first one occurred on March 9, 2017, and that was with a Barbara Fisher.
MR. HERNANDEZ: I'm sorry, just bear with me for two seconds.
THE WITNESS: Sure.
MR. HERNANDEZ: Never mind. Go ahead. I apologize for interrupting. March 9, 2017.
THE WITNESS: Barbara Fisher. She was a 70-year-old woman who was in cabin 1354. It was about 8 o'clock in the morning. She was --
MR. HERNANDEZ: Let me stop you. Fisher, F-i-s-c-h-e-r, or F-i-s-h-e-r?
THE WITNESS: Just s-h-e-r. F-i-s-h-e-r.
MR. HERNANDEZ: Okay. I'm sorry. Go ahead.



THE WITNESS: She stated that as she was stepping out of the shower in the bathroom in her cabin around 9 o'clock in the morning, her left foot caught on the shower threshold as she was exiting, and she lost her balance and fell forward, landing on her knees and elbows.
BY MR. HERNANDEZ:
Q. The -- does your -- does your investigative -- strike that. Does your claim -- strike that again. Do you have a claim file for Fisher, or do you just have an investigative file?
A. Let me go into our claim database to see if any claim was filed by Ms. Fisher. No. There was no claim for Ms. Fisher, it was just reported onboard.
Q. Sounds like a silly question but no claim meaning no lawsuit either, right?
A. Correct. No claim. No lawsuit. No letter after the cruise. No letter from a lawyer or her.
Q. So --
A. There was no request for compensation.
Q. Was an accident report prepared?
A. Yes.
Q. Were statements done -- taken?
A. Let me check for you. Let me see if they list the attachments. It looks like the only statement



taken was of the guest herself, and the passenger injury statement.
Q. Of Barbara Fisher?
A. That's correct. Yes.
Q. Was she seen in your medical department?
A. I believe so. Let me see what the narrative says here. Yes. She reported it the next day and she went to the medical center and sought medical treatment in the medical center the following day.
Q. How many visits to the medical department?
A. I don't have the medical records, I just have the notation that she went to the medical center the next day, and that the investigator was then notified, and they started the accident investigation.
Q. Were photographs taken of the shower -- strike that. Were photographs taken of the bathroom or the shower?
A. Yes.
Q. How many?
A. I note seven photographs attached to the accident report. I don't have them all, but I do have one.
Q. How do you only have one?
A. I mean, it's just what counsel provided to me for the priors. I didn't pull all the accident

reports. I guess Monica probably pulled it and just pulled one of the photos to show generally it's the same configuration.
Q. I'm sorry, so what you're looking at is not your file, so to speak. It's your file after it's been returned to you by your lawyers?
A. So in -- when I prepare for these depositions, they send me everything electronically that might be relevant in the deposition, and -- in folders. And I've asked Monica for prior incidents, for all of my depos, to include the accident report, the injury statement, and at least one photo, so that we can verify that, you know, the area is similar to what is at issue in the underlying lawsuit. So that's what I have here.
Q. All right. So tell me what's depicted in the one photograph that you do have available to you.
A. The shower cabin in cabin 1354 onboard the Valor.
Q. Is the floor of that bathroom the blue with speckles as we've got in this case?
A. Yes.
Q. And is it that same blue speckled color throughout the bathroom floor, shower ledge, shower floor?



A. All of the bathrooms on the valor are similarly configured. Yes.
Q. So and how about layout? Is it laid out just as it was in Ms. Hall's cabin? One walks in, shower is to the right. To the front and a little bit to the left is the commode, and to the left is the vanity?
A. No. It's a different configuration. Similar, but different.
Q. What was the configuration?
A. The door opens out. You walk in, the shower is to your left. The commode is to center left, and I assume the sink is to the right.
Q. Okay. So it's a mirror configuration to Ms. Hall's, is it not?
A. I can't say specifically that it's exactly a mirror configuration, but it looks very similar to be.
Q. White shower curtain?
A. There is a white shower curtain. Yes.
Q. And what is Ms. Fisher's address?
A. Let me see if I can find it here. It just says Florissant, Missouri 63033. F-l-o-r-i-s-s-a-n-t, Missouri.
Q. Wait. Wait. Okay. I'm sorry. Give me that again.
A. Hold on, I'm going to try to go to her



passenger injury statement and see if she wrote her full address on there. Okay. The city is Florissant, F-l-o-r-i-s-s-a-n-t, Missouri. And she writes it's 6328 Lake Paddock Drive.
Q. Paddock or Haddock?
A. Paddock, P-a-d-d-o-c-k.
Q. Any zip code?
A. Yes. 63133.
Q. Telephone number?
A. 314-942-6346.
Q. Email?
A. Mama5454 -- mama5454 --
Q. I'm sorry, my phone went off. Can you go back to mama?
A. Mama5454225@att.net.
Q. Let me confirm. Mama5454225@att.net?
A. Actually, there's another five. It's 54542255@att.net.
Q. And in her statement what, if anything, did she attribute her fall to?
A. She just didn't -- she just said to the investigators she wasn't paying attention. She said, "In stepping out of the shower, fell forward in bathroom. Left foot caught on bar of shower floor and lost balance. Landed on floor on both knees." It



says, "What could you have done to avoid it?" It just says, "Not use the shower." So, but she told the investigator in the investigation that she had used the shower numerous times and that she just forgot that the lip was there. And also that she wears glasses, and she wasn't wearing her glasses, she said.
Q. And the second incident, the second prior incident.
A. Yes.
Q. Date and name?
A. That is -- the first name is Diana. The last name is Blythe, B-l-y-t-h-e. And she is a --
Q. Date?
A. It was June 25, 2017.
Q. June 25th?
A. 6/25/17.
Q. What cabin?
A. Cabin number was 6296.
Q. What happened here?
A. Here it looks like she was using the mirror and then stepped backwards and forgot about the threshold and tripped back -- she was walking backwards and fell backwards into the shower.
Q. And I'm sorry, going back to Fisher for a moment. I know you told me it was the same

configuration, but the curb, the step itself into the shower, same size as Ms. Hall's cabin, right?
A. You know, in that angle, it looks like it might be a little taller. I can't really tell. We would have to measure the two. But it looks about that same. I mean, somewhere around two, three inches.
Q. What was the injury to Ms. Blythe?
A. Let's see. I don't really like giving their medical --
Q. No. Just tell me as you did before. You can be cryptic.
A. Yeah. She just kind of fell back onto her buttocks. Because she was walking backwards and just wasn't watching where she was going, forgot about the threshold, and fell backwards into the shower.
Q. Any clam, any lawsuit, any lawyer letter?
A. No. Nothing.
Q. None of those three?
A. Correct. It was just an incident reported onboard.
Q. Did it result in an accident report and statements?
A. There is an accident report. An accident investigation was conducted. She didn't go to the



medical center initially; she went a couple of days later. Husband of injured guest --
Q. Who was -- who provided a statement?
A. There's a passenger injury statement. I can't tell if the husband provided a statement or not. It just says that there's a PDF. It's probably just his photograph, but I can't be sure. I don't have all the attachments. I only -- I have one photograph, I have the passenger injury statement, and I have the narrative of the report itself.
Q. How many total photos were taken as part of the Blythe investigation?
A. One, two. It looks like.
Q. You've only access to one today though?
A. Correct.
Q. Tell me what it shows.
A. It shows a configuration of a shower similar to Barbara Fisher's in that the door is -- opens outward, and the shower is on the left, and then you have the toilet, and then on the right, you have the sink. And it is similarly configured to Ms. Fisher's where it's sort of, you know, the angled showered, there's a white shower curtain. There's a rolled up white towel in front of it that the guests use when, you know, exiting the shower, so they don't slip. And



it shows a similar, you know, threshold.
Q. Similar in height to Ms. Hall's?
A. Yes.
Q. The floor in cabin -- the floor in the cabin bathroom of 6296, is it the same color, that blue speckled polyurethane, or whatever the actual material is, as in Ms. Hall's cabin bathroom?
A. It looks to be the same.
Q. And is it throughout, meaning bathroom, step into shower, and shower?
A. Yeah. The floor inside and outside the shower is flush, and then the lip goes around the shower to prevent the water from coming into the bathroom.
Q. I understand, but the colors are all the same --
A. It's all the blue -- it's all the speckled blue resin surface, or whatever that is.
Q. And the shower curtain white as -- white as in the other two?
A. Yes.
Q. At the time of Ms. Blythe's fall, was the shower curtain drawn or open? Drawn -- was it open or closed?
A. I don't know. She said she had just recently gotten out of the shower, and then she was getting



ready in front of the mirror, and then she just stepped backwards and forgot that the lip was there and tripped backwards.
Q. And Ms. Blythe's address and contact details?
A. 5401 Coventry Place, C-o-v-e-n-t-r-y, Place. And is it Colleyville, Texas? C-o-l-l-e-y-v-i-l-e.
Q. I'm sorry, C -- can you spell Colleyville against?
A. Yeah. Let me see if I can get -- it's just her handwriting, it's not great. Let me see if it's in the accident report itself somewhere. Yeah. Colleyville, Texas. C-o-l-l-e-y-v-i-l-l-e, Texas. And zip code is 76034.
Q. Telephone number, please?
A. 817-571-2307.
Q. And email?
A. It's kind of hard to read. It looks like dmbl -- it's either blu or bw -- I think it's dmbwestie.
Q. Wait, wait. Now you skipped the b that you gave me previously. Dm --
A. Dmbwestie@aol.com.
Q. Dmbwestie?
A. That's what it looks like to me. It's possible that it is dmbluestie, but I think it makes more sense that it's westie, like dmbwestie, Like

Page 106

Diana M. Blythe westie. Get it? That's her name, Diana Blythe. So it seems like it's dmbwestie.

Q. Okay. And I'm sorry, you said -- is there a statement of hers, or a statement of her husband?

A. I can't tell. She says in here that the husband witnessed it, and it says there is an attachment, a PDF. It just says, "Husband of guest." So I don't know if that's his statement, or if that's his APASS photo. Sometimes they just attach the APASS photo of the traveling companion, and sometimes it will be a statement. I don't know.

Q. Well wait a second. So you can't see the statement in whatever you're looking at?

A. That's right. I don't have all the attachments. I only have the accident report itself with the narrative, one picture, and the passenger injury statement filled out by Ms. Blythe.

Q. Oh, that's what I mean. You do have her passenger injury statement then.

A. I have hers. I don't know if her husband wrote a statement or not.

Q. Okay. So what does she attribute the fall to in her statement?

A. "I fell back from the floor and fell into the shower. My head hit the back of the shower wall, and

Page 107

my butt hit the floor. I had just gotten out of the shower."

Q. And in order to -- what databases were researched which revealed these two incidents, Blythe and Fisher, we've been talking about?

A. Monica would have had to review the Info Ship database, which is where all the old accident reports lived prior to 2019. She would have researched the Sea Event database which is where all the accident reports live since 2019. And the rollout was over various months in 2019. But she knows how to search all the databases. And then she also searched our RiskConsole database for any potential claims or lawsuits that arose from similar allegations where an accident report was not prepared.

Q. The one you mentioned in the middle is called Sea Event?

A. Yes. That is the new accident reporting database, Sea Event.

Q. S-e-a?

A. Uh-huh (affirmative). Sea.

Q. And this, her research in Info Ship, Sea Event, and RiskConsole, this is done electronically, right? These are databases that are accessible by way of computer?

Page 108

A. Yes.

Q. And just as she did it for Valor here, it is doable for the other ships in the Conquest class, right?

A. It is doable. I mean, it's a complex process and it's a pain, but yeah, she can do it. That's -- if we asked her to.

Q. Let's take like a minute break so I can go through my notes and parse some things that I don't need to ask you out.

A. Okay.

MR. PELAEZ: Okay.

MR. HERNANDEZ: Or restroom break. Whatever you all want to make it.

THE VIDEOGRAPHER: Very good. Off the record at 3:33.

(Recess taken from 3:33 p.m. to 3:39 p.m.)

THE VIDEOGRAPHER: Back on the record at 3:39.

BY MR. HERNANDEZ:

Q. All right, Ms. Vasquez. Back in 2020, what, if any, inspections were undertaken on a routine basis of the cabin bathrooms on the Valor?

A. I'm sorry, can you repeat that again?

Q. Back in 2020, what, if any, inspections were undertaken on a routine basis of cabin bathrooms on

Page 109

the Valor?

A. They are inspected daily by the housekeeping staff. Each cabin is assigned a steward and an assistant steward, and one, if not both of them, come in every single day and clean the cabin, and there's a checklist including cleaning and scrubbing all areas of the bathroom.

Q. And I'm sorry, when you say -- you said there's a what? There's a cabin attendant and assistant?

A. Uh-huh (affirmative.) One cabin steward and an assistant steward.

Q. And the inspections that you say they did daily in 2020, what did that entail? What were they looking for? What were they inspecting?

A. There's a whole checklist. They have to clean the cabin. So there's a checklist of everything they have to do, including cleaning the balconies, including the cabin bathrooms. So they do a visual and physical inspection as they're cleaning. So, to the extent that something becomes loose, or whatever, they would be cleaning it, they'd feel it. I don't think there's any allegation that anything was loose here, but, nonetheless.

Q. This checklist that you're referring to, is it

Page 110

a checklist for cleaning and maintenance, or a checklist for inspections?

A. It's the same thing. I mean, it's -- you know, they come in every single day and clean, so that there's also an inspection because they are cleaning the cabin with their hands and seeing it with their eyes.

Q. And this checklist, is it something that they physically, you know, write on, each time they get into a cabin?

A. No. It's like a -- it's kind of like the procedure for cleaning cabins, and it just kind of lists everything. And then there's some diagrams about how to clean the toilets, and how to clean the showers, et cetera. And sort of just a list of the items that need to be cleaned and tidied daily.

Q. Okay. I get it, I think. It's not a I did this, I did that, check it off type checklist.

A. That is correct. It's a procedure -- it is not that. It is a procedure that includes all of the things that the cabins stewards should be doing on a daily basis in each cabin.

Q. All right. The -- in the -- say in the two years prior to March of 2020, had there been any repairs, changes, refurbishment to this cabin

Page 111

bathroom, 8429?

A. I think we looked at workorders, but not two years. I think we went three or six months.

THE WITNESS: Victor, can you help me out?

BY MR. HERNANDEZ:

Q. You went three years and six months?

A. No. We went three months or six months back for workorders. We don't usually two years.

Q. Well we asked for two years, right?

MR. PELAEZ: We objected --

THE WITNESS: Yeah. I don't know what the scope of the discovery was.

MR. PELAEZ: There was an objection that appeared out of the scope of workorders. Right.

MR. HERNANDEZ: Well, just because there is an objection doesn't mean that you don't -- I don't get the information, Mr. Pelaez.

MR. PELAEZ: Well, no. But we objected to it. We advised you of our objection over a week ago. You decided not to confer with us or try to narrow the scope at all. So we objected to it.

MR. HERNANDEZ: Yeah. That's not really at all what happened. Because if you look at your file, you'd see my notice of unavailability. This deposition was set in October. Be that as it may, you

Page 112

know, I'll add this to the list of things we're taking up. But let's deal with --

THE WITNESS: For workorders? Why does everything have to be contentious with you guys? It's very strange. Everybody just needs to chill out.

BY MR. HERNANDEZ:

Q. So what period of time, Ms. Vasquez, did you take it upon yourself to search for, despite us asking for two years?

A. I think it was three to six months, but I would have to verify with counsel what was requested of Monica and which workorders she searched. But there were none in the three to six months prior.

MR. PELAEZ: There were no workorders pertaining to the subject list. You know, part of the objection to the workorders was that the request was overbroad and that it asked for all workorders pertaining to anything happening in the bathroom. So, for instance, things involving the toilet, or the plumbing, or the sinks, which would be completely irrelevant and unrelated to this matter. I do know there was a search for workorders performed for the subject cabin, and there was nothing involving this --

MR. HERNANDEZ: Well, you know, Mr. Pelaez, as much as I appreciate it, I need the testimony of the

Page 113

witness. So I'll ask my questions. If she can't answer them, you know, we'll talk, and I guess we'll deal with it in court.

BY MR. HERNANDEZ:

Q. All right. So, Ms. Vasquez, for the two years prior to March of 2020, were there any repairs, modifications, refurbishment of this bathroom in cabin 8429?

MR. PELAEZ: Objection, form. They only discuss --

THE WITNESS: I don't know. I don't think so. But we only searched workorders for three or six months, and I did not go back to see if this particular cabin configuration changed. I doubt it did, given the fact that we see -- the only two prior instances were from three years before, and all the other bathrooms look similar to the one that Ms. Hall found herself in. So I don't believe there were any like dry dock refurbishment of the bathrooms onboard the Valor during that time period.

BY MR. HERNANDEZ:

Q. All right. You keep saying three or six months. Which was it?

A. I don't know. I'd have to look at counsel. I don't know what objected to or produced to you in

discovery. All I know is that there were none in the time period searched.

MR. PELAEZ: Mr. Hernandez, if we can go off the record for five minutes and I can speak with the witness, I can point her to documents showing the search that was performed --

MR. HERNANDEZ: We're not doing that. You can't talk to the witness mid deposition.

MR. PELAEZ: I'm not -- do you want the information or not? There's information --

MR. HERNANDEZ: Yeah. I want it from her, Counsel, not from you.

MR. PELAEZ: There's information -- she's not a robot. She's not memorizing everything here. There's information in the documents that were provided to Ms. Vasquez regarding a prior search for workorders consisting of three years for the subject bathroom -- the subject bathroom, which don't indicate any workorders relating to this shower lip that Ms. Hall alleges that she tripped on.

THE WITNESS: I assume that was produced in discovery to you, Mr. Hernandez.

MR. HERNANDEZ: No, it wasn't.

MR. PELAEZ: There were no workorders produced because there were no responsive workorders and the



scope was objected to and never resolved.

MR. HERNANDEZ: No. Of course, because everything is objected to. Let's do this. I mean, if you want to speak to her, you can, but not one on one. If you want to direct her somewhere that will make this go quicker, we can go off the record for that.

MR. PELAEZ: Sure. Let's go off the record. I'm happy to do it, you know, here. That's fine. But off the record.

MR. HERNANDEZ: Yeah. We can go off the record for that.

THE VIDEOGRAPHER: Off the record at 3:47.

(Recess taken from 3:47 p.m. to 3:50 p.m.)

THE VIDEOGRAPHER: Back on the record at 3:50.

BY MR. HERNANDEZ:

Q. All right. One matter of housekeeping that came up during our break. The three crew members that we spoke of earlier, apparently you now have employment status for each?

A. Yes. So for Joseph Cagumbay, the nurse, crew ID is 539547. He is currently on the Conquest until February 21, 2022. For Dmytro Sukhomlin, which is crew ID number 523314, and he is a guest services agent, he is currently onboard the Elation, with no sign off noted at this time. And then as for Dennis,



the other guest services agent whose name I'm not going to even try to butcher, but the crew ID is 281832, he retired as of June 21, 2020. His home address is in Russia, and we do have the prior address if you want that.

Q. Rather than trying to read it into the record, you want to just provide it to me through your lawyer, the prior address?

A. Sure. Yeah. No problem.

Q. Okay. So now let's go back to where we were. What logs, records, reports, AVOs, workorders, whatever term you want to use for them, were located for a three-year period related to changes, repairs, modifications of the cabin bathroom in cabin 8429?

A. There were none relating to anything about the shower or the shower lip. Monica searched in our Info Ship database which is the database that actually holds all the workorders and work requests. She went from March 1, 2017, through April 1, 2020, for cabin 8429, and there's nothing related to the, you know, the shower lip or the shower floor itself. Most of them were like toilet not flushing, you know, sink was blocked, bathroom door was making a noise, et cetera. But nothing related to the subject lip or threshold, whatever we're calling it.



Q. So I'm sorry, the ones that did come up were passing plumbing issues, so to speak?

A. There was also a couple about the bathroom light being out, the safe box was blocked. I mean, there was -- but just nothing relevant to the allegations in this lawsuit which involve the lip or the threshold around the shower enclosure.

Q. For that same period for the two years prior to March of 2020, any outside vendor workorders, reports, AVOs related to repairs, refurbishment, or modifications of the bathroom in cabin 8429?

A. So I did not search whether 8429 had been modified in any way in the three years prior. We did a prior incident search for all the cabins. We know that the cabins in -- excuse me, my cat. Sorry. I had locked her in a room, but obviously, one of the kids let her out.

For sure, but it doesn't appear to me, based on my experience with the company, that any modifications to any of these passenger cabins were done in that three years. Simply because the incident reports --

MR. PELAEZ: Sorry to interject. Sorry, Ms. Vasquez, if you can look at the email that you just reviewed, that, you know, when went off the

record. There's a response to number 10 in terms of a search for refurbishment.
THE WITNESS: Oh, she did. Okay. Monica is so thorough.
None.
BY MR. HERNANDEZ:
Q. This is none for outside vendors, right? Is that what you're --
A. Well there was just -- refurbishment. It wasn't changed out in a dry dock. That would be the only time a contractor would be brought in to make repairs would be a dry dock situation, where you're refurbishing or remodeling the cabins. And in the three years prior to Ms. Hall's cruise, this bathroom was not modified.
Q. And you've come to that conclusion because this ship didn't dry dock in those three years?
A. No. Monica specifically researched based on your request for information, "Did any refurbishments and/or structural and/or flooring changes occur to the cabin bathrooms of the Carnival Valor, i.e. plaintiff's cabin, and similar such cabins on the same deck, in the three-year period prior to March 1, 2020?" And the answer is none. No.
Q. I understand that. But then you talked about



dry docking. Is the answer none based on --
A. None.
Q. The fact that there was no dry docking, or just none? I don't know if you're understanding me.
A. I understand you fine. I feel like I've answered it three times. There were no changes made to the subject bathrooms. Whether the ship went on a dry dock or not, I don't know. It's just, in those dry docks, they didn't change the bathrooms. That it was researched specifically.
Q. All right. In the six months following March of 2020, any reports, logs, AVOs, workorders, that reflect changes, modifications, repairs, refurbishments to the cabin bathroom in 8429?
A. No. She searched --
MR. PELAEZ: We asserted an objection to the scope of that to the extent it seeks any information beyond the time of the incident and six months out. I believe the search encompassed two weeks post incident.
THE WITNESS: No. Well, the only reason it was two weeks is because as of March 14, 2020, it was a complete pause it all cruise operations, so there would have been nothing. There was nothing. She searched through April 1st of 2020, knowing there



would be nothing after that because there was no -- the ship was not in service.
BY MR. HERNANDEZ:
Q. All right. So I still need an answer to my question.
A. No. The answer is no.
Q. Let me finish please. Albeit, for two weeks because of the cessation of operations, any reports, logs, AVOs, or documents reflecting changes, repairs, refurbishments to the cabin bathroom in 8429?
A. No.
Q. In that same period that was searched, those two weeks through March 14 of 2020, any documentation by way of logs, AVOs, workorders, reports, where an outside vendor made any changes, refurbishments, or modifications to the cabin bathroom in 8429?
MR. PELAEZ: Objection to the form.
THE WITNESS: No.
BY MR. HERNANDEZ:
Q. So is it your understanding that that cabin bathroom is in the same condition today, structurally, that it was on March 1st of 2020?
A. I know that it was the same condition in the pictures from the ship inspection based on my communications with counsel. I don't know when that



ship inspection occurred. I have not researched since the ship inspection in this litigation. So, between the time --
Q. When you say ship inspection, by the experts?
A. Correct.
Q. Okay. That was --
A. Right.
Q. 10 days ago, 15 days ago.
A. Oh, okay. So I didn't know when that took place. So, yes. As of that -- the date of that inspection, no changes were made, and you can tell by the pictures it's basically the same configuration of the cabin.
Q. For the three-year period prior to March of 2020, are you aware of any minutes of safety meetings, safety committee meetings, departmental meetings, that addressed the issue of curbs or steps in cabin bathrooms on Conquest class ships?
A. No. But I think we've provided all of them to you, so.
MR. PELAEZ: We objected to the --
MR. HERNANDEZ: I have not been provided any minutes of these meetings.
Mr. PELAEZ: WE objected to the scope of the request for meeting minutes as overly broad,

disproportionate to the needs of this case.

MR. HERNANDEZ: Well, again, that's not the law. That doesn't mean she doesn't have to answer.

THE WITNESS: I'm not aware of any meeting minute onboard the Valor that addresses anything regarding the shower lip in the showers in the cabin bathrooms.

BY MR. HERNANDEZ:

Q. When you say you're not aware, was a search conducted?

A. Yes. Monica looked through. She pulled all of them. But I don't think any of them reference anything regarding the shower lip. There may be something that discusses the step up into the bathroom, but I'm not sure about that.

Q. When you say step up into, you mean from cabin to bathroom.

A. Yes. Right.

Q. All right. So it's your testimony that in the three years prior to March of 2020, there are no minutes of any type of meeting that addresses the step or shower on the Valor?

MR. PELAEZ: I'm going to reassert that there's an objection to that request -- to the scope of that request as being overly broad, which is



pending and has not been resolved. And you refused to narrow it or limit it in any fashion before today's deposition.

MR. HERNANDEZ: Well, I wasn't contacted as you were supposed to, Counsel.

MR. PELAEZ: You were contacted. You were contacted --

MR. HERNANDEZ: You simply don't know the law, unfortunately.

MR. PELAEZ: Thank you. We'll refer to you on the law then, Mr. Hernandez.

MR. HERNANDEZ: I appreciate that.

BY MR. HERNANDEZ:

Q. So now, going back to my question -- going back to my question before the continued interruptions of Mr. Pelaez, are you aware of any minutes of any type of meeting on the Valor addressing the shower or step into the shower?

A. I am not aware of any, and I think to clarify for you, or to get rid of this pending objection or dispute between the two of you, I think we can agree that we will produce to you all those meeting minutes, redacted of anything irrelevant to the subject threshold. So if there's anything mentioning the threshold, then it would be unredacted and it would be



provided to you.

THE WITNESS: Can we agree to that Victor, or? That's the way we usually do it.

MR. HERNANDEZ: I appreciate that, but it should have been produced to me because it was part of the duces tecum. But I'll deal with that with your lawyer.

MR. PELAEZ: There's an objection to it. We produced three years' worth of meeting minutes, and I'll tell you, normally, in terms of what the judges' rule in this district, are limited to one year, normally, for the subject ship. I'm not sure, I don't have the request in front of me, but I think it may have been overly broad in terms of seeking meeting minutes beyond just the subject vessel for the entire class.

So there's pending issues with respect to the scope that were not resolved before the deposition. Certainly, if we can resolve those objections as to the scope, we can supplement and produce. And we're happy to produce -- you know, we can search for and produce anything with respect to this subject ship one year back meeting minutes referencing any issues, complaints, concerns involving the subject shower lip or door.



BY MR. HERNANDEZ:

Q. Are you aware, Ms. Vasquez, of any minutes of safety minutes, safety committee meetings, or department meetings, for the three-year period prior to March of 2020, addressing the shower or shower step curb, on any Conquest class vessel?

MR. PELAEZ: Same issue with the objection. I won't go through it again, but it's the same basis as the last objection that I've been referencing.

THE WITNESS: Monica only searched the Valor. She only searched the subject ship.

BY MR. HERNANDEZ:

Q. Why?

A. Because that's what she was asked to search.

Q. By whom?

MR. PELAEZ: Same objection.

BY MR. HERNANDEZ:

Q. Who decided on what Ms. Borteseggi should or should not search?

A. Counsel usually wages the objections to overbroad discovery and then asks us to limit whatever the search is to what is reasonable or what the judge has ordered to be produced, and that's what she searched. So she did search three years prior to March 1st. So I do think we actually have those.

THE WITNESS: Victor, I know it's a pain to actually go and redact them, but it shouldn't be that hard because there's nothing that references the threshold, so you just, you know. Or we just --
BY MR. HERNANDEZ:
Q. You're saying three years, but only this ship?
A. Yeah. I mean, to search the class of many meeting minutes, that's like a needle in the haystack and it's ridiculous. It's very, very overbroad and very cumbersome for the litigation folks to have to do that.
Q. Yeah. Well, you know, so is my client's injury, but that's what we're dealing with. Are you aware of any minutes of safety meetings, safety committee meetings, or departmental meetings for the three-year period prior to March of 2020, which addressed safety concerns with the bathroom floor, shower floor, or step into the shower on Conquest class ships?
MR. PELAEZ: Same objection as before.
THE WITNESS: I mean, I am not -- so I know that there was nothing related to the threshold. I don't know if there's any talk about like slippery floors or any of that. I have not --
THE WITNESS: So I mean, I think the best



thing to do here, since we have the documents already pulled, Victor -- not related to the shower, either floor or lip. And then he'd have the information. It wouldn't be an issue.
BY MR. HERNANDEZ:
Q. So is this for the class, or are you again limiting it to the Valor?
MR. PELAEZ: Just for the ship.
THE WITNESS: We only have the Valor. Yeah. We only have the Valor. But we do have three years, so that work has been done. They just haven't gone through them and redacted them for you. So if we can just get an agreement, I mean, I -- you know, I don't think the magistrate needs hear anymore from us on this nonsense.
MR. PELAEZ: Just to clarify, the documents were provided to us. The problem is that three years' worth of meeting minutes is a very large amount of documentation, information, with tons of information that has nothing to do with things like shower doors, which is why the objection is raised at the scope being overly broad.
MR. HERNANDEZ: Counsel, are you done, again, with the speaking objection?
MR. PELAEZ: Are you done asking questions



about issues that she's already responded --
MR. HERNANDEZ: No, I'm not.
MR. PELAEZ: We've objected to and that we've indicated to you that we're willing to talk about and discuss potentially narrowing the scope, producing information and supplementing, if you're willing to confer with us in good faith, which you have not been able, or are willing to do thus far.
MR. HERNANDEZ: That's your opinion.
BY MR. HERNANDEZ:
Q. Ms. Vasquez, are there any minutes of safety meetings, minutes of departmental meetings, addressing safety concerns with the bathroom floor, shower floor, or step curb in the shower for the three-year period for the entire Conquest class of ships?
MR. PELAEZ: Same objection.
THE WITNESS: As think I have testified to numerous times, I don't know. Because we only searched three years on the Valor.
BY MR. HERNANDEZ:
Q. And this is because -- for the same reason as previously, you only searched the Valor because that's what your lawyer told you to do?
MR. PELAEZ: Same objection.
THE WITNESS: There was an objection to the



discovery request, and the request for the deposition. So, yes. That is correct.
BY MR. HERNANDEZ:
Q. Prior to Ms. Hall's fall, did Carnival verbally warn her of the step that she tripped over?
A. No. There's no -- there would be no need to warn of something that's obvious and open and that she knew about, and we know that she knew about it. There are cabin videos that are played in the pier, the ports, and also in the cabin in a loop, that discuss getting around the cabin, generally, and also not stubbing your toe into the step up into the bathroom and turning on the lights before you enter the bathroom, and that type of thing. But nothing specific to the shower lip in question.
Q. Prior to my client's fall, did Carnival in writing via, you know, on a piece of paper, on a placard, anything like that, warn Ms. Hall of the lip, curb, step into her cabin shower?
A. Again, that -- no warning was necessary. She knew about it. She just forgot about it on the evening in question.
Q. Why is the entire bathroom floor, including the step and shower, all the same color?
MR. PELAEZ: Objection. Beyond the scope of

the deposition.
You can answer if you know it.
THE WITNESS: I really don't know.
MR. HERNANDEZ: Let's go off the record. I think I'm done. I just want to look at my notes.
THE WITNESS: Okay.
THE VIDEOGRAPHER: Off the record at 4:09.
(Recess taken from 4:09 p.m. to 4:11 p.m.)
THE VIDEOGRAPHER: Back on the record at 4:11.
BY MR. HERNANDEZ:
Q. Ms. Vasquez, at the time of my client's cruise, what were Carnival's policies for providing emergency medical care to a sick or injured passenger unable to pay?
A. Any emergency care that's needed is going to be rendered regardless of ability to pay, or whether a promissory note. Any emergent situation would be taken care of.
Q. And that what you just said, is this in writing anywhere? Is there, you know -- I know you guys have a medical department manual. You may call it something else. Is it in there? Does it say that?
A. I don't know. I didn't pull all the medical procedures or policies. But it's my experience, for sure, that there is -- if a guest needs emergency



medical assistance, it will just be provided. They're not even going to discuss a guest consultation form, or payment, or any of that.
Q. So we know that my client sustained a fracture, why wasn't she provided emergency medical care?
A. Because she didn't report it. And it wasn't an emergency, obviously. She didn't report it for several days. She -- at the time when she decided not to see the doctor on the 4th, she actually went to see her doctor and they did not even deem it to be emergency. He scheduled her for a surgery later, but it wasn't an emergency situation.
However, had she wanted to see the doctor, or said she needed to see the doctor, she would have seen the doctor, and they would have dealt with the payment situation later.
Q. So it's your testimony, under oath, that she went down to the medical department, but didn't want to see the doctor for her fracture; is that what you're saying?
A. It appears, from the testimony of the nurse that had the interaction with her, that she wanted to know if there would be a fee, and he said, "Customarily, yes. There's a fee to see the doctor.



It's $100 or $125." Or whatever it was back then. And that she then didn't want to see the doctor. She didn't want to pay and then she made the assessment that she -- it had already been three days. She was getting off the ship the next day. And that she would just see her own doctor when she got home 24 hours later. Which is what she did.
Q. So what were your company's policies back in March of 2020 for accepting passenger health insurance in the case of a passenger that needed emergent medical care?
A. We don't accept insurance. We're not a health care provider that way. We're not a HIPAA facility in that regard, so we can accept insurance. However, guests are encouraged to buy their travel insurance, which would pay for, you know, emergency medical care and medical assistance that's rendered onboard. So there is a level of insurance that you can buy medical issues that might arise during your cruise. I don't believe that she elected to have that coverage, but I have not researched that to be sure.
Q. So, in the routine instance, if a passenger -- forget routine. Back in March of 2020 on the Valor, if a passenger went to the ship's medical department, the only form of payment accepted was self-pay,



effectively?
MR. PELAEZ: Objection to form.
THE WITNESS: Right. Like I don't think most American based health insurance covers in foreign waters, or in foreign ports. So insurance is not really an option. It usually just gets tagged to the person's sail and sign account when they sign their guest consultation form. It denotes that when they sign up. Like I said, exceptions are made all the time as for payment and how that looks. But that's generally the procedure, is that it would go to the guest's sail and sign account.
BY MR. HERNANDEZ:
Q. Did you bring any documents to today's deposition that I have not discussed with you?
A. I didn't bring anything. Everything was emailed to me in a link, so I do have access to everything that we've been discussing today. I have access to all of the file materials, but nothing that you don't have. Other than, maybe, the HAT meeting minutes which have to redacted based on whatever you guys decide.
Q. Okay. No. What I meant by brought to today's deposition, that you would be producing to me that I haven't discussed with you.

A. No.

Q. And is that because none are -- none exist responsive to what I asked for, or because of these pending objections that I keep hearing about?

A. I think it's the pending objections. The overbroad requests.

MR. PELAEZ: We responded to the duces tecum request back on November 22, 2021. We asserted objections as needed to the -- let me see how many duces tecum requests there are included here -- 53 duces tecum document requests that were included. We asserted objections back to November 22, 2021, as to some of the areas for the duces tecum request. And we also indicated for several of those areas where documents had already been produced and responded to, and for several others, we responded there were none. So there were no new documents to be produced today.

MR. HERNANDEZ: Okay, Ms. Vasquez, that's all I have.

THE WITNESS: Okay.

MR. PELAEZ: We'll read.

THE WITNESS: Thank you. All right guys. That was fun.

Jorge, nice to see you.

Oliver, nice to see you.



THE VIDEOGRAPHER: Always a pleasure.

THE WITNESS: Everybody have a great afternoon. And thanks for everything.

THE REPORTER: Eddie, you want to order this?

THE WITNESS: Bye guys.

MR. HERNANDEZ: Yes, please. Yeah. Regular service. No expedited or anything like that. Full and a mini, please. I'll send you. There's only two exhibits. Do you want me to flip them to you directly, or to DLE?

THE REPORTER: DLE.

Victor, do you want a copy?

MR. PELAEZ: Yes, please.

THE REPORTER: Yes, please.

MR. HERNANDEZ: To the same email I was given earlier, Jorge? info@dlecourtreporters?

THE REPORTER: All right. So you want a order full and a mini, right?

MR. HERNANDEZ: Yes.

THE REPORTER: How about you, Victor?

MR. PELAEZ: Full and mini is fine. Electronic only.

THE REPORTER: Electronic only. All right. Thank you, guys.

MR. HERNANDEZ: I don't need the exhibits



back, Jorge. But I will send them to you.

THE REPORTER: All right. Thank you.

MR. PELAEZ: Thank you.

THE VIDEOGRAPHER: All right, guys. Take care. Good to see you.

MR. HERNANDEZ: Thank you.

(Deposition concluded at 4:19 p.m.)



CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF MIAMI-DADE

I, Jorge Garcia, Court Reporter, Notary Public, State of Florida, certify that Susan Vasquez, appeared before me at 10691 North Kendall Drive, Number 109, Miami, Florida 33176, on the 30th day of November 2021, and was duly sworn.

Signed this 14th day of December 2021.

Jorge Garcia, Court Reporter
Notary Public, State of Florida
Commission No.: GG 316602
Commission Expires: 3/27/2023

Page 138

CERTIFICATE OF REPORTER

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

I, Jorge Garcia, Court Reporter, certify that I was authorized to and did report the Deposition of Susan Vasquez; that a review of the transcript will be done, and that the transcript is a true and correct record of my notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties. I am not a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 14th day of December 2021.

____________________________
Jorge Garcia, Court Reporter

Page 139

ERRATA SHEET
DO NOT WRITE ON THE TRANSCRIPT
ENTER CHANGES ON THIS PAGE
IN RE: Barbara Hall vs. Carnival Corporation
SUSAN VASQUEZ
December 14, 2021

Page No. Line No. Change Reason

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

____________________________
Susan Vasquez Date