UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 21-cv-20557-BLOOM/Otazo-Reyes

BARBARA HALL,

Plaintiff,

v.

CARNIVAL CORPORATION,

Defendant.
______________________________/

THE VIDEO-RECORDED VIDEOTELECONFERENCE
DEPOSITION OF JOSEPH CAGUMBAY, RN

DATE: WEDNESDAY, JUNE 2, 2021

TIME: 8:24 A.M. - 10:54 A.M.

TAKEN BY: THE PLAINTIFF

PLACE: VIA ZOOM/REMOTE

REPORTED BY: LYSSA D. URBAN, Stenograph Shorthand Reporter and Notary Public, State of Florida at Large

A P P E A R A N C E S:

PETER G. WALSH, ESQUIRE
OF: David W. Singer & Associates, P.A.
1011 South Federal Highway
Hollywood, Florida 33020
(954) 920-1571
pwalsh@1800askfree.com
Counsel for the Plaintiff

CHRISTOPHER B. SMITH, ESQUIRE
OF: Fowler White Burnett, P.A.
1395 Brickell Avenue, 14th Floor
Miami, Florida 33131
(305) 789-9211
csmith@fowler-white.com

Counsel for the Defendant

ALSO PRESENT: DeAndre Shivers, Video Specialist



C O N T E N T S

TESTIMONY OF JOSEPH CAGUMBAY, RN
Direct Examination by Mr. Walsh......................5
Cross-Examination by Mr. Smith.....................43
Redirect Examination by Mr. Walsh..................76
Recross Examination by Mr. Smith..................104
CERTIFICATE OF OATH...............................107
CERTIFICATE OF REPORTER...........................108

* * * * * *

EXHIBITS

DEFENDANT'S
Exhibit "A"...........................................106
(Medical Staff Interaction Log dated 3/4/2020)



P R O C E E D I N G S

* * * * * * * * *

THE VIDEOGRAPHER: This is the beginning of the videotaped deposition of Nurse Joseph Cagumbay in the matter --

THE WITNESS: Yes.

THE VIDEOGRAPHER: -- of Barbara Hall versus Carnival Corporation.

Today's date is June 2, 2021, and the time is 8:24 a.m.

Counsel, please introduce yourselves after which our court reporter will swear in the witness.

MR. WALSH: Good morning. This is Peter Walsh and I represent the plaintiff, Barbara Hall.

MR. SMITH: And I'm Christopher Smith of Fowler White Burnett on behalf of the defendant, Carnival.

THE COURT REPORTER: The attorneys --

THE WITNESS: Hello.

THE COURT REPORTER: -- participat- -- the attorneys participating in this deposition acknowledge that I, the court reporter, am not physically present with the witness and that I'll be reporting the proceedings and administering the oath remotely. The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.



Please indicate your agreement by stating your name and your agreement on the record, starting with noticing counsel.

MR. WALSH: Good morning. This is Peter Walsh, I agree.

MR. SMITH: And Christopher Smith, I agree, as well.

THE COURT REPORTER: Okay.

THE WITNESS: Hello.

THE COURT REPORTER: Mr. Cagumbay, can you raise your right hand?

THE WITNESS: Yes, ma'am.

THE COURT REPORTER: Do you swear or affirm the testimony you're about to give in this cause will be the truth, and nothing but the truth?

THE WITNESS: Yes, I will give -- I will provide my statement, only the truth.

THE COURT REPORTER: Okay. Thank you.

THE WITNESS: Thank you.

MR. WALSH: Okay. We all ready?

THE COURT REPORTER: Yes. Go ahead.

JOSEPH CAGUMBAY, RN,

after having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. WALSH:
Q Sir, what is your name?
A Is he asking about -- with regards to me?
Q Yes.
A Oh, okay. Hello, Mr. Peter Walsh; I'm Joseph Cagumbay. I am the -- I am the nurse -- I am one of the medical team in nursing, the Valor.
Q And could you spell your last name, please.
A My last name? C-A- -- C-A-G-U-M-B-A-Y, Cagumbay.
Q Could you spell -- do it a little slower; I'm writing it down.
A Okay. C-A-G-U-M- --
Q "D" -- D-U, like "D" --
A -- B --
Q C-A, "D," like David?
A C-A, "G" -- "G," as in goat --
Q Okay.
A -- U-M-B-A-Y, Cagumbay.
Q Cagumbay?
A Yes, sir.
Q And -- and, sir, where are you today?
A I am here now in the Philippines, sir.
Q Is that your --
A My township --
Q -- nationality?



A Yes, sir, I am a Filipino.
Q And who is -- who do you work for?
A As of now, I am going to tell you the -- I did hospitals here because I work -- I will -- I -- I working as a nurse.
Q And on March 1, 2020, who were you working for?
A March 1, 2020?
Q Yes.
A Ah. Last year, do you mean, sir? It's last year, right? Yes --
Q Right.
A -- I am connected with -- I -- I work as a nurse in Carnival. In the Carnival -- specifically, in Carnival Valor at that time.
Q Do you remember Barbara Hall?
A If -- if you're asking me, sir, if I remember Barbara Hall, it's been a year already, it's more than a year, honestly, I don't remember her, sir.
Q Do you remember the incident that forms the basis for this lawsuit?
A Again, sir.
Q Yeah.
A Again.
Q Hold -- hold on. Let me just look at my notes before I ask that question.



A Okay.
Q Yes. You were listed on the interaction log.
A Yes, sir.
Q What is the interaction log?
A Sir, a medical interaction log is a policy that we -- it is a medical interaction policy that we -- we are doing on board. Every interaction with our patient or our guest, we are putting it there, sir.
Q You say it's fallacy?
A Yes. We are doing that one on board every time we have our interaction for our guest or our patient, medical interaction log, yes.
Q So did you use -- did you use the word fallacy?
MR. SMITH: No. He said policy.
MR. WALSH: Oh.
MR. CAGUMBAY: Policy. Policy.
MR. SMITH: Policy.
BY MR. WALSH:
Q Policy, sorry.
A Yes.
Q Sorry. All right. So whenever -- and -- and how does it work? How does -- how does the log work?
A First of all, if one of our guests -- guest or patient coming in in the medical center or some of them are calling -- calling on-call nurse, so every interaction,



either it is a direct con- -- direct con- -- direct count -- encounter or it is a phone.
For example, the routine, they will ask for any consultation, they're -- they're asking for when is -- the doctor is available, or like that, for example, if it is a phone call, so as a documentation, we -- we are putting there the medical interaction that every patient or every guest we encounter.
Q What if it's for something -- I -- I know if it's for something big, you would make an entry; what if it's for something small, like, a guest calls down and says, hey, I'd like a Tylenol or an aspirin?
A So with that, sir, they're asking for Tylenol or aspirin, we have in medical center, also. It is available -- it is also available -- what we call this one -- over-the-counter medication, we can simply give them.
Q But would you write that in the log?
A Yes. There is -- when we dispense a medication -- when we dispense a medication, there is -- there is -- we are putting there the note that this patient bought a Tylenol and whatever medications he -- whatever medications he or she bought from us that they take from the medical center, I mean. We're notes -- we're putting in notes there, they're our remarks.
Q Barbara Hall -- have you seen the log for March 1,

Page 10

2020?
MR. SMITH: Objection to form.
THE WITNESS: I think it's -- yeah, March 4, 2020, yeah, because I ask this one -- I ask -- this medical interaction log to Mr. Smith so, therefore, I -- I check the -- I check my notes there. I check my statement in the medical interaction log.
BY MR. WALSH:
Q Okay. And is there an interaction listed for Barbara Hall?
A Again, sir.
Q Is there an interaction listed for Barbara Hall?
A Yes, sir.
Q Tell me what it says.
A Based on my medical interaction log, the date is March 4, 2020, 15:05 hours, military time. Her name is Barbara Hall with a cabin number 8429. It is a direct encounter with me. So her nature of regress, the guest stated that she fell down in her bathroom three days ago. She acquired right forearm trauma.
She asked how much it will cost for doctor's consultation. So informed the guest the possible charges. So my advice is to -- I advised her that -- the guest to be seen by the doctor for treatment and further evaluation, and her response, on my advice, the guest stated or a verbal

Page 11

host stated that she will just see the doctor back home. She stated that she's also a nurse and she stated that it's already happened three days ago. That is all, sir.
Q You told her about the possible charges, right?
A Yes, sir. Because since she asked again how much it will cost, the doctor's consultation. We can see the possible charges, it's because we have the list, so that's why we know.
Q And did you tell her -- did she ask -- did -- did you tell her that it was $500 to see the doctor?
A Again, sir.
Q Did you tell her it was $500 it would cost her to see the doctor?
A Absolutely, no, sir; I didn't tell that one.
Q Well, how -- how much is it to see the doctor?
A I -- unfortunately, sir, it's more than a year already that -- that I'm not -- I didn't work in the Carnival, but you can check with them, you can ask the Carnival, sir, if they have the -- they have the list how much the doctor's consultation.
For now, I -- I don't remember already because it's more than a year that I -- I did not work onboard so somehow I forgot it. So just to be -- to be honest with you, just ask Carnival, they know how much it will cost for the doctor's consultation.

Page 12

Q You said absolutely not $500?
A Yes, sir. No.
Q It's less than that?
A Yes. Less than -- for doctor's consultation, it will not -- as far as I know, it would not reach $500. As far as I know, it's $100 or more, $125. But to be sure, just ask Carnival with that.
Q Did you tell Barbara Hall she had to pay in order to be seen?
A Absolutely, no, sir. We in the medical center, we are nurses, we're not -- we're not dealing with the payment.
Q But you did tell her -- well, what do you mean you don't deal with the payments? Don't you have to pay to --
A Yes, with the --
Q -- wait --
A With -- with regards with the payment, sir, we nurses or we people on the medical team onboard, we're not dealing with any payment. On how will they pay, you know, how they would pay later on, we don't know. Some of them, they're using their credit cards, some of them debit cards or Sail & Sign Cards, but on how they will pay it later on, we don't know already.
Q So if I come down to the medical center --
A Yes.
Q -- you won't charge me anything to be seen by a

Page 13

doctor?
A Absolutely no, sir. We will not charge you. As long as you complete a consultation form, the reason of your visit, you can go directly to the doctor any time.
Q Well, then, what are the charges all about?
The charges are -- are they optional?
MR. SMITH: Objection to form.
THE WITNESS: Sir, the -- we have -- we have charges but we are not demanding immediately for the payment before the payment. You can seek -- you can seek medical attention any time, but with regards with the payment, no.
BY MR. WALSH:
Q Are you saying -- hold on one second. I'll get right back.
A Okay.
(A brief recess was taken.)
MR. WALSH: Hello, I'm back. Can you --
MR. SMITH: Hello.
MR. WALSH: -- hear me?
MR. SMITH: Yes.
THE WITNESS: Yes, sir. Yes.
MR. WALSH: Hello. Can you hear me?
MR. SMITH: We can hear you.
THE WITNESS: We can hear you.

Page 14

MR. WALSH: Okay. Sorry. Sorry, I had another call come in I had to cancel.

BY MR. WALSH:

**Q So -- so tell me exactly how it works if I come down to the desk and I --**

A Uh-huh.

**Q -- I want to be seen by some- -- by a doctor. If I don't --**

A Okay.

**Q If I don't -- how does the subject come up of how much it costs?**

A Sir, if -- if you are -- if you're a guest or a patient seeking for a medical attention, yeah, you came down in the medical center, so we -- we -- we, either the medical team or a nurse see you already in the medical center, of course, we are very courteous and polite for every guest there. So...

**Q You're very what?**

A We are very polite and courteous for our guests. So we -- we greet them when they came in the medical center, so they're asking for -- if they're looking for any -- for medical attention. So we ask what is their complaint. So if they feel like they have, like, a fever or whatever, so if they're ask -- looking for a doctor's -- doctor's consultation.

Page 15

So we have there, sir, a form, we have called it a consultation form. So we give the consultation form to the patient or guest, they will sent up there. The consultation form contains the name, the age, the cabin number, their medical history, what is their -- what is their current medications or ongoing medications, what is their -- any allergies, and the reason of visit.

So if you filled out that form so we can check -- because this is a very important consultation form because it is our baseline data. We know what medications that we will give because -- if you have any allergies like that. And, then, after that, we will check the vital signs. After checking the vital signs, if the doctor is already available we can -- she -- he or she, the patient, will come to the -- to the doctor's office and the doctor will evaluate the -- evaluate the patient. That's it, sir.

**Q And what about the subject of cost?**

**When do you tell the -- when do you tell the patient how much this treatment is going to cost?**

A Ah. After the consult- -- after the consultation, sir, because we in the medical center, we are -- we have a list of charges, what is the medical procedure, the list of medical procedure, for example, back slab or suturing. So it -- it's acting like already -- medical supplies, it's already there.

Page 16

So the time that the patient -- the time the patient finish for all the procedure, we're doing our notes, what procedure -- medical notes, the doctor's note, the nurse's notes, we are doing that one, and we will -- we, in the medical center.

So what is the medical procedure that's done by the doctor, for example, suturing, we have there, we can -- we can select that charges. So that's why we -- somehow we know what -- we know the estimated or the possible charges that the patient can obtain.

**Q Do you tell the patient -- when do you tell the patient how much it's going to cost?**

**Do you tell them?**

A The time -- the time that the patient always ask how much it will -- how much it will cost, for example, how much it will cost for doctor consultation, of course, it's her right to know. Since you know also the answer of how it will cost, yeah, you can tell -- we are telling them that this is the cost of our doctor's consultation, ma'am, like that -- simply like that.

**Q And what if the patient doesn't -- can't afford to pay for the care, what do you do then?**

A Can't afford? We have patients also that if they are saying they can't afford, we have a -- guest services that can help them. For example, they will go to guest

Page 17

services that -- for example, we will do the -- we will do the medical procedure for her, for example, we will do suturing or back slab, some of them are taking a promissory note that they can pay it later on.

But with exact -- with exact -- with that time, if the patient can't really pay, we don't care, sir; we proceed for the -- we -- we will proceed for any medical treatment as long as the guest will -- will agree and sign the consent for the procedure; there is no problem with that.

**Q And the consent for procedure form also is a promise to pay form, isn't it?**

MR. SMITH: Objection to form.

THE WITNESS: As -- the consent is a consent that the patient agree that the doctor will do the procedure, for example, suturing, like that. That the patient agree that the doctor will do the procedure for her or the medical team will do a medical treatment for her. The sole --

BY MR. WALSH:

Q So is --

A -- consent I'm referencing.

**Q So is it your testimony that if a pat- -- if a patient comes down and says, I can't afford to pay for any care, you'll treat --**

Page 18

A Uh-huh.
Q -- you will treat her --
A Uh-huh.
Q -- or him anyway?
A Yes, sir.
MR. SMITH: Objection.
THE WITNESS: Of course. Absolutely.
MR. SMITH: You can answer.
BY MR. WALSH:
Q But first -- but first they have to go up to some other department to sign a promissory note; is that right?
A Somehow they will come to the guest services on how the guest services will -- will do it. But, see, sir, this is a -- yeah, like -- like that, they will go to guest services to -- to seeking help for them, not -- not seek for help, ask -- ask a -- what we call this one, a -- what -- what -- what they can usually do if we cannot afford, like, that too, the guest services will tell them, yeah, you can -- you can proceed with the medical treatment, but if you will do the promissory note, you can pay it later on, on how -- and how you -- but I don't know already how they -- how they will deal with that, sir, because we are not dealing with the payment, actually.
Q So it's your treatment (sic) that you'll treat everybody, even if they don't have any money?

Page 19

MR. SMITH: Objection to form.
THE WITNESS: Yes, sir. If -- if they want to be -- if they want to be seen by the doctor, yeah, they will be seen by the -- if they want to be seen by the doctor, we can -- the doctor will -- any -- any of the medical team will see them.
BY MR. WALSH:
Q And your -- was your only interactions with Ms. Hall on March 4th?
A Uh-huh.
Q Was that your only interaction with her on that date? Is that it?
A Yes, sir. That's the only date of interaction.
Q And -- and am I right that you don't remember her at all; in other words, if you saw her today, you wouldn't recognize her?
MR. SMITH: Objection to form.
THE WITNESS: If I saw her today, sir, I -- I cannot -- I cannot recognize and I cannot remember her.
BY MR. WALSH:
Q And am I right that you do not remember the interaction with her?
A The time --
MR. SMITH: Objection to form.
THE WITNESS: Sir, the time that Mr. Smith sent

Page 20

this one to me, somehow it refresh my mind, this interaction. It refreshed my mind, that this interaction really happened, but outside of this physical interaction, I cannot remember already.
BY MR. WALSH:
Q So you have the form that says there was an interaction --
A Yes, sir. Because --
Q -- is that right?
A Yes, sir. Because I asked this one to Mr. Smith, to send me this medical interaction log.
Q And now that you have the form, do you remember Ms. Hall?
A With her -- with her face, what is the -- what it totally happened that time, unfortunately, sir, I cannot remember her. What is her face, what is the -- I don't remember really, sir, because it's been more than a year and a lot of things happened already, so I cannot remember her actually.
But --
Q What would --
A -- based on my -- but it refresh my mind based on this medical interaction, I know myself, I know that this interaction really happened.
Q And you know that because of a piece of paper?

Page 21

A Yeah, because it -- it somehow refreshed my mind that -- it flashback in my mind that this is really -- this is really -- Ms. Barbara Hall -- me and Barbara Hall really have an interaction.
Q And the date is March 4, 2020?
A Yes.
Q What else does it say? Tell me everything that it says.
A That's it, only it states here in the medical interaction log.
Q But what else does it say?
A Other than that, sir, I cannot -- I don't have any -- other than -- outside of my medical interaction log, I don't remember anything.
Q Okay. Could -- could you read me the -- the note?
A Sure. The date, March 4, 2020, 15:05 hours military time. The name is Barbara Hall. Cabin number 8429. It's a direct encounter. The guest stated that she fell down in her bathroom three days ago and she acquired a right forearm trauma. She asked how much it will cost for doctor's consultation. I informed the guest the possible charges. Advised the -- advised the guest to be seen by the doctor for treatment and further evaluation. Her response, the guest stated that she would just see the doctor back home. She stated that she's also a nurse and she stated

Page 22

that it's already happened three days ago.
Q And is that the only reference to Barbara Hall?
A For me, sir, this is the only reference that I have for -- for our medical -- for our interaction.
Q Did you see any other references to Barbara Hall on any other dates?
A No.
Q Were you working on March 1st at the medical center?
A March 1st? Well, I don't know, sir. I cannot remember already if I'm working that moment. I don't know. I cannot remember already.
Q Could you describe the layout of the medical center on the Valor.
Is there a reception desk at the front that -- that a --
A Yes.
Q -- that a guest -- that a guest stops at before coming in?
A Yeah. I can describe to you, sir. The medical center is located in deck zero -- deck zero. And, then, there's a full-tier out -- a full medical center. The time that you came in, so you -- you would see, immediately, the nurse's station where we sit. So the time that I --
THE COURT REPORTER: I didn't -- excuse me.

Page 23

THE WITNESS: So -- hello.
THE COURT REPORTER: Mr. Cagumbay, can you slow down just a little bit? Because you're kind of coming in and out of the internet so I'm trying to piece together what you're saying. Just slow down a little bit and -- I don't know about your internet, but it is coming in and out a little bit.
THE WITNESS: Okay. Okay. When -- the time that you came in in the medical center, you will saw -- you will saw -- you will see already the nurses' station where we stayed. So the time that the guests will came in, we can see them immediately. And, then, in front of the -- in front of the -- in front of the nurses' station, we have a bench there that a patient can wait, can sit down until they will be called by the doctor.
And at the back of our -- at the back of our nurses' station, the doctor's -- the doctor's office is -- the doctor's room is there, and if you go -- if you proceed more and go inside -- so we have different rooms there -- the first room is in the -- this is -- that is our ICU room, it's only one room for our ICU patient, and we have -- we have also room for our procedure room, if we have any -- doing for back slab or x-ray and everything. And we have also a observation room that contains -- one, two, three -- it

Page 24

contains four beds, and we have also one isolation room contains one bed. That's it, sir.
BY MR. WALSH:
Q How busy were you went Barbara Hall came down?
A Unfortunately, sir, I cannot remember really that moment how busy we are; I cannot remember. Specifically, I cannot remember already.
Q Does the form that you have in front of you help you figure out how busy you were at the time?
A No, sir. Unfortunately, I cannot really remember that time. I cannot remember already. It's more than a year.
Q Right. But does that form help you at all?
A What you mean form --
Q The log. The log.
A Yeah. We -- we are put- -- because our -- in our policy, the time that we encounter with our -- with our guest or patient, the time that they came in and we have done with our interaction, we put immediately there in the medical interaction log because it -- because it is our policy that we need to put our interactions with the -- with the -- with the guest. So we are doing that one, it's in our routine. We are doing that one really.
Q Yeah. But what I'm asking you is, can't you look at the log and can't that tell you how busy you were?

Page 25

A No. We have -- we have -- don't we don't have a -- I don't have a -- any lab with that, sir, on how busy we are. We don't have -- we don't have. And I don't -- I don't know, and I cannot remember that moment really.
Q Yeah. Maybe you didn't understand my question, though. I'm asking, doesn't -- the log that you have in front of you, doesn't it tell you how many other patients were -- were there around that same time?
A Oh, okay. No, sir. I -- I don't -- I don't know. I don't know with the -- with the log. Maybe you -- you can ask Carnival with that, because they have the reference. But, for me, I don't know because I cannot remember really that moment.
Q When did you start working for Carnival Cruise?
A 2019 of October, sir. 2019 of October, yes. October -- yeah, 2019 of October.
Q Before that, where did you work?
A Before Carn- -- before I -- before that, I work in Saudi Arabia as an ER nurse. I worked there for three-and-a-half years.
THE COURT REPORTER: Can you repeat that a little slower, please?
THE WITNESS: Before I work in Carnival, I work in Saud- -- Kingdom of Saudi Arabia for three-and-a-half years as an ER nurse.

Page 26

THE COURT REPORTER: I'm sorry. I still didn't understand you. Your internet kind of came in and out when you said the name of the place. Can you just spell the name of the place that you worked at.

THE WITNESS: I work in Kingdom of Saudi Arabia, ma'am. Saudi. Saudia Arabia. I work in Kingdom of Saudi Arabia for three -- three years and six months as an ER nurse.

BY MR. WALSH:

Q And before that, where did you work?

A Before -- before Saudi Arabia, sir?

Q Yes.

A I work here in Philippines. I work, for almost, I think four years here, before I go abroad in Saudi Arabia.

Q And how old are you today?

A Me? I am 30 years old.

Q Thirty?

A Yes, sir.

Q Did you receive your nurse's training in the Philippines?

A Yes, sir.

Q And -- and is that your native nation?
Is that where you were born?

A Yes, sir.

Q And when did -- how old were you when you

Page 27

graduated from nursing school?

A I graduated at the age of 20, sir.

Q How many years of school does it take to become a nurse in the Philippines?

A Before? After you finish high school, you -- you proceed for college. And nursing, it takes four years for you to -- to finish nursing and you need to -- after that -- after finishing four years, of course, you need to take the board exam.

Q And so you managed to do all of that by age, what, 20?

A Yes, sir.

Q And I know a lot of -- I know it's true that a lot of people leave the Philippines to work abroad, for example, in Saudi Arabia --

A Yes, sir.

Q -- or on a -- on a cruise ship?

A Uh-huh.

Q Why is that?

A Why is that? Because -- what you're -- what do you mean, sir? What you're asking me? Why is it that a lot of nurses working abroad?

Q Well, a lot of Philippine -- Philippine citizens choose --

A Yes.

Page 28

Q -- to work -- they choose -- especially professionals like doctors, nurses, they choose to work abroad; why is that?

A Yeah, of course. Working opportunity -- our big opportunity because the, we as, a nurse, we have -- we lose a lot here in our country, so it is very -- a big opportunity for us to work abroad, like, Saudi, or going outside, like, in a western country. So that's it, sir, opportunity, salary, to be honest with this answer. So...

Q Can -- can you earn more as a nurse working on a ship than you can earn working in the Philippines?

A To be honest, sir, yes, absolutely.

Q Is it more than double -- can you earn more than double on a cruise ship?

A Based on our salary here in the Philippines, sir, yes.

Q Could you just give me a rough idea --

A Uh-huh.

Q -- of what a -- of -- of how much a -- a -- a nurse would earn --

A Uh-huh.

Q -- in the -- in the Philippines if he graduated at age 20 --

A Uh-huh.

Q -- and he gets a -- you know, in his first year,

Page 29

how much --

A Uh-huh.

Q -- would he earn per year in the Philippines working as a nurse?

A Somehow, sir, it depends on the institution. If you are working in the government, 30,000 pesos or -- that is the range, 30 -- 25 to 30,000 pesos. I don't know I -- if I can calculate it in dollars, I -- we can -- so if in the private institution, it's -- it's a little bit smaller, it just ranges 15 to -- 15 to 20,000 pesos. Pesos.

Q And -- and I don't need a precise number, but how much is that in -- in U.S. dollars, do you think, roughly, roughly, generally?

A Just check -- I will check certain for -- for a while. So if I will work in the government, sir, if they provide me a 30,000 pesos -- 30,000 pesos, it will be $600 a month.

Q Okay. So it's 30,000 pesos a year?

A Month. 30,000 pesos per month, if you are working in a pri- -- government institution, but if you are working in a private institution, lower than that.

Q Okay. All right. Fine. And, then, on a cruise ship, what is the average -- average pay that a nurse receives on a cruise ship? Just a rough average.

A I will give you a range, sir. It's -- I

Page 30

receiving -- a range only -- four-thou- -- 4,000 to -- 4,000 to 4,400, like that. 4,000 to $4,400.
Q Is that per trip? Per year? What is it? Per month?
A Per month, sir.
Q Okay. Four to -- 4,000 to 4,400 per month is what you earn on a cruise ship as a nurse?
A Yes, sir, 4,000 -- ranges from 4,000 to 4,400, yes, as a nurse -- as a nurse.
Q So I'd imagine that it's -- it's hard to get a job on a cruise ship; they're very competitive, right?
A Yes, sir. Yes, sir.
Q When -- when you went to work at Carnival, did you have to go through training in Miami?
A No, sir. I don't have any training in Miami.
Q Where did you have your training when you went to work for Carnival?
A Here in the Philippines, sir, we have training.
Q Does Carnival have an office in the Philippines?
A Again, sir.
Q Does Carnival have an office in the Philippines?
A No, sir.
Q But what I'm asking is, does Carnival, itself, give you special training?
A The Carnival, sir, required me a training, like,

Page 31

BLS, basic life support; ACLS, advanced cardiac life support; spouse or a patient advanced life support and -- and ITLS, or international trauma life support. What -- what is --
THE COURT REPORTER: Okay. I'm --
THE WITNESS: Hello.
THE COURT REPORTER: Excuse me. You're going to have to -- you're going to have to repeat that. Can you slow down a little bit, please. You're -- the -- you have a strong accent and I'm having a hard time understanding when you speak fast.
THE WITNESS: Oh, okay. Okay. Sorry. Sorry.
THE COURT REPORTER: Sorry about that.
THE WITNESS: Okay. We have BLS, it is a basic life support; ACLS, advanced cardiac life support; spouse or patient/pediatric advanced life support; ITLS, international trauma life support. So those are things that I complied.
BY MR. WALSH:
Q And when you're on the ship, do you have to pay for your own meals and your own cabin?
MR. SMITH: Objection to form.
THE WITNESS: No, sir.
BY MR. WALSH:
Q So in addition to the -- to the monthly salary --

Page 32

A Uh-huh.
Q -- of 4,000 to 4400 a month, you also get three meals a day, plus a cabin?
A Yes, sir.
Q Okay.
A We're not paying for our the meals and for our cabin.
Q And -- and do you share a cabin with others, if you're a nurse?
A No, sir, I'm alone.
Q And is it the same type of cabin that a guest would have, or is it a -- in a different area? Is it a different -- what is it?
A It's a different cabin, sir. It's different. We're located in the deck zero, but it's a cabin for -- for some of the crew. So the cabin is different from -- different design from the guests.
Q And are you employed directly by Carnival?
Are you a Carnival employee when you're on the ship?
A No, sir. We are -- we are in -- we are indirect -- we're inde- -- independent -- what do we call this one?
Q Contractors?
A Yes, independent contract.

Page 33

Q So who's -- who is your employer when you're on the ship?
MR. SMITH: Objection to form.
THE WITNESS: So we have the -- we have a -- and we -- so the -- Carnival who hired me from that -- we have a -- an agency here in the Philippines that doing a process for us, going to -- going to the ship.
BY MR. WALSH:
Q And do you get a paycheck every week, or how does it work?
A For our payment, sir, our salary go in every 15 days.
Q And do you receive --
A Every 15 days.
Q Do you receive a check?
A A check? No. It goes directly in our -- in our -- in our card, in our -- I forgot -- our (inaudible).
Q And who -- and who -- where does the money come from?
What -- what's the name of the company who pays you?
A It came from Carnival, from the -- of course, from the company.
Q So Carnival pays you and, when you're on the ship, you're working for Carnival --

MR. SMITH: Objection --
BY MR. WALSH:
Q -- right?
MR. SMITH: -- to the form.
THE WITNESS: Yes, sir.
BY MR. WALSH:
Q But you said you're an independent contractor; could you explain that?
MR. SMITH: Objection to form.
THE WITNESS: Inde- -- we are inde- -- we nurses and doctors who are -- we're having independent contractor. If there is -- we -- the -- the company will hire us if there's a need of -- of crew. So when --
BY MR. WALSH:
Q What company will hire you?
A Carnival.
Q Okay. Go ahead.
A Carnival has --
Q Go ahead.
A Carnival has an agency here, so I -- I pass all my -- I have all my needed requirements in our agency here, and that's it.
Q And -- and what does Carnival's agency office look like? Is it a --



A Yeah, we have here.
Q Is it an off- -- is it an office and the -- is there a sign that says "Carnival Cruise Line"?
A No, sir. First, we -- we have a Bahia -- Bahia Shipping Lines is their agency. So Bahia Shipping Lines hold their -- their recruiting services, they also hold -- hold in America, Fred. Olsen, like that, and Carnival Cruise. So this -- that is our -- that is our agency here.
THE COURT REPORTER: What is the name of it, Bahia?
THE WITNESS: Bahia Shipping Lines, yes.
THE COURT REPORTER: Thank you.
BY MR. WALSH:
Q Does -- is that B-A-H-I-A?
A B-A-H-I-A, yes. Bahia Shipping Lines.
Q And is it -- does Carnival pay Bahia and, then, Bahia pays you, or does Carnival pay you directly?
A Well, I not -- I'm not sure with the process, sir, how -- how -- I -- I -- I don't know how -- how -- how they do the process for payment for us. Just ask Carnival, they can provide the answer because, for me, I don't know that one.
Q And what -- please describe the uniform you wear when you're working on a ship in March of 2020.
A Unfortunately, sir, I cannot -- I cannot describe



my uniform at that moment because sometimes you are wearing a white, and some -- white uniform, and sometimes you are wearing a -- what they call this one -- scrubs suit. So I cannot tell you what is the exact uniform that I wear at that moment; I cannot remember.
Q Does your uniform contain a name tag with your name?
A Yes, sir, we are always wearing our name tag.
Q Does the name tag say "Carnival" on it?
MR. SMITH: Objection to form.
THE WITNESS: We have a name tag, it just says "Joseph," and below that name, it states our nation- -- out country. Like, Joseph, Nurse Joseph, under that name is Philippines. Joseph only.
BY MR. WALSH:
Q Does the name tag say anything about Carnival?
MR. SMITH: Objection to the form.
THE WITNESS: No, sir. But they're -- no, sir. But our name tag, it -- it has a fun- -- it -- it has a funnel logo. Our name tag is half the funnel logo.
BY MR. WALSH:
Q A what logo?
A A funnel -- funnel logo. The logo -- a funnel logo.
Q Is that the logo --



A Funnel.
Q Is that the logo -- oh, funnel, F-U-N-N-E-L?
A Yeah.
THE COURT REPORTER: Thank you.
BY MR. WALSH:
Q Is that the logo of Carnival Cruise Line?
A That is our name tag, sir, with a -- with a logo of Carnival or what it is, I'm not -- I'm not sure; I don't know.
Q The name tag -- is your name tag the same as -- the same style as other crew members' name tags?
A Yes, sir. We are -- we have the same name tag.
Q And I -- when I ask about other crew, I'm talking about other crew who do not work in the medical center, for example, a -- a server in a dining room.
A Yes.
Q Does he or she have the same name tag as you?
A Yes. We have the same name -- we have the same name tag, but -- but the difference only, we put the name and we -- under that name, we have the -- we have our job descr- -- we have our job. For example, my name is Joseph; Under my name is a "Nurse."
So other than -- other people, for example, her name is Benet (ph), and -- and they put in "Housekeeping," like that. So they -- they put the -- somehow the name of

your -- the name and your job, I think.
Q And how about the rest of your uniform; does it say any -- does it contain any Carnival logo?
A No, sir. They are -- in our uniform, we have -- we have the white dressed, we have a white dressed and white -- white -- white shoes. But with Car- -- with the -- I think we don't have -- we don't have a Carnival logo. Only the name tag -- the name tag.
Q And in a -- in a seven-day week, how many days do you work?
A In a -- we are working, sir, forty- -- 48 hours -- 48 hours a week. That's just in our contract, I think, 48 hours a week, but there is -- there is overtime sometimes.
MR. SMITH: Could you repeat that? I -- I didn't quite catch that. Sorry to interrupt. For the record to make sure it's clear, was it 14 or 40 hours?
THE WITNESS: Forty, sir. I -- forty -- no --
MR. SMITH: Four, zero?
THE WITNESS: Yes.
MR. SMITH: Okay. Thank you. Sorry.
BY MR. WALSH:
Q I thought you said 48.
THE COURT REPORTER: So did I.
THE WITNESS: Forty- -- I will just check, sir, to be sure, forty- -- 40 or more -- eight -- 48 -- 48



hours a week.
BY MR. WALSH:
Q Okay.
MR. SMITH: And, that, just, again, sorry to interrupt, for the record, that's four, eight?
THE WITNESS: Yes, four, eight hours.
MR. SMITH: Okay. Thank you.
BY MR. WALSH:
Q And anything beyond that is considered overtime?
A Yes, sir.
Q And do you get an increased rate of pay for overtime work?
A For overtime, yes.
Q How much extra do you get for overtime?
A Sir, to be honest with you, I cannot remember all the details that -- numbers because it's been a year already I'm not working with. So I don't have a copy of my contract here now, so I cannot -- I cannot provide you the exact answer. But we have payment for our overtime.
MR. WALSH: All right. Could we take a break for five minutes, please?
MR. SMITH: Yeah. Do you mind if we take ten? I have to use the restroom.
MR. WALSH: Yeah, let's take a ten-minute break. It's --



MR. SMITH: Okay.
MR. WALSH: It's 9:20; let's resume at 9:30.
MR. SMITH: Okay. Mr. --
MR. WALSH: It's not --
MR. SMITH: -- Cagumbay?
THE WITNESS: Yes, sir.
MR. SMITH: When you take a break, please just mute yourself and turn off your screen and, then, when you come back at 9:30, turn everything back on, okay?
THE WITNESS: Okay.
THE VIDEOGRAPHER: Okay. The time is 9:19 a.m.; we're off the record.
(A brief recess was taken.)
THE VIDEOGRAPHER: The time is 9:31 a.m.; we're back on the record.
BY MR. WALSH:
Q Sir, could you tell me, who was it at the medical center who actually spoke to Ms. Hall on March 4th?
A Sorry, sir. Can you repeat?
Q Were you the person at the medical center who actually spoke to Barbara Hall on March 4th?
A Yes, sir. Based on the medical interaction, it's true -- it's true me and Ms. Barbara Hall really had the interaction in March 4.
Q Did she see any other -- did she interact with any



other folks on that day at the medical center?
A To be honest, sir, I don't remember. I cannot remember that -- if she interacted with the other nurses or the other people in the medical.
Q Where did -- what part of her body did she say was injured?
A Yeah, based on my medical interaction there, sir, it's in the right forearm.
Q How did it look to you?
A I'm sorry, sir, I did- -- I don't remember already how did it look; I cannot remember how it looked, the trauma.
Q Did you examine her arm at all?
A No, sir.
Q Did you look at it?
A Right at that moment, really, sir, I cannot remember. I cannot remember.
Q What -- who was the doctor on duty at that time on March 4th in the afternoon?
A To be honest sir, I cannot remember who is the -- the doctor. Because we have two doctors, I cannot remember which one of them, the doctor.
Q Was the medical center crowded when Barbara Hall spoke to you on March 4, 2020?
A To be honest, sir, I cannot remember if it was

crowded or not.
Q What was your shift -- what hours were you working that day?
A I worked, based on the medical interaction log, sir, because it is 15:05, so I worked in the -- in the afternoon. So we have -- we have time, we're working -- we start at 1:00 p.m. until -- until 5:00 -- until 5:00 p.m.
Q 1:00 p.m. until 5:00 p.m.?
A Yeah. I think that is my schedule with that -- at time because I am on duty in the afternoon.
Q But that's only four hours.
A Yeah. And that included in the morning, sir.
Q Okay. So -- so you worked in the morning, too?
A Yes. We have -- we have duty also in the morning, and, then, close -- we started 7:00 -- 7:00 -- 7:00 a.m. until 7:00 -- 7:00 -- 11:00 a.m. and, then, we have -- I think 12:00 -- 12:00 noon and, then, we have -- we have a rest and then we resume 1:00.
Q So you worked from 7:00 to 12:00, then, you have a rest from 12:00 to 1:00 --
A Yes.
Q -- and, then, you work 1:00 to 4:00 -- excuse me --
A 1:00 --
Q -- 1:00 to 5:00?



A Yeah.
Q And -- all right.
MR. WALSH: Thank you, sir. I have no further questions.
THE WITNESS: Thank you, sir.
MR. SMITH: Mr. Cagumbay --
THE WITNESS: Yes, sir.
MR. SMITH: -- I do have a few questions for you and I'll -- I'll try to be quick, but would you please stay on?
THE WITNESS: Okay.
CROSS-EXAMINATION
BY MR. SMITH:
Q So this is Christopher Smith for Carnival. And, Mr. Cagumbay, my first question is -- and I apologize, some of these questions are going to be incredibly basic. I'm not trying to frustrate you; I just think in these types of legal cases, it's sometimes necessary to ask about the background of things, okay?
A Okay.
Q When was it again that you joined up with the ship Carnival Valor?
A I joined -- again, I don't know the specific date, but I -- I know that it was October -- October of 2019. And I -- and I disembark -- I leave the ship May 2 -- May 2,



2020.
Q Okay. So you stayed with Carnival Valor through May of 2020?
A May 2, 2020, yes.
Q Okay. And, at some point, did the cruise ship stop sailing with passengers due to the Coronavirus pandemic?
A Yes, sir. I can't -- I can't remember that one because it is the time that we stopped the cruising. It's May 14 -- the time was May 14th, the cruise -- the cruise -- we stopped the cruising already. So we disembarked all -- at the time of May 14 we don't have any guests anymore.
Q Okay. And why did you, Mr. Cagumbay, have to stay onboard the ship past March 14, 2020?
A I was -- actually I was scheduled to leave the ship March 14th, but the thing is, if it's a surge of -- there's a surge of COVID at that time, we have -- we have patients -- we have our crew member who are infected with the virus. So I was -- I was -- what we call this one -- I was informed by the office to extend somehow to help the team for surge -- surge of infect- -- of COVID infection.
Q Okay.
A So I was extended for two months.
Q Okay. So while you were onboard Carnival Valor from middle of May until -- or middle of March, excuse me,



until May of 2020, you were helping care for sick crew members?
A Yes, sir, for our crew -- for the crew members.
Q Okay.
A We don't have passenger anymore.
Q Okay. But were you -- what I'm trying to understand is, during that time you were still onboard the ship after the passengers left, were you in quarantine or were you actually providing -- helping provide care to sick crew members?
A No, sir, we are not in quarantine. We are -- we are treating the crew members who are infected with COVID.
Q Okay. And, then, before you got onboard Carnival Valor in October, approximately, of 2019 --
A Yes, sir.
Q -- had you ever been onboard a Carnival ship before then?
A Again, sir. Sorry.
Q Had you ever been onboard a Carnival ship before October of 2019?
A No, sir. That -- that was the first contract, so I haven't been on -- I haven't onboard in different ships of Carnival; that is my first contract.
Q Okay. And it sounds like you testified earlier that you got some certifications before you went onboard

Carnival Valor, certifications particular to your work as a nurse, correct?
A Yes. Yes.
Q And those particular certification courses, you took in the Philippines; is that right?
A Yes, sir.
Q Okay. Were those courses taught by Carnival?
A Again, sir.
Q Were the courses you took for your certifications -- additional certifications, were those courses taught by Carnival Cruise Line?
A Asked by Carnival Cruise Line?
Q Sorry. Let's just give the intranet a second here. My question is --
A Uh-huh.
Q -- of those certifications courses you took before joining the Carnival Valor, did Carnival teach those certification courses to you?
A It's the requirement, sir, that I -- that I should have the trainings before I can go onboard.
Q Okay.
A They required -- they required training that -- those trainings.
Q But who conducted the training?
Was it actual Carnival personnel in the



Philippines, or was it someone else that conducted your training in the Philippines?
A No, sir. It -- it isn't -- it is not the Carnival personnel. We have -- there's medical training here that they conducted those trainings, like, BLS, ACLS, but it's not -- it's not from Carnival.
Q Okay. After you got onboard the Carnival Valor, sir, did you learn about the policy of completing the medical interaction log?
A One of our -- one of our lead nurse -- lead -- our lead nurse informed me to -- to -- that this medical interaction log policy should be religiously filled up for any -- for any of our patients or our guests. So that's why --
Q Okay.
A -- I always complete those -- those medical interaction logs right after we interact with our guests.
Q Okay. So, yeah, what -- what is the policy on the timing of which the medical interaction log should be completed after you have a direct encounter or a phone call with the Carnival Cruise passengers?
A We are completing our medical interaction log, sir, right after we finish our conversation of our interaction. So we are putting immediately there in the sys- -- in the -- our statement we will put in the -- in the



system in the medical interaction log.
Q Okay. And is the policy of the medical interaction logs, not just to put -- input the information immediately after the interaction, but to input it accurately, as well?
A Again, sir. Sorry.
Q Does the policy also include -- require you to accurately input the information into the medical interaction log after you have an interaction with the Carnival guest?
A Yes, sir. This is --
MR. WALSH: Objection, leading.
BY MR. SMITH:
Q Now, each time that you completed the medical interaction log during your contract onboard the Carnival Valor, Nurse Cagumbay --
A Yes.
Q -- in each circumstance, did you come -- did you fill out the log immediately after the interaction with whatever guest?
MR. WALSH: Objection, leading.
THE WITNESS: I'm so sorry. I cannot -- can you repeat it again?
BY MR. SMITH:
Q Sure. Whenever you had the chance or whenever



it was required of you to complete a medical interaction log during your time on Carnival Valor, how long after the interaction would you fill out the medical interaction log?
A Well, after we are finishing the medical inter- -- we are doing the medical interaction log, right after we finish our conversation, we're doing it immediately after our conversation. After our interaction with the guest, so that we cannot forget everything, we put it immediately after we done our interactions with our guests -- our client -- our patient.
Q Okay. And what is the purpose of doing it immediately thereafter you have an interaction with a Carnival guest?
A In order for us -- in order for us to have a reference with our -- with our interaction, if we -- if we forgot -- we forgot those interactions, so we can go back to our reference, the medical interaction log.
Q Okay. So in case later, because there's thousands of cruise passengers on the ship voyage after voyage, you'll have a record so as to know what -- what your interaction was with any number of guests, correct?
A Yes, sir.
Q Now, let me just -- bear with me here. I'm going to actually put the medical interaction log of March 4, 2020 up on the screen for us all to look at, okay?

A Okay.
Q Do you see this medical interaction -- medical staff interaction log onboard your screen, sir?
A Yes, sir.
MR. SMITH: Okay. So I'm going to mark this as Exhibit "A" -- Defendant's Exhibit "A" to the -- to the deposition.
BY MR. SMITH:
Q And if I need to make it a little bit bigger -- I'm going to just try to do that, okay?
Does it come up a little bigger on your screen now?
A Yes, sir.
Q And up here on the top left it says, "Ship Name: Valor," correct?
A Yes.
Q And there's an associated voyage number, correct?
A Yes, sir.
Q And when you look at this form overall, Exhibit "A," Mr. Cagumbay, is this the standard form for the medical interaction logs that you fill out if you interact with a guest onboard the ship?
A Yes.
Q Okay. And so does this form look like a true and accurate medical staff interaction log that you would have



used onboard Carnival Valor during your contract from October 2019 through May 2020?
A Yes, sir.
Q Now, there' a column here for date and time.
A Uh-huh.
Q Can you please just -- can you please describe, what your -- you know, even though it's a pretty obvious question, but what is the purpose of this column: "Date and Time"?
A The purpose of the date and time, sir, so that, of course you can accurately -- you can -- the purpose of it is for accuracy, sir, that -- that time you finish the interaction with the -- with the guest, and so that's why I put the time there --
Q Okay.
A -- the date and time that we have our interactions.
Q And so you put under "Date and Time," the date of the interaction, correct?
A Yes, sir.
Q And you put the time that the interaction with the Carnival guest occurred, correct?
A Yes. Yes.
Q And do you complete an interaction log regardless of whether or not the passenger consents to actually receive



care?
A Yes.
Q Okay. Now, you also have a time here, "15:05" hours; is that the ship time recorded in sort of the military time format?
A Because ship times are -- we always use the ship time.
Q Okay. And under "Name and Cabin Number," what is the purpose of this column on the medical interaction log?
A Of course, there's -- when -- we put that one so we can determine the name of the -- name of the guest, or the patient, and, of course, the cabin number because at least we know we have the (unintelligible) on her.
Q So Barbara Hall's cabin was 8429?
A Yes, sir.
Q And you put Barbara Hall's name here because she was the one you had an interaction with on March 4, 2020?
A Yes, sir.
Q And to the right of this column for cabin number and name, there's a column called "Phone Call or Direct Encounter."
A Yes.
Q Can you tell us, under the medical interaction policy log, what is this column for?
A Yeah, because we have also our encounter with



our -- with our guests via phone call because they are -- they are inquiring -- inquiring sometimes when is the doctor available, what time -- what is the cost of the consultations, you have available medicine like these. So those are -- those are some of the phone call that we encounter. So direct encounter, if we -- we nurses and the -- and the patient having a face-to-face encounter.
Q Okay. So it signifies here next to Barbara Hall's name "Direct Encounter." What does that signify to you?
A That -- where, sir, here?
Q Next to Barbara Hall's name to the right, it indicates "Direct Encounter."
A Ah.
Q Does that mean that your encounter with Barbara Hall was face-to-face?
A Yes, sir.
Q And, then, further --
A A direct encounter.
Q Further, to the right, what is this column, "Nature of the Request" for?
A Uh-huh. Yes.
Q Can you please explain what "Nature of the Request" is for?
A Definitely, sir. This patient came in in the medical center, so with -- based on just my medical

Page 54

interaction log, I -- I approached this lady because she's state in his (sic) complaint that she's having -- she fell down in her bathroom three days ago and she acquired a right forearm trauma. And, then, she asked how much it's going to cost for doctor's consultation. So, for me, I'm having also the knowledge, so that's the reason I can inform the guest of possible charges.
Q Okay. So is "Nature of the Request" where you record what the gue- -- Carnival cruise passenger is asking for or -- or why they have come to the medical center?
A Most probably, sir, this -- this lady is really looking for -- most probably she's -- what we call this one? She's inquiring -- most probably she's inquiring or if she -- if she agreed with the -- if she agreed with the treatment for -- right away we can -- we can -- she should be seen by the doctor if -- if she wants. Because I
Q Okay. Let me just back --
A Because I advised her --
Q Let me just break it down briefly. The first question I have for you here is just in a general sense about what the policy is, okay?
A Yes.
Q Okay. So under "Nature of Request" in the medical staff interaction log, what is the -- what are you supposed to put down in that column, "Nature of the Request"?

Page 55

A I think this lady's asking for -- looking for a -- looking for a doctor's consultation.
Q Okay. Is the nature of the request section for the purpose of recording accurately what the guest was -- was wanting from the medical center?
MR. WALSH: Objection, leading.
THE WITNESS: Hello.
BY MR. SMITH:
Q You could answer. Do you want me to -- do I -- should I repeat the question? Did you hear it?
A Yes, sir. Yes, I can -- I -- I can hear, so could you repeat --
Q I'm --
A -- the question?
Q -- just trying to clarify, is the "Nature of the Request" column you see on the screen, for the purpose of --
A Uh-huh.
Q -- accurately recording what the guest was wanting?
MR. WALSH: Objection, leading.
BY MR. SMITH:
Q You can answer.
A The -- yeah, this -- the guest is really looking for -- the guest is looking for a doctor's consultation, sir.

Page 56

Q Okay. That's what Ms. Hall was looking --
A Because --
Q -- for, right?
A Yeah, because she's asking how much it will cost, the doctor's consultation. So most probably, she's really look -- she's looking for a doctor's consultation.
Q Okay. Let me -- let me try this one more time. I'm not asking about what Ms. Hall was asking for right now, okay?
A Okay.
Q I'm just -- generally speaking, the policy under "Nature of the Request," are you supposed to put in there accurately what the guest is seeking -- what a guest is seeking when --
A Yeah, of course, sir.
Q Okay.
A Yes.
Q And, in this particular instance, Ms. Hall was requesting to know how much it would cost for a doctor's consultation per your notes in the medical interaction log, correct?
A Yes, sir.
MR. WALSH: Objection, leading.
BY MR. SMITH:
Q And did you, on March 4, 2020, accurately record

Page 57

what Ms. Hall told you that she was requesting from the medical center, as we see here in the "Nature of the Request" column on this form?
A Yes, sir.
Q What is this "Advice or Treatment" given column for; what's its purpose?
A That's for, possibly, sir, is that we in the medical center, "we," as the nurse -- for example, she's -- she's complaining that she fell down and -- and she acquired forearm trauma. For us, really advise and suggest every -- every patient, that they should be seen by our doctor.
Q Okay. So explain in the --
A So that means --
Q In the case of Ms. Hall on March 4, 2020, you recommended that she be seen by the doctor for an evaluation; is that --
A Yes, sir.
Q -- correct?
A Yes.
Q Okay. And you informed, at her request, Ms. Hall's request, what the possible charges would be for seeing the doctor; is that correct?
A Yes.
MR. WALSH: Objection, leading.

BY MR. SMITH:
Q Nurse Cagumbay, did you ever precondition that she pay up front, Ms. Hall, in order to be able to see the doctor?
A No, sir. Absolutely no.
Q From your understanding from working onboard the ship from October 2019 through May of 2020, was it ever --
A Uh-huh.
Q -- the policy to require prepayment before a Carnival cruise passenger could be seen in the medical center?
A Absolutely no, sir. We are not requiring for payment before the patient or guest can be seen by the doctor.
Q As someone who worked in the medical center, Nurse Cagumbay, would you ever be responsible for handling money, meaning, cash payments or credit card transactions?
A We -- we nurses, we in the medical center, we -- we in the medical center; we're not responsible for handling any payment of our guests or any of our patients. We focus on just healthcare; we are not -- we're not dealing with any payment, sir.
Q Okay. And are you familiar what a Sail & Sign transaction -- you know, transfer- -- the Sail & Sign card is?



A Again, sir.
Q Are you familiar with what the Carnival Sail & Sign card is?
A Yes. Yes.
Q Okay. And are you familiar with that Sail & Sign card from --
A Yes.
Q -- working onboard the Carnival Valor?
A Yes, I'm familiar with the Sail & Sign card.
Q Okay. What -- can you describe, in your own words, what the Sail & Sign card is?
A A Sail & Sign card, sir, I know that it is a card that you can use -- you can use onboard in purchasing any items, like, if you want a drink -- if you want a drink or any -- or any -- for example, you will go to a steakhouse, so if you have the -- it's, like, your -- it's, like, your cash there in the -- onboard that you will use to -- to purchase something.
Q Okay.
A Sail & Sign card, that's what -- that's what I know.
Q Okay. Do all -- do all Carnival cruise passengers have a Sail & Sign card?
A Yes, sir, they have.
Q And the Sail & Sign card is something that, when



it comes to actually paying up the charges, is that something that the guest is welcome to pay for later?
A Again, sir. Sorry.
Q Can the -- can the guests -- if you know, can the guests, with their Sail & Sign card, when it comes to actually have to pay the bill, are they welcome to pay the bill later?
A Yeah, of course.
MR. WALSH: Objection to form.
THE WITNESS: Of course.
BY MR. SMITH:
Q So they -- I mean, from -- from your knowledge of the Sail & Sign card, are they welcome to pay for the charges -- pay for -- put charges for the medical center on their Sail & Sign card?
MR. WALSH: Objection to form.
BY MR. SMITH:
Q If you know.
A We don't require any charge -- we don't require any payment for -- before -- before the -- before the guest or any patient can be seen by the doctor, sir.
Q Okay.
A We're not dealing with the payment.
Q But if -- but if they want to choose -- I know that there's no payment required upfront in cash or via --



A Uh-huh.
Q -- some card --
A Uh-huh.
Q -- but if they want to put charges on their Sail & Sign card for being seen in the medical center, are they -- is the guest able to do so?
MR. WALSH: Objection to form.
THE WITNESS: Yes, sir, of course. If the patient will agree to be seen by the -- if -- if -- if they want really to be seen by the doctor, we have a consultation form that they need to fill up. We will give the consultation form to them, they would fill up their -- in the consultation form they have the medical history, any allergies, reasons for visit, and the name, cabin number.
So it's -- somehow it's your medical history so that the doctor can also evaluate you. And we do for them; we put in the consultation form. So after they finish the consultation form, if the doctor is really available already, he doesn't have any waiting patients, you can go directly to the doctor and the doctor will evaluate you again -- re-evaluate and ask you again -- inform you again and will check you.
BY MR. SMITH:
Q Okay. Now, you mentioned a con- -- you know, a

Page 62

consultation form.
A Yeah.
Q Actually, I have a -- I have a question about consent for treatment, okay?
A Yeah.
Q Are you able to treat a guest if they do not consent to receive treatment?
A No, sir.
Q Okay.
A Only having consent. The consent should be signed first. The doctor will inform the -- the patient that this is a procedure that we will do, this is the medication that we can give. The patient or the client should be totally informed whatever that we will do for him. So the time that she is totally informed, she will sign the con- -- the consent, so that's the time we can proceed for our procedures.
Q Okay. Did Ms. Barbara Hall provide the medical center consent for any treatment on March 4, 2020?
A No, sir.
Q The column -- we talked about the column that's "Advice or Treatment Given." There's another column to the right on the form called "Response to Advice."
A Uh-huh.
Q What -- what -- what are you supposed to record

Page 63

there in that column, Nurse Cagumbay?
A Wit -- and you're certain that "Response to Advice"?
Q Referring to "Response to Advice," what is the purpose of that column when you're completing out the -- completing the medical interaction log?
A So, sir, this is the response of the -- of the guest or -- of the guest that we -- that we advise to her. So that's the -- it's her feedback on -- on our treatment and advice to her.
Q Okay. And so in the instance here on March 4, 2020, how did Barbara Hall respond to the advice you -- you provided to her?
A Again, sir. Sorry.
Q How did Barbara Hall respond to the advice that you provided to her, Nurse Cagumbay, on March 4, 2020?
A Based in her -- based on my medical interaction log, sir, her response on my advice was she would just see the doctor back home.
Q Okay. And so she chose -- it looks like from this, that Ms. Barbara Hall chose not to see the doctor; is that correct?
A Yes, sir.
MR. WALSH: Objection, form.

Page 64

BY MR. SMITH:
Q And if this is the only medical interaction log that was completed, Mr. Cagumbay, concerning Barbara Hall; would I be accurate that this is the only time that Barbara Hall would have come to the medical center during the Carnival Valor cruise in March 2020?
A Yes, sir.
MR. WALSH: Objection to form.
BY MR. SMITH:
Q You can answer.
A Yes, sir, that -- I can really say that this time that she went to the medical center.
Q Okay. At the end of the form here, it says "Medical Staff Signature and Printed Name"; is that -- is that your name on the far right-hand side of the form?
A Yes, sir, absolutely, it's my name, Joseph Cagumbay, and -- and the ID number is also correct, 539547.
Q Okay. And that -- that signature name of yours there on the form, is that how you know that this was the form that you completed on March 4, 2020?
A Yes, sir.
Q Now, as you had testified earlier, when you first saw this form, regardless of whether you could, you know, physically remember Ms. Hall's face --
A Yes.

Page 65

Q -- was this form helpful in refreshing your memory about the specific interaction depicted here on March 4, 2020?
A Yes.
MR. WALSH: Objection to form.
THE WITNESS: Yes, sir. It really -- when -- at the time that I saw this one, I'm confident that this is really my statement --
BY MR. CAGUMBAY:
Q Okay.
A -- my statement, and this is really accurate with our interactions of Ms. Barbara Hall.
Q Okay. Even if you couldn't remember Ms. Barbara Hall at all, Nurse Cagumbay, do you agree that, at all times while you were sailing onboard Carnival Valor, you knew what the medical staff interaction log policy was?
A Yes, sir.
Q And, at all times that you were sailing onboard Carnival Valor from October 2019 through May 2020, Nurse Cagumbay, do you agree that you followed the medical staff interaction policy?
A Of course, sir, yes.
MR. WALSH: Objection to form.
BY MR. SMITH:
Q And do you agree that, at all times you were

sailing onboard Carnival Valor from October 2019 through May of 2020, Nurse Cagumbay, that any time you had an interaction with a Carnival cruise guest, you recorded that interaction immediately thereafter in the medical staff interaction log?
A Correct, sir. We were --
MR. WALSH: Objection to form.
THE WITNESS: -- doing that one. We are doing that one.
BY MR. SMITH:
Q Okay. And you agree that, at any time you completed the medical staff interaction log after having an interaction with a cruise passenger, you were recording in the medical interaction log, based upon what you directly knew of the interaction at the time it happened?
A Yes, sir.
MR. WALSH: Objection to form.
BY MR. SMITH:
Q Was that "yes"?
A Yes.
Q And when completing these medical interaction logs, sir, onboard Carnival Valor from October 2019 through May 2020, you recorded the information in the log when it was fresh in your memory, correct?
A Yes.



MR. WALSH: Objection to form.
THE WITNESS: Yes.
BY MR. SMITH:
Q And for this March 4, 2020 interaction log, Mr. Cagumbay --
A Uh-huh.
Q -- at the time that you recorded it on March 4, 2020 at 15:05 hours ship time --
A Yes.
Q -- you recorded this information based upon what you knew about at the time, correct?
A Yes.
MR. WALSH: Object- --
THE WITNESS: Yes.
MR. WALSH: Objection to form.
BY MR. SMITH:
Q And what you knew about at the time on March 4, 2020, was your direct encounter with Barbara Hall onboard Carnival Valor, correct?
A Yes.
MR. WALSH: Objection to form.
BY MR. SMITH:
Q And at the time you had the direct encounter with Barbara Hall on March 4, 2020 --
A Uh-huh.



Q -- did you accurately record the interaction you had on this medical interaction log with Ms. Barbara Hall?
MR. WALSH: Objection to form.
THE WITNESS: Yes, sir, definitely, it is -- it is accurate.
BY MR. SMITH:
Q And what you were informed --
THE COURT REPORTER: Hang on, I'm sorry. I'm sorry. What was your answer?
THE WITNESS: Yes, I accurately made that medical interaction log that moment.
BY MR. SMITH:
Q And with respect to the interaction with Barbara Hall on March 4, 2020, Nurse Cagumbay, did you also accurately record the statements that Ms. Barbara Hall made to you on March 4, 2020, in this Exhibit "A" log we see up on the screen?
A Yes, sir.
MR. WALSH: Objection to form.
BY MR. SMITH:
Q And is it accurate that, when making this log on March 4, 2020, you did not wait, you know, some unreasonable length of time before you recorded the information into the log, correct?
A Yes, sir.



MR. WALSH: Objection to form.
BY MR. SMITH:
Q You recorded the information on this log in Exhibit "A" while it was fresh in your memory; is that accurate?
A Yes.
MR. WALSH: Objection to form.
BY MR. SMITH:
Q I'm going to stop sharing the screen now and I just have a few more questions for you to wrap up, okay? I appreciate your patience and time.
A Thank you, sir.
Q Nurse Cagumbay, do you remember being asked about the difference in the rate of pay between working onboard a Carnival ship versus working in your home country, the Philippines?
A The rate of pay?
Q Yeah, the rate of pay or the salary difference.
A Yeah, it's --
Q Okay.
A Yeah, the difference.
Q You approximated that on the Carnival ship, you were paid 4,000 U.S. dollars a month?
A Yes, that is the range, sir, for the --
Q Okay. And the approximate converted amount to

Page 70

U.S. dollars for working in the Philippines may be about $600 a month; is that -- is that accurate?
A Yeah. If -- yeah, in my -- that's a lot here in the Philippines.
Q Okay. Did you -- did you seek out working on the Carnival ship to -- to better yourself, financially?
A Again, sir. Sorry.
Q Did you seek out the opportunity on the Carnival ship to better provide for yourself financially, compared to the work available in the Philippines?
A Yes, sir.
Q Okay.
A Yes.
Q And by seeking out the opportunity to work onboard a Carnival Cruise Line ship as a nurse, Joseph -- Mr. Cagumbay --
A Yes.
Q -- does -- does the increase in pay in any way relate to whether you're -- well, strike that.
Is there any reason -- Nurse Cagumbay, for the simple fact that you received an increase in your pay, does that give you any reason to somehow not tell the truth about your interactions with Ms. Hall on the Carnival Valor in March 2020?
A Would you repeat, sir.

Page 71

MR. WALSH: Objection to form.
THE WITNESS: Could you -- could you repeat the question?
BY MR. SMITH:
Q Right. Does -- does the increase in your pay --
A Uh-huh.
Q -- from Carnival --
A Uh-huh.
Q -- does that give you any reason to inaccurately testify about what your interaction was with Ms. Hall onboard the Carnival Valor?
A No.
Q Okay.
A No, sir.
Q And why not?
A 'Cause I'm just following the -- I'm just following the policy where I work with her.
Q Okay.
A That's why I -- I need to put accurately what -- what to be -- what should -- what should I do to --
Q Did you take pride in the work you did onboard Carnival Valor?
A Sorry, sir. Again.
Q Did you take pride in the work you did on -- onboard Carnival Valor?

Page 72

A Yes.
Q While working onboard Carnival Valor, did you receive any compliments or thank yous from any of -- any of the guests that you treated while onboard?
A To be honest, sir, yes.
Q You did?
A Yeah.
Q Okay. And in past jobs, before you worked for Carnival, in Saudi Arabia --
A Yes.
Q -- did you take pride in the work you did as a nurse in Saudi Arabia?
A Of course, sir.
Q Did you take pride in any of the work you've done in your home country, the Philippines?
A Yes.
Q Regardless of whether you're working in Saudi Arabia, the Philippines or on a Carnival ship --
A Uh-huh.
Q -- is it part of your character to always follow the -- the appropriate policies?
A Yes, sir, absolutely.
MR. WALSH: Objection to form.
BY MR. SMITH:
Q When you were working in Saudi Arabia, sir, did

Page 73

you ever get reprimanded for not following a policy?
A No, sir.
MR. WALSH: Objection to form.
THE WITNESS: For -- for three years and six months, sir, I haven't received any reprimand.
BY MR. SMITH:
Q Okay.
MR. WALSH: Objection to form.
THE COURT REPORTER: I'm sorry. Can -- can the witness repeat your answer, please.
THE WITNESS: For my three years and six months in Saudi Arabia, I haven't reprimand for any action -- for any not -- not-good actions.
BY MR. SMITH:
Q And you worked as an ER nurse in Saudi Arabia, correct?
A Yes, sir.
Q So you were dealing with people that were dealing with life-threatening circumstances sometimes; is that --
A Absolutely.
Q -- correct?
A Absolutely sir.
Q Okay. Why did you want to become a nurse in the first place, Mr. Cagumbay?
A To be honest, sir, we -- I want to be a nurse

Page 74

because, you know, here in the Philippines, we know that a nursing course or being a nurse has a great opportunity of going abroad, so that is really the reason, sir, so I chose to be -- I choose to study nursing. But that is the real reason, sir.

Q Okay. Did you use any of the income when you went abroad that you received working as a nurse to help any family members back in the Philippines?

A Yes, sir.

Q Okay. Who were you --

MR. WALSH: Objection to the form.

BY MR. SMITH:

Q Who were you helping out financially back in the Philippines?

MR. WALSH: Objection to form.

THE WITNESS: My family, sir.

BY MR. SMITH:

Q Okay.

A My family.

Q How much family do you have in the Philippines currently?

A No, I don't -- I (unintelligible) -- I have my -- I'm helping my mother and my father; they don't -- they don't work anymore, they are old, so I am the one who are providing their needs.

Page 75

Q Okay. Does -- does the Philippines have any type of Social Security system?

A Social Security system?

Q Like, a retirement benefit that comes from the government?

A Yes, there is.

Q Okay. Are your parents able to receive that retirement benefit?

A Yeah, they're -- they're receiving retire- -- retirement benefits.

Q Do you -- do you use your income gained abroad to help supplement their income?

A I use my -- I use my pay -- my salary abroad to help them to fix our house, to provide their -- to give their ones -- or to have their -- what we call this one there, medication -- medication, like, for -- for their anti-hypertensive, diabetes, so I'm -- I'm the one buying for them.

Q Okay.

A For their maintenance, I mean. Maintenance.

Q So you help them with purchasing their medications so they can --

A Yes.

Q -- maintain their health?

A Yes. Yes.

Page 76

Q Okay. So that's very -- that's noble -- I -- that's really great. Let me just look through my notes. I don't think I have any other questions.

MR. SMITH: All right. I don't have any other questions at this time. Thank you so much for your time.

THE WITNESS: Thank you, sir.

MR. WALSH: All right. This is Peter Walsh. I have some follow-up questions.

REDIRECT EXAMINATION

BY MR. WALSH:

Q Sir, did you ever --

A (Inaudible.) Yes.

Q Did you ever complain to Carnival that they were underpaying you; that is to say, that they were paying you much less than they'd have to pay an American nurse working on American soil?

A No, sir.

Q You're aware, though, that nurses in the United States make a lot more than you make on the Carnival cruise ship?

MR. SMITH: Objection to form.

THE WITNESS: I'm not aware, sir; I don't know.

BY MR. WALSH:

Q The form that we've been discussing --

Page 77

A Yes.

Q -- how did you fill that out? Did you fill it out -- did you type it into a computer or did you handwrite it?

A Computer, sir. Type in --

Q And --

A -- the computer.

Q And do you later go back through it and proofread it or change it or anything?

MR. SMITH: Objection to form.

THE WITNESS: No, sir. After we finish -- after we finish it, we will -- we save it in the system, and that's it.

BY MR. WALSH:

Q So all of the information I see on that form was written on March 4th of 2020; is that right?

A Yes, sir.

Q Does your supervisor check it?

MR. SMITH: Objection to form.

THE WITNESS: I'm not sure, sir, if they -- if they check it. Because eve- -- each and -- each and every one of us are nurses, we are putting that one, and we are -- we are compiling it every -- every month. So every month we -- we compile every medical interaction log.

BY MR. WALSH:
Q Okay. What do you mean you compile it every month?
A We save -- we save it, sir, so that it will not lost.
Q But don't you save it immediately after you type it into the system?
A I mean, sir, we are printing it and we are putting it in the -- in our logbook, in our -- so we have there a medical interaction logbook. So every -- so every medical interaction that we have, for example, this month, week -- this month or this -- this is March, so we compile in every -- per month, so it will be organized. We have a logbook for that one, sir.
Q When will -- so between -- when did you -- in preparing for this deposition, when did you see that logbook page?
A The time that Mr. Smith e-mailed me, sir, regarding this case, because, in the e-mail it stated -- states, sir, that Mr. --
Q Okay. Let me stop --
A Yes.
Q Let me stop you.
MR. WALSH: You know, Chris, I think that's attorney-client privilege, isn't it?



THE WITNESS: I'm sorry. Again, sir.
MR. SMITH: Yeah, I mean, we'll -- we'll assert it but, I mean, if you -- if you don't -- I mean, if -- if you will agree to stipulate not to -- waiver of the privilege, I mean, I don't have a problem with him --
MR. WALSH: Yeah.
MR. SMITH: -- telling you how he got it. Like, I -- he just -- he asked me for it, if he could see a copy, and I e-mailed it to him. Is basically --
MR. WALSH: I see. Okay. Okay.
MR. SMITH: I mean, if -- if -- if that stipulates (sic) you, I don't have a problem with you --
MR. WALSH: Yeah, I stipulate that any -- any -- that this does not constitute a waiver of any privilege.
MR. SMITH: Okay. So if you -- yeah, if you -- if -- with that stipulation, then, I don't mind if you ask him how he got a copy of it; that's fine.
BY MR. WALSH:
Q Okay. Sir, go ahead, you can tell me how you got the copy.
A Mr. Smith, sir, e-mailed me that there is -- there is a guest that filed a case, that -- likely that this is Ms. Barbara Hall. So -- and they said that I -- they find out that I have my medical interaction log, and my name is



there, so -- so they asked me if -- to confirm, like, this, so I asked -- I asked them to send this medical interaction log for me so that I can confirm also, because I can't remember Ms. -- Ms. Barbara Hall, so that's the reason why I asked for the medical interaction log with him.
Q And when did you receive it?
A I want you to -- because I cannot -- I cannot remember.
Q No. No. When?
A Just --
Q When did you receive it?
A Just give -- just give me some time because I was checking my e- -- e-mail -- e-mail.
Q Yeah. I -- okay.
A Because I cannot remember what is the -- what is the -- exactly -- what is exact date for this one.
Q Okay.
A Medical interaction log, I receive this one, sir, May 27. May 27, that's --
Q All right. Is that the first time you saw -- you saw it since March of 2020?
A This is the -- this is the second time, sir, because first -- first -- first time that we -- we -- Ms. Hall -- Mr. Hall -- Mr. Smith, I asked what I -- what is deposition. I don't know what is that one. This is the



first time I -- I attended with a case, so I -- I ask what -- what is a deposition. So he explained to me that I will -- I will just give my statement, just tell the truth, and that's it.
So this is the second time.
Q Did you see anything else, any other documents, photographs or anything?
A Nothing, sir.
Q So you've never seen a photograph of Barbara Hall?
A No, sir. Just -- just the medical interaction log, that's it.
Q What did you say to Barbara Hall when she asked you how much it would cost to see the doctor?
A Based on my medical interaction log, sir, I informed her the -- the -- the possible -- the possible charges that moment. But if you will ask me now, I cannot remember because I -- it's been a year that I did not work there onboard, so I forgot the -- the exact amount.
Q Okay. And, in that form -- could you hold on just one second?
A Yes. Yes.
Q All right. This is -- hold on. Can you hear me?
A Yes, sir.
Q Hold on. Now I can't hear you. Okay. Can you hear me?

Page 82

A Yes, sir.
Q Sorry. I had a call I had to cancel. It -- it -- so it -- it seems as though you wrote down in that form everything that she said and everything you said in the interaction; is that right?
A Yes, sir.
Q I mean, not the details; for example, you told her how much it was, but you don't -- don't put that dollar figure in the form, right?
A Yes, sir, I didn't -- yes, I didn't put the...
Q But the important -- the important stuff, you did put in the form, right?
MR. SMITH: Objection to form.
THE WITNESS: Yes. Yes, sir, the -- the -- the conversation that really we -- we -- made by Ms. Barbara Hall, I put it there.
BY MR. WALSH:
Q And the way this interaction worked was Ms. Hall came down and told you that she had injured her right forearm; is that right?
MR. SMITH: Objection to form.
THE WITNESS: Based on the medical interaction, sir, yes, she -- she said that she fell down in her bathroom and she -- for -- three days ago, and she acquired her -- a right forearm trauma.

Page 83

BY MR. WALSH:
Q And the next thing she asked you was how much it will cost to see a doctor, right?
A Based on my medical interaction log, sir, she asked me how much it will cost for the doctor's consultation.
Q And, then, you told her how much it would cost, right?
A Yeah, I informed -- I inform her the possible charges.
Q And, then, she said, well, I'll just wait till I get home?
A Again, sir. Sorry.
Q And, then, she told you, well, I'll just wait till I get home?
A I cannot remember, sir. Outside of this medical interaction log, I cannot remember, what -- what -- what else she's telling. But I cannot remember already.
Q Well, what -- you can use the form, you can read from it; what does it say that she said?
A Where particularly, sir?
Q Well, is there anywhere on that form where it says -- where it describes her response after you told her how much it would cost to see the doctor?
A I did not put -- I did not put in the exact amount

Page 84

of how much it cost, sir, but I -- I just put it here that I informed the guest for the pos- -- for the possible charge of doctor -- for the -- for the possible charges.
Q Right. I'm not asking you about what you said; now I'm asking you about her response.
What did she say in response to that?
A Based on my medical interaction log, sir, she responded that she will just see her doctor back home, and that -- and she stated that she is also a nurse, and she stated that it is already happened three days ago.
Q So was it clear to you that the reason she did not choose to see a doctor at that time was because of the expense?
MR. SMITH: Objection to form.
THE WITNESS: I'm not sure with her, sir; I -- I don't know.
BY MR. WALSH:
Q Well, you do know that she asked you how much it would cost to see the doctor, right?
A Yes, sir.
Q You do know that she came all the way down to the medical center. This -- this wasn't a telephone call, was it?
A Yes, it is a direct encounter, sir.
Q So she came all the way down to the medical center

Page 85

with an injured arm and she asked you how much it would cost to see the doctor, and you told her, right?
A Yes, sir, I inform her.
Q And, then, immediately after that, immediately after, she says, well, I'll wait till I get home, right?
MR. SMITH: Objection to form.
THE WITNESS: Based on my medical interaction log, sir, her response was that she will just see the doctor back home.
BY MR. WALSH:
Q So wasn't it pretty obvious to you that the reason she wasn't going to see a doctor at the medical center was because of the expense?
MR. SMITH: Objection to form.
THE WITNESS: I'm not -- I'm not sure with her, sir. I don't -- I don't know what is her real reason because I don't -- I don't know.
BY MR. WALSH:
Q Well, you're not a mind reader, I know that. But --
A Yeah.
Q -- isn't it pretty obvious? I mean, the only thing she asked you was how much it costs and, then, you told her and, then, she immediately said, well, I'll just wait till I go home.

So isn't it -- isn't that pretty obvious that the reason she wasn't going to see the doctor at that time was because of the expense?
MR. SMITH: Objection to form; asked and answered.
BY MR. WALSH:
Q I'm just asking whether --
A Absolutely, sir --
Q -- whether it was obvious.
MR. SMITH: Objection to form.
THE WITNESS: Absolutely, sir, I don't know --
BY MR. WALSH:
Q Well, why do you --
A -- what's in her mind.
Q Well, she came --
A I absolutely don't know what's in her mind.
Q She came all the way down to the medical center to get treated for a -- an injured arm.
Why do you think she walked away without getting the treatment?
MR. SMITH: Objection to form.
THE WITNESS: Well, I don't know, sir, why -- why she -- why she did not proceed for -- to be seen by the doctor. But based on my medical interaction log, this is only her response, so with what -- what's in her mind, I don't know why she did -- why she did not



proceed for -- to be seen by the doctor.
BY MR. WALSH:
Q Yeah. And I'm not asking you what's in her mind; I'm -- I'm asking you what you saw and actually witnessed.
So -- so -- so, at that point, she just turns and walks away; is that right?
MR. SMITH: Objection to form.
THE WITNESS: Aft- -- after she had a feedback on a -- on this -- on -- after -- after she made this response to my advice, that is the -- that is the -- that is the end of our conversation, sir.
BY MR. WALSH:
Q Was there anyone with her?
A I don't remember either, that moment, if somebody was with her or anyone with her; I don't remember.
Q Did you tell her at any point, well, you really should see a doctor for that arm injury?
MR. SMITH: Object to form.
THE WITNESS: Yes, sir. Based on her complaint, I really suggest that she should be seen by the doctor. I advised that she -- she should be seen by the doctor for treatment and for further evaluation.
BY MR. WALSH:
Q And when did you advise that; did you advise her of that before you told her how much it would cost or after



you told her how much it would cost?
MR. SMITH: Objection to form.
THE WITNESS: I don't really remember, no, sir, what -- what -- what is the -- that -- the exact timing of -- if I ask her before or after; I don't remember. I really (inaudible) --
BY MR. WALSH:
Q And the rea- --
A -- my medical interaction log.
Q And the reason you advised her to get medical care is because you realized that this was possibly a serious injury that she had to her forearm, right?
MR. SMITH: Objection to form.
THE WITNESS: And she has -- and she has a complaint, sir, because we, in the medical center, every patient or every guest that complain for -- whether it's a flu or whatever, we really suggest that they should be seen by the doctor, because we're -- because that is for -- better for them that they should be seen by the doctor.
BY MR. WALSH:
Q Oh. So that's something you just tell everybody, regardless of the injury; is that right?
MR. SMITH: Objection to form.
THE WITNESS: Yeah, if there patients coming into



the medical center, a guest, they should be seen -- we -- we tell them that they -- if they have a medical complaint, they should be really seen by the doctor.
BY MR. WALSH:
Q What if they just come down with a headache and say, ah, I have a little headache; do you say, well, you should see a doctor or --
A No, sir.
Q -- do you just give them aspirin? What do -- go ahead. Tell me.
A No, sir.
MR. SMITH: Objection to form.
THE WITNESS: It depends on the -- it depends on their -- it depends on then, also, because some -- some are asking for doctor's consultation, some are asking only for -- for over-the-counter medications.
BY MR. WALSH:
Q And -- and is it your testimony that you try to steer them in the direction of -- of seeing a doctor?
MR. SMITH: Objection to form.
THE WITNESS: Yes, sir. I -- based -- based on the interaction log, I advised her to be seen by the doctor.
BY MR. WALSH:
Q And that's because you realized she had a serious

Page 90

injury?
MR. SMITH: Objection to form.
BY MR. WALSH:
Q Is that right?
A We are doing that one for every patient or guest, sir, that asking for -- asking for a doctor's consultation.
Q Well --
A Asking for a medical treatment, so we are -- we really suggest that you should be seen by the doctor.
Q Did you -- before she walked away, did you offer her any type of, I don't know, Advil or anti-inflammatory drugs?
A Because, sir, I don't remember already.
Q Did you offer her -- well, if you had offered that, you would have written that in your report, surely, wouldn't you have?
MR. SMITH: Objection to form.
THE WITNESS: I -- I don't remember, sir; I don't know, because this is -- I just -- based on my medical interaction log and, other than that, I cannot -- I don't remember already. I don't even remember Bar- -- the face of Barbara Hall.
BY MR. WALSH:
Q Did you offer to giver her an Ace bandage?
MR. SMITH: Objection to form.

Page 91

THE WITNESS: I don't remember, sir, if I offer it, no, I don't remember.
BY MR. WALSH:
Q Well, if you had offered her an Ace bandage, you would have written that in the interaction log, right?
MR. SMITH: Objection to form.
THE WITNESS: I don't remember, sir.
BY MR. WALSH:
Q And isn't it true that you didn't offer her anything after she -- after you told her how much it would cost to see the doctor?
MR. SMITH: Objection to form.
THE WITNESS: For sure, sir, the time that she came to the medical center and having complained, I advised her to be seen by the doctor or to be seen for further evaluation with her -- with regards to her condition.
BY MR. WALSH:
Q But you don't know whether you told her that before she asked you -- before you told her how much it would cost, or after you told her how much it would cost; is that right?
MR. SMITH: Objection to form.
THE WITNESS: The thing, sir, is I cannot remember if before or after I -- I tell her.

Page 92

BY MR. WALSH:
Q Isn't it true that you write that in all of your interactions when a patient declines to be seen?
MR. SMITH: Objection to form.
THE WITNESS: Again, sir. Sorry.
BY MR. WALSH:
Q When a patient declines to be seen by you or by a doctor, don't you always write that you advised the patient to be seen by a doctor?
MR. SMITH: Objection to form.
THE WITNESS: We suggest that they should be seen by the doctor, sir, so if -- so if they -- if they decline, we cannot force them.
BY MR. WALSH:
Q And don't you always write that on the interaction log, "Advised patient to be seen by a doctor"?
Isn't that something you always write when they decline?
MR. SMITH: Objection to form.
THE WITNESS: If -- we only -- we -- we wrote -- we wrote our medical interaction log, sir, based on our interaction with the guest or the patient.
BY MR. WALSH:
Q Is that a "yes"?
MR. SMITH: Objection to form.

Page 93

THE WITNESS: Sir, we are -- we are putting our medical interaction log based on our -- based on our conversations or interactions with our guest or patient.
BY MR. WALSH:
Q But aren't you told and -- that every time a patient declines to be seen by a doctor, you're supposed to write, "I advised the patient to be seen by a doctor"?
Isn't that true?
MR. SMITH: Objection to form.
BY MR. WALSH:
Q It's a yes-or-no question.
A We always -- we always advise the guest, sir, or the patient that they should be seen by the doctor, because the doctor will -- they have the -- they have more -- they can -- they can assess and evaluate more for the guest. So if we got complaint, really we suggest that the patient be seen by the doctor, we give that advice.
Q Then tell me -- tell me exactly what you told Ms. Hall.
How did you advise her to see the doctor?
Did you say, I hereby advise you to see a doctor?
MR. SMITH: Objection to form.
BY MR. WALSH:
Q How did you put it, in your own words?

Page 94

A Yes, sir. Based on our medical interaction log, we always -- when the patient came in and they have complaint with that -- with that -- for example, with that injury, we can -- we simply say, we suggest you -- that you should be seen by the doctor or with our physician for you to be evaluated.

Q And -- and you always say that; is that right?

MR. SMITH: Objection to form.

THE WITNESS: For our -- for really -- for our patient with a complaint, sir, with medical complaint, that look -- that I'm looking for a medical attention, so we advise that they should be seen by the doctor.

BY MR. WALSH:

Q So it was your opinion that she should have been seen by a doctor, right?

MR. SMITH: Objection to form.

THE WITNESS: Yes, sir. I already advised that based on my medical interaction log, I -- I said yes. And I advised that she should be seen by our doctor.

BY MR. WALSH:

Q And that opinion is based on your experience as a professional nurse, right?

A Yes, sir.

MR. SMITH: Objection --

THE WITNESS: Yes, sir.

Page 95

MR. SMITH: -- to form.

BY MR. WALSH:

Q So to summarize, she comes down to the medical center and she asks you how much to see a doctor --

MR. SMITH: Objection to form.

BY MR. WALSH:

Q -- then, you tell her how much it costs, right?

MR. SMITH: Objection to form; asked and answered, cumulative.

MR. WALSH: Right. I'm just summarizing and, then, I'm going to get to the conclusion.

THE WITNESS: Yeah. She came down --

BY MR. WALSH:

Q But then --

A Yeah.

Q So I just -- did I describe that interaction right?

MR. SMITH: Objection to the form.

THE WITNESS: She came down and then told to -- told to me what happened to her, that, based on my medical interaction log, that she fell down in her bathroom three days ago and she acquired that right forearm trauma.

BY MR. WALSH:

Q All right. And you advised her to see a doctor because it was your opinion she should see a doctor and, then, she asked you how much it cost and you told her, right?

Page 96

MR. SMITH: Objection to form.

THE WITNESS: The she -- she asked -- she told her complaint to me that she fell down in her bathroom three days ago, so with that, she asked -- she asked also how much would it cost for the doctor's consultation. And, of course, I responded and informed her with the charges.

So with her -- with her -- with her condition, I don't -- I don't know when -- when -- when I totally tell to her, but I advised her that she should be -- a doctor should be seeing you and evaluate your -- your trauma.

BY MR. WALSH:

Q And, then, she walked away, right?

MR. SMITH: Objection to form.

THE WITNESS: No. She -- she -- of course, she replied -- she re- -- I need her advice -- that I need -- I need her response with my advice. So based on my medi- -- medical interaction log, this is her -- this is her response to me, that she would just see the doctor back home.

Page 97

BY MR. WALSH:

Q And, then, she walked away?

A With that, after that one, she stated also that she is also a nurse, and she stated that it already happen -- it already happened three days ago. So after that one -- after conversations that we have, I cannot remember already, sir.

Q And, then, she walked away?

MR. SMITH: Objection to form.

THE WITNESS: I cannot remember already, sir, if she walks away at that moment.

BY MR. WALSH:

Q Well, did -- do you remember her stay- -- staying around after that?

A No, sir. Unfortun- -- unfortunately, I don't remember.

Q Would there be any reason for her to stay around after that?

MR. SMITH: Objection to form.

THE WITNESS: No, sir, I don't remember if she stay around or if she walk away. I don't remember the specific moment, really.

BY MR. WALSH:

Q And, at the end of that interaction, after she told you that she was going to see a doctor when she got

home, did you tell her, don't worry, you don't have to pay right now?
MR. SMITH: Objection to form.
BY MR. WALSH:
Q Did you tell her that?
A I don't -- I don't remember, sir. I -- I cannot remember. Based -- outside of my medical interaction log, I cannot say anything, because the truth is I cannot remember based on -- outside of my medical interaction log.
Q Right. And the fact is you didn't tell her that, right?
MR. SMITH: Objection to form.
THE WITNESS: I -- I don't know, sir; I don't remember. I can't --
BY MR. WALSH:
Q Well, if you had told -- if you did tell her that, you would have written it in your medical report -- in your interaction log, right?
MR. SMITH: Objection to form.
THE WITNESS: Again, sir. Sorry.
BY MR. WALSH:
Q If -- if you had told her, don't worry, you don't have to pay now, you can pay later, if you told her that, you would have written that in your interaction log, wouldn't you have?



MR. SMITH: Objection to form.
THE WITNESS: Well, I don't remember, sir. I cannot --
BY MR. WALSH:
Q No, I'm not asking you what you remember; I'm asking if you had said that to her, you would have written -- you would have noted that statement in your interaction log, wouldn't you have?
MR. SMITH: Objection to form.
THE WITNESS: If that is our conversation, sir, if that is our interaction, I will wrote -- I would have wrote it in the medical interaction log.
BY MR. WALSH:
Q All right. And after -- at the end of that conversation, this woman who you believe needs medical care, is -- is leaving, she's declining medical care against your advice, did you tell her, look, if you can't pay now, there are other options; did you tell her that?
MR. SMITH: Objection to form.
THE WITNESS: No, sir, I don't -- I don't know; I cannot remember.
BY MR. WALSH:
Q Yeah.
A I don't know
Q If you did -- right. If you did tell her that,



you would have written that in your interaction log, right?
MR. SMITH: Objection to form.
THE WITNESS: Sorry, sir. I -- I don't know; I don't remember really --
BY MR. WALSH:
Q So --
A -- our interaction. I'm sorry for that.
Q Right. So -- so just -- just in summary and in conclusion, a woman comes down for medical care, you believe she needs medical care, you tell her how much it costs and she --
A Because she -- yeah, she asked me.
Q Right, she asked you. And, then --
A Uh-huh.
Q And, then, she says, well, I'll wait till I go home, and she walks away, and you don't tell her, hey, come on in, you don't have to pay now. You -- you didn't tell her anything like that, you let a woman needing medical area walk away from the medical center, right?
MR. SMITH: Objection to form.
THE WITNESS: Sir, I cannot force somebody if they don't want to be seen by the doctor.
BY MR. WALSH:
Q Oh, no, I'm not asking --
A You can't force them.



Q -- about force. I'm not asking about running out and grabbing her and pulling her back into the medical center; I'm just asking about giving her a helping hand by saying, don't worry, you don't have to pay now, I want to clear up any misunderstanding?
MR. SMITH: Objection to form.
THE WITNESS: That -- at that time, sir, I -- I really don't know what -- I cannot remember really what would hap- -- what is our -- what happened outside of my medical interaction log --
BY MR. WALSH:
Q Yeah.
A -- I cannot remem- -- I cannot remember. Sorry sir.
Q Yeah. And -- and, in fact, you don't remember ever telling her that she did not have to pay right then and there?
A Again, sir. Sorry. Hello. Can you -- can you repeat?
Q Yes. I just want to make it clear that you don't remember -- well, let me -- let me make this clear. As far as you know, you never told her that she didn't have to pay on the spot?
MR. SMITH: Objection to form.
THE WITNESS: Sir, as far as I know, we -- in the

medical center, we're not asking for a payment before the -- before the guest or the client can be seen by the doctor. We're not asking because we, the medical team, we nurses, we're not dealing with any payment, sir.
BY MR. WALSH:
Q But she asked you how much it'd cost, and you told her. So --
A Yeah. The reason why --
Q -- why -- why -- why didn't you just tell her, but you don't have to pay that right away?
MR. SMITH: Objection to form.
BY MR. WALSH:
Q Why didn't you just say that, you don't to have to pay it right away? Don't worry. Come on in. You don't have to pay right now if you don't have it.
Why didn't you say something like that?
MR. SMITH: Look, objection to form --
THE WITNESS: Because (inaudible).
MR. SMITH: -- he's indicated that he can't remember, like, six times. It's harassing at this point; I just need to put that on the record.
But you can answer the question, Joseph.
BY MR. WALSH:
Q So why didn't you say something like that to her?



A Sir, sorry, I cannot -- I cannot say something more because I don't really remember how -- why -- I cannot remember anymore what happened outside -- outside of my medical interaction log. I cannot even remember she walk away or -- or I can't remember her face. I totally don't remember, sir. This is only -- but I'm pretty sure that this -- my medical interaction log is -- accurately happened.
Q All right. I'm -- I just want to make this record clear.
A Okay.
Q Do you have any reason to believe that you told Ms. Hall she did not have to pay immediately?
If you don't understand that question, I'll repeat it.
MR. SMITH: Objection; cumulative, asked and answered.
THE WITNESS: I don't remember, sir; I don't know.
MR. WALSH: All right. I have no further questions.
MR. SMITH: I have one final question for you, Joseph.
THE WITNESS: Yes, sir.

RECROSS EXAMINATION



BY MR. SMITH:
Q In all your times working in the shipboard medical center on Carnival Valor, did you ever once demand payment upfront from a guest before they could see the doctor?
A For the rest of staying onboard, sir, we never demand for payment. We never demand, because it's not our job, it's not our duty to --
Q But I'm asking you, had you --
A -- to deal with -- to deal with payment.
Q I'm asking you, had you ever demanded payment upfront before the guest -- a guest could see a doctor onboard Carnival Valor?
A No, sir.
Q Okay.
MR. SMITH: Thank you. I have nothing further. You get to -- Mr. Cagumbay, it's totally up to you, you have a right to read your transcript, a copy of it, to make sure it was recorded accurately. You don't have to read it if you don't want to; you can waive that and you trust Lyssa, our court reporter, who's a very experienced court reporter, to get everything down accurately. Totally, your choice.
What would you like to do?
THE WITNESS: Sir, I don't --
MR. SMITH: You can read the transcript before



it's final to make sure it was accurately recorded. There's a written record of what you said today. You don't have to review that if you don't want to; you can waive your right to read it.
THE WITNESS: No, sir.
MR. SMITH: Would you like to read a copy?
THE WITNESS: No, sir.
MR. SMITH: Okay. So he'll waive.
THE WITNESS: I don't -- I don't want to --
MR. SMITH: That's fine.
THE WITNESS: -- receive a copy of it.
MR. SMITH: That's fine. Okay. So we'll waive. We'll order the transcript, but not the video this time.
THE VIDEOGRAPHER: Okay. The time is 10:53 a.m.; we're off record.
THE COURT REPORTER: Okay. Mr. Walsh, did you want to order the transcript?
MR. WALSH: No, I'm -- not yet. Thank you.
THE COURT REPORTER: Okay. Mr. Smith, you are ordering, you said?
MR. SMITH: Yeah, well, we'll go ahead -- well, I'll defer for a while, as well. We'll keep in touch.
(The proceedings were concluded at 10:54 a.m.; and the reading and signing were waived.)

(The transcript was backordered by Christopher Smith on August 17, 2021.)

(Defendant's Exhibit "A" was subsequently marked for identification.)



CERTIFICATE OF OATH
(VIDEOTELECONFERENCE PROCEEDINGS)

STATE OF FLORIDA
COUNTY OF SEMINOLE

I, LYSSA D. URBAN, Shorthand Reporter and Notary Public, State of Florida, certify that JOSEPH CAGUMBAY, RN appeared before me via videoteleconference on the 2nd day of June, 2021 and was duly sworn/affirmed.

WITNESS my hand and official seal this 31st day of August, 2021.

*Lyssa D. Urban*
LYSSA D. URBAN, Notary Public
State of Florida, My Commission:
GG 176656, Expires MARCH 22, 2022

Personally known (no) OR
produced identification (yes)
type of identification produced,
Republic of the Philippines Driver License.



CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF SEMINOLE

I, LYSSA D. URBAN, Shorthand Reporter and Notary Public, State of Florida, do hereby certify that I was authorized to and did stenographically report the remote deposition of JOSEPH CAGUMBAY, RN; that a review of the transcript was not requested; and the foregoing transcript, pages 4 through 106, is a true and accurate record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

WITNESS my hand and official seal this 31st day of August 2021.

*Lyssa D. Urban*
LYSSA D. URBAN, Notary Public,
State of Florida at Large

**Exhibits**

**CagumbayJ A** 3:12

**$**

**$100** 12:6
**$125** 12:6
**$4,400** 30:2
**$500** 11:10, 12 12:1,5
**$600** 29:16 70:2

**1**

**1** 7:6,7 9:25
**10:53** 105:15
**10:54** 105:24
**11:00** 42:16
**12:00** 42:17, 19,20
**14** 38:16 44:10,12, 14
**14th** 44:10, 16
**15** 29:10 33:11,14
**15:05** 10:16 21:16 42:5 52:3 67:8
**17** 106:2
**1:00** 42:7, 8,18,20, 22,24,25
**1st** 22:8,10

**2**

**2** 4:9 43:25 44:4
**20** 27:2,11 28:23
**20,000** 29:10
**2019** 25:15, 16 43:24 45:14,20 51:2 58:7 65:19 66:1,22
**2020** 7:6,7 10:1,3,16 21:5,16 35:24 41:24 44:1,3,4, 14 45:1 49:24 51:2 52:17 56:25 57:14 58:7 62:19 63:12,16 64:6,20 65:3,19 66:2,23 67:4,8,18, 24 68:14, 16,22 70:24 77:16 80:21
**2021** 4:9 106:2
**25** 29:7
**27** 80:19

**3**

**30** 26:16 29:7
**30,000** 29:6, 7,16,18,19

**4**

**4** 10:3,16 21:5,16 40:24 41:24 49:24 52:17 56:25 57:14 62:19 63:11,16 64:20 65:2 67:4,7,17, 24 68:14, 16,22 69:23
**4,000** 30:1, 2,6,8 32:2
**4,400** 30:2, 6,8
**40** 38:16,25
**4400** 32:2
**48** 38:11, 12,22,25
**4:00** 42:22
**4th** 19:9 40:18,21 41:19 77:16

**5**

**539547** 64:17
**5:00** 42:7, 8,25

**7**

**7:00** 42:15, 16,19

**8**

**8429** 10:17 21:18 52:14
**8:24** 4:10

**9**

**9:19** 40:11
**9:20** 40:2

**9:30** 40:2,9

**9:31** 40:14

**A**

**a.m.** 4:10 40:11,14 42:15,16 105:15,24

**abroad** 26:14 27:14,22 28:3,7 74:3,7 75:11,13

**absolutely** 11:14 12:1,10 13:2 18:7 28:12 58:5,12 64:16 72:22 73:20,22 86:7,10,15

**accent** 31:10

**accuracy** 51:12

**accurate** 50:25 64:4 65:11 68:5,21 69:5 70:2

**accurately** 48:5,8 51:11 55:4,18 56:13,25 68:1,10,15 71:19 103:7 104:18,22 105:1

**Ace** 90:24 91:4

**acknowledge** 4:20

**ACLS** 31:1, 15 47:5

**acquired** 10:20 21:19 54:3 57:9 82:25 95:22

**acting** 15:24

**action** 73:12

**actions** 73:13

**actual** 46:25

**addition** 31:25

**additional** 46:10

**administering** 4:23

**advanced** 31:1,2,15, 16

**advice** 10:23,25 57:5 62:22,23 63:3,4,10, 12,15,18 87:10 93:18 96:20,21 99:17

**Advil** 90:11

**advise** 57:10 63:8 87:24 93:13,21, 22 94:12

**advised** 10:23 21:22 54:18 87:21 88:10 89:22 91:15 92:8,16 93:8 94:17,19 95:25 96:13

**affirm** 5:13

**afford** 16:21,23, 24 17:24 18:17

**Aft-** 87:8

**afternoon** 41:19 42:6,10

**age** 15:4 27:2,10 28:23

**agency** 33:6 34:21,22, 24 35:5,8

**agree** 5:5,6 17:8,15,17 61:9 65:14,20, 25 66:11 79:4

**agreed** 54:14

**agreement** 5:1,2

**ahead** 5:21 34:18,20 79:20 89:10 105:22

**allergies** 15:7,11 61:14

**America** 35:7

**American** 76:16,17

**amount** 69:25 81:18 83:25

**anti-hypertensive** 75:17

**anti-inflammatory**

90:11

**anymore** 44:12 45:5 74:24 103:3

**apologize** 43:15

**approached** 54:1

**approximate** 69:25

**approximated** 69:22

**approximately** 45:14

**Arabia** 25:19,24 26:5,6,7, 11,14 27:15 72:9,12, 18,25 73:12,15

**area** 32:12 100:18

**arm** 41:13 85:1 86:17 87:17

**arrangement** 4:24

**asks** 95:4

**aspirin** 9:12,14 89:9

**assert** 79:2

**assess** 93:16

**attended** 81:1

**attention** 13:11 14:13,22 94:11

**attorney-client** 78:25

**attorneys** 4:17,20

**August** 106:2

**average** 29:23,24

**aware** 76:19, 23

B

**B-A-H-I-A** 35:14,15

**back** 11:1 13:15,18 15:23 17:3 21:24 23:16,23 40:9,15 49:16 54:17 63:19 74:8,13 77:8 84:8 85:9 96:24 101:2

**background** 43:19

**backordered** 106:1

**Bahia** 35:4, 5,10,11, 15,16,17

**bandage** 90:24 91:4

**Bar-** 90:21

**Barbara** 4:7, 14 7:15,17 9:25 10:10,12, 17 12:8 21:3,17 22:2,5 24:4 40:21,23 41:23 52:14,16 53:8,11,14 62:18 63:12,15, 21 64:3,4 65:12,13 67:18,24 68:2,13,15 79:24 80:4 81:9,12 82:16 90:22

**based** 10:15 20:22 28:15 40:22 41:7 42:4 53:25 63:17 66:14 67:10 81:14 82:22 83:4 84:7 85:7 86:23 87:19 89:21 90:19 92:21 93:2 94:1,18,21 95:20 96:21 98:7,9

**baseline** 15:10

**basic** 31:1, 14 43:16

**basically** 79:9

**basis** 7:19

**bathroom** 10:19 21:19 54:3 82:24 95:22 96:6

**bear** 49:23

**bed** 24:2

**beds** 24:1

**beginning** 4:3

**behalf** 4:16

bench 23:14

benefit 75:4,8

benefits 75:10

Benet 37:24

big 9:10 28:4,6

bigger 50:9, 11

bill 60:6,7

bit 23:3,6, 7 29:9 31:9 50:9

BLS 31:1,14 47:5

board 8:7,10 27:9

body 41:5

born 26:23

bought 9:20, 22

break 39:20, 24 40:7 54:19

briefly 54:19

Burnett 4:16

busy 24:4, 6,9,25 25:2

buying 75:17

C

C-A 6:15,16

C-A- 6:9

C-A-G-U-M- 6:12

C-A-G-U-M-B-A-Y 6:9

cabin 10:17 15:4 21:17 31:21 32:3,7,8, 11,14,15, 16 52:8, 12,14,19 61:15

Cagumbay 4:4 5:10,22 6:6,9,18, 19 8:16 23:2 40:5 43:6,15 44:13 48:16 50:20 58:2,16 63:1,16 64:3,17 65:9,14,20 66:2 67:5 68:14 69:13 70:16,20 73:24 104:16

calculate 29:8

call 9:6,15 14:2 18:16 32:22 36:3 44:19 47:20 52:20 53:1,5 54:12 75:15 82:2 84:22

called 15:1 23:15 52:20 62:23

calling 8:25

calls 9:11

cancel 14:2 82:2

Car- 38:6

card 33:17 58:17,24 59:3,6,9, 11,12,20, 23,25 60:5,13,15 61:2,5

cardiac 31:1,15

cards 12:20, 21

care 16:22 17:6,25 45:1,9 52:1 88:10 99:15,16 100:9,10

Carn- 25:18

Carnival 4:8,16 7:13 11:18,19, 24 12:7 25:11,14, 23 30:13, 17,19,21, 23,25 32:18,19 33:5,22, 24,25 34:17,19, 21 35:3,7, 16,17,20 36:9,16 37:6,8 38:3,7 43:14,22 44:2,24 45:13,16, 19,23 46:1,7,11, 12,17,25 47:3,6,7, 21 48:10, 15 49:2,13 51:1,22 54:9 58:10 59:2,8,22 64:6 65:15,19

66:1,3,22 67:19 69:15,22 70:6,8,15, 23 71:7, 11,22,25 72:2,9,18 76:14,20 104:3,12

**Carnival's** 34:24

**case** 49:18 57:14 78:19 79:23 81:1

**cases** 43:18

**cash** 58:17 59:17 60:25

**catch** 38:15

**center** 8:24 9:14,23 12:10,23 14:14,15, 20 15:21 16:5 22:9, 14,21,22 23:9 37:14 40:18,20 41:1,23 53:25 54:10 55:5 57:2,8 58:11,15, 18,19 60:14 61:5 62:19 64:5,12 84:22,25 85:12 86:16 88:15 89:1 91:14 95:4 100:19 101:3 102:1 104:3

**certification** 46:4,18

**certifications** 45:25 46:1,10,16

**chance** 48:25

**change** 77:9

**character** 72:20

**charge** 12:25 13:2 60:19 84:2

**charges** 10:22 11:4,7 13:5,6,9 15:22 16:8,9 21:22 54:7 57:21 60:1,14 61:4 81:16 83:10 84:3 96:10

**check** 10:6 11:18 15:8,12 29:14 33:15,16 38:24 61:23 77:18,21

**checking** 15:13 80:13

**choice** 104:22

**choose** 27:24 28:1,2 60:24 74:4 84:12

**chose** 63:20, 21 74:3

**Chris** 78:24

**Christopher** 4:15 5:6 43:14 106:1

**circumstance** 48:18

**circumstances** 73:19

**citizens** 27:23

**clarify** 55:15

**clear** 38:16 84:11 101:5,20, 21 103:10

**client** 49:10 62:13 102:2

**close** 42:15

**college** 27:6

**column** 51:4, 8 52:9,19, 20,24 53:19 54:25 55:16 57:3,5 62:21,22 63:1,5

**company** 33:20,23 34:12,16

**compared** 70:9

**competitive** 30:11

**compile** 77:24 78:2,12

**compiling** 77:23

**complain** 76:14 88:16

**complained** 91:14

**complaining** 57:9

**complaint** 14:22 54:2 87:19 88:15 89:3 93:17 94:3,10 96:6

**complete** 13:3 47:16 49:1 51:24

**completed** 47:20 48:14 64:3,20 66:12

**completing** 47:8,22 63:5,6 66:21

**complied** 31:18

**compliments** 72:3

**computer** 77:3,5,7

**con-** 9:1 61:25 62:15

**concluded** 105:24

**conclusion** 95:11

100:9

**condition** 91:17 96:11

**conducted** 46:24 47:1,5

**confident** 65:7

**confirm** 80:1,3

**connected** 7:12

**consent** 4:24 17:9,11, 14,22 62:4,7,10, 16,19

**consents** 51:25

**considered** 39:9

**constitute** 79:14

**consult-** 15:20

**consultation** 9:4 10:22 11:6,20,25 12:4 13:3 14:25 15:2,3,9, 20 16:16, 19 21:21

54:5 55:2, 24 56:5,6, 20 61:11, 12,13,18, 19 62:1 83:6 89:15 90:6 96:9

**consultations** 53:4

**contract** 32:25 38:12 39:17 45:21,23 48:15 51:1

**contractor** 34:7,12

**Contractors** 32:24

**conversation** 47:23 49:6,7 82:15 87:11 99:10,15

**conversations** 93:3 97:6

**converted** 69:25

**copy** 39:17 79:9,18,21 104:17 105:6,11

**Coronavirus** 44:6

**Corporation** 4:8

**correct** 46:2 49:21 50:15,17 51:19,22 56:21 57:18,22 63:22 64:17 66:6,24 67:11,19 68:24 73:16,21

**cost** 10:21 11:6,12,24 15:17,19 16:12,15, 16,18,19 21:20 53:3 54:5 56:4, 19 81:13 83:3,5,7, 24 84:1,19 85:1 87:25 88:1 91:11,21 96:2,8 102:7

**costs** 14:11 85:23 95:7 100:10

**counsel** 4:11,24 5:3

**count** 9:1

country 28:6,8 36:13 69:15 72:15

courses 46:4,7,9, 11,16,18

court 4:12, 17,19,21 5:8,10,13, 18,21 22:25 23:2 25:21 26:1 31:5,7,13 35:9,12 37:4 38:23 68:8 73:9 104:20,21 105:17,20

courteous 14:16,19

COVID 44:17, 21 45:12

credit 12:20 58:17

crew 32:16 34:13 37:11,13, 14 44:18 45:1,3,10, 12

CROSS-EXAMINATION 43:12

crowded 41:23 42:1

cruise 25:14 27:17 28:14 29:22,24 30:7,11 35:3,8 37:6 44:5, 10 46:11, 12 47:21 49:19 54:9 58:10 59:22 64:6 66:3,13 70:15 76:20

cruising 44:9,11

cumulative 95:9 103:16

current 15:5

D

D-U 6:13

data 15:10

date 4:9 10:15 19:12,13 21:5,16 43:23 51:4,8,10, 16,18 80:16

dates 22:6

David 6:15

day 32:3 41:1 42:3

days 10:19 11:3 21:19 22:1 33:12,14 38:9 54:3 82:24 84:10 95:22 96:7 97:5

deal 12:13 18:22 104:9

dealing 12:11,18 18:23 58:21 60:23 73:18 102:4

debit 12:20

deck 22:21 32:15

decline 92:13,18

declines 92:3,7 93:7

declining 99:16

defendant 4:16

defendant's 50:6 106:3

defer 105:23

demand 104:3,6

demanded 104:10

demanding 13:9

department 18:11

depends 29:5 89:13,14

depicted 65:2

deposition 4:4,20 50:7 78:16 80:25 81:2

descr- 37:21

describe 22:13,20 35:23,25 51:6 59:10 95:16

describes 83:23

design 32:17

desk 14:5 22:15

details 39:16 82:7

**determine** 52:11

**diabetes** 75:17

**did-** 41:10

**difference** 37:19 69:14,18, 21

**dining** 37:15

**direct** 5:24 9:1 10:17 21:18 47:20 52:20 53:6,9,12, 18 67:18, 23 84:24

**direction** 89:19

**directly** 13:4 32:18 33:16 35:17 61:21 66:14

**discussing** 76:25

**disembark** 43:25

**disembarked** 44:11

**dispense** 9:18,19

**doctor** 9:5 10:24 11:1,10, 13,15 13:1,4 14:7 15:13,15 16:7,16 17:15,17 19:3,5 21:23,24 23:15 41:18,21, 22 53:2 54:16 57:11,15, 22 58:4,14 60:21 61:10,17, 19,21,22 62:11 63:19,21 81:13 83:3,24 84:3,8,12, 19 85:2,8, 12 86:2,23 87:1,17, 20,21 88:18,20 89:3,7,19, 23 90:9 91:11,15 92:8,9,12, 16 93:7,8, 14,15,18, 21,22 94:5,12, 15,19 95:4,25 96:1,14,24 97:25 100:22 102:3 104:4,11

**doctor's** 10:21 11:6,20,25 12:4 14:24 15:15 16:3,19 21:21 23:17,18 54:5 55:2, 24 56:5,6, 19 83:5 89:15 90:6 96:8

**doctors** 28:2 34:11 41:21

**documentation** 9:6

**documents** 81:6

**dollar** 82:8

**dollars** 29:8,12 69:23 70:1

**double** 28:13,14

**dressed** 38:5

**drink** 59:14

**drugs** 90:12

**due** 44:6

**duly** 5:23

**duty** 41:18 42:10,14 104:7

**E**

**e-** 80:13

**e-mail** 78:19 80:13

**e-mailed** 78:18 79:9,22

**earlier** 45:24 64:22

**earn** 28:10, 11,13,20 29:3 30:7

**employed** 32:18

**employee** 32:19

**employer** 33:1

**encounter** 9:2,8 10:18 21:18 24:17 47:20 52:21,25

53:6,7,9, 12,14,18 67:18,23 84:24

**end** 64:13 87:11 97:24 99:14

**entry** 9:10

**ER** 25:19,25 26:8 73:15

**estimated** 16:9

**evaluate** 15:15,16 61:17,22 93:16 96:14

**evaluated** 94:6

**evaluation** 10:24 21:23 57:16 87:22 91:16

**eve-** 77:21

**exact** 17:5 36:4 39:18 80:16 81:18 83:25 88:4

**exam** 27:9

**EXAMINATION** 5:24 76:10 103:24

**examine** 41:13

**excuse** 22:25 31:7 42:22 44:25

**Exhibit** 50:6,20 68:16 69:4 106:3

**expense** 84:13 85:13 86:3

**experience** 94:21

**experienced** 104:21

**explain** 34:8 53:22 57:12

**explained** 81:2

**extend** 44:20

**extended** 44:23

**extra** 39:14

**F**

**F-U-N-N-E-L** 37:2

**face** 20:14, 16 64:24 90:22 103:5

**face-to-face** 53:7,15

**fact** 70:21 98:10 101:15

**fallacy** 8:9, 13

**familiar** 58:23 59:2,5,9

**family** 74:8, 16,19,20

**fast** 31:11

**father** 74:23

**feedback** 63:9 87:8

**feel** 14:23

**fell** 10:19 21:19 54:2 57:9 82:23 95:21 96:6

**fever** 14:23

**figure** 24:9 82:9

**filed** 79:23

**Filipino** 7:1

**fill** 48:19 49:3 50:21 61:11,12 77:2

**filled** 15:8 47:12

**final** 103:21 105:1

**financially** 70:6,9 74:13

**find** 79:24

**fine** 29:22 79:18 105:10,12

**finish** 16:2 27:5,7 47:23 49:6 51:12 61:19 77:11,12

**finishing** 27:8 49:4

**fix** 75:14

**flashback** 21:2

**flu** 88:17

**focus** 58:20

**folks** 41:1

**follow** 72:20

**follow-up** 76:9

**force** 92:13 100:21,25 101:1

**forearm** 10:20

21:20 41:8 54:4 57:10 82:20,25 88:12 95:23

**forget** 49:8

**forgot** 11:23 33:17 49:16 81:18

**form** 10:2 13:3,7 15:1,2,4, 8,9 17:11, 12,13 19:1,17,24 20:6,12 24:8,13,14 31:22 33:3 34:4,9 36:10,17 50:19,20, 24 57:3 60:9,16 61:7,11, 12,13,18, 19 62:1,23 63:24 64:8,13, 15,19,20, 23 65:1,5, 23 66:7,17 67:1,15,21 68:3,19 69:1,7 71:1 72:23 73:3,8 74:11,15 76:22,25 77:10,15, 19 81:19 82:3,9,12, 13,21 83:19,22 84:14 85:6,14 86:4,9,20 87:7,18 88:2,13,24 89:12,20 90:2,17,25 91:6,12,23 92:4,10, 19,25 93:10,23 94:8,16 95:1,5,8, 18 96:4,18 97:9,19 98:3,12,19 99:1,9,19 100:2,20 101:6,24 102:12,18

**format** 52:5

**forms** 7:19

**forty** 38:17

**forty-** 38:11,24, 25

**four-thou-** 30:1

**Fowler** 4:15

**Fred** 35:7

**fresh** 66:24 69:4

**front** 22:15 23:12,13 24:8 25:7 58:3

**frustrate** 43:17

**full** 22:22

**full-tier** 22:22

**fun-** 36:19

**funnel** 36:20,23 37:1,2

G

**gained** 75:11

**general** 54:20

**generally** 29:13 56:11

**give** 5:14, 16 9:16 15:2,11 28:17 29:25 30:24 46:13 61:12 62:13 70:22 71:9 75:14 80:12 81:3 89:9 93:18

**giver** 90:24

**giving** 101:3

**goat** 6:16

**Good** 4:13 5:4

**government** 29:6,15,20 75:5

**grabbing** 101:2

**graduated** 27:1,2 28:22

**great** 74:2 76:2

**greet** 14:20

**gue-** 54:9

**guest** 8:8, 11,23 9:8, 11 10:18, 22,23,25 14:12,16 15:3 16:24,25 17:8 18:12,13, 14,18 21:18,21, 22,24 22:18 24:18,22

32:11 48:10,20 49:7,13 50:22 51:13,22 52:11 54:6 55:4,18, 23,24 56:13 58:13 60:2,20 61:6 62:6 63:8 66:3 79:23 84:2 88:16 89:1 90:5 92:22 93:3,13,16 102:2 104:4,11

**guests** 8:23 14:19 23:11 32:17 44:12 47:13,17 49:9,21 53:1 58:20 60:4,5 72:4

**H**

**half** 36:20

**Hall** 4:7,14 7:15,17 9:25 10:10,12, 17 12:8 19:9 20:13 21:3,17 22:2,5 24:4 40:18,21, 23 41:23 53:15 56:1,8,18 57:1,14 58:3 62:18 63:12,15, 21 64:3,5 65:12,14 67:18,24 68:2,14,15 70:23 71:10 79:24 80:4,24 81:9,12 82:16,18 90:22 93:20 103:13

**Hall's** 52:14,16 53:8,11 57:21 64:24

**hand** 5:11 101:3

**handling** 58:16,19

**handwrite** 77:3

**Hang** 68:8

**hap-** 101:9

**happen** 97:5

**happened** 11:3 20:3, 15,18,24 22:1 66:15 84:10 95:20 97:5 101:9 103:3,8

**harassing** 102:21

**hard** 30:10 31:10

**he'll** 105:8

**headache** 89:5,6

**health** 75:24

**healthcare** 58:21

**hear** 13:20, 23,24,25 55:10,11 81:22,24, 25

**helpful** 65:1

**helping** 45:1,9 74:13,23 101:3

**hey** 9:11 100:16

**high** 27:5

**hire** 34:13, 16

**hired** 33:5

**history** 15:5 61:14,16

**hold** 7:24 13:14 35:6,7 81:19,22, 24

**home** 11:1 21:25 63:19 69:15 72:15 83:12,15 84:8 85:5, 9,25 96:24 98:1 100:16

**honest** 11:23 28:9,12 39:15 41:2,20,25 72:5 73:25

**honestly** 7:18

**hospitals** 7:4

**host** 11:1

**hours** 10:16 21:16 38:11,12,

13,16 39:1,6 42:2,11 52:4 67:8

**house** 75:14

**Housekeeping** 37:24

**I**

**ICU** 23:21

**ID** 64:17

**idea** 28:17

**identification** 106:4

**imagine** 30:10

**immediately** 13:9 22:23 23:12 24:19 47:24 48:4,19 49:6,8,12 66:4 78:6 85:4,24 103:13

**important** 15:9 82:11

**inaccurately** 71:9

**inaudible** 33:17 76:13 88:6 102:19

**incident** 7:19

**include** 48:7

**included** 42:12

**income** 74:6 75:11,12

**increase** 70:18,21 71:5

**increased** 39:11

**incredibly** 43:16

**inde-** 32:22 34:10

**independent** 32:22,25 34:7,11

**indirect** 32:22

**infect-** 44:21

**infected** 44:18 45:12

**infection** 44:21

**inform** 54:6 61:23 62:11 83:9 85:3

**information** 48:3,8 66:23 67:10 68:23 69:3 77:15

**informed** 10:22 21:21 44:20 47:11 57:20 62:14,15 68:7 81:15 83:9 84:2 96:9

**injured** 41:6 82:19 85:1 86:17

**injury** 87:17 88:12,23 90:1 94:4

**input** 48:3, 4,8

**inquiring** 53:2 54:13

**inside** 23:19

**instance** 56:18 63:11

**institution** 29:5,9,20, 21

**inter-** 49:4

**interact** 40:25 47:17 50:21

**interacted** 41:3

**interaction** 8:2,4,5,6, 7,11,12,25 9:7 10:5, 7,9,12,15 19:11,13, 22 20:2,3, 4,7,11,23, 24 21:4, 10,13 22:4 24:19,20 40:22,24 41:7 42:4 47:9,12, 17,19,22, 24 48:1,3, 4,9,15,19 49:1,3,5, 7,12,15, 17,20,24 50:2,3,21, 25 51:13, 19,21,24 52:9,17,23 54:1,24 56:20 63:6,17 64:2 65:2, 16,21 66:3,4,5, 12,13,14, 15,21 67:4

68:1,2,11, 13 71:10 77:25 78:10,11 79:25 80:2,5,18 81:10,14 82:5,18,22 83:4,17 84:7 85:7 86:23 88:9 89:22 90:20 91:5 92:15,21, 22 93:2 94:1,18 95:16,21 96:22 97:24 98:7,9,18, 24 99:8, 11,12 100:1,7 101:10 103:4,7

**interactions** 19:8 24:21 49:9,16 51:17 65:12 70:23 92:3 93:3

**international** 31:3,17

**internet** 23:4,6 26:2

**interrupt** 38:15 39:5

**intranet** 46:13

**introduce** 4:11

**isolation** 24:1

**items** 59:14

**ITLS** 31:3, 17

J

**job** 30:10 37:20,21 38:1 104:7

**jobs** 72:8

**joined** 43:21,23

**joining** 46:17

**Joseph** 4:4 5:22 6:5 36:12,13, 14 37:21 64:16 70:15 102:23 103:22

**June** 4:9

K

**kind** 23:3 26:2

**Kingdom** 25:24 26:5,6

**knew** 65:15 66:15 67:11,17

**knowledge** 54:6 60:12

L

**lab** 25:2

**lady** 54:1, 11

**lady's** 55:1

**lawsuit** 7:20

**layout** 22:13

**lead** 47:10, 11

**leading** 48:12,21 55:6,20 56:23 57:24

**learn** 47:8

**leave** 27:14 43:25 44:15

**leaving** 99:16

**left** 45:8 50:14

**legal** 43:18

**length** 68:23

**life** 31:1, 2,3,15,16, 17

**life-threatening** 73:19

**Lines** 35:5, 11,15

**list** 11:7, 19 15:22

**listed** 8:2 10:9,12

**located** 22:21 32:15

**log** 8:2,4, 5,12,22 9:17,25 10:5,7,15 20:11 21:10,13 24:15,20, 25 25:6,10 42:4 47:9, 12,19,22 48:1,9,15, 19 49:1,3, 5,17,24 50:3,25 51:24 52:9,24 54:1,24 56:20

63:6,18 64:2 65:16 66:5,12, 14,23 67:4 68:2,11, 16,21,24 69:3 77:25 79:25 80:3,5,18 81:11,14 83:4,17 84:7 85:7 86:23 88:9 89:22 90:20 91:5 92:16,21 93:2 94:1, 18 95:21 96:22 98:7,9,18, 24 99:8,12 100:1 101:10 103:4,7

**logbook** 78:9,10, 14,16

**logo** 36:20, 22,23,24, 25 37:2,6, 7 38:3,7

**logs** 47:17 48:3 50:21 66:22

**long** 13:3 17:8 49:2

**looked** 41:11

**lose** 28:5

**lost** 78:5

**lot** 20:18 27:13,21, 23 28:6 70:3 76:20

**lower** 29:21

**Lyssa** 104:20

**M**

**made** 68:10, 15 82:15 87:9

**maintain** 75:24

**maintenance** 75:20

**make** 9:10 38:16 50:9 76:20 101:20,21 103:9 104:18 105:1

**making** 68:21

**managed** 27:10

**manner** 4:25

**March** 7:6,7 9:25 10:3, 16 19:9 21:5,16 22:8,10 35:24 40:18,21, 24 41:19, 24 44:14, 16,25 49:24 52:17 56:25 57:14 62:19 63:11,16 64:6,20 65:2 67:4, 7,17,24 68:14,16, 22 70:24 77:16 78:12 80:21

**mark** 50:5

**marked** 106:3

**matter** 4:5

**meals** 31:21 32:3,6

**meaning** 58:17

**means** 57:13

**medi-** 96:22

**medical** 6:7 8:5,6,11, 24 9:7,14, 22 10:4,7, 15 12:10, 17,23 13:11 14:13,14, 15,20,22 15:5,21, 22,23,24 16:3,5,6 17:2,7,18 18:19 19:6 20:11,23 21:9,13 22:4,8,13, 20,22 23:9 24:20 37:14 40:17,20, 22 41:1,4, 7,23 42:4 47:4,9,11, 16,19,22 48:1,2,8, 14 49:1,3, 4,5,17,24 50:2,21,25 52:9,23 53:25 54:10,23 55:5 56:20 57:2,8 58:10,15, 18,19 60:14 61:5,13,16 62:18 63:6,17 64:2,5,12, 14 65:16, 20 66:4, 12,14,21

68:2,10 77:24 78:10 79:25 80:2,5,18 81:10,14 82:22 83:4,16 84:7,22,25 85:7,12 86:16,23 88:9,10,15 89:1,2 90:8,19 91:14 92:21 93:2 94:1,10, 11,18 95:3,21 96:22 98:7,9,17 99:12,15, 16 100:9, 10,18,19 101:2,10 102:1,3 103:4,7 104:2

**medication** 9:16,18,19 62:12 75:16

**medications** 9:21 15:6, 10 75:21 89:16

**medicine** 53:4

**member** 44:18

**members** 45:2,3,10, 12 74:8

**members'** 37:11

**memory** 65:1 66:24 69:4

**mentioned** 61:25

**Miami** 30:14, 15

**middle** 44:25

**military** 10:16 21:17 52:5

**mind** 20:1, 2,22 21:1, 2 39:22 79:17 85:19 86:13,15, 25 87:3

**minutes** 39:21

**misunderstanding** 101:5

**moment** 22:11 24:6 25:4, 13 36:1,5 41:16 68:11 81:16 87:14 97:11,22

**money** 18:25 33:18 58:16

**month** 29:17, 19 30:4,5, 6 32:2 69:23 70:2 77:23,24 78:3,11, 12,13

**monthly** 31:25

**months** 26:7 44:23 73:5,11

**morning** 4:13 5:4 42:12, 13,14

**mother** 74:23

**mute** 40:8

**N**

**nation** 26:22

**nation-** 36:12

**nationality** 6:25

**native** 26:22

**nature** 10:18 53:20,22 54:8,23,25 55:3,15 56:12 57:2

**needed** 34:22

**needing** 100:18

**noble** 76:1

**noon** 42:17

**not-good** 73:13

**note** 9:20 16:3 17:4 18:11,20 21:15

**noted** 99:7

**notes** 7:24 9:23 10:6 16:2,3,4 56:20 76:2

**noticing** 5:3

**number** 10:17 15:4 21:17 29:11 49:21 50:17 52:8,12,19 61:15 64:17

**numbers** 39:16

**nurse** 4:4 6:6 7:5,12 8:25 11:2 14:15 21:25

25:19,25 26:8 27:4 28:5,10,20 29:4,23 30:7,9 32:9 36:13 37:22 46:2 47:10,11 48:16 57:8 58:2,15 63:1,16 65:14,19 66:2 68:14 69:13 70:15,20 72:12 73:15,23, 25 74:2,7 76:16 84:9 94:22 97:4

**nurse's** 16:4 22:24 26:19

**nurses** 12:11,17 27:22 28:2 34:10 41:3 53:6 58:18 76:19 77:22 102:4

**nurses'** 23:10,13, 17

**nursing** 6:7 27:1,6,7 74:2,4

O

**oath** 4:23

**Object** 87:18

**Object-** 67:13

**objection** 10:2 13:7 17:13 18:6 19:1,17,24 31:22 33:3 34:1,9 36:10,17 48:12,21 55:6,20 56:23 57:24 60:9,16 61:7 63:24 64:8 65:5, 23 66:7,17 67:1,15,21 68:3,19 69:1,7 71:1 72:23 73:3,8 74:11,15 76:22 77:10,19 82:13,21 84:14 85:6,14 86:4,9,20 87:7 88:2, 13,24 89:12,20 90:2,17,25 91:6,12,23 92:4,10, 19,25 93:10,23 94:8,16,24 95:5,8,18 96:4,18 97:9,19 98:3,12,19 99:1,9,19 100:2,20 101:6,24 102:12,18 103:16

**objections** 4:25

**observation** 23:25

**obtain** 16:10

**obvious** 51:7 85:11,22 86:1,8

**occurred** 51:22

**October** 25:15,16 43:24 45:14,20 51:2 58:7 65:19 66:1,22

**off-** 35:2

**offer** 90:10, 14,24 91:1,9

**offered** 90:14 91:4

**office** 15:15 23:17 30:19,21 34:24 35:2 44:20

**Olsen** 35:7

**on-call** 8:25

**onboard** 11:22 12:17 44:14,24 45:7,13, 16,19,22, 25 46:20 47:7 48:15 50:3,22 51:1 58:6 59:8,13,17 65:15,18 66:1,22 67:18 69:14 70:14 71:11,21, 25 72:2,4 81:18 104:5,12

**ongoing** 15:6

**opinion** 94:14,21 96:1

**opportunity**

28:4,5,7,9 70:8,14 74:2

**optional** 13:6

**options** 99:18

**order** 12:8 49:14 58:3 105:13,18

**ordering** 105:21

**organized** 78:13

**over-the-counter** 9:16 89:16

**overtime** 38:13 39:9,12,13,14,19

P

**p.m.** 42:7,8

**paid** 69:23

**pandemic** 44:7

**paper** 20:25

**parents** 75:7

**part** 41:5 72:20

**participat-** 4:19

**participating** 4:20

**parties** 4:24

**pass** 34:21

**passenger** 45:5 51:25 54:9 58:10 66:13

**passengers** 44:6 45:8 47:21 49:19 59:22

**past** 44:14 72:8

**pat-** 17:23

**patience** 69:11

**patient** 8:7,11,24 9:7,20 14:13 15:3,14,16,19 16:1,2,10,11,12,14,21 17:6,15,17,24 23:14,22 24:18 31:2 49:10 52:12 53:7,24 57:11 58:13 60:21 61:8 62:11,13 88:16 90:5 92:3,7,8,16,22 93:4,7,8,14,17 94:2,10

**patient/pediatric** 31:16

**patients** 16:23 25:7 44:18 47:13 58:20 61:21 88:25

**pay** 12:8,13,18,19,21 16:22 17:4,6,12,24 18:20 29:23 31:20 35:16,17 39:11 58:3 60:2,6,13,14 69:14,17,18 70:18,21 71:5 75:13 76:16 98:1,23 99:17 100:17 101:4,16,22 102:11,15,16 103:13

**paycheck** 33:9

**paying** 32:6 60:1 76:15

**payment** 12:11,16,18 13:10,12 18:23 33:11 35:20 39:19 58:13,20,22 60:20,23,25 102:1,4 104:3,6,9,10

**payments** 12:13 58:17

**pays** 33:20,24 35:17

**people** 12:17 27:14 37:23 41:4 73:18

**person** 40:20

**personnel** 46:25 47:4

**pesos** 29:6,7,10,16,18,19

**Peter** 4:13 5:4 6:5 76:8

**ph** 37:24

**Philippine** 27:23

**Philippines** 6:22 26:13,20 27:4,14 28:11,15, 22 29:3 30:18,19, 21 33:6 36:14 46:5 47:1,2 69:16 70:1,4,10 72:15,18 74:1,8,14, 20 75:1

**phone** 9:2,6 47:20 52:20 53:1,5

**photograph** 81:9

**photographs** 81:7

**physical** 20:4

**physically** 4:21 64:24

**physician** 94:5

**piece** 20:25 23:4

**place** 26:3,4 73:24

**plaintiff** 4:14

**point** 44:5 87:5,16 102:22

**policies** 72:21

**policy** 8:5, 6,14,16, 17,19 24:17,21 47:8,12,18 48:2,7 52:24 54:21 56:11 58:9 65:16,21 71:17 73:1

**polite** 14:16,19

**pos-** 84:2

**possibly** 57:7 88:11

**precise** 29:11

**precondition** 58:2

**preparing** 78:16

**prepayment** 58:9

**present** 4:21

**pretty** 51:7 85:11,22 86:1 103:6

**pri-** 29:20

**pride** 71:21, 24 72:11, 14

**Printed** 64:14

**printing** 78:8

**private** 29:9,21

**privilege** 78:25 79:5,15

**problem** 17:9 79:5,12

**procedure** 15:22,23 16:2,3,6 17:2,9,11, 16,17 23:23 62:12

**procedures** 62:17

**proceed** 17:7 18:19 23:19 27:6 62:16 86:22 87:1

**proceedings** 4:23 105:24

**process** 33:7 35:18,20

**professional** 94:22

**professionals** 28:2

**promise** 17:12

**promissory** 17:3 18:11,20

**proofread** 77:8

**provide** 5:16 29:16 35:21 39:18 45:9 62:18 70:9 75:14

**provided** 63:13,16

**providing** 45:9 74:25

**pulling** 101:2

**purchase** 59:18

**purchasing** 59:13

75:21

**purpose** 49:11 51:8,10,11 52:9 55:4,16 57:6 63:5

**put** 24:19,21 37:19,24,25 47:25 48:3 49:8,24 51:14,18,21 52:10,16 54:25 56:12 60:14 61:4,18 71:19 82:8,10,12,16 83:25 84:1 93:25 102:22

**put-** 24:16

**putting** 8:8 9:6,20,23 47:24 77:22 78:8 93:1

Q

**quarantine** 45:8,11

**question** 7:25 25:5 43:15 46:14 51:8 54:20 55:10,14 62:3 71:3 93:12 102:23 103:14,21

**questions** 43:4,8,16 69:10 76:3,5,9 103:20

**quick** 43:9

R

**raise** 5:10

**range** 29:7,25 30:1 69:24

**ranges** 29:10 30:8

**rate** 39:11 69:14,17,18

**re-** 96:20

**re-evaluate** 61:22

**rea-** 88:8

**reach** 12:5

**read** 21:15 83:19 104:17,19,25 105:4,6

**reader** 85:19

**reading** 105:25

**ready** 5:20

**real** 74:4 85:16

**realized** 88:11 89:25

**reason** 13:3 15:7 54:6 70:20,22 71:9 74:3,5 80:4 84:11 85:11,16 86:2 88:10 97:17 102:9 103:12

**reasons** 61:14

**receive** 26:19 33:13,15 51:25 62:7 72:3 75:7 80:6,11,18 105:11

**received** 70:21 73:5 74:7

**receives** 29:24

**receiving** 30:1 75:9

**reception** 22:15

**recess** 13:17 40:13

**recognize** 19:16,19

**recommended** 57:15

**record** 5:2 38:15 39:5 40:12,15 49:20 54:9 56:25 62:25 68:1,15 102:22 103:9 105:2,16

**recorded** 52:4 66:3,23 67:7,10 68:23 69:3 104:18 105:1

**recording** 55:4,18 66:13

**RECROSS** 103:24

**recruiting** 35:6

**REDIRECT** 76:10

**reference** 22:2,3 25:11 49:15,17

**references** 22:5

**referencing** 17:22

**Referring** 63:4

**refresh** 20:1,22

**refreshed** 20:2 21:1

**refreshing** 65:1

**regress** 10:18

**relate** 70:19

**religiously** 47:12

**remarks** 9:24

**remem-** 101:13

**remember** 7:15,16,18,19 11:21 19:14,19,21 20:4,12,16,17,18 21:14 22:11,12 24:5,6,7,10,11 25:4,12 36:5 39:15 41:2,3,10,11,17,20,21,25 44:8 64:24 65:13 69:13 80:4,8,15 81:17 83:16,17,18 87:14,15 88:3,5 90:13,18,21 91:1,2,7,24 97:6,10,13,16,20,21 98:6,7,8,14 99:2,5,21 100:4 101:8,13,15,21 102:21 103:2,3,4,5,6,18

**remotely** 4:23

**repeat** 25:21 31:8 38:14 40:19 48:23 55:10,12 70:25 71:2 73:10 101:19 103:14

**replied** 96:20

**report** 90:15 98:17

**reporter** 4:12,17,19,21 5:8,10,13,18,21 22:25 23:2 25:21 26:1 31:5,7,13 35:9,12 37:4 38:23 68:8 73:9 104:20,21 105:17,20

**reporting** 4:22,25

**represent** 4:14

**reprimand** 73:5,12

**reprimanded** 73:1

**request** 53:20,23 54:8,23,25 55:3,16 56:12 57:3,20,21

**requesting** 56:19 57:1

**require** 48:7 58:9 60:19

**required** 30:25 46:22 49:1 60:25

**requirement** 46:19

**requirements** 34:22

**requiring** 58:12

**respect** 68:13

**respond** 63:12,15

**responded** 84:8 96:9

**response** 10:25 21:23 62:23 63:2,4,7,18 83:23 84:5,6 85:8 86:24 87:10 96:21,23

**responsible** 58:16,19

**rest** 38:2 42:18,20

104:5
**restroom** 39:23
**resume** 40:2 42:18
**retire-** 75:9
**retirement** 75:4,8,10
**review** 105:3
**right-hand** 64:15
**RN** 5:22
**room** 23:18, 20,21,22, 23,25 24:1 37:15
**rooms** 23:20
**rough** 28:17 29:24
**roughly** 29:12,13
**routine** 9:3 24:23
**running** 101:1

S

**Sail** 12:21 58:23,24 59:2,5,9, 11,12,20, 23,25 60:5,13,15 61:4
**sailing** 44:6 65:15,18 66:1
**salary** 28:9, 15 31:25 33:11 69:18 75:13
**Saud-** 25:24
**Saudi** 25:19, 24 26:5,6, 7,11,14 27:15 28:7 72:9,12, 17,25 73:12,15
**Saudia** 26:6
**save** 77:12 78:4,6
**schedule** 42:9
**scheduled** 44:15
**school** 27:1, 3,5
**screen** 40:8 49:25 50:3,11 55:16 68:17 69:9
**scrubs** 36:3
**section** 55:3
**Security** 75:2,3
**seek** 13:10, 11 18:15 70:5,8
**seeking** 14:13 18:15 56:13,14 70:14
**select** 16:8
**send** 20:11 80:2
**sense** 54:20
**server** 37:15
**services** 16:24 17:1 18:12,13, 15,18 35:6
**seven-day** 38:9
**share** 32:8
**sharing** 69:9
**shift** 42:2
**ship** 27:17 28:11,14 29:23,24 30:7,11 31:20 32:20 33:2,7,24 35:24 43:21,25 44:5,14,16 45:8,16,19 49:19 50:14,22 52:4,6 58:7 67:8 69:15,22 70:6,9,15 72:18 76:21
**shipboard** 104:2
**Shipping** 35:5,11,15
**ships** 45:22
**shoes** 38:6
**sic** 18:24 54:2 79:12
**sick** 45:1,9
**side** 64:15
**sign** 12:21 17:8 18:11 35:3 58:23,24 59:3,5,9, 11,12,20, 23,25 60:5,13,15 61:5 62:15
**signature** 64:14,18
**signed** 62:10
**signifies**

53:8

**signify** 53:9

**signing** 105:25

**signs** 15:12, 13

**simple** 70:21

**simply** 9:16 16:20 94:4

**sir** 6:2,20, 21,22 7:1, 9,16,18,21 8:3,5,8 9:13 10:11,13 11:3,5,11, 14,16,19 12:2,10,16 13:2,8,22 14:12 15:1,16,21 17:6 18:5, 13,22 19:2,13, 18,25 20:8,10, 15,17 21:12 22:3,10,20 24:2,5,10 25:2,9,15 26:11,18, 21,24 27:2,12, 16,21 28:8,12,15 29:5,15,25 30:5,8,12, 15,18,20, 22,25 31:23 32:4,10, 14,21 33:11 34:5 35:4,18,25 36:8,18 37:7,12 38:4,11, 17,24 39:10,15 40:6,17, 19,22 41:2,7,10, 14,16,20, 25 42:5,12 43:3,5,7 44:8 45:3, 11,15,18, 21 46:6,8, 19 47:3,8, 23 48:6,11 49:22 50:3,4,13, 18 51:3, 10,12,20 52:15,18 53:10,16, 24 54:11 55:11,25 56:15,22 57:4,7,17 58:5,12,22 59:1,12,24 60:3,21 61:8 62:8, 20 63:7, 14,18,23 64:7,11, 16,21 65:6,17,22 66:6,16,22 68:4,18,25 69:12,24 70:7,11,25 71:14,23 72:5,13, 22,25 73:2,5,17, 22,25 74:3,5,9, 16 76:7, 12,18,23 77:5,11, 17,20 78:4,8,14, 18,20 79:1,20,22 80:18,22 81:8,10, 14,23 82:1,6,10, 14,23 83:4,13, 16,21 84:1,7,15, 20,24 85:3,8,16 86:7,10,21 87:11,19 88:3,15 89:8,11,21 90:6,13,18 91:1,7,13, 24 92:5, 12,21 93:1,13 94:1,10, 17,23,25 97:7,10, 15,20 98:6,13,20 99:2,10,20 100:3,21 101:7,14, 18,25 102:5 103:1,6, 18,23 104:5,13, 24 105:5,7

**sit** 22:24 23:15

**slab** 15:23 17:3 23:23

**slow** 23:2,5 31:9

**slower** 6:10 25:22

**small** 9:11

**smaller** 29:9

**Smith** 4:15 5:6 8:14, 17 10:2,5 13:7,19, 21,24 17:13 18:6,8 19:1,17,

24,25 20:10 31:22 33:3 34:1,4,9 36:10,17 38:14,18, 20 39:4,7, 22 40:1,3, 5,7 43:6, 8,13,14 48:13,24 50:5,8 55:8,21 56:24 58:1 60:11,17 61:24 64:1,9 65:24 66:10,18 67:3,16,22 68:6,12,20 69:2,8 71:4 72:24 73:6,14 74:12,17 76:4,22 77:10,19 78:18 79:2,7,11, 16,22 80:24 82:13,21 84:14 85:6,14 86:4,9,20 87:7,18 88:2,13,24 89:12,20 90:2,17,25 91:6,12,23 92:4,10, 19,25 93:10,23 94:8,16,24 95:1,5,8, 18 96:4,18 97:9,19 98:3,12,19 99:1,9,19 100:2,20 101:6,24 102:12,18, 20 103:16, 21 104:1, 15,25 105:6,8, 10,12,20, 22 106:2

**Social** 75:2, 3

**soil** 76:17

**sole** 17:19

**some-** 14:7

**sort** 52:4

**sounds** 45:24

**speak** 31:11

**speaking** 56:11

**special** 30:24

**specific** 43:23 65:2 97:22

**specifically** 7:13 24:6

**spell** 6:8,10 26:4

**spoke** 40:18, 21 41:24

**spot** 101:23

**spouse** 31:2, 16

**staff** 50:3, 25 54:24 64:14 65:16,20 66:4,12

**standard** 50:20

**start** 25:14 42:7

**started** 42:15

**starting** 5:2

**state** 54:2

**stated** 10:19,25 11:1,2 21:18,24, 25 78:19 84:9,10 97:3,4

**statement** 5:17 10:7 47:25 65:8,11 81:3 99:7

**statements** 68:15

**states** 21:9 36:12 76:20 78:20

**stating** 5:1

**station** 22:24 23:10,14, 17

**stay** 43:10 44:13 97:17,21

**stay-** 97:13

**stayed** 23:11 44:2

**staying** 97:13 104:5

**steakhouse** 59:15

**steer** 89:19

**stipulate** 79:4,13

**stipulates** 79:11

**stipulation** 79:17

**stop** 44:6 69:9

78:21,23

**stopped** 44:9,11

**stops** 22:18

**strike** 70:19

**strong** 31:10

**study** 74:4

**stuff** 82:11

**style** 37:11

**subject** 14:10 15:17

**subsequently** 106:3

**suggest** 57:10 87:20 88:17 90:9 92:11 93:17 94:4

**suit** 36:3

**summarize** 95:3

**summarizing** 95:10

**summary** 100:8

**supervisor** 77:18

**supplement** 75:12

**supplies** 15:24

**support** 31:1,2,3, 15,16,17

**supposed** 54:24 56:12 62:25 93:7

**surely** 90:15

**surge** 44:16, 17,21

**suturing** 15:23 16:7 17:3,16

**swear** 4:12 5:13

**sworn** 5:23

**sys-** 47:25

**system** 48:1 75:2,3 77:12 78:7

**T**

**tag** 36:6,8, 9,11,16, 19,20 37:7,10, 12,17,19 38:8

**tags** 37:11

**takes** 27:6

**taking** 17:3

**talked** 62:21

**talking** 37:13

**taught** 46:7, 11

**teach** 46:17

**team** 6:7 12:17 14:15 17:18 19:6 44:21 102:4

**telephone** 84:22

**telling** 16:18 79:7 83:18 101:16

**ten** 39:22

**ten-minute** 39:24

**testified** 5:23 45:24 64:22

**testify** 71:10

**testimony** 5:14 17:23 89:18

**there'** 51:4

**thing** 44:16 83:2 85:23 91:24

**things** 20:18 31:18 43:19

**Thirty** 26:17

**thought** 38:22

**thousands** 49:18

**three-and-a-half** 25:20, 24

**till** 83:11, 14 85:5,25 100:15

**time** 4:9 7:14 8:10 10:16 13:4,11 16:1,14 17:5 19:23,25 20:15 21:17 22:22,24 23:8,11 24:9,11, 17,18 25:8 31:10 40:11,14 41:18 42:6,10 44:9,10, 12,17 45:7 48:14 49:2 51:4,9,10, 12,14,16,

18,21 52:3,4,5,7 53:3 56:7 62:14,16 64:4,11 65:7 66:2, 11,15 67:7,8,11, 17,23 68:23 69:11 76:5,6 78:18 80:12,20, 22,23 81:1,5 84:12 86:2 91:13 93:6 101:7 105:14,15

**times** 52:6 65:14,18, 25 102:21 104:2

**timing** 47:19 88:4

**today** 6:21 19:15,18 26:15 105:2

**Today's** 4:9

**told** 11:4 57:1 82:7, 19 83:7, 14,23 85:2,24 87:25 88:1 91:10,19, 20,21 93:6,19 95:19,20 96:2,5 97:25 98:16,22, 23 101:22 102:7 103:12

**top** 50:14

**totally** 20:15 62:13,15 96:12 103:5 104:16,22

**touch** 105:23

**township** 6:24

**training** 26:19 30:14,15, 16,18,24, 25 46:22, 24 47:2,4

**trainings** 46:20,23 47:5

**transaction** 58:24

**transactions** 58:17

**transcript** 104:17,25 105:13,18 106:1

**transfer-** 58:24

**trauma** 10:20 21:20 31:3,17 41:12 54:4 57:10 82:25 95:23 96:15

**treat** 17:25 18:2,24 62:6

**treated** 72:4 86:17

**treating** 45:12

**treatment** 10:24 15:19 17:8,18 18:19,24 21:23 54:15 57:5 62:4,7,19, 22 63:9 86:19 87:22 90:8

**trip** 30:3

**true** 27:13 40:23 50:24 91:9 92:2 93:9

**trust** 104:20

**truth** 5:15, 17 70:22 81:3 98:8

**turn** 40:8,9

**turns** 87:5

**Tylenol** 9:12,13,21

**type** 32:11 75:1 77:3, 5 78:6 90:11

**types** 43:17

**U**

**U-M-B-A-Y** 6:18

**U.S.** 29:12 69:23 70:1

**Uh-huh** 14:6 18:1,3 19:10 27:18 28:18,21, 24 29:2 32:1 46:15 51:5 53:21 55:17 58:8 61:1,3 62:24 67:6,25 71:6,8 72:19

100:14

**underpaying** 76:15

**understand** 25:5 26:2 45:7 103:14

**understanding** 31:11 58:6

**Unfortun-** 97:15

**uniform** 35:23 36:1,2,4,6 38:2,4

**unintelligible** 52:13 74:22

**United** 76:19

**unreasonable** 68:22

**upfront** 60:25 104:4,11

V

**Valor** 6:7 7:14 22:14 43:22 44:2,24 45:14 46:1,17 47:7 48:16 49:2 50:15 51:1 59:8 64:6 65:15,19 66:1,22 67:19 70:23 71:11,22, 25 72:2 104:3,12

**verbal** 10:25

**versus** 4:7 69:15

**video** 105:13

**virus** 44:19

**visit** 13:4 15:7 61:14

**vital** 15:12, 13

**voyage** 49:19 50:17

W

**wait** 12:15 23:14 68:22 83:11,14 85:5,25 100:15

**waiting** 61:20

**waive** 4:25 104:19 105:4,8,12

**waived** 105:25

**waiver** 79:4, 14

**walk** 97:21 100:19 103:4

**walked** 86:18 90:10 96:17 97:2,8

**walks** 87:6 97:11 100:16

**Walsh** 4:13 5:4,20 6:1,5 8:15,18 10:8 13:13,18, 20,23 14:1,3 17:20 18:9 19:7,20 20:5 24:3 26:9 31:19,24 33:8 34:2, 6,15 35:13 36:15,21 37:5 38:21 39:2,8,20, 24 40:2,4, 16 43:3 48:12,21 55:6,20 56:23 57:24 60:9,16 61:7 63:24 64:8 65:5, 23 66:7,17 67:1,13, 15,21 68:3,19 69:1,7 71:1 72:23 73:3,8 74:11,15 76:8,11,24 77:14 78:1,24 79:6,10, 13,19 82:17 83:1 84:17 85:10,18 86:5,11 87:2,12,23 88:7,21 89:4,17,24 90:3,23 91:3,8,18 92:1,6,14, 23 93:5, 11,24 94:13,20 95:2,6,10, 13,24 96:16 97:1,12,23 98:4,15,21 99:4,13,22 100:5,23

101:11 102:6,13, 24 103:19 105:17,19

**wanting** 55:5,19

**wear** 35:23 36:4

**wearing** 36:1,3,8

**week** 33:9 38:9,12,13 39:1 78:11

**western** 28:8

**white** 4:16 36:2 38:5, 6

**Wit** 63:2

**witnessed** 87:4

**woman** 99:15 100:9,18

**word** 8:13

**words** 19:15 59:11 93:25

**work** 7:2,4, 12 8:22 11:17,22 25:17,18, 23 26:5,6, 10,13 27:14 28:1,2,7 29:15 30:13,17 33:10 37:14 38:10 39:12 42:22 46:1 70:10,14 71:17,21, 24 72:11, 14 74:24 81:17

**worked** 25:19 26:4 42:4, 5,13,19 58:15 72:8 73:15 82:18

**working** 7:4, 6 22:8,11 25:14 27:22 28:4,10,11 29:4,6,19, 20 33:25 35:24 38:11 39:17 42:2,6 58:6 59:8 69:14,15 70:1,5 72:2,17,25 74:7 76:16 104:2

**works** 14:4

**worry** 98:1, 22 101:4 102:15

**wrap** 69:10

**write** 9:17 92:2,8,15, 17 93:8

**writing** 6:11

**written** 77:16 90:15 91:5 98:17,24 99:7 100:1 105:2

**wrote** 82:3 92:20,21 99:11,12

**X**

**x-ray** 23:24

**Y**

**year** 7:9, 17,18 11:16,22 20:17 24:12 28:25 29:3,18 30:3 39:16 81:17

**years** 25:20, 25 26:7, 14,16 27:3,6,8 73:4,11

**yes-or-no** 93:12

**yous** 72:3