UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 21-CIV-2057-BLOOM

BARBARA HALL,

Plaintiff,

-vs-

CARNIVAL CORPORATION,

Defendant.
___________________________/

**VIDEO**TAPED **DEPOSITION OF KENNETH UNRUH, M.D.**

LOCATION: Remote Audio-Video Communication
Pursuant to Supreme Court of Florida
Administrative Order No. AOSC21-17

DATE: December 17, 2021

TIME: 5:05 p.m. - 7:30 p.m.

Pages 1 through 141

Stenographically Reported By:

Teresa R. Cruise, RPR, CRR, FPR-C, FPR
Registered Professional Reporter
Certified Realtime Reporter
Florida Professional Reporter
Notary Public, State of Florida



REMOTE APPEARANCES:

On Behalf of the Plaintiff:

Eduardo J. Hernandez, L.L.C.
10691 North Kendall Drive
Suite 109
Miami, FL 33176
(305) 567-0910
Ehernandez@ejh-law.com
BY: EDUARDO J. HERNANDEZ, ESQUIRE

On Behalf of the Defendant:

Fowler, White, Burnett, P.A.
1395 Brickell Avenue
14th Floor
Miami, FL 33131
(305) 789-9200
Csmith@fowler-white.com
BY: CHRISTOPHER SMITH, ESQUIRE

Also Present:
Brandon Mendiola, Videographer

INDEX OF PROCEEDINGS


| Deposition of KENNETH UNRUH, M.D. | Page |
|---|---|
| Direct Examination by Mr. Smith | 5 |
| Cross-Examination by Mr. Hernandez | 77 |
| Redirect Examination by Mr. Smith | 122 |
| Stipulations | 139 |
| Certificate of Oath | 140 |
| Certificate of Reporter | 141 |




INDEX TO EXHIBITS

PLAINTIFF'S EXHIBITS:


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| A | Billing Records......................... | 113 |


*(Exhibits Provided Electronically to the Reporter)*

DEFENDANT'S EXHIBITS:


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Curriculum Vitae......................... | 9 |
| 2 | Rate Sheet.............................. | 24 |
| 3 | December 29, 2020, Letter................ | 54 |
| 4 | November 14, 2020, Letter................ | 55 |
| 5 | Ms. Hall's Chart......................... | 77 |


*(Exhibits Provided Electronically to the Reporter)*



The deposition of KENNETH UNRUH, M.D. was taken pursuant to notice on Friday, December 17, 2021, commencing at 5:05 p.m.

Said deposition was reported remotely by Teresa R. Cruise, RPR, CRR, FPR-C, FPR, Notary Public, State of Florida at Large.

\- - - - - - - - -

THE VIDEOGRAPHER: In the case styled Barbara Hall versus Carnival Cruise Lines, this is the video deposition of Kenneth Unruh, M.D., on December 17, 2021.

The time is now 5:05 p.m.

Would counsel please state their appearances for the record?

MR. HERNANDEZ: Eddy Hernandez for the Plaintiff.

MR. SMITH: Christopher Smith for Carnival.

(The witness, having already presented their government-issued identification by holding it up to the camera for verification and his identity verified, was sworn in as follows.)

THE STENOGRAPHER: Doctor, would you please raise your right hand?

Do you swear or affirm the testimony you're about to give will be the truth, the whole truth, and nothing but the truth, so help you God?
THE WITNESS: I do.
THE STENOGRAPHER: You can put your hand down.
THEREUPON:
KENNETH UNRUH, M.D.,
having been first duly sworn, was examined and testified as follows:
DIRECT EXAMINATION
BY MR. SMITH:
**Q.** Good afternoon, Doctor.
Would you please state your full name for the record?
**A. Yeah, Kenneth Patrick Unruh.**
**Q.** And, Doctor, can you tell us what your professional address is, please?
**A. 3651 College Boulevard, Leawood, Kansas 66211.**
**Q.** Terrific.
Now, Doctor, are you an orthopedic surgeon?
**A. Am I a what?**



**Q.** Are you an orthopedic surgeon?
**A. Yes.**
**Q.** All right. And where do you practice orthopedics at -- at present, please?
**A. At the Kansas City Orthopedic Institute in Leawood, Kansas.**
**Q.** Terrific.
How long have you been with that practice now?
**A. It's going to be seven years.**
**Q.** All right. And, Doctor, do you have hospital privileges?
**A. Yes.**
**Q.** Where do you have your hospital privileges, please?
**A. Kansas City Orthopedic Institute and Advent Health. Also East -- we call it Trinity Mission Medical Center.**
**Q.** Okay. And, Doctor, are you licensed to practice medicine in the state of Missouri [sic]?
**A. I am in Kansas. I'm not sure about Missouri.**
**Q.** Okay. So you're -- you're licensed to practice in the state of Kansas?



**A. Yep.**
**Q.** Terrific.
I know the -- the border is pretty close there, so I'm sorry I mixed that up.
As an orthopedic surgeon, do you specialize in any specific parts of the body, Doctor?
**A. Mainly, like, elbow through the fingertips.**
**Q.** Okay. Can you summarize, please, Doctor, your educational background?
You can start after high school. You don't need to go quite back that far.
**A. Yeah. So I went to the University of Kansas for undergraduate school, studied chemistry and philosophy there, and then went to medical school at the Mayo Clinic in Rochester, Minnesota.**
**My residency was in orthopedic surgery at Vanderbilt, and then my hand fellowship was at the Indiana Hand Center in Indianapolis, Indiana.**
**Q.** Okay. Terrific.
I have a copy of your CV.
**A. Uh-huh.**
**Q.** I'm going to put that up on the screen for us all.



Can you see your CV --
**A. Yep.**
**Q.** -- up on the screen?
It's a two-page document. I'm going to slowly scroll through it for your sake.
**A. Uh-huh.**
**Q.** And, Doctor, is this -- does this look like a true and accurate copy of your curriculum viteae?
**A. Yeah, I think it's probably, I don't know, a few years outdated but it's -- everything is pretty -- and then, like, you know, my address is different on there.**
**Q.** Okay.
**A. Uh-huh.**
**Q.** Other than your address, is this CV up-to-date?
**A. Probably not, not -- probably not entirely just because it doesn't have like, you know, my current -- my current job location at the Kansas City Orthopedic Institute.**
**But there's no other additional, like, research articles or, you know, any awards that I would put in there.**
**Q.** Okay. This -- this particular CV

9

doesn't actually say anything about your current place of employment, though, right?

**A. Yes.**

Q. Okay. Very well.

Have you worked anywhere else besides your current clinic after leaving medical school?

**A. Nope.**

Q. Very well.

MR. SMITH: So the CV I'll go ahead and mark, Teresa, as Exhibit 1 to the deposition.

THE STENOGRAPHER: That will be marked.

(Defendant's Exhibit No. 1 was marked for identification.)

BY MR. SMITH:

Q. And, Dr. Unruh, are you board certified?

**A. Yes.**

Q. Okay. And what areas are you board certified, please?

**A. I'm board certified in orthopedic surgery and then I -- I have what's called a certificate of additional qualification in -- in hand surgery.**

10

Q. Terrific. Okay.

And, bear with me, I have some sort of general background questions that I just kind of need to go through.

Doctor, does part of your practice of medicine include completing treatment notes?

**A. Yeah.**

Q. Yes?

**A. Yes.**

Q. Okay. Are your treatment notes, Doctor, organized in a format that's called Subjective, Objective, Assessment and Plan?

**A. I would say most of the notes that would be -- the only time I really use that is in the hospital.**

Q. Okay.

**A. I usually would use Chief Complaint, History of Present Illness, Physical Examination, Radiograph Assessment and Plan would be the general pattern of my notes.**

Q. Okay. Is that same general pattern the type of treatment note you used to record your treatment on the patient Barbara Hall?

**A. Yep.**

Q. Terrific. Okay.

11

So you -- it sounds like -- well, let me ask it this way.

Are you familiar with the term Past Medical History as it relates to a treatment note?

**A. Yep.**

Q. Can you tell us, Doctor, what is past medical history?

**A. It would be the diagnosis for which the patient -- the patient -- diagnoses the patient has received from prior medical care.**

Q. Okay. And why is that information recorded in your treatment notes, Doctor?

**A. I'd say, honestly, at the -- probably at the date and time of her evaluation, a lot of it has to do with just keeping up your -- your chart for billing purposes.**

**And, then, at times you can have past medical history that's attributed -- attributable to your line of care; although, in orthopedic surgery it's maybe not quite as --**

Q. Okay.

**A. -- common.**

Q. Okay. Where is the information that goes in Past Medical History obtained?

**A. That's usually going to be obtained by -- in our office, it would be obtained by a questionnaire is probably going to be the most common, on, like, a question intake questionnaire.**

**And there are certain things I might ask for if I -- or certain diagnosis that I find are important. Probably, like, diabetes would be the most common thing I would say that affects the -- a patient's hand care.**

**Or, for instance, if they've had a history of like, you know, heart attack that would preclude them from having a general anesthesia.**

**So the majority is probably patient -- patients fills out. The second would be me asking maybe a couple past medical pertinent questions that would go in there.**

Q. Okay. So -- so ultimately does the information that's recorded in the Past Medical History section of the treatment note come from the patient themselves?

**A. Yes.**

Q. And is it -- Doctor, is it useful to record that information to assist you in -- in treating the patient?

**A. I would say, for the most part, I'm going to ask that -- the things that I -- I've**

13

gotten in the habit of asking for those past medical things that I think are the most critical, partially 'cause patients will forget those and I don't want to rely on their memory of their past medical history.
So yeah, I think I usually try to ask it myself if I find it to be -- if I think it's -- if I think it's an important past medical history to know I'll usually ask it myself.
Q. Okay.
A. Particularly, if it's not filled out myself.
Q. Okay.
A. I just don't -- I don't think the patient's past medical history, in and of itself, that they supply, is always everything you need to know.
Q. Okay. So in addition to taking information from an intake sheet, you -- it's part of your practice to ask the patient for pertinent information?
A. Correct.
Q. And, then, you take that pertinent information that you do obtain and you record it in the past medical history section?

14

A. Correct.
Q. Okay.
A. Well, no, a lot of times that will be in the HPI section.
Q. Okay. History of Present Illness?
A. Yeah.
Q. Okay.
A. Yeah.
Q. So the information you obtain may be found in either Past Medical History or History of Present Illness?
A. Yeah. As it pertains to past medical history, yeah.
Q. Okay. Doctor, is it ultimately the physician's responsibility for accurately recording information in the Past Medical History in the chart?
A. Yeah, I think so, for the most part.
Q. Okay.
A. I mean, it -- in our office, you know, there's a -- I would say things like Past Medical History, Social History, Surgical History, a lot of that is, you know, imported by our office staff.
But it's the combination of the office staff getting it in there, the patient being honest

15

with their past medical history, and us, you know, supplying the additional history that we find most pertinent.
Q. Okay.
A. So I don't -- yeah.
I would be kind of hedging a little bit on saying that everything that's in the chart is the doctor's responsibility because there are certainly things in the medical chart that I have no control over getting in there.
Q. All right. Do -- do you -- do you review the chart and have to sign it?
A. Not everything that goes in the chart do I have to sign.
Q. Okay.
A. Like, if there's a phone note, for instance, I may not sign the phone note or, oh, there may be a -- there may be an image or something that gets in there that my partner ends up, you know, signing 'cause they saw while it's in their chart but it's not under my jurisdiction, you know, of care.
If somebody has a wrist injury and a knee injury --
Q. All right.

16

A. -- well, the knee injury's not under my line of care --
Q. Okay.
A. -- so things like that.
Q. If it's a -- if it's an office specifically with yourself with one of your patients is that -- is that a note you'll have the responsibility to sign for?
A. Yep. Uh-huh.
Q. And, then, during your office visits, in the ordinary course of your practice, Doctor, do you conduct a physical examination?
A. Yes.
Q. All right. And in that -- is the physical examination also recorded in your treatment notes?
A. Yep.
Q. And, then, do you do -- do you do some sort of assessment and plan in your treatment notes in the ordinary course of your work?
A. Yes.
Q. Okay. And do you create these treatment notes in this fashion the same way each time, regardless of who the patient is?
A. No.

Q. Okay. Well, I'm just asking you -- and let me clarify.
As far as the process goes what, if any, changes are there from one patient to the next as far as recording treatment notes?
**A. Yeah, so, for instance, a patient may come in just for an X-ray check. I may not need to -- that might be just a radiograph -- radiograph report assessment and plan.**
Q. Okay.
**A. So that patient will not have Past Medical History, Social History, Family History, all that.**
Q. Okay.
**A. They may not even that much of an HPI.**
**There may be a patient that comes in for an injection. I don't have to go through the same, you know, note structure again. Maybe somebody doesn't have an X-ray, maybe -- you know, so those -- depending on the patient complaint there may or may not be portions of that examination or note that are written there.**
Q. Okay. So on some occasions there's a -- sort of a limited visit where you might not have to do a physical examination?



**A. Right.**
**Or other portions of it, yeah.**
Q. Okay. When you record the information in your treatment notes, Doctor, do you do so at or near the time that you visit with the patient?
**A. Yeah. So in my office, typically, I have -- I have a medical scribe who will -- who is in the room with me and records, to the best of their ability, the patient visit.**
**And, then, I will be, you know, responsible for kind of going through that note, and then I might, you know, I might dictate something in. And, then, I would then, you know, sign that note. It may or may not be that day.**
**Sometimes I'll -- sometimes I'll leave a note open-ended if I have to follow up with something, okay, I'm going to not sign this note because I've got to talk to so-and-so, and then I'll add the note and be done with it, that sort of thing.**
Q. Okay.
**A. So it's not always just, you know, see and sign.**
Q. Very well.
A couple more questions, Doctor, then



we'll get into your treatment of Ms. Hall specifically.
**A. Uh-huh.**
Q. Did you do anything specific to prepare yourself for today's deposition, Doctor?
**A. Just, you know, chart -- chart review, image review, main thing.**
Q. Okay. Have you testified in a deposition before, Doctor?
**A. Yep.**
Q. Before today's deposition, can you estimate how many times you've -- you've had to testify in deposition before?
**A. Two or three. I think two or three.**
Q. Okay. And those two or three occasions, were you testifying on behalf of a patient?
**A. On all -- on all occasions, yes.**
Q. Okay. Have you testified in trial before, Doctor?
**A. And I guess I'm not -- maybe I don't understand the difference between trial and deposition.**
Q. A trial is just the formal trial, you're in a courtroom in front of a judge and jury.



**A. Not -- not in a formal trial, no.**
Q. Okay. Do you do any expert litigation consulting work at all, Doctor?
**A. I will have some -- people will -- you know, attorneys will come and ask me on my opinion or this or that case, what do you think about this, that I think is not really in a deposition format. So I think that's what you're getting at.**
Q. Yeah. Let me just clarify.
Are those occasions where you're saying attorneys may come and ask opinions about a case, are those instances where they're asking about one of your patients?
**A. I've had both.**
Q. Okay. Both.
Okay. So sometimes you have -- have you had sometimes attorneys come to you seeking opinions as, like, a retained expert --
**A. Yep.**
Q. -- on an individual who's not your patient?
**A. Correct.**
Q. Okay. How often do you do that type of work where it's an opinion rendered on someone who is not your patient?

A. Probably once or twice a year.
Q. Okay. And how much do you charge for your time doing that type of work, Doctor?
A. Oh, that's a great question that I wish I knew --
Q. Okay.
A. -- the honest answer to.
I mean, all -- the -- I think it may have changed with the merger. We've got the new, kind of, med/legal department that -- that edits that.
Maybe I'm just revealing my ignorance in terms of charging when I say that I let my office staff do it and I try not to get in the middle of it, you know. I try to keep it all the same time.
Q. Okay.
A. I don't --
Q. Let me see if I can help --
A. Yeah.
Q. -- because it's not necessarily a test of your memory here.
A. Yeah.
Q. This was a fee sheet we received in this case --



A. Yep.
Q. -- pertaining to yourself.
Do you see this up on the screen?
A. Yep.
Q. Does this document refresh your recollection about what your charges are for various litigation-related services?
A. Yeah. So if you look at the top, that's -- that's our new merge group, the Kansas City Orthopedic Alliance.
Q. Okay.
A. And I would say as of, like, October 19th, that might have been -- that -- that merger just happened in July. So I may not have ever seen this document since the merger of this alliance, and then they formatted all of these charges group wide.
Q. Okay. So it sounds like as far as -- as far as you are concerned personally, Doctor, you don't set your own rates --
A. Correct.
Q. -- when it comes to some sort of litigation work?
A. Correct. That's done by our med/legal department to -- essentially, sets those for us.



So I don't know that I've ever seen this document before, but they set those rates and they send them out. And that's why, I mean, I kind of don't really even mess with it.
Q. Okay. And my next question, Doctor -- this is if you know, if you don't know that's okay just tell me -- but do you know whether your fees change when you're testifying in connection with someone who's actually your patient versus someone who is a -- not a patient and just a retained expert witness in a case?
A. I don't know.
Q. Okay. Very well.
So let me ask you this.
For today's deposition, are we being charged the $2,500 for the minimum of two hours?
A. I really don't know.
Q. Okay.
A. You know, again, maybe I should be paying more attention to this. Maybe this is why doctors have such a hard time with financial issues, but I don't know.
Q. That's okay. I just thought I'd ask.
MR. SMITH: So I'll mark that copy of the fee sheet as Exhibit 2 to the



deposition.
(Defendant's Exhibit No. 2 was marked for identification.)
BY MR. SMITH:
Q. And, Doctor, do you have a copy of your medical chart on the Plaintiff in this case, Barbara Hall?
A. Yeah, I do.
Q. Okay. Can you tell us, Doctor, what is the first date of treatment for Ms. Hall?
A. I have it down as three -- 3/9/20.
Q. Okay. So that's March 9, 2020?
A. March 9 -- yep.
Q. And what was your very last date of treatment with, Ms. Hall, Doctor?
A. That would have been 10/5/2020.
Q. October 5, 2020?
A. Yep.
Q. Okay. And on October 5, 2020, was that a visit where you conduct -- where you took past medical history, conducted a physical examination and provided a diagnosis?
A. Let me tell you, that would be a -- a history of present illness, physical exam and assessment and plan.

Q. Okay.
A. **So no past -- no past medical history was taken.**
Q. Does the copy of the chart you have in front of you, Doctor, contain any intake sheets that were obtained about Ms. Hall?
A. **I guess, what do you mean by intake sheets? Like...**
Q. Does your copy of the chart have -- have intake paperwork that was completed by Ms. Hall when she came to see you -- or, before she came to see -- March 9th of 2020?
A. **So a lot of the intake paperwork will be included in the note.**
**Like, for instance, on my note, 3/9/2020, a lot of the past medication history, medications, allergies, that sort of thing, that's on -- that is all from intake paperwork. It's not separate.**
Q. Okay.
A. **So it does include intake, you know, paperwork items.**
Q. Okay. Doctor, is the document you have in front of you that you're referencing a true, accurate and authentic copy of your treatment



records --
A. **Yes.**
Q. -- on of the Plaintiff -- I'm sorry -- the Plaintiff and your patient, Barbara Hall?
A. **Yes.**
Q. Okay. And, Doctor, do you recall -- do you specifically recall treating Ms. Hall?
A. **Yes.**
Q. And so, Doctor, if I could ask you, when Ms. Hall came to you for treatment on March 9, 2020, what were her presenting complaints?
A. **So, you know, main thing there would be pain within the wrist is -- is the main complaint.**
Q. Okay. And which wrist are we talking about?
A. **The right wrist.**
Q. All right. Did you take a Past Medical History on March 9, 2020, Doctor?
A. **Yep.**
Q. And what was that Past Medical History significant for?
A. **So for -- for me, it's most significant in the HPI in that she denies any heart or lung issues. Just a question to make sure that**



**she's, you know, seemingly fit for -- for anesthesia. I think that's the main thing that I was looking for.**
Q. Okay. So I've got my copy of the chart just up on my own computer here from on March 9th 2020, Doctor.
A. **Uh-0hu.**
Q. You refer to HPI. Just for clarity of the record's sake, that's the "History of Present Illness"?
A. **Yes, sir.**
Q. Okay. And the History of Present Illness on March 9, 2020, who took -- who took that information down?
A. **That would have been probably -- well, that's kind of -- that's probably my scribe --**
Q. Okay.
A. **-- who would have taken that down.**
Q. And who did your scribe obtain that information from?
A. **From either me -- kind of a conjunction of me and the patient.**
Q. Okay. The second paragraph in the History of Present Illness in your note reads, "Barb presents today with a chief complaint of



right wrist -- wrist fracture."
A. **Uh-huh.**
Q. "She reports she was on a cruise, and the first night, she got up in the middle of the night to go to the bathroom and the boat rocked and she flew into the shower stall and hit her wrist."
How did you obtain that information?
A. **That would have been from patient to me transcribed by my scribe.**
Q. Okay. And why was it important to record that information here on March 9th, 2020, in the History of Present Illness, Doctor?
A. **I just -- it's good to get to know -- know to the story, you know, what happened here.**
Q. Okay. Is it helpful to know the story for purposes of your treatment and care of Ms. Hall?
A. **I'm not sure that I -- I mean, to be honest, I'm not sure that exact mechanism of where and when it happened for her care right then and there, but I do like establish rapport and in basics, you just want to know what -- what the story was.**
Q. Okay.
A. **I'm really not sure how much how --**

**how much the details of that part of the HPI really matter in her overall care.**
Q. Okay. It goes on to state, from what I last picked up off reading that, "She was not seen by any provider on the ship, but she was seen at KCOI urgent care once she returned and had X-rays obtained with reported distal radius fracture."
Did you see where I read that, Doctor?
**A. Yep.**
Q. And where did you obtain that information?
**A. Same deal. That would have just been patient reporting to me, transcribed by my scribe.**
Q. Okay. And is it important for you to know whether or not the patient has been seen by a previous medical provider for the injuries she coming in complaining of?
**A. Yeah, think that's important to know.**
Q. What is KCOI Urgent care, if you know?
**A. That's called the -- it's the Kansas City Orthopedic institute. It's an orthopedic only hospital that has an urgent care for patients.**
Q. Okay. Is that a practice that's affiliated with your own?



**A. Yeah. So the -- many of the doctors who work at the hospital will also kind of be on -- you know, provide call coverage for that urgent care.**
Q. Okay. And, then, below that, you begin the Past Medical History section of the note --
**A. Uh-huh.**
Q. -- of March 9th, 2020, correct?
**A. Uh-huh.**
Q. In there, you do note diabetes.
**A. Uh-huh.**
Q. Did the diabetes, in this particular case of treating Ms. Hall, have any impact upon the care that you provided?
**A. Not that I'm -- not that I'm aware of.**
Q. Okay.
**A. I think diabetes can have a -- have a role to play and if somebody has it --**
Q. Okay.
**A. -- they certainly can -- it can hinder wound -- wound healing delayed. But I just can't recall anything where diabetes was an issue.**
Q. Do you have any opinions in this case, Doctor, about whether diabetes had any impact on



this distal radial fracture of Ms. Hall's?
**A. I don't think so.**
Q. Okay. Did you perform an examination of Ms. Hall on March 9, 2020, Doctor?
**A. Yes.**
Q. And following your -- your examination, Doctor, did you formulate a treatment plan?
**A. Yes.**
Q. And what was your plan?
**A. So plan at that point in time was to proceed with operative fixation of her distal radius.**
Q. Okay. What -- when did you take Ms. Hall into surgery, Doctor?
**A. I think it was the next day.**
Q. Okay. Is the operative note a part of your chart there?
**A. Yes.**
Q. Can you confirm, please, what the -- the date of the surgery was?
**A. 3/10 -- or March 10, 2020.**
Q. Okay. Terrific.
And what procedure did you perform, Doctor, again?



**A. Yep. That's called an open reduction internal fixation of the distal radius.**
Q. All right. And following -- well, let me -- let me ask you this.
When do you first evaluate the -- whether or not surgery has been successful?
**A. I think it's a -- I mean, that's a -- that's a constant evaluation --**
Q. Right.
**A. -- in terms of you're checking success at all levels.**
**You know, within the OR, you're looking at the X-rays and determining whether or not you've got good fixation. So yeah, I don't know that there's really a stop point at which you say, okay, this has been a success or not.**
Q. Okay.
**A. That's a very fluid concept.**
Q. Let me rephrase the question.
After you completed the procedure on March 10, 2020, were you satisfied with the result?
**A. Yeah. I mean, I think she has a very difficult fracture in terms of the -- kind of the plate positioning and alignment.**
**So are there aspects of her fracture**

**fixation that -- would I like to be better? Yes.**
**Is it -- is it successful? Well, yeah, I think it's an acceptable treatment. But there are aspects of her -- what we would call her construct that I wish were better.**
**Q.** Can you explain? I'm kind of curious there. Can you explain what you mean that there are aspects of her construct that you wish were better?
**A. Yeah. So her fracture is a very difficult fracture in that it's very far near the end of bone.**
**Q.** Okay.
**A. To fix that with a plate and screw successfully, you have to put the plate, then, very near the end of the bone. And when you put the plate very near the end of the bone, it can be -- the plate can be prominent and so you'd rather it not be prominent.**
**And so when I looked at her X-rays at her postoperative visit, I'd say, yeah -- yeah, I wish it was a little bit -- but I think it's more of a nature of her injury than it is, you know, craftsmanship.**
**Q.** Okay. Other than the nature of her



injury, as you explained, were you otherwise satisfied -- satisfied, as the surgeon, with her result?
**A. Yes.**
**Q.** Let me ask you this.
I'm looking at your chart and actually, it looks like on March 9, 2020, there was -- there was a comment about return to work status.
**A. Uh-huh.**
**Q.** Was -- was Ms. Hall released to return to her work?
**A. With a -- yes, with a weight restriction.**
**Q.** Okay. And she was permitted to go back to work when?
**A. That would have been on March 11th.**
**Q.** Of 2020?
**A. Of 2020.**
**Q.** Okay. How long did you keep the one pound weight restriction in place for -- for the right upper extremity?
**A. I think it would have been about six weeks probably. I mean, on March -- on April 21, 2020, her work duty says able to return**



**to full work.**
**Q.** Okay. And, Doctor, what was your post-surgical plan of care for Ms. Hall?
**A. So we typically have them treated in a -- well, initially, the postoperative pain and a dressing. We take that dressing off at around the two-week point.**
**We get them going on hand therapy at that point in time for progressive range of motion and strengthening.**
**And the -- ultimately, usually around six weeks postoperative, we let them kind of advance back into their -- their full activity and I -- and I usually shoot for around three months to kind of be through the entire postoperative course.**
**Q.** Okay. Did Ms. Hall, in this instance, follow your recommendations?
**A. As far as I'm a -- as far -- as far as I'm aware, yeah.**
**Q.** Okay. And when is the next time you saw Ms. Hall in the -- in your clinic for an office visit after her surgery?
**A. So that would have been March 23.**
**Q.** Okay. And what was the purpose of that visit on March 23rd, 2020?



**A. That visit is for, you know, wound check, making sure that she's healed up okay, X-ray check to confirm that the alignment has been staying satisfactory, and then, you know, to provide further guidelines in terms of therapy, activity limitations.**
**Q.** Okay. And following your review of X-rays taken postsurgery, how -- how did the alignment of the repair look?
**A. Yeah, very -- very good.**
**And I just note on the radiographs that she has that volar plate that's a little prominent due to the fracture being so distal.**
**Q.** Okay. Did -- did Ms. Hall exhibit any post-surgical infection?
**A. Not at that time.**
**Q.** Any or abnormal complications following surgery that you picked up on on March 23rd?
**A. No.**
**Q.** All right. When is the next time you saw Ms. Hall in your office for a visit, Doctor?
**A. On April -- April 20th.**
**Q.** Okay. Was this another postoperative follow up?

37

A. **Yes.**
Q. Were there any significant findings from the visit of April 20, 2020?
A. **Early bone healing, you know, which is a positive finding.**
**And at that point in time, she still had -- we started to realize -- recognize that she wasn't getting full ability to go palm up, which we call supination.**
Q. Okay.
A. **But everything else -- you know, incision still looked good, X-rays looked good.**
Q. Okay. No infection?
A. **No.**
Q. You talked about the supination.
How was Ms. Hall in the other -- in the other areas of range of motion?
A. **So, you know, by part -- flexion extension and pronation were fairly good.**
Q. Okay.
A. **Those looked like they were going well.**
Q. At this point, I think it's six -- about six weeks after her surgery.
Did you adjust any of the weight restrictions on her -- on the lifting, I should say, restrictions?

38

A. **That's when we put -- essentially, took off any weight restrictions.**
Q. Okay. Doctor, when was your next visit?
A. **That would have been June 15, 2020.**
Q. Before -- before we get there, it looks likes there's a note about return to work on April 21, 2020, correct?
A. **Uh-huh. Yes.**
Q. And what does -- what does the recommendation regarding work there on April 21, 2020 indicate?
A. **Full -- release to full work.**
Q. Okay. Any restrictions on her at that point?
A. **No.**
Q. And your next office with her was when again, Doctor?
A. **June 15, 2020.**
Q. Okay. Were there any significant findings related to the wrist on June 15th?
A. **So at that point, she continued to have poor supination and she began to start having some pain on the small finger side of her wrist, which we call the ulnar side.**

39

Q. Okay. Were there any other pain complaints besides the one you just noted?
A. **No.**
Q. How was range of motion and the other claims besides supination?
A. **Not noted -- it's not noted there in the -- in the exam portion.**
Q. Okay. Did you recall take X-rays in June?
A. **Yes.**
Q. And how did the X-rays look?
A. **Good.**
**You know, I do note, at that point, she -- with her having pain on the ulnar side of the wrist, I -- I did note that she is what we call slightly ulnar positive. So her ulna is -- appears slightly longer than her radius bone.**
Q. Okay. What, if anything, did the X-rays tell you, Doctor, about the union of Ms. Hall's bones at this point?
A. **Yeah, so it looks united. She may have a little portion of it on the thumb side that's not completely united, but it looks united.**

40

Q. Okay. Any signs of infection or other abnormalities?
A. **No.**
Q. And, Doctor, your next follow-up visit was when?
A. **Next follow up would have been July 13th of 2020.**
Q. Did the -- did the patient, Ms. Hall, have any complaints of numbness or tingling?
A. **Not at that time.**
Q. Did you again take some X-rays?
A. **Yes.**
Q. How did those look?
A. **They look -- they -- you know, fairly normal at that time, other than, you know, kind of pulling forth the prior imaging she still was probably ulnar positive at that prominent volar plate.**
Q. Okay. Is looks like a -- you -- an injection was provided to Ms. Hall at that point; is that right?
A. **Yes.**
Q. How many injections had she had at this point, if you recall?
A. **Just one, this one.**

**Q.** Okay. Did she have any follow-up cortisone injections?
**A. Are you asking did she have any subsequent cortisone injections?**
**Q.** Yes.
**A. Not that I'm aware of.**
**Q.** Okay. And, Doctor, when -- when was your very next follow-up visit with Ms. Hall?
**A. I believe we're up to August of 2020.**
**Q.** Okay.
**A. August 24th of 2020.**
**Q.** And in August of 2020, what were Ms. Hall's complaints, if any?
**A. So we were just checking up on her injection.**
**And, at that point in time, she had noticed that the injection was quite helpful in resolving the pain on that side of the wrist, but that she continued to have difficulty with the ability to fully supinate.**
**Q.** Okay. Was she having any difficulty in the other planes of range of motion?
**A. Not really verbalized. Looking at her exam, she has 30 degrees of extension, which is a little on the low side at that point.**



**Q.** Okay. Did you take X-rays again on -- in August?
**A. Not that I'm aware of, no.**
**Q.** Okay. And, Doctor, when was the next visit with Ms. Hall?
**A. On October the 5th, 2020.**
**Q.** All right. Is this the last -- very last time you saw Ms. Hall?
**A. Yes.**
**Q.** And in October 2020, what were Ms. Hall's primary complaints, please?
**A. So she had pulled back a little bit from the improvement on her injection, and she reported that she was using kind of a wrap on her wrist for support, and then she continued to lack that ability for full supination of the wrist, and continued to have tenderness on the -- the ulnar side of the wrist.**
**Q.** Did she have --
MR. HERNANDEZ: I'm sorry, over the what?
THE WITNESS: Ulnar side of the wrist.
BY MR. SMITH:
**Q.** Did you have any additional recommendations for Ms. Hall at that point in October of 2020?



**A. It was really kind of preparing her for, you know, possibilities of the future. Like, if she had continued to have ulnar-sided wrist pain, that might require additional treatment. Or if we start -- started to find that the flexor tendons were being irritated by the plate, that might require the plate being removed.**
**Q.** Okay. Had -- to your knowledge, has Ms. Hall had her surgical hardware removed?
**A. No.**
**Q.** And did you -- following your visit in October of 2020, did you ask Ms. Hall to come back and see you?
**A. We -- we wanted to kind of get a follow-up questionnaire just for kind of complete -- completeness.**
**She was having issues -- there's a question regarding impairment and things like that, and I -- we reached out to get her fill out what's called a QUICK DASH form.**
**Q.** Okay.
**A. And that was on -- that's -- I'm not sure when she finished it but that was imported on December 30th.**



**Q.** What -- what is QUICK DASH questionnaire?
**A. Yeah, a QUICK DASH is a patient-reported outcomes measure that is -- is kind of well -- well verified in terms of its applicability to the upper extreme in postoperative -- in really all patients with upper extremity complaints.**
**Q.** Okay. Sort of in lay terms, what -- what's the purpose of the form?
**A. Yeah, so it would be like -- it's applying a number -- trying to get to some sort of a number to score the -- the functionality of the patient's extremity, their arm and hand.**
**Q.** Okay. And the QUICK DASH form is completed by whom?
**A. By the patient.**
**Q.** Does the physician play any role in the completion of the QUICK DASH form?
**A. The -- I would -- it's in the instructions for the QUICK DASH, but we typically, you know, just ask them to answer regarding one limb, you know, for, like, the -- the recent history, the last week, for instance, how -- how -- you know, answer as if you're answering for the**

last week.
**Q.** Okay. So -- well, is it the -- is the patient relied upon to self-report on the --
**A. Yes.**
**Q.** -- QUICK DASH form?
**A. Yes.**
**Q.** Okay. Does -- does the physician provide any opinions on the QUICK DASH form in their own right?
**A. No.**
**Q.** Okay. And I think I saw in -- in one of your letters, Doctor, that there was a score of 50 on the QUICK DASH form for Ms. Hall?
**A. Yes.**
**Q.** All right. And what does 50 mean?
**A. Oh, you know, a normal QUICK DASH is going to be, you know, below 20 to 30. We'd consider that to be normal.**
**So when somebody reports a QUICK DASH score of 50, then that's showing they have some disability of that arm.**
**Q.** Okay. How high do the numbers go on the QUICK DASH score scale?
**A. I think 100.**
**Q.** Okay. So if you're at 100, what does



that mean? Can you put it into context?
**A. I mean, yeah -- I mean, just that you're -- it think it's showing that you have a severe disability.**
**Q.** Okay.
**A. It doesn't mean that your arm is, you know, functionless or something like that. It just means that that's a more severe disability --**
**Q.** Okay.
**A. -- as reported by the patient.**
**Q.** Very well.
Is there a copy of the QUICK DASH form in your chart?
**A. Yes.**
**Q.** Did you have Ms. Hall, as your patient, complete any other forms, similar forms?
**A. Not that I'm aware of, no.**
**Q.** Okay. In the typical course of your medical practice, Doctor, do you opine on things like future care needs?
Does that -- do you put that information into the medical records in the ordinary course of what you do?
**A. Yeah. I mean, I think for -- particularly, for a distal radius patient, if they**



**have any prominence of their hardware, I'm always going to tell them they need to keep an eye out for irritation of their flexor tendons as the hardware might need to come out.**
**Q.** Uh-huh.
**A. And then, you know, just in a case of -- if any patient has some sort of lingering issue, I like them to know what -- what's the next step going to be and then I like to comment on that in the chart so I can refer back to that.**
**If I get a phone call, I can say, you know, yep, we know about that, this is the plan.**
**Q.** Okay.
**A. So it's common.**
**Q.** And, Doctor, in the ordinary course of your medical practice, when treating a patient, do you typically assess the individual's impairment, if any, under American Medical Association Guidelines?
**A. Not necessarily under AMA, no.**
**Q.** Okay. So in this particular case you did provide a rating under the AMA for Ms. Hall, correct?
**A. Uh-huh.**
**Q.** And who asked to you do that?



**A. Let's see. I've got to look it up.**
**We were -- yeah, we received a request for that, and -- I think, in our chart, dated 8/25/2020, David W. Singer & Associates.**
**Q.** Okay. You received a letter from Ms. Hall's attorneys requesting that?
**A. Uh-huh. Well, I don't -- I mean, yeah. I mean, I'm assuming that they're representing the patient at this point in time.**
**Q.** Okay. Had you not received a letter from Ms. Hall's attorneys requesting an evaluation of permanency under AMA Guidelines, would you have ordinarily provided such a rating in the regular course of treating someone like Ms. Hall?
**A. Probably not. Maybe have gotten -- maybe we would have gotten a QUICK DASH but maybe not a -- I probably -- I wouldn't rate somebody unless I was asked to.**
**Q.** Okay. Did the letter requesting an evaluation from Ms. Hall's attorneys ask you to do anything else beside provide an opinion on permanent impairment?
**A. Oh, discussed things like, you know, the future care that might be needed, you know, if -- will there would be any limitations in the**

**future, you know, and in what way her current limitations were related to her original injury, that sort of thing.**
**Q.** Okay. Doctor, I'm sharing my screen now.
I have a one-page document --
**A. Uh-huh.**
**Q.** -- that's -- that's signed by yourself at the bottom.
**A. Uh-huh.**
**Q.** Is this what you produced in response to the request of Mr. Singer's office?
**A. What's the -- what do you have as the date on that?**
**Q.** I have 12/29.
**A. I think so, uh-huh.**
**Q.** So this looks like a true and accurate copy of your response to Mr. Singer --
**A. Yes.**
**Q.** -- about Ms. Hall?
**A. Yes.**
**Q.** Do you see here that you -- you provided estimates about the cost of various future care?
**A. Uh-huh.**



**Q.** In the ordinary course of your practice as a doctor, Dr. Unruh, would you provide the patient with cost estimates if they were just someone you were treating?
**A. I would only -- it would depend on if they had insurance. If they were a private pay, they may want to know the cost of something like that but, otherwise, no.**
**Q.** Okay. In this letter, Doctor, you state, "The patient will continue to have physical limitations in terms of heavy lifting, grip strength, decreased supination, decreased wrist flexion and extension."
Do you see where I read that?
**A. Uh-huh.**
**Q.** In the course of your treatment of Ms. Hall, did you ever test her grip strength -- her grip strength using a denominator?
**A. I wouldn't have done that in my office, no.**
**Q.** You didn't perform that testing?
**A. Not in my office, no.**
**Q.** Okay. Did you ever do that testing on Ms. Hall?
**A. I will do it if -- like, I'll rely on,**



**a lot of times, on my hand therapists to do that --**
**Q.** Okay.
**A. -- but I typically don't do it -- a grip test.**
**Q.** Did any -- did any of your hand therapists, to your knowledge, in this case, specifically test Ms. Hall's grip strength left compared to right?
**A. I'd have to -- I'd have to get access to their records to confirm or deny it. I don't know.**
**Q.** So sitting here today, you don't know?
**A. No.**
**Q.** Okay. When you say physical limitations in terms of heavy lifting, have you given Ms. Hall any specific weight limit as far as lifting restrictions?
**A. No.**
**Q.** Is Ms. Hall capable of lifting objects to her tolerance?
MR. HERNANDEZ: Form.
THE WITNESS: That would be the definition of lifting to your tolerance. You know, like, you just asked me if they would -- if she would be able to lift to



her tolerance, yes. The answer would always be yes.
BY MR. SMITH:
**Q.** Well, let me ask you this.
In your medical opinion, Doctor, is Ms. Hall capable of lifting, you know, what -- well, strike that.
In your opinion, she -- you don't have a specific restriction -- weight limit restriction for her?
**A. No.**
**Q.** Okay. Doctor, today is December 17, 2021. Have you had any consultation at all with Ms. Hall since your last visit with her in October of 2020?
**A. We did the QUICK DASH questionnaire, so that was done, you know, after my meeting with her.**
**But that was -- other than that, I haven't had any direct interactions with her that I'm aware of.**
**Q.** Okay. Have you had any phone calls with the patient, Ms. Hall, since October of 2020?
**A. Just that QUICK DASH questionnaire, and I think that that would have been my medical**

**assistant who did that.**

**Q.** Very well.

Have you had any phone or Zoom conferences with any of Ms. Hall's attorneys?

**A. Yeah. I mean, I had a -- I had a phone conversation with her counsel, I don't know, maybe a couple weeks ago --**

**Q.** Okay.

**A. -- a month ago or so, just in preparation for -- to let me know this was coming and would I be willing to, you know, be an expert --**

**Q.** Okay.

**A. -- you know, witness or, you know...**

**Q.** I don't really want to know too many specifics about what you spoke about, okay?

**A. That's fine.**

**Q.** I'm not really asking that.

I just wanted to know how long did you -- well, who was it that you spoke with from Plaintiff's legal team?

**A. I can't remember who -- which -- which one specifically on the phone.**

**Q.** Okay. Was it Mr. Hernandez?

**A. I don't know. I can't -- I can't -- I can't remember the exact names of her...**



**Q.** Was it Mr. Peter Walsh?

**A. These would all -- these would all be I don't knows.**

**Q.** Okay. Do you recall how long the phone conference was that you had with one of Ms. Hall's legal representatives?

**A. Five, ten minutes. Five minutes. Not that long.**

**Q.** Okay.

MR. SMITH: I'm going to mark that December 2020 note we just looked at as Exhibit -- I think it's Exhibit 3, following the CV and the fee sheet.

(Defendant's Exhibit No. 3 was marked for identification.)

BY MR. SMITH:

**Q.** I'm going to show another correspondence here on the screen now, Doctor --

**A. Uh-huh.**

**Q.** -- dated November 14, 2021.

**A. Uh-huh.**

**Q.** This is a two-page document.

**A. Uh-huh.**

MR. SMITH: We'll mark this as Exhibit 4.



(Defendant's Exhibit No. 4 was marked for identification.)

BY MR. SMITH:

**Q.** Do you recognize what you're looking at on the screen, Doctor?

**A. Yes.**

**Q.** How did you come to author this letter, Doctor?

**A. That was as a result of that phone conversation. That's where this came from.**

**Q.** Okay. Did you review the Plaintiff's deposition that was taken in this case?

**A. No.**

**Q.** Did you review any deposition testimony that was taken in this case, Doctor?

**A. No.**

**Q.** What did you -- what did you look at -- well, what, if anything, were you provided, Doctor, in order to produce this November 14, 2021, letter?

**A. I mean, this was pretty much out of my chart.**

**Q.** Okay. Did you receive anything from Ms. Hall's legal team to assist you in drafting this letter of November 14, 2021?



**A. No, the -- no.**

**Q.** Okay. In the letter, Doctor, you state, in the third paragraph, "Her injury was sustained on March 1st, 2020. She tripped over a step on the floor of a cruise ship, landing upon the right upper extremity resulting in her distal radius fracture."

**A. Uh-huh.**

**Q.** Did you see where I read that?

**A. Uh-huh.**

**Q.** Where did you obtain that information, if you recall?

**A. So we had mentioned before that she presented to the urgent care -- Kansas City Orthopedic Institute Urgent Care on March the 6th.**

**Q.** Okay.

**A. So I'm -- having access to that and having access to my chart, I'm just kind of putting those together.**

**Q.** Okay. I wanted to ask you about -- I'm moving down to this paragraph that states, "The patient's six-week follow-up appointment was on April 20, 2020 via telemedicine."

Do you see that paragraph, Doctor?

**A. Uh-huh.**
Q. So this was a telemedicine appointment, but you state that, in the next sentence, "Plaintiff's supination was 30 degrees."
How did you --
**A. Yes.**
Q. How did you obtain that?
**A. It was by -- by video.**
Q. Okay. So this was -- was this like a Zoom teleconference on April 20, 2020?
**A. Yeah. This was in the middle of the, you know, COVID stuff --**
Q. Okay.
**A. -- so we didn't really have access to the clinic like we would typically have access to them. So we had to do what we had to do to get people taken care of.**
Q. So in the context of this Zoom meeting, Doctor, can you explain how you did evaluation, actually evaluate range of motion --
**A. Yes. So --**
Q. -- considering you're obviously not in the examination room with her?
**A. Yeah. So you'd have a -- you'd have a -- I mean, I'll just do it right here.**



**So I make sure that my patient is there and I can use the video to check their, you know, flexion or extension, I can monitor their supination, pronation through, you know, Zoom video (indicating).**
Q. Okay. So -- so doing it through Zoom, you have to ask them to do the motions or show them what motions you would like them to try to attempt?
**A. Yeah. Usually, I'll just say would mind -- you know, put your elbows at your side and I would show them and -- just because they don't know what supination is usually (indicating).**
Q. Okay. So going back to pre-COVID times, does that differ how you would take range of motion in the ordinary course when you're physically present with the patient?
**A. Surprisingly not.**
Q. Okay. When you ask them to perform the motions for you, Doctor, is that consider active or passive range of motion?
**A. Usually, that's going to be active motion.**
Q. Okay. What's the difference between the two, active and passive range of motion?
**A. So active is when they are firing**



**their own muscles to move their own joints.**
**Passive is when a provider is using the provider's muscles to move their joints.**
Q. Okay. And in the course of your practice when treating an injury like the one Ms. Hall has, do you perform -- or do you conduct passive range of motion --
**A. Yeah, there are --**
Q. -- when evaluating --
**A. There are times to consider passive range of motion versus just active, but typically I -- I just -- I'll go with active first.**
Q. Okay.
**A. And then, yeah, in -- with the Zoom, I couldn't do a passive in Zoom, unless I have a family come in and do it, and then I would -- I wouldn't really know how much force is being applied, so I don't really think it's accurate.**
Q. Okay. Does active range of motion, Doctor, depend on patient's good faith effort to perform the motions?
**A. Yeah.**
Q. The next paragraph we're talking about, the June 15, 2020, visit; is that correct, Doctor?



**A. Yes.**
Q. Did Ms. Hall exhibit improvement in the supination?
**A. Yes.**
Q. How much improvement did she experience from April to June 15, 2020?
**A. 15 degrees.**
Q. At the top of the next page of the report, where it starts to state, "At the patient's six month postoperative visit on August 24, 2020," what do you mean by, "She reported 80 to 90 percent improvement of her ulnar-sided symptoms"?
**A. So we had given her the cortical steroid injection the visit before, and so she's reporting 80 to 90 percent improvement from her symptoms the prior visit.**
Q. Okay. In the -- in the following paragraph, it looks like -- well, it states that there was a postoperative -- perhaps a, "Postoperative visit December 5, 2020."
Is that a typo?
**A. I'm wondering if that's supposed to be October 5, 2020.**
Q. Okay. Could you -- could you check your chart just to make sure there's not a

December 5, 2020, visit?
**A. There is not.**
Q. Okay. So this -- the December 5 reference must be -- must be referring to the October 5 visit?
**A. Yes.**
Q. Okay. Very well.
Is this around the time you got the DASH score from Ms. Hall?
**A. I would have got -- we get the DASH score later --**
Q. Okay.
**A. -- like, I think, around December.**
Q. I see that.
**A. Uh-huh.**
Q. Thank you.
You note here, "Potential future medical care following this type of injury was provided in my letter dated 12/29/2020."
That's a -- is that a reference back to the previous exhibit we looked at?
**A. Yes.**
Q. Okay. All right. So you're just -- you're just reprinting the information here in this November letter that you already provided us,



correct?
**A. Yes.**
Q. Okay. As stated here, it states again, "The patient may require further intervention on behalf of this wrist injury. These procedures might include, but are not limited to, consideration of hardware removal, wrist arthroscopy, triangular fiber cartilage repair or debridement."
Do you where I'm looking at?
**A. Yes.**
Q. Okay. Are these procedures at this point -- well, can you tell me when in the future these procedures might be required?
**A. No, not really. I don't know when they would be.**
Q. Okay.
**A. Like, if that's somewhat -- that can be --**
Q. Okay. At this point in time, is there any possibilities --
**A. Yes.**
Q. -- as far as future care needs?
MR. HERNANDEZ: Form.
THE WITNESS: Yes.



BY MR. SMITH:
Q. Doctor, I'm sorry?
**A. What was your question?**
Q. My question is, sitting here today, is it your opinion that these future care needs are possibilities?
MR. HERNANDEZ: Form.
THE WITNESS: Yes, these are -- these are possibilities.
BY MR. SMITH:
Q. Okay. So we've looked at your letter of December 29, 2020, and we've looked at your letter here of November 14, 2021.
**A. Uh-huh.**
Q. Okay.
MR. HERNANDEZ: And I'm sorry, Teresa, what exhibit is this letter here, November 14, 2021, going to be?
THE STENOGRAPHER: It should be Number 5.
MR. SMITH: Okay. So this -- November 14th letter is Exhibit 5.
BY MR. SMITH:
Q. My question to you, Dr. Unruh, is are these -- do these two letters reflect all of the



opinions in this case that you have with respect to your patient, Barbara Hall?
**A. I guess I don't understand that -- that question.**
Q. Well, do you -- well, let me ask you this.
Are you providing medical opinions on your patient, Barbara Hall, in this case?
**A. Am I -- I guess I just don't -- am I applying medical opinions?**
Q. Right.
Are you -- are you providing any medical opinions on behalf of Barbara Hall in her case that we're other obviously to talk with you about today?
MR. HERNANDEZ: Form.
THE WITNESS: I guess I -- I'm willing to provide opinions that are -- that are, you know, asked about, I guess, but...
BY MR. SMITH:
Q. Okay. What -- what do you consider this November 14, 2021, letter?
**A. That letter? I consider that to be a summary of her care, a, you know, statement of her status at the most recent visit with her, and**

**potential expectations of the future.**
**I don't -- I would not claim that that letter is all inclusive of all information from the patient's chart or you know...**
**Q.** Yeah.
**A.** **Right.**
**Q.** Okay. Yeah, my question's not that this November 14th letter encapsulates everything that you observed during your treatment of Ms. Hall, but does this November 14th letter contain any medical opinions that you may have about Ms. Hall?
MR. HERNANDEZ: Objection to form.
THE WITNESS: I guess -- I guess I'm not understanding what the question -- I'm not following -- sure of the definition of the medical -- medical opinion. This has opinions in it.
BY MR. SMITH:
**Q.** Okay.
**A.** **I guess, it has conclusions -- you know, my thoughts on the case, but by no means would that be considered exhaustive.**
**Q.** Okay. Well, what -- what -- what particular opinions have you not included in this



November 14, 2021, letter?
MR. HERNANDEZ: Form.
THE WITNESS: Oh, man, I mean, that -- that list could be endless. I mean -- yeah, I don't -- I don't -- I'm not...
BY MR. SMITH:
**Q.** Okay.
**A.** **That's kind of asking me to give you an entire break down of everything I know about distal radius fractures, and her care, and TFCC and how likely that is or unlikely that is or...**
**Q.** Okay.
**A.** **You know, there's a lot of opinions that I've never asked to provide that I'm sure could be a part of my opinions on the case, but I don't really know.**
**Q.** Let me rephrase the question, then, that based -- your answer may be will help us.
**A.** **Yeah.**
**Q.** Based upon what you've been asked to provide --
**A.** **Yeah.**
**Q.** -- Dr. Unruh, does the November 14th letter here reflect, at this stage, a complete set of what your medical opinions are in this case



involving Ms. Hall?
**A.** **Still probably no.**
**Q.** Okay.
**A.** **I mean, it just -- it just -- this just reflects the, you know, the -- what I was -- you know, what I was -- what I was asked to come -- to put in the letter, a review of the history. By no means is that exhaustive.**
**Q.** Okay. But -- but sitting here today, can you tell me any additional opinions that you do hold, as we sit here talking today, on December 17th, 2021?
**A.** **I mean, again, I don't -- I don't really have them until, I guess, I'm asked the question about -- about them.**
**Q.** Very well.
Okay. I just have a few more questions and then I'll -- I'll wrap up my part here.
**A.** **Uh-huh.**
**Q.** Okay. Doctor, so we looked at that November 14th letter, I had another question about that, I realized. Let me just pull that up or sake of convenience.
On the second page of your



November 14th letter, Doctor, you state -- sorry, let me find it here.
Here we go.
I'm sorry. Let me correct myself.
Page one, the second paragraph, you state, "First, within a reasonable degree of medical certainty, Ms. Hall's distal radius fracture of the right upper extremity is secondary to her injury sustained while on a cruise ship on March 1, 2020."
Do you see where I read that?
**A.** **Uh-huh.**
**Q.** Okay. So besides the distal radius fracture that you talk about there on March 1st, 2020, did Ms. Hall, in your opinion, suffer any additional injury between the -- the date of the fall March 1st, 2020, and your first visit with her on March 9, 2020?
MR. HERNANDEZ: Form.
THE WITNESS: Not -- not to my knowledge.
BY MR. SMITH:
**Q.** Okay. So let me ask -- let me ask that question another way just to make sure.
What other injuries, Dr. Unruh, if

any, did Ms. Hall suffer between the distal radius fracture of March 1st, 2020, and the first time you saw her on March 9, 2020?
A. What other injuries? I mean -- I mean, I guess, it kind of -- there is -- there's -- I guess, I'm not sure this would be considered an injury.
Like, you know, if you have a -- if you have a broken arm, I can't account for every single thing that was done for that broken arm from the time that she injured to the time she saw me.
So she could have had it -- there's a lot of things that could have happened that I don't know about.
Q. Okay.
A. How was it treated initially, was it in a splint, was it casted -- I know it -- I know it wasn't casted -- was it elevated, what sort of advice was she given to that -- I could see how somebody could look at those sorts of things and say well those are actually injuries to the patient.
And not knowing those, she could have sustained other types of injurious, you know, injuries from the time that she was injured to the



time she saw me.
Q. Uh-huh. Okay.
A. Did she have another fall that I'm aware of no? But one could consider, you know, either a delay in treatment or inappropriate initial treatment or as, you know, injurious to the patient --
Q. Okay.
A. -- I guess -- yeah.
MR. SMITH: Sorry, I'm going to pause here while I have some janitorial assistance.
BY MR. SMITH:
Q. Okay. Doctor, so given what you've just stated, is it your testimony you don't know whether or not any of that occurred before you saw Ms. Hall on March --
A. Yeah.
Q. -- 9, 2020?
MR. HERNANDEZ: Objection to form.
THE WITNESS: I don't know if any of that occurred.
BY MR. SMITH:
Q. Doctor, you -- you took Ms. Hall into surgery, as you told us earlier, on March 10, 2020,



right?
A. Yeah.
Q. Okay. How many days after Plaintiff's alleged fall on the cruise ship was that?
A. That would have been ten days.
Q. Okay. Doctor, is a -- is ten days -- well, can a surgeon, such as yourself, Dr. Unruh, still achieve a good surgical result a distal radius fracture, such as Ms. Hall's, with a ten-day window within the initial injury and the surgery?
MR. HERNANDEZ: Form.
THE WITNESS: Yeah, you can.
BY MR. SMITH:
Q. Okay. Is there any medical literature you're aware of, Doctor, that -- that indicates ten days is too much of a delay to perform the open reduction internal fixation surgery when you got ten days between initial injury and surgery?
A. No, there's not a specific article that I can look at but, I think, in general, time to injury to fracture care is seen as important for a good outcome.
Q. Okay.
A. I mean, I think it's well reflected on the fact that we saw her on the 9th and we operated



on her the next day.
Q. Okay. Obviously, Doctor, I represent Carnival Cruise Line, so I needed -- I wanted to ask you: Do you have any criticisms of anyone that was working on the Carnival Cruise Line ship that Ms. Hall was traveling on?
MR. HERNANDEZ: Objection to -- objection to form.
THE WITNESS: Same thing. I don't know details of her care on the ship, so I can't really be critical of them.
BY MR. SMITH:
Q. Okay.
A. It doesn't mean I'm not critical of them, it means I just don't know.
Q. Okay. Doctor, the November 14th letter we have up on the screen here, were you -- were you -- you paid for your time in drafting this letter?
A. I don't know.
Q. Okay.
A. We're back to that pay thing and I -- now I just feel bad not knowing.
Q. Well, that's okay.
Let me ask you this. Again, it's if

you know:
**A.** **Yeah.**
**Q.** When you do when you do a letter like that -- well, when you take on a case that involves some sort of litigation and -- and you're doing work pursuant to that fee sheet you saw earlier --
**A.** **Uh-huh.**
**Q.** -- do you get a portion of the fees yourself?
**A.** **I think so, yeah.**
**Q.** Is there accounting or any invoice that -- that you have access to that would show what you've been paid for any and all work on this particular case on behalf of Ms. Hall?
**A.** **I could. I -- I -- maybe. I don't know.**
**Q.** Okay. Do you have access to it as you sit here today?
**A.** **I can -- do you want me to look? I can look --**
**Q.** Well, I don't want you to tear apart -- necessarily tear apart the office obviously --
**A.** **No, no, no, no, no.**
**Q.** -- but if it's something you have --



if you have ready access to it, then that's fine. But if not, maybe you can ask someone after the deposition and we can get that information.
**A.** **No, yeah, I mean, I -- I have a conference call payment of $250 --**
**Q.** Okay.
**A.** **-- $250, and I have a deposition -- it looks like a deposition, at least a bill for $2,500.**
**Q.** That one my office is paying for your time.
**A.** **So you know about that one.**
**Q.** Yeah.
The $250 -- the $250, Doctor, that's for a telephone conference you said?
**A.** **Conference call, uh-huh.**
**Q.** Okay. Who was that conference call with?
**A.** **I think that's the one that we noted before --**
**Q.** Okay.
**A.** **-- with -- with her attorney.**
**Q.** That was the conference call with Plaintiff's legal team?
**A.** **Yes.**



**Q.** Okay. And for a $250 call, how much time does that take up?
**A.** **I -- I don't know. I think we do, like, a -- I think it's a flat fee for a certain amount of time, whether it takes that time or not.**
**Q.** Okay. Do you know how much --
**A.** **I think that's how it works.**
**Q.** -- time the $250 would be for?
**A.** **No.**
**Q.** Have you had any other phone conferences, besides the one you've already told us about, with Plaintiff's legal team?
**A.** **I don't -- I don't think so.**
**Q.** All right. Have you ever been retained as a medical expert witness on behalf of a defendant or some party that was defending against an injury claim?
**A.** **Not in a deposition, but only in -- what we had talked about before, you know, having a conversation on is this a -- is there a case here, is there not, what's your thought on it --**
**Q.** Okay.
**A.** **-- things I should be looking out for, you know, that sort of thing.**
**Q.** All right. Very well.



MR. SMITH: All right. Dr. Unruh, I don't have any other questions for you at this time.
Thank you.
THE WITNESS: You're welcome.
MR. HERNANDEZ: Let's go off the record for a second.
MR. SMITH: I'll be back in two minutes. I'm just going to get a glass of water.
THE VIDEOGRAPHER: We're going off the record at 6:19 p.m.
(A recess was held.)
THE VIDEOGRAPHER: We're going back on the record at 6:23 p.m.
MR. SMITH: Okay. I just wanted to briefly clean up a housecleaning issue with the exhibits.
Exhibit 1, for me, the Defendant was the Doctor's CV.
Exhibit 2 was the Doctor's rate sheet.
Exhibit 3 was the December 29, 2020, letter that Dr. Unruh authored.
Exhibit 4 is his November 14th, 2021 letter.

And Exhibit 5 -- I would ask to mark as Composite Exhibit 5, the chart that -- the current version of the chart, which we requested via subpoena from Dr. Unruh's office.

Dr. Unruh, if at the end of deposition, please, if you'd advise us who we can be in contact with to get a full copy of that chart, please?

THE WITNESS: Sure.

MR. SMITH: Thank you.

(Defendant's Exhibit No. 5 was marked for identification.)

CROSS-EXAMINATION

BY MR. HERNANDEZ:

Q. Good evening, Doctor.

You and I have never met face-to-face, right?

A. **Correct.**

Q. Okay. And where is -- where's your practice located?

A. **In Leawood, Kansas.**

Q. And what is the address there?

A. **3651 College Boulevard.**

Q. Okay. What is your medical specialty,



Doctor?

A. **It's hand and upper extremity surgery.**

Q. You're an orthopedic surgeon?

A. **Yes.**

Q. And so the hand and upper extremity, is that a subspecialty of sorts?

A. **Yes.**

Q. Okay. And, if you would, tell the jury generally what types of patients you see in your practice.

A. **Most common things going to be carpal tunnel syndrome, cubital tunnel syndrome, fractures, tendon injuries, arthritis within the hand, wrist, or elbow.**

**That's gonna -- that's probably gonna take about 80 percent of it.**

Q. Okay. And I -- I think you've just touched upon this, but within that 80 percent, you see folks that have injuries to the hand, injuries to the upper extremities?

A. **Yes.**

Q. Okay. Tell us, if you would, a little bit about your education and training.

A. **So went to University of Kansas for undergraduate school, majored in chemistry and**



**philosophy there.**

**And then my medical school is at Mayo Clinic in Minnesota, and then my residency in orthopedic surgery at Vanderbilt, and my hand fellowship was at the Indiana Hand Center in Indianapolis, Indiana.**

Q. And how long was your fellowship?

A. **It was a one year -- hand fellowships are pretty much all one year.**

Q. And your residency, how long was that?

A. **Five.**

Q. And how long have you been in private practice?

A. **Seven years.**

Q. And where are you licensed?

A. **Kansas.**

Q. Have you board certified?

A. **Yes, in orthopedic surgery with a certificate of additional qualification in hand surgery.**

Q. What year did you become board certified?

A. **Oh, I'm thinking it's '15.**

Q. I didn't mean to stump you with that one. Okay. That's fine.



And if you would, just generally, for the jury's benefit, what does it mean to be board certified as a physician?

A. **So specifically for orthopedic surgery, to be board certified mean -- would mean that you would have graduated from an accredited medical school and residency.**

**Orthopedic board certification then also requires, at least during my certification process, requires an approximately six-month review of your orthopedic cases, to which you take that to an orthopedic board, which is -- which are orthopedic surgeons tenured in orthopedic surgery, who then review your cases, X-rays, charting, follow up, outcomes; and then they are the panel that then finally deems you as eligible for board certification.**

**And then that's also -- along with an orthopedic examination, you have to take a board exams that's a written test that you have to get a certain percentage correct on.**

**The combination of the test plus the -- that interview and -- and case-reporting process is what you go through to become board certified.**

**Q.** Got it.

And remind me, in orthopedics, is the board certification due for renewal every so often?

**A. So that's -- that's changed. So they now --**

**Q.** Okay.

**A. -- do a -- kind of a ten-year continued maintenance plan where you, over the ten-year period after you're board reviewed, you kind much do a -- kind of a yearly examination and review of critical materials. And then, I believe, at the end of that they do a more paired down case review.**

**My maintenance -- what's called the maintenance of certification was a little bit delayed because after I did my board certification, I did my -- essentially, my hand certification, which was kind of a whole other process, but that's in -- that's in flux.**

**So there's now this maintenance thing where you kind of do it over -- over time.**

**Q.** Understood.

So do you -- do you effectively have two board certifications, one in orthopedic surgery or one in the hand?



MR. SMITH: Form.

THE WITNESS: Not necessarily. The hand doesn't have its own board. So it's still under the -- the Academy of Orthopedic Surgeons. Like, they still are the board, you just have an additional qualification for hand surgery.

And that's an examination and case review process. The case review process isn't quite as intense for that -- for that. That's an exam plus a case review as well.

BY MR. HERNANDEZ:

**Q.** Understood. Thanks for that.

Where do you maintain hospital privileges?

**A. At the Kansas City Orthopedic Institute and Advent Health.**

**Q.** Turning, then, to Barbara Hall, in so far as your participation in her care, when did she first become a patient of yours?

**A. That would have been March of 2020.**

**Q.** You had not seen Barbara before her fall on the cruise ship?

**A. No.**



**Q.** Okay. When did you first see her?

**A. March 9, 2020.**

**Q.** And when did you last see her?

**A. That would have been December 5 -- I'm sorry -- October 5, 2020.**

**Q.** Why did she come under your care?

**A. She came under my -- under my care -- well, because of her wrist fracture, she was seen at the urgent care that I help take call at at the hospital, and I think that's how she ended up getting to me.**

**Q.** And when you say getting to you, meaning it stands to reason your name or your practice's name was given to her at the urgent care?

MR. SMITH: Objection to the form.

THE WITNESS: Yeah. The urgent care is -- like, my office is also in the same building as that, as the urgent care.

So there's -- they may or may not given her name -- I'd have to look in the chart to see, they may not have given my name but there's a connection there that I'm sure facilitated her engagement with me initially.



BY MR. HERNANDEZ:

**Q.** Okay. Got it.

So turning then -- Exhibit -- I think it's been -- well, your chart's been attached as Defense Exhibit 5, so I'll refer to it as Defense 5. Feel free to look at your chart if you need to.

**A. Uh-huh.**

**Q.** When you first saw her on March 9th of 2020, what -- what was Barbara's chief complaint?

**A. That would have been her wrist fracture.**

**Q.** Okay. Was she voicing any complaints of pain that day?

**A. The -- yeah, she was. She had a severity of 8 out of 10 pain.**

**Q.** 10 being the most severe?

**A. 10 being the most severe, yeah.**

**Q.** Did you understand her to be right-hand dominant when you first --

**A. Yes.**

**Q.** Did you answer?

**A. Yes.**

THE STENOGRAPHER: Mr. Hernandez, your internet froze and I was not able to hear

the end of your question.
MR. HERNANDEZ: Oh, I'm sorry. On my end or the Doctor's?
THE STENOGRAPHER: Your end, sir.
BY MR. HERNANDEZ:
**Q.** Okay. Did you understand her to be right-hand dominant when you first saw her on March 9 of 2020, Doctor?
**A. Yes.**
**Q.** Okay. From the history that was provided to you, after her fall on the ship, was she seen by any physician, any medical personnel on the ship?
MR. SMITH: Object to the form.
THE WITNESS: I don't -- I don't know if she was or not.
BY MR. HERNANDEZ:
**Q.** Let me suggest [sic] your attention to the second paragraph under your HPI.
**A. Uh-huh.**
**Q.** "She was not seen by any provider on the ship."
**A. Okay. Yeah.**
**Q.** Okay. So ultimately -- and we'll speak -- we'll speak to this in a moment --



ultimately, you came to understand what her injury was, what type of fracture she had, right?
**A. Correct.**
**Q.** Okay. With the injury that you came to understand she suffered, in your experience as a physician who treats these types of injuries, is this the type of injury where emergency care is typically called for?
MR. SMITH: Objection to form.
THE WITNESS: Yeah, I would say emergent to urgent care.
BY MR. HERNANDEZ:
**Q.** Okay. And why is that?
**A. Oh, because you want to try to get this stabilized as quickly as you can. That helps prevent patient pain, can reduce swelling.**
**There's some potential complications down the road if you don't, kind of, get the -- you know, swelling -- if you have too much edema in the hand and wrist, that can cause future problems down the road.**
**So yeah, in general, this is the type of injury you want to splint and immobilize and try to get swelling down as quick as possible.**
**Q.** And, if you would, tell us a little



bit about what these complications from excessive swelling can be.
**A. So --**
MR. SMITH: Objection to form.
THE WITNESS: -- probably the biggest thing I worry about is -- is stiffness, stiffness of the fingers, stiffness of the wrist.
We know that she's going to have some swelling from the fracture, but we also know that the longer that fracture is not immobilized, the more swelling they're going to develop.
I think that's probably good enough there.
BY MR. HERNANDEZ:
**Q.** Yeah, no, I got -- I'm with you.
Are you --
**A. There's more that can go in to, but I'm not sure that it's...**
**Q.** No, I think that suffices.
And you mentioned this, from a pain standpoint --
**A. Uh-huh.**
**Q.** -- any consequence to her not having



been seen by the ship's medical staff?
MR. SMITH: Objection to form.
THE WITNESS: Yeah, you just don't -- that -- that -- that wrist is going to be moving around. It's going to be moving that fracture around which could certainly increase the patient's pain.
BY MR. HERNANDEZ:
**Q.** All right. I mean, that -- that movement of a fracture such as this, within a reasonable degree of probability, is that a pain generator?
**A. Yes.**
MR. SMITH: Objection to form.
MR. HERNANDEZ: What's wrong with the form?
MR. SMITH: You're leading him.
BY MR. HERNANDEZ:
**Q.** Once she was home, where do you understand she first sought medical treatment?
**A. From what I understand, it's -- it was at the urgent care visit on March 6th.**
**Q.** Okay. And I believe in your note I saw reference to X-rays and/or a CT scan.
**A. Yes.**

Q. When she came to you on March 9th, did you have the benefit -- were you able to review either the scans themselves or the imaging reports?
**A. I -- I mean, I -- I don't know if I had -- I think I had access to the CT scan like -- but it may have been done, like, that day.**
Q. I think it was, in fact.
**A. Yeah. My guess is the urgent care saw the patient and ordered the CT scan and got me involved all at the same time.**
Q. Okay. I mean, that -- that makes sense.
And as much you submitted her to surgery on the 10th, I presume you must have seen some imaging before the surgery, right?
**A. Yeah, X-ray and CT.**
Q. Okay. And really what -- what I'm getting after is from an imaging standpoint what was revealed?
**A. That she had an intraarticular -- or, a fracture of the distal radius that goes into the joint.**
Q. That's what -- is that what intraarticular means?
**A. Yes, in the joint, into the joint.**



Q. Okay. And did it also reflect that the fracture was comminuted?
**A. Yes. There's multiple fragments of it.**
Q. How many?
**A. Oh -- I'm looking at it right here just to be -- be sure.**
**At least three, at least three fragments.**
Q. And for my benefit and, I guess, the jury's benefit, is that what the word comminuted means, the fracture is fragmented?
**A. I mean, a lot of orthopedic surgeons use comminuted to just -- to suggest multifragmented, but comminuted, technically, I think comes from the root word meaning dust. So I wouldn't consider this dusted. It's not, you know, that.**
**But it's -- you know, it's -- you know, I would refer to this as a multi-fragment, you know, intraarticular fragment. I may not use the word comminuted. That's just my personal -- I don't like to use that word because I think it's overused.**
Q. Okay. But, I mean, this particular



fracture -- are you -- are you looking at the actual film on your computer as we speak?
**A. Uh-huh.**
Q. Okay. Whether the term comminuted is used or not, there were fragments of bone in the fracture?
**A. Yeah.**
Q. Okay. From your records, from your examination, from the imaging, was the fracture displaced?
**A. Yes.**
Q. And what does that mean?
**A. Displacement means that it's not in its -- it's not in its -- in its anatomic alignment. Its placement is not where it's supposed to be.**
Q. Based upon your education, experience, training and clinical practice, is this type of fracture painful to the patient?
**A. Yes.**
Q. And what did your exam reveal that day, March 9th of 2020?
**A. So on those exams, we're typically going to be testing the nerve as per status [ph] of the hand. So we just want to make sure that the**



**hand's working and that she was in a splint, and at that point, I'm not going to take down that splint for the exam. So I'm just making sure that the hand is working okay.**
Q. And I presume it was?
**A. Yeah. She had good blood flow and didn't seem to have any nerve damage.**
Q. The splint that you just mentioned, do you know where that had been applied?
**A. The -- I'm just -- I would assume that that's coming from the urgent care.**
Q. And I see in your note, towards the bottom -- I suggest your attention to the bottom of page two, "Given that her fracture appears to be very distal on imaging."
**A. Uh-huh.**
Q. Distal means what?
**A. Away from the body, so closer to the fingertips.**
Q. So hers was a fracture of the wrist, you know, almost at where the hand is, right?
**A. Yeah. I mean -- yeah. I mean, it's -- yeah.**
Q. Okay. And what -- what did you discuss with her, if anything, given where this

fracture was?
A. The -- when it's that -- so if you imagine you have two -- you know, two blocks of wood. If you have a large blocks, it's easier to fit those two large blocks of wood, regardless of where the plates and screws are.
But in her case, the end block of wood was so small, that that it makes it very difficult to repair and that then lends itself to some additional complications, like the hardware being prominent volarly on the palm side, or the hardware actually going into the joint because it's hard to lay screws in underneath the joint surface. On a fracture like that, you have very little bone to fit the screws in to.
So with her, I just wanted her to be prepared that this is going to be a fracture where it's so far distal that she needs to understand that she's at a higher risk for this of these postoperative complications.
Q. And your recommendation was what?
A. Was to prepare for surgery.
Q. There's another -- there's another note dated March 9, 2020, work status.
What were you indicating there?



A. Just allowing her to -- are you talking about March 9th?
Q. Yeah. I think if you go a little farther in your chart, you're going to see a work status report of that same date.
A. Yeah. So she -- I think she just wanted to be able to go -- go back to work and wanted something from me to say that she could go back to work, but I would have her on limitation postoperatively.
Q. And the limitation was what, if any?
A. One pound of restriction on that right upper extremity.
Q. And as of March 9, this one pound restriction, what was your restriction insofar as time frame?
A. You mean starting on the 11? That actually would be her first postoperative day.
Q. No, what I -- I asked a lousy question.
A. Oh, how long?
Q. Yeah. How long were you going to restrict her on the one pound?
A. At least -- probably at least about four to six weeks. I don't think it had an end to



it at that time.
Q. So now I see that the surgery was very next day.
Why so quickly from your -- from your visit of March 9 to submitting her to surgery March 10?
A. I mean, that just speaks to you don't want any -- you know, any additional delay if you can avoid it. You don't want that bone to start heeling in the wrong spot, is one thing. That just makes the surgery more difficult.
There's also something to be said for just -- you know, we know this is what has to happen and we're not going to really get on the road to recovery until we get -- until we start down this path.
So it's good customer service, you know, wanting to get it healed, you know, get going quickly.
Q. Apropos of that, if you'd have seen her on March 1st after her fracture, do you anticipate you'd have been doing the surgery on March 2nd?
A. I'm not sure that this is a fracture that would -- you know, if March 2nd was a, you



know, Sunday, and it would have had to have been an emergent case, probably not, but, you know, I would have done it probably the next available operating day I had, yeah.
Q. Okay. Now, during your operative report, I don't need a blow-by-blow --
A. Uh-huh.
Q. -- but what -- what was your preoperative diagnosis, what was your postoperative diagnosis?
A. And so preoperative is a intraarticular distal radius fracture and that was the same for the pre and post.
Q. Okay. What type of anesthesia sedation was this done under?
A. Let's see.
It would have been a general, so some amount of general anesthesia.
Q. What if any -- oh, I'm sorry, go ahead.
A. General anesthetic.
Q. What, if any, are the risks of general anesthesia?
A. Oh, I mean, main things I worry about are, you know, heart and lunch issues, brain --

**brain issues, brain fog, stroke. I mean, you can put death on there. Those would be the main things I worry about --**

Q. Okay.

A. **-- with general anesthesia.**

Q. And if you would, just give us -- give us a -- again, it doesn't have to be blow-by-blow --

A. **Okay.**

Q. -- but can you -- in as layman's terms as you can, describe the procedure?

A. **Yeah. So with this procedure, the -- we make an incision on the palm side of the wrist, the incision is on the thumb side of the forearm, probably an incision like that, probably 4 or 5 inches (indicating).**

**We're going to be going passed the skin, passed the tendons, passed the -- some of the muscles down to the bone. We're going to clean off the bone and we're going to apply a plate that has some screws that fix into both the -- you know, the portion of the bone on the proximal side, the forearm, and also some screws that fix into the distal side of the bone, the fractured side of the bone.**



**We're going to -- we'll use live X-ray during that procedure to make sure that the alignment is correct, and then we're going to end up, you know, closing her when we're done.**

Q. And, in her case, how many -- how many screws were inserted on the proximal, on the forearm side of the fracture?

A. **That's typically three; and, in her case, it was three.**

Q. And how about the distal hand side of the fracture?

A. **That's six.**

Q. So is it -- is it a total of nine screws and a plate?

A. **Yes.**

Q. And when did you -- when did you first -- when did you first see her -- going back for a moment.

About how long did the procedure take?

A. **Let's see if I have our --**

Q. If you know.

A. **I mean, these are usually going to take about an hour -- hour -- hour and a half.**

Q. When did you see her after the surgery?



A. **That would have been the March 23rd visit.**

Q. How was she doing?

A. **I think fairly well at that point in time. The -- you know, no obvious, you know, complications at that point in time. It's a fairly standard two-week postop visit.**

Q. I'm sorry, you said March 23rd?

A. **Uh-huh.**

Q. Okay. And did you maintain the one-pound lifting restriction as of that day?

A. **I can't recall.**

Q. Let me -- let me suggest your attention to three line items up from the bottom.

A. **Yeah, she would have stayed on that, then, yeah.**

Q. And you wanted to see her back, I presume?

A. **Yep, at the six-week point.**

Q. When did you next see her?

A. **That would have been April 20, 2020.**

Q. How was she doing then?

A. **At that point, she's doing okay.**

**We're starting to notice, again, some of the prominence of the plate and some restriction**



**of her supination.**

Q. Volar prominence, are you saying that the plate kind of juts out a little bit?

A. **Yeah.**

Q. You can see it under the skin?

A. **No, you can't see it under the skin. There's too much, kind of, stuff in the way, but, yeah, it's a little bit part of the -- actually, it's a little part of the bone.**

Q. Okay. And when I say -- I shouldn't have said see it out the skin --

A. **No.**

Q. -- but is there a protrusion or no?

A. **No.**

Q. Okay. I couldn't see it, you can, so to speak. You know it's there --

A. **On an -- on an X-ray.**

Q. Oh.

A. **You wouldn't be able to tell it clinically.**

Q. Even palpating you can't -- you can't tell?

A. **Probably not.**

Q. Okay. Understood.

And what was she reporting, if

anything, insofar as pain as of April 20th?

**A. I mean, at that point in time, I just note that she's -- she kind of has typical kind of postoperative discomfort.**

**Q.** Had you -- I mean, that's -- is that to be expected in an injury and surgery like this?

**A. Yes.**

**Q.** By this point, had you referred her to any therapy? Physical? Occupational?

**A. I believe we had at that point in time, uh-huh.**

**Q.** Okay. And I ask because I've not seen the records --

**A. Uh-huh.**

**Q.** -- but do you know what therapy regimen you'd recommended for her?

**A. Typically, we're going to recommend them to get a splint made and then an active range of motion program for them to start work on range of motion those first six weeks.**

**Q.** Six weeks total or six weeks and reassess? How does it work?

**A. Yep. Six weeks postop, then reassess.**

**Q.** Okay. And I think you mentioned she was starting to exhibit some problems with



supination?

**A. Yes.**

**Q.** What did you measure it at that day?

**A. In April at 30th degrees.**

**Q.** All right. And correct me if I'm wrong, normal supination is 80 degrees?

**A. It vary -- it can vary in an individual but, you know, you shoot for somewhere between 70 and 80.**

**Q.** Is -- so in your opinion, based upon a reasonable degree of medical possibility, is 30 degrees of supination below normal?

**A. Yes.**

**Q.** Okay. So what did you -- what was your plan as of that day, April 20 of 2020?

**A. To remove her splint, continue with focusing on her supination ability and to advance to full ridging with the hand.**

**Q.** All right. From the chart records I have, I think you next saw her on June 15 of 2020?

**A. Yes.**

**Q.** How was she doing?

**A. Still -- still with stiffness in supination and she started to kind of note some of this pain on the ulnar side or the small finger**



**side of her wrist.**

**Q.** Okay. The ulnar side is here below the pinky?

**A. Uh-huh.**

**Q.** And I see in your note, "Positive TACC tenderness."

**A. Uh-huh.**

**Q.** What is that?

**A. Well, the A is a -- is a typo, it should be TFCC.**

**Q.** Ah.

**A. And that's Triangular Fibrocartilage Complex. That's -- that's the soft tissue that's right here on the ulnar side of the wrist.**

**Q.** And what, if anything, is that indicative of?

**A. It can be indicative of a cartilage tear on that side of the wrist, it can be indicative of what we call ulnar -- ulnar carpal abutment where there's just not enough space between the ulna and the wrist bones.**

**Those would be the two main things you'd be thinking of.**

**Q.** And in this case, have you an opinion, based upon a reasonable degree of medical



probability, whether this tenderness that you're noting at the TFCC on June 15 is as a result of the injury and/or your intervention?

**A. Yes. I think it's more of a result of her injury. TFCC tears are very common to have with distal radius fractures. They don't -- they don't always turn out to be symptomatic.**

**Q.** All right. And I also see a note of "positive ulnar carpal grind."

**A. Uh-huh.**

**Q.** What is that?

**A. So your -- with an ulnar carpal grind, you're taking the wrist, which is the carpus, and you're pushing it towards the ulna bone on the small finger side of the wrist and then you're rotating the wrist.**

**And that -- if that causes pain, then that's a sign that those two bones, the ulna and then the carpal, or wrist bones, are essentially too close to one another and that's causing pain.**

**Q.** Okay. And similar question: Based upon a reasonable degree of medical probability, in Barbara's case, do you attribute that ulnar carpal grind to her injury and/or your resulting intervention?

A. Yes.
Q. And what did you recommend, if anything, for her that day if her issues of her discomfort continued?
**A. I would have then considered a cortisone injection.**
Q. All right. And think you did the injection on the next visit, July 13?
**A. Yes.**
Q. And what -- I -- is -- is this -- the injection that you administered on the 13th of July, is that -- is that intended for pain to cure the problem or what's -- what was the intentions of the injection?
**A. So the intent -- intention of injection is to take away her pain.**
**The -- not all after these -- as I mentioned earlier, TFCC tears are very common with distal radius fractures and they don't always need to be, you know, surgically repaired or surgically debrided. Sometimes you can treat that with a cortisone injection, pull enough inflammation out of the joint that they then become asymptomatic.**
**And if a TFCC tear is asymptomatic, then it doesn't require any further treatment.**



Q. Okay. So apropos of that, you're seeking the assuage the symptoms, but that doesn't cure the cartilage tear, if there is one, does it?
MR. SMITH: Objection to form.
THE WITNESS: No. If there is a cartilage tear, and you do a cortisone injection, you're still going to have a cartilage tear.
BY MR. HERNANDEZ:
Q. Was she still experiencing the TFCC tenderness when you saw her on July 13?
**A. Yes.**
Q. And what, if anything, did she report that day insofar as range of motion?
**A. Still with limitation, particularly with supination.**
Q. What, if anything, did she report that day insofar as pain?
**A. Continued pain on that ulnar side of the wrist.**
Q. And, by this point, what are we, about 90 days after surgery?
**A. I --**
Q. Oh, 120, right?
**A. About four months out, yeah.**



Q. Okay. And when did you next see her? Is it August 24?
**A. Yes.**
Q. I'm sorry, going -- going back to July 13 for a moment.
What was your assessment and plan that day?
**A. So plan that day was to provide a cortisone injection for her ulnar-sided wrist discomfort, and then to, you know, reassess if that took away her pain?**
Q. And I see here that you had a discussion with her insofar as imaging findings, X-ray findings. What -- tell me about that, if you would.
**A. So on her -- essentially, her imaging on 7/17 is not showing anything different then her prior imaging X-rays.**
Q. Okay. And why did you have this discussion insofar as two considerations? Do you see where I'm at? The top of the second page?
**A. In the bottom -- let's see.**
**Oh, oh, oh, so we -- I like to kind of outline for my patients what their options are. So in this case, one option is to provide an**



**injection.**
**The other is to do some sort of further investigation in terms of, you know, additional imaging that that could identify the presence or absence of a tear.**
Q. And so on -- on this day you went the injection route?
**A. Correct.**
Q. Okay. Back to where we were then.
You next saw her on August 24?
**A. Yes.**
Q. What, if any, was her chief complaint that day?
**A. That she had had improvement from the cortisone injection, continued to struggle with some of her supination. Those are kind of the key -- key points.**
Q. All right. So was -- her supination was still below normal limits on August 24th of 2020?
**A. I mean, according to the patient, at that point in time, she was still, you know, struggling with that. I don't think I have an obvious -- a number that I attributed to it that day.**

**Q.** You noted extension of 30 degrees --
**A.** **Uh-huh.**
**Q.** -- did you not?
**A.** **Uh-huh.**
**Q.** What is -- what is normal extension of the wrist?
**A.** **You're looking for above 60 on wrist extension.**
**Q.** Flexion seemed to be okay at 60, right?
**A.** **Correct.**
**Q.** Okay. And she -- did she continue with the TFCC tenderness?
**A.** **Yes.**
**Q.** What was your assessment and plan for her that day, August 24th of 2020?
**A.** **So at that point, it's really kind of discussing with her about, you know, what the future could hold.**
**So I was okay with her kind of being discharged from the clinic, but there are some things that I wanted her to keep an eye on, the ulnar-sided wrist pain, if she started having any pain about the palmer side of her wrist or irritation of her flexion tendons of her hands,**



**that those would be reasons for her to be in touch.**
**Q.** All right. And did you discuss with her the potential for the heart -- for hardware removal that day?
**A.** **Yes.**
**Q.** And why were you considering hardware removal for her that day?
**A.** **It just has to do with -- I wasn't really considering hardware removal.**
**I was just discussing with her that we need to be attentive to if she starts having any symptoms of flexion tendon irritation, that she would be somebody who I would consider taking the hardware out.**
**Q.** Is this at least, in part, because of what you described to me earlier the -- how far distal her fracture was?
**A.** **Yes. Yep.**
**Q.** And, I mean, with a fracture of -- of this type and her post-surgical course through August 24 of 2020, within a reasonable degree of medical probability, can you rule out that Barbara may, in the future, need hardware removal?
MR. SMITH: Object to the form.
THE WITNESS: She may still need that.



BY MR. HERNANDEZ:
**Q.** And I don't have the note, and I'm not going to take our time tonight to get it, but I think you last saw her October 5 of 2020?
**A.** **Yes.**
**Q.** How was she doing?
**A.** **You know, she had kind of pulled back from some of her earlier improvement from the injection. Fortunately, she was back to doing most activities, but she was using a wrist support to kind of be back to doing most everything.**
**Still with some tenderness over the ulnar side of the wrist, still with some limited supination on that right -- on the right forearm, and then the flexor tendons appear to be -- appeared to be fine over the plate.**
**Q.** Okay. And on October 5 of 2020, did you maintain the same -- same thought process insofar as potential future needs, medical needs?
MR. SMITH: Objection to form.
THE WITNESS: Yes.
BY MR. HERNANDEZ:
**Q.** All right. So now, in the end, Doctor, within a reasonable degree of medical probability do you attribute her right wrist



fracture and the treatment that you provided her to the fall on the Carnival ship?
**A.** **Yes.**
**Q.** All right. And I know you've generated two reports that are attached as his Defense Exhibits 3 and 4.
How do you understand -- I'll suggest your attention to the November 14 report.
So how do you understand that she fell?
**A.** **The -- that she had tripped on the floor --**
**Q.** All right.
**A.** **-- on the cruise ship.**
**Q.** The -- the treatment that you provided her, the surgery that you submitted her to, her visit to urgent care and the therapy postsurgery, do you have an opinion, based upon a reasonable degree of medical probability, whether that treatment that I've just described was reasonable and necessary given the injury she sustained on the Carnival ship?
MR. SMITH: Objection to form.
THE WITNESS: Yes, that would be reasonable and necessary.

BY MR. HERNANDEZ:
**Q.** All right. I'm going to share my screen again briefly. Let me know when you can see my screen, Doctor.
**A. I can.**
**Q.** Okay.
MR. HERNANDEZ: This will be -- actually, I didn't attach your chart to my examination because it's Defense 5. So these records, these billing records, will be my Exhibit A.
(Plaintiff's Exhibit No. A was marked for identification.)
BY MR. HERNANDEZ:
**Q.** Do you recognize -- let me scroll through them kind of quickly -- and I just want to know if you recognize these as the billing records from your practice and from the surgery center.
**A. Those are the -- I can't tell you the surgery -- yeah, those would be surgery center there, yeah.**
**Q.** Okay. You're familiar with the -- with the bills from your practice in the surgery center?
**A. Yes.**



**Q.** Is this the surgery center that your practice frequents, that your practice uses?
**A. It's one that I use.**
**Q.** Okay. You're familiar with their billing practice?
**A. I mean, I think to whatever extent I should be, yeah.**
**Q.** Okay. I see your practice's total charges for the care and treatment of Ms. Hall as "$9,383."
Do you see that here?
**A. Yes.**
**Q.** All right. Based upon your education, experience and practice, is this reasonable and customary in your locality?
MR. SMITH: Objection to form.
THE WITNESS: Yes.
BY MR. HERNANDEZ:
**Q.** The surgery center's bill is for "$17,722.30."
Based upon your education and experience and practice, is this reasonable and customary in your locality?
MR. SMITH: Objection to form.
THE WITNESS: Yes.



BY MR. HERNANDEZ:
**Q.** All right. Now, insofar as future treatment for Barbara, do you have opinions, based on future degree of medical probability, relative to future care needs of hers?
MR. SMITH: Form.
THE WITNESS: Yeah. I mean, to me, the future cares needs -- that would be -- the most closely relied to her case would be potential surgical management of her ulnar-sided wrist pain in addition to potential volar plate hardware removal.
Those are the ones that are most -- those would be the most likely interventions required.
BY MR. HERNANDEZ:
**Q.** All right. And --
**A. There still -- there still would be a possible intervention in the future, should she develop wrist arthritis, but that would be probably further off and more separate.**
**Q.** Okay. The first one you mentioned, I'm sorry, was what?
**A. Her ulnar-sided wrist pain.**
**Q.** What are your opinions insofar as



future care for that, foe the ulnar-sided wrist pain?
**A. She's already been through, you know, a cortical steroid injection.**
**Future care might include getting advanced imaging, like an MRI, plus the surgical management would be an arthroscopy, a likely debridement of that tear, possible what we call ulnar shortening osteotomy, and then the subsequent therapy for that.**
**Q.** And you mentioned hardware removal.
Is that separate and apart from what you've just described for us?
**A. Yes.**
**Q.** And what would be the motivating reason, within a reasonable degree of medial probability, for the hardware removal?
**A. If she were to start exhibiting flexor tendon irritation over the plate.**
**Q.** All right. What do you estimate -- if she is to undergo the hardware removal, what do you estimate the cost of that?
MR. SMITH: Objection to form.
THE WITNESS: I think, you know, all in -- well, charge -- yeah, probably,

charges would be maybe -- maybe $15,000 maybe.
MR. HERNANDEZ: Okay.
THE WITNESS: $10,000 to $15,000.
BY MR. HERNANDEZ:
**Q.** Does that include therapy or are you just speaking of the actual intervention, the surgery?
**A. That's just taking out hardware.**
**Q.** Okay.
**A. And usually that doesn't need much therapy.**
**Q.** So she wouldn't need -- okay. Fine. Yep.
And, then, what you were talking about a moment earlier, if she persist with the ulnar-sided wrist pain?
**A. Uh-huh.**
**Q.** What if she has to undergo an arthroscopy? Do you have an opinion based upon reasonable degree of medical probability as to the anticipated costs of that?
MR. SMITH: Object to the form.
THE WITNESS: Arthroscopy is going to be somewhere around probably $15,000.



BY MR. HERNANDEZ:
**Q.** And I know you indicated it's -- well, strike that.
What if she necessitates repair of the TFCC and/or a debridement? Do you have an opinion, based upon the reasonable degree of medical probability, as to the anticipated costs of that?
MR. SMITH: Objection to form.
THE WITNESS: Probably around the same, $15,000.
BY MR. HERNANDEZ:
**Q.** And if she's fortunate and doesn't have to undergo any of these, do you have an opinion, based upon a reasonable degree of medical probability, whether Barbara will still necessitate you know nonsurgical visits for example with you or another specialist?
MR. SMITH: Objection to the form.
THE WITNESS: Outside of those things, I think the main thing would be if she needed to see, you know, a hand -- a hand therapist for kind of just reengaging and making sure she's, you know, staying strong.
Or if -- if she would develop



arthritis in her wrist necessitating kind of an evaluation for that.
BY MR. HERNANDEZ:
**Q.** And what -- do you have an opinion based upon a reasonable degree of medical probability, as to anticipated costs of therapy if she has to undergo that?
MR. SMITH: Form.
THE WITNESS: $1,000, $2,000.
BY MR. HERNANDEZ:
**Q.** Is that for sort of one --
**A. That would be for, like, multiple visits over a period of, like, a month or two.**
**Q.** Okay. And do you think she'll necessitate, within a reasonable degree of medical probability, future imaging?
MR. SMITH: Form.
THE WITNESS: Do I think that she will? I don't know.
BY MR. HERNANDEZ:
**Q.** Okay.
**A. I don't know.**
**Q.** And, then, finally, Doctor, have you any opinions, based upon a reasonable degree of medical probability, insofar as physical



limitations that Barbara has been left with?
MR. SMITH: Objection to form.
THE WITNESS: Physical limitations would be limited -- mainly would be limitation of her range of motion, that she still does have some pain on the ulnar side of her wrist, and those two things could -- could affect her -- affect her overall function of her wrist mainly with regards to grip and strength.
BY MR. HERNANDEZ:
**Q.** And, I'm sorry, I should have asked you earlier.
You mentioned arthritis.
**A. Uh-huh.**
**Q.** It occurs to me, with a fracture like this, you might have an opinion related to premature onset of arthritis or traumatic arthritis.
Do you have any such opinion?
MR. SMITH: Form.
THE WITNESS: The -- given that it's an intraarticular fracture, my guess is that at some time she probably will develop arthritis, but that may or may not be

symptomatic for her, and that's probably, you know, ten, 15, 20 years down the road.
BY MR. HERNANDEZ:
**Q.** And, finally, Doctor, have you arrived at an opinion, based upon a reasonable degree of medical probability, whether Barbara has sustained a permanent impairment as a result of the fall on the cruise ship and the surgery that was necessitated?
**A. Yes. I do think she has an impairment of that, of her -- of her wrist.**
**Q.** And what is the impairment of the wrist?
**A. I'm going to -- I'm gonna look at my little letter here. I can't remember what I put.**
**About 10 percent for the hand and wrist.**
**Q.** Okay. And how does that translate, if at all, to the body as a whole?
**A. That -- that's 6 percent.**
**Q.** The opinions that you've expressed this evening, Doctor, are they all within a reasonable degree of medical probability?
**A. Yes.**
MR. HERNANDEZ: Thank you very much.



MR. SMITH: All right. Doctor, I have a few follow up in regard to that.
I don't have a ton, but would you like to take a break? Get a glass of water?
THE WITNESS: I'm good.
MR. SMITH: Okay. So I'll get started and we'll hopefully get you out of here.
REDIRECT EXAMINATION
BY MR. SMITH:
**Q.** Doctor, do you usually provide an American Medical Association impairment rating opinion for those of your patients not involved in a lawsuit?
MR. HERNANDEZ: Form.
THE WITNESS: Well, frequently they do that for workers' compensation as well, not necessarily in a lawsuit.
BY MR. SMITH:
**Q.** Okay. I want to include, for purposes of my question, when I say "lawsuit," I mean any sort of legal proceeding.
**A. Oh.**
**Q.** So in any sort of legal proceeding, do you usually -- well, do you usually provide an American Medical Association impairment rating for



any of your patients that are not involved in a legal proceeding?
MR. HERNANDEZ: Form.
THE WITNESS: No.
BY MR. SMITH:
**Q.** And, Doctor, regarding Ms. Hall herself, do you know what she does for a living?
**A. I can't remember off my -- I think she's a nurse. I think she works in health care.**
**Q.** Okay. And do you know if Plaintiff is currently work at the present time?
**A. I do not know.**
**Q.** All right. Doctor, is it possible in this case that Plaintiff, Ms. Hall, may not require any future surgery at all?
MR. HERNANDEZ: Form.
THE WITNESS: That's possible.
BY MR. SMITH:
**Q.** Okay. And I think we covered this earlier, but am I correct, you don't know when Plaintiff might require a future surgery, if any?
**A. That's correct.**
**Q.** Doctor, as of your office visit of October 5, 2020, did Plaintiff, Ms. Hall, exhibit any flexor tender [sic] irritation on her



examination?
**A. Not that I'm aware of.**
**Q.** Okay. Doctor, you were presented a billing statement, which was marked as Plaintiff's Exhibit A.
Do you recall that billing statement?
**A. Yes.**
**Q.** On Plaintiff's Exhibit A, Doctor, there was a line item that said "Charges" and there was a line item that said "Write Offs."
Do you recall seeing that?
**A. Yes.**
**Q.** Doctor, what does it mean by the write offs?
MR. HERNANDEZ: Form.
THE WITNESS: I don't know -- I don't know everything that can be a write off, but sometimes that's like an insurance contracted rate that either the practice or the surgery center may have that might adjust the charges.
BY MR. SMITH:
**Q.** Okay. Does anyone -- Doctor, to your knowledge, does anyone ever owe, to you or the surgery center, those written off charges?

MR. HERNANDEZ: Form.
THE WITNESS: I have no idea. I don't know. Like -- I don't know.
I think some of those are kind of charges that are either -- usually, those are kind of, like, precontracted things, where it's, like, a certain insurance company with a hospital or surgeon and they -- it's just the -- the agreed-upon rate between hospital and surgeon and insurance company.
There may be other write offs that might occur and, unfortunately, your prior experience with me, based on my own recollection of how we bill things like this, I'm probably not the best person to know exactly what happens to those write offs.
BY MR. SMITH:
**Q.** Okay. Well, Doctor with your own billing records at your practice, are there -- are there contractual agreements with insurance companies?
MR. HERNANDEZ: Form.
THE WITNESS: Yes.



BY MR. SMITH:
**Q.** There are?
**A. I think so.**
**Q.** Okay. And in those contractual agreements with health insurance companies, is the health insurance company entitled to a reduced rate for the services provided by your practice?
**A. I don't --**
MR. HERNANDEZ: Form.
THE WITNESS: I don't know what -- I don't know how that negotiation occurs.
BY MR. SMITH:
**Q.** Okay. Doctor, do you get to recoup all the money that you bill when you bill someone like Ms. Hall, who has insurance?
MR. HERNANDEZ: Form.
THE WITNESS: I guess -- I guess any money that would come in would be based on -- would be put on my revenue but that doesn't always filter down to me. That may go to other things.
BY MR. SMITH:
**Q.** Okay. As far as your practice at your clinic, Doctor, do you also have written-off charges on your billing?



MR. HERNANDEZ: Form.
THE WITNESS: I think so.
Isn't that what you just asked? Like, the written off charges that you had seen on the --
BY MR. SMITH:
**Q.** Right.
**A. Yeah.**
**Q.** You referred to the surgery center though as far as the write offs --
**A. Oh, right, right.**
**Q.** -- right?
**A. Both. Yeah, I think they're both.**
**Q.** Okay.
**A. But I saw on the -- the surgery center paperwork, there's also some on there --**
**Q.** Okay.
**A. -- on that Exhibit.**
**Q.** All right. Well, a write off sounds to me like its something that -- that no one ever owes, a payment no one ever owes, correct?
MR. HERNANDEZ: Form.
THE WITNESS: No. I mean, I don't think that -- I don't think that that's really -- would be an accurate way of



perceiving a -- a written off payment.
BY MR. SMITH:
**Q.** Well, the write offs on your billing, Doctor, is that something Ms. Hall will actually have to pay if they're written off or not?
**A. I don't -- I don't think so.**
**But these are all questions for the -- that be best -- you know, I'm not -- I'm not the biller. So I don't -- I don't know all of the details of what is written off and what's not and what the contract says.**
**Q.** Okay.
**A. I'm just not an expert in that.**
**Q.** Well, based upon what you do know, the write offs on the bill to Ms. Hall, that's not a charge Ms. Hall actually owes to you or your clinic, correct?
MR. HERNANDEZ: Form.
THE WITNESS: I don't think that is correct.
I think when we make a charge, we make a charge and, then, unfortunately, for whatever reason, that charge will go through various aspects of the billing process, and there may be or may not be

write offs and those may be considered -- those might be contractual things, that might be -- I mean, that might be a patient that is sent to collections and we just can't get it.

I think there's a lot -- I think there's a lot of things that are included in that concept of a write off that I'm not privy to.

BY MR. SMITH:

**Q.** Okay. If it's a -- if it's an insurance adjustment is that something that is owed by the patient?

MR. HERNANDEZ: Form.

THE WITNESS: Gosh, I don't know.

I guess it has to do with, like, their standing with their insurance company and stuff, as long as that's in good payment, I'm not sure that there would be a -- I'd put it this way.

If there's a -- my best is if there is an insurance adjustable contracted adjustment that there's not going to be a further attempt to recoup funds to the -- from the patient beyond that.



But, again, I'm not an expert in that. I don't -- I don't know how that all works.

BY MR. SMITH:

**Q.** Okay. But is that something that you derive from your experience working at your practice?

MR. HERNANDEZ: Asked and answered.

THE WITNESS: I guess my experience is that I'm sad every time I see a write off, but I don't know -- I don't know exactly how common that is or uncommon that is.

For better or for worse, I'm not the best when it comes to monitoring all my billing in and out. I have my staff for that.

BY MR. SMITH:

**Q.** Okay. At the outset of the examination by Mr. Hernandez, Dr. Unruh, he said that you had two never met before face-to-face before; is that correct?

**A. I don't think we met face-to-face before.**

**Q.** Okay. Have you two met by any other means?

THE WITNESS: Did we speak on the



phone? Were you on that -- that initial phone call, that one phone call?

MR. HERNANDEZ: I was, Doctor.

THE WITNESS: Yeah, he was.

BY MR. SMITH:

**Q.** Okay. So you met with Mr. Hernandez by phone before?

**A. Yep.**

**Q.** How many times have you met with Mr. Hernandez by phone?

**A. I think just one.**

**Q.** Did you meet with Mr. Hernandez at all before this deposition proceeding today, like, in the week before?

**A. No.**

**Q.** Dr. Unruh, do you know what an ACE™ wrap bandage is?

**A. Uh-huh.**

**Q.** Do you agree that that's one means of immobilizing a wrist injury?

**A. Like, any wrist injury or, like, this fracture?**

**Q.** Well, just -- my question just a wrist injury, is that a -- is that one means of immobilizing a wrist injury?



**A. Yeah.**

MR. HERNANDEZ: Form.

THE WITNESS: It would be one means.

BY MR. SMITH:

**Q.** Okay. And did Ms. Hall tell you she had immobilized her injury with an ACE™ wrap while she was on board the cruise ship?

MR. HERNANDEZ: Form.

THE WITNESS: I don't recall that.

BY MR. SMITH:

**Q.** Do you agree a nurse would probably know what to do to immobilize a wrist fracture?

**A. No.**

MR. HERNANDEZ: Form.

BY MR. SMITH:

**Q.** I'm sorry, Doctor?

**A. No.**

**Q.** No?

MR. HERNANDEZ: Objection withdrawn.

BY MR. SMITH:

**Q.** And why do you say that?

**A. That's -- that's a -- that's just a big assumption.**

**Q.** Okay. Well, what a nurse probably have more knowledge than a lay person about how to

immobilize a wrist fracture?
MR. HERNANDEZ: Form.
THE WITNESS: Maybe. I don't know.
And that hurts me to say, because my wife's a nurse, but she may or may not know -- she -- the likely response to that question.
BY MR. SMITH:
**Q.** All right.
**A. I guess, I've deal with -- I've dealt with situations where it's worse, you know, so...**
**Q.** Doctor, you were looking at some X-ray films, I think, earlier. Do you recall that?
**A. Uh-huh.**
**Q.** X-ray films, by looking at those you can see what's objectively going on within -- well, under the skin, correct?
**A. Yes, yes.**
**Q.** Is there any way that you can objectively measure pain, Doctor?
**A. There are -- yeah, I think there are objective ways that you can assess whether or not somebody's in pain, yeah.**
**Q.** Well, Doctor --
**A. Heart rate, blood pressure.**



**Q.** Well, Doctor, if someone says they're, like, at an 8 out of 10 in pain is there any sort of diagnostic tool you can use to -- to -- to quantify -- objectively quantify that?
**A. I typically don't use one, but there may be that I don't know of, one that I don't know of.**
**Q.** Okay. When -- when you evaluate pain, Doctor, do you typically rely upon the subjective complaints of the patient?
**A. Yes.**
**Q.** Doctor, do you have any actual direct knowledge of what was going inside Ms. Hall's wrist when she was on board the cruise ship before she came to see you on March 9, 2020?
**A. Other than her having a distal radius fracture, no.**
**Q.** Okay.
**A. I mean, I know that because she has -- she has it.**
**Q.** All right. Doctor, do you have any actual knowledge of what Plaintiff's activities were on board the cruise ship after her fall on March 1st, 2020?
MR. HERNANDEZ: Form.



THE WITNESS: No.
BY MR. SMITH:
**Q.** Doctor, do you have any actual knowledge of what Plaintiff's activities were off of the cruise ship at ports of the call after her fall on March 1st, 2020?
MR. HERNANDEZ: Form.
THE WITNESS: No.
BY MR. SMITH:
**Q.** Dr. Unruh, you're a physician, can alcohol intoxication impair an individual's coordination?
**A. Yes.**
MR. HERNANDEZ: Form.
BY MR. SMITH:
**Q.** Can alcohol intoxication negatively affect ones gait?
MR. HERNANDEZ: Form.
THE WITNESS: Yes.
BY MR. SMITH:
**Q.** Can alcohol intoxication negatively affect ones balance?
MR. HERNANDEZ: Form. All beyond the scope of cross.
THE WITNESS: Yes.



BY MR. SMITH:
**Q.** Can alcohol intoxication negatively affect ones perception?
MR. HERNANDEZ: Form.
THE WITNESS: Yes.
BY MR. SMITH:
**Q.** Doctor, you last saw Ms. Hall on October 5, 2020, correct?
**A. Yes.**
**Q.** It's now December of 2017 [sic], so it's been -- would you agree it's been approximately 14 months since Ms. Hall last came to see you?
**A. Yes.**
MR. HERNANDEZ: Form.
BY MR. SMITH:
**Q.** That's over a year isn't it?
MR. HERNANDEZ: Form.
BY MR. SMITH:
**Q.** Do you know if Ms. Hall has follow up with any other orthopedic surgeons in the 14 months since you last saw her?
**A. No.**
MR. HERNANDEZ: Form.
Again, it's beyond the scope of cross.

BY MR. SMITH:
**Q.** Could you repeat your answer?
MR. SMITH: The objection is noted.
THE WITNESS: No, I don't have of any.
BY MR. SMITH:
**Q.** Okay. Do you know if Plaintiff has had any medical care at all in the last 14 months --
MR. HERNANDEZ: Form.
BY MR. SMITH:
**Q.** -- since you last saw her?
**A. Not -- not that I know of. I don't know.**
**Q.** Okay.
MR. SMITH: All right. I have no further questions.
Thank you.
MR. HERNANDEZ: Nothing further here, Doctor.
MR. SMITH: So Doctor, you have the opportunity, if you would like to, read a -- read a copy of the transcript just to make sure you feel like what you said is accurately transcribed.
You don't have to do that, you can



just waive a reading. It's completely your option.
What would you like to do or what would you prefer to do?
THE WITNESS: I just waive the reading.
MR. SMITH: Okay. Very well.
THE VIDEOGRAPHER: We're going off the record at 7:27 p.m.
(The following discussion was had off the video record.)
THE STENOGRAPHER: Counsel, did you want to order this? I can have it to you by Monday.
MR. SMITH: I'm not going to order it for Monday, no.
THE STENOGRAPHER: Copy?
MR. HERNANDEZ: I'll let you guys know. More than likely, but I'll let you know.
(The deposition was concluded at 7:30 p.m.)
(Reading and signing of the deposition was waived by the witness and all parties.)
\- - -



**S T I P U L A T I O N S**

It was stipulated by and between counsel for the respective parties herein that:

1. Reading and signing of the deposition by the deponent are waived.



CERTIFICATE OF OATH

THE STATE OF FLORIDA
COUNTY OF PASCO

I, Teresa R. Cruise, Notary Public, State of Florida, certify that KENNETH UNRUH, M.D. remotely appeared before me on the 17th of December, 2021, and was duly sworn.

Signed this 23rd day of December, 2021.



TERESA R. CRUISE, CRR, RPR, FPR-C, FPR
Notary Public - State of Florida
Commission Number: GG303089
Commission Expires: 2/25/2023




Teresa Cruise
NOTARY PUBLIC
STATE OF FLORIDA
Comm# GG303089
Expires 2/25/2023

CERTIFICATE

THE STATE OF FLORIDA
COUNTY OF PASCO

I, Teresa R. Cruise, a Certified Shorthand Reporter, do hereby certify:

That I was authorized to and did stenographically report the foregoing remote deposition of KENNETH UNRUH, M.D., pages 1 through 141, that a review of the transcript was not requested, and that the transcript is a true record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or direction of the certifying reporter.

DATED this 23rd day of December, 2021.

_________________________________________
TERESA R. CRUISE, CRR, RPR, FPR-C, FPR

## $

**$1,000** [1] - 119:9
**$10,000** [1] - 117:4
**$15,000** [4] - 117:1, 117:4, 117:25, 118:10
**$17,722.30** [1] - 114:20
**$2,000** [1] - 119:9
**$2,500** [2] - 23:16, 74:9
**$250** [6] - 74:5, 74:7, 74:14, 75:1, 75:8
**$9,383** [1] - 114:10

## '

**'15** [1] - 79:23

## 1

**1** [8] - 1:18, 3:14, 9:10, 9:14, 68:10, 76:19, 139:5, 141:6
**10** [9] - 31:22, 32:21, 70:25, 84:16, 84:17, 84:18, 95:6, 121:16, 134:2
**10/5/2020** [1] - 24:16
**100** [2] - 45:24, 45:25
**10691** [1] - 2:4
**109** [1] - 2:4
**10th** [1] - 89:14
**11** [1] - 94:17
**113** [1] - 3:4
**11th** [1] - 34:17
**12/29** [1] - 49:15
**12/29/2020** [1] - 61:19
**120** [1] - 106:24
**122** [1] - 2:18
**13** [3] - 105:8, 106:11, 107:5
**139** [1] - 2:18
**1395** [1] - 2:9
**13th** [2] - 40:7, 105:11
**14** [12] - 3:15, 54:21, 55:20, 56:1, 63:13, 63:18, 64:22, 66:1, 112:8, 136:12, 136:21, 137:8
**140** [1] - 2:19
**141** [3] - 1:18, 2:19, 141:7
**14th** [9] - 2:9, 63:22, 65:8, 65:10, 66:23, 67:22, 68:1, 72:16, 76:24
**15** [8] - 38:7, 38:21, 59:24, 60:6, 60:7, 102:20, 104:2, 121:2
**15th** [1] - 38:23
**17** [4] - 1:14, 4:2, 4:11, 52:13
**17th** [2] - 67:12, 140:9
**19th** [1] - 22:13
**1st** [7] - 56:5, 68:15, 68:17, 69:2, 95:21, 134:24, 135:6

## 2

**2** [4] - 3:14, 23:25, 24:2, 76:21
**2/25/2023** [1] - 140:20
**20** [7] - 37:3, 45:17, 56:24, 57:10, 99:21, 102:15, 121:2
**2017** [1] - 136:10
**2020** [75] - 3:15, 3:15, 24:12, 24:17, 24:19, 25:12, 26:11, 26:19, 27:6, 27:13, 28:11, 30:9, 31:4, 31:22, 32:21, 34:7, 34:18, 34:19, 34:25, 35:25, 37:3, 38:7, 38:10, 38:14, 38:21, 40:7, 41:9, 41:11, 41:12, 42:6, 42:10, 43:1, 43:13, 52:15, 52:23, 54:12, 56:5, 56:24, 57:10, 59:24, 60:6, 60:10, 60:20, 60:23, 61:1, 63:12, 68:10, 68:15, 68:17, 68:18, 69:2, 69:3, 70:19, 70:25, 76:22, 82:22, 83:2, 83:5, 84:10, 85:8, 91:22, 93:24, 99:21, 102:15, 102:20, 108:20, 109:16, 110:21, 111:4, 111:17, 123:24, 134:15, 134:24, 135:6, 136:8
**2021** [16] - 1:14, 4:2, 4:11, 52:13, 54:21, 55:20, 56:1, 63:13, 63:18, 64:22, 66:1, 67:12, 76:24, 140:10, 140:12, 141:16
**20th** [2] - 36:23, 101:1
**21** [3] - 34:25, 38:10, 38:14
**21-CIV-2057-BLOOM** [1] - 1:2
**23** [1] - 35:23
**23rd** [6] - 35:25, 36:19, 99:1, 99:8, 140:12, 141:16
**24** [5] - 3:14, 60:10, 107:2, 108:10, 110:21
**24th** [3] - 41:11, 108:19, 109:16
**29** [3] - 3:15, 63:12, 76:22
**2nd** [2] - 95:23, 95:25

## 3

**3** [5] - 3:15, 54:13, 54:15, 76:22, 112:6
**3/10** [1] - 31:22
**3/9/20** [1] - 24:11
**3/9/2020** [1] - 25:16
**30** [5] - 41:24, 45:17, 57:4, 102:12, 109:1
**305** [2] - 2:5, 2:10
**30th** [2] - 43:25, 102:4
**33131** [1] - 2:10
**33176** [1] - 2:5
**3651** [2] - 5:20, 77:24

## 4

**4** [6] - 3:15, 55:1, 55:2, 76:24, 97:15, 112:6

## 5

**5** [24] - 2:17, 3:16, 24:17, 24:19, 60:20, 60:23, 61:1, 61:3, 61:5, 63:20, 63:22, 77:1, 77:2, 77:12, 83:4, 83:5, 84:5, 84:6, 97:15, 111:4, 111:17, 113:9, 123:24, 136:8
**50** [3] - 45:13, 45:15, 45:20
**54** [1] - 3:15
**55** [1] - 3:15
**567-0910** [1] - 2:5
**5:05** [3] - 1:15, 4:3, 4:12
**5th** [1] - 42:6

## 6

**6** [1] - 121:20
**60** [2] - 109:7, 109:9
**66211** [1] - 5:21
**6:19** [1] - 76:12
**6:23** [1] - 76:15
**6th** [2] - 56:16, 88:22

## 7

**7/17** [1] - 107:17
**70** [1] - 102:9
**77** [2] - 2:17, 3:16
**789-9200** [1] - 2:10
**7:27** [1] - 138:9
**7:30** [2] - 1:15, 138:22

## 8

**8** [2] - 84:16, 134:2
**8/25/2020** [1] - 48:4
**80** [6] - 60:11, 60:15, 78:16, 78:18, 102:6, 102:9

## 9

**9** [17] - 3:14, 24:12, 24:13, 26:11, 26:19, 27:13, 31:4, 34:7, 68:18, 69:3, 70:19, 83:2, 85:8, 93:24, 94:14, 95:5, 134:15
**90** [3] - 60:11, 60:15, 106:22
**9th** [9] - 25:12, 27:6, 28:11, 30:9, 71:25, 84:9, 89:1, 91:22, 94:2

## A

**ability** [5] - 18:9, 37:8, 41:20, 42:16, 102:17
**able** [6] - 34:25, 51:25, 84:25, 89:2, 94:7, 100:19
**abnormal** [1] - 36:17
**abnormalities** [1] - 40:2
**absence** [1] - 108:5
**abutment** [1] - 103:20
**academy** [1] - 82:4
**acceptable** [1] - 33:3
**access** [9] - 51:9, 56:18, 56:19, 57:14, 57:15, 73:12, 73:17, 74:1, 89:5
**according** [1] - 108:21
**account** [1] - 69:9
**accounting** [1] - 73:11
**accredited** [1] - 80:6
**accurate** [5] - 8:8, 25:25, 49:17, 59:18, 127:25
**accurately** [2] - 14:15, 137:24
**ACE™** [2] - 131:16, 132:6
**achieve** [1] - 71:8
**action** [2] - 141:11, 141:12
**active** [8] - 58:20, 58:21, 58:24, 58:25, 59:11, 59:12, 59:19, 101:18
**activities** [3] - 111:10, 134:22, 135:4
**activity** [2] - 35:13, 36:6
**actual** [5] - 91:2, 117:7, 134:12, 134:22, 135:3
**add** [1] - 18:19
**addition** [2] - 13:18, 115:11
**additional** [12] - 8:22, 9:24, 15:2, 42:24, 43:5, 67:10, 68:16, 79:19, 82:6, 93:10, 95:8, 108:4
**address** [4] - 5:19, 8:12, 8:16, 77:23
**adjust** [2] - 37:25, 124:21
**adjustable** [1] - 129:22
**adjustment** [2] - 129:12, 129:23
**administered** [1] - 105:11
**Administrative** [1] - 1:13
**advance** [2] - 35:13, 102:17
**advanced** [1] - 116:6
**Advent** [2] - 6:17, 82:18
**advice** [1] - 69:19
**advise** [1] - 77:7
**affect** [5] - 120:8, 135:17, 135:22, 136:3
**affects** [1] - 12:7
**affiliated** [1] - 29:25
**affirm** [1] - 5:1
**afternoon** [1] - 5:14
**ago** [2] - 53:7, 53:9
**agree** [3] - 131:19, 132:11, 136:11
**agreed** [1] - 125:9
**agreed-upon** [1] - 125:9
**agreements** [2] - 125:22, 126:5
**ahead** [2] - 9:9, 96:20
**alcohol** [4] - 135:11, 135:16, 135:21,

136:2
**alignment** [5] - 32:24, 36:3, 36:9, 91:15, 98:3
**alleged** [1] - 71:4
**allergies** [1] - 25:17
**Alliance** [1] - 22:10
**alliance** [1] - 22:16
**allowing** [1] - 94:1
**almost** [1] - 92:21
**AMA** [3] - 47:20, 47:22, 48:12
**American** [3] - 47:18, 122:11, 122:25
**amount** [2] - 75:5, 96:18
**anatomic** [1] - 91:14
**anesthesia** [6] - 12:11, 27:2, 96:14, 96:18, 96:23, 97:5
**anesthetic** [1] - 96:21
**answer** [7] - 21:7, 44:22, 44:25, 52:1, 66:18, 84:22, 137:2
**answered** [1] - 130:7
**answering** [1] - 44:25
**anticipate** [1] - 95:22
**anticipated** [3] - 117:22, 118:7, 119:6
**AOSC21-17** [1] - 1:13
**apart** [3] - 73:22, 116:12
**appear** [1] - 111:15
**appearances** [1] - 4:14
**APPEARANCES** [1] - 2:1
**appeared** [2] - 111:16, 140:9
**applicability** [1] - 44:6
**applied** [2] - 59:18, 92:9
**apply** [2] - 97:20, 141:13
**applying** [2] - 44:12, 64:10
**appointment** [2] - 56:23, 57:3
**April** [13] - 34:25, 36:23, 37:3, 38:10, 38:13, 56:24, 57:10, 60:6, 99:21, 101:1, 102:4, 102:15
**apropos** [2] - 95:20, 106:1
**areas** [2] - 9:20, 37:17
**arm** [5] - 44:14, 45:21, 46:6, 69:9, 69:10
**arrived** [1] - 121:4
**arthritis** [7] - 78:13, 115:20, 119:1, 120:14, 120:18, 120:19, 120:25
**arthroscopy** [4] - 62:8, 116:7, 117:20, 117:24
**article** [1] - 71:19
**articles** [1] - 8:23
**aspects** [4] - 32:25, 33:4, 33:8, 128:24
**assess** [2] - 47:17, 133:22
**assessment** [7] - 10:12, 10:19, 16:19, 17:9, 24:25, 107:6, 109:15
**assist** [2] - 12:22, 55:25
**assistance** [1] - 70:12
**assistant** [1] - 53:1
**Associates** [1] - 48:4
**Association** [2] - 122:11, 122:25
**association** [1] - 47:18
**assuage** [1] - 106:2
**assume** [1] - 92:10
**assuming** [1] - 48:8
**assumption** [1] - 132:23
**asymptomatic** [2] - 105:23, 105:24
**attach** [1] - 113:8
**attached** [2] - 84:4, 112:5
**attack** [1] - 12:10
**attempt** [2] - 58:8, 129:24
**attention** [5] - 23:20, 85:18, 92:13, 99:14, 112:8
**attentive** [1] - 110:11
**attorney** [2] - 74:22, 141:10
**attorneys** [8] - 20:5, 20:11, 20:17, 48:6, 48:11, 48:20, 53:4, 141:11
**attributable** [1] - 11:18
**attribute** [2] - 104:23, 111:25
**attributed** [2] - 11:18, 108:24
**Audio** [1] - 1:12
**Audio-Video** [1] - 1:12
**August** [10] - 41:9, 41:11, 41:12, 42:2, 60:10, 107:2, 108:10, 108:19, 109:16, 110:21
**authentic** [1] - 25:25
**author** [1] - 55:8
**authored** [1] - 76:23
**authorized** [1] - 141:5
**available** [1] - 96:3
**Avenue** [1] - 2:9
**avoid** [1] - 95:9
**awards** [1] - 8:23
**aware** [9] - 30:16, 35:19, 41:6, 42:3, 46:17, 52:21, 70:4, 71:15, 124:2

## B

**background** [2] - 7:11, 10:3
**bad** [1] - 72:23
**balance** [1] - 135:22
**bandage** [1] - 131:17
**Barb** [1] - 27:25
**Barbara** [14] - 4:9, 10:23, 24:7, 26:4, 64:2, 64:8, 64:13, 82:19, 82:23, 110:22, 115:3, 118:15, 120:1, 121:6
**BARBARA** [1] - 1:4
**Barbara's** [2] - 84:10, 104:23
**based** [19] - 66:18, 66:20, 91:17, 102:10, 103:25, 104:21, 112:18, 114:13, 114:21, 115:3, 117:20, 118:6, 118:14, 119:5, 119:24, 121:5, 125:14, 126:18, 128:14
**basics** [1] - 28:22
**bathroom** [1] - 28:5
**bear** [1] - 10:2
**become** [4] - 79:21, 80:24, 82:21, 105:23
**began** [1] - 38:25
**begin** [1] - 30:6
**behalf** [5] - 19:16, 62:5, 64:13, 73:14, 75:15
**Behalf** [2] - 2:2, 2:7
**below** [5] - 30:5, 45:17, 102:12, 103:2, 108:19
**benefit** [4] - 80:2, 89:2, 90:10, 90:11
**beside** [1] - 48:21
**best** [5] - 18:8, 125:16, 128:8, 129:21, 130:13
**better** [4] - 33:1, 33:5, 33:9, 130:12
**between** [9] - 19:22, 58:23, 68:16, 69:1, 71:18, 102:9, 103:21, 125:10, 139:3
**beyond** [3] - 129:25, 135:23, 136:25
**big** [1] - 132:23
**biggest** [1] - 87:5
**bill** [6] - 74:8, 114:19, 125:15, 126:14, 128:15
**biller** [1] - 128:9
**billing** [11] - 11:16, 113:10, 113:17, 114:5, 124:4, 124:6, 125:21, 126:25, 128:3, 128:24, 130:14
**Billing** [1] - 3:4
**bills** [1] - 113:23
**bit** [8] - 15:7, 33:22, 42:12, 78:23, 81:15, 87:1, 100:3, 100:8
**block** [1] - 93:7
**blocks** [3] - 93:3, 93:4, 93:5
**blood** [2] - 92:6, 133:25
**blow** [4] - 96:6, 97:8
**blow-by-blow** [2] - 96:6, 97:8
**board** [21] - 9:17, 9:20, 9:22, 79:17, 79:21, 80:2, 80:5, 80:8, 80:12, 80:16, 80:19, 80:24, 81:3, 81:9, 81:16, 81:24, 82:3, 82:6, 132:7, 134:14, 134:23
**boat** [1] - 28:5
**body** [3] - 7:6, 92:18, 121:19
**bone** [15] - 33:12, 33:16, 33:17, 37:4, 39:19, 91:5, 93:14, 95:9, 97:19, 97:20, 97:22, 97:24, 97:25, 100:9, 104:14
**bones** [4] - 39:22, 103:21, 104:18, 104:19
**border** [1] - 7:3
**bottom** [5] - 49:9, 92:13, 99:14, 107:22
**Boulevard** [2] - 5:20, 77:24
**brain** [3] - 96:25, 97:1
**Brandon** [1] - 2:13
**break** [2] - 66:9, 122:4
**Brickell** [1] - 2:9
**briefly** [2] - 76:17, 113:3
**broken** [2] - 69:9, 69:10
**building** [1] - 83:19
**Burnett** [1] - 2:8
**but..** [1] - 64:19
**BY** [76] - 2:6, 2:11, 5:13, 9:16, 24:4, 42:23, 52:3, 54:17, 55:4, 63:1, 63:10, 63:23, 64:20, 65:19, 66:6, 68:22, 70:13, 70:23, 71:13, 72:12, 77:15, 82:13, 84:1, 85:5, 85:17, 86:12, 87:16, 88:8, 88:18, 106:9, 111:1, 111:22, 113:1, 113:14, 114:18, 115:1, 115:16, 117:5, 118:1, 118:11, 119:3, 119:10, 119:20, 120:11, 121:3, 122:9, 122:18, 123:5, 123:18, 124:22, 125:19, 126:1, 126:12, 126:22, 127:6, 128:2, 129:10, 130:3, 130:16, 131:5, 132:4, 132:10, 132:15, 132:20, 133:8, 135:2, 135:9, 135:15, 135:20, 136:1, 136:6, 136:16, 136:19, 137:1, 137:5, 137:10

## C

**camera** [1] - 4:21
**capable** [2] - 51:19, 52:6
**care** [46] - 11:10, 11:19, 12:8, 15:22, 16:2, 28:16, 28:20, 29:2, 29:6, 29:20, 29:23, 30:4, 30:15, 35:3, 46:20, 48:24, 49:24, 56:15, 56:16, 57:17, 61:18, 62:23, 63:5, 64:24, 66:10, 71:21, 72:10, 82:20,

83:6, 83:7, 83:9, 83:15, 83:17, 83:19, 86:7, 86:11, 88:22, 89:8, 92:11, 112:17, 114:9, 115:5, 116:1, 116:5, 123:9, 137:7
**cares** [1] - 115:8
**Carnival** [6] - 4:9, 4:18, 72:3, 72:5, 112:2, 112:22
**CARNIVAL** [1] - 1:7
**carpal** [6] - 78:11, 103:19, 104:9, 104:12, 104:19, 104:23
**carpus** [1] - 104:13
**cartilage** [5] - 62:8, 103:17, 106:3, 106:6, 106:8
**CASE** [1] - 1:2
**case** [36] - 4:8, 20:6, 20:12, 21:25, 23:11, 24:6, 30:14, 30:24, 47:6, 47:21, 51:6, 55:13, 55:16, 64:1, 64:8, 64:14, 65:22, 66:15, 66:25, 73:4, 73:14, 75:20, 80:23, 81:12, 82:8, 82:9, 82:11, 93:7, 96:2, 98:5, 98:9, 103:24, 104:23, 107:25, 115:9, 123:14
**case-reporting** [1] - 80:23
**cases** [2] - 80:11, 80:14
**casted** [2] - 69:17, 69:18
**causes** [1] - 104:17
**causing** [1] - 104:20
**center** [11] - 6:18, 7:20, 79:5, 113:18, 113:20, 113:24, 114:1, 124:20, 124:25, 127:9, 127:15
**center's** [1] - 114:19
**certain** [5] - 12:4, 12:5, 75:4, 80:21, 125:7
**certainly** [3] - 15:9, 30:21, 88:6
**certainty** [1] - 68:7
**Certificate** [2] - 2:19, 2:19
**certificate** [2] - 9:24, 79:19
**CERTIFICATE** [1] - 140:1
**certification** [8] - 80:8, 80:9, 80:17, 81:3, 81:15, 81:16, 81:17, 141:13
**certifications** [1] - 81:24
**certified** [8] - 9:18, 9:21, 9:22, 79:17, 79:22, 80:3, 80:5, 80:25
**Certified** [2] - 1:22, 141:4
**certify** [3] - 140:8, 141:4, 141:9
**certifying** [1] - 141:14
**change** [1] - 23:8
**changed** [2] - 21:9, 81:4
**changes** [1] - 17:4
**charge** [6] - 21:2, 116:25, 128:16, 128:21, 128:22, 128:23
**charged** [1] - 23:16
**charges** [10] - 22:6, 22:17, 114:9, 117:1, 124:9, 124:21, 124:25, 125:5, 126:25, 127:4
**charging** [1] - 21:13
**chart** [30] - 11:15, 14:17, 15:7, 15:9, 15:12, 15:13, 15:21, 19:6, 24:6, 25:4, 25:9, 27:5, 31:18, 34:6, 46:13, 47:10, 48:3, 55:23, 56:19, 60:25, 65:4, 77:2, 77:3, 77:9, 83:22, 84:6, 94:4, 102:19, 113:8
**chart's** [1] - 84:4
**Chart.......................** [1] - 3:16
**charting** [1] - 80:14
**check** [5] - 17:7, 36:2, 36:3, 58:2, 60:24
**checking** [2] - 32:10, 41:14
**chemistry** [2] - 7:15, 78:25
**chief** [4] - 10:17, 27:25, 84:10, 108:12
**Christopher** [1] - 4:17
**CHRISTOPHER** [1] - 2:11
**city** [4] - 22:10, 29:22, 56:15, 82:17
**City** [3] - 6:5, 6:16, 8:21
**claim** [2] - 65:2, 75:17
**claims** [1] - 39:7
**clarify** [2] - 17:2, 20:9
**clarity** [1] - 27:8
**clean** [2] - 76:17, 97:19
**Clinic** [1] - 7:17
**clinic** [7] - 9:6, 35:21, 57:15, 79:3, 109:21, 126:24, 128:17
**clinical** [1] - 91:18
**clinically** [1] - 100:20
**close** [2] - 7:4, 104:20
**closely** [1] - 115:9
**closer** [1] - 92:18
**closing** [1] - 98:4
**collections** [1] - 129:4
**College** [2] - 5:20, 77:24
**combination** [2] - 14:24, 80:22
**coming** [3] - 29:18, 53:10, 92:11
**commencing** [1] - 4:3
**comment** [2] - 34:8, 47:9
**comminuted** [6] - 90:2, 90:11, 90:14, 90:15, 90:22, 91:4
**Commission** [2] - 140:19, 140:20
**common** [8] - 11:22, 12:3, 12:7, 47:14, 78:11, 104:5, 105:18, 130:11
**Communication** [1] - 1:12
**companies** [2] - 125:23, 126:5
**company** [4] - 125:8, 125:11, 126:6, 129:17
**compared** [1] - 51:8
**compensation** [1] - 122:16
**complaining** [1] - 29:18
**complaint** [6] - 10:17, 17:20, 26:14, 27:25, 84:10, 108:12
**complaints** [8] - 26:11, 39:4, 40:9, 41:13, 42:11, 44:8, 84:13, 134:10
**complete** [3] - 43:17, 46:16, 66:24
**completed** [3] - 25:10, 32:20, 44:16
**completely** [2] - 39:25, 138:1
**completeness** [1] - 43:17
**completing** [1] - 10:6
**completion** [1] - 44:19
**complex** [1] - 103:13
**complications** [6] - 36:17, 86:17, 87:1, 93:10, 93:20, 99:6
**composite** [1] - 77:2
**computer** [2] - 27:5, 91:2
**concept** [2] - 32:18, 129:8
**concerned** [1] - 22:19
**concluded** [1] - 138:21
**conclusions** [1] - 65:21
**conduct** [3] - 16:12, 24:20, 59:6
**conducted** [1] - 24:21
**conference** [6] - 54:6, 74:5, 74:15, 74:16, 74:17, 74:23
**conferences** [2] - 53:4, 75:11
**confirm** [3] - 31:20, 36:3, 51:10
**conjunction** [1] - 27:22
**connected** [1] - 141:11
**connection** [2] - 23:8, 83:23
**consequence** [1] - 87:25
**consider** [8] - 45:18, 58:19, 59:10, 64:21, 64:23, 70:4, 90:17, 110:13
**consideration** [1] - 62:7
**considerations** [1] - 107:20
**considered** [4] - 65:23, 69:6, 105:5, 129:1
**considering** [3] - 57:22, 110:6, 110:9
**constant** [1] - 32:8
**construct** [2] - 33:5, 33:8
**consultation** [1] - 52:13
**consulting** [1] - 20:3
**contact** [1] - 77:8
**contain** [2] - 25:5, 65:11
**context** [2] - 46:1, 57:18
**continue** [3] - 50:10, 102:16, 109:12
**continued** [9] - 38:24, 41:19, 42:15, 42:17, 43:4, 81:8, 105:4, 106:19, 108:15
**contract** [1] - 128:11
**contracted** [2] - 124:19, 129:22
**contractual** [3] - 125:22, 126:4, 129:2
**control** [2] - 15:10, 141:14
**convenience** [1] - 67:24
**conversation** [3] - 53:6, 55:11, 75:20
**coordination** [1] - 135:12
**copy** [13] - 7:22, 8:8, 23:24, 24:5, 25:4, 25:9, 25:25, 27:4, 46:12, 49:18, 77:9, 137:22, 138:17
**CORPORATION** [1] - 1:7
**correct** [26] - 13:22, 14:1, 20:22, 22:21, 22:24, 30:9, 38:10, 47:23, 59:24, 62:1, 68:4, 77:19, 80:21, 86:3, 98:3, 102:5, 108:8, 109:11, 123:20, 123:22, 127:21, 128:17, 128:20, 130:20, 133:17, 136:8
**correspondence** [1] - 54:19
**cortical** [2] - 60:13, 116:4
**cortisone** [7] - 41:2, 41:4, 105:6, 105:22, 106:6, 107:9, 108:15
**cost** [4] - 49:23, 50:3, 50:7, 116:22
**costs** [3] - 117:22, 118:7, 119:6
**counsel** [6] - 4:13, 53:6, 138:12, 139:3, 141:10, 141:11
**COUNTY** [2] - 140:4, 141:2
**couple** [3] - 12:14, 18:25, 53:7
**course** [12] - 16:11, 16:20, 35:15, 46:18, 46:23, 47:15, 48:14, 50:1, 50:16, 58:15, 59:4, 110:20

**COURT** [1] - 1:1
**Court** [1] - 1:12
**courtroom** [1] - 19:25
**coverage** [1] - 30:3
**covered** [1] - 123:19
**COVID** [2] - 57:12, 58:13
**craftsmanship** [1] - 33:24
**create** [1] - 16:22
**critical** [4] - 13:2, 72:11, 72:14, 81:11
**criticisms** [1] - 72:4
**Cross** [1] - 2:17
**CROSS** [1] - 77:14
**cross** [2] - 135:24, 136:25
**Cross-Examination** [1] - 2:17
**CROSS-EXAMINATION** [1] - 77:14
**CRR** [4] - 1:21, 4:5, 140:18, 141:22
**CRUISE** [2] - 140:18, 141:22
**cruise** [11] - 28:3, 56:6, 68:9, 71:4, 82:24, 112:14, 121:8, 132:7, 134:14, 134:23, 135:5
**Cruise** [7] - 1:21, 4:5, 4:9, 72:3, 72:5, 140:7, 141:4
**csmith@fowler** [1] - 2:11
**csmith@fowler-white.com** [1] - 2:11
**CT** [4] - 88:24, 89:5, 89:9, 89:16
**cubital** [1] - 78:12
**cure** [2] - 105:12, 106:3
**curious** [1] - 33:6
**current** [6] - 8:20, 9:1, 9:6, 49:1, 77:3
**Curriculum** [1] - 3:14
**curriculum** [1] - 8:8
**customary** [2] - 114:15, 114:23
**customer** [1] - 95:17
**CV** [7] - 7:22, 8:1, 8:16, 8:25, 9:9, 54:14, 76:20

## D

**damage** [1] - 92:7
**DASH** [18] - 43:21, 44:1, 44:3, 44:15, 44:19, 44:21, 45:5, 45:8, 45:13, 45:16, 45:19, 45:23, 46:12, 48:16, 52:16, 52:24, 61:9, 61:10
**date** [8] - 8:17, 11:14, 24:10, 24:14, 31:21, 49:14, 68:17, 94:5
**DATE** [1] - 1:14
**dated** [4] - 48:3, 54:21, 61:19, 93:24
**DATED** [1] - 141:16
**David** [1] - 48:4
**days** [6] - 71:3, 71:5, 71:6, 71:16, 71:18, 106:22
**deal** [2] - 29:13, 133:10
**dealt** [1] - 133:10
**death** [1] - 97:2
**debrided** [1] - 105:21
**debridement** [3] - 62:9, 116:8, 118:5
**December** [19] - 1:14, 3:15, 4:2, 4:11, 43:25, 52:13, 54:12, 60:20, 61:1, 61:3, 61:13, 63:12, 67:12, 76:22, 83:4, 136:10, 140:10, 140:12, 141:16
**decreased** [2] - 50:12
**deems** [1] - 80:16
**defendant** [2] - 75:16, 76:19
**Defendant** [2] - 1:8, 2:7
**Defendant's** [5] - 9:14, 24:2, 54:15, 55:2, 77:12
**dEFENDANT'S** [1] - 3:12
**defending** [1] - 75:16
**Defense** [1] - 84:5
**defense** [3] - 84:6, 112:6, 113:9
**definition** [2] - 51:23, 65:16
**degree** [18] - 68:6, 88:11, 102:11, 103:25, 104:22, 110:21, 111:24, 112:19, 115:4, 116:16, 117:21, 118:6, 118:14, 119:5, 119:15, 119:24, 121:5, 121:23
**degrees** [7] - 41:24, 57:4, 60:7, 102:4, 102:6, 102:12, 109:1
**delay** [3] - 70:5, 71:16, 95:8
**delayed** [2] - 30:22, 81:16
**denies** [1] - 26:24
**denominator** [1] - 50:18
**deny** [1] - 51:10
**department** [2] - 21:10, 22:25
**deponent** [1] - 139:6
**Deposition** [1] - 2:16
**DEPOSITION** [1] - 1:10
**deposition** [24] - 4:1, 4:4, 4:10, 9:11, 19:5, 19:9, 19:11, 19:13, 19:23, 20:7, 23:15, 24:1, 55:13, 55:15, 74:3, 74:7, 74:8, 75:18, 77:7, 131:13, 138:21, 138:23, 139:5, 141:6
**derive** [1] - 130:5
**describe** [1] - 97:11
**described** [3] - 110:16, 112:20, 116:13
**DESCRIPTION** [2] - 3:3, 3:13
**details** [3] - 29:1, 72:10, 128:10
**determining** [1] - 32:13
**develop** [4] - 87:13, 115:20, 118:25, 120:24
**diabetes** [6] - 12:6, 30:11, 30:13, 30:18, 30:23, 30:25
**diagnoses** [1] - 11:9
**diagnosis** [5] - 11:8, 12:5, 24:22, 96:9, 96:10
**diagnostic** [1] - 134:3
**dictate** [1] - 18:12
**differ** [1] - 58:14
**difference** [2] - 19:22, 58:23
**different** [2] - 8:13, 107:17
**difficult** [4] - 32:23, 33:11, 93:8, 95:11
**difficulty** [2] - 41:19, 41:21
**Direct** [1] - 2:17
**DIRECT** [1] - 5:12
**direct** [3] - 52:20, 134:12, 141:14
**direction** [1] - 141:14
**disability** [3] - 45:21, 46:4, 46:8
**discharged** [1] - 109:21
**discomfort** [3] - 101:4, 105:4, 107:10
**discuss** [2] - 92:25, 110:2
**discussed** [1] - 48:23
**discussing** [2] - 109:18, 110:10
**discussion** [3] - 107:13, 107:20, 138:10
**displaced** [1] - 91:10
**displacement** [1] - 91:13
**distal** [23] - 29:7, 31:1, 31:12, 32:2, 36:13, 46:25, 56:7, 66:10, 68:7, 68:13, 69:1, 71:8, 89:21, 92:15, 92:17, 93:18, 96:12, 97:24, 98:10, 104:6, 105:19, 110:17, 134:16
**DISTRICT** [2] - 1:1, 1:1
**Doctor** [93] - 4:24, 11:6, 19:9, 19:20, 20:3, 21:3, 22:19, 23:5, 24:5, 24:9, 24:15, 25:5, 25:23, 26:6, 26:9, 26:19, 27:6, 28:12, 29:9, 30:25, 31:4, 31:7, 31:15, 31:25, 35:2, 36:22, 38:5, 38:20, 39:21, 40:4, 41:7, 42:4, 45:12, 46:19, 47:15, 49:4, 50:9, 52:5, 52:12, 54:19, 55:6, 55:9, 55:16, 55:20, 56:3, 56:25, 57:19, 58:19, 59:20, 59:25, 63:2, 67:21, 68:1, 70:14, 70:24, 71:6, 71:15, 72:2, 72:16, 74:14, 77:16, 78:1, 85:8, 111:24, 113:4, 119:23, 121:4, 121:22, 122:1, 122:10, 123:6, 123:13, 123:23, 124:3, 124:8, 124:13, 124:23, 125:20, 126:13, 126:24, 128:4, 131:3, 132:16, 133:12, 133:20, 134:1, 134:9, 134:12, 134:21, 135:3, 136:7, 137:19, 137:20
**doctor** [19] - 5:14, 5:18, 5:23, 6:11, 6:19, 7:7, 7:11, 8:7, 10:5, 10:11, 11:12, 12:21, 14:14, 16:11, 18:4, 18:25, 19:5, 50:2, 133:24
**doctor's** [2] - 15:8, 76:21
**Doctor's** [2] - 76:20, 85:3
**doctors** [2] - 23:21, 30:1
**document** [7] - 8:4, 22:5, 22:15, 23:2, 25:23, 49:6, 54:23
**dominant** [2] - 84:20, 85:7
**done** [9] - 18:19, 22:24, 50:19, 52:17, 69:10, 89:6, 96:3, 96:15, 98:4
**down** [15] - 5:7, 24:11, 27:14, 27:18, 56:22, 66:9, 81:12, 86:18, 86:20, 86:24, 92:2, 95:16, 97:19, 121:2, 126:20
**Dr** [13] - 9:17, 50:2, 63:24, 66:23, 68:25, 71:7, 76:1, 76:23, 77:4, 77:6, 130:18, 131:16, 135:10
**drafting** [2] - 55:25, 72:18
**dressing** [2] - 35:6
**Drive** [1] - 2:4
**due** [2] - 36:13, 81:3
**duly** [2] - 5:10, 140:10
**during** [5] - 16:10, 65:9, 80:9, 96:5, 98:2
**dust** [1] - 90:16
**dusted** [1] - 90:17
**duty** [1] - 34:25

## E

**early** [1] - 37:4
**easier** [1] - 93:4
**East** [1] - 6:17
**Eddy** [1] - 4:15
**edema** [1] - 86:19
**edits** [1] - 21:10

**Eduardo** [1] - 2:3
**EDUARDO** [1] - 2:6
**education** [4] - 78:23, 91:17, 114:13, 114:21
**educational** [1] - 7:11
**effectively** [1] - 81:23
**effort** [1] - 59:20
**ehernandez@ejh** [1] - 2:6
**ehernandez@ejh-law.com** [1] - 2:6
**either** [6] - 14:10, 27:21, 70:5, 89:3, 124:19, 125:5
**elbow** [2] - 7:8, 78:14
**elbows** [1] - 58:10
**Electronically** [2] - 3:5, 3:17
**elevated** [1] - 69:18
**eligible** [1] - 80:16
**emergency** [1] - 86:7
**emergent** [2] - 86:11, 96:2
**employee** [2] - 141:10, 141:10
**employment** [1] - 9:2
**encapsulates** [1] - 65:8
**end** [12] - 33:12, 33:16, 33:17, 77:6, 81:12, 85:1, 85:3, 85:4, 93:7, 94:25, 98:3, 111:23
**ended** [2] - 18:16, 83:10
**endless** [1] - 66:4
**ends** [1] - 15:19
**engagement** [1] - 83:24
**entire** [2] - 35:15, 66:9
**entirely** [1] - 8:19
**entitled** [1] - 126:6
**ESQUIRE** [2] - 2:6, 2:11
**essentially** [5] - 22:25, 38:3, 81:17, 104:19, 107:16
**establish** [1] - 28:21
**estimate** [3] - 19:12, 116:20, 116:22
**estimates** [2] - 49:23, 50:3
**evaluate** [3] - 32:5, 57:20, 134:8
**evaluating** [1] - 59:9
**evaluation** [6] - 11:14, 32:8, 48:11, 48:20, 57:20, 119:2
**evening** [2] - 77:16, 121:22
**exact** [2] - 28:19, 54:1
**exactly** [2] - 125:17, 130:10
**exam** [6] - 24:24, 39:9, 41:24, 82:11, 91:21, 92:3
**Examination** [3] - 2:17, 2:17, 2:18
**examination** [16] - 10:18, 16:12, 16:15, 17:22, 17:25, 24:22, 31:3, 31:7, 57:23, 80:19, 81:10, 82:8, 91:9, 113:9, 124:1, 130:18
**EXAMINATION** [3] - 5:12, 77:14, 122:8
**examined** [1] - 5:10
**example** [1] - 118:16
**exams** [2] - 80:20, 91:23
**excessive** [1] - 87:1
**exhaustive** [2] - 65:23, 67:8
**exhibit** [8] - 36:14, 60:2, 61:21, 63:17, 84:3, 101:25, 123:24, 127:18
**Exhibit** [22] - 9:10, 9:14, 23:25, 24:2, 54:13, 54:15, 55:1, 55:2, 63:22, 76:19, 76:21, 76:22, 76:24, 77:1, 77:2, 77:12, 84:5, 113:11, 113:12, 124:5, 124:8
**exhibiting** [1] - 116:18
**EXHIBITS** [3] - 3:1, 3:2, 3:12
**Exhibits** [3] - 3:5, 3:17, 112:6
**exhibits** [1] - 76:18
**expectations** [1] - 65:1
**expected** [1] - 101:6
**experience** [8] - 60:6, 86:5, 91:17, 114:14, 114:22, 125:14, 130:5, 130:8
**experiencing** [1] - 106:10
**expert** [7] - 20:2, 20:18, 23:11, 53:12, 75:15, 128:13, 130:1
**Expires** [1] - 140:20
**explain** [3] - 33:6, 33:7, 57:19
**explained** [1] - 34:1
**expressed** [1] - 121:21
**extension** [7] - 37:19, 41:24, 50:13, 58:3, 109:1, 109:5, 109:8
**extent** [1] - 114:6
**extreme** [1] - 44:6
**extremities** [1] - 78:20
**extremity** [8] - 34:22, 44:8, 44:14, 56:7, 68:8, 78:2, 78:5, 94:13
**eye** [2] - 47:2, 109:22

## F

**face** [6] - 77:17, 130:19, 130:21
**face-to-face** [3] - 77:17, 130:19, 130:21
**facilitated** [1] - 83:24
**fact** [2] - 71:25, 89:7
**fairly** [4] - 37:19, 40:14, 99:4, 99:6
**faith** [1] - 59:20
**fall** [9] - 68:17, 70:3, 71:4, 82:24, 85:11, 112:2, 121:7, 134:23, 135:6
**familiar** [3] - 11:3, 113:22, 114:4
**family** [2] - 17:12, 59:16
**far** [16] - 7:13, 17:3, 17:5, 22:18, 22:19, 33:11, 35:18, 51:16, 62:23, 82:20, 93:18, 110:16, 126:23, 127:10
**fashion** [1] - 16:23
**fee** [5] - 21:24, 23:25, 54:14, 73:6, 75:4
**fees** [2] - 23:7, 73:8
**fell** [1] - 112:10
**fellowship** [3] - 7:19, 79:5, 79:7
**fellowships** [1] - 79:8
**few** [3] - 8:11, 67:17, 122:2
**fiber** [1] - 62:8
**fibrocartilage** [1] - 103:12
**fill** [1] - 43:20
**filled** [1] - 13:11
**fills** [1] - 12:13
**film** [1] - 91:2
**films** [2] - 133:13, 133:15
**filter** [1] - 126:20
**finally** [3] - 80:16, 119:23, 121:4
**financial** [1] - 23:21
**financially** [1] - 141:11
**findings** [4] - 37:2, 38:23, 107:13, 107:14
**fine** [5] - 53:17, 74:1, 79:25, 111:16, 117:13
**finger** [3] - 39:1, 102:25, 104:15
**fingers** [1] - 87:7
**fingertips** [2] - 7:9, 92:19
**finished** [1] - 43:24
**firing** [1] - 58:25
**first** [19] - 5:10, 24:10, 28:4, 32:5, 59:12, 68:6, 68:17, 69:2, 82:21, 83:1, 84:9, 84:20, 85:7, 88:20, 94:18, 98:17, 101:20, 115:22
**fit** [3] - 27:1, 93:5, 93:15
**five** [3] - 54:8, 79:11
**fix** [3] - 33:14, 97:21, 97:23
**fixation** [5] - 31:12, 32:2, 32:14, 33:1, 71:17
**FL** [2] - 2:5, 2:10
**flat** [1] - 75:4
**flew** [1] - 28:6
**flexion** [6] - 37:18, 50:13, 58:3, 109:9, 109:25, 110:12
**flexor** [5] - 43:6, 47:3, 111:15, 116:18, 123:25
**floor** [2] - 56:6, 112:12
**Floor** [1] - 2:9
**florida** [1] - 140:19
**FLORIDA** [3] - 1:1, 140:3, 141:2
**Florida** [5] - 1:12, 1:23, 1:23, 4:6, 140:8
**flow** [1] - 92:6
**fluid** [1] - 32:18
**flux** [1] - 81:19
**focusing** [1] - 102:17
**foe** [1] - 116:1
**fog** [1] - 97:1
**folks** [1] - 78:19
**follow** [12] - 18:16, 35:17, 36:25, 40:4, 40:6, 41:1, 41:8, 43:16, 56:23, 80:15, 122:2, 136:20
**follow-up** [5] - 40:4, 41:1, 41:8, 43:16, 56:23
**following** [10] - 31:6, 32:3, 36:7, 36:18, 43:12, 54:14, 60:17, 61:18, 65:16, 138:10
**follows** [2] - 4:23, 5:11
**force** [1] - 59:17
**forearm** [4] - 97:14, 97:23, 98:7, 111:14
**foregoing** [2] - 141:6, 141:13
**forget** [1] - 13:3
**form** [67] - 43:21, 44:10, 44:15, 44:19, 45:5, 45:8, 45:13, 46:12, 51:21, 62:24, 63:7, 64:16, 65:13, 66:2, 68:19, 70:20, 71:11, 72:8, 82:1, 83:16, 85:14, 86:9, 87:4, 88:2, 88:14, 88:16, 106:4, 110:24, 111:20, 112:23, 114:16, 114:24, 115:6, 116:23, 117:23, 118:8, 118:18, 119:8, 119:17, 120:2, 120:21, 122:14, 123:3, 123:16, 124:15, 125:1, 125:24, 126:9, 126:16, 127:1, 127:22, 128:18, 129:14, 132:2, 132:8, 132:14, 133:2, 134:25, 135:7, 135:14, 135:18, 135:23, 136:4, 136:15, 136:18, 136:24, 137:9
**formal** [2] - 19:24, 20:1
**format** [2] - 10:11, 20:7
**formatted** [1] - 22:16
**forms** [2] - 46:16
**formulate** [1] - 31:7
**forth** [1] - 40:16
**fortunate** [1] - 118:12
**fortunately** [1] - 111:9
**four** [2] - 94:25, 106:25
**Fowler** [1] - 2:8
**FPR** [8] - 1:21, 4:5, 140:18, 141:22
**FPR-C** [4] - 1:21, 4:5,

140:18, 141:22
**fracture** [47] - 28:1, 29:8, 31:1, 32:23, 32:25, 33:10, 33:11, 36:13, 56:8, 68:8, 68:14, 69:2, 71:9, 71:21, 83:8, 84:12, 86:2, 87:10, 87:11, 88:6, 88:10, 89:21, 90:2, 90:12, 91:1, 91:6, 91:9, 91:19, 92:14, 92:20, 93:1, 93:14, 93:17, 95:21, 95:24, 96:12, 98:7, 98:11, 110:17, 110:19, 112:1, 120:16, 120:23, 131:22, 132:12, 133:1, 134:17
**fractured** [1] - 97:24
**fractures** [4] - 66:10, 78:13, 104:6, 105:19
**fragment** [2] - 90:20, 90:21
**fragmented** [1] - 90:12
**fragments** [3] - 90:3, 90:9, 91:5
**frame** [1] - 94:16
**free** [1] - 84:6
**frequently** [1] - 122:15
**frequents** [1] - 114:2
**Friday** [1] - 4:2
**front** [3] - 19:25, 25:5, 25:24
**froze** [1] - 84:25
**full** [9] - 5:15, 35:1, 35:13, 37:8, 38:15, 42:16, 77:8, 102:18
**fully** [1] - 41:20
**function** [1] - 120:9
**functionality** [1] - 44:13
**functionless** [1] - 46:7
**funds** [1] - 129:24
**future** [24] - 43:3, 46:20, 48:24, 49:1, 49:23, 61:17, 62:13, 62:23, 63:5, 65:1, 86:20, 109:19, 110:23, 111:19, 115:2, 115:4, 115:5, 115:8, 115:19, 116:1, 116:5, 119:16, 123:15, 123:21

## G

**gait** [1] - 135:17
**general** [11] - 10:3, 10:19, 10:21, 12:11, 71:20, 86:22, 96:17, 96:18, 96:21, 96:22, 97:5
**generally** [2] - 78:9, 80:1
**generated** [1] - 112:5
**generator** [1] - 88:12
**GG303089** [1] - 140:19
**given** [11] - 51:16, 60:13, 69:19, 70:14, 83:14, 83:21, 83:22, 92:14, 92:25, 112:21, 120:22
**glass** [2] - 76:9, 122:4
**god** [1] - 5:4
**gonna** [3] - 78:15, 121:14
**gosh** [1] - 129:15
**government** [1] - 4:20
**government-issued** [1] - 4:20
**graduated** [1] - 80:6
**great** [1] - 21:4
**grind** [3] - 104:9, 104:12, 104:24
**grip** [6] - 50:11, 50:17, 50:18, 51:4, 51:7, 120:10
**group** [2] - 22:9, 22:17
**guess** [21] - 19:21, 25:7, 64:3, 64:9, 64:17, 64:19, 65:14, 65:21, 67:14, 69:5, 69:6, 70:9, 89:8, 90:10, 120:23, 126:17, 129:16, 130:8, 133:10
**guidelines** [3] - 36:5, 47:19, 48:12
**guys** [1] - 138:18

## H

**habit** [1] - 13:1
**half** [1] - 98:23
**Hall** [70] - 4:9, 10:23, 19:1, 24:7, 24:10, 24:15, 25:6, 25:11, 26:4, 26:7, 26:10, 28:17, 30:14, 31:4, 31:15, 34:11, 35:3, 35:16, 35:21, 36:14, 36:22, 37:16, 40:8, 40:20, 41:8, 42:5, 42:8, 42:25, 43:10, 43:13, 45:13, 46:15, 47:22, 48:14, 49:20, 50:17, 50:24, 51:16, 51:19, 52:6, 52:14, 52:23, 59:6, 60:2, 61:9, 64:2, 64:8, 64:13, 65:10, 65:12, 67:1, 68:15, 69:1, 70:17, 70:24, 72:6, 73:14, 82:19, 114:9, 123:6, 123:14, 123:24, 126:15, 128:4, 128:15, 128:16, 132:5, 136:7, 136:12, 136:20
**HALL** [1] - 1:4
**Hall's** [15] - 3:16, 31:1, 39:22, 41:13, 42:11, 48:6, 48:11, 48:20, 51:7, 53:4, 54:7, 55:25, 68:7, 71:9, 134:13
**hand** [33] - 4:25, 5:7, 7:19, 7:20, 9:25, 12:8, 35:8, 44:14, 51:1, 51:5, 78:2, 78:5, 78:14, 78:19, 79:4, 79:5, 79:8, 79:19, 81:17, 81:25, 82:3, 82:7, 84:20, 85:7, 86:20, 91:25, 92:4, 92:21, 98:10, 102:18, 118:21, 121:16
**hand's** [1] - 92:1
**hands** [1] - 109:25
**hard** [2] - 23:21, 93:12
**hardware** [16] - 43:10, 47:1, 47:3, 62:7, 93:10, 93:11, 110:3, 110:6, 110:9, 110:14, 110:23, 115:12, 116:11, 116:17, 116:21, 117:9
**healed** [2] - 36:2, 95:18
**healing** [2] - 30:22, 37:4
**health** [3] - 123:9, 126:5, 126:6
**Health** [2] - 6:17, 82:18
**hear** [1] - 84:25
**heart** [5] - 12:10, 26:24, 96:25, 110:3, 133:25
**heavy** [2] - 50:11, 51:15
**hedging** [1] - 15:6
**heeling** [1] - 95:10
**held** [1] - 76:13
**help** [4] - 5:4, 21:19, 66:18, 83:9
**helpful** [2] - 28:15, 41:17
**helps** [1] - 86:15
**her..** [1] - 54:1
**hereby** [1] - 141:4
**herein** [1] - 139:4
**Hernandez** [9] - 2:3, 2:17, 4:15, 53:24, 84:24, 130:18, 131:6, 131:10, 131:12
**HERNANDEZ** [76] - 2:6, 4:15, 42:20, 51:21, 62:24, 63:7, 63:16, 64:16, 65:13, 66:2, 68:19, 70:20, 71:11, 72:7, 76:6, 77:15, 82:13, 84:1, 85:2, 85:5, 85:17, 86:12, 87:16, 88:8, 88:15, 88:18, 106:9, 111:1, 111:22, 113:1, 113:7, 113:14, 114:18, 115:1, 115:16, 117:3, 117:5, 118:1, 118:11, 119:3, 119:10, 119:20, 120:11, 121:3, 121:25, 122:14, 123:3, 123:16, 124:15, 125:1, 125:24, 126:9, 126:16, 127:1, 127:22, 128:18, 129:14, 130:7, 131:3, 132:2, 132:8, 132:14, 132:19, 133:2, 134:25, 135:7, 135:14, 135:18, 135:23, 136:4, 136:15, 136:18, 136:24, 137:9, 137:18, 138:18
**herself** [1] - 123:7
**high** [2] - 7:12, 45:22
**higher** [1] - 93:19
**hinder** [1] - 30:21
**History** [13] - 10:18, 14:10, 14:16, 14:22, 17:12, 26:19, 26:21, 27:9, 27:12, 27:24, 28:12, 30:6
**history** [25] - 11:4, 11:7, 11:18, 11:24, 12:10, 12:18, 13:5, 13:8, 13:15, 13:25, 14:5, 14:10, 14:13, 14:22, 15:1, 15:2, 17:12, 24:21, 24:24, 25:2, 25:16, 44:24, 67:7, 85:10
**hit** [1] - 28:6
**hold** [2] - 67:11, 109:19
**holding** [1] - 4:21
**home** [1] - 88:19
**honest** [3] - 14:25, 21:7, 28:19
**honestly** [1] - 11:13
**hopefully** [1] - 122:7
**hospital** [9] - 6:12, 6:14, 10:15, 29:23, 30:2, 82:15, 83:10, 125:8, 125:10
**hour** [3] - 98:23
**hours** [1] - 23:16
**housecleaning** [1] - 76:17
**HPI** [6] - 14:4, 17:15, 26:24, 27:8, 29:1, 85:19
**hurts** [1] - 133:4

## I

**idea** [1] - 125:2
**identification** [7] - 4:20, 9:15, 24:3, 54:16, 55:3, 77:13, 113:13
**identify** [1] - 108:4
**identity** [1] - 4:22
**ignorance** [1] - 21:12
**illness** [2] - 14:5, 24:24
**Illness** [6] - 10:18, 14:11, 27:10, 27:13, 27:24, 28:12
**image** [2] - 15:18, 19:7
**imagine** [1] - 93:3
**imaging** [12] - 40:16, 89:3, 89:15, 89:18, 91:9, 92:15, 107:13, 107:16, 107:18, 108:4, 116:6, 119:16
**immobilize** [3] - 86:23, 132:12, 133:1
**immobilized** [2] - 87:12, 132:6
**immobilizing** [2] - 131:20, 131:25
**impact** [2] - 30:14, 30:25
**impair** [1] - 135:11
**impairment** [8] - 43:19, 47:17, 48:22, 121:7, 121:10,

121:12, 122:11, 122:25
**important** [6] - 12:6, 13:8, 28:10, 29:15, 29:19, 71:21
**imported** [2] - 14:23, 43:24
**improvement** [7] - 42:13, 60:2, 60:5, 60:12, 60:15, 108:14, 111:8
**inappropriate** [1] - 70:5
**inches** [1] - 97:16
**incision** [4] - 37:12, 97:13, 97:14, 97:15
**include** [6] - 10:6, 25:21, 62:6, 116:5, 117:6, 122:19
**included** [3] - 25:14, 65:25, 129:7
**inclusive** [1] - 65:3
**increase** [1] - 88:7
**INDEX** [2] - 2:15, 3:1
**Indiana** [4] - 7:20, 79:5, 79:6
**Indianapolis** [2] - 7:20, 79:6
**indicate** [1] - 38:14
**indicated** [1] - 118:2
**indicates** [1] - 71:15
**indicating** [1] - 93:25
**indicating)** [3] - 58:5, 58:12, 97:16
**indicative** [3] - 103:16, 103:17, 103:19
**individual** [2] - 20:20, 102:8
**individual's** [2] - 47:17, 135:11
**infection** [3] - 36:15, 37:13, 40:1
**inflammation** [1] - 105:22
**information** [20] - 11:11, 11:23, 12:17, 12:22, 13:19, 13:21, 13:24, 14:9, 14:16, 18:3, 27:14, 27:20, 28:7, 28:11, 29:12, 46:22, 56:12, 61:24, 65:3, 74:3
**initial** [4] - 70:6, 71:10, 71:18, 131:1
**injection** [19] - 17:17, 40:20, 41:15, 41:17, 42:13, 60:14, 105:6, 105:8, 105:11, 105:14, 105:16, 105:22, 106:7, 107:9, 108:1, 108:7, 108:15, 111:9, 116:4
**injections** [3] - 40:23, 41:2, 41:4
**injured** [2] - 69:11, 69:25
**injuries** [9] - 29:17, 68:25, 69:4, 69:21, 69:25, 78:13, 78:19, 86:6
**injurious** [2] - 69:24, 70:6
**injury** [30] - 15:23, 15:24, 33:23, 34:1, 49:2, 56:4, 59:5, 61:18, 62:5, 68:9, 68:16, 69:7, 71:10, 71:18, 71:21, 75:17, 86:1, 86:4, 86:7, 86:23, 101:6, 104:3, 104:5, 104:24, 112:21, 131:20, 131:21, 131:24, 131:25, 132:6
**injury's** [1] - 16:1
**inserted** [1] - 98:6
**inside** [1] - 134:13
**insofar** [10] - 94:15, 101:1, 106:14, 106:18, 107:13, 107:20, 111:19, 115:2, 115:25, 119:25
**instance** [6] - 12:9, 15:17, 17:6, 25:15, 35:16, 44:24
**instances** [1] - 20:12
**Institute** [4] - 6:6, 8:21, 56:16, 82:18
**institute** [2] - 6:16, 29:22
**instructions** [1] - 44:21
**insurance** [11] - 50:6, 124:18, 125:7, 125:11, 125:22, 126:5, 126:6, 126:15, 129:12, 129:17, 129:22
**intake** [8] - 12:3, 13:19, 25:5, 25:7, 25:10, 25:13, 25:18, 25:21
**intended** [1] - 105:12
**intense** [1] - 82:10
**intent** [1] - 105:15
**intention** [1] - 105:15
**intentions** [1] - 105:13
**interactions** [1] - 52:20
**interested** [1] - 141:11
**internal** [2] - 32:2, 71:17
**internet** [1] - 84:25
**intervention** [5] - 62:5, 104:3, 104:25, 115:19, 117:7
**interventions** [1] - 115:15
**interview** [1] - 80:23
**intoxication** [4] - 135:11, 135:16, 135:21, 136:2
**intraarticular** [5] - 89:20, 89:24, 90:21, 96:12, 120:23
**investigation** [1] - 108:3
**invoice** [1] - 73:11
**involved** [3] - 89:10, 122:12, 123:1
**involves** [1] - 73:4
**involving** [1] - 67:1
**irritated** [1] - 43:7
**irritation** [5] - 47:3, 109:25, 110:12, 116:19, 123:25
**issue** [3] - 30:23, 47:8, 76:17
**issued** [1] - 4:20
**issues** [6] - 23:22, 26:25, 43:18, 96:25, 97:1, 105:3
**it's..** [1] - 87:20
**item** [2] - 124:9, 124:10
**items** [2] - 25:22, 99:14
**itself** [2] - 13:15, 93:9


## J


**janitorial** [1] - 70:11
**job** [1] - 8:20
**joint** [6] - 89:22, 89:25, 93:12, 93:13, 105:23
**joints** [2] - 59:1, 59:3
**judge** [1] - 19:25
**July** [6] - 22:14, 40:7, 105:8, 105:12, 106:11, 107:4
**June** [8] - 38:7, 38:21, 38:23, 39:11, 59:24, 60:6, 102:20, 104:2
**jurisdiction** [1] - 15:21
**jury** [2] - 19:25, 78:9
**jury's** [2] - 80:2, 90:11
**juts** [1] - 100:3


## K


**Kansas** [15] - 5:21, 6:5, 6:6, 6:16, 6:22, 6:25, 7:15, 8:21, 22:9, 29:21, 56:15, 77:22, 78:24, 79:16, 82:17
**KCOI** [2] - 29:6, 29:20
**keep** [4] - 21:15, 34:20, 47:2, 109:22
**keeping** [1] - 11:15
**Kendall** [1] - 2:4
**KENNETH** [6] - 1:10, 2:16, 4:1, 5:9, 140:8, 141:6
**Kenneth** [2] - 4:10, 5:17
**key** [2] - 108:17
**kind** [43] - 10:3, 15:6, 18:11, 21:10, 23:3, 27:16, 27:21, 30:2, 32:23, 33:6, 35:12, 35:15, 40:15, 42:14, 43:2, 43:15, 43:16, 44:5, 56:19, 66:8, 69:5, 81:7, 81:10, 81:18, 81:21, 86:18, 100:3, 100:7, 101:3, 102:24, 107:23, 108:16, 109:17, 109:20, 111:7, 111:11, 113:16, 118:22, 119:1, 125:4, 125:6
**knee** [2] - 15:24, 16:1
**know..** [2] - 53:14, 65:4
**knowing** [2] - 69:23, 72:23
**knowledge** [8] - 43:9, 51:6, 68:21, 124:24, 132:25, 134:13, 134:22, 135:4
**knows** [1] - 54:4


## L


**L.L.C** [1] - 2:3
**lack** [1] - 42:15
**landing** [1] - 56:6
**large** [2] - 93:4, 93:5
**Large** [1] - 4:6
**last** [14] - 24:14, 29:4, 42:7, 42:8, 44:24, 45:1, 52:14, 83:3, 111:4, 136:7, 136:12, 136:22, 137:7, 137:11
**law.com** [1] - 2:6
**lawsuit** [3] - 122:13, 122:17, 122:20
**lay** [3] - 44:9, 93:13, 132:25
**layman's** [1] - 97:10
**leading** [1] - 88:17
**least** [7] - 74:8, 80:9, 90:8, 94:24, 110:15
**leave** [1] - 18:15
**leaving** [1] - 9:6
**Leawood** [3] - 5:20, 6:6, 77:22
**left** [2] - 51:7, 120:1
**legal** [8] - 53:21, 54:7, 55:25, 74:24, 75:12, 122:21, 122:23, 123:2
**lends** [1] - 93:9
**letter** [30] - 48:5, 48:10, 48:19, 50:9, 55:9, 55:21, 56:1, 56:3, 61:19, 61:25, 63:11, 63:13, 63:17, 63:22, 64:22, 64:23, 65:3, 65:8, 65:10, 66:1, 66:24, 67:7, 67:22, 68:1, 72:17, 72:19, 73:3, 76:23, 76:25, 121:15
**Letter..............** [2] - 3:15, 3:15
**letters** [2] - 45:12, 63:25
**levels** [1] - 32:11
**licensed** [3] - 6:19, 6:24, 79:15
**lift** [1] - 51:25
**lifting** [8] - 38:1, 50:11, 51:15, 51:17, 51:19, 51:23, 52:6, 99:11
**like..** [1] - 25:8
**likely** [5] - 66:11, 115:14, 116:7, 133:6, 138:19
**limb** [1] - 44:23
**limit** [2] - 51:16, 52:9
**limitation** [4] - 94:9, 94:11, 106:15, 120:5
**limitations** [7] - 36:6, 48:25, 49:2, 50:11, 51:15, 120:1, 120:3
**limited** [4] - 17:24, 62:6, 111:13, 120:4
**limits** [1] - 108:19
**line** [5] - 11:19, 16:2, 99:14, 124:9, 124:10
**Line** [2] - 72:3, 72:5
**Lines** [1] - 4:9
**lingering** [1] - 47:7

**list** [1] - 66:4
**literature** [1] - 71:14
**litigation** [4] - 20:2, 22:7, 22:23, 73:5
**litigation-related** [1] - 22:7
**live** [1] - 98:1
**living** [1] - 123:7
**locality** [2] - 114:15, 114:23
**located** [1] - 77:21
**LOCATION** [1] - 1:12
**location** [1] - 8:20
**look** [15] - 8:7, 22:8, 36:9, 39:13, 40:13, 40:14, 48:1, 55:18, 69:20, 71:20, 73:19, 73:20, 83:21, 84:6, 121:14
**looked** [9] - 33:20, 37:12, 37:21, 54:12, 61:21, 63:11, 63:12, 67:21
**looking** [12] - 27:3, 32:13, 34:6, 41:23, 55:5, 62:10, 75:23, 90:6, 91:1, 109:7, 133:12, 133:15
**looks** [8] - 34:7, 38:9, 39:23, 39:25, 40:19, 49:17, 60:18, 74:8
**lousy** [1] - 94:19
**low** [1] - 41:25
**lunch** [1] - 96:25
**lung** [1] - 26:25

## M

**M.D** [7] - 1:10, 2:16, 4:1, 4:11, 5:9, 140:8, 141:6
**main** [8] - 19:7, 26:12, 26:13, 27:2, 96:24, 97:2, 103:22, 118:20
**maintain** [3] - 82:15, 99:10, 111:18
**maintenance** [4] - 81:8, 81:14, 81:15, 81:20
**majored** [1] - 78:25
**majority** [1] - 12:12
**man** [1] - 66:3
**management** [2] - 115:10, 116:7
**March** [46] - 24:12, 25:12, 26:11, 26:19, 27:6, 27:13, 28:11, 30:9, 31:4, 31:22, 32:21, 34:7, 34:17, 34:24, 35:23, 35:25, 36:19, 56:5, 56:16, 68:10, 68:15, 68:17, 68:18, 69:2, 69:3, 70:17, 70:25, 82:22, 83:2, 84:9, 85:8, 88:22, 89:1, 91:22, 93:24, 94:2, 95:5, 95:6, 95:21, 95:23, 95:25, 99:1, 99:8, 134:15, 134:24, 135:6
**march** [2] - 24:13, 94:14
**mark** [5] - 9:10, 23:24, 54:11, 54:25, 77:1
**marked** [8] - 9:13, 9:14, 24:2, 54:15, 55:2, 77:12, 113:12, 124:4
**materials** [1] - 81:11
**matter** [1] - 29:2
**Mayo** [2] - 7:17, 79:2
**mean** [58] - 14:20, 21:8, 23:3, 25:7, 28:18, 32:7, 32:22, 33:7, 34:24, 45:15, 46:1, 46:2, 46:6, 46:24, 48:7, 48:8, 53:5, 55:22, 57:25, 60:11, 66:3, 66:4, 67:4, 67:13, 69:4, 69:5, 71:24, 72:14, 74:4, 79:24, 80:2, 80:5, 88:9, 89:4, 89:11, 90:13, 90:25, 91:12, 92:22, 94:17, 95:7, 96:24, 97:1, 98:22, 101:2, 101:5, 108:21, 110:19, 114:6, 115:7, 122:20, 124:13, 127:23, 129:3, 134:19
**meaning** [2] - 83:13, 90:16
**means** [13] - 46:8, 65:22, 67:8, 72:15, 89:24, 90:12, 91:13, 92:17, 130:24, 131:19, 131:24, 132:3, 141:14
**measure** [3] - 44:4, 102:3, 133:20
**mechanism** [1] - 28:19
**med/legal** [2] - 21:10, 22:24
**medial** [1] - 116:16
**medical** [63] - 6:18, 7:16, 9:6, 11:4, 11:7, 11:10, 11:18, 11:24, 12:14, 12:17, 13:2, 13:5, 13:8, 13:15, 13:25, 14:10, 14:12, 15:1, 15:9, 18:7, 24:6, 24:21, 25:2, 29:17, 46:19, 46:22, 47:16, 52:5, 52:25, 61:18, 64:7, 64:10, 64:13, 65:11, 65:17, 66:25, 68:7, 71:14, 75:15, 77:25, 79:2, 80:7, 85:12, 88:1, 88:20, 102:11, 103:25, 104:22, 110:22, 111:19, 111:24, 112:19, 115:4, 117:21, 118:6, 118:14, 119:5, 119:15, 119:25, 121:6, 121:23, 137:7
**Medical** [9] - 14:16, 14:21, 17:12, 26:19, 26:21, 30:6, 47:18, 122:11, 122:25
**medication** [1] - 25:16
**medications** [1] - 25:17
**medicine** [2] - 6:20, 10:6
**meet** [1] - 131:12
**meeting** [2] - 52:17, 57:19
**memory** [2] - 13:4, 21:22
**Mendiola** [1] - 2:13
**mentioned** [8] - 56:14, 87:22, 92:8, 101:24, 105:18, 115:22, 116:11, 120:14
**merge** [1] - 22:9
**merger** [3] - 21:9, 22:14, 22:15
**mess** [1] - 23:4
**met** [6] - 77:17, 130:19, 130:21, 130:23, 131:6, 131:9
**Miami** [2] - 2:5, 2:10
**middle** [3] - 21:15, 28:4, 57:11
**might** [20] - 12:4, 17:8, 17:24, 18:12, 22:13, 43:5, 43:8, 47:4, 48:24, 62:6, 62:14, 116:5, 120:17, 123:21, 124:20, 125:13, 129:2, 129:3
**mind** [1] - 58:10
**minimum** [1] - 23:16
**Minnesota** [2] - 7:17, 79:3
**minutes** [3] - 54:8, 76:9
**mission** [1] - 6:18
**Missouri** [2] - 6:20, 6:23
**mixed** [1] - 7:4
**moment** [4] - 85:25, 98:18, 107:5, 117:16
**Monday** [2] - 138:14, 138:16
**money** [2] - 126:14, 126:18
**monitor** [1] - 58:3
**monitoring** [1] - 130:13
**month** [4] - 53:9, 60:10, 80:10, 119:13
**months** [5] - 35:14, 106:25, 136:12, 136:21, 137:8
**most** [17] - 10:13, 12:2, 12:7, 12:24, 13:2, 14:18, 15:2, 26:23, 64:25, 78:11, 84:17, 84:18, 111:9, 111:11, 115:9, 115:13, 115:14
**motion** [16] - 35:9, 37:17, 39:6, 41:22, 57:20, 58:15, 58:20, 58:22, 58:24, 59:7, 59:11, 59:19, 101:19, 101:20, 106:14, 120:5
**motions** [4] - 58:7, 58:8, 58:19, 59:21
**motivating** [1] - 116:15
**move** [2] - 59:1, 59:3
**movement** [1] - 88:10
**moving** [3] - 56:22, 88:5
**MR** [165] - 4:15, 4:17, 5:13, 9:9, 9:16, 23:24, 24:4, 42:20, 42:23, 51:21, 52:3, 54:11, 54:17, 54:25, 55:4, 62:24, 63:1, 63:7, 63:10, 63:16, 63:21, 63:23, 64:16, 64:20, 65:13, 65:19, 66:2, 66:6, 68:19, 68:22, 70:10, 70:13, 70:20, 70:23, 71:11, 71:13, 72:7, 72:12, 76:1, 76:6, 76:8, 76:16, 77:11, 77:15, 82:1, 82:13, 83:16, 84:1, 85:2, 85:5, 85:14, 85:17, 86:9, 86:12, 87:4, 87:16, 88:2, 88:8, 88:14, 88:15, 88:17, 88:18, 106:4, 106:9, 110:24, 111:1, 111:20, 111:22, 112:23, 113:1, 113:7, 113:14, 114:16, 114:18, 114:24, 115:1, 115:6, 115:16, 116:23, 117:3, 117:5, 117:23, 118:1, 118:8, 118:11, 118:18, 119:3, 119:8, 119:10, 119:17, 119:20, 120:2, 120:11, 120:21, 121:3, 121:25, 122:1, 122:6, 122:9, 122:14, 122:18, 123:3, 123:5, 123:16, 123:18, 124:15, 124:22, 125:1, 125:19, 125:24, 126:1, 126:9, 126:12, 126:16, 126:22, 127:1, 127:6, 127:22, 128:2, 128:18, 129:10, 129:14, 130:3, 130:7, 130:16, 131:3, 131:5, 132:2, 132:4, 132:8, 132:10, 132:14, 132:15, 132:19, 132:20, 133:2, 133:8, 134:25, 135:2, 135:7, 135:9, 135:14, 135:15, 135:18, 135:20, 135:23, 136:1, 136:4, 136:6, 136:15, 136:16, 136:18, 136:19, 136:24, 137:1, 137:3, 137:5, 137:9, 137:10, 137:15, 137:18, 137:20, 138:7, 138:15, 138:18
**MRI** [1] - 116:6
**multi** [1] - 90:20
**multi-fragment** [1] - 90:20
**multifragmented** [1] - 90:15

**multiple** [2] - 90:3, 119:12
**muscles** [3] - 59:1, 59:3, 97:19
**must** [3] - 61:4, 89:14

## N

**name** [5] - 5:15, 83:13, 83:14, 83:21, 83:23
**names** [1] - 54:1
**nature** [2] - 33:23, 33:25
**near** [4] - 18:5, 33:11, 33:16, 33:17
**necessarily** [5] - 21:21, 47:20, 73:22, 82:2, 122:17
**necessary** [2] - 112:21, 112:25
**necessitate** [2] - 118:15, 119:15
**necessitated** [1] - 121:9
**necessitates** [1] - 118:4
**necessitating** [1] - 119:1
**need** [14] - 7:13, 10:4, 13:16, 17:7, 47:2, 47:4, 84:7, 96:6, 105:19, 110:11, 110:23, 110:25, 117:11, 117:13
**needed** [3] - 48:24, 72:3, 118:21
**needs** [8] - 46:20, 62:23, 63:5, 93:18, 111:19, 115:5, 115:8
**negatively** [3] - 135:16, 135:21, 136:2
**negotiation** [1] - 126:11
**nerve** [2] - 91:24, 92:7
**never** [3] - 66:14, 77:17, 130:19
**new** [2] - 21:9, 22:9
**next** [23] - 17:4, 23:5, 31:16, 35:20, 36:21, 38:5, 38:19, 40:4, 40:6, 41:8, 42:4, 47:8, 57:3, 59:23, 60:8, 72:1, 95:3, 96:3, 99:20, 102:20, 105:8, 107:1, 108:10
**night** [2] - 28:4, 28:5
**nine** [1] - 98:13
**NO** [3] - 1:2, 3:3, 3:13
**nonsurgical** [1] - 118:16
**normal** [7] - 40:15, 45:16, 45:18, 102:6, 102:12, 108:19, 109:5
**North** [1] - 2:4
**not..** [1] - 66:5
**Notary** [4] - 1:23, 4:6, 140:7, 140:19
**note** [33] - 10:22, 11:4, 12:18, 15:16, 15:17, 16:7, 17:18, 17:22, 18:11, 18:14, 18:16, 18:17, 18:19, 25:14, 25:15, 27:24, 30:7, 30:11, 31:17, 36:11, 38:9, 39:15, 39:17, 54:12, 61:17, 88:23, 92:12, 93:24, 101:3, 102:24, 103:5, 104:8, 111:2
**noted** [6] - 39:4, 39:8, 74:19, 109:1, 137:3
**notes** [11] - 10:6, 10:10, 10:13, 10:20, 11:12, 16:16, 16:19, 16:23, 17:5, 18:4, 141:8
**nothing** [2] - 5:3, 137:18
**notice** [2] - 4:2, 99:24
**noticed** [1] - 41:17
**noting** [1] - 104:2
**November** [18] - 3:15, 54:21, 55:20, 56:1, 61:25, 63:13, 63:18, 63:22, 64:22, 65:8, 65:10, 66:1, 66:23, 67:22, 68:1, 72:16, 76:24, 112:8
**number** [4] - 44:12, 44:13, 63:20, 108:24
**Number** [1] - 140:19
**numbers** [1] - 45:22
**numbness** [1] - 40:9
**nurse** [4] - 123:9, 132:11, 132:24, 133:5

## O

**OATH** [1] - 140:1
**Oath** [1] - 2:19
**object** [3] - 85:14, 110:24, 117:23
**objection** [20] - 65:13, 70:20, 72:7, 72:8, 83:16, 86:9, 87:4, 88:2, 88:14, 106:4, 111:20, 112:23, 114:16, 114:24, 116:23, 118:8, 118:18, 120:2, 132:19, 137:3
**objective** [2] - 10:12, 133:22
**objectively** [3] - 133:16, 133:20, 134:4
**objects** [1] - 51:19
**observed** [1] - 65:9
**obtain** [7] - 13:24, 14:9, 27:19, 28:7, 29:11, 56:12, 57:7
**obtained** [5] - 11:24, 11:25, 12:1, 25:6, 29:7
**obvious** [2] - 99:5, 108:24
**obviously** [4] - 57:22, 64:14, 72:2, 73:23
**occasions** [4] - 17:23, 19:16, 19:18, 20:10
**occupational** [1] - 101:9
**occur** [1] - 125:13
**occurred** [2] - 70:16, 70:22
**occurs** [2] - 120:16, 126:11
**October** [16] - 22:13, 24:17, 24:19, 42:6, 42:10, 43:1, 43:13, 52:15, 52:23, 60:23, 61:5, 83:5, 111:4, 111:17, 123:24, 136:8
**OF** [8] - 1:1, 1:10, 2:15, 140:1, 140:3, 140:4, 141:2, 141:2
**office** [19] - 12:1, 14:20, 14:23, 14:24, 16:5, 16:10, 18:6, 21:14, 35:21, 36:22, 38:19, 49:12, 50:20, 50:22, 73:22, 74:10, 77:5, 83:18, 123:23
**offs** [8] - 124:10, 124:14, 125:12, 125:18, 127:10, 128:3, 128:15, 129:1
**often** [2] - 20:23, 81:3
**once** [3] - 21:1, 29:6, 88:19
**one** [44] - 16:6, 17:4, 20:13, 34:20, 39:4, 40:25, 44:22, 45:11, 49:6, 53:23, 54:6, 59:5, 68:5, 70:4, 74:10, 74:12, 74:19, 75:11, 79:8, 79:9, 79:25, 81:24, 81:25, 94:12, 94:14, 94:23, 95:10, 99:11, 104:20, 106:3, 107:25, 114:3, 115:22, 119:11, 127:20, 127:21, 131:2, 131:11, 131:19, 131:24, 132:3, 134:5, 134:6
**one-page** [1] - 49:6
**one-pound** [1] - 99:11
**ones** [4] - 115:13, 135:17, 135:22, 136:3
**onset** [1] - 120:18
**open** [3] - 18:16, 32:1, 71:16
**open-ended** [1] - 18:16
**operated** [1] - 71:25
**operating** [1] - 96:3
**operative** [3] - 31:12, 31:17, 96:5
**opine** [1] - 46:19
**opinion** [19] - 20:5, 20:24, 48:21, 52:5, 52:8, 63:5, 65:17, 68:15, 102:10, 103:24, 112:18, 117:20, 118:5, 118:14, 119:4, 120:17, 120:20, 121:5, 122:12
**opinions** [20] - 20:11, 20:18, 30:24, 45:8, 64:1, 64:7, 64:10, 64:13, 64:18, 65:11, 65:18, 65:25, 66:13, 66:15, 66:25, 67:10, 115:3, 115:25, 119:24, 121:21
**opportunity** [1] - 137:21
**option** [2] - 107:25, 138:2
**options** [1] - 107:24
**OR** [1] - 32:12
**or..** [1] - 66:11
**order** [3] - 55:20, 138:13, 138:15
**Order** [1] - 1:13
**ordered** [1] - 89:9
**ordinarily** [1] - 48:13
**ordinary** [6] - 16:11, 16:20, 46:23, 47:15, 50:1, 58:15
**organized** [1] - 10:11
**original** [1] - 49:2
**orthopedic** [24] - 5:23, 6:1, 6:16, 7:5, 7:18, 9:22, 11:19, 22:10, 29:22, 78:3, 79:4, 79:18, 80:4, 80:8, 80:11, 80:12, 80:13, 80:19, 81:24, 82:5, 82:17, 90:13, 136:21
**Orthopedic** [4] - 6:5, 8:21, 29:22, 56:16
**orthopedics** [2] - 6:4, 81:2
**osteotomy** [1] - 116:9
**otherwise** [2] - 34:1, 50:8
**outcome** [1] - 71:22
**outcomes** [2] - 44:4, 80:15
**outdated** [1] - 8:11
**outline** [1] - 107:24
**outset** [1] - 130:17
**outside** [1] - 118:19
**overall** [2] - 29:2, 120:8
**overused** [1] - 90:24
**owe** [1] - 124:24
**owed** [1] - 129:12
**owes** [3] - 127:21, 128:16
**own** [9] - 22:20, 27:5, 29:25, 45:9, 59:1, 82:3, 125:14, 125:20

## P

**P.A** [1] - 2:8
**p.m** [8] - 1:15, 4:3, 4:12, 76:12, 76:15, 138:9, 138:22
**page** [8] - 8:4, 49:6, 54:23, 60:8, 67:25, 68:5, 92:14, 107:21
**Page** [1] - 2:16
**PAGE** [2] - 3:3, 3:13
**Pages** [1] - 1:18
**pages** [1] - 141:6
**paid** [2] - 72:18, 73:13
**pain** [33] - 26:13, 35:5, 39:1, 39:3, 39:16, 41:18, 43:5, 84:14, 84:16, 86:16, 87:22, 88:7, 88:11, 101:1, 102:25, 104:17, 104:20, 105:12, 105:16, 106:18, 106:19, 107:11, 109:23, 109:24, 115:11, 115:24, 116:2, 117:17, 120:6, 133:20,

133:23, 134:2, 134:8
**painful** [1] - 91:19
**paired** [1] - 81:12
**palm** [3] - 37:8, 93:11, 97:13
**palmer** [1] - 109:24
**palpating** [1] - 100:21
**panel** [1] - 80:15
**paperwork** [5] - 25:10, 25:13, 25:18, 25:22, 127:16
**paragraph** [8] - 27:23, 56:4, 56:22, 56:25, 59:23, 60:18, 68:5, 85:19
**part** [12] - 10:5, 12:24, 13:19, 14:18, 29:1, 31:17, 37:18, 66:15, 67:18, 100:8, 100:9, 110:15
**partially** [1] - 13:3
**participation** [1] - 82:20
**particular** [6] - 8:25, 30:13, 47:21, 65:25, 73:14, 90:25
**particularly** [3] - 13:11, 46:25, 106:15
**parties** [3] - 138:24, 139:4, 141:10
**parties'** [1] - 141:11
**partner** [1] - 15:19
**parts** [1] - 7:6
**party** [1] - 75:16
**PASCO** [2] - 140:4, 141:2
**passed** [3] - 97:17, 97:18
**passive** [6] - 58:20, 58:24, 59:2, 59:7, 59:10, 59:15
**past** [18] - 11:3, 11:6, 11:17, 11:24, 12:14, 12:17, 13:1, 13:4, 13:8, 13:15, 13:25, 14:10, 14:12, 15:1, 24:21, 25:2, 25:16
**Past** [6] - 14:16, 14:21, 17:11, 26:18, 26:21, 30:6
**path** [1] - 95:16
**patient** [56] - 10:23, 11:9, 12:12, 12:19, 12:23, 13:20, 14:25, 16:24, 17:4, 17:6, 17:11, 17:16, 17:20, 18:5, 18:9, 19:17, 20:21, 20:25, 23:9, 23:10, 26:4, 27:22, 28:8, 29:14, 29:16, 40:8, 44:4, 44:17, 45:3, 46:10, 46:16, 46:25, 47:7, 47:16, 48:9, 50:3, 50:10, 52:23, 58:1, 58:16, 62:4, 64:2, 64:8, 69:22, 70:7, 82:21, 86:16, 89:9, 91:19, 108:21, 129:3, 129:13, 129:25, 134:10
**patient's** [8] - 12:8, 13:15, 44:14, 56:23, 59:20, 60:9, 65:4, 88:7
**patient-reported** [1] - 44:4
**patients** [10] - 12:13, 13:3, 16:7, 20:13, 29:23, 44:7, 78:9, 107:24, 122:12, 123:1
**Patrick** [1] - 5:17
**pattern** [2] - 10:20, 10:21
**pause** [1] - 70:10
**pay** [3] - 50:6, 72:22, 128:5
**paying** [2] - 23:20, 74:10
**payment** [4] - 74:5, 127:21, 128:1, 129:18
**people** [2] - 20:4, 57:17
**per** [1] - 91:24
**perceiving** [1] - 128:1
**percent** [6] - 60:11, 60:15, 78:16, 78:18, 121:16, 121:20
**percentage** [1] - 80:21
**perception** [1] - 136:3
**perform** [7] - 31:3, 31:24, 50:21, 58:18, 59:6, 59:21, 71:16
**perhaps** [1] - 60:19
**period** [2] - 81:9, 119:13
**permanency** [1] - 48:12
**permanent** [2] - 48:22, 121:7
**permitted** [1] - 34:15
**persist** [1] - 117:16
**person** [2] - 125:16, 132:25
**personal** [1] - 90:22
**personally** [1] - 22:19
**personnel** [1] - 85:12
**pertaining** [1] - 22:2
**pertains** [1] - 14:12
**pertinent** [4] - 12:14, 13:20, 13:23, 15:3
**Peter** [1] - 54:2
**ph** [1] - 91:24
**philosophy** [2] - 7:16, 79:1
**phone** [15] - 15:16, 15:17, 47:11, 52:22, 53:3, 53:6, 53:23, 54:6, 55:10, 75:10, 131:1, 131:2, 131:7, 131:10
**physical** [11] - 10:18, 16:12, 16:15, 17:25, 24:21, 24:24, 50:10, 51:14, 101:9, 119:25, 120:3
**physically** [1] - 58:16
**physician** [6] - 44:18, 45:7, 80:3, 85:12, 86:6, 135:10
**physician's** [1] - 14:15
**picked** [2] - 29:4, 36:18
**pinky** [1] - 103:3
**place** [2] - 9:2, 34:21
**placement** [1] - 91:15
**Plaintiff** [4] - 1:5, 2:2, 26:4, 123:14
**plaintiff** [7] - 4:16, 24:6, 26:3, 123:10, 123:21, 123:24, 137:6
**PLAINTIFF'S** [1] - 3:2
**plaintiff's** [1] - 53:21
**Plaintiff's** [10] - 55:12, 57:4, 71:3, 74:24, 75:12, 113:12, 124:4, 124:8, 134:22, 135:4
**plan** [15] - 10:12, 10:19, 16:19, 17:9, 24:25, 31:8, 31:10, 31:11, 35:3, 47:12, 81:8, 102:15, 107:6, 107:8, 109:15
**planes** [1] - 41:22
**plate** [16] - 32:24, 33:14, 33:15, 33:17, 33:18, 36:12, 40:18, 43:7, 43:8, 97:20, 98:14, 99:25, 100:3, 111:16, 115:12, 116:19
**plates** [1] - 93:6
**play** [2] - 30:19, 44:18
**plus** [3] - 80:22, 82:11, 116:6
**point** [29] - 31:11, 32:15, 35:7, 35:9, 37:6, 37:23, 38:17, 38:24, 39:15, 39:22, 40:20, 40:24, 41:16, 41:25, 42:25, 48:9, 62:13, 62:20, 92:2, 99:4, 99:6, 99:19, 99:23, 101:2, 101:8, 101:10, 106:21, 108:22, 109:17
**points** [1] - 108:17
**poor** [1] - 38:25
**portion** [4] - 39:9, 39:24, 73:8, 97:22
**portions** [2] - 17:21, 18:2
**ports** [1] - 135:5
**positioning** [1] - 32:24
**Positive** [1] - 103:5
**positive** [4] - 37:5, 39:18, 40:17, 104:9
**possibilities** [4] - 43:3, 62:21, 63:6, 63:9
**possibility** [1] - 102:11
**possible** [5] - 86:24, 115:19, 116:8, 123:13, 123:17
**post** [4] - 35:3, 36:15, 96:13, 110:20
**post-surgical** [3] - 35:3, 36:15, 110:20
**postop** [2] - 99:7, 101:23
**postoperative** [13] - 33:21, 35:5, 35:12, 35:15, 36:24, 44:7, 60:10, 60:19, 60:20, 93:20, 94:18, 96:9, 101:4
**postoperatively** [1] - 94:10
**postsurgery** [2] - 36:8, 112:17
**potential** [7] - 61:17, 65:1, 86:17, 110:3, 111:19, 115:10, 115:12
**pound** [5] - 34:21, 94:12, 94:14, 94:23, 99:11
**practice** [28] - 6:3, 6:9, 6:20, 6:25, 10:5, 13:20, 16:11, 29:24, 46:19, 47:16, 50:2, 59:5, 77:21, 78:10, 79:13, 91:18, 113:18, 113:23, 114:2, 114:5, 114:14, 114:22, 124:19, 125:21, 126:7, 126:23, 130:6
**practice's** [2] - 83:14, 114:8
**pre** [2] - 58:13, 96:13
**pre-COVID** [1] - 58:13
**preclude** [1] - 12:11
**precontracted** [1] - 125:6
**prefer** [1] - 138:4
**premature** [1] - 120:18
**preoperative** [2] - 96:9, 96:11
**preparation** [1] - 53:10
**prepare** [2] - 19:5, 93:22
**prepared** [1] - 93:17
**preparing** [1] - 43:2
**presence** [1] - 108:5
**Present** [7] - 2:12, 10:18, 14:11, 27:9, 27:12, 27:24, 28:12
**present** [5] - 6:4, 14:5, 24:24, 58:16, 123:11
**presented** [3] - 4:19, 56:15, 124:3
**presenting** [1] - 26:11
**presents** [1] - 27:25
**pressure** [1] - 133:25
**presume** [3] - 89:14, 92:5, 99:18
**pretty** [4] - 7:3, 8:12, 55:22, 79:9
**prevent** [1] - 86:16
**previous** [2] - 29:17, 61:21
**primary** [1] - 42:11
**private** [2] - 50:6, 79:12
**privileges** [3] - 6:12, 6:15, 82:16
**privy** [1] - 129:9
**probability** [16] - 88:11, 104:1, 104:22, 110:22, 111:25, 112:19, 115:4, 116:17, 117:21, 118:7, 118:15, 119:6, 119:16, 119:25, 121:6, 121:23
**problem** [1] - 105:13
**problems** [2] - 86:20, 101:25
**procedure** [6] - 31:24, 32:20, 97:11, 97:12, 98:2, 98:19
**procedures** [3] - 62:6,

62:12, 62:14
**proceed** [1] - 31:12
**proceeding** [4] - 122:21, 122:23, 123:2, 131:13
**PROCEEDINGS** [1] - 2:15
**process** [8] - 17:3, 80:10, 80:24, 81:18, 82:9, 111:18, 128:25
**produce** [1] - 55:20
**produced** [1] - 49:11
**professional** [1] - 5:19
**Professional** [2] - 1:22, 1:23
**program** [1] - 101:19
**progressive** [1] - 35:9
**prominence** [3] - 47:1, 99:25, 100:2
**prominent** [5] - 33:18, 33:19, 36:13, 40:17, 93:11
**pronation** [2] - 37:19, 58:4
**protrusion** [1] - 100:13
**provide** [13] - 30:3, 36:5, 45:8, 47:22, 48:21, 50:2, 64:18, 66:14, 66:21, 107:8, 107:25, 122:10, 122:24
**Provided** [2] - 3:5, 3:17
**provided** [12] - 24:22, 30:15, 40:20, 48:13, 49:23, 55:19, 61:19, 61:25, 85:11, 112:1, 112:15, 126:7
**provider** [4] - 29:5, 29:17, 59:2, 85:21
**provider's** [1] - 59:3
**providing** [2] - 64:7, 64:12
**proximal** [2] - 97:22, 98:6
**Public** [4] - 1:23, 4:6, 140:7, 140:19
**pull** [2] - 67:23, 105:22
**pulled** [2] - 42:12, 111:7
**pulling** [1] - 40:16
**purpose** [2] - 35:24, 44:10
**purposes** [3] - 11:16, 28:16, 122:19
**Pursuant** [1] - 1:12
**pursuant** [2] - 4:2, 73:6
**pushing** [1] - 104:14
**put** [14] - 5:6, 7:24, 8:24, 33:15, 33:16, 38:3, 46:1, 46:21, 58:10, 67:7, 97:2, 121:15, 126:19, 129:20
**putting** [1] - 56:19

## Q

**qualification** [3] - 9:24, 79:19, 82:7
**quantify** [2] - 134:4
**question's** [1] - 65:7
**questionnaire** [6] - 12:2, 12:3, 43:16, 44:2, 52:16, 52:24
**questions** [7] - 10:3, 12:14, 18:25, 67:18, 76:2, 128:7, 137:16
**quick** [1] - 86:24
**QUICK** [16] - 43:21, 44:1, 44:3, 44:15, 44:19, 44:21, 45:5, 45:8, 45:13, 45:16, 45:19, 45:23, 46:12, 48:16, 52:16, 52:24
**quickly** [4] - 86:15, 95:4, 95:19, 113:16
**quite** [4] - 7:13, 11:20, 41:17, 82:10

## R

**radial** [1] - 31:1
**radiograph** [3] - 10:19, 17:8
**radiographs** [1] - 36:11
**radius** [16] - 29:7, 31:13, 32:2, 39:19, 46:25, 56:8, 66:10, 68:7, 68:13, 69:1, 71:9, 89:21, 96:12, 104:6, 105:19, 134:16
**raise** [1] - 4:25
**range** [15] - 35:9, 37:17, 39:6, 41:22, 57:20, 58:14, 58:20, 58:24, 59:7, 59:11, 59:19, 101:18, 101:19, 106:14, 120:5
**rapport** [1] - 28:21
**rate** [6] - 48:17, 76:21, 124:19, 125:10, 126:6, 133:25
**Rate** [1] - 3:14
**rates** [2] - 22:20, 23:2
**rather** [1] - 33:18
**rating** [4] - 47:22, 48:13, 122:11, 122:25
**ray** [9] - 17:7, 17:19, 36:2, 89:16, 98:1, 100:17, 107:14, 133:12, 133:15
**rays** [13] - 29:7, 32:13, 33:20, 36:8, 37:12, 39:10, 39:13, 39:21, 40:11, 42:1, 80:14, 88:24, 107:18
**reached** [1] - 43:20
**read** [6] - 29:9, 50:14, 56:10, 68:11, 137:21, 137:22
**Reading** [2] - 138:23, 139:5
**reading** [3] - 29:4, 138:1, 138:6
**reads** [1] - 27:24
**ready** [1] - 74:1
**realize** [1] - 37:7
**realized** [1] - 67:23
**really** [24] - 10:14, 20:7, 23:4, 23:17, 28:25, 29:1, 32:15, 41:23, 43:2, 44:7, 53:15, 53:18, 57:14, 59:17, 59:18, 62:15, 66:16, 67:14, 72:11, 89:17, 95:14, 109:17, 110:9, 127:25
**Realtime** [1] - 1:22
**reason** [3] - 83:13, 116:16, 128:23
**reasonable** [21] - 68:6, 88:11, 102:11, 103:25, 104:22, 110:21, 111:24, 112:18, 112:20, 112:25, 114:14, 114:22, 116:16, 117:21, 118:6, 118:14, 119:5, 119:15, 119:24, 121:5, 121:23
**reasons** [1] - 110:1
**reassess** [3] - 101:22, 101:23, 107:10
**receive** [1] - 55:24
**received** [5] - 11:10, 21:24, 48:2, 48:5, 48:10
**recent** [2] - 44:23, 64:25
**recess** [1] - 76:13
**recognize** [4] - 37:7, 55:5, 113:15, 113:17
**recollection** [2] - 22:6, 125:15
**recommend** [2] - 101:17, 105:2
**recommendation** [2] - 38:13, 93:21
**recommendations** [2] - 35:17, 42:25
**recommended** [1] - 101:16
**record** [13] - 4:14, 5:16, 10:22, 12:22, 13:24, 18:3, 28:11, 76:7, 76:12, 76:15, 138:9, 138:11, 141:7
**record's** [1] - 27:9
**recorded** [3] - 11:12, 12:17, 16:15
**recording** [2] - 14:15, 17:5
**records** [11] - 18:8, 26:1, 46:22, 51:10, 91:8, 101:13, 102:19, 113:10, 113:17, 125:21
**Records.................... .....** [1] - 3:4
**recoup** [2] - 126:13, 129:24
**recovery** [1] - 95:15
**Redirect** [1] - 2:18
**REDIRECT** [1] - 122:8
**reduce** [1] - 86:16
**reduced** [1] - 126:6
**reduction** [2] - 32:1, 71:17
**reengaging** [1] - 118:22
**refer** [4] - 27:8, 47:10, 84:5, 90:20
**reference** [3] - 61:4, 61:20, 88:24
**referencing** [1] - 25:24
**referred** [2] - 101:8, 127:9
**referring** [1] - 61:4
**reflect** [3] - 63:25, 66:24, 90:1
**reflected** [1] - 71:24
**reflects** [1] - 67:5
**refresh** [1] - 22:5
**regard** [1] - 122:2
**regarding** [4] - 38:13, 43:19, 44:22, 123:6
**regardless** [2] - 16:24, 93:5
**regards** [1] - 120:9
**regimen** [1] - 101:16
**Registered** [1] - 1:22
**regular** [1] - 48:13
**related** [4] - 22:7, 38:23, 49:2, 120:17
**relates** [1] - 11:4
**relative** [3] - 115:4, 141:10, 141:10
**release** [1] - 38:15
**released** [1] - 34:11
**relied** [2] - 45:3, 115:9
**rely** [3] - 13:4, 50:25, 134:9
**remember** [4] - 53:22, 54:1, 121:15, 123:8
**remind** [1] - 81:2
**remote** [1] - 141:6
**Remote** [1] - 1:12
**REMOTE** [1] - 2:1
**remotely** [2] - 4:4, 140:9
**removal** [9] - 62:7, 110:4, 110:7, 110:9, 110:23, 115:12, 116:11, 116:17, 116:21
**remove** [1] - 102:16
**removed** [2] - 43:8, 43:10
**rendered** [1] - 20:24
**renewal** [1] - 81:3
**repair** [4] - 36:9, 62:8, 93:9, 118:4
**repaired** [1] - 105:20
**repeat** [1] - 137:2
**rephrase** [2] - 32:19, 66:17
**report** [9] - 17:9, 45:3, 60:9, 94:5, 96:6, 106:13, 106:17, 112:8, 141:6
**reported** [6] - 4:4, 29:7, 42:14, 44:4, 46:10, 60:11
**Reported** [1] - 1:20
**reporter** [1] - 141:15
**Reporter** [7] - 1:22, 1:22, 1:23, 2:19, 3:5, 3:17, 141:4
**reporting** [4] - 29:14, 60:15, 80:23, 100:25
**reports** [4] - 28:3, 45:19, 89:3, 112:5
**represent** [1] - 72:2
**representatives** [1] - 54:7
**representing** [1] - 48:9
**reprinting** [1] - 61:24
**reproduction** [1] - 141:13
**request** [2] - 48:2,

49:12
**requested** [2] - 77:4, 141:7
**requesting** [3] - 48:6, 48:11, 48:19
**require** [6] - 43:5, 43:8, 62:4, 105:25, 123:14, 123:21
**required** [2] - 62:14, 115:15
**requires** [2] - 80:9, 80:10
**research** [1] - 8:23
**residency** [4] - 7:18, 79:3, 79:10, 80:7
**resolving** [1] - 41:18
**respect** [1] - 64:1
**respective** [1] - 139:4
**response** [3] - 49:11, 49:18, 133:6
**responsibility** [3] - 14:15, 15:8, 16:8
**responsible** [1] - 18:11
**restrict** [1] - 94:23
**restriction** [9] - 34:14, 34:21, 52:9, 94:12, 94:15, 99:11, 99:25
**restrictions** [5] - 38:1, 38:2, 38:4, 38:16, 51:17
**result** [7] - 32:21, 34:3, 55:10, 71:8, 104:2, 104:4, 121:7
**resulting** [2] - 56:7, 104:24
**retained** [3] - 20:18, 23:10, 75:15
**return** [4] - 34:8, 34:11, 34:25, 38:9
**returned** [1] - 29:6
**reveal** [1] - 91:21
**revealed** [1] - 89:19
**revealing** [1] - 21:12
**revenue** [1] - 126:19
**review** [16] - 15:12, 19:6, 19:7, 36:7, 55:12, 55:15, 67:7, 80:10, 80:14, 81:11, 81:13, 82:9, 82:11, 89:2, 141:7
**reviewed** [1] - 81:9
**ridging** [1] - 102:18
**right-hand** [2] - 84:20, 85:7
**risk** [1] - 93:19
**risks** [1] - 96:22
**road** [4] - 86:18, 86:21, 95:15, 121:2
**Rochester** [1] - 7:17
**rocked** [1] - 28:5
**role** [2] - 30:19, 44:18
**room** [2] - 18:8, 57:23
**root** [1] - 90:16
**rotating** [1] - 104:16
**route** [1] - 108:7
**RPR** [4] - 1:21, 4:5, 140:18, 141:22
**rule** [1] - 110:22

## S

**sad** [1] - 130:9
**sake** [3] - 8:5, 27:9, 67:23
**satisfactory** [1] - 36:4
**satisfied** [3] - 32:21, 34:2
**saw** [23] - 15:20, 35:21, 36:22, 42:8, 45:11, 69:3, 69:11, 70:1, 70:16, 71:25, 73:6, 84:9, 85:7, 88:24, 89:8, 102:20, 106:11, 108:10, 111:4, 127:15, 136:7, 136:22, 137:11
**scale** [1] - 45:23
**scan** [3] - 88:24, 89:5, 89:9
**scans** [1] - 89:3
**school** [7] - 7:12, 7:15, 7:17, 9:6, 78:25, 79:2, 80:7
**scope** [2] - 135:24, 136:25
**score** [6] - 44:13, 45:12, 45:20, 45:23, 61:9, 61:11
**screen** [9] - 7:24, 8:3, 22:3, 49:4, 54:19, 55:6, 72:17, 113:3, 113:4
**screw** [1] - 33:14
**screws** [7] - 93:6, 93:13, 93:15, 97:21, 97:23, 98:6, 98:14
**scribe** [5] - 18:7, 27:16, 27:19, 28:9, 29:14
**scroll** [2] - 8:5, 113:15
**second** [7] - 12:13, 27:23, 67:25, 68:5, 76:7, 85:19, 107:21
**secondary** [1] - 68:8
**section** [4] - 12:18, 13:25, 14:4, 30:6
**sedation** [1] - 96:15
**see** [48] - 8:1, 18:22, 21:19, 22:3, 25:11, 25:12, 29:9, 43:14, 48:1, 49:22, 50:14, 56:10, 56:25, 61:14, 68:11, 69:19, 78:9, 78:19, 83:1, 83:3, 83:22, 92:12, 94:4, 95:2, 96:16, 98:17, 98:20, 98:24, 99:17, 99:20, 100:5, 100:6, 100:11, 100:15, 103:5, 104:8, 107:1, 107:12, 107:21, 107:22, 113:3, 114:8, 114:11, 118:21, 130:9, 133:16, 134:15, 136:13
**seeing** [1] - 124:11
**seeking** [2] - 20:17, 106:2
**seem** [1] - 92:7
**seemingly** [1] - 27:1
**self** [1] - 45:3
**self-report** [1] - 45:3
**send** [1] - 23:3
**sense** [1] - 89:12
**sent** [1] - 129:4
**sentence** [1] - 57:4
**separate** [3] - 25:19, 115:21, 116:12
**service** [1] - 95:17
**services** [2] - 22:7, 126:7
**set** [3] - 22:20, 23:2, 66:24
**sets** [1] - 22:25
**seven** [2] - 6:10, 79:14
**severe** [4] - 46:4, 46:8, 84:17, 84:18
**severity** [1] - 84:16
**share** [1] - 113:2
**sharing** [1] - 49:4
**sheet** [6] - 13:19, 21:24, 23:25, 54:14, 73:6, 76:21
**Sheet........................ .....** [1] - 3:14
**sheets** [2] - 25:5, 25:8
**ship** [18] - 29:5, 56:6, 68:9, 71:4, 72:5, 72:10, 82:24, 85:11, 85:13, 85:22, 112:2, 112:14, 112:22, 121:8, 132:7, 134:14, 134:23, 135:5
**ship's** [1] - 88:1
**shoot** [2] - 35:14, 102:8
**shortening** [1] - 116:9
**Shorthand** [1] - 141:4
**show** [4] - 54:18, 58:7, 58:11, 73:12
**shower** [1] - 28:6
**showing** [3] - 45:20, 46:3, 107:17
**sic** [4] - 6:21, 85:18, 123:25, 136:10
**side** [27] - 39:1, 39:2, 39:16, 39:24, 41:18, 41:25, 42:18, 42:22, 58:10, 93:11, 97:13, 97:14, 97:22, 97:24, 98:7, 98:10, 102:25, 103:1, 103:2, 103:14, 103:18, 104:15, 106:19, 109:24, 111:13, 120:6
**sided** [8] - 43:4, 60:12, 107:9, 109:23, 115:11, 115:24, 116:1, 117:17
**sign** [8] - 15:12, 15:14, 15:17, 16:8, 18:14, 18:17, 18:23, 104:18
**signed** [1] - 49:8
**Signed** [1] - 140:12
**significant** [4] - 26:22, 26:24, 37:2, 38:22
**signing** [3] - 15:20, 138:23, 139:5
**signs** [1] - 40:1
**similar** [2] - 46:16, 104:21
**singer** [2] - 48:4, 49:18
**singer's** [1] - 49:12
**single** [1] - 69:10
**sit** [2] - 67:11, 73:18
**sitting** [3] - 51:12, 63:4, 67:9
**situations** [1] - 133:11
**six** [14] - 34:23, 35:12, 37:23, 37:24, 56:23, 60:10, 80:10, 94:25, 98:12, 99:19, 101:20, 101:21, 101:23
**six-month** [1] - 80:10
**six-week** [2] - 56:23, 99:19
**skin** [5] - 97:18, 100:5, 100:6, 100:11, 133:17
**slightly** [2] - 39:18, 39:19
**slowly** [1] - 8:5
**small** [4] - 39:1, 93:8, 102:25, 104:15
**SMITH** [91] - 2:11, 4:17, 5:13, 9:9, 9:16, 23:24, 24:4, 42:23, 52:3, 54:11, 54:17, 54:25, 55:4, 63:1, 63:10, 63:21, 63:23, 64:20, 65:19, 66:6, 68:22, 70:10, 70:13, 70:23, 71:13, 72:12, 76:1, 76:8, 76:16, 77:11, 82:1, 83:16, 85:14, 86:9, 87:4, 88:2, 88:14, 88:17, 106:4, 110:24, 111:20, 112:23, 114:16, 114:24, 115:6, 116:23, 117:23, 118:8, 118:18, 119:8, 119:17, 120:2, 120:21, 122:1, 122:6, 122:9, 122:18, 123:5, 123:18, 124:22, 125:19, 126:1, 126:12, 126:22, 127:6, 128:2, 129:10, 130:3, 130:16, 131:5, 132:4, 132:10, 132:15, 132:20, 133:8, 135:2, 135:9, 135:15, 135:20, 136:1, 136:6, 136:16, 136:19, 137:1, 137:3, 137:5, 137:10, 137:15, 137:20, 138:7, 138:15
**Smith** [3] - 2:17, 2:18, 4:17
**so-and-so** [1] - 18:18
**so..** [1] - 133:11
**Social** [1] - 14:22
**social** [1] - 17:12
**soft** [1] - 103:13
**someone** [8] - 20:24, 23:9, 48:14, 50:4, 74:2, 126:14, 134:1
**sometimes** [6] - 18:15, 20:16, 20:17, 105:21, 124:18
**somewhat** [1] - 62:18
**somewhere** [2] - 102:8, 117:25
**sorry** [16] - 7:4, 26:3, 42:20, 63:2, 63:16, 68:1, 68:4, 70:10, 83:5, 85:2, 96:19,

99:8, 107:4, 115:23, 120:12, 132:16
**sort** [18] - 10:2, 16:19, 17:24, 18:19, 22:22, 25:17, 44:9, 44:12, 47:7, 49:3, 69:18, 73:5, 75:24, 108:2, 119:11, 122:21, 122:23, 134:2
**sorts** [2] - 69:20, 78:6
**sought** [1] - 88:20
**sounds** [3] - 11:1, 22:18, 127:19
**SOUTHERN** [1] - 1:1
**space** [1] - 103:20
**speaking** [1] - 117:7
**speaks** [1] - 95:7
**specialist** [1] - 118:17
**specialize** [1] - 7:6
**specialty** [1] - 77:25
**specific** [5] - 7:6, 19:4, 51:16, 52:9, 71:19
**specifically** [6] - 16:6, 19:2, 26:7, 51:7, 53:23, 80:4
**specifics** [1] - 53:16
**splint** [7] - 69:17, 86:23, 92:1, 92:2, 92:8, 101:18, 102:16
**spot** [1] - 95:10
**stabilized** [1] - 86:15
**staff** [5] - 14:23, 14:25, 21:14, 88:1, 130:14
**stage** [1] - 66:24
**stall** [1] - 28:6
**standard** [1] - 99:7
**standing** [1] - 129:17
**standpoint** [2] - 87:23, 89:18
**stands** [1] - 83:13
**start** [7] - 7:12, 38:25, 43:6, 95:9, 95:15, 101:19, 116:18
**started** [5] - 37:7, 43:6, 102:24, 109:23, 122:6
**starting** [3] - 94:17, 99:24, 101:25
**starts** [2] - 60:9, 110:11
**STATE** [2] - 140:3, 141:2
**State** [4] - 1:23, 4:6, 140:7, 140:19
**state** [11] - 4:13, 5:15, 6:20, 6:25, 29:3, 50:10, 56:4, 57:3, 60:9, 68:1, 68:6
**statement** [3] - 64:24, 124:4, 124:6
**STATES** [1] - 1:1
**states** [3] - 56:22, 60:18, 62:3
**status** [5] - 34:9, 64:25, 91:24, 93:24, 94:5
**stayed** [1] - 99:15
**staying** [2] - 36:4, 118:23
**STENOGRAPHER** [8] - 4:24, 5:6, 9:12, 63:19, 84:24, 85:4, 138:12, 138:17
**stenographic** [1] - 141:8
**Stenographically** [1] - 1:20
**stenographically** [1] - 141:6
**step** [2] - 47:9, 56:6
**steroid** [2] - 60:14, 116:4
**stiffness** [4] - 87:6, 87:7, 102:23
**still** [21] - 37:6, 37:12, 40:16, 67:2, 71:8, 82:4, 82:5, 102:23, 106:7, 106:10, 106:15, 108:19, 108:22, 110:25, 111:12, 111:13, 115:18, 118:15, 120:6
**stipulated** [1] - 139:3
**Stipulations** [1] - 2:18
**stop** [1] - 32:15
**story** [3] - 28:14, 28:15, 28:23
**strength** [5] - 50:12, 50:17, 50:18, 51:7, 120:10
**strengthening** [1] - 35:10
**strike** [2] - 52:7, 118:3
**stroke** [1] - 97:1
**strong** [1] - 118:24
**structure** [1] - 17:18
**struggle** [1] - 108:15
**struggling** [1] - 108:23
**studied** [1] - 7:15
**stuff** [3] - 57:12, 100:7, 129:18
**stump** [1] - 79:24
**styled** [1] - 4:8
**subjective** [2] - 10:12, 134:9
**submitted** [2] - 89:13, 112:16
**submitting** [1] - 95:5
**subpoena** [1] - 77:4
**subsequent** [2] - 41:4, 116:9
**subspecialty** [1] - 78:6
**success** [2] - 32:10, 32:16
**successful** [2] - 32:6, 33:2
**successfully** [1] - 33:15
**suffer** [2] - 68:16, 69:1
**suffered** [1] - 86:5
**suffices** [1] - 87:21
**suggest** [5] - 85:18, 90:14, 92:13, 99:13, 112:7
**Suite** [1] - 2:4
**summarize** [1] - 7:10
**summary** [1] - 64:24
**Sunday** [1] - 96:1
**supinate** [1] - 41:20
**supination** [20] - 37:9, 37:15, 38:25, 39:7, 42:16, 50:12, 57:4, 58:4, 58:12, 60:3, 100:1, 102:1, 102:6, 102:12, 102:17, 102:24, 106:16, 108:16, 108:18, 111:14
**supply** [1] - 13:16
**supplying** [1] - 15:2
**support** [2] - 42:15, 111:10
**supposed** [2] - 60:22, 91:16
**Supreme** [1] - 1:12
**surface** [1] - 93:13
**surgeon** [8] - 5:24, 6:1, 7:5, 34:2, 71:7, 78:3, 125:8, 125:10
**surgeons** [4] - 80:13, 82:5, 90:13, 136:21
**surgery** [47] - 7:18, 9:23, 9:25, 11:20, 31:15, 31:21, 32:6, 35:22, 36:18, 37:24, 70:25, 71:10, 71:17, 71:18, 78:2, 79:4, 79:18, 79:20, 80:5, 80:13, 81:24, 82:7, 89:14, 89:15, 93:22, 95:2, 95:5, 95:11, 95:22, 98:25, 101:6, 106:22, 112:16, 113:18, 113:20, 113:23, 114:1, 114:19, 117:8, 121:8, 123:15, 123:21, 124:20, 124:25, 127:9, 127:15
**surgical** [8] - 14:22, 35:3, 36:15, 43:10, 71:8, 110:20, 115:10, 116:6
**surgically** [2] - 105:20
**surprisingly** [1] - 58:17
**sustained** [5] - 56:5, 68:9, 69:24, 112:21, 121:6
**swear** [1] - 5:1
**swelling** [6] - 86:16, 86:19, 86:24, 87:2, 87:10, 87:12
**sworn** [3] - 4:23, 5:10, 140:10
**symptomatic** [2] - 104:7, 121:1
**symptoms** [4] - 60:12, 60:16, 106:2, 110:12
**syndrome** [2] - 78:12

## T

**TACC** [1] - 103:5
**team** [4] - 53:21, 55:25, 74:24, 75:12
**tear** [9] - 73:21, 73:22, 103:18, 105:24, 106:3, 106:6, 106:8, 108:5, 116:8
**tears** [2] - 104:5, 105:18
**technically** [1] - 90:15
**teleconference** [1] - 57:10
**telemedicine** [2] - 56:24, 57:2
**telephone** [1] - 74:15
**ten** [9] - 54:8, 71:5, 71:6, 71:9, 71:15, 71:18, 81:7, 81:9, 121:2
**ten-day** [1] - 71:9
**ten-year** [2] - 81:7, 81:9
**tender** [1] - 123:25
**tenderness** [6] - 42:17, 103:6, 104:1, 106:11, 109:13, 111:12
**tendon** [3] - 78:13, 110:12, 116:19
**tendons** [5] - 43:7, 47:3, 97:18, 109:25, 111:15
**tenured** [1] - 80:13
**Teresa** [6] - 1:21, 4:5, 9:10, 63:16, 140:7, 141:4
**TERESA** [2] - 140:18, 141:22
**term** [2] - 11:3, 91:4
**terms** [10] - 21:13, 32:10, 32:23, 36:5, 44:5, 44:9, 50:11, 51:15, 97:10, 108:3
**terrific** [6] - 5:22, 7:2, 7:21, 10:1, 10:25, 31:23
**Terrific** [1] - 6:7
**test** [6] - 21:21, 50:17, 51:4, 51:7, 80:20, 80:22
**testified** [3] - 5:11, 19:8, 19:19
**testify** [1] - 19:13
**testifying** [2] - 19:16, 23:8
**testimony** [3] - 5:1, 55:16, 70:15
**testing** [3] - 50:21, 50:23, 91:24
**TFCC** [9] - 66:10, 103:10, 104:2, 104:5, 105:18, 105:24, 106:10, 109:13, 118:5
**THE** [76] - 4:8, 4:24, 5:5, 5:6, 9:12, 42:22, 51:22, 62:25, 63:8, 63:19, 64:17, 65:14, 66:3, 68:20, 70:21, 71:12, 72:9, 76:5, 76:11, 76:14, 77:10, 82:2, 83:17, 84:24, 85:4, 85:15, 86:10, 87:5, 88:3, 106:5, 110:25, 111:21, 112:24, 114:17, 114:25, 115:7, 116:24, 117:4, 117:24, 118:9, 118:19, 119:9, 119:18, 120:3, 120:22, 122:5, 122:15, 123:4, 123:17, 124:16, 125:2, 125:25, 126:10, 126:17, 127:2, 127:23, 128:19, 129:15, 130:8, 130:25, 131:4, 132:3, 132:9, 133:3, 135:1, 135:8, 135:19, 135:25,

136:5, 137:4, 138:5, 138:8, 138:12, 138:17, 140:3, 141:2
**themselves** [2] - 12:19, 89:3
**therapist** [1] - 118:22
**therapists** [2] - 51:1, 51:6
**therapy** [9] - 35:8, 36:5, 101:9, 101:15, 112:17, 116:10, 117:6, 117:12, 119:6
**THEREUPON** [1] - 5:8
**they've** [1] - 12:9
**thinking** [2] - 79:23, 103:23
**third** [1] - 56:4
**thoughts** [1] - 65:22
**three** [10] - 19:14, 19:15, 24:11, 35:14, 90:8, 98:8, 98:9, 99:14
**thumb** [2] - 39:24, 97:14
**TIME** [1] - 1:15
**tingling** [1] - 40:9
**tissue** [1] - 103:13
**TO** [1] - 3:1
**today** [9] - 27:25, 51:12, 52:12, 63:4, 64:15, 67:9, 67:11, 73:18, 131:13
**today's** [3] - 19:5, 19:11, 23:15
**together** [1] - 56:20
**tolerance** [3] - 51:20, 51:23, 52:1
**ton** [1] - 122:3
**tonight** [1] - 111:3
**took** [6] - 24:20, 27:13, 38:4, 70:24, 107:11
**tool** [1] - 134:3
**top** [3] - 22:8, 60:8, 107:21
**total** [3] - 98:13, 101:21, 114:8
**touch** [1] - 110:1
**touched** [1] - 78:18
**towards** [2] - 92:12, 104:14
**training** [2] - 78:23, 91:18
**transcribed** [3] - 28:9, 29:14, 137:24
**transcript** [4] - 137:22, 141:7, 141:7, 141:13
**translate** [1] - 121:18
**traumatic** [1] - 120:18
**traveling** [1] - 72:6
**treat** [1] - 105:21
**treated** [2] - 35:4, 69:16
**treating** [7] - 12:23, 26:7, 30:14, 47:16, 48:14, 50:4, 59:5
**treatment** [32] - 10:6, 10:10, 10:22, 10:23, 11:4, 11:12, 12:18, 16:16, 16:19, 16:23, 17:5, 18:4, 19:1, 24:10, 24:15, 25:25, 26:10, 28:16, 31:7, 33:3, 43:5, 50:16, 65:9, 70:5, 70:6, 88:20, 105:25, 112:1, 112:15, 112:20, 114:9, 115:3
**treats** [1] - 86:6
**trial** [5] - 19:19, 19:22, 19:24, 20:1
**triangular** [2] - 62:8, 103:12
**trinity** [1] - 6:17
**tripped** [2] - 56:5, 112:11
**true** [4] - 8:8, 25:25, 49:17, 141:7
**truth** [3] - 5:2, 5:3
**try** [6] - 13:6, 21:14, 21:15, 58:8, 86:14, 86:23
**trying** [1] - 44:12
**tunnel** [2] - 78:12
**turn** [1] - 104:7
**turning** [2] - 82:19, 84:3
**twice** [1] - 21:1
**two** [24] - 8:4, 19:14, 19:15, 23:16, 35:7, 54:23, 58:24, 63:25, 76:8, 81:24, 92:14, 93:3, 93:5, 99:7, 103:22, 104:18, 107:20, 112:5, 119:13, 120:7, 130:19, 130:23
**two-page** [2] - 8:4, 54:23
**two-week** [2] - 35:7, 99:7
**type** [10] - 10:22, 20:23, 21:3, 61:18, 86:2, 86:7, 86:22, 91:18, 96:14, 110:20
**types** [3] - 69:24, 78:9, 86:6
**typical** [2] - 46:18, 101:3
**typically** [13] - 18:6, 35:4, 44:21, 47:17, 51:3, 57:15, 59:11, 86:8, 91:23, 98:8, 101:17, 134:5, 134:9
**typo** [2] - 60:21, 103:9

### U

**uh-0hu** [1] - 27:7
**ulna** [4] - 39:18, 103:21, 104:14, 104:18
**ulnar** [26] - 39:2, 39:16, 39:18, 40:17, 42:17, 42:22, 43:4, 60:12, 102:25, 103:2, 103:14, 103:19, 104:9, 104:12, 104:23, 106:19, 107:9, 109:23, 111:13, 115:11, 115:24, 116:1, 116:9, 117:17, 120:6
**ulnar-sided** [8] - 43:4, 60:12, 107:9, 109:23, 115:11, 115:24, 116:1, 117:17
**ultimately** [5] - 12:16, 14:14, 35:11, 85:24, 86:1
**uncommon** [1] - 130:11
**under** [16] - 15:21, 16:1, 47:18, 47:20, 47:22, 48:12, 82:4, 83:6, 83:7, 85:19, 96:15, 100:5, 100:6, 133:17, 141:14
**undergo** [4] - 116:21, 117:19, 118:13, 119:7
**undergraduate** [2] - 7:15, 78:25
**underneath** [1] - 93:13
**understood** [3] - 81:22, 82:14, 100:24
**unfortunately** [2] - 125:13, 128:22
**union** [1] - 39:21
**UNITED** [1] - 1:1
**united** [3] - 39:23, 39:25
**University** [2] - 7:14, 78:24
**unless** [3] - 48:18, 59:15, 141:14
**unlikely** [1] - 66:11
**Unruh** [14] - 4:11, 5:17, 9:17, 50:2, 63:24, 66:23, 68:25, 71:7, 76:1, 76:23, 77:6, 130:18, 131:16, 135:10
**UNRUH** [6] - 1:10, 2:16, 4:1, 5:9, 140:8, 141:6
**Unruh's** [1] - 77:4
**up** [36] - 4:21, 7:4, 7:24, 8:3, 8:17, 11:15, 15:20, 18:16, 22:3, 27:5, 28:4, 29:4, 36:2, 36:18, 36:25, 37:8, 40:4, 40:6, 41:1, 41:8, 41:9, 41:14, 43:16, 48:1, 56:23, 67:18, 67:23, 72:17, 75:2, 76:17, 80:15, 83:10, 98:4, 99:14, 122:2, 136:20
**up-to-date** [1] - 8:17
**upper** [9] - 34:22, 44:6, 44:7, 56:7, 68:8, 78:2, 78:5, 78:20, 94:13
**urgent** [15] - 29:6, 29:20, 29:23, 30:3, 56:15, 56:16, 83:9, 83:14, 83:17, 83:19, 86:11, 88:22, 89:8, 92:11, 112:17
**useful** [1] - 12:21
**uses** [1] - 114:2

### V

**Vanderbilt** [2] - 7:19, 79:4
**various** [3] - 22:7, 49:23, 128:24
**vary** [2] - 102:7
**verbalized** [1] - 41:23
**verification** [1] - 4:22
**verified** [2] - 4:22, 44:5
**version** [1] - 77:3
**versus** [3] - 4:9, 23:9, 59:11
**via** [2] - 56:24, 77:4
**Video** [1] - 1:12
**video** [5] - 4:10, 57:8, 58:2, 58:4, 138:11
**Videographer** [1] - 2:13
**VIDEOGRAPHER** [4] - 4:8, 76:11, 76:14, 138:8
**VIDEOTAPED** [1] - 1:10
**visit** [32] - 17:24, 18:5, 18:9, 24:20, 33:21, 35:22, 35:25, 36:1, 36:22, 37:3, 38:6, 40:4, 41:8, 42:5, 43:12, 52:14, 59:24, 60:10, 60:14, 60:16, 60:20, 61:1, 61:5, 64:25, 68:18, 88:22, 95:5, 99:2, 99:7, 105:8, 112:17, 123:23
**visits** [3] - 16:10, 118:16, 119:13
**Vitae......................** [1] - 3:14
**viteae** [1] - 8:9
**voicing** [1] - 84:13
**volar** [3] - 36:12, 40:17, 115:12
**Volar** [1] - 100:2
**volarly** [1] - 93:11
**vs** [1] - 1:6

### W

**waive** [2] - 138:1, 138:5
**waived** [2] - 138:24, 139:6
**Walsh** [1] - 54:2
**water** [2] - 76:10, 122:4
**ways** [1] - 133:22
**week** [7] - 35:7, 44:24, 45:1, 56:23, 99:7, 99:19, 131:14
**weeks** [9] - 34:24, 35:12, 37:24, 53:7, 94:25, 101:20, 101:21, 101:23
**weight** [6] - 34:13, 34:21, 37:25, 38:4, 51:16, 52:9
**welcome** [1] - 76:5
**White** [1] - 2:8
**white.com** [1] - 2:11
**whole** [3] - 5:3, 81:18, 121:19
**wide** [1] - 22:17
**wife's** [1] - 133:5
**willing** [2] - 53:11, 64:17
**window** [1] - 71:10
**wish** [4] - 21:5, 33:5, 33:8, 33:22
**withdrawn** [1] - 132:19

**witness** [5] - 4:19, 23:11, 53:14, 75:15, 138:24
**WITNESS** [62] - 5:5, 42:22, 51:22, 62:25, 63:8, 64:17, 65:14, 66:3, 68:20, 70:21, 71:12, 72:9, 76:5, 77:10, 82:2, 83:17, 85:15, 86:10, 87:5, 88:3, 106:5, 110:25, 111:21, 112:24, 114:17, 114:25, 115:7, 116:24, 117:4, 117:24, 118:9, 118:19, 119:9, 119:18, 120:3, 120:22, 122:5, 122:15, 123:4, 123:17, 124:16, 125:2, 125:25, 126:10, 126:17, 127:2, 127:23, 128:19, 129:15, 130:8, 130:25, 131:4, 132:3, 132:9, 133:3, 135:1, 135:8, 135:19, 135:25, 136:5, 137:4, 138:5
**wondering** [1] - 60:22
**wood** [3] - 93:4, 93:5, 93:7
**word** [4] - 90:11, 90:16, 90:22, 90:23
**workers'** [1] - 122:16
**works** [3] - 75:7, 123:9, 130:2
**worry** [3] - 87:6, 96:24, 97:3
**worse** [2] - 130:12, 133:11
**wound** [3] - 30:22, 36:1
**wrap** [4] - 42:14, 67:18, 131:17, 132:6
**wrist** [62] - 15:23, 26:13, 26:15, 26:17, 28:1, 28:6, 38:23, 39:1, 39:17, 41:18, 42:15, 42:16, 42:18, 42:22, 43:4, 50:12, 62:5, 62:7, 78:14, 83:8, 84:11, 86:20, 87:8, 88:4, 92:20, 97:13, 103:1, 103:14, 103:18, 103:21, 104:13, 104:15, 104:16, 104:19, 106:20, 107:9, 109:6, 109:7, 109:23, 109:24, 111:10, 111:13, 111:25, 115:11, 115:20, 115:24, 116:1, 117:17, 119:1, 120:7, 120:9, 121:11, 121:13, 121:17, 131:20, 131:21, 131:23, 131:25, 132:12, 133:1, 134:13
**write** [12] - 124:10, 124:13, 124:17, 125:12, 125:17, 127:10, 127:19, 128:3, 128:15, 129:1, 129:8, 130:9
**written** [8] - 17:22, 80:20, 124:25, 126:24, 127:4, 128:1, 128:5, 128:10
**written-off** [1] - 126:24

**X**

**X-ray** [9] - 17:7, 17:19, 36:2, 89:16, 98:1, 100:17, 107:14, 133:12, 133:15
**X-rays** [13] - 29:7, 32:13, 33:20, 36:8, 37:12, 39:10, 39:13, 39:21, 40:11, 42:1, 80:14, 88:24, 107:18

**Y**

**year** [7] - 21:1, 79:8, 79:9, 79:21, 81:7, 81:9, 136:17
**yearly** [1] - 81:10
**years** [4] - 6:10, 8:11, 79:14, 121:2
**yourself** [6] - 16:6, 19:5, 22:2, 49:8, 71:7, 73:9

**Z**

**Zoom** [7] - 53:3, 57:10, 57:18, 58:4, 58:6, 59:14, 59:15