UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 21-CIV-2057-BLOOM

BARBARA HALL,

Plaintiff,

-vs-

CARNIVAL CORPORATION,

Defendant.
_______________________________/

SWORN VIDEO DEPOSITION

TUESDAY, NOVEMBER 30, 2021

12:54 P.M. TO 4:19 P.M.

DEPOSITION OF

SUSAN VASQUEZ

Taken before Jorge Garcia, Court Reporter, a Notary Public for the State of Florida at Large, pursuant to Notice of Taking Deposition Duces Tecum filed in the above-styled cause.

saying.
Q. All right. My understanding is you've located prior similar incidents on this ship for a three-year period?
A. Yes.
Q. All right. I want to get into those with you, and this is absolutely without prejudice to my position that what we've requested has not been complied with. We asked for three years on the same class of ship, which I think is only three or four ships. So are you prepared to talk about prior incidents on any ship other than Valor?
A. No. I believe all of that was objected to in discovery and they only -- they only asked Monica to pull the Valor. Prior similar trip-and-fall incidents on shower lips on the Valor.
Q. Well, let's talk about those then. I guess we'll have to address the other part with the court. How many -- how many years did Ms. Borteseggi search?
A. She did three years from your client's cruise, back.
Q. On the Valor, right?
A. Yes. Yes.
Q. All cabins, or just a certain configuration of cabin?



A. All cabins.
Q. And how many incidents were revealed?
A. Two.
Q. All right. Tell me about the first one. And, again, you can -- I'm not saying that I won't seek production of these records that you're looking at, for perhaps another reason, but I stipulate that you're looking at them now, will not be deemed a waiver.
A. Okay. Thank you.
MR. PELAEZ: Thank you, Counsel.
THE WITNESS: Okay. The first one occurred on March 9, 2017, and that was with a Barbara Fisher.
MR. HERNANDEZ: I'm sorry, just bear with me for two seconds.
THE WITNESS: Sure.
MR. HERNANDEZ: Never mind. Go ahead. I apologize for interrupting. March 9, 2017.
THE WITNESS: Barbara Fisher. She was a 70-year-old woman who was in cabin 1354. It was about 8 o'clock in the morning. She was --
MR. HERNANDEZ: Let me stop you. Fisher, F-i-s-c-h-e-r, or F-i-s-h-e-r?
THE WITNESS: Just s-h-e-r. F-i-s-h-e-r.
MR. HERNANDEZ: Okay. I'm sorry. Go ahead.



THE WITNESS: She stated that as she was stepping out of the shower in the bathroom in her cabin around 9 o'clock in the morning, her left foot caught on the shower threshold as she was exiting, and she lost her balance and fell forward, landing on her knees and elbows.
BY MR. HERNANDEZ:
Q. The -- does your -- does your investigative -- strike that. Does your claim -- strike that again. Do you have a claim file for Fisher, or do you just have an investigative file?
A. Let me go into our claim database to see if any claim was filed by Ms. Fisher. No. There was no claim for Ms. Fisher, it was just reported onboard.
Q. Sounds like a silly question but no claim meaning no lawsuit either, right?
A. Correct. No claim. No lawsuit. No letter after the cruise. No letter from a lawyer or her.
Q. So --
A. There was no request for compensation.
Q. Was an accident report prepared?
A. Yes.
Q. Were statements done -- taken?
A. Let me check for you. Let me see if they list the attachments. It looks like the only statement



taken was of the guest herself, and the passenger injury statement.
Q. Of Barbara Fisher?
A. That's correct. Yes.
Q. Was she seen in your medical department?
A. I believe so. Let me see what the narrative says here. Yes. She reported it the next day and she went to the medical center and sought medical treatment in the medical center the following day.
Q. How many visits to the medical department?
A. I don't have the medical records, I just have the notation that she went to the medical center the next day, and that the investigator was then notified, and they started the accident investigation.
Q. Were photographs taken of the shower -- strike that. Were photographs taken of the bathroom or the shower?
A. Yes.
Q. How many?
A. I note seven photographs attached to the accident report. I don't have them all, but I do have one.
Q. How do you only have one?
A. I mean, it's just what counsel provided to me for the priors. I didn't pull all the accident

reports. I guess Monica probably pulled it and just pulled one of the photos to show generally it's the same configuration.

Q. I'm sorry, so what you're looking at is not your file, so to speak. It's your file after it's been returned to you by your lawyers?

A. So in -- when I prepare for these depositions, they send me everything electronically that might be relevant in the deposition, and -- in folders. And I've asked Monica for prior incidents, for all of my depos, to include the accident report, the injury statement, and at least one photo, so that we can verify that, you know, the area is similar to what is at issue in the underlying lawsuit. So that's what I have here.

Q. All right. So tell me what's depicted in the one photograph that you do have available to you.

A. The shower cabin in cabin 1354 onboard the Valor.

Q. Is the floor of that bathroom the blue with speckles as we've got in this case?

A. Yes.

Q. And is it that same blue speckled color throughout the bathroom floor, shower ledge, shower floor?



A. All of the bathrooms on the valor are similarly configured. Yes.

Q. So and how about layout? Is it laid out just as it was in Ms. Hall's cabin? One walks in, shower is to the right. To the front and a little bit to the left is the commode, and to the left is the vanity?

A. No. It's a different configuration. Similar, but different.

Q. What was the configuration?

A. The door opens out. You walk in, the shower is to your left. The commode is to center left, and I assume the sink is to the right.

Q. Okay. So it's a mirror configuration to Ms. Hall's, is it not?

A. I can't say specifically that it's exactly a mirror configuration, but it looks very similar to be.

Q. White shower curtain?

A. There is a white shower curtain. Yes.

Q. And what is Ms. Fisher's address?

A. Let me see if I can find it here. It just says Florissant, Missouri 63033. F-l-o-r-i-s-s-a-n-t, Missouri.

Q. Wait. Wait. Okay. I'm sorry. Give me that again.

A. Hold on, I'm going to try to go to her



passenger injury statement and see if she wrote her full address on there. Okay. The city is Florissant, F-l-o-r-i-s-s-a-n-t, Missouri. And she writes it's 6328 Lake Paddock Drive.

Q. Paddock or Haddock?

A. Paddock, P-a-d-d-o-c-k.

Q. Any zip code?

A. Yes. 63133.

Q. Telephone number?

A. 314-942-6346.

Q. Email?

A. Mama5454 -- mama5454 --

Q. I'm sorry, my phone went off. Can you go back to mama?

A. Mama5454225@att.net.

Q. Let me confirm. Mama5454225@att.net?

A. Actually, there's another five. It's 54542255@att.net.

Q. And in her statement what, if anything, did she attribute her fall to?

A. She just didn't -- she just said to the investigators she wasn't paying attention. She said, "In stepping out of the shower, fell forward in bathroom. Left foot caught on bar of shower floor and lost balance. Landed on floor on both knees." It



says, "What could you have done to avoid it?" It just says, "Not use the shower." So, but she told the investigator in the investigation that she had used the shower numerous times and that she just forgot that the lip was there. And also that she wears glasses, and she wasn't wearing her glasses, she said.

Q. And the second incident, the second prior incident.

A. Yes.

Q. Date and name?

A. That is -- the first name is Diana. The last name is Blythe, B-l-y-t-h-e. And she is a --

Q. Date?

A. It was June 25, 2017.

Q. June 25th?

A. 6/25/17.

Q. What cabin?

A. Cabin number was 6296.

Q. What happened here?

A. Here it looks like she was using the mirror and then stepped backwards and forgot about the threshold and tripped back -- she was walking backwards and fell backwards into the shower.

Q. And I'm sorry, going back to Fisher for a moment. I know you told me it was the same

configuration, but the curb, the step itself into the shower, same size as Ms. Hall's cabin, right?
A. You know, in that angle, it looks like it might be a little taller. I can't really tell. We would have to measure the two. But it looks about that same. I mean, somewhere around two, three inches.
Q. What was the injury to Ms. Blythe?
A. Let's see. I don't really like giving their medical --
Q. No. Just tell me as you did before. You can be cryptic.
A. Yeah. She just kind of fell back onto her buttocks. Because she was walking backwards and just wasn't watching where she was going, forgot about the threshold, and fell backwards into the shower.
Q. Any clam, any lawsuit, any lawyer letter?
A. No. Nothing.
Q. None of those three?
A. Correct. It was just an incident reported onboard.
Q. Did it result in an accident report and statements?
A. There is an accident report. An accident investigation was conducted. She didn't go to the



medical center initially; she went a couple of days later. Husband of injured guest --
Q. Who was -- who provided a statement?
A. There's a passenger injury statement. I can't tell if the husband provided a statement or not. It just says that there's a PDF. It's probably just his photograph, but I can't be sure. I don't have all the attachments. I only -- I have one photograph, I have the passenger injury statement, and I have the narrative of the report itself.
Q. How many total photos were taken as part of the Blythe investigation?
A. One, two. It looks like.
Q. You've only access to one today though?
A. Correct.
Q. Tell me what it shows.
A. It shows a configuration of a shower similar to Barbara Fisher's in that the door is -- opens outward, and the shower is on the left, and then you have the toilet, and then on the right, you have the sink. And it is similarly configured to Ms. Fisher's where it's sort of, you know, the angled showered, there's a white shower curtain. There's a rolled up white towel in front of it that the guests use when, you know, exiting the shower, so they don't slip. And



it shows a similar, you know, threshold.
Q. Similar in height to Ms. Hall's?
A. Yes.
Q. The floor in cabin -- the floor in the cabin bathroom of 6296, is it the same color, that blue speckled polyurethane, or whatever the actual material is, as in Ms. Hall's cabin bathroom?
A. It looks to be the same.
Q. And is it throughout, meaning bathroom, step into shower, and shower?
A. Yeah. The floor inside and outside the shower is flush, and then the lip goes around the shower to prevent the water from coming into the bathroom.
Q. I understand, but the colors are all the same --
A. It's all the blue -- it's all the speckled blue resin surface, or whatever that is.
Q. And the shower curtain white as -- white as in the other two?
A. Yes.
Q. At the time of Ms. Blythe's fall, was the shower curtain drawn or open? Drawn -- was it open or closed?
A. I don't know. She said she had just recently gotten out of the shower, and then she was getting



ready in front of the mirror, and then she just stepped backwards and forgot that the lip was there and tripped backwards.
Q. And Ms. Blythe's address and contact details?
A. 5401 Coventry Place, C-o-v-e-n-t-r-y, Place. And is it Colleyville, Texas? C-o-l-l-e-y-v-i-l-e.
Q. I'm sorry, C -- can you spell Colleyville against?
A. Yeah. Let me see if I can get -- it's just her handwriting, it's not great. Let me see if it's in the accident report itself somewhere. Yeah. Colleyville, Texas. C-o-l-l-e-y-v-i-l-l-e, Texas. And zip code is 76034.
Q. Telephone number, please?
A. 817-571-2307.
Q. And email?
A. It's kind of hard to read. It looks like dmbl -- it's either blu or bw -- I think it's dmbwestie.
Q. Wait, wait. Now you skipped the b that you gave me previously. Dm --
A. Dmbwestie@aol.com.
Q. Dmbwestie?
A. That's what it looks like to me. It's possible that it is dmbluestie, but I think it makes more sense that it's westie, like dmbwestie. Like

Diana M. Blythe westie. Get it? That's her name, Diana Blythe. So it seems like it's dmbwestie.

Q. Okay. And I'm sorry, you said -- is there a statement of hers, or a statement of her husband?

A. I can't tell. She says in here that the husband witnessed it, and it says there is an attachment, a PDF. It just says, "Husband of guest." So I don't know if that's his statement, or if that's his APASS photo. Sometimes they just attach the APASS photo of the traveling companion, and sometimes it will be a statement. I don't know.

Q. Well wait a second. So you can't see the statement in whatever you're looking at?

A. That's right. I don't have all the attachments. I only have the accident report itself with the narrative, one picture, and the passenger injury statement filled out by Ms. Blythe.

Q. Oh, that's what I mean. You do have her passenger injury statement then.

A. I have hers. I don't know if her husband wrote a statement or not.

Q. Okay. So what does she attribute the fall to in her statement?

A. "I fell back from the floor and fell into the shower. My head hit the back of the shower wall, and



my butt hit the floor. I had just gotten out of the shower."

Q. And in order to -- what databases were researched which revealed these two incidents, Blythe and Fisher, we've been talking about?

A. Monica would have had to review the Info Ship database, which is where all the old accident reports lived prior to 2019. She would have researched the Sea Event database which is where all the accident reports live since 2019. And the rollout was over various months in 2019. But she knows how to search all the databases. And then she also searched our RiskConsole database for any potential claims or lawsuits that arose from similar allegations where an accident report was not prepared.

Q. The one you mentioned in the middle is called Sea Event?

A. Yes. That is the new accident reporting database, Sea Event.

Q. S-e-a?

A. Uh-huh (affirmative). Sea.

Q. And this, her research in Info Ship, Sea Event, and RiskConsole, this is done electronically, right? These are databases that are accessible by way of computer?



A. Yes.

Q. And just as she did it for Valor here, it is doable for the other ships in the Conquest class, right?

A. It is doable. I mean, it's a complex process and it's a pain, but yeah, she can do it. That's -- if we asked her to.

Q. Let's take like a minute break so I can go through my notes and parse some things that I don't need to ask you out.

A. Okay.

MR. PELAEZ: Okay.

MR. HERNANDEZ: Or restroom break. Whatever you all want to make it.

THE VIDEOGRAPHER: Very good. Off the record at 3:33.

(Recess taken from 3:33 p.m. to 3:39 p.m.)

THE VIDEOGRAPHER: Back on the record at 3:39.

BY MR. HERNANDEZ:

Q. All right, Ms. Vasquez. Back in 2020, what, if any, inspections were undertaken on a routine basis of the cabin bathrooms on the Valor?

A. I'm sorry, can you repeat that again?

Q. Back in 2020, what, if any, inspections were undertaken on a routine basis of cabin bathrooms on



the Valor?

A. They are inspected daily by the housekeeping staff. Each cabin is assigned a steward and an assistant steward, and one, if not both of them, come in every single day and clean the cabin, and there's a checklist including cleaning and scrubbing all areas of the bathroom.

Q. And I'm sorry, when you say -- you said there's a what? There's a cabin attendant and assistant?

A. Uh-huh (affirmative.) One cabin steward and an assistant steward.

Q. And the inspections that you say they did daily in 2020, what did that entail? What were they looking for? What were they inspecting?

A. There's a whole checklist. They have to clean the cabin. So there's a checklist of everything they have to do, including cleaning the balconies, including the cabin bathrooms. So they do a visual and physical inspection as they're cleaning. So, to the extent that something becomes loose, or whatever, they would be cleaning it, they'd feel it. I don't think there's any allegation that anything was loose here, but, nonetheless.

Q. This checklist that you're referring to, is it

Page 130

the deposition.
You can answer if you know it.
THE WITNESS: I really don't know.
MR. HERNANDEZ: Let's go off the record. I think I'm done. I just want to look at my notes.
THE WITNESS: Okay.
THE VIDEOGRAPHER: Off the record at 4:09.
(Recess taken from 4:09 p.m. to 4:11 p.m.)
THE VIDEOGRAPHER: Back on the record at 4:11.
BY MR. HERNANDEZ:
Q. Ms. Vasquez, at the time of my client's cruise, what were Carnival's policies for providing emergency medical care to a sick or injured passenger unable to pay?
A. Any emergency care that's needed is going to be rendered regardless of ability to pay, or whether a promissory note. Any emergent situation would be taken care of.
Q. And that what you just said, is this in writing anywhere? Is there, you know -- I know you guys have a medical department manual. You may call it something else. Is it in there? Does it say that?
A. I don't know. I didn't pull all the medical procedures or policies. But it's my experience, for sure, that there is -- if a guest needs emergency

Page 131

medical assistance, it will just be provided. They're not even going to discuss a guest consultation form, or payment, or any of that.
Q. So we know that my client sustained a fracture, why wasn't she provided emergency medical care?
A. Because she didn't report it. And it wasn't an emergency, obviously. She didn't report it for several days. She -- at the time when she decided not to see the doctor on the 4th, she actually went to see her doctor and they did not even deem it to be emergency. He scheduled her for a surgery later, but it wasn't an emergency situation.
However, had she wanted to see the doctor, or said she needed to see the doctor, she would have seen the doctor, and they would have dealt with the payment situation later.
Q. So it's your testimony, under oath, that she went down to the medical department, but didn't want to see the doctor for her fracture; is that what you're saying?
A. It appears, from the testimony of the nurse that had the interaction with her, that she wanted to know if there would be a fee, and he said, "Customarily, yes. There's a fee to see the doctor.

Page 132

It's $100 or $125." Or whatever it was back then. And that she then didn't want to see the doctor. She didn't want to pay and then she made the assessment that she -- it had already been three days. She was getting off the ship the next day. And that she would just see her own doctor when she got home 24 hours later. Which is what she did.
Q. So what were your company's policies back in March of 2020 for accepting passenger health insurance in the case of a passenger that needed emergent medical care?
A. We don't accept insurance. We're not a health care provider that way. We're not a HIPAA facility in that regard, so we can accept insurance. However, guests are encouraged to buy their travel insurance, which would pay for, you know, emergency medical care and medical assistance that's rendered onboard. So there is a level of insurance that you can buy medical issues that might arise during your cruise. I don't believe that she elected to have that coverage, but I have not researched that to be sure.
Q. So, in the routine instance, if a passenger -- forget routine. Back in March of 2020 on the Valor, if a passenger went to the ship's medical department, the only form of payment accepted was self-pay,

Page 133

effectively?
MR. PELAEZ: Objection to form.
THE WITNESS: Right. Like I don't think most American based health insurance covers in foreign waters, or in foreign ports. So insurance is not really an option. It usually just gets tagged to the person's sail and sign account when they sign their guest consultation form. It denotes that when they sign up. Like I said, exceptions are made all the time as for payment and how that looks. But that's generally the procedure, is that it would go to the guest's sail and sign account.
BY MR. HERNANDEZ:
Q. Did you bring any documents to today's deposition that I have not discussed with you?
A. I didn't bring anything. Everything was emailed to me in a link, so I do have access to everything that we've been discussing today. I have access to all of the file materials, but nothing that you don't have. Other than, maybe, the HAT meeting minutes which have to redacted based on whatever you guys decide.
Q. Okay. No. What I meant by brought to today's deposition, that you would be producing to me that I haven't discussed with you.