UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO: 1:21-cv-20557-BB

BARBARA HALL,

Plaintiff,

v.

CARNIVAL CORPORATION,
d/b/a CARNIVAL CRUISE LINES,

Defendant.
_________________________________/

Remote Audio-Video Communication

Friday, June 29, 2021

10:03 a.m. - 3:08 p.m.

VIDEOTAPED DEPOSITION OF BARBARA HALL

Taken before Paula Pace, RPR, Notary Public in and for the State of Florida at Large, pursuant to Notice of Taking Deposition filed in the above case.

layers of the floor and no warning signs. You know, everything the same color. Like I said, when you're sleepy...
Q. Is there anything else?
A. I don't think so.
Q. Ma'am, do you have any complaints about the functionality of the lights in your cabin, including the cabin bathroom?
A. No.
Q. Okay. The lights were operational at the time of your incident, correct?
A. Correct.
Q. And when you lit up the bathroom did it provide sufficient light for you to be able to see things clearly?
A. Yeah.
Q. Do you agree that after drinking alcohol, ma'am, it can affect your stability from walking?
A. If you drink too much, yes.
Q. Okay. And if you drink too much do you also agree that alcohol can affect your judgment?
A. Yes.
Q. When you drink too much do you also



agree with me that alcohol can affect your depth perception?
A. Yes.
Q. You also agree with me that alcohol is a depressant?
A. Yes.
Q. Do you agree that alcohol can exacerbate the feeling of being tired?
A. Yes.
Q. I have a couple more documents here just to go through, okay, and then we'll be getting I think very close to being finished. Thank you for your patience.
A. I lost a day's pay today. I thought it was only going to be an hour or two.
Q. I'm going to try to share my screen again. If you need me to make the image larger, please let me know.
A. Okay.
Q. Here is, this is a transactional record, ma'am, from February 29, 2020 at 1 p.m. Do you recall being on the Carnival VALOR on that date and time?
A. Well, I guess so. I mean --
Q. Is this your name, Barbara Hall, on



the document?
A. Yes. I have to say I didn't remember what time we got on the cruise, on the ship.
Q. Do you agree with me that you must have been on board by at least one o'clock on February 29th?
A. Correct.
Q. And this thing you purchased here is called a Fun Ship Special Premium.
A. Okay.
Q. Do you see that?
A. Uh-huh.
Q. It looks like you purchased it in the Winner's Luck Bar, correct?
A. Okay.
Q. Is the Winner's Luck Bar the name of the casino bar?
A. No, it wasn't. You get the drink before that, so.
Q. Okay. So you think you got a drink before 1 p.m. at the Winner's Luck Bar?
A. No, I'm saying that was before the casino, the Winner's Luck Bar.
Q. Okay. Well, what type --
A. It was like a portable bar that they



met us out. So it might have been the casino bar, but it was like a portable bar.
Q. Okay.
A. You know what I mean? She met us almost by the door when you walk, when you first walk in on the ship.
Q. So the Winner's Luck Bar here, this Fun Ship Special Premium, what kind of drink is the Fun Ship Special Premium?
A. It was a fruity drink.
Q. Okay. A mixed drink, right?
A. Yes.
Q. And you used your Cheers package to purchase that, right?
A. Yes.
(Thereupon, Defendant's Exhibit No. 15 was marked for identification.)
BY MR. SMITH:
Q. Okay. So we'll mark that as Exhibit 15.
A. I guess, I mean, I don't know. It shows that it didn't charge, so I don't know. I don't know if that went on my debit card or on the drink card.
(Thereupon, Defendant's Exhibit No. 16

was marked for identification.)
BY MR. SMITH:
Q. So we'll mark this next document as Exhibit 16. This is another transaction record from February 29, 2020 at 1:28.
Do you see it says again the Winner's Luck Bar?
A. Uh-huh.
Q. And it has your name, ma'am, here at the bottom, Barbara Hall, correct?
A. Uh-huh.
Q. So does this document jog your memory as to where the Winner's Luck Bar is located?
A. It's probably the casino bar then.
Q. So at 1:28 did you purchase another Fun Ship Special Premium at the casino bar?
A. I purchased another drink. I don't know if that's what it was, but.
Q. It says here, "Item, Fun Ship Special Premium."
A. Okay, yeah.
Q. That's the fruity mixed drink, right?
A. Uh-huh.
Q. Okay.
A. And what time was the other one at,



1:06?
Q. 1:06.
A. Okay.
(Thereupon, Defendant's Exhibit No. 17 was marked for identification.)
BY MR. SMITH:
Q. I'm now going to mark Exhibit 17. This is another transaction record where it says, it looks like you -- it records your purchase of the Cheers program. Do you recall if this is about the price you paid for the Cheers package?
A. I thought it was more than that. I thought it was 300 even.
Q. Okay. This is again your name beside where it says, "Guest Name," right?
A. Uh-huh.
Q. That was Exhibit 17. Now we're going to mark Exhibit 18.
(Thereupon, Defendant's Exhibit No. 18 was marked for identification.)
BY MR. SMITH:
Q. This is another transaction record. This time from the location called the Breeze Lobby Bar. Do you remember where the Breeze Lobby Bar is located on the ship, ma'am?



A. No.
Q. Here on February 29, 2020 at about 3:04 p.m., do you recall purchasing another Fun Ship Special Premium?
A. No, I mean, I don't remember what I bought and that must have been what the special was called that I was drinking while I was on the cruise.
Q. Okay. This is the fruity mixed drink, right?
A. Uh-huh.
(Thereupon, Defendant's Exhibit No. 19 was marked for identification.)
BY MR. SMITH:
Q. I believe this next one is going to be Exhibit 19. This is another transaction record from 3:45 on February 29th, 2020. Again, this is back now at the Winner's Luck Bar. Another Fun Ship Special Premium purchased under Barbara Hall's name.
A. Okay.
Q. Do you see that on your screen?
A. Yes.
Q. Do you recall purchasing this drink at 3:45 in the casino bar?



A. I don't recall, but I guess I did.
(Thereupon, Defendant's Exhibit No. 20 was marked for identification.)
BY MR. SMITH:
Q. The next is going to be Exhibit 20, a purchase again February 29, 2020 at 5:45 p.m. at the Winner's Luck Bar. It looks like you purchased another Fun Ship Special Premium at that time, correct?
A. Okay. That's what it shows, yes.
(Thereupon, Defendant's Exhibit No. 21 was marked for identification.)
BY MR. SMITH:
Q. Exhibit 21 I'm going to mark now is another transaction record for a Fun Ship Special Premium purchased under your name, ma'am, at 6:27 p.m.
A. I don't recall, but if it says I did.
(Thereupon, Defendant's Exhibit No. 22 was marked for identification.)
BY MR. SMITH:
Q. I think we're up to Exhibit 22, another purchase on 2-29-2020, 6:35 p.m., another Fun Ship Special Premium under your name, ma'am, at the Winner's Luck Bar, correct?

A. Yes, that's what it shows.
Q. This was the fruity mixed drink, right?
A. Can I ask you, I just, I guess I don't know, it says Winner's Luck and then it says $0.89 total charge. And then down here it says 9.95, okay, I see what it is.
Q. 89 cents I believe is the tax.
A. Yeah, I see where it is, yeah.
Q. So this is part of the unlimited drink package, so you're not actually being charged the 9.95.
A. I see that now, yes.
Q. Okay. So do you recall purchasing this drink at 6:35 p.m., Winner's Luck Bar?
A. I don't recall. Like I said, it's on there so I must have. I was on vacation. I wasn't counting. I didn't drink all of them, you know, the whole thing sometimes, like I said, sometimes I would go over to the casino.
(Thereupon, Defendant's Exhibit No. 23 was marked for identification.)
BY MR. SMITH:
Q. Okay. Here's I believe we're up to Exhibit 23, a 7:42 p.m. purchase on 2-29 at the



Winner's Luck Bar, another Fun Ship Special Premium. Do you see that?
A. Uh-huh.
Q. And do you see that's a transaction under your name, ma'am?
A. Yes.
(Thereupon, Defendant's Exhibit No. 24 was marked for identification.)
BY MR. SMITH:
Q. Exhibit 24, 2-29-2020 at 7:54, it appears you purchased another Fun Ship Special Premium at the Winner's Luck Bar, correct?
A. Yes, that's what it shows.
(Thereupon, Defendant's Exhibit No. 25 was marked for identification.)
BY MR. SMITH:
Q. Exhibit 25, another purchase on February 29 at 8:31 p.m. This time it's a blush wine, correct, ma'am?
A. Uh-huh.
(Thereupon, Defendant's Exhibit No. 26 was marked for identification.)
BY MR. SMITH:
Q. Exhibit 26 is another transaction record, some blush wine from February 29 at 9:11



p.m. This time it shows the purchase of a Woo Woo shooter. Do you see that, ma'am?
A. Yes.
Q. And on Exhibit 26 we see again your name, correct?
A. Uh-huh.
Q. Is this the one you tried to dispute, the purchase you tried to dispute with guest services?
A. I didn't, I didn't try and dispute, I didn't try and dispute it, I was just asking what it was, yes.
Q. Okay. So that shot that you -- that shot of alcohol you had was from the first night, February 29th, correct?
A. The first one was, yes.
(Thereupon, Defendant's Exhibit No. 27 was marked for identification.)
BY MR. SMITH:
Q. Okay. Exhibit 27 is another transaction record from February 29th at 10:30 p.m. at the Winner's Luck Bar again, another Fun Ship Special Premium purchased by you, correct?
A. Uh-huh.
Q. Is that again the Fun Ship Special



Premium, the mixed alcohol drink?
A. Yes.
Q. Does this, having looked at these, does this jog your memory of which type of liquor the drink was mixed with?
A. No.
Q. And this last purchase at 10:30, this would have been before you went to bed on the 29th, correct?
A. Correct.
Q. All right. I think those are all the purchases for alcohol that you made on February 29th, ma'am. Having looked at those, do you agree that it looks like you purchased more than five alcoholic drinks before your incident?
A. Yeah, it looks like I purchased more than five, uh-huh.
Q. Do you agree it looks like you purchased more than ten alcoholic drinks on the night before your incident took place?
A. I don't know, I didn't count them.
Q. I believe there were 12 in total.
A. Okay.
Q. So if the record is correct and there's 12 purchases in total, you would have

purchased more than ten alcoholic drinks the night before -- well, the day before you had your fall in the bathroom, correct?

A. Correct.

Q. And you drank all or at least part of all those more than ten drinks, correct?

A. Part of all of them, correct.

Q. But is it your testimony today that alcohol did not play a role in your fall in the early morning of March 1st, 2020?

A. I am testifying that I don't know and I don't believe it was.

Q. Okay. Have you reported to anyone else since the incident any other contributing causes to your incident that you're aware of?

A. Any other contributing, no.

Q. Okay. Did you report to anyone else after the incident that your fall was brought about for a reason other than a high threshold?

A. No. That I tripped in the bathroom and...

Q. Who is your current health insurance provider, ma'am?

A. Spira Care, Blue Cross Blue Shield.

Q. Was Blue Cross Blue Shield your health



insurance at the time of the incident?

A. Yes.

Q. Did you purchase any trip insurance when you went on the cruise?

A. No.

Q. Did you have any other health insurance at the time of the cruise?

A. No.

Q. I don't want to know anything you spoke about with your attorney, ma'am, okay, but did you review anything to help yourself prepare for today's deposition?

A. No.

Q. And again, I also don't want to hear anything about the content of what you spoke with your attorney about, but did you meet with your attorney before you appeared and testified today?

A. Physically, no.

Q. Physically, no. Did you meet over the telephone?

A. Before the deposition, yes.

Q. Okay. And again, I don't want to know anything about the content about what you spoke about. Do you recall how long your conversation with your attorney was before the deposition today?



A. No.

Q. Was it more than 30 minutes?

A. I don't remember.

Q. Bear with me, I'm just looking through my notes here.

A. Uh-huh.

Q. At home, ma'am, what type of shower do you have?

A. What type of a shower do I have?

Q. Yes.

A. One that I have to step into the tub.

Q. So it's a tub shower combo?

A. Yes.

Q. So when you step into your shower you have to step your foot over the tub part to get in?

A. Yes.

Q. Okay. So before the cruise you knew that showers could have a threshold you might have to step over?

A. Yes.

MR. SMITH: All right. I don't have any other questions for you at this time. Thank you.

THE WITNESS: Thank you.

MR. WALSH: This is Peter. I have a



couple of questions.

(Thereupon, a discussion was held off the record.)

THE VIDEOGRAPHER: We're going off the record at 2:48 p.m.

(Thereupon, a short recess was taken.)

THE VIDEOGRAPHER: We're going back on the record at 2:55 p.m.

CROSS-EXAMINATION

BY MR. WALSH:

Q. So, Barbara, I think you just said that you're familiar with obviously you've stepped into your shower at home, right, before?

A. Correct.

Q. And to step into your shower you have to step into a tub, right?

A. Correct.

Q. Over the side of the tub, okay. The shower that you encountered on the ship, did it have any similarity to your shower at home, other than the fact that water comes out of a --

A. No.

Q. -- a nozzle in the wall?

MR. SMITH: Objection to form.

THE WITNESS: Nothing at all.