UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-CIV-20557-BLOOM

BARBARA HALL,

Plaintiff,

v.

CARNIVAL CORPORATION,

Defendant.
_______________________________________/

# PLAINTIFF, BARBARA HALL'S, RESPONSE/OPPOSITION TO DEFENDANT'S STATEMENT OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS FORECLOSING ENTRY OF SUMMARY JUDGMENT

Plaintiff, BARBARA HALL ("Plaintiff"), by and through undersigned counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules for the Southern District of Florida, herby files this, her Response/Opposition to Defendant's Statement of Material Facts and her Additional Material Facts Foreclosing Entry of Summary Judgment, as follows:

## I. PLAINTIFF'S RESPONSE/OPPOSITION TO DEFENDANT'S STATEMENT OF MATERIAL FACTS

1. Plaintiff, a Missouri resident, was a cruise passenger onboard the Carnival *Valor* for a February 29, 2020, Caribbean cruise leaving from New Orleans, Louisiana. [Plaintiff Depo. p. 84, attached as Exhibit 1].
**Admitted.**

2. Plaintiff booked her own cruise online using her debit card. [Plaintiff Depo. p. 85].
**Admitted, but immaterial.**

3. Plaintiff also purchased an alcoholic drink package for her cruise, allowing her to purchase 15 drinks per day. [Plaintiff Depo. p. 106]. The alcoholic drink package cost $259.75. [Plaintiff Depo. Ex. 17, attached as Exhibit 2].
**Admitted, but immaterial.**[1]

4. Plaintiff is a licensed practical nurse. [Plaintiff Depo. p. 17-18].
**Admitted, but immaterial.**

[1] While Defendant contends that Plaintiff was intoxicated and that this caused her fall, her purported intoxication is of no moment to Defendant's Motion for Summary Judgment and the Court should not permit Defendant to thus conflate the issues.

5. Plaintiff maintains employer-based health insurance. [Plaintiff Depo. p. 42].
**Admitted, but immaterial.**

6. After boarding the ship, Plaintiff and her traveling companion, Angela Vaughn, had a drink at the ship's welcome party. [Plaintiff Depo. p. 97-98]. Vaughn is also a nurse. [Vaughn Depo. p. 16, attached as Exhibit 3].
**Admitted, but immaterial.**

7. Vaughn had her own individual alcoholic drink package as well. [Plaintiff Depo. p. 188].
**Admitted, but immaterial.**

8. Plaintiff then dropped her luggage off at her cabin. [Plaintiff Depo. p. 98]. She used the cabin bathroom without issue. [Plaintiff Depo. p. 100-01].
**Admitted.**

9. Plaintiff testified that she had to walk over a threshold between the cabin and the bathroom to enter same. [Plaintiff Depo. p. 101]. Plaintiff was able to observe that the bathroom had a shower. [Plaintiff Depo. p. 101]. Nothing blocked Plaintiff's view of the bathroom's shower. [Plaintiff Depo. p. 101].
**Admitted. Admitted. Denied; Plaintiff did not see the shower step/ledge at the time of her fall:**

**Q. Did you see the shower threshold prior to falling in the early morning -**
**A. That, I honestly don't recall.**

**Q. So the second shower threshold you don't recall whether you saw it prior to falling?**
**A. Correct.**

**[Plaintiff Deposition at P123, L24 - P124, L4, attached as <u>Exhibit 1 to D's MSJ</u>]**

10. Plaintiff admitted that she noticed that the shower had a blue threshold separating it from the bathroom on her first use of the bathroom. [Plaintiff Depo. p. 102]. She admitted the threshold was visible to her. [Plaintiff Depo. p. 103].
**Admitted. Denied; Plaintiff did not see the shower step/ledge at the time of her fall. [Plaintiff Deposition at P123, L24 - P124, L4, attached as <u>Exhibit 1 to D's MSJ</u>]**

11. Plaintiff used a tub/shower combination at home so she was used to having to step over the tub portion to use the shower. [Plaintiff Depo. p. 179]. Plaintiff was aware that showers have thresholds that may need to be stepped over. [Plaintiff Depo. p. 179].
**Admitted, but immaterial. Admitted, but immaterial.**

12. Plaintiff and Vaughn "walked all over the ship" after dropping off their luggage. [Plaintiff Depo. p. 107]. They visited the casino bar. [Plaintiff Depo. p. 108]. Plaintiff and Vaughn drank at the casino bar. [Plaintiff. Depo. p. 11-12].
**Admitted, but immaterial. Admitted, but immaterial.**

13. Plaintiff and Vaughn had more drinks after dinner. [Plaintiff Depo. p. 113].

**Admitted, but immaterial.**

14. Plaintiff purchased at least 12 drinks - a combination of fruity cocktails, shots, and wine - on the day of the incident. [S. Vazquez Depo. p. 45, attached as Exhibit 4; Plaintiff Depo. p. 176-77]. Plaintiff admitted to drinking at least part of all 12 drinks. [Plaintiff Depo. p. 177].

**Admitted, but immaterial. Admitted, but immaterial.**

15. Plaintiff and Vaughn retired to their cabin sometime before midnight. [Plaintiff Depo. p. 114].

**Admitted.**

16. In response to a question "were you drunk when you went to bed?" Plaintiff responded "I had been drinking." [Plaintiff Depo. p. 181].

**Admitted, but immaterial.**

17. Vaughn testified that "I just don't remember a whole bunch, as terrible as that sounds." [Vaughn Depo. p. 49]. Vaughn "was drinking shots like they were going out of style[ ]" and "drinking like a sieve." [Vaughn Depo. p. 54, 78].

**Admitted, but immaterial. Admitted, but immaterial.**

18. Plaintiff used the bathroom again without issue of the shower threshold before going to sleep. [Plaintiff Depo. p. 115].

**Admitted.**

19. Plaintiff woke up "in the middle of the night" to use the bathroom again. [Plaintiff Depo. p. 117]. Plaintiff turned on the lights in the bathroom. [Plaintiff Depo. p. 122]. Plaintiff admitted the lights provided sufficient illumination to the bathroom for her to see clearly. [Plaintiff Depo. p. 165]. Plaintiff closed the door shut behind her. [Plaintiff Depo. p. 147].

**Admitted. Admitted. Denied; Plaintiff testified that the lights provided "sufficient light," not sufficient illumination. [Plaintiff's Deposition at P165, L13-16, attached as Exhibit 1 to D's MSJ] Admitted.**

20. Plaintiff - while trying to use the toilet - tripped over the shower threshold and fell. [Plaintiff Depo. p. 117]. Plaintiff testified it was a small bathroom. [Plaintiff Depo. p. 190].

**Denied; Plaintiff tripped and fell while attempting to get to the toilet. [Plaintiff's Deposition at P117, L18-24, attached as Exhibit 1 to D's MSJ] Denied as phrased; Plaintiff testified that the bathroom is "very tiny" and she is used to a "big bathroom at home." [Plaintiff's Deposition at P117, L18-24, attached as Exhibit 1 to D's MSJ]**

21. There was no water or liquid on the bathroom floor. [Plaintiff Depo. p. 124]. Nothing blocked Plaintiff's view of the shower threshold. [Plaintiff Depo. p. 147].

**Admitted, but immaterial. Denied as phrased; Plaintiff testified "there was nothing there" and "there was no towel or anything there" to distinguish the blue shower step/ledge. [Plaintiff's Deposition at P124, L5-9; P147, L12-16, attached as Exhibit 1 to D's MSJ]**

22. Plaintiff admitted to perceiving the threshold into the bathroom and stepping over same. [Plaintiff Depo. p. 123-24].

**Admitted insofar as the threshold at the door to the bathroom, but immaterial.**

23. Plaintiff knew there was a threshold between the shower and the rest of the bathroom. [Plaintiff Depo. p. 181-82].

**Denied as phrased; Plaintiff did not realize how high the shower step/ledge was. [Plaintiff's Deposition at P182, L7-12, attached as Exhibit 1 to D's MSJ]**

24. After the fall, Plaintiff and Vaughn suspected that Plaintiff suffered a sprained or fractured wrist. [Plaintiff Depo. p. 125]. Vaughn was "kind of on the fence" whether Plaintiff's wrist was sprained or fractured. [Vaughn Depo. p. 72].

**Denied; Ms. Vaughn had no opinion about the severity if injury immediately after Plaintiff's fall and "hoped" it was only sprained and in the morning believed it was a fracture. [Plaintiff's Deposition at P125, L2-13, attached as Exhibit 1 to D's MSJ] Denied, Ms. Vaughn was "on the fence" about the severity of Plaintiff's injury when the two were at the ship's infirmary. [A Vaughn Deposition at P72, L1-24, attached as Exhibit 3 to D's MSJ]**

25. Plaintiff did not call for medical assistance or go to the medical center immediately following her fall. [Plaintiff Depo. p. 125].

**Admitted.**

26. The following morning on March 1st, Plaintiff went to the guest services desk to inquire about a refund of an upcoming ziplining shore excursion. [Plaintiff Depo. p. 126].

**Denied; Plaintiff's purpose in going to guest services was not to obtain a refund on the shore excursion, although that is when she received a refund as she was physically unable to participate in the excursion because of the severity of her injury:**

**Q. Okay. And when you went down to guest relations that's when they refunded your shore excursion.**
**A. Yes.**

**Q. Do you recall any other conversation with guest relations at that time?**
**A. I told her, I said, yeah, I think I sprained or broke my wrist and showed her my wrist. And she said, yeah, you can't very well do zip lining with that and she refunded my money and was it. And then we went on shore.**

**[Plaintiff's Deposition at P126, L18 - P127, L3 attached as Exhibit 1 to D's MSJ]**

27. Plaintiff and Vaughn left the vessel on March 2nd in Cozumel, Mexico to visit the beach and shop for souvenirs. [Plaintiff Depo. p. 128].

**Admitted, but immaterial.**

28. Plaintiff claims that she visited the medical center that evening after eight hours in Cozumel. Plaintiff alleges that she went to guest services again to ask about the medical center, and "they told me it was going to be $500 on my credit card and I said I didn't have that, so I had to leave. I was just outraged. You know, I told them I have my insurance and they said they don't take private insurance." [Plaintiff Depo. p. 130].

**Denied; Plaintiff was only ashore in Cozumel for approximately 5 hours. [Movement Details, attached as Exhibit A]**

29. Plaintiff claims that the conversation was a minute or two. [Plaintiff Depo. p. 132].

**Admitted, but immaterial.**

30. Vaughn testified that Plaintiff's injury was not an emergency. [Vaughn Depo. p. 73]. According to Vaughn, "[i]t takes a lot to be an emergency for a couple of nurses." [Vaughn Depo. p. 73].

**Denied as phrased; Ms. Vaughn testified the injury was "not an emergency" in the context that they "didn't leave the ship, you know, and go home." [A Vaughn Deposition at P73, L1-9 attached as Exhibit 3 to D's MSJ]. Admitted, but immaterial.**[2]

31. Vaughn testified that the shipboard medical personnel did not intend to harm Plaintiff; "[h]e wasn't very helpful, but he didn't hurt her, so." [Vaughn Depo. p. 77].

**Admitted, but immaterial.**

32. The shipboard medical center is generally a self-pay facility as American-based health insurance is not accepted. [S. Vazquez Depo. p. 133]. Charges at the medical center are typically charged to the passenger's onboard account. [S. Vazquez Depo. p. 133].

**Admitted.**

33. If Plaintiff wanted to see the shipboard physician, "she would have seen the doctor, and they would have dealt with the payment situation later." [S. Vazquez Depo. p. 131].

**Denied; Plaintiff was twice refused consults with Defendant's physician as she was unable to pay for the consults up front:**

**Q. Did anything of note occur on board when you got back on that evening?**
**A. I went and asked about the med bay then. And I went down, Angela stayed up there, I went down. She stayed up watching a show right there by the guest relations. I went down, talked to them, they told me it was going to be $500 on my credit card and I said I didn't have that, so I had to leave. I was just outraged. You know, I told them I have my insurance and they said they don't take private insurance.**

**Q. Okay. What day was this?**
**A. That was the 1st, that was that evening when we got back from the shore.**

**[Plaintiff's Deposition at P129, L23 - P130, L8, attached as Exhibit 1 to D's MSJ]**

**Q. Was there anything else you recall about the conversation you had on March 1st, 2020 down at the medical center?**
**A. Just the cost for the doctor visit and x-ray would be about $500.**

**Q. Okay.**
**A. And you have to use a Visa card because they don't take my insurance.**

---

[2] As with other "contextual liberties" it takes in its Motion, although Defendant attempts to paint Ms. Vaughn as an expert on orthopaedic injuries or emergency medicine, it fails to bring to the Court's attention that she works as a Nurse in a nursing home. [A Vaughn Deposition at P15, L25]

**[Plaintiff's Deposition at P134, L15-22, attached as <u>Exhibit 1 to D's MSJ</u>]**

**Q. Okay. Between your visit, well, between March 3rd, 2020 and the end of voyage back in New Orleans did you make any other stops back to the medical center?**
**A. Yes, I did. I went up to the guest relations and I talked to a guy and he told me, you know, I showed him my wrist, I unwrapped it, showed him my wrist. He told me that sometimes when people can't afford, they have a compassionate care and I should go down there and tell them that. So when I went down there and talked to the gentleman that was down there, he said he didn't know what the guy was talking about, they don't have any such thing. Angela was with me then.**

**[Plaintiff's Deposition at P138, L15 - P139, L4, attached as <u>Exhibit 1 to D's MSJ</u>]**

**Q. What day was this next visit you had to guest services?**
**A. The 4th.**

**Q. Okay. And you say Angela went down to the medical center with you, right?**
**A. Yes.**

**Q. And who did you talk to down there?**
**A. I don't know who he was.**

**Q. Okay. He was a male?**
**A. It was a male at the desk, uh-huh.**

**Q. Do you know if it was the same person you saw the first time?**
**A. I don't know.**

**Q. Did you get a name for this gentleman?**
**A. No. I'll be honest, I was very upset with the way I was treated the first time, so I didn't even want to go the second time. But then when he said that sometimes they do compassionate care, I figured there's no sense in going when they're not going to do anything for me.**

**[Plaintiff's Deposition at P141, L7- P142, L1, attached as <u>Exhibit 1 to D's MSJ</u>]**

**Q. What was the -- what did you talk about the second time down to the medical center on March 4th?**
**A. The second time I just went down there and I told them that I'd been down there before and they said I had to have the five, almost $500 to see the doctor and x-rays. I said, I have my insurance. They said they don't take private insurance on the cruise because of not being able to run it or something. And I said, told them that the guy upstairs told me about the compassionate care. He said, well, I don't know what he's talking about, we don't have that. And I said okay, I guess I'll wait until I can see the doctor at home.**

**[Plaintiff's Deposition at P142, L13 - P143, L4, attached as Exhibit 1 to D's MSJ]**

**Q.** **What did you two do at that point after you found out about her injury?**
**A.** **Went down to the -- I guess they call it the infirmary there.**

**Q.** **Is that the first thing you remember doing after becoming aware of her injury?**
**A.** **That and we went and canceled our outing.**

**[A Vaughn Deposition P61, L5-12, attached as Exhibit 3 to D's MSJ]**

**Q.** **Okay. And do you remember what day it was at this point that you became aware of her injury and you went to the infirmary and the customer service desk?**
**A.** **The day after boarding.**

**. . . . .**

**Q.** **Okay. So you did go down to the medical infirmary with Ms. Hall the day after you boarded; is that right?**
**A.** **Right.**

**Q.** **All right. Do you know what time of day it was when you went down there?**
**A.** **In the morningish.**

**[A Vaughn Deposition at P62, L7-24, attached as Exhibit 3 to D's MSJ]**

**Q.** **What do you remember of the visit to the infirmary, medical infirmary area?**
**A.** **That it was way down in the bottom.**

**Q.** **Okay.**
**A.** **And old and kind of creepy. And the gentleman -- I'm not sure what he was, really, what title, but I guess he wanted a bunch of money beforehand. So we left. She just didn't have it.**

**[A Vaughn Deposition at P63, L5-13, attached as Exhibit 3 to D's MSJ]**

**Q.** **Okay. What specifically did Ms. Hall say, if you remember, to the gentleman?**
**A.** **Just that she hurt her arm.**

**Q.** **Okay. Did she say anything else besides she hurt her arm?**
**A.** **Boy. I don't know.**

**Q.** **Okay. Is that she hurt her arm all that you can remember that Ms. Hall said on that visit to the medical infirmary?**

**A. Yeah. And they -- that and they wanted a bunch of money that she didn't have. They wanted it, you know, beforehand.**

**Q. Who allegedly said that?**
**A. Who said what? Oh, it was the little lady at the -- yeah, at the window, that it was going to be -- I'm not sure how much, but it was, you know, more than she had readily available, so.**

**Q. You don't remember any -- are you saying there was a specific amount of money discussed?**
**A. Yeah, they wanted some down before they would look at her.**

**[A Vaughn Deposition at P65, L17 - P66, L14, attached as <u>Exhibit 3 to D's MSJ</u>]**

**Q. Okay. Do you remember any other visits at all down to the medical infirmary after that first one we have already talked about?**
**A. Yeah, we went down there one more time. Don't ask me when, because I don't know.**

**Q. You went down again?**
**A. Yeah.**

**[A Vaughn Deposition at P87, L10-17, attached as <u>Exhibit 3 to D's MSJ</u>]**

**Q. Do you remember anything that happened the second time you went down to the medical infirmary?**
**A. All I really remember is them wanting some money that she didn't have, so. I mean, they wouldn't see her either without – I mean, that's just crazy, I think. You know, that's her only option. If you're hurt, they should see you.**

**[A Vaughn Deposition at P88, L2-10, attached as <u>Exhibit 3 to D's MSJ</u>]**

**Q. Okay. You've referred to some sort of a demand for payment. Where did you get that information from?**
**A. Because they were wanting a significant amount of money to see her in the infirmary.**

**Q. Okay. But where does that – where did that information come from? Because you can't remember any specific statements that, you know --**
**A. Well, I remember leaving the infirmary and her saying, "I didn't have the money for that." She told me they wanted a bunch of money, that's why nothing happened there.**

**Q. You heard the plaintiff, Ms. Hall, say "I don't have the money for that"; is that right?**
**A. Correct.**

**[A Vaughn Deposition at P91, L1-20, attached as <u>Exhibit 3 to D's MSJ</u>]**

34. Payment is not an upfront requirement to see the shipboard physician. [Cagumbay Depo. p. 13, attached as Exhibit 5]. The medical center does not demand payment as a precondition to consult the shipboard physician. [Cagumbay Depo. p. 13].

**Denied; Plaintiff was twice refused consults with Defendant's physician as she was unable to pay for the consults <u>up front</u>. [See No. above 33 above]**

35. Passengers will be treated in the medical center even if they cannot afford to pay for treatment. [Cagumbay Depo. p. 17-18].

**Denied; Plaintiff was twice refused consults with Defendant's physician as she was unable to pay for the consults <u>up front</u>. [See No. above 33 above]**

36. Plaintiff went on another shore excursion to Progreso/Yucatan, Mexico the following day on March 3rd. [Plaintiff Depo. p. 135-36]. Plaintiff bought an ACE bandage wrap in Yucatan, but did not seek out medical treatment. [Plaintiff Depo. p. 135-36].

**Admitted, but immaterial.**

37. Plaintiff claims she went back to the guest services desk, where she was told "that sometimes when people can't afford, they have a compassionate care and I should go down there and tell them that. So when I went down there and talked to the gentleman that was down there, he said he didn't know what the guy was talking about, they don't have any such thing." [Plaintiff Depo. p. 138-39].

**Admitted.**

38. Plaintiff testified that she showed her wrist to the crewmembers at guest services, but there is no evidence she showed her wrist to anyone in the medical center. [Plaintiff Depo. p. 138-39].

**Denied; Nurse Cagumbay cannot remember whether he looked at Plaintiff's fracture, but knows here injury was to the right forearm. [Cagumbay Deposition at P41, L5-17, attached as <u>Exhibit 5 to D's MSJ</u>]**

39. Plaintiff chose not to consult with the shipboard physician. [S. Vazquez Depo. p. 25; Cagumbay Depo. p. 63].

**Denied; Plaintiff was twice refused consults with Defendant's physician as she was unable to pay for the consults <u>up front</u>. [See No. above 33 above]**

40. Plaintiff thought it was unnecessary to pay a consultation fee associated with seeing the shipboard physician because she is a nurse and would seek treatment when she returned home from the cruise. [S. Vazquez Depo. p. 66]. Plaintiff stated she had insurance and did not want to pay the medical charges. [S. Vazquez Depo. p. 73].

**Denied. Ms. Vazquez was not present on the ship and appeared only in the capacity of Corporate Representative, having spoken to no one who was present on the ship [Corporate Representative Deposition at P8, L3-7, attached as <u>Exhibit 4 to D's MSJ</u>]. She is neither competent to testify as to what Plaintiff "thought" or what Plaintiff "stated." Further, Plaintiff was twice refused consults with Defendant's physician as she was unable to pay for the consults <u>up front</u>. [See No. above 33 above]**

41. Joseph Cagumbay was the nurse onboard the *Valor* during Plaintiff's cruise. The shipboard medical center maintains a medical interaction log of every interaction with guests or

patients. [Cagumbay Depo. p. 8; Interaction Log, attached as Exhibit 6]. There is no interaction with Plaintiff for March 1st. [Cagumbay Depo. p. 10]. Plaintiff only appears on the medical interaction log on March 4th. [Cagumbay Depo. p. 10, 19].

**Denied; Mr. Cagumbay was one of the nurses aboard Valor at the time of Plaintiff's cruise. [Cagumbay Deposition at P6, L4-7 and P40, L25 - P41, L4, attached as Exhibit 5 to D's MSJ] Admitted. Denied; Mr. Cagumbay never testified as Defendant posits that there is "no interaction with Plaintiff for March 1st," he testified that his interaction with Plaintiff was March 4th. [Cagumbay Deposition at P9, L25 - P11, L3, attached as Exhibit 5 to D's MSJ] Denied; again, Mr. Cagumbay never testified as Defendant posits that "Plaintiff only appears on the medical interaction log on March 4th," he testified that his only interaction with Plaintiff was on March 4th. [Cagumbay Deposition at P19, L8-13 attached as Exhibit 1 to D's MSJ] Plaintiff went to Defendant's infirmary on March 2nd:**

**Q. Did anything of note occur on board when you got back on that evening?**
**A. I went and asked about the med bay then. And I went down, Angela stayed up there, I went down. She stayed up watching a show right there by the guest relations. I went down, talked to them, they told me it was going to be $500 on my credit card and I said I didn't have that, so I had to leave. I was just outraged. You know, I told them I have my insurance and they said they don't take private insurance.**

**Q. Okay. What day was this?**
**A. That was the 1st, that was that evening when we got back from the shore.**

**Q. March 1st, 2020?**
**A. Yes.**

**. . . . .**

**Q. Okay. The next day what happened.**
**A. Just, you know, I think March 1st was actually March 2nd. I think March 1st was all cruising.**

**[Plaintiff's Deposition at P129, L23 - P130, L13 and P135, L12-15, attached as Exhibit 1 to D's MSJ; see also No. 33 above]**

42. According to Cagumbay, Plaintiff "asked how much it will cost for doctor's consultation. So informed the guest possible charges. So my advice is to – I advised her that – the guest to be seen by the doctor for treatment and further evaluation, and her response, on my advice, the guest stated or a verbal host stated that she will see the doctor back home. She stated that she's also a nurse and she stated that it's already happened three days ago. That is all, sir." [Cagumbay Depo. p. 10-11].

**Admitted that this was Mr. Cagumbay's testimony. However, Plaintiff was twice refused consults with Defendant's physician as she was unable to pay for the consults up front. [See No. 33 above]**

43. Plaintiff disembarked the vessel on March 5th when it arrived back in New Orleans. [Plaintiff Depo. p. 156].

**Admitted.**

44. Plaintiff did not seek out any medical treatment in New Orleans after leaving the ship. [Plaintiff Depo. p. 156]. Plaintiff and Vaughn instead made the two-day drive back home to Missouri. [Plaintiff Depo. p. 156-57].

**Admitted, but immaterial.**

45. Plaintiff did not seek urgent care in Missouri either since she "figured it's already been broke for five days, so." [Plaintiff Depo. p. 157].

**Admitted, but immaterial.**

46. Plaintiff had surgery on her wrist to repair a distal radius fracture on March 10th. [Plaintiff Depo. p. 158]. None of her treating doctors have told Plaintiff her having surgery ten days after her fall was too much of a delay or that sooner surgery would have provided a better result. [Plaintiff Depo. p. 158-59].

**Admitted. Denied; Dr. Unruh has testified that Plaintiff's injury required "emergent to urgent care" in order to stabilize the fracture and "prevent patient pain" and "reduce swelling;" he further testified that movement of a fracture such as Plaintiff's is a "pain generator." [K Unruh Deposition at P86, L4 - P88, L13, attached as Exhibit 7 to D's MSJ]**

47. Plaintiff's treating orthopedic surgeon, Dr. Kenneth Unruh, testified that patients can have a good surgical result of a distal radius fracture with a ten day window from their initial injury. [Dr. Unruh Depo. p. 71, attached as Exhibit 7].

**Admitted, but immaterial.**

48. Dr. Unruh was of the opinion that Plaintiff did not suffer any additional injury from the date of Plaintiff's fall to his initial visit on March 9th. [Dr. Unruh Depo. p. 68].

**Denied; pain is an injury and Dr. Unruh testified that Plaintiff's injury required "emergent to urgent care" in order to stabilize the fracture and "prevent patient pain" and "reduce swelling;" he further testified that movement of a fracture such as Plaintiff's is a "pain generator." [K Unruh Deposition at P86, L4 - P88, L13, attached as Exhibit 7 to D's MSJ]**

49. Dr. Unruh had no opinion regarding Plaintiff's treatment onboard the *Valor*, testifying "I don't know details of her care on the ship, so I can't really be critical of them." [Dr. Unruh Depo. p. 72].

**Denied. This is in keeping with Defendant's manipulation of facts and testimony. How can there be an "opinion regarding Plaintiff's treatment onboard the Valor" when Plaintiff was refused treatment and, consequently had none? [See No. 33 above]**

50. Plaintiff contends that the shipboard medical staff should have done more to make her more comfortable. [Plaintiff Depo. p. 160].

**Admitted, but immaterial.**

51. There were no work orders related to changes, repairs, or modifications to the shower threshold in the bathroom in Plaintiff's cabin for the three year period preceding her incident. [S. Vazquez Depo. p. 116].

**Admitted, but immaterial.**

52. Carnival does not warn passengers that there is a threshold to enter the cabin bathroom shower. [S. Vazquez Depo. p. 129]. There are no warnings signs or placards that the shower has a threshold. [S. Vazquez Depo. p. 129].

**Admitted.**

53. Carnival has contemporaneously filed a Motion in *Limine* to exclude four dissimilar prior incidents of passengers tripping on shower thresholds.

**Not an undisputed fact.**

54. Carnival has contemporaneously filed a *Daubert* Motion to strike Plaintiff's expert, Mark Young.

**Not an undisputed fact.**

## II. ADDITIONAL MATERIAL FACTS
## FORECLOSING ENTRY OF SUMMARY JUDGMENT FOR DEFENDANT

1. Prior to her fall, Plaintiff had not made use of the shower in her cabin. [A Vaughn Deposition at P113, L10-16 and P114, L2-4, attached as Exhibit 3 to D's MSJ]

2. Plaintiff did not see the shower step/ledge at the time of her fall. [Plaintiff Deposition at P123, L24 - P124, L4, attached as Exhibit 1 to D's MSJ]

3. At the time of Plaintiff's fall, the white towel demarking the step/ledge into the shower was not in place. [Plaintiff's Deposition at P144, L25 - P145, L2, attached as Exhibit 1 to D's MSJ]

4. Although Plaintiff was aware of the presence of the step/ledge prior to her fall, she was not aware of its height prior to her fall and she had never stepped over the step/ledge. [Plaintiff's Deposition at P182, L7-12 and P184, L3-8 attached as Exhibit 1 to D's MSJ]

5. There were no markings, warnings, or indications to advise Plaintiff of the degree to which the step/ledge was raised. [Plaintiff's Deposition at P182, L14-19, attached as Exhibit 1 to D's MSJ]

6. There were no warning signs on the outside or upon entering the cabin bathroom. [A Vaughn Deposition, P118, L6-19, attached as Exhibit 3 to D's MSJ]

7. There were no handrails in the immediate entrance are to the cabin bathroom. [A Vaughn Deposition, P118, L20-23, attached as Exhibit 3 to D's MSJ]

8. The fact that the entire bathroom floor (bathroom floor, ledge, and shower floor) was all the same color made the step/ledge invisible. "Because of the essentially monochromatic nature of the bathroom and shower flooring surface as well as the shower curbing, it is difficult for the user to distinguish or identify the presence of the curbing. The curbing is basically invisible. From an architectural design and human factor perspective, the shower curbing should be of a different color and/or surface type from that used on the floor and the shower basin. This color differentiation would provide a visual cue of the existence of the shower curbing." [M Young Report at p. 3, attached as **Exhibit B**] On this issue, Ms. Vaughn further testified:

**Q.** Okay. So you'd agree that all of this, bathroom floor, ledge and shower floor, are all the same color and -- all the same color; right?
**A.** Right, yeah, yeah, you can't really ascertain one from the other, yeah.

[A Vaughn Deposition at P117, L-14, attached as Exhibit 3 to D's MSJ]

**Q.** Okay. And going back to Exhibit A for another moment, you said it looked horrible. Do you mean by that that the ledge blended into the bathroom floor and blended into the shower floor?
**A.** Yeah. Yeah, that's – I mean -- yeah, that's not good.

[A Vaughn Deposition at p. 119, L2-9, attached as Exhibit 3 to D's MSJ; Exhibit A to Deposition of A. Vaughn, attached as **Exhibit C**]

9. There is no reason why the shower step/ledge could not have been painted a different color from the remainder of the bathroom floor. [D Martyn Deposition at P42, L8 - P46, L21, attached as **Exhibit D**; Corporate Representative Deposition at P129, L23 - P130, L3, attached as Exhibit 4 to Defendant's MSJ]

10. Prior to Plaintiff's cruise, on March 9, 2017, Defendant's passenger Barbara Fisher tripped on the step/ledge of a shower configured identical to that of Plaintiff's cabin bathroom, with the step/ledge of the same height, with the bathroom floor, step, and shower floor all the same blue to that of Plaintiff's cabin, and with the same white shower curtain as in Plaintiff's cabin. [Corporate Representative Deposition at P95, L12 - P99, L18, attached as Exhibit 4 to Defendant's MSJ ; Defendant's Supplemental Answers to 2nd Interrogatories, attached as **Exhibit E**; Accident Summary Photographs, attached as **Exhibit F**]

11. Prior to Plaintiff's cruise, on June 25, 2017, Defendant's passenger Diana Blythe tripped on the step/ledge of a shower configured identical to that of Plaintiff's cabin bathroom, with the step/ledge of the same height, with the bathroom floor, step, and shower floor all the same blue to that of Plaintiff's cabin, and with the same white shower curtain as in Plaintiff's cabin. [Corporate Representative Deposition at P101, L11 - P104, L20, attached as Exhibit 4 to Defendant's MSJ ; Defendant's Supplemental Answers to 2nd Interrogatories, attached as **Exhibit E**; Accident Summary Photographs, attached as **Exhibit F**]

12. Prior to Plaintiff's cruise, on June 17, 2018, Defendant's passenger Jane O'Bryan tripped on the step/ledge of a shower configured identical to that of Plaintiff's cabin bathroom, with the step/ledge of the same height, with the bathroom floor, step, and shower floor all the same blue to that of Plaintiff's cabin, and with the same white shower curtain as in Plaintiff's cabin. [Defendant's Supplemental Answers to 2nd Interrogatories, attached as **Exhibit E**; USCG Report of Marine Casualty, attached as **Exhibit G**; Accident Summary Photographs, attached as **Exhibit F**]

13. Prior to Plaintiff's cruise, on January 21, 2019, Defendant's passenger Cheryl Bigtree tripped on the step/ledge of a shower configured identical to that of Plaintiff's cabin bathroom, with the step/ledge of the same height, with the bathroom floor, step, and shower floor all the same blue to that of Plaintiff's cabin, and with the same white shower curtain as in Plaintiff's cabin. [Defendant's Supplemental Answers to 2nd Interrogatories, attached as **Exhibit E**; Accident Summary Photographs, attached as **Exhibit F**]

14. On the morning of March 1st, Plaintiff went to guest services and told Defendant's employee "I think I sprained or broke my wrist" and even "showed her my wrist." [Plaintiff's Deposition at P126, L22 - P127, L3, attached as Exhibit 1 to D's MSJ]

15. On the afternoon of March 2nd, Plaintiff went to Defendant's infirmary, spoke to a medical staff member, and was refused treatment when she was unable to pay. [Plaintiff's Deposition at P129, L23 - P130, L8, attached as Exhibit 1 to D's MSJ; A Vaughn Deposition at P63, L5-13 and P65, L23 - P66, L14, attached as Exhibit 3 to D's MSJ] The cost to be seen by Defendant's ship's physician was $500 and this had to be paid with Visa; however, Plaintiff only had with her on the cruise a debit card and no cash at the time. [Plaintiff's Deposition at P134, L15-L22 and P132, L14-20, attached as Exhibit 1 to D's MSJ; A Vaughn Deposition at P69, L20-25, attached as Exhibit 3 to D's MSJ]

16. On March 4th, with the pain growing worse, Plaintiff returned to guest services and "showed him my wrist, I unwrapped it, showed him my wrist" and "[h]e told me that sometimes when people can't afford, they have a compassionate care and I should go down there and tell them that." [Plaintiff's Deposition at P138, L15 - P139, L4, attached as Exhibit 1 to D's MSJ]

17. Thereafter, Plaintiff returned to Defendant's infirmary and was advised by Nurse Cagumbay that "he didn't know what the guy was talking about, they don't have any such thing;" she was again refused care. [Plaintiff's Deposition at P138, L15 - P139, L4 and P142, L13 - P143, L4, attached as Exhibit 1 to D's MSJ; A Vaughn Deposition at P88, L2-10 and P91, L1-20, attached as Exhibit 3 to D's MSJ]

18. Defendant's Nurse believed that Plaintiff should have been seen by a physician when she came down to the infirmary. [Cagumbay Deposition at P94, L14-19, attached as Exhibit 5 to D's MSJ]

19. Plaintiff's injury required "emergent to urgent care" in order to stabilize the fracture and "prevent patient pain" and "reduce swelling;" movement of a fracture such as Plaintiff's is a "pain generator." [Dr K Unruh Deposition at P86, L4 - P88, L13, attached as Exhibit 7 to D's MSJ]

20. Following her injury, while still on the cruise, Plaintiff was unable to use her hand and Ms. Vaughn had to help her dress. [A Vaughn Deposition at P80, L7-11, attached as Exhibit 3 to D's MSJ]

21. Some of the drinks Plaintiff purchased on the first day of the cruise were consumed by Ms. Vaughn. [A Vaughn Deposition at P120, L16 - P121, L3, attached as Exhibit 3 to D's MSJ]

22. Plaintiff's fall occurred at approximately 2:30 am. [Plaintiff's Deposition at P181, L8-12, attached as Exhibit 1 to Defendant's MSJ] Plaintiff's last drink purchase was 4 hours earlier, at 10:30 pm the night before. [Drink Receipt, attached as **Exhibit H**]

Dated: January 31, 2022
Miami, Florida

/s/ *Eduardo J. Hernandez*
EDUARDO J. HERNANDEZ
Florida Bar No.: 061451
ehernandez@ejh-law.com
EDUARO J. HERNANDEZ, LLC
10691 N. Kendall Drive - Suite 109
Miami, Florida 33176
Tel.: (305) 567-0910
Fax.: (786) 454-8905

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished this 31st day of January, 2022, via Email to all Counsel on the attached Service List.

**EDUARDO J. HERNANDEZ, LLC**
10691 N. Kendall Drive - Suite 109
Miami, Florida 33176
Tel.: (305) 567-0910
Fax.: (786) 454-8905

/s/ *Eduardo J Hernandez*
EDUARDO J. HERNANDEZ
Florida Bar No.: 061451
ehernandez@ejh-law.com

**SERVICE LIST**

**Peter G. Walsh**
Florida Bar No. 970417
pwalsh@1800askfree.com
DAVID W. SINGER & ASSOC., P.A.
1011 South Federal Highway
Hollywood, Florida 33020
Tel.: (954) 920-1571
Fax.: (954) 926-5746

**Eduardo J. Hernandez**
Florida Bar No. 061451
ehernandez@ejh-law.com
EDUARDO J. HERNANDEZ, LLC
10691 N. Kendall Drive - Suite 109
Miami, Florida 33176
Tel.: (305) 567-0910
Fax.: (786) 454-8905

**Attorneys for Plaintiff**

**Christopher Smith**
Florida Bar No. 607363
csmith@fowler-white.com
FOWLER, WHITE, BURNETT, P.A.
1395 Brickell Avenue – 14th Floor
Miami, Florida 33131
Tel.: (305) 789-9200
Fax.: (305) 789-9201

**Attorneys for Defendant**