UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 21-CIV-2057-BLOOM

BARBARA HALL,

Plaintiff,

vs.

CARNIVAL CORPORATION

Defendant.
_____________________________/

DATE TAKEN: Dec. 17th, 2021
TIME: 11:09 a.m.
PLACE: Remote-Audio Video Communication Pursuant to Supreme Court of Florida Administrative Order No. AOSC20-23

DEPOSITION OF DAVID MARTYN

Taken before Julio A. Mocega, Shorthand Reporter, Notary Public in and for the State of Florida at Large, pursuant to Notice of Taking Deposition filed in the above case.





APPEARANCES:

ON BEHALF OF THE PLAINTIFF:
EDUARDO J. HERNANDEZ, LLC
10691 N. Kendall Drive
Suite 109
Miami, Florida 33176
BY: Eduardo J. Hernandez, Esq.

ON BEHALF OF THE DEFENDANT:
FOWLER WHITE BURNETT, P.A.
ESPIRITO SANTO BUILDING
1395 Brickell Avenue
14th Floor
Miami, Florida 33131
BY: Chris Smith, Esq.

\- - - - - -

I N D E X

\- - - - - -


| DAVID MARTYN | PAGE |
|---|---|
| By Mr. Hernandez | 5, 93 |
| By Mr. Smith | 71 |






E X H I B I T S


| | |
|---|---|
| Plaintiff's Exhibit No. A | 18 |






THE COURT REPORTER: The attorneys participating in this deposition acknowledge that I, Julio Mocega, certified court stenographer, am not present with the witness and that I will be reporting the proceedings and administering the oath remotely. The arrangement is pursuant to the Florida Supreme Court Administrative Order issued regarding Covid-19. The parties and their counsel consent to the arrangement and waive any objections to this manner of reporting.

Due to the need for this deposition to take place remotely because of the government's order for social distancing, the parties will stipulate that the court stenographer may swear in the witness over the video conference and that the witness has verified that he is, in fact, David Martyn.

Counsel, please indicate your agreement by stating your name and your agreement on the record, and then I

will swear in the witness.
MR. HERNANDEZ: Yes, we agree.
MR. SMITH: On behalf of the Defendant, we agree to the COVID protocols. Thanks.
Thereupon,
DAVID MARTYN,
was called as a witness and, having been first duly sworn, was examined and testified as follows:
DIRECT EXAMINATION
BY MR. HERNANDEZ:
**Q.** Good morning, sir. My name is Eddy Hernandez.
Please state your name and business address.
**A.** David John Martyn. Business address is 3403 North Sam Houston Parkway West, Suite 350, Houston, Texas, 77086.
THE COURT REPORTER: Your suite number again?
THE WITNESS: 350 is the suite.
BY MR. HERNANDEZ:
**Q.** Is that where you are at present?
**A.** No, I'm at a hotel room in





Lynchburg, Virginia.
**Q.** Are you in Virginia on business or a personal matter?
**A.** Business.
**Q.** Okay. What kind of business?
**A.** Doing some consultation on a barge salvage.
**Q.** Is this work that you're doing for the company SEA Limited?
**A.** No, not for SEA. SEA is my employer.
**Q.** So do you do work independent of SEA?
**A.** No.
I think I misunderstood your question.
Yes, this is an SEA -- I'm doing this work in the course of my employment for SEA.
**Q.** It's an SEA assignment?
**A.** Yes.
**Q.** Okay. All right. How long have you been with SEA?
**A.** Since the end of June of 2016.
**Q.** And what exactly is SEA,





Mr. Martyn?
**A.** It's a multidisciplinary forensic engineering firm.
**Q.** And what is your position at SEA?
**A.** I am a project engineer.
**Q.** Do you have an ownership interest in SEA?
**A.** No, I don't.
**Q.** So I don't need to know numbers, but how are you compensated, salary, hourly, other?
**A.** I have an annual salary.
**Q.** Would you agree with me that -- well, SEA has offices in multiple locations, right?
**A.** Correct.
**Q.** Okay. For example, they have one in Houston, they have one here in South Florida, right?
**A.** Right.
**Q.** You'd agree that overall the work of SEA is more for the defense than it is for the Plaintiff in these matters of litigation, right?
**A.** I don't know for certain, but





probably.
**Q.** How many years have you been doing this kind of expert witness work, litigation forensics?
**A.** Five and a half years now.
**Q.** And in those five and a half years what percentage of your professional time is taken up by this kind of work, what you're doing in this case, litigation forensics?
**A.** For litigation roughly 60 percent.
**Q.** And tell me a little bit about the other 40 percent, if you would.
**A.** That's investigating insurance claims and consulting work.
**Q.** You'd agree that the investigation of insurance claims is on behalf of the insurer, right?
**A.** Yes.
**Q.** Okay. And so we're left with this consulting work. Tell me a little bit about that.
**A.** Just doing general engineering consulting, it's not litigation related work. Performing analyses, calculations. Sometimes helping clients navigate regulatory

requirements.
Q. Apropos of your use of the word "navigate," I take it from your CV that the litigation support you do, the forensic work, the insurance claims, the consulting is on the marine side, given your background?
A. Probably about roughly half is marine related and the other half is nonmarine.
Q. Does that hold true for litigation as well?
A. Yes, it does.
Q. Is your employment at SEA the sole source of your income in the last five and a half years?
A. I do have a retirement pension from the U.S. Coast Guard.
Q. What is your hourly rate for litigation work such as what you're doing for the Defendant and its lawyers in this case?
A. SEA charges $325 per hour.
Q. And what am I being charged for this morning's deposition?
A. The same rate.
Q. 325 an hour?
A. Yes, sir.





Q. Any hourly minimum?
A. No.
Q. While we're on the subject of your fees, the work that you've done thus far for the Defendant and its lawyers, has that all been charged at 325 an hour or have there been differences, depending on what you've done?
A. It's all been charged at 325 per hour.
Q. What have you billed to date coming into the start of this deposition?
A. One billing invoice and the amount of that invoice was $5,050.64. And then there's a significant amount of work in progress since then. Up to the start of this deposition, I don't know the exact number, but it will be approximately $9300.
Q. In addition to the 5050 or total?
A. In addition to.
Q. Okay. And I'm sorry, nine what?
A. 9300.
Q. So the $5,050.64, through what date was that?
A. That was through November 12th.
Q. And so from November 13 to today,





December 17, you've billed an additional $9300?
A. Yes, sir.
Q. Okay. So that brings us to approximately $14,300 through today, December 17?
A. Correct.
Q. Okay. Going back, knowing that -- strike that.
If you come to trial in this matter, you understand that trial -- the case in trial, the case is pending in trial will be here in the Southern District of Florida, right?
A. Yes.
Q. So you'll be coming from Houston?
A. Correct.
Q. Okay. And you charge for your travel time, I presume, right?
A. Yes.
Q. The time it takes you to get from Houston to Miami, and then the time it takes you to get from Miami back home to Houston, right?
A. Right. I'd estimate about eight to nine hours round trip.





Q. Obviously you'll charge for the time you're on the stand and/or in court waiting to take the stand, right?
A. Correct.
Q. How do you handle time, let's say, you're in Miami for trial but you're not at the courthouse? That gets billed as well, I presume?
A. Some of it. Depending on what work I can do on other matters. So typically I would bill for an eight-hour day, subtract the time I work elsewhere on other matters.
Q. So if we take this as, you know, if you were to come to trial and you spent eight hours of travel time back and forth and, say, just a single day, eight hour bill, that's 16 times 325, that would be another approximately $5200 that you would bill Defendant and its lawyers for coming to testify at trial, right?
A. Correct.
Q. Plus expenses, I presume, right?
A. Plus travel expenses, yes.
Q. Travel, hotel, rental car, that --
A. Travel, hotel, meals, Uber or taxi

ride, $1,000 is a ballpark estimate.
Q. In the last three years, can you estimate the total number of cases, whether Plaintiff or Defendant, in which you have been retained to work on? And when I say "cases," cases such as this litigation.
A. I don't keep a list. I'm roughly estimating on just litigation probably 75 to 100.
Q. And we'll talk in a moment about your testimony log, as you call it. Certainly all the cases that you're retained on don't make it to the testimony log because you don't give testimony in each and every case, right?
A. Correct.
Q. All right. Of those 75 to 100 cases, what percentage have been for the Defendant?
A. Probably about -- percentage of those total, probably a little over 10 percent. I would say ten total. So however the math works with 75 over 10.
Q. Wait, wait. 10 percent of those 75 to 100 cases for the Defendant?
A. Oh, I'm sorry, 90 percent. I





thought you said -- my apologies. Yes, 90 percent for the defense, 10 percent for the Plaintiff.
Q. Got it. And how much -- well, that's going to -- starting out to be a bad question.
What percentage, say, in the last three years of your litigation forensic work is for the cruise lines, regardless of what line?
A. It's pretty small. Probably ten cases total. So --
Q. Ten cases total in the last three years?
A. Maybe seven or eight in the last three years. I couldn't tell you exactly how many.
Q. Ten in how long, the five and a half years you've been with SEA?
A. Probably ten max, yes.
Q. And I presume all ten of those have been for the cruise line and/or its lawyers, right?
A. Correct.
Q. I know you've been retained in the past by Carnival, right?





A. Yes.
Q. And I know you've been retained in the past by Royal Caribbean, right?
A. Yes.
Q. Have you also been retained by NCL?
A. No. No, I have not.
Q. Oh, I'm sorry.
You've been retained in the past by this defense firm Fowler White, right?
A. Yes.
Q. And you've also been retained by a group of defense lawyers, Mase Mebane & Seitz?
A. Yes.
Q. And you've been retained by another defense group that is frequented by the cruise lines, Horr Novak & Skipp, right?
A. Correct.
Q. In fact, you recently testified in a case for David Horr here in the Southern District, right?
A. Yes.
Q. And, of course, these retentions by Fowler White, the Mase group, the Horr group, these have all been on behalf of the





cruise lines, right?
A. Correct.
Q. What other defense firms in Miami have you been retained by in the last five and a half years?
A. The only other one would be Hamilton Miller.
Q. And, of course, that would have been on behalf of another cruise line, right?
A. Yes.
Q. In the last five and a half years how many times have you been retained by Fowler White?
A. I believe four, including this case.
Q. Have those all been cruise line cases?
A. Yes.
Q. Wow. So almost half of the ten total cruise line cases that you've done have been for this defense firm?
A. At least for of them, yes.
Q. 40 percent, right?
A. Yes.
Q. When were you retained in this

matter?
A. Looking at my retention agreement.
Q. Sure.
A. September 14, 2021.
Q. I'm sorry. September 14, 2021?
A. Yes.
MR. HERNANDEZ: I'll tell you what, this is as good a time as any. Let's do a little housekeeping because I've got a couple of exhibits. I'm going to share my screen real quick. Bear with me for two seconds.
BY MR. HERNANDEZ:
Q. Can you see it yet? Can you see my screen?
A. No, sir, not yet.
Q. How about now?
A. It just has a -- it just gives a dark screen. It says your name has started screen sharing.
I see it.
Q. Now you can see it?
A. The retention agreement?
Q. Yes. Well, what I'm going to do, just because I didn't have time to do them





separately. This will be my -- Plaintiff's Exhibit A. I'm going to scroll through it.
Is this the retention agreement that you were just referring to, September 14, 2021?
A. Yes.
(Thereupon, the above mentioned document was marked as Plaintiff's Exhibit A, for identification.)
BY MR. HERNANDEZ:
Q. I think it's four pages, right?
A. The retention agreement is usually two.
Q. All right.
A. Unless -- okay. Maybe it is four.
Q. Okay. I mean, you know, this is a fair and accurate copy of it; yes?
A. Yes, it is.
Q. Okay. And then, like I said, I jumbled everything into Exhibit A. But then I have three pages of invoice, which comport with the $5,050.64 that you told me for your work through November 12, right? You see that?
A. Yes.
Q. Fair and accurate as well?





A. Correct.
Q. And then the last page of Exhibit A is a page of handwritten notes. I presume DJM is you; yes?
A. Yes, it is.
Q. And you prepared these when you went on the ship at New Orleans, right?
A. Correct.
Q. Is this the extent of the notes and diagraming that you did on the ship on November 11?
A. Yes, it is.
Q. All right. And there's a set of handwritten notes at the top of the page and then there's a diagram. Is this the extent of the diagraming and measuring you did?
A. Yes.
Q. All right. And this was -- again, this was done on the CARNIVAL VALOR at New Orleans, right?
A. Yes.
Q. And Mr. Smith, who's defending your deposition this morning, was there with you, right?
A. Correct.





Q. And while you were doing your measurements and your inspection, you had a chance to discuss with him and consult with him, right?
A. Yes.
Q. Before you went on the ship on November 11, how many telephone calls had you had with Mr. Smith?
A. I'm sure there were for planning purposes. They would be indicated on that billing invoice.
Q. I don't see any. Surely you must have spoken to him before you went on the ship, right?
A. Let's see, 10-28, client contact, that's with Addie Blanco. That was by e-mail for scheduling. Other than that, I think we spoke on this -- I think we were trying to find each other prior to boarding.
Maybe the actual time we spoke prior to going on board.
Q. Are you still looking or --
A. Yes, I'm looking at the billing invoice.
Q. All right. Let's move on, so I

don't -- I don't want to take up too much of your time.

**A.** Okay. And probably during the project scheduling there was a brief conversation as well about the scope of work.

**Q.** This would be with the lawyer that hired you; yes?

**A.** Yes.

**Q.** And speaking of the work -- the significant work as you called it that you've done since November 13, has that been reduced to an invoice?

**A.** Not yet.

**Q.** Any particular reason?

**A.** It will go out at the end of the month.

**Q.** Okay. Certainly since you did the inspection on the ship, you must have had multiple talks with Mr. Smith and/or his colleagues, right?

**A.** We've -- I provided a couple of reports. Certainly we discussed those reports when they were issued, and we had a conversation yesterday to prep for this deposition.





And there may have been another couple of calls with his office, not necessarily with Mr. Smith, on scheduling the deposition.

**Q.** How long did your pre-deposition conference take yesterday, December 16?

**A.** Approximately half an hour.

**Q.** Let me go back to your notes for a moment.

What is this way at the bottom? Is this -- well, you tell me. Way at the bottom, lower left of the page.

**A.** I just wanted to get the general shape of the threshold, so I used a -- I'll call it a spline, but it's just a device that's got numerous pins and you just fit it over an object and it gives you a profile of a shape. Then you put it on a piece of paper and trace it out with a pencil, is what I did here.

So looking at that, certainly on the left side of that drawing you see the little bumps in there. Those would indicate the actual individual spline.

**Q.** So this is -- this is the curve, the threshold, the step that divides the cabin





bathroom from the shower?

**A.** Yes. Now not its entire height, but it's just the shape -- I wanted to get the shape, the general shape of it. So it's angled on each side with a curved surface on top.

But yes, that is the actual -- from the actual shower threshold.

**Q.** Okay. So is the height of the threshold two and three quarter inches?

**A.** As I measured it, yes.

**Q.** Okay.

**A.** To the top of that curve.

**Q.** Okay. What is the width of the threshold?

**A.** Approximately, because it varies, I call it approximately an inch.

**Q.** I'm sorry, you said an inch?

**A.** Approximately an inch, and it varies because it's wider at the base, a little narrower at the top.

**Q.** Okay. Going back to your retainer agreement for a moment. Paragraph 10 indicates that In the event of a challenge raised insofar as qualifications in this case of yours, methodology, admissibility of opinions, the





lawyers that hired you must immediately notify you, right?

**A.** Yes.

**Q.** And SEA and/or your lawyers must be allowed to become involved in the defense of any such challenge, right?

**A.** Right.

**Q.** And your company and/or you must also be allowed to participate fully in any hearing and/or preparation of written submissions related thereto, right?

**A.** Right.

**Q.** And all of this is at Fowler White and/or Carnival's expense, right?

**A.** Yes.

**Q.** Do you have your case list handy?

**A.** Yes, I do.

**Q.** Okay. So this does not encompass the entirety of your time at SEA, right? It only goes back to May of 2018?

**A.** Right. This is -- this is for the past four years to date.

**Q.** Okay. I count 18 cases here, because three are repeated, at least to my quick view.

Were you retained by the defense in every one of these cases?
A. Two of these are for the Plaintiff.
Q. Can you tell me which two were for the Plaintiff?
A. Sure. Starting on the last page.
Q. Yep.
A. Francisco Ortega Garcia, on September 28, 2018.
Q. Got it.
A. And Amanda Tailor, which is on the first page, March 25th, 2021.
Q. Got it. All right. So in 17 of the 19 cases that are reflected here, you were retained by the defense, right?
A. Correct.
Q. I see three cruise line cases. In each of those instances you were retained by the defense, right?
A. Yes. There's actually four, but yes, I was retained by the defense.
Q. Help me out. Name them for me because I've only got three.
A. All right. Daniel Gaithers





(phonetic) versus Carnival. Are you looking at the most up-to-date version of this document?
Q. Looks like I don't. What page are you on?
A. I provided an up-to-date with my file.
Q. You know what, the lawyers turned that over. Let me go to it real quick.
MR. SMITH: I can e-mail a quick copy of it to you.
MR. HERNANDEZ: No, I got it. Don't -- it's just that I'm working off what I had -- bear with me for two seconds, I probably have it.
All right. I apologize. Thanks for the clarification.
BY MR. HERNANDEZ:
Q. So that kind of changes what I was just asking you a little bit. Let me -- so that would make it, from your case list, in 18 of the 20 cases that appear here you were hired by the defense, right?
A. Correct.
Q. In two you were hired by the Plaintiff?





A. Yes.
Q. All right. Who hired you -- what law firm hired you in Gaithers versus Carnival?
A. It's the same firm as Mr. Smith.
Q. Fowler White, right?
A. Yes.
Q. And Fowler White hired you in the Quastion (phonetic) versus Carnival case, right?
A. Correct.
Q. My memory is in Fylling versus Royal Caribbean that was Horr Novak & Skipp, right?
A. Correct.
Q. And in Strongosky, S-T-R-O-N-G-O-S-K-Y, versus Carnival that was Mase Mebane --
A. And Seitz, yes.
Q. And Seitz.
What is the Gaithers case about? I don't need a blow-by-blow but just something brief, please.
A. It's a fall. Part of the case is what caused the fall.
Q. Right. A fall of a passenger?





A. Yes. Walking -- walking down a corridor.
Q. Okay. And have you rendered a report yet in Gaithers?
A. Yes, I have.
Q. Did you come to the conclusion that the cruise line was not at fault?
A. Yes.
Q. What is the Quastion -- what is the Quastion case about?
A. Involves a door, hand, allegedly, injured on a closing door.
Q. In fact, I think that case resulted in a finger or fingers being severed, right?
A. Fingertip. Yes.
Q. And in the Quastion case did you also come to the conclusion that the Defendant cruise line, the same as in our case, was not negligent?
A. Correct.
Q. And in the Fylling, F-Y-L-L-I-N-G, versus Royal Caribbean case, what was that case about?
A. It was another passenger stumbled

and fell.
Q. Over what?
A. While walking up a ramp. There was no trip.
Q. Okay. And in that case as well you came to the conclusion that the cruise line wasn't at fault, right?
A. Correct.
Q. And finally, Strongosky versus Carnival, what was that case about, or is that case about?
A. That's a slip and fall.
Q. On -- where, generally? Or not generally. Where on the ship?
A. It was in the -- one of the restaurants.
Q. And in that case as well you came to the conclusion that the cruise line wasn't liable?
A. I think so, yes.
Q. Although they may not be on your case list, how many active cruise line cases do you have right now?
A. Active?
Q. Yes.





A. One was just -- I got reported, was resolved yesterday. I think, yeah, these are it.
Q. So when you say "these are it" --
A. The ones listed here, other than Fylling, that's already been resolved as well.
Q. Right.
A. So just Strongosky, Quastion, Gaither and your client.
Q. Got it.
Other than -- strike that.
So you told me earlier that this law firm, Fowler White, has sent you four cases in the last five years. I only see two on the list.
I presume the other two, either you didn't give testimony or they're three or four years --
(Simultaneously speaking.)
THE WITNESS: We have a case for your client, Miss Hall, and then, yes, there was another one, I did not provide any written opinions or testimony.
BY MR. HERNANDEZ:





Q. Okay. And one more question on your invoices. Has the initial invoice of $5,050 been paid?
A. I don't know. That's -- that's up to our accounting department to manage that.
Q. Insofar as cruise ships, before joining SEA, were you ever involved in the design of a cruise ship?
A. Involved in -- yes, I was involved in terms of regulatory oversight of their design, yes.
Q. Tell me what you mean by "regulatory oversight of design."
A. Making sure that the vessel meets all of the Coast Guard safety regulations.
Q. Is this for U.S. flagged ships?
A. Yes.
Q. Okay. You've never been involved in the design of a foreign flag passenger ship, right?
A. The design, no.
Q. And you've never been involved in the pre-construction engineering of a foreign flagged passenger ship, right?
A. Not directly, no.





Q. Have you ever been employed or engaged outside of the litigation context by a cruise line as an architect?
A. I've never been employed by a cruise line.
Q. Have you ever been employed or engaged by a cruise line, outside of the litigation context, as a designer?
A. No, I have not been employed by a cruise line.
Q. Have you ever been employed or engaged by a cruise line, outside of the litigation context, as an engineer?
A. No, I have not been employed by a cruise line.
Q. Are you still in the Coast Guard or are you completely out?
A. I retired in May of 2016.
Q. Congratulations.
Since retiring from the Coast Guard, have you taught in the area of walking surfaces?
A. Taught, no.
Q. Since leaving the Coast Guard, have you taught in the area of safety aboard

cruise ships, passenger ships?
A. Taught, yes.
Q. Tell me about that.
A. I've given continuing education presentations to adjusters, to attorneys, talking about Coast Guard and/or regulatory oversight of the commercial shipping industry to include cruise ships.
Q. Where have you spoken?
A. I've spoken -- oh, I don't recall. It's been a while. I have done presentations to the Houston Claims Association. I've done presentations at the -- oh, I can't recall the name of the organization.
There's a Texas defense attorneys -- I can't recall the exact name of the organization off the top of my head. I've spoken at an admiralty law conference.
Q. Okay. I appreciate it. I get a feel for where you've spoken.
Certainly when you've spoken or taught adjusters, this is from a defense standpoint, correct?
A. It's just from -- neither standpoint. It's, here's the correct way to do





things, here's the incorrect way to do things. That's the standpoint.
Q. All right. The adjusters that you've spoken to or taught, certainly they're on the insurance side of things, right?
A. Yes.
Q. Okay. Have you ever taught in the area of foreign flagged passenger vessel design?
A. Specific to that topic, no.
Q. Have you ever taught in the area of foreign flagged passenger vessel engineering?
A. I'm sure some of my presentations may have covered that.
Q. Do you know of any, as you sit here today?
A. No, not off the top of my head.
Q. How many times have you testified in court?
A. In court, five times.
Q. Have you ever taught in the area of foreign flagged passenger vessel maintenance?
A. No.





Q. Have you ever taught in the area of the regulations applicable to foreign flag passenger vessels?
A. Yes.
Q. Tell me about that.
A. That's giving an overview of SOLAS requirements. It's a Safety of Life at Sea convention. Load line convention. International tonnage convention. International convention for the prevention of pollution from ships.
Various class society rules and how they interact with respect to flag state and U.S. regulatory enforcement.
Q. And similar to my prior question, in what context have you done this teaching, at seminars, at symposium?
A. Seminars, yes.
Q. Have you ever published in the area of walking surfaces?
A. Published, no.
Q. Have you ever published in the area of safety aboard foreign flag passenger ships?
A. Published, no.





Q. Have you ever published in the area of design or engineering relative to foreign flag passenger ships?
A. No.
Q. Have you ever published in the area of maintenance aboard foreign flag passenger ships?
A. No.
Q. Have you ever published in the area of the regulations applicable to foreign flag passenger ships?
A. No.
Q. Tell me what materials you've reviewed in this case so far.
A. They are listed in my report, so that's what I'm pulling up now.
Q. I'll tell you -- once you get there, let me know and this may save us a little time.
A. Okay. I'm there.
Q. Are you speaking of --
A. Starting with the November 23rd, 2021 report.
Q. Right. Are you on page seven?
A. Yes.

Q. Okay. So here, I think we can shortcut this a little bit. Beyond what's listed on page seven of your initial report, what if anything else, have you looked at?
A. Beyond what's listed on page seven of this report and page two of my December 6 report, I also reviewed the Defendant's -- pardon me, get the correct title of these. Supplemental Response to the Plaintiff's Second Request for Production, and the Defendant's Supplemental Answers to Plaintiff's Second Set of Interrogatories.
I received those documents yesterday.
Q. All right. And those are the materials that deal primarily, if not exclusively, with prior similar incidents, right?
A. Correct.
Q. And I'm sorry, you made mention of page six of your rebuttal report. I don't see --
A. Page two.
Q. Page two. I don't see a list of things reviewed there.





A. If you look at top of page two, in addition to the reports listed in my November 23rd, 2021 report, I reviewed the report of (audio distorted) --
THE COURT REPORTER: The report of who?
THE WITNESS: Mark A. Young.
THE COURT REPORTER: Thank you.
THE WITNESS: And then I also reviewed the NFPA 101 standard, 2003 edition.
BY MR. HERNANDEZ:
Q. Just so I'm clear then, everything that's listed on page seven of your initial report, Mr. Young's report and the NFPA, the Supplemental Response to Request for Production from the Defendant and the Supplemental Answers to Interrogatories from the Defendant, right?
A. Yes.
Q. Okay. How long were you on the ship on November 11?
A. Not very long. I don't recall the exact time. Maybe more than an hour, less than two.
Q. And other than the cabin and its





bathroom, did your inspection involve any -- anything else?
A. No.
MR. SMITH: If we can, in the next couple of minutes, just have a short break.
MR. HERNANDEZ: Yeah, let me ask one more question and that will be fine.
BY MR. HERNANDEZ:
Q. The cabin and its bathroom, I mean, if there weren't -- well, strike that.
This cabin had a balcony, right?
A. Yes.
Q. Okay. If this had been an interior cabin without a porthole, you know, the average person may not know he or she is on a cruise ship, right?
MR. SMITH: Objection to form.
THE WITNESS: Yeah, I can't speak for what the average person may or may not know.
BY MR. HERNANDEZ:
Q. All right. Well, the cabin itself, there's nothing uniquely maritime about





it, right?
MR. SMITH: Objection to form.
THE WITNESS: No, its size is certainly significantly smaller than any hotel room I've ever been in.
BY MR. HERNANDEZ:
Q. Have you stayed at a hotel room in New York?
A. In New York, no.
Q. So other than its size, nothing really uniquely maritime, right?
MR. SMITH: Objection to form.
THE WITNESS: Well, it's got life jackets, it's got warning signs on what to do, and that you need to muster at your lifeboat station, but beyond those things, no.
MR. HERNANDEZ: All right. We can take a break.
MR. SMITH: Just five minutes is fine. Thank you, everyone.
(Thereupon, a short recess was taken.)
BY MR. HERNANDEZ:
Q. Okay, Mr. Martyn, I think you told

me earlier that the shower ledge in question was two-and-three-quarter high -- two-and-three-quarter inch high, approximately one inch wide.
Do I have that right?
A. Yes, approximately two-and-three-quarter inch high and approximately one inch wide.
Q. Did you measure the height of the threshold from the cabin into the bathroom?
A. Yes, I did.
Q. What was the height on the cabin side?
A. I wrote it down on my notes. That's what I'm referring to.
So the threshold of the bathroom door from the cabin floor was six inches.
Q. What was the height of that threshold on the bathroom side?
A. Approximately three-quarters of an inch.
Q. All right. So there's a difference when one steps from the cabin into the bathroom of five-and-a-quarter inches, right?





A. Yes.
Q. Meaning, if I'm stepping from cabin to the bathroom, I'm stepping from a lower level to a higher level?
A. Yes.
Q. Right?
A. Yes.
Q. Okay. Now, speaking of the ledge in particular, the ledge to the shower, you'd agree with me that there's nothing keeping that ledge from being painted a different color, right, than the rest of the bathroom floor in the shower?
MR. SMITH: Objection to form.
THE WITNESS: I don't know for certain in terms of, you know, what kind of paint would, you know, would stick or itself become a problem.
So I can't say with any certainty on that.
BY MR. HERNANDEZ:
Q. All right. Well, you can't rule out that there's some paint out there that properly affixes to the material of that ledge. We can agree on that, right?





MR. SMITH: Objection to form.
THE WITNESS: I don't know, there may be.
BY MR. HERNANDEZ:
Q. Okay. And assuming there is such a paint, we can agree that there's nothing that kept Carnival from painting that ledge yellow, orange, any color that it chose, other than blue?
MR. SMITH: Form.
THE WITNESS: Well, if you have other means of visibility, you know, the paint may not be necessary. But I agree, yes, there's nothing that prevents them from using different color combinations when they design these bathrooms.
BY MR. HERNANDEZ:
Q. Not only when they design them, but even after the fact. I mean, Carnival, after it took delivery of the ship, could have, if it had chosen to, painted the ledge in this bathroom and other similar bathrooms a different color than the speckled blue? We can agree on that, right?





MR. SMITH: Objection to form.
THE WITNESS: Again, I don't have enough information in terms of coatings that could be applied here, but to my knowledge, yes, it's possible.
BY MR. HERNANDEZ:
Q. Do you have any information, any at all that the material that this floor is made of prevents it from being painted?
A. No.
Q. And assuming it's susceptible of painting, you would agree that it could be have been done at shipyard stage?
MR. SMITH: Objection to form.
THE WITNESS: Well, again, you know, then we're talking about, we're getting back into the discussion about coatings in terms of, you know, applied at the shipyard, you know, wear and tear, how long does it last.
Are there any problems with it chipping or peeling? Again, we don't know.
BY MR. HERNANDEZ:
Q. Okay. My question is not insofar

as maintenance of a painted ledge. I'm simply asking, assume there's a paint that adheres to this surface, it could have been painted at the shipyard stage; yes?
MR. SMITH: Objection to form.
THE WITNESS: Yes, possibly.
BY MR. HERNANDEZ:
**Q.** Okay. And same set of assumptions, assuming there's a paint that adheres to this surface, it certainly could have been painted after Carnival took delivery; yes?
MR. SMITH: Form.
THE WITNESS: Under those assumptions, yes.
BY MR. HERNANDEZ:
**Q.** Yes.
And it could have also been painted after Carnival learned of other instances where passengers fell on a similar ledge, right?
MR. SMITH: Objection to form.
THE WITNESS: Well, I don't know what you mean by similar incidents.
BY MR. HERNANDEZ:





**Q.** Well, you told me you reviewed the defense Answers, Supplemental Answers to Interrogatories and the defense Supplemental Responses to Request for Production, and I know you saw in there some prior incidents where other folks tripped on the same ledge that Miss Hall tripped on, right?
You saw that?
**A.** Yes, I saw that, but I didn't see any indication of visibility being an issue in those incidents.
**Q.** In the aftermath of those incidents, nonetheless, the same holds true, a paint that adheres to this surface could have been applied had Carnival chosen to; yes?
MR. SMITH: Objection to form.
THE WITNESS: Assuming those assumptions, yes. But there's no indication it would have made a difference in either -- any of those cases.
BY MR. HERNANDEZ:
**Q.** And in fact in your rebuttal report, you agree that the ledge is the same color and material as the remainder of the





floor and shower surfaces, right?
**A.** Yes, I agree.
**Q.** Okay. Do you have any education in human factors?
**A.** Yes. I studied human factors engineering in order to earn my Master's of Science in industrial and operations engineering.
**Q.** I'm sorry, that answer was completely garbled on my end.
**A.** I studied human factors engineering in order to earn a Master of Science in industrial and operations engineering.
**Q.** Is that in your CV?
**A.** The industrial and operations engineering degree is listed in my CV, along with human factors as part of my skill set.
**Q.** What page of your CV?
**A.** I believe my education is listed on page one.
**Q.** What courses of study in human factors did you take towards your Master's in industrial and operations engineering?
**A.** I took courses in human





performance, human factors engineering, safety engineering, safety management, ergonomics.
**Q.** Have you, since obtaining your Master's, practiced in the area of human factors?
**A.** Most of my Coast Guard career as a marine investigator and a marine inspector was applying human factors principles to enforcing safety regulations for commercial vessels, particularly cruise ships.
**Q.** You were in the Coast Guard from when to when?
**A.** July of 1990 to May of 2016.
**Q.** July 1990, May of 2016?
**A.** Yes.
**Q.** And where were you stationed those years?
**A.** It's outlined in my CV, but the first four year was the Coast Guard Academy, graduating in 1994. Two years was spent as a shipboard engineer aboard the Coast Guard Cutter FORWARD from '94 to '96.
From 1996 to '98, I was a graduate student at the University of Michigan.
From 1998 to 2002, I worked at the

Coast Guard Headquarters Office of Design & Engineering Standards. That's the office that develops, interprets and maintains the regulatory standard for commercial vessels.
From 2000- --
Q. That's the one in D.C., right?
A. Yes, sir.
Q. Okay.
A. From 2002 to 2005, I worked as a marine inspector, that's inspecting commercial -- U.S. flagged commercial vessels in Mobile, Alabama.
From 2005 to 2008, I was in Jacksonville, Florida. Two of my years there were spent overseeing all Coast Guard inspections, including cruise ships, as well as marine accident investigations.
2008 to 2010, I worked at North American Aerospace Defense Command & U.S. Northern Command in Colorado Springs as a maritime instructor.
In -- from 2010 to 2013, I oversaw all Coast Guard inspections, commercial inspections and marine accident investigations out of St. Louis, Missouri.





And from 2013 to 2016, the same out of New Orleans for the Gulf of Mexico offshore oil and gas industry.
Q. Did you take any video when you did your ship inspection?
A. No, I did not.
Q. You did take photographs, right?
A. Yes.
Q. You'd agree that an engineering standard may be used to provide guidance without it being mandatory, right?
A. I agree.
Q. And you'd agree that the literature supports the proposition that changes in floor elevation may pose a risk, right?
A. Generally, yes. But that presumes it's a walking surface.
Q. And you'd agree that the literature supports the proposition that thresholds may also pose a fall risk, right?
A. Yes.
Q. And you'd agree that the literature supports the proposition that changes -- that a change in elevation above a





quarter of an inch may pose a risk, right?
A. Yes.
Q. When you did your ship inspection, you'd agree that there were no warning signs of any nature on the outside of the bathroom door or the bulkhead where the bathroom is, right?
MR. SMITH: Objection to form.
THE WITNESS: Are you referring to a verbal warning sign?
BY MR. HERNANDEZ:
Q. Well, it would be a written warning sign, wouldn't it?
A. Well, yeah, with words, sorry. I agree, yes. There is -- there was no such signage.
Q. And you'd agree that once one enters the bathroom there were no written warning signs of any nature inside the bathroom, right?
MR. SMITH: Objection to form.
THE WITNESS: I don't recall if there were or were not.
BY MR. HERNANDEZ:
Q. Well, is there something in your file that would refresh your recollection?





A. I'm looking at the photographs.
There is a sign above the toilet. Warns people not to flush certain objects.
Q. You consider that a warning sign? No, right?
A. That's a warning sign, yes.
Q. It's a warning sign relative to the safety of a passenger?
MR. SMITH: Objection to form.
THE WITNESS: Yes, could be. You don't want the toilet overflowing water.
BY MR. HERNANDEZ:
Q. Is that warning sign warning not to flush objects in the toilet in any way related to, you know, walking safety or physical safety in the bathroom?
A. Not directly.
MR. SMITH: Objection to form.
BY MR. HERNANDEZ:
Q. Okay. Other than the warning sign atop the toilet, any other warning sign in the bathroom?
A. No.
Q. You'd agree that there was a

version of the life safety code, the NFPA, that existed prior to the hull being laid for this ship, right?

MR. SMITH: Objection to form.

THE WITNESS: Yes, I agree. That's why I looked at the 2003 edition.

BY MR. HERNANDEZ:

Q. And you'd also agree that there -- you know what the ASTM is, right?

A. Yes.

Q. Okay. You'd agree that there was an ASTM version in print before the hull was laid for this ship, right?

A. ASTM version, I don't know which ASTM you're referring to.

Q. I mean, when you say you don't know what ASTM I'm referring to, you're familiar with the American Society of Testing Materials, right?

A. Yes. And they publish many standards.

Q. All right.

A. I don't know --

Q. And I'm sure in your years in the





industry you have come across ASTM Standard 5.2, right?

MR. SMITH: Objection to form.

THE WITNESS: I'm not familiar with 5. -- what's 5.2?

BY MR. HERNANDEZ:

Q. Walkway changes in level.

A. Okay. I don't think that's the correct number, but I don't recall what it is off the top of my head.

But as a generic ASTM standard, not marine specific, that does cover walkway surfaces, yes, I am aware of it.

Q. And you're aware that it existed before the ship was constructed, right?

A. I'm not certain off the top of my head.

Q. Do you have anything to dispute that a version of the ASTM related to changes in level of walking surfaces existed before this ship was built?

A. No.

Q. Did you get my question?

A. I said, no.

Q. Oh, I'm sorry, I didn't hear you.





Okay.

And -- and so I'm clear, the ASTM standard I'm referring to is F1637-13 standard practice for safe walking surfaces.

You'd agree that a version of this existed before this ship was constructed, right?

A. If you tell me it did, I just don't know.

Q. Well, do you have anything to dispute that it existed?

A. No, I don't. I don't know -- I just don't know when that standard came into effect or when it was first drafted.

MR. HERNANDEZ: Let's go off the record for a second.

(Thereupon, a short recess was taken.)

BY MR. HERNANDEZ:

Q. I think you mentioned earlier that you taught in the area of SOLAS, right?

A. Yes.

Q. SOLAS is a promulgation of the IMO, right, International Maritime Organization?





A. Correct.

Q. Okay. You'd agree that the IMO certainly applied to this ship, right?

A. Yes.

Q. And it applied to the ship when she was built?

A. Yes.

Q. Right?

A. Yes.

Q. It applied to the ship when she was delivered?

A. Yes.

Q. And it applied to the ship once Carnival took possession and was running her, right?

A. Correct.

Q. And if the IMO has a circular related to safe walking surfaces, you'd agree that would apply here, right?

MR. SMITH: Objection to form.

THE WITNESS: Depending on the specifics of that document, possibly, yes.

BY MR. HERNANDEZ:

Q. Did you prepare a draft report

that you circulated to the lawyers that hired you before issuing your final report?
A. No.
Q. In your initial report, you posit that the bathroom floor was raised above the cabin floor to accommodate the bathroom plumbing in between, right?
A. Yes.
Q. That's nowhere in the records that the lawyers who hired you have provided you, right?
A. Right.
Q. So what's your bases for coming to this conclusion?
A. Just my knowledge of ship -- knowledge and experience of ship construction, having observed hundreds, if not thousands of different vessels under construction.
The idea is, you want to minimize all of your pipe penetrations through decks. So they do -- they minimize, you know, the things that actually go through the steel deck and then branch out all of the plumbing from there.
Q. And the reason you want to





reduce -- reduce that is for fire prevention, right?
A. Fire prevention and structural integrity, generally, yes.
Q. Okay. We can agree that none of what you've just said has anything to do with the color of the threshold that separates the shower from the rest of the bathroom? Can we agree on that?
MR. SMITH: Objection to form.
THE WITNESS: Yes.
BY MR. HERNANDEZ:
Q. Okay. Also in your report -- and I'm on the initial report now.
Also in your report you say that according to the letter from Miss Hall's attorney to Carnival, dated May 29, 2020, the incident was described as a trip and fall when the ship swayed. Right?
A. Yes, I provided that as a factual statement from the -- from the file materials.
Q. Right. Other than the representation letter of May 29, 2020, you've not seen in any other piece of material that you've been provided, any reference to ship





movement having had anything to do with Miss Hall's fall, right?
A. Right.
Q. You also say in your report, "Absent any regulatory or classification society criteria, the safe design of the shower threshold is left to the discretion of the ship's designers and/or builders." Right?
A. Correct.
Q. So I mean, are you saying they could construct this cabin bathroom however they wanted?
MR. SMITH: Objection to form.
THE WITNESS: Well, they still have an obligation to make it safe. So that -- again, there's generic safety criteria, common sense, industry practice.
Those are the things that all go into those decisions. But they still have an obligation to build a safe ship.
BY MR. HERNANDEZ:
Q. And you'd agree, of course, that this obligation to build a safe ship extends to





the cabin, right?
A. Yes.
Q. It also extends to the cabin bathroom, right?
A. Correct.
Q. Okay. And this opinion that "Absent any regulation or classification society criteria, the safe design of the shower threshold is left to the discretion of designers and builders, I mean, what methodology, if any, went into formulating this opinion?
MR. SMITH: Objection to form.
THE WITNESS: Methodology is my knowledge and experience of ship construction.
BY MR. HERNANDEZ:
Q. Anything else?
A. Regulatory oversight of that. And knowing that -- my experience as a regulator, that the ship is indeed safe.
Q. I'm sorry, regulatory oversight as a what, you said?
A. My experience as -- yes, my experience as a regulator.

Q. Okay. You also say in your report, "In addition to the direct observation indicators for the presence of the shower threshold to reduce potential trips, the placement of the white rolled-up bathmat/towel by housekeeping, parallel against the edge of the threshold, provides a visual indication of the shower's placement within the bathroom."
You saw that, right? I'm sorry, you wrote that, right?
A. Yes.
Q. You acknowledge, of course, that this rolled-up towel/bathmat, was not there when Miss Hall fell, right?
MR. SMITH: Objection to form.
THE WITNESS: No, the testimony is not clear on that.
BY MR. HERNANDEZ:
Q. How is it unclear? Didn't she specifically testify it wasn't there when she fell?
You read her depo, right?
A. I believe she said she didn't recall if it was there or not. And she didn't recall if it was there in her previous visits





to the bathroom.
Q. Right. Do me a favor, can you read the first line of page 15 of your report into the record.
THE COURT REPORTER: Slowly.
THE WITNESS: Okay. So yeah, all right. So thank you for clarifying that.
"Although Miss Hall indicated that the rolled-up towel/bathmat was not present during her fall, it would have been present during her initial visit to the cabin to drop off her luggage."
BY MR. HERNANDEZ:
Q. All right.
A. And I'll stand by my statement that she wasn't clear or know whether it was there or not during her two previous trips to the bathroom, prior to the trip that resulted in her fall.
Q. All right. But I'm only asking you about when she fell. We can agree that the evidence in this record reflects that it wasn't there then, right?
A. Yes.





Q. Okay. So now, this opinion about direct observation and other visual indicators to show the presence of the shower threshold, what's the methodology that you've applied here?
MR. SMITH: Objection to form.
THE WITNESS: Well, the idea is that if it was there before, it would have -- it should have mentally tracked -- mentally occurred to her, okay, that it was there for, you know, successive visits. And now, the basic methodology is that you have a bright white towel against a blue floor. No, I did not directly measure the contrast, but I think the contrast is readily apparent.
Therefore, if you see the towel, your attention is drawn to it, and you can understand why it's there when you look at it.
BY MR. HERNANDEZ:
Q. Okay. If the towel is there, right?
A. Yes.





Q. Okay. And you'd agree that this issue of the rolled-up towel making the ledge apparent, if the jury were to be shown a photo of this, their collective knowledge and wisdom is sufficient to make a determination whether that provides a contrast or not, right?
MR. SMITH: Objection to form.
THE WITNESS: I think it's apparent -- it should be apparent to everybody, except those who are blind, that white contrasts the dark blue quite well.
BY MR. HERNANDEZ:
Q. And this issue of appearance and contrast, as a marine engineer and architect, how are you qualified to opine on that?
A. My studies in human factors engineering, particularly with respect to performance and the limitations of human eyesight make me qualified to opine on that.
Q. And you told me a moment ago that you didn't do any testing to measure the contrast, right?
A. Right. In this particular instance with respect to the towel to the

floor, no, I did not.
Q. So this opinion, we can agree, is almost based on what you consider to be obviousness?
A. Well --
MR. SMITH: Objection to form.
THE WITNESS: I'm explaining why it's apparent -- why it would be apparent to somebody looking at it, and that is due to the contrast of light versus dark.
BY MR. HERNANDEZ:
Q. Right. But we can show a photo --
(Simultaneously speaking.)
THE WITNESS: -- looking at the -- to explain why that is requires some human factors knowledge.
BY MR. HERNANDEZ:
Q. We can show a photograph to the jury and they can come to that determination whether the white contrasts against the blue flooring.
You'd agree with that, right?
MR. SMITH: Form.
THE WITNESS: Well, they can





visually distinguish the white from the blue, yes.
BY MR. HERNANDEZ:
Q. And I think this dovetails to the remainder of that paragraph.
"Additionally, the white towel's contrast against the blue floor immediately draws your attention after you open the bathroom door. If, presumably, passengers open the bathroom and notice the bright metallic threshold between the cabin and the bathroom, their gaze is already drawn to this area."
You wrote that as well, right?
A. Correct.
Q. What methodology di you apply here?
MR. SMITH: Objection to form.
THE WITNESS: The same thing. You have the -- the bright contrast of the metallic surface of the door threshold against the darker color of the floor.
I only have the knowledge that people generally walking, stepping up over thresholds will look down in order not to trip on them.





BY MR. HERNANDEZ:
Q. Okay. But you said you have the bright contrast of the door threshold against the darker floor.
A. Yes.
Q. What is that based on other than your observation?
MR. SMITH: Objection to form.
THE WITNESS: I'm afraid I don't understand the question.
BY MR. HERNANDEZ:
Q. You've just said -- and correct me if I'm wrong -- that the methodology involved having the brighter contrast of the door threshold against the darker floor, right?
A. Yes. The methodology is -- all right, is this visually distinct -- you ask the question of yourself, by applying scientific method here, is it visually distinguishable?
You look at the evidence.
Yes.
You have two different materials of significantly varying brightness, dark versus bright, and you can draw the conclusion that there is sufficient contrast.





In this case, by observation that there -- it is sufficient that you would notice it.
Q. Okay. Other than "by observation," what other methodology did you apply here?
MR. SMITH: Objection to form.
THE WITNESS: That's the methodology I applied, scientific method.
BY MR. HERNANDEZ:
Q. Well, you know, my memory of the scientific method is, it starts with a hypothesis.
A. Yes, in this case this -- this threshold is visually distinguishable.
Q. So you've got to test the hypothesis, right, to conclude the scientific method?
MR. SMITH: Objection to form.
THE WITNESS: Yes. Simple observation confirms that.
BY MR. HERNANDEZ:
Q. Okay. So the testing that you did ostensibly to test this hypothesis is your own

observation?
A. Yes.
Q. Nothing beyond that?
A. Correct.
Q. Okay. Now, you also say that, "The discontinuity in the floor's molded grid pattern created by the threshold and adjoining drain channels may provide an additional visual indicator to the presence of the threshold.
Finally, the presence of the shower curtain visible, without looking at the floor, should also provide a visual indication of the presence of the shower threshold.
What methodology did you apply here, your observation again?
MR. SMITH: Objection to form.
THE WITNESS: Yes, I'm merely applying my observations.
BY MR. HERNANDEZ:
Q. Okay.
MR. HERNANDEZ: Julio, read back that answer.
(Thereupon, the above mentioned answer was read by the reporter as above transcribed.)





BY MR. HERNANDEZ:
Q. As you did for the white contrast of the towel or mat, right?
A. Yes, I applied my observations through scientific method to come to those conclusions.
Q. You'd agree that if the shower curtain is closed, this ledge is not very visible, right?
MR. SMITH: Objection to form.
THE WITNESS: It depends on which side of the curtains the ledge is on.
BY MR. HERNANDEZ:
Q. Well, let's assume the shower curtain has been closed in such a way that the ledge is on the shower side.
I mean, you'd agree that one looking down could reasonably miss this ledge in terms of seeing it? Reasonably not see the ledge is a better question?
MR. SMITH: Objection to form.
THE WITNESS: All right. So we're assuming the shower is outside -- excuse me, the shower curtain is outside of the threshold in this --





BY MR. HERNANDEZ:
Q. Yes.
A. -- question?
Q. Yes.
A. Okay. Well, then, you know, I would think somebody would still presume there's a threshold.
But yeah, possibly you would not see it.
Q. Are there any opinions you expect to express at trial that you have not shared with me this morning that are not in your initial report or in your rebuttal report?
A. No, there are not.
MR. HERNANDEZ: Let's go off the record for a second. I think I'm done.
MR. SMITH: Can we take five? Because I'll take -- I'll take a restroom break and look at my notes as well.
And I might have just a few questions as well.
(Thereupon, a short recess was taken.)
MR. HERNANDEZ: I have nothing





further for now, Mr. Martyn. Thanks.
THE WITNESS: Thank you.
MR. SMITH: I don't have a lot of questions for you, Dave. Do you want to take a break or just continue on?
THE WITNESS: I'm ready to continue.
MR. SMITH: All right. Terrific.

CROSS-EXAMINATION

BY MR. SMITH:
Q. So, Mr. Martyn, I wanted to start and ask you a little bit about your education. So why don't I go ahead and I'm going to share my screen.
You see my screen with what looks like your CV up on there?
A. Yes, I do.
Q. Okay. Your CV is four pages, which I've just scrolled through.
Does this look like a true and accurate copy of your most current CV, Mr. Martyn?
A. Yes, it does.
Q. And you attended United States Coast Guard Academy, didn't you?

A. Correct.
Q. And what did you study at the United States Coast Guard Academy?
A. I did the course of study in naval architecture and marine engineering, and I graduated with a Bachelor's of Science in that discipline with honors.
Q. Okay. And so your degree was a Bachelor of Science in naval architecture and marine engineering; is that correct?
MR. HERNANDEZ: Form.
THE WITNESS: Correct.
BY MR. SMITH:
Q. What did you graduate from United States Coast Guard Academy, what degree?
A. The degree was a Bachelor's of Science in naval architecture and marine engineering with honors.
Q. Does the course work require of you to obtain a Bachelor of Science in naval architecture and marine engineering require you to take courses in human factors?
A. Not directly in that subject, no. However, there are -- part of the design principles in ship design do include human





factors elements, particularly with respect to accommodations, crew comfort, minimizing motions of the vessel for the comfort of the crew.
Making sure the crew and passengers have access to the places they need to be, as well as the functionality of the bridge design to ensure that the consoles and information provided to the ship operators is in a way that they can effectively interpret and apply that information to the -- to safely navigate the vessel.
Q. All right. So if you're going to study vessel design, as you've done, human factors is an unavoidable topic that you learn about; is that correct?
MR. HERNANDEZ: Form.
THE WITNESS: That's correct. Because ships are designed to -- they're basically systems where humans interact with that system, particularly in terms of the operation.
But in terms of the passenger ship, it would be for the accommodation of the passengers as well.





BY MR. SMITH:
Q. Okay. And your education didn't stop there, did it?
A. No. The Coast Guard sent me to the University of Michigan from 1996 to 1998. I earned two master of science degrees; the first in naval architecture and marine engineering, and the second in industrial and operations engineering.
I studied industrial and operations engineering for the purpose of learning human factors and safety engineering.
Q. Okay. So if you're going to obtain a master's of science degree like you did in industrial and operations engineering, is human factors a part of that field of study?
A. Yes, it's one of the core elements of that field of study, and it was also the -- my area of concentration.
Q. Okay. And what -- why is it a -- why is human factors one of the core areas of study in industrial and operations engineering?
A. Industrial and operations engineering is the engineering discipline for designing a process or a system. And humans





typically are a part of that process or system. Therefore, the capabilities and limitations of the humans involved had to be taken into account into the process or system design.
Q. Okay. So after you left University of Michigan with the two Master's Degrees, Mr. Martyn, did you take what you learned at University of Michigan and apply it in your work for the Coast Guard?
A. Yes, both in terms of regulatory development during my time at Coast Guard headquarters, regulatory interpretation, as well as being able to speak to the underlying principles that make up the most of the safety regulations for the commercial maritime industry that I, as a Coast Guard officer, was in charge of enforcing.
Q. Okay. Tell us, Mr. Martyn, how specifically you applied your human factors knowledge in your work for the Coast Guard?
MR. HERNANDEZ: Form.
THE WITNESS: So it's applied in the sense that, you know, first in developing criteria, some of that is pretty clear-cut. The other is more --

it's not as clear as what would be considered safe and unsafe. So it's doing the -- looking at something and being able to say, all right, does this meet the intent of what would be considered safe?

When you're looking at things, everything from lighting, egress routes, some things -- the movement of the vessel are an important element in terms of -- maybe not so much an issue for cruise ships, but speed craft you're worried about G-forces, acceleration, deceleration rates. So you need to take that into account.

Maybe the ship can structurally handle some wave pounding, but the people on board cannot. So therefore, that would be the limiting factor in your design criteria.

And signage, that appropriate signage in terms of not just the content of the signage but also the -- making sure that it can be interpreted correctly, particularly those that





don't use words. That's why there's different standards out there through IMO that apply uniform signage. I just use that as an example.

(Simultaneously speaking.)

THE WITNESS: -- of the bridge. These are all different elements that need to be considered.

BY MR. SMITH:

**Q.** Let me ask you this, are vessels, including cruise ships, an example of a built environment that's going to be carrying people?

**A.** Yes, it is. And the designers have to take into account their safety and comfort.

**Q.** And vessels are -- including cruise ships, are something that, you know, not only is going to carry people but those vessels will contain walkways and walking surfaces, right?

MR. HERNANDEZ: Form.

THE WITNESS: That's correct.

BY MR. SMITH:

**Q.** All right. And so a naval architecture and marine engineer has to





consider when -- has to consider how individuals are going to be using these particular walking surfaces on board a vessel, correct?

**A.** Correct. And some of the, you know, the things that have to be taken into consideration are the motion of the vessel itself, in terms of dynamic motion, but also sometimes they have set lists or trim that's a side-to-side heel or a forward aft incline or decline.

Those conditions may exist periodically as well. So that certainly complicates some of the factors that go into safe walkway design.

And then being able to provide hand holds and appropriate lighting as well where needed.

**Q.** Okay. And so in your work experience with the Coast Guard, did you have the opportunity to analyze whether vessel walking surfaces complied with regulations or standards?

**A.** Yes. Every cruise ship the Coast Guard verifies the egress routes from --





basically going from all of the stateroom corridors all the way on down to -- or up, depending on the situation, to the lifeboat deck, and that's making sure it's -- they're safe routes, that's got appropriate lighting, appropriate dimensional, meet the appropriate dimensional requirements and have the appropriate signage to safely guide passengers and crew to those lifeboat stations.

**Q.** Okay. And so did your past experience in working for the Coast Guard, applying its regulations, applying and interpreting its regulations to vessels, does that --

Did that help you in your later analysis, including in this case, considering whether, for instance, things like SOLAS applied to a cruise vessel?

**A.** Yes, I have a pretty -- well, good working knowledge of which regulations do apply both U.S. -- there are some U.S. regulations that apply to foreign flagged cruise ships, as well as the international requirements which are developed primarily by IMO, as well as flag state -- flag state requirements, which

generally for cruise ships, are handled through the various classification societies.
Q. Okay. You talked about various course work you had done in your Master's program.
One of them was ergonomics?
A. Yes.
Q. Basic definition, what is ergonomics?
A. Ergonomics is -- it's the science of understanding human capability and limitations and applying it to designing human machine interfaces.
Q. Okay. And you mentioned a course called human performance. Can you give us a basic definition of that?
A. That gets more into the physiological science of how our senses work, whether it be our eyesight or hearing, our tactile sensitivity, as well as reactions to stressors like heat, noise, vibration, light. Those are just some examples.
Q. Okay. So that human performance course is where you may have learned about concepts of contrasts. Is that fair to say?





MR. HERNANDEZ: Form.
THE WITNESS: Yes. Understanding contrasts would be, you know, into the scientific level, would be the understanding that the sensors around the periphery of the retina are better. They're more or less better attuned to detecting differences of light versus dark, which is what contrast is, as well as motion.
Whereas -- you know, so that's what grabs your attention in your peripheral vision. Whereas, towards the inner side or the center of your retina, the center is more attuned to detecting color.
So that's the underlying scientific principle to how our eyesight works in terms of understanding contrast.
BY MR. SMITH:
Q. Okay. Mr. Martyn, do you agree that in life, generally speaking, you encounter words that have both a scientific or an engineering meaning as well as a common sort of





definition?
MR. HERNANDEZ: Form.
THE WITNESS: Yes.
BY MR. SMITH:
Q. Okay. Does the word "contrast," does that have a specific -- is that a concept that has specific meaning within the field of human factors?
A. When we're talking contrast in terms of visual conspicuity, yes. It's -- there's actually a method for measuring and coming up with a contrast index in order to analyze the difference between maybe two -- two colors that are very close or two areas of light and dark that are very, very close in terms of light or dark, versus the other extreme, white versus black would be the -- would be the extreme at the other end of contrast.
Q. Now, in your every day life you come across lay people, non-engineers all the time. You know, meet people in the airport, whatever the case may be. Do you agree with that?
A. Yes.





Q. And from your experience, would you agree that lay people are not familiar with what the term "contrast" means within the realm of human factors or the realm of marine architecture and engineering?
MR. HERNANDEZ: Form.
THE WITNESS: I agree. They might not -- most likely are not going to be aware of the formal definition or analysis of color contrast.
BY MR. SMITH:
Q. Right. And would you agree, from your life experience, that the average lay person is not familiar with how the human factors concept of contrast actually applies within the field of engineering?
MR. HERNANDEZ: Form.
THE WITNESS: Yes, I agree with that.
BY MR. SMITH:
Q. Okay. So as a marine architect and naval engineer, Mr. Martyn, are you someone that's capable of explaining what contrast means within the field of engineering?
A. Yes, I am.

Q. And are you, as a marine architect and -- well, as a naval architect and marine engineer, are you capable of explaining to lay people how to apply the concept of contrast in the field of engineering?

A. Yes, I am.

Q. Now, we talked about the scientific method. Can you give us a brief explanation of what that is.

A. It's basically a process for analyzing a -- basically a question, but that's what your hypothesis is and you come up with an explanation for what it is you're trying to answer.

You test the hypothesis and, you know, if the test reveals that the hypothesis is wrong, you go back, revise your hypothesis, begin the cycle again. However, you know, you have to keep into account that if the hypothesis -- the test shows the hypothesis is correct, you still need an alternative explanation as well before you can say that hypothesis is exclusively correct.

So this is the whole part of the methodology behind the scientific method.





Q. All right. And is that a methodology you applied throughout both of your two reports in this matter?

A. Yes, it yes.

Q. And in order to carry out the scientific method, Mr. Martyn, did you go on board the ship to do a site inspection?

A. Yes, I -- I documented the bathroom in that particular cabin.

Q. Okay. So in your site inspection you took the number of measurements, correct?

A. Yes, measurements and photographs.

Q. All right. And those measurements and photographs, were they germane to undertaking this scientific method that you applied?

A. Yes, it is. They are part of the input data in analyzing any hypothesis that I proposed.

Q. All right. And here's another question about the meaning of words. You were asked about making observations. Is it the same thing when a person who's a trained naval architect and marine engineer makes an observation or when an average lay person makes





an observation of something?

MR. HERNANDEZ: Form.

THE WITNESS: Yes. Observation is a critical part of the scientific method. It's basically critical component of science in general. And direct observations can be just that, where it gives you the information you need in order to analyze your -- (audio distortion.)

BY MR. SMITH:

Q. Right. But my question is this, let's say, you know, as a lawyer when I look at a contract and read the words on the page, my observation of that contract is informed by my expertise versus a lay person is not going to take away the same thing from that contract, most likely.

So my question to you is, when you make observations as a marine engineer, does that differ from the observations that an average lay person is capable of making?

MR. HERNANDEZ: Form.

THE WITNESS: Yes, because I have an understanding of the information I





need in order to perform my analysis.

BY MR. SMITH:

Q. Okay. And is observation, within the context of the scientific method, observations a form of doing a test, correct?

MR. HERNANDEZ: Form.

THE WITNESS: Yes, it is.

BY MR. SMITH:

Q. And so the testing -- the testing that you do, this observation, is, again, it's not just any observation, it's informed by your education, training and experience in the field of marine engineering and naval architecture, correct?

MR. HERNANDEZ: Form.

THE WITNESS: And human factors, yes.

BY MR. SMITH:

Q. Okay. And is that observational testing something you did in this case?

A. Yes, it is.

Q. And is that sort of same observational testing something you had done, let's say, when you worked for the Coast Guard and you were not doing litigation cases and you

were simply trying to analyze, you know, regulatory compliance?
A. Yes, it is.
Q. Now, you were asked also, Mr. Martyn, about changes in floor elevation. Do you recall those questions?
A. Yes, I do.
Q. You were asked about, you know, what a quarter of an inch change in elevation means in a general sense. Do you remember that?
MR. HERNANDEZ: Form.
THE WITNESS: Yes. Yes, I do. A quarter of an inch on a walkway is considered an elevation change.
BY MR. SMITH:
Q. Isn't there a caveat to that standard?
MR. HERNANDEZ: Form.
BY MR. SMITH:
Q. In other words, isn't there --
A. It certainly --
(Simultaneously speaking.)
BY MR. SMITH:
Q. Let me rephrase the question then,





so we don't overlap.
The standards that discuss changes in elevation, Mr. Martyn, isn't a caveat in that standard that it applies where there are adjoining walking surfaces?
MR. HERNANDEZ: Form.
THE WITNESS: Yeah. It does not. And certainly thresholds and stairs, steps are considered differently versus a continuous walkway.
BY MR. SMITH:
Q. What we're talking about here, Mr. Martyn, is a shower, correct?
A. Yes.
Q. And the floor in the shower in this cabin involving Miss Hall, that floor, the design intent of that floor was just to stand on, correct?
MR. HERNANDEZ: Form.
THE WITNESS: That's correct.
MR. HERNANDEZ: No predicate.
BY MR. SMITH:
Q. What informs your answer there? Is it your education, training and experience in vessel architecture and engineering?





MR. HERNANDEZ: Form.
THE WITNESS: Yes. And this is a shower, it's not a through walkway. It's intended to be a separate surface, particularly in this instance and probably just about any shower to make sure you capture the water in order to prevent it from spreading on the -- to the floor and the rest of the bathroom or whatever compartment or room it's in.
BY MR. SMITH:
Q. Okay. And this raised shower threshold, Mr. Martyn, given what you just testified to, it is not in violation of any ASTM or NFPA standard; is that correct?
MR. HERNANDEZ: Form.
THE WITNESS: That's correct.
BY MR. SMITH:
Q. And, in fact, assuming that the Plaintiff is -- assuming that anyone using the Plaintiff's cabin in this case was entering the restroom -- entering the bathroom to use the toilet, there was an available, unobstructed walkway to the toilet, correct?





MR. HERNANDEZ: Form.
THE WITNESS: Yes. There's a clear, unobstructed walkway between the bathroom door and the toilet that does not involve walking through the shower.
BY MR. SMITH:
Q. There's no need for any passenger to walk into the shower over the threshold to simply get to the toilet, correct?
MR. HERNANDEZ: Form.
THE WITNESS: Correct.
BY MR. SMITH:
Q. You were also asked about some prior -- alleged prior incidents. I believe there were four in total, Mr. Martyn?
A. Yes.
Q. Did you have a chance to review that discovery?
A. Yes, I did.
Q. And from an architectural or marine engineering standpoint, did you find that those particular incidents were in any way similar to the incident alleged by the Plaintiff in this case?
MR. HERNANDEZ: Form.

THE WITNESS: No, I did not. Three of the incidents involved people stepping backward or backing up from the vanity. Therefore, in those instances, the visibility of the threshold would not be an issue.

And the forth involved somebody stepping out of the shower -- again, a different circumstance in terms of stepping over out of the shower versus walking between the bathroom door and the toilet.

BY MR. SMITH:

**Q.** All right. Did Carnival Cruise Line, in operating the ship, Mr. Martyn, take account of the SOLAS regulations as it pertains to this cabin bathroom?

**A.** Yes, they did. Generally you haves access from the bathroom out of the cabin and to the corridor for an egress route to the lifeboat deck.

**Q.** All right, very well.

MR. SMITH: And I think that's all I have for you. Thank you.

REDIRECT EXAMINATION





BY MR. HERNANDEZ:

**Q.** Mr. Martyn, your reports in this case, the first report and the rebuttal report, neither contains a contrast index analysis, right?

**A.** Right. I'm merely rebutting Mr. Young's contention that there was no contrast or conspicuity of the threshold versus the surrounding floor.

**Q.** And you didn't conduct one yourself, right?

**A.** Correct.

MR. HERNANDEZ: That's all I have.

MR. SMITH: All right. Thank you, everyone.

Mr. Martyn, do you want to read the transcript?

THE WITNESS: Yes, please.

MR. SMITH: All right. So we'll order a copy then for that purpose and provide it to Mr. Martyn. Thank you.

MR. HERNANDEZ: Since they're ordering, Julio, I'll take a copy.

MR. SMITH: All right.

(Thereupon, the deposition was





concluded at 1:07 p.m., and the formalities or reading and signing were not waived.)





CERTIFICATE OF SHORTHAND REPORTER

STATE OF FLORIDA )
) SS.
COUNTY OF DADE )

I, the undersigned authority hereby certify that the foregoing transcript, pages 1 through 96 are a true and correct transcription of the deposition of David Martyn, taken before me at the time and place stated in the caption hereof.

I further certify that the said witness was duly sworn according to law.

I further certify that I am not of counsel to either of the parties to said cause or otherwise interested in the event thereof.

IN WITNESS WHEREOF, I hereunto set my hand and affix my official seal of office this 22nd day of December, 2021.

Julio A. Mocega, Shorthand Reporter
Notary Public in and for
the State of Florida at Large
My Commission Expires: 6-29-22

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF DADE

I, the undersigned authority, certify that David Martyn personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 22nd day of December, 2021.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _

Julio A. Mocega

Notary Public State of Florida
My commission Expires: 6-29-2022





ERRATA SHEET

I, David Martyn, do hereby acknowledge that I have read this transcript and find it to be accurate except for the corrections noted below.

PAGE ___ LINE ___ /
PAGE ___ LINE ___ / ______________________
PAGE ___ LINE ___ /
PAGE ___ LINE ___ /
PAGE ___ LINE ___ /
PAGE ___ LINE ___ / ______________________
PAGE ___ LINE ___ / ______________________
LINE ___ LINE ___ / ______________________
PAGE ___ LINE ___ /
PAGE ___ LINE ___ /

David Martyn

Signed and dated this ___ day of _______ 2021.





JULIO A. MOCEGA & ASSOC., INC.
25 Southeast 2nd Avenue, Suite 545
Miami, Florida 33131
Telephone (305) 374-0181

TO: David Martyn
C/O FOWLER WHITE BURNETT, P.A.
ESPIRITO SANTO BUILDING
1395 Brickell Avenue
14th Floor
Miami, Florida 33131

Dec. 22nd, 2021

IN RE: BARBARA HALL
vs.
CARNIVAL CORPORATION
CASE NO: 21-CIV-2057-BLOOM

Dear Mr. Martyn,

With reference to the examination of YOURSELF, deponent in the above-styled cause, taken on Dec. 17th, 2021, please be advised that the transcript of the Deposition has been transcribed and is awaiting your signature.

Please arrange to conclude this matter at your earliest convenience. We would suggest that you telephone this office and arrange an appointment suitable for all concerned.

However, if this has not been taken care of by January 23rd, 2022 we shall conclude the reading and signing of said deposition has been waived, and shall then proceed to file the original of the said transcript with the party who took the deposition, without further notice to any parties.

Sincerely,

____________________________________
Julio A. Mocega
cc: All Counsel of Record.